IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CASE NO. 2:07-cv-645-MEF |
| STATE OF ALABAMA DEPARTMENT OF | ) | |
| TRANSPORTATION, JOE MCINNES, *etc.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, the State of Alabama Department of Transportation (hereinafter "ALDOT") and Joe McInnes, and submit the following memorandum brief in support of their Motion for Summary Judgment, filed contemporaneously herewith. Defendants state as follows:

### FACTS

Plaintiff LaShundra Jackson began her employment with ALDOT on July 3, 2006, by appointment from a merit system register for Engineering Assistant I applicants. (See June 20, 2006, letter to Lashundra Yates, and accompanying policy acknowledgments, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment, as "Defendants' Exhibit 1".) Before accepting the position, Jackson was aware that the position involved outdoor work, in woods and bushes. (See transcript of deposition of Plaintiff LaShundra Jackson, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment, at 38:11-39:11.) Jackson reported to Ms. Debra Hadley for new employee paperwork, orientation as to ALDOT policies and rules (including the workplace

violence policy, grievance policy, employee work rules and principles of business conduct), and math placement tests. (See Defendants' Exhibit 1.)

Jackson then reported to Austin Harville to receive job assignments. As with other employees, Jackson was placed on probationary status for six months in order to assess her ability to perform the jobs assigned to her and to observe her work habits. (See Defendants' Exhibit 1.) During the six-month probationary period, Jackson was to take and pass basic math and algebra. (See Affidavit of Ronnie Poiroux, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment.) Jackson initially failed both basic math and algebra. (See July 3, 2006, memorandum to LaShundra Yates, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 2.") Jackson had no prior work experience or training similar to the work she was required to perform as an EA I. (See Jackson deposition at 44:2-10; see also, LaShundra Yates' Application for Examination for Engineering Assistant (20116), dated February 8, 2003, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 3.")

Jackson's first assignment under Harville was on U.S. Highway 98 (referred to in deposition as the "Wilmer project"). (Jackson deposition at 47:15-48:6.) Jackson was instructed to use a machete to clear areas where she would tie orange ribbons as markers for later work. (*Id.* at 49:14-50:16.) Harville would check the progress from time to time. (*Id.* at 51:8-9.) This project covered miles of road and, according to Jackson, there could have been others working at other locations within the project area. (*Id.* at 50:17-51:7.)

Jackson next worked on the Natchez project. (*Id.* at 53:6-18.) She took sod measurements, asphalt or tar temperatures, depth of tack coat, took 'tickets" from trucks

delivering asphalt and other supplies, and checked on tree clearing.  (*Id*. at 53:23-61:1.)  Jackson

stated that she learned how to perform her assigned tasks, but there was just too much to do.  (*Id*.

at 61:2-62:6.)  While on the Natchez project, Jackson had problems with the contractors

performing their jobs correctly.  (*Id*. at 71:19-72:6.)  She called Harville, who came out to the

site and straightened out the problem.  (*Id*. at 72:4-73:2.)

       In late August 2006, Jackson made a complaint to Harville that she was not able to

handle all of her assignments.  (*Id*. at 74:1-75:6.)  Harville assigned another ALDOT employee,

Floyd Hansworth, to assist her, which seemed to resolve the problem.  (*Id*. at 75:7-19.)  Vincent

Calametti learned of Jackson's complaint around August 31, 2006, and contacted Samuel J.

"Jay" Palmer and Harville about the matter.  (See Affidavit of Vincent Calametti, attached to

Defendants' Evidentiary Materials in Support of Motion for Summary Judgment.)  Harville

advised Calametti that he had assigned Hansworth to work with Jackson.  (*Id*.)  Calametti went

to the job site as well to discuss the matter with Jackson.  (*Id*.)  Calametti asked Jackson if the

assignment of Hansworth was all right, and she agreed that it was.  (*Id*.)  Calametti also advised

Jackson that he was aware that she had not been to training classes but advised her that, during

the six-month probationary period, she needed to concentrate on passing the math and algebra

classes and on-the-job training.  (*Id.*)

       On September 18, 2006, Jackson was assigned to work for Project Engineer Bret Paulk.

(See September 18, 2006, letter to LaShundra Jackson, from Vincent Calametti, a copy of which

is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as

"Defendants' Exhibit 4.")

       On October 4, 2006, Jackson complained to Jay Palmer that someone had scratched her

car.  (See Affidavit of Samuel J. Palmer, attached to Defendants' Evidentiary Materials in

Support of Motion for Summary Judgment.) Jackson did not know who had done this, but was holding ALDOT responsible for the injury. Mr. Palmer inspected the car but found only what he considered to be normal wear. (*Id.*) Mr. Palmer offered to let Jackson park in front near his office where it could be better monitored. (*Id.*)

On October 5, 2006, Jackson came into Josh McElhenney's trailer loudly demanding to talk with him. (See Affidavit of Josh McElhenney, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment.) Ms. Jackson told him that someone had been scratching her car and stated, "And I am pretty sure no one wants to get hurt for putting scratches on someone's car." (See Affidavit of Josh McElhenney; see also, Jackson deposition at 127:20-128:4.) Jackson's disruptive tirade and threat was made in the presence of McElhenney, Bret Paulk, and other employees who were in the trailer at the time. (See Jackson deposition at 128:5-9; see also, Affidavit of Bret Paulk, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment, and Affidavit of Josh McElhenney.) Paulk immediately reported Jackson's conduct to Palmer. Paulk also looked at Jackson's car and noted only minor wear and tear. (See Affidavit of Bret Paulk.)

On October 6, 2006, Palmer met with Ms Jackson about her disruptive conduct the previous day. (Affidavit of Samuel J. Palmer.) Jackson admitted that she had been very upset. (*Id.*) Mr. Palmer advised her that her conduct and comments had been inappropriate and reminded her of ALDOT's workplace violence policy. (*Id.*) A memorandum documenting the counseling session was placed in Jackson's file as a result of her conduct. (See October 6, 2006, memorandum, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 5.")

In October 2006, Jackson was scheduled to take the algebra course, which was to have been taken and passed during her initial six-month probationary period of employment. Jackson declined to take the course citing two doctors' appointments during the dates of the training. Jackson did not attempt to reschedule her doctors' appointments so that she could complete the required algebra course. (See Jackson deposition at 145:19-146:7.; see also, October 19, 2006, ALDOT Course Cancellation/Declination/Extension/Suspension Form, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibits 6," and electronic mail correspondence, dated October 19, 2006, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 7.")

On or about November 2, 2006, Paulk met with Jackson to discuss her midappraisal. (See Employee Performance Midappraisal, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 8.") Paulk emphasized Jackson's need to attend the next available algebra class and her need to become more familiar with standard specifications and drawings. (*Id.*) Paulk also spoke with Jackson about conducting herself in a professional manner in an office setting, referring to her outburst with McElhenney over her car. (*Id.*)

On December 14, 2006, Jackson was scheduled to attend Basic Concrete training on January 5, 2007, beginning at 8:00 am. (See December 14, 2006, memorandum to Lashundra Jackson, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 9.") The memorandum to Jackson indicated that registration for the training was to begin 30 minutes before 8:00 am. (*Id.*)

Around December 20, 2006, Paulk prepared Jackson's performance appraisal.  (See

Affidavit of Bret Paulk.)  During his final review, he noticed an error that had been made and

corrected the error, annotating with his initials "BP" where changes had been made.  (*Id.*)  At the

time of the appraisal, Paulk had been Jackson's supervisor for about three months but had

previously consulted with Harville about her work and performance.  (*Id.*)  Paulk discussed with

her each of her responsibilities and areas of improvement.  (*Id.*)  Jackson refused to sign her

evaluation.  (*Id.*)  Clearly printed on the appraisal form is the following:

> APPRAISAL SIGNATURES:  Signatures are to be provided after
> the form has been completed.  Signatures denote supervision and
> employee discussion and receipt of form, not agreement.  All
> signatures are mandatory.

(See Employee Performance Probationary appraisal, Form 13F, dated December 29, 2006,

attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as

"Defendants' Exhibit 10.")

Palmer met with Jackson concerning her refusal to sign her appraisal.  (See Affidavit of

Samuel J. Palmer.)  Jackson complained that it was unfair to extend her probation and that Paulk

was not qualified to make that decision or to evaluate her since he had been her supervisor for

only a short time.  (*Id*.)  Later, Calametti met with Jackson as well and finally convinced her to

sign the appraisal form.  (See Affidavit of Vincent Calametti.)

On December 22, 2006, Division Engineer Ronnie Poiroux recommended that Jackson's

probation be extended 90 days due to her failure to pass the algebra course during her initial

probationary period.  (See December 22, 2006, letter to ALDOT Personnel Director Ron Green,

attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as

"Defendants' Exhibit 11.")  On December 29, 2006, ALDOT Personnel Director Ron Green

asked State Personnel Director Jackie Graham to extend Jackson's probationary period of

employment for 90 days.  (See December 29, 2006, letter to Jackie Graham from Ron Green,

attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as

"Defendants' Exhibit 12.")

In early January 2007, Ms. Jackson complained to Poiroux about Palmer and Paulk in a

memorandum entitled, "Retaliation/Discrimination/Evaluation Rebuttal."  (See memorandum of

January 2, 2007, a copy of which is attached to Defendants' Evidentiary Materials in Support of

Motion for Summary Judgment as "Defendants' Exhibit 13.").  In the memorandum, Jackson

complained that her six-month probation was denied, that her evaluation score was decreased

from 22 to 20, and that she did not agree with her evaluation scores.  (*Id.*)  Jackson complained

that, since Paulk had only been her supervisor for a short time, she did not think he knew enough

about her work to evaluate her.  (*Id.*)  Jackson complained that there were employees who did

not pass algebra but achieved permanent status anyway.  (*Id.*)  Jackson complained that her

starting salary was lower than a fellow EA I who had no prior experience but who was related to

an ALDOT employee.  (*Id.*)  Jackson referenced a prior conversation with Poiroux regarding

extending her probation wherein Poiroux stated "Sometimes they do that."  (*Id.*)  Jackson also

questioned Palmer's authority to recommend her probation extension.  (*Id.*)

On the morning of January 5, 2007, Paulk asked Jackson to sign ALDOT's tape

recording policy.  (See Affidavit of Bret Paulk.)  Paulk made this request of all of the employees

under his supervision.  *Id.*  Jackson refused to sign the acknowledgment of receipt of the policy

and became disruptive.  (*Id.*)  Jackson claimed the policy was illegal.  (*Id.*)  Paulk explained that

signing the acknowledgment did not mean that she agreed with the policy, only that she had

received it.  (*Id.*)  Jackson continued to refuse to sign the policy.  *Id.*  Jackson left Paulk's office

without having signed the policy and proceeded to Joseph Fresolone's office, rather than

reporting to her training course. (See Affidavit of Bret Paulk and Affidavit of Joseph Fresolone, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment; see also, Jackson deposition at 167:9-22.) Paulk tried to reach Jackson on her cell phone. Jackson acknowledged that she knew Paulk had called her but further admitted that she did not return his call. (Jackson deposition at 168:22-169:22.)

Jackson complained to Fresolone that she thought the stressful environment she complained of was caused by others' dislike for her mother-in-law. (See Affidavit of Joseph Fresolone.) Jackson complained about the scratches on her car but could not identify who had done this. (*Id.*) Jackson complained that her probation had been extended but John Majercik's had not, even though he had not passed the math courses. (*Id.*) Jackson complained about being left alone on projects and about a lack of training. (*Id.*) During the course of the day, Fresolone met with Jackson on two more occasions, during which time Jackson offered her reasons for not signing the tape recording policy. (*Id.*) Both Fresolone and Leon Malone, the Ninth Division's EEO officer, explained that signing the policy did not mean agreement with it. Jackson was argumentative and uncooperative. Finally, near the end of the day, Jackson signed the policy. (See Affidavit of Joseph Fresolone; see also, ALDOT Ninth Division Policy on Recording Devices, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 14.")

On January 5, 2007, Jackson presented a doctors' note dated January 3, 2007, indicating that she should perform no heavy lifting during her pregnancy. (See copy attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 15.") This note was the first notification by Jackson that she was pregnant. (See Affidavit of Bret Paulk.) Subsequent to submitting this note, Jackson continued to work her

regular job; however, she was not made to perform any heavy lifting, and, by her own admission, her pregnancy did not interfere with her ability to perform any of her required work. (Jackson deposition at 103:15-104:17, 107:17-111:8, 117:2-5; see also, Affidavit of Bret Paulk.) There is no indication that Ms. Jackson ever notified her supervisors of any difficulty she was experiencing in performing her duties on account of her pregnancy nor did she personally request any light duty status. (Jackson deposition at 11:10-111:8, 112:2-113:5; see also, Affidavit of Samuel J. Palmer.) On January 18, 2007, Ms. Jackson was issued a reprimand for her actions on January 5, 2007. (See January 18, 2007, letter to Lashundra Jackson, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 16.")

Subsequent to the January 5, 2007, doctors' note (Exhibit 15), Calametti asked Jackson to go back to her doctor for specifics as to what work she could and could not do. Jackson states that she told her doctor that she worked for ALDOT but did not describe the type or nature of the work she performed. (Jackson deposition at 115:8-116:4.) The doctor issued another note restricting Ms. Jackson to office work. (See copy attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 17") Jackson states that she did not ask the doctor to write it. (See Jackson deposition at 116:5-12; see also, Exhibit 17.) Jackson presented this second note to her supervisors some time after February 1, 2007. For several days thereafter, Jackson continued to work her regular jobs, without incident or problems arising from her pregnancy. (Jackson deposition at 113:15-19, 115:2-9.)

On February 13, 2007, Calametti instructed that Jackson be reassigned to work inside the office work during her pregnancy. (See February 13, 2007, memorandum to Jay Palmer,

attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 18.")  She was assigned to work for Tony Cooper.

On February 22, 2007 Palmer sent a memorandum to Calametti recommending that Jackson's employment be terminated on account of her misconduct.  (See February 22, 2007, letter to Vince Calametti from Samuel J. Palmer, Jr., attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 19.")

On February 23, 2007, Poiroux sent a memorandum to ALDOT Personnel Director Ron Green requesting that Jackson's employment be terminated.  (See February 23, 2007, letter to Ron Green from R.F. Poiroux, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 20.")

On March 6, 2007, State Transportation Director McInnes sent Jackson a letter advising her that she would be separated from employment effective March 9, 2007.  (See copy attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 21.")

John Majercik began employment with ALDOT as an EA I on July 3, 2006, the same date as Jackson.  (See Affidavit of Jeanette Brown, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment.)  Majercik passed his initial basic math test but failed the algebra test.  (*Id.*)  Majercik was scheduled for, took, and passed the algebra course in October 2006, before the end of his initial six-month probationary period.  (See ALDOT Ninth Division Basic Math and Algebra Class Results for January 2002 – February 27, 2008, a copy of which is attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 22"; see also Affidavit of Jeanette Brown.)  Majercik was given permanent status in January 2007, having passed the required math and

algebra courses and having performed satisfactorily. (Defendants' Exhibit 22; see also, January 3, 2007, letter to John Majercik from Jeanette Brown, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 23.")

Trent Lowery began employment with ALDOT as an EA I on March 20, 2006. (See March 17, 2006, letter to Trenton E. Lowery from Jeanette Brown and accompanying March 2, 2006, request for above-the-minimum entrance salary and December 4, 2005, Application for Examination for Engineering Assistant I, by Trenton E. Lowery, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 24"; see also, Affidavit of Jeanette Brown.) Prior to his employment with ALDOT, Lowery had worked in the construction field and had taken math courses deemed useful to his ALDOT position. (*Id.*) Consequently, Lowery began employment at a higher salary. (*Id.*)

Shannon Lee, an EA I, was already working at an inside position when she notified ALDOT that she was pregnant. (See Affidavit of Jeanette Brown.) Thus, there was no need to change her job or duties to accommodate her pregnancy. (*Id.*)

Mary Weaver, an EA I, was working in an outside position when she notified ALDOT that she was pregnant. (See Affidavit of Jeanette Brown.) Ms. Weaver continued to work her outside position up to the time she took pregnancy leave. (*Id.*)

## **STANDARD OF REVIEW**

Summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. For purposes of summary judgment, the district court resolves all reasonable doubts about the facts in favor of the nonmoving party. *Warrior Tombigbee Transport Co., Inc. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983). The party opposing the motion for summary judgment,

however, cannot rest on his pleadings to present an issue of fact, but rather must make a response to the motion by filing affidavits, depositions, or otherwise that illustrate material facts in the case necessitating trial. *Van T. Junkins & Assoc. v. U.S. Industries, Inc.,* 736 F.2d 656, 658 (11th Cir. 1984).

Summary judgment is appropriate if the non-moving party bears the onus of proving an element of his case and fails to produce evidence adequate to create a genuine question of fact regarding the existence of that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986). The moving party may produce evidence demonstrating the inability of the nonmoving party to prove his case at trial. *Celotex Corp. v. Catrett, supra*.

## ARGUMENT

### PLAINTIFF HAS FAILED TO PROVE A *PRIMA FACIE* CASE OF RACE OR GENDER DISCRIMINATION OR RETALIATION.

As this Court has recently observed:

> An employee bringing a discrimination claim must initially establish a *prima facie* case of discrimination through one of three methods: by presenting direct evidence of discriminatory intent, presenting circumstantial evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny or by introducing statistical evidence of discrimination. *Walker v. NationsBank of Florida, N.A*., 53 F.3d.1548, 1556 (11th Cir 1995).

*Sanders v. City of Montgomery*, 319, F.Supp. 2d, 1296 (M.D. Ala.2004). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without inference or presumption." *Hall v. Lowder Realty Co., Inc.*, 160 F.Supp 3d 1299, 1315 (M.D. Ala. 2001) (quoting *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998)). The Eleventh Circuit regards "only the most blatant remarks, whose intent could be nothing other than to discriminate" as direct evidence. *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1359 (11th Cir.1999). To be direct evidence, a comment must be made by the decision-maker about the particular employment decision at issue. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (O'Connor, J., concurring) ("stray remarks in the workplace … statements by non-decision-makers, or statements by decision-makers unrelated to the decisional process itself" do not constitute direct evidence of discrimination).

In this case, having failed to prove her case by direct or statistical evidence, Jackson must rely on circumstantial evidence. *See McDonnell Douglas*, 411 U.S. at 802. Proving a case of employment discrimination by circumstantial evidence requires a plaintiff to first demonstrate a *prima facie* case of discrimination. *Id*. The defendant may then produce non-discriminatory reasons for having made the employment decision. *Id*. The plaintiff is then required to produce evidence to persuade the fact-finder either that the defendant's asserted reasons for the decision are pretextual or that the decision was motivated by a discriminatory intent. *Id*. at 804. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Eleventh Circuit has applied the *McDonnell Douglas* burden-shifting framework to both discrimination claims and retaliation claims. *See Rojas v. Florida*, 285 F.3d 1339, 1342

(11th Cir.2002). Therefore, Defendants will first address whether Jackson has produced sufficient evidence of pretext to overcome Defendant's articulated reasons for their employment action.

**A.    Plaintiff has failed to prove a *prima facie* case of race discrimination.**

To prove a *prima facie* case of race discrimination, Jackson must show that she was treated differently from "similarly situated" persons outside her protected class. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 2193, 144 L.Ed.2d 540 (1999) (Kennedy, J., concurring in the judgment) (the "normal definition of discrimination" is "differential treatment of similarly situated groups"); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")

Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case of race discrimination under Title VII by showing:  (1) he or she belongs to a racial minority, (2) he or she was subjected to an adverse job action, (3) his or her employer treated similarly situated employees outside his classification more favorably, and (4) he or she was qualified to do the job. *Mizell v. Miami-Dade County, Florida,* 342, F.Supp.2d 1084 (S.D.Fla.2004); *Holifield v. Reno*, 115 F.3d 1555(11th Cir.1997); *Coutu v. Martin County Bd. of Cty. Comm'rs.*, 47 F.3d 1068, 1073 (11th Cir.1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994).

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir.1994); *Bass v. Bd. of County Comm'rs.* 242 F.3d 996, 1004 (11th Cir. 2001).

In *Holifield*, *supra*, the defendants noted than the plaintiff had failed to point to a similarly situated non-minority employee who was treated more favorably that the plaintiff.  The *Holifield* court noted that:

> As part of the Title VII plaintiff's *prima facie* case, the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably that herself....  To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects….  In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways....

*Holifield*, 115 F.3d at 1562 (internal citations omitted.)  The Court went on to note:

> *"If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."*  *See, e.g. Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.3d 179, 182 (1st Cir. 1989).

*Id*. (emphasis in the original).

As noted above, a plaintiff who fails to show that a comparator is actually similarly situated fails to demonstrate a *prima facie* case.  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186-87 (11th Cir.1984).  As this Court has held, "a plaintiff seeking to demonstrate that similarly situated white employees were treated differently must produce evidence that his comparators were 'similarly situated in all relevant respects.'"  *Gibbons v. Auburn Univ. at Montgomery*, 108 F.Supp.2d 1311, 1318 (M.D.Ala.2000) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)).  In the case at bar, Jackson has failed to produce such a comparator that complies with the above-mentioned case law.

Jackson was a new hire who was serving her probation and was terminated at the end of her extended probation.  In support of her claim of race discrimination, Jackson complained that she was assigned to work on highway projects where she was the only ALDOT employee

present on the project and that she received no training from ALDOT during those assignments. It is not uncommon for an EA I to work alone at a site within a project area; thus, Jackson was not treated differently than other EAs.  (See Affidavit of Vincent Calametti.)  Jackson admits that road projects have different sides and there could have been other ALDOT employees working on a project, just not at the site where she was working.  (Jackson deposition at 50:17 through 51:7, Affidavit of Vincent Calametti, Affidavit of Samuel J. Palmer.)  During her probationary period, Jackson was assigned to various tasks and learned by on the job training.  For instance, on one project, Jackson was instructed to use a machete and go through the bushes or trees a certain number of feet and tie an orange ribbon on a tree or some landmark where it could be found.  (Jackson deposition at 49-14 through 50:10.)  Other tasks required taking measurements and recording the measurements on a piece of paper. (*Id.* at 53:23 through page 57:20) or taking "tickets" to make sure vendors had delivered supplies (*Id.* at 58:12 through 59:7) or making sure that trees were cleared a sufficient distance (*Id.* at 59:18 through 60:16.)  Basically, Jackson was shown how to do a task and then began performing the task.

On one occasion, Jackson had difficulty operating  the nuclear density gauge, but her supervisor, Bret Paulk, came out and showed Jackson and her white co-worker, "Ray," how to use the device.  (*Id.* at 93:8 through 94:23.)  Jackson did not express any particular difficulty in knowing how to perform her assigned tasks.  In fact, Jackson stated that, if she could read and get directions, it would not take her long to know how to do a task.  (*Id.* at 98:17 through 99:14.) Jackson's complaint was that she didn't have enough time to do all of the tasks.  (*Id.* at 61:2 through 62:5).  Jackson has failed to demonstrate that she was not adequately trained to perform her assigned tasks during her probationary period.  During late August, Jackson complained to

her supervisor, Harville, that she needed help on the job. Harville responded by assigning another employee, Floyd Hansworth, to assist her. (*Id.* at 74:22 through 75:17.)

Jackson initially complained that no one wanted to work with her because "they" thought she was the daughter of another employee, Bertha Alexander. Jackson was, in fact, Ms. Alexander's daughter-in-law. Jackson could not identify any person who had expressed dislike for her mother-in-law. To the contrary, when Jackson discussed her relationship to Ms. Alexander with others, they indicated that "everyone loves her." Jackson never heard anyone say they did not want to work with her due to the relationship nor could she imagine why her relationship to Ms. Alexander would cause a problem. (*Id.* at 80:22 through 82: 13.)

In support of her claim of racial discrimination, Jackson explained that, when she received assistance on her job, a black man, Hansworth, was sent to help. Jackson complains that, when she needed a ride to a particular project, a black person happened to pick her up and, when she started working on the Dauphin Island project, she worked with a black female. However, on the Natchez project, Jackson was assigned to work with a white female. When she worked on the Dog River Bridge project, she worked with a white male. When she worked on the Wilmer project, she worked with three white males. Jackson stated that, while working on the U.S. 98 relocation project, she worked with two white males. (*Id.* at 82:14 through 86:3 and 100:14 through 102:14.) Jackson worked with blacks, whites, males, and females during her tenure with ALDOT. There is no evidence that her assignments were race selective or that other co-workers did not want to work with her, either on account of her relationship with Ms. Alexander or on account of her race.

Jackson contends that her probationary evaluation, received in December 2006, was lower than she deserved and that her low score was the product of racial discrimination. She

contends that Bret Paulk changed her evaluation from 22 to 20. Plaintiff claims that Paulk had

not been her supervisor long enough to properly evaluate her. When Paulk took over supervision

of Jackson from Harville, he discussed her work and performance with Harville and also had the

opportunity to observe her work while her supervisor. (Affidavit of Bret Paulk; Defendants'

Exhibit 10.) There was no reason for him not to evaluate her. Evaluations are subjective, and

Paulk's evaluation indicates that Jackson met the standards of the job. Jackson offers no basis

for her assertion that her scores were skewed on account of her race. The change in the score by

Paulk was made to correct a typographical error. (*Id.*)

As evidence of racial discrimination, Jackson contends that another EA, who had no prior

experience, was hired at a salary higher than hers. Plaintiff also claims that the employee was a

relative of an ALDOT employee. This purported comparator, Trent Lowery, was hired as an

EA I on March 20, 2006. Prior to employment with ALDOT, Lowery had worked for Radcliff

Contractors for two years. Lowery also had college math courses that were beneficial to

ALDOT. Consequently, Lowery was offered a position at above the minimum starting salary for

EA I. On the other hand, Jackson's prior work experience consisted chiefly of retail sales and

office work with no experience in the construction field. (Jackson deposition at 44:2-10;

Defendants' Exhibits 3 and 23.) Lowery is not a proper comparator as he was not similarly

situated to Jackson.

Jackson also names John Majercik as a comparator, claiming that Majercik began work

on the same date as she did but was only required to serve a six-month probationary period,

despite having failed to pass the basic math and algebra requirements within the probationary

period. While it is true that Majercik entered service with ALDOT on the same date as Jackson,

Majercik passed the basic math requirement but initially failed the algebra requirement. Jackson

failed both the basic math and algebra courses but, at the end of her initial probationary period, had only passed the basic math course. Jackson had declined to attend her scheduled algebra course in October 2006, citing medical appointments. Majercik took and passed the algebra course in October 2006, during his initial probationary period. So, at the end of his probation, Majercik was given permanent status. Majercik is not a proper comparator as he is not similarly situated to the Jackson. (See January 3, 2007, letter to John Majercik from Jeanette Brown, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment as "Defendants' Exhibit 24; see also Defendants' Exhibit 22.)

Jackson does not assert that she was the subject of any racial slurs or derogatory comments by either her co-workers or supervisors during the course of her employment. (Jackson deposition at 87:8-14.) Jackson contends that evidence of Paulk's racism was that he had once called her on her cell phone thinking she was late when she was actually in class. (Jackson deposition at 110:16-21.) Jackson also contends that Paulk's racism was demonstrated when, after she had refused to sign the ALDOT Tape Recording Policy on January 5, 2006, and had left his office, he tried to reach her on her cell phone. (*Id.* at 168:22 through 169:11.) Jackson contends that Paulk was hostile towards her and yelled at her during their meeting regarding the Tape Recording Policy. She also contends that she was threatened by Palmer's position, in that Palmer was higher up the management chain. Jackson did not explain further. (*Id.* at 183:14 through 184:6.)

"Not all conduct taken by an employer which causes a negative effect on an employee constitutes an adverse employment action." *Davis v. Town of Lake Park, Florida,* 245 F.3d 1232 (11th Cir.2001). "There must be some threshold level of substantiality that must be met for unlawful discrimination to be recognizable." *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453,

1456 (11th Cir.1998).  "This limitation is consistent with the basic principle that Title VII is …

neither a general civility code nor a statute making actionable the 'ordinary tribulations of the

workplace.'"  *Davis,* 245 F.3d at 1239 (quoting *Gupta,* 212 F.3d at 587); *see also Wu v. Thomas,*

996 F.2d 271, 273-274 (11th Cir.1993) (noting that an adverse employment action does not

result from every unkind act, even those without economic consequences).  Assuming *arguendo*

that Paulk or Palmer, or others, were hard and demanding taskmasters, as supervisors, they

certainly had authority to direct Jackson on how to perform her tasks and to counsel her when

she failed to perform her tasks properly or when she engaged in misconduct.  In *Smith v. State of*

*Alabama*, 252 F.Supp.2d 1317 (M.D. Ala. 2003), the Department of Human Resources

commissioner's alleged acts of verbal assault, humiliation, lashing out, and writing up the

plaintiff were not held to have constituted adverse employment actions.  There is scant evidence

of such in this case, save Jackson's allegation that Paulk raised his voice during the January 5,

2007, meeting.

     Jackson further alleges that similarly situated white employees who had committed

similar infractions to those alleged against her were not demoted nor disciplined.  When asked to

identify those white male employees similarly situated to her, she could name none.  (Jackson

deposition at 207:1-12.)  When asked about non-pregnant employees who had engaged in

misconduct similar to her, who were treated less harshly, Jackson referenced a white woman

named "Liz" who was late or did not show up and was not written up.  (Jackson deposition at

186:11-17.)  It should be noted that Jackson was never charged with being absent or late.  As

stated above, in order for Jackson to compare herself and her situation to those of non-minorities

to prove racial discrimination, her situation and that of the non-minorities must be similar in all

relevant aspects.  The comparator must be "nearly identical" to the plaintiff to prevent courts

from second-guessing a reasonable decision by the employer.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).  Jackson has failed to meet this burden.  Defendants argue that vague generalities and conclusory allegations, which are not supported by significant probative evidence, should not be considered.  *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371 (11th Cir.1996).

**B.    Plaintiff has failed to prove a *prima facie* case of gender discrimination.**

Jackson has alleged that she was discriminated against on account of her gender, more specifically, due to her pregnancy.  It is clearly established that Jackson did not advise her supervisors of her pregnancy until January 5, 2007, when she purportedly gave one or more of them the January 3, 2007, note from her doctor stating "No heavy lifting during pregnancy." (Defendants' Exhibit 15.)  Prior to that time, Jackson had made no complaints of any problems she was having in performing her tasks.  (Jackson deposition at 112:18 through 113:5.) Subsequent to January 5, 2007, Jackson continued to work her regular job without difficulty. She was not required to perform any heavy lifting or work beyond her physical capacity. (Jackson deposition at 115:2-9.)  Jackson did not believe that her pregnancy would prevent her from doing most of the tasks that she had performed in the field.  She was able to perform her job regardless of her pregnancy.  (*Id.* at 117:2 through 118:3.)  Calametti asked Jackson to have her doctor specify what work she could or could not perform.  Jackson merely told her doctor that she worked for ALDOT but did not tell her doctor what type of work she was doing or that she was not performing any heavy lifting.  There is no indication that Jackson expressed to the doctor any problems she was having in performing her normal tasks and assignments.  The doctor issued a second note on February 1, 2007, which indicated that Jackson should be assigned to office duty during her pregnancy.  Jackson stated that she did not ask the doctor to

write that note. (*Id.* at 114:1 through 117:17; Defendants' Exhibit 17.)  Jackson now complains that Paulk continued to assign her to outside duty for a time after the second doctor's note.  On February 13, 2007, however, Calametti directed that Jackson be reassigned to office work. Jackson was then under the supervision of Tony Cooper.

Jackson claimed that she was treated differently than others with respect to her pregnancy stating that Mary Weaver, a white female, who was also an EA I, was reassigned from her outside work to an office job.  In actuality, Ms. Weaver continued to work her outside job until she took leave for her pregnancy.  Jackson also named Shannon Lee, a black female, stating that she was not sure as to Ms. Lee's situation.  In actuality, Ms. Lee had already been working at an inside position prior to her pregnancy, so no reassignment was needed.  (Jackson deposition at 207:13 through 209; Affidavit of Jeanette Brown.)  Jackson did not request to be assigned to office work, did not request her doctor to write the February 1, 2007, note restricting her to office work, and, by her own admission, had no difficulty performing her job despite her pregnancy. Jackson offered no evidence of any injury or harm suffered by her during the brief time between the February 1, 2007, note and her assignment to office duty under Cooper.

Jackson mentions that, when she gave Bret Paulk the second doctor's note, around February 1, 2007, he asked her if she really wanted to be moved and she told him "yes."  Jackson stated that Paulk then said, "Well, I really can't go forward in my condition no way."  Paulk denies having made such a statement; however, at the time the alleged statement was made, Jackson was being transferred to another supervisor and other duties, nor did Paulk initiate the decision to terminate Jackson's employment.  "Stray remarks in the workplace … do not constitute direct evidence of discrimination."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277,

109 S.Ct. 1775, 109 L.Ed.2d 268 (1989). And, as stated by Jackson, she had "no problems at all

with Mr. Cooper." (Jackson deposition at 190:20 through 191:13.)

Defendants assert that Jackson has failed to present sufficient evidence to support her claim of

gender-based or pregnancy-based discrimination.

**C.    Plaintiff has failed to prove a *prima facie* case of retaliation.**

Retaliation is a separate offense under Title VII, 42 U.S.C.A. § 2000e-3(a). To prove her

retaliation claim, Jackson must first prove a *prima facie* case by showing that (1) she engaged in

protected activity, (2) she was subjected to an adverse employment action, and (3) the adverse

employment action was causally related to the protected activity. *Little v. United Technologies,*

*Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir.1997) (citing C*outu v. Martin County Bd.*

*of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir.1995).

Jackson's records indicate that, at the time of her termination, she filed an internal

complaint with ALDOT. The first time it was filed was in October 2006, and it was resubmitted

in January 2007. (See Defendants' Exhibit 13.) There is no record of a complaint having been

filed by Jackson in October 2006, as alleged in her Complaint (Doc. No. 1). Jackson identifies

the October 2006 complaint as being the result of scratches made to her vehicle. (See Jackson

deposition at 135:14-23, 124:12-125:22, 175:22-176:1.) Jackson also alleges retaliation based on

her relationship with her mother-in-law, another ALDOT employee. (*Id.* at 79:22-82:13; 180: 1-

22.)

Defendants assert that the internal complaint (2006 and 2007)--scratches to her vehicle

and relation to her mother-in-law--provide no basis for Jackson's claim of retaliation.

Jackson alleges that she was retaliated against because of her mother-in-law. Bertha

Alexander, Plaintiff's mother-in-law, is employed by ALDOT's Ninth Division in Mobile. The

basic premise of Jackson's allegation is that co-workers thought she was Ms. Alexander's daughter rather than daughter-in-law.  (See Jackson deposition at 79:22-81:12:11-23.)  On the other hand, Jackson says that everyone "loves" her mother-in-law.  (*Id.* at 81:6-18.)  ALDOT is unaware of any jurisdiction that has held that a person may establish a Title VII or § 1981 retaliation claim for the acts of another employee, person, or relative.  Moreover, there is no evidence that Jackson's supervisors even knew that Bertha Alexander was her mother-in-law.  (See Affidavits of Bret Paulk and Joseph Fresolone, attached to Defendants' Evidentiary Materials in Support of Motion for Summary Judgment.)  Jackson herself cannot explain why or how anyone was retaliating against her for her relationship to Ms. Alexander.  (Jackson deposition at 82:1-7.)

Jackson alleges that scratches made to her vehicle were an act of retaliation.  (*Id.* at 135:14-23, 124:12-125:22, 175:22-176:1.)  However, when asked, Jackson was unable to state who made the scratches to her vehicle.  (*Id.* at 121:11-23.)  Furthermore, Jackson cannot explain why the scratches were made to her vehicle.  (*Id* at 125:3-22.)  Jackson cannot explain what would have prompted the unknown and unnamed vandals to damage her vehicle in the first place.

Jackson alleges that she filed a complaint in October 2006 after an incident involving scratches to her vehicle; however, she cannot establish that ALDOT received it.  (*Id.* at 135:14-23, 124:12-125:22, 175:22-176:1.)  The complaint memorandum filed by Jackson is not date-stamped until January 29, 2008.  (See Defendants' Exhibit 13.)  Jackson alleged that she talked by telephone with EAP Coordinator Jeremy Taylor, whose office is in Montgomery, in October 2006 about the incident involving the scratches to her vehicle but did not allege discrimination.  (Jackson deposition at 175:9-16.)  Jackson also alleges that she filed an internal complaint at that

time and sent it to Mr. Taylor. (*Id.* at 175:17-21.) However, she does not allege this complaint was based on discrimination. (*Id.* at 175:22-1.) Jackson offers no evidence that anyone in her supervisory chain knew about the October 2006 complaint memorandum.

The only evidence of receipt of the October 2006 complaint is a date stamp of January 29, 2007 on the upper right hand corner. (See Defendants' Exhibit 13.) Jackson does not know exactly when the complaint was mailed or received by ALDOT. (Jackson deposition at 177:21-179:15.) Jackson also alleges that she sent another copy of the complaint to Sandi Dietz in ALDOT's Compliance Section, but she cannot establish when it was received by ALDOT either. (*Id.* at 176:9-177:20.) Jackson did not notify anyone at ALDOT's Ninth Division about her desire to file a complaint until January 2, 2007. (See Affidavit of Ronnie Poiroux.) Jackson's direct supervisor, Bret Paulk, was unaware of any complaints of discrimination until after her performance appraisal in December 2006. (See Affidavit of Bret Paulk.) Mr. Paulk was not Jackson's supervisor at the time her employment was terminated, and he did not make the decision to terminate her employment. The December performance appraisal coincided with the extension of Jackson's probation. Joseph Fresolone was unaware of any complaints Jackson had regarding race until the incident regarding the tape recording policy on January 5, 2007. (See Affidavit of Joseph Fresolone.) Mr. Fresolone did not make a decision on the termination of Jackson's employment. Vince Calametti and Samuel Palmer were not aware of any internal complaints by Plaintiff at the time she was not retained for employment. (See affidavits of Vince Calametti and Samuel J. Palmer.)

Prior to January 29, 2007, Jackson had been counseled and reprimanded several times. (See Affidavit of Samuel J. Palmer.) On October 5, 2007, Jackson was disruptive and used threatening language and was warned that that her actions violated ALDOT's workplace

violence policy.  (See affidavits of Samuel Palmer, Bret Paulk, and Josh McElhenney.)  On

January 5, 2007, Jackson was insubordinate to her supervisor, Bret Paulk, and received a written

reprimand.  (See affidavits of Joseph Fresolone and Bret Paulk.)  Jackson also declined to take an

algebra class required to achieve permanent status.  (See affidavits of Ronnie Poiroux and Bret

Paulk.)  None of the decision-makers, Paulk, Fresolone, Palmer, or Calametti, was aware of any

internal complaint filed by Jackson when they made the decision to extend her probation.  (See

affidavits of Bret Paulk, Joseph Fresolone, Samuel J. Palmer, and Vince Calametti.)  Jackson

cannot prove otherwise.  Temporal proximity alone is insufficient to create a genuine issue of

fact as to a causal connection where there is unrebutted evidence that the decision-maker did not

have knowledge that the employee had engaged in protected activity.  *Brungart v. BellSouth

Telecommunications, Inc.,* 231 F.3d 791 (11th Cir.2000).

      The allegations made by Jackson were thoroughly investigated by ALDOT's EEO

investigator, Sandi Dietz.  Ms. Dietz determined that Jackson had not been mistreated or treated

differently than other employees.  (See February 16, 2007, letter to Lashundra Jackson from

then-Assistant Transportation Director L. Daniel Morris and accompanying February 14, 2007,

Investigative Determination by Sandi Dietz, memorandum to ALDOT EAP Coordinator

Jeremiah Taylor from LaShundra Jackson (dated October 14, 2006, but marked "Rec'd

1/16/07"), Complaint Form submitted by LaShundra Jackson.)  Ms. Dietz did not find any

protected activity that Plaintiff had engaged in.  (*Id.*).

      Thus, Plaintiff has failed to make a *prima facie* case of retaliation.

**D.**    **Plaintiff has failed to prove that the legitimate reasons proffered by Defendants for their actions were a pretext for unlawful discrimination.**

      **O**nce a plaintiff establishes a *prima facie* case of race discrimination or gender

discrimination or retaliation, the burden shifts to the defendant to present a legitimate,

nondiscriminatory reason for its action.  *Rojas v. Florida*, 285 F. 3d 1339, 1342 (11th Cir.2002)

(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 1824 (1973).  Once the

defendant does so, the plaintiff bears the burden of showing that the reasons given by the

defendant were a mere pretext for unlawful discrimination or retaliation.  *Id.  See Texas Dept. of

Community Affairs v. Burdine,* 450 U.S.248, 256 (1981) (a plaintiff may establish pretext "either

directly by persuading the court that a discriminatory reason more likely [than not] motivated the

employer or indirectly by showing the employer's proffered explanation is unworthy of

credence"): *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th

Cir.1984).  Jackson's conclusory assertions that her termination was discriminatory and/or

retaliatory are not a substitute for concrete evidence in the form of specific facts showing that the

Defendants' proffered reason for her termination was mere pretext.  *See Earley v. Champion

International Corp.*, 907 F.2d. 1077, 1081 (11th Cir.1990).

   The Eleventh Circuit cautions that, in analyzing Title VII discrimination and retaliation

claims:

> "[W]e must be careful not to allow Title VII plaintiffs simply to
> litigate whether they are, in fact, good employees.  The factual
> issue to be resolved is not the wisdom or accuracy of [the
> defendant's] conclusion that [the plaintiff] was an unsatisfactory
> employee.  We are not interested in whether the conclusion is a
> correct one, but whether it is an honest one.  Like all Title VII
> cases where pretext is an issue, the question the factfinder must
> answer is whether Fleming's proffered reasons were a 'coverup for
> … a discriminatory decision.'  *McDonnell Douglas*, 93 S.Ct. at
> 1826.  'We are not in the business of adjudging whether
> employment decisions are prudent or fair.  Instead, our sole
> concern is whether unlawful discriminatory animus motivates a
> challenged employment decision.'  *Damon v. Fleming
> Supermarkets of Fla. Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999)."

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2002).

The undisputed evidence establishes that Jackson has failed to establish a *prima facie* case for either discrimination or retaliation. However, assuming that a *prima facie* case was established, Defendants' "legitimate, nondiscriminatory reasons for its action" are clearly established.

Jackson was a probationary employee; thus she was in the midst of a "test" or "probationary" period to determine whether or not she should remain in the classification of Engineering Assistant I in permanent status. One of the requirements during this initial probationary period was that Jackson take and pass tests in both basic math test and algebra. Jackson was made aware of this requirement on several occasions during her initial probationary period. Jackson failed both of these tests initially but was able to pass the basic math test. She was then scheduled to take the algebra course/test from October 30 through November 3, 2006. She declined to take the algebra course as scheduled, citing medical appointments. Jackson now raises as an issue, and as evidence of discrimination, the fact that her probation was extended on account of not having passed the algebra course during probation. Jackson *chose* not to attend the October/November 2006 algebra course, knowing full well that her failure to pass the test would likely result in the extension of her probation. Jackson made no attempts to have her doctor's appointments rescheduled so that she could attend the algebra course, in spite of the apparent importance she now places on having not been given permanent status after the six-month probationary period ended. (Jackson deposition at 145:19 through 146:7.) Defendants were justified in extending Jackson's probationary period an additional 90 days.

Defendants were justified in issuing Jackson a counseling report for her October 5, 2006, outburst and threats made in Josh McElhenney's office and in the presence of Bret Paulk and other employees. Clearly this was disruptive, unprofessional, and in violation of ALDOT rules

and policies.  Jackson admits she was angry and loud and that she said, "And I am pretty sure no one wants to get hurt for putting scratches on someone's car."  Defendants were justified in considering Jackson's words as a threat and taking appropriate action, including suggesting that she contact the Employee Assistance Officer in Montgomery.

Defendants were justified in counseling Jackson during her November 2006 mid-appraisal with respect to her unprofessional conduct.  Defendants were justified in issuing Jackson a written reprimand for her disruptive behavior in connection with her refusal to sign the Tape Recording Policy on January 5, 2006.  An employer has the right to promulgate reasonable policies and procedures for its employees and to expect an employee to acknowledge receipt of a copy of the policy.  Whether the employee agrees with the policy or not is of no moment, as signing the form did not denote agreement, merely receipt.  This was fully explained to Jackson, yet she disrupted the office for nearly an entire day until she finally signed the form, a form that all employees were required to sign.  Moreover, when Jackson left Paulk's office without having signed the form, she went to another supervisor's office instead of reporting to her assigned post for the day.  And, she failed to contact Bret Paulk when he attempted to contact her via telephone, albeit she knew he had advised her to contact him.

As stated elsewhere, Jackson was a new employee, on probationary status.  As the end of her probationary period neared, District Engineer Palmer recommended that Jackson's employment be terminated due to the problems she had created during her short time of employment.  The decision to terminate her employment was a reasonable one, made without regard as to Jackson's race, gender, or complaints allegedly filed.

In *Rioux v. City of Atlanta, Georgia*, 520 F.3d 1269 (11th Cir. 2008), the Court stated that "[c]learly established law provides that state officials 'can be motivated, in part, by a dislike or

hostility toward a certain protected class to which a citizen belongs and still act lawfully….'"

*Foy*, 94 F.3d at 1534 (citing *Vil. of Arlington Hts. v. Metro. Housing Dev.,* 429 U.S. 252, 269-71

n. 21, 97 S.Ct.555, 50 L.Ed.2d 450 (1977); *see also Mt. Healthy v. Doyle*, 429 U.S 274, 286-87,

97 S.Ct. 568, 50 L.Ed. 471 (1977).  Thus, "state officials act lawfully despite having

discriminatory intent, where the record shows they would have acted as they, in fact, did even if

they lacked discriminatory intent."  Defendants deny that any discriminatory or retaliatory intent

accompanied their decision to extend Jackson's probation or to terminate her employment.  The

facts of this case clearly reflect a legitimate basis for extending Jackson's probation and evidence

of misconduct on her part sufficient to terminate her employment.

## CONCLUSION

Defendants argue that Plaintiff Jackson has failed to make a *prima facie* case for either

Title VII race- or gender-based discrimination or retaliation.  Assuming, *arguendo*, that a *prima*

*facie* case was made, Defendants argue that Jackson has failed to meet her burden to prove that

the legitimate reasons given by Defendants for their actions were mere pretext.  Summary

judgment should be granted in favor of Defendants ALDOT and McInnes.

Defendants further argue that Jackson's claims under 42 U.S.C. § 1981 have the same

requirements of proof and are subject to the same analytical framework as the Title VII claims of

discrimination and retaliation.  *Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th

Cir.1995); *Turnes v. AmSouth Bank N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994); *Howard v. BP Oil*

*Co., Inc.*, 32 F.3d 520, 524 n.2 (11th Cir.1994).

Defendants, assert, therefore, the same facts and arguments as presented are dispositive

of Jackson's § 1981 claims of race discrimination and retaliation.

RESPECTFULLY SUBMITTED
TROY KING
ATTORNEY GENERAL


s/ Andrew W. Redd
Jim R. Ippolito, Jr. (IPP001)
Assistant Attorney General
Chief Counsel


Andrew W. Redd (RED001)
Jason A. Trippe (TRI012)
Assistant Attorneys General
Assistant Counsel

**ADDRESS OF COUNSEL:**
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
Telephone:  (334) 242-6350
Facsimile:  (334) 264-4359
redda@dot.state.al.us
trippej@dot.state.al.us

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LASHUNDRA JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **CASE NO. 2:07-cv-645-MEF** |
| **STATE OF ALABAMA DEPARTMENT OF** | ) | |
| **TRANSPORTATION, JOE MCINNES,** *etc.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 30, 2008, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECT system, which will send notification to the following:

Mr. Kell A. Simon, Esq.
Ross Melton, P.C.
1104 San Antonio Street
Austin, Texas 78701
ATTORNEY FOR PLAINTIFF


s/ Andrew W. Redd
Andrew W. Redd (RED001)
Assistant Attorney General
Assistant Counsel

**ADDRESS OF COUNSEL:**
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
(334) 242-6350 (office)
(334) 264-4359 (facsimile)
redda@dot.state.al.us