IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LASHUNDRA JACKSON, | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | ) |
| | ) CASE NO. 2:07-cv-645-MEF |
| STATE OF ALABAMA DEPARTMENT OF | ) |
| TRANSPORTATION, JOE MCINNES, *etc.*, | ) |
| | ) |
| **Defendants.** | ) |

<u>EVIDENTIARY MATERIALS IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</u>

Defendants State of Alabama Department of Transportation (hereinafter "ALDOT") and

Joe McInnes submit the following evidentiary materials in support of their Motion for Summary

Judgment, filed contemporaneously herewith:

Deposition of LaShundra Jackson, taken March 12, 2008;

Affidavit of Ronnie Poiroux;

Affidavit of Vincent E. Calametti;

Affidavit of Samuel J. "Jay" Palmer;

Affidavit of Josh McElhenney;

Affidavit of Bret Paulk;

Affidavit of Jeanette Brown;

Affidavit of Joseph Fresolone;

**DEFENDANTS' EXHIBITS**

1.      June 20, 2006, letter to Lashundra Yates from Jeanette Brown and accompanying

        policy acknowledgments ;

2.    July 3, 2006, memorandum to LaShundra Yates regarding math placement assessment;

3.    LaShundra Yates' Application for Examination for Engineering Assistant (20116), dated February 8, 2003;

4.    September 18, 2006, letter to LaShundra Jackson from Vincent Calametti regarding personnel transfer;

5.    October 6, 2006, counseling memorandum;

6.    October 19, 2006, ALDOT Course Cancellation/Declination/Extension/ Suspension Form;

7.    Electronic mail correspondence, dated October 19, 2006;

8.    November 2, 2006, Employee Performance Midappraisal;

9.    December 14, 2006, memorandum to Lashundra Jackson regarding basic concrete training;

10.   Employee Performance Probationary appraisal, Form 13F, dated December 29, 2006;

11.   December 22, 2006, letter to ALDOT Personnel Director Ron Green from Ronnie Poiroux requesting three-month extension of probationary period;

12.   December 29, 2006, letter to State Personnel Director Jackie Graham from ALDOT Personnel Director Ron Green requesting three-month extension of probationary period;

13.   January 2, 2007, memorandum to Ronnie Poiroux from LaShundra Jackson entitled, "Retaliation/Discrimination/Evaluation Rebuttal";

14.     ALDOT Ninth Division Policy on Recording Devices signed by LaShundra Jackson on November 5, 2007;

15.     Doctor's note regarding LaShundra Jackson dated January 3, 2007;

16.     January 18, 2007, letter of reprimand to Lashundra Jackson from Bret Paulk;

17.     Doctor's note regarding LaShundra Jackson dated February 1, 2007;

18.     February 13, 2007, memorandum to Jay Palmer from Vincent Calametti regarding temporary work restriction on LaShundra Jackson;

19.     February 22, 2007, letter to Vince Calametti from Samuel J. Palmer, Jr., recommending termination of LaShundra Jackson's employment;

20.     February 23, 2007, letter to Ron Green from Ronnie Poiroux requesting termination of LaShundra Jackson's employment;

21.     March 6, 2007, termination letter to LaShundra Jackson from State Transportation Director D.J. McInnes;

22.     ALDOT Ninth Division Basic Math and Algebra Class Results for January 2002 through February 27, 2008;

23.     January 3, 2007, letter to John Majercik from Jeanette Brown regarding permanent employment status;

24.     March 17, 2006, letter to Trenton E. Lowery from Jeanette Brown and accompanying March 2, 2006, request for above-the-minimum entrance salary and Application for Examination for Engineering Assistant I, by Trenton E. Lowery;

25.    February 16, 2007, letter to LaShundra Jackson from Assistant Transportation

Director L. Daniel Morris, Jr., regarding investigation of complaint, with

accompanying copy of investigative report and complaint.

RESPECTFULLY SUBMITTED
TROY KING
ATTORNEY GENERAL

s/ Andrew W. Redd
Jim R. Ippolito, Jr. (IPP001)
Assistant Attorney General
Chief Counsel

Andrew W. Redd (RED001)
Jason A. Trippe (TRI012)
Assistant Attorneys General
Assistant Counsel

**ADDRESS OF COUNSEL:**
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
Telephone:  (334) 242-6350
Facsimile:  (334) 264-4359
redda@dot.state.al.us
trippej@dot.state.al.us

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CASE NO. 2:07-cv-645-MEF |
| STATE OF ALABAMA DEPARTMENT OF | ) | |
| TRANSPORTATION, JOE MCINNES, *etc.*, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that, on May 30, 2008, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification to the following:

Mr. Kell A. Simon, Esq.
Ross Melton, P.C.
1104 San Antonio Street
Austin, Texas 78701
ATTORNEY FOR PLAINTIFF


s/ Andrew W. Redd
Andrew W. Redd (RED001)
Assistant Attorney General
Assistant Counsel

**ADDRESS OF COUNSEL:**
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
(334) 242-6350 (office)
(334) 264-4359 (facsimile)
redda@dot.state.al.us

# LASHUNDRA JACKSON v. STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION, et al.

## LASHUNDRA JACKSON

**March 12, 2008**

Reagan Reporters, LLC
Phone: 334.262.7556
Fax: 334.262.4437
www.ReaganReporters.com

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON,        )
        Plaintiff,        )
                          )
        VS.               )  CASE NO:2:07 CV-645-MEF
                          )
STATE OF ALABAMA DEPARTMENT )
OF TRANSPORTATION, JOE McINNES,)
in his official capacity as )
Director of the State of    )
Alabama Department of       )
Transportation,             )
        Defendants.         )

        The deposition of LASHUNDRA JACKSON, taken by the
Defendants, pursuant to the Federal Rules of Civil
Procedure, before Kimberly B. Faucette, ACCR-309,
Certified Court Reporter and Notary Public in and for the
State of Alabama at Large, at the State of Alabama
Department of Transportation, Montgomery, Alabama, on the
12th day of March, 2008, at 9:00 a.m., pursuant to
notice.

                *   *   *   *   *

APPEARANCES:

FOR THE PLAINTIFF:           FOR THE DEFENDANTS:

MR. KELL A SIMON             MR. ANDREW REDD
Ross/Melton, P.C.            MR. JASON A. TRIPPE
Attorneys at Law             Alabama Department
1104 San Antonio Street          of Transportation
Austin, Texas  78701         Legal Division
                             Montgomery, Alabama

---

Page 2

1    STIPULATIONS
2        It is stipulated by and between counsel for
3    the parties that this deposition is taken at this time
4    by Kimberly B. Faucette, Court Reporter and Notary
5    Public, State at Large, who is to act as commissioner
6    without formal issuance of commission to her; that said
7    deposition shall be taken down stenographically,
8    transcribed, and certified by the commissioner.
9        Except for objections as to the form
10   of questions, no objections need be made at the time of
11   the taking of the deposition by either party, but may be
12   interposed by either party at the time the deposition is
13   read into evidence, which shall be ruled upon by the
14   Court on the trial of the cause upon the grounds of
15   objection then and there assigned.
16
17
18
19
20
21
22
23              *   *   *   *   *

---

Page 3

1           LASHUNDRA JACKSON
2    having been first duly sworn, testified as follows,
3    to-wit:
4              EXAMINATION
5
6    BY MR. REDD:
7        Q   As I stated, my name is Andy Redd, with me is
8    Jason Trippe. We are both attorneys with the Department
9    of Transportation. And, of course, we represent the
10   defendants in this case, Joe McInnes, and the Department
11   of Transportation. We are here to take your deposition.
12       Have you ever had a deposition taken of you before
13   in any matter?
14       A   Yes.
15       Q   And could you tell me what the nature of that
16   was and when it was?
17       A   I think it was like January of '06, I think,
18   or January of '07, I think. I am not for sure of the
19   date.
20       Q   If you can, what was the nature of that
21   deposition and why did they ask you any questions, if,
22   in fact, they did?
23       A   It was concerning my husband.

---

Page 4

1        Q   Was this a matter that was in civil court?
2    Was somebody suing him or was he suing somebody?
3        A   No.
4        Q   Was he a witness?
5        A   Well, actually, he had given his money to a
6    friend and the police took his money. So he tried to
7    get his money back, and that was that.
8        Q   As I said, I will be asking you some questions
9    about the case that you filed, the lawsuit that you
10   filed against my clients. I will try to ask clear
11   questions so you will understand them. But if I do not
12   make myself clear or you don't understand the question
13   that I am asking you, please ask me to rephrase my
14   question or restate my question, because if you answer,
15   we will assume that you fully understood what I asked
16   and that is your honest answer. Is that fair?
17       A   That's fair.
18       Q   And if you need a break, let me know. The
19   lady's room is around the corner and the drink box is
20   down the hall there. I called it a drink box. It's
21   down the hall. But just let me know.
22       MR. SIMON: She is diabetic. I brought a
23   couple of cereal bars if you need them.

Page 5

1    MR. REDD: My wife is, too, and I understand
2    completely.
3        MR. TRIPPE: And there is a Coke machine down
4    the hall.
5        MR. REDD: That is what a drink box is.
6    Q    I will try to be as brief as I can. I do have
7    a number of questions I need to ask you.
8        So let me ask you this: Are you taking any kind of
9    medication today that might interfere with your ability
10   to understand and comprehend?
11   A    No, not at all.
12   Q    Very well. Let's get started. Your full name
13   is LaShundra Yates Jackson?
14   A    That's correct.
15   Q    And when were you born?
16   A    October 27th, 1976.
17   Q    And where were you born?
18   A    Mobile, Alabama.
19   Q    And where do you currently live?
20   A    I live at 714 South Cedar, C-E-D-A-R, Street.
21   Q    And how long have you lived at that Cedar
22   Street address?
23   A    I have been there for, I think, about four

Page 6

1    years now.
2    Q    And where did you live before you lived at
3    that address?
4    A    3061 -- I'm not for sure of the address, but
5    it is Pinetuckett Road.
6    Q    Is that in the Mobile area?
7    A    Yes. That is off Moffett Road, actually.
8    Q    And how long did you live at that address?
9    A    For three years.
10   Q    And before that, can you remember where?
11   A    I don't remember the numbers, but it was
12   Howells Ferry Road.
13   Q    Mobile again?
14   A    Mobile, yes. Well, actually, I think they
15   would classify that as Semmes, I think.
16   Q    In the general Mobile area, south Alabama?
17   A    That's right.
18       MR. SIMON: There is a lot of background
19   noise. Make sure you speak up so the
20   court reporter can hear you.
21   Q    Please do. And another thing that I failed to
22   advise you, she can't take down nods, or this way or
23   whatever. So if it is a no, say no; if it is yes, yes.

Page 7

1    Just so she will understand it. Because she needs to
2    take down everything we say and ask accurately.
3    A    Okay.
4    Q    Are your parents still living?
5    A    Yes.
6    Q    What is your mother's name?
7    A    Donna Fentroy Yates.
8    Q    And your father?
9    A    Cedrick Yates, Senior.
10   Q    Are they still married and living together?
11   A    Yes, sir.
12   Q    And where do they live?
13   A    With my sister at 1307 Central, C-E-N-T-R-A-L,
14   Drive, and that is in Mobile, Alabama, also.
15   Q    And you mentioned your sister. Do you have
16   brothers and sisters?
17   A    Of course.
18   Q    How many?
19   A    I have three sisters and two brothers.
20   Q    And just for the sake of brevity, this case is
21   filed in the Middle District of Alabama Federal Court,
22   and the counties that encompass that district are
23   highlighted and listed on that piece of paper. Let me

Page 8

1    let me take a minute and I will ask you whether or not
2    you have any brothers, sisters, aunts, uncles, or close
3    friends who live in any of those counties.
4    A    Okay.
5    Q    If so, let me know who they are and where they
6    live.
7    A    Actually, my three sisters and one of my
8    brothers, they are in Mobile, Alabama. But I have a
9    brother that is incarcerated right now, and I am not for
10   sure exactly where he is at.
11   Q    He could be in those counties or be -- Is he
12   in State custody, Alabama custody?
13   A    Yes.
14   Q    So he could be at any of the prisons within
15   the state?
16   A    I want to say it is Atmore. I'm not for sure.
17   Q    Holman, Fountain, or one of the facilities
18   at --
19   A    No. J. O. Davis.
20   Q    That is across the street from Holman.
21   A    Okay. That is what it is.
22   Q    So other than a brother who may be in the
23   Atmore area, the rest of your brothers and sisters are

Page 9

1    in the Mobile area?
2        A    That's correct.
3        Q    Let me get your brothers' names right now,
4    excluding the brother who is incarcerated.
5        A    The only one is Roderick, R-O-D-E-R-I-C-K,
6    Yates.
7        Q    And is he married?
8        A    No.  I think he is twenty-one.
9        Q    Does he work?
10       A    Not at this time.
11       Q    And your sisters, oldest to youngest?
12       A    Kimberly Davis, Tiffany Jones, and Katrina
13   Yates.
14       Q    Are any of your sisters over twenty-one?
15       A    All of them are.
16       Q    Is Kimberly married?
17       A    Yes.  Kimberly is married.  She is thirty-six.
18       Q    What is her husband's name?
19       A    Charles Davis.
20       Q    Do they work?
21       A    Yes.
22       Q    Where?
23       A    I couldn't tell you that.

Page 10

1        Q    This is not a test.  It is just whatever you
2    can remember.  Tiffany?
3        A    Tiffany is married to Nathaniel Jones.
4        Q    What kind of work do either one of them do?
5        A    Nathaniel, he gets disability.  He is not
6    working.  And Tiffany, she is like a promoter.
7        Q    Like entertainment?
8        A    Exactly.
9        Q    Does she have a company she works for?
10       A    Her own.
11       Q    Does it have a name, if you know?
12       A    I am not for sure the name of it.
13       Q    And Katrina?
14       A    No.  She is unemployed.
15       Q    Do any of your brothers or sisters have any
16   children that are over twenty-one?
17       A    No.
18       Q    Now, you have two children now; is that
19   correct?
20       A    That's correct.
21       Q    The oldest is a boy?
22       A    That's correct.
23       Q    Brandon?

Page 11

1        A    Brandon Jackson.  He is eight years old.
2        Q    And what is your youngest child's name?
3        A    Olivia.  She is seven months.
4        Q    What is her birth date?
5        A    July 27, 2007.
6        Q    And now you are married to Bernard Jackson?
7        A    Bernard Jackson, Junior.
8        Q    Is Bernard the natural father of Brandon?
9        A    Yes, of both of them.
10       Q    Now, your husband, Bernard, what kind of work
11   is he involved in?
12       A    Construction.
13       Q    Do you know who he works for?
14       A    Himself.  It is called R&B Concrete, or
15   Bernard's Contracting, whatever name they put down
16   there.  It is the same, actually.
17       Q    Tell me what you know about his company.  Who
18   do they work for?
19       A    They work for companies or individuals like
20   households.  Like they could do --
21       Q    Driveways or something like that?
22       A    Driveways, patios.
23       Q    Has he ever done any work for transportation,

Page 12

1    that you know of?
2        A    No, none at all.
3        Q    Has he ever put a bid in for a job with the
4    transportation department, that you know of?
5        A    The only thing I really actually know of, he
6    told me he had gone out to Jay Palmer's house and they
7    did an estimate out there.
8        Q    For his personal?
9        A    Personal, for his home.
10       Q    Not for a business?
11       A    Not that I know of.
12       Q    Let me ask this:  With Brandon, did you have
13   any difficulty with that pregnancy?
14       A    With Brandon?
15       Q    Yes.
16       A    Yes, I did.
17       Q    If you will, just explain to me what kind of
18   problems you experienced.
19       Well, first, let me ask you:  Was he full term?
20       A    I always -- They are going to say he was
21   thirty-six weeks.  Seeming that I knew when I got
22   pregnant, I kind of like told them when I would have
23   him.  I like to say that they were wrong and I was

Page 13

1  right.
2      Q   How big a baby was he?
3      A   He was five eight, five pounds and eight
4  ounces.
5      Q   That is not real small.
6      A   No.
7      Q   What kind of complications or problems did you
8  have with that particular pregnancy?
9      A   Well, during that pregnancy, I was like real
10  stressed with his father, and I dilated at sixteen
11  weeks.  I dilated like one centimeter.  So after that, I
12  was like off my feet.
13     Q   Were you put to bedrest by a physician?
14     A   Yes, sir.
15     Q   And how long did you actually have to stay on
16  bedrest before you delivered?
17     A   Honestly, she told me to, but I still had to
18  work.  Not long.  Because afterwards, she --
19     Q   Several weeks?  Several days?
20     A   I would say several weeks, because she gave me
21  some shots and it stopped the dilation.
22     Q   Now, you mentioned that you were having stress
23  with your husband?

Page 14

1      A   Yes.
2      Q   Was that problems with the marriage at that
3  time?  What kind of stress?
4      A   During that time, we were not married.  We
5  were dating.  We were -- it is -- He was young.  That is
6  what he is going to blame it on.  He was young and just
7  wanted to be free, I gathered.
8      Q   I am glad to see he stood up.  That is good.
9  But, I mean, just marital problems?  You weren't having
10  anything on the job you were working at, at the time, or
11  anything like that?
12     A   No, huh-uh.  Because, actually, during that
13  time, I was working for a parts store.  So that wasn't
14  stressful at all.
15     Q   But you delivered Brandon?
16     A   Yes.
17     Q   Did he have any complications?
18     A   Not at all.  He was actually ready to go home
19  before I was.
20     Q   So he was a good healthy baby?
21     A   Good and healthy.
22     Q   And I assuming he is doing fine now?
23     A   He is doing great.

Page 15

1      Q   Now, let me ask you a little bit about Olivia.
2  Did she go full term?
3      A   No.  I actually had Olivia, well, I told you,
4  July 27th.  My due date was for August the 25th.
5      Q   So she was about a month early according to
6  the physician?
7      A   Yes.
8      Q   What was her size?
9      A   She was seven pounds, five ounces, and
10  twenty-one inches long.
11     Q   So she was a good, healthy baby?
12     A   Good and healthy.
13     Q   And she is doing fine?
14     A   She is doing perfect.
15     Q   No complications at all with the baby?
16     A   No.  She had jaundice, but they say a lot of
17  babies normally have that.  That was it.
18     Q   I think they call it the bilirubin count is
19  up?
20     A   Exactly.
21     Q   And they put them under a light and that
22  usually takes care of it in a matter of days?
23     A   Exactly.

Page 16

1      Q   Is that about what you experienced?
2      A   That's exactly it.
3      Q   I have got three.  I know the plan.
4          MR. REDD:  You probably do, too, don't you,
5  Kell?
6      Q   Yourself with this pregnancy, did you have any
7  complications?
8      A   Yes.
9      Q   Tell me about what problems you had with that
10  pregnancy.
11     A   Well, on the job, when I started experiencing
12  stress, I would hemorrhage, which is stress related
13  anyway.  Several times I had to take off.  I had to be
14  -- well, my physician told me to take a day or two and
15  just to stay in the bed and all.  It was more like
16  cramping.  It was just very uncomfortable.
17     Q   How far along in the pregnancy did you start
18  experiencing these problems, the hemorrhaging or
19  cramping?  What month do you recall this being, or
20  months?
21     A   I think in December or January.
22     Q   Of '06?
23     A   '06 and '07, yes.

4 (Pages 13 to 16)

LASHUNDRA JACKSON – 3/12/2008

Page 17

1  Q  And were you able to take days off when your
2  physician recommended it, or when you were having those
3  particular problems?
4  A  Yes. I actually took off.
5  Q  As a new employee, had you accumulated
6  sufficient sick leave to cover the days you were off?
7  A  Yes.
8  Q  Did you have any trouble getting your leave
9  approved?
10  A  No.
11  Q  When you would have to take the leave in
12  January, or in December of '06, and '07, who would have
13  been the person who would have signed and approved your
14  leave?
15  A  Bret Paulk.
16  Q  And he was your immediate supervisor, Mr.
17  Paulk?
18  A  Yes. That is what I was told.
19  Q  Are there any other problems that you had
20  during this pregnancy, besides what you have indicated
21  as stress-related hemorrhaging and cramping?
22  A  No. Just they were all, like I say, stress
23  related, related to the job.

Page 18

1  Q  Did you have any trouble with the actual
2  delivery or anything like that, complications with that?
3  A  No, I actually requested a C-section.
4  Q  Do you have a recollection of how long you
5  actually stayed in the hospital before you were allowed
6  to go home?
7  A  Normally, after a C-section, you stay four
8  days. Normally, you stay four days. I think I went
9  home on the third day. I would actually have to see the
10  release sheet.
11  Q  I guess what I am asking, they didn't keep you
12  any longer than normally required for a C-section
13  delivery, did they?
14  A  No. It just all depends on your healing.
15  Everyone heals differently.
16  Q  Have you had any other pregnancies that did
17  not end in the birth of a child?
18  A  Yes, I have. Well, actually, I had her. It
19  was the baby before Olivia, and I was twenty-two weeks.
20  Q  That child did not live? She was premature or
21  what?
22  A  She was premature. She lived four weeks and
23  then she passed.

Page 19

1  Q  And what year was that?
2  A  That was '06.
3  Q  Early '06?
4  A  March 23rd.
5  Q  That is before you came to work for ALDOT?
6  A  Exactly.
7  Q  Aside from being premature, were you having
8  any complications with that pregnancy?
9  A  Yes. I was stressed out with the school my
10  son was attending. They played silly little games.
11  Q  What school was he going to?
12  A  He was attending Craig Head.
13  Q  Is that a public school?
14  A  Yes, a public school.
15  Q  Craig Hill?
16  A  Craig Head, C-R-A-I-G, H-E-A-D.
17  Q  And you were having some problems with this
18  school?
19  A  I had major problems with that school.
20  Q  With his teachers?
21  A  Not his teacher in particular, but the
22  principal and other teachers.
23  Q  If I may ask a little further, what kind of

Page 20

1  problems were you having with the school and your son?
2  He would have been in what grade are we talking about?
3  A  He would have been in the second grade.
4  He had fallen one time, and he busted his lip.
5  They wouldn't let him go to first aid. I went there to
6  get him one day, and they told me he was gone and no one
7  knew where he was. They told me that someone had called
8  and got him a phone dismissal, which was unusual because
9  they stopped doing that when I was in middle school.
10  And they actually wouldn't let him go to the restroom
11  and he was sick. He had defecated on every shred of
12  clothing that he was wearing. They called me at like
13  2:30 to pick him up, which means that all of the other
14  kids were exposed to defecation. I kept going to see
15  Harold Dodge trying to get him a transfer.
16  Q  Who is that?
17  A  He was the superintendent.
18  Q  Dodge?
19  A  Yes, Dodge, Harold Dodge.
20  Q  He is no longer in the school system down
21  there, is he?
22  A  No.
23  Q  I was thinking he was a finalist for the

Page 21

1  Montgomery County Schools.
2      A    I thought so, too, but they said he didn't get
3  the job.
4      Q    He was one of the finalists. He didn't get
5  the job. I thought I recognized the name.
6      So you went to the superintendent?
7      A    Exactly.
8      Q    Did he give you any assistance or help or
9  resolution?
10     A    He said that the other schools were full so
11 Brandon couldn't get a transfer. So I was forced to
12 leave him there, which made it even worse anyway.
13     Q    Academically, how was he doing?
14     A    Brandon made A's and B's.
15     Q    From a behavioral standpoint, how was he
16 doing?
17     A    He's never had a disciplinary action, period.
18     Q    And I am assuming he is in a regular
19 curriculum, regular classes?
20     A    Third. Yes.
21     Q    Or is he in the new accelerated program?
22     A    Regular curriculum.
23     Q    Let me ask you a bit about your educational

Page 22

1  background. You finished high school?
2      A    Correct.
3      Q    Where did you attend?
4      A    U.S.A. High school, I attended Williamson
5  High.
6      Q    And you had course work at the University of
7  South Alabama?
8      A    Yes.
9      Q    And you indicated on your job application you
10 were in the pre-med curriculum?
11     A    Yes.
12     Q    How many years did you actually attend or how
13 many semesters?
14     A    I just attended a year, I guess. '96, '97.
15     Q    That would be two full semesters?
16     A    Not actually two full.
17     Q    They are on the semester system, as I recall,
18 or were?
19     A    I am not sure.
20     Q    But you don't have any degree from that
21 school?
22     A    No, I don't.
23     Q    And I think you attended a technical school?

Page 23

1      A    That's correct, for phlebotomy.
2      Q    And you do have a certificate as a certified
3  phlebotomist?
4      A    Yes, a phlebotomist.
5      Q    Other than high school, some college, and a
6  certificate from technical school, and excluding any
7  training you might have gotten through ALDOT, have you
8  received any other kind of training through a college or
9  tech school or anything like that?
10     A    No.
11     Q    Let me ask you a little bit about where you
12 worked before you came to work for ALDOT. I am looking
13 at your job application. If there is anything you need
14 to add, please do.
15     But after graduating from high school, I am looking
16 at a job with Montgomery Ward?
17     A    Right.
18     Q    Is that the first -- I hate to use "real job."
19 But as opposed to, say, part-time work after school or
20 something like that, is that the first full-time job
21 that you had after high school?
22     A    Well, that was seasonal.
23     Q    Christmas holidays and things like that?

Page 24

1      A    Right.
2      Q    And it says you were a sales rep. Is that
3  basically cashier or retail sales, floor sales?
4      A    It was retail. I was actually in the
5  electronics department.
6      Q    So, basically, you would sell electronic
7  products, ring up the sales, and explain the product to
8  customers, and that type thing?
9      A    Yes.
10     Q    What kind of training did you receive from
11 Montgomery Ward's to take care of that particular job?
12     A    There wasn't any training.
13     Q    On-the-job training?
14     A    Well, yes, I guess.
15     Q    One of the other clerks showed you how to ring
16 up as cashier and the other one would tell you how this
17 product worked, et cetera?
18     A    Yes.
19     Q    I am showing you worked there on and off for
20 two years?
21     A    Uh-huh.
22     Q    It says from August of '97 to February of '98?
23     A    Roughly, right.

6 (Pages 21 to 24)

LASHUNDRA JACKSON - 3/12/2008

Page 25

1  Q   The next job I show is Discount Auto Parts?
2  A   Yes.  That was a parts store.
3  Q   That is on Dauphin Island Parkway?
4  A   Yes.
5  Q   Who was your supervisor at Discount Auto
6  Parts?
7  A   Chris.
8  Q   Simms?
9  A   I guess, if that is --
10  Q   Does that sound about right?
11  A   I know his name is Chris.
12  Q   This is an auto parts store where basically
13  you would sell auto parts?
14  A   Right.  Like alternators, brakes, brake fluid.
15  Q   You would be required to look up inventory and
16  determine whether or not you had the part in stock and
17  then you would sell it to a customer?
18  A   Right, or I could order it.
19  Q   Or order it.  Run the cash register?
20  A   Cash register.
21  Q   That kind of work?
22  A   Right.
23  Q   What kind of -- Let me just ask this:  How

Page 26

1  much do you know about car parts, if anything?
2  A   I know a little bit.  I had a Bronco, and I
3  worked on it myself, actually.
4  Q   So you had at least a working knowledge of
5  vehicles?
6  A   Yes.
7  Q   So if somebody asked you whether or not they
8  needed an alternator, at least you knew what an
9  alternator was?
10  A   Of course.
11  Q   Did you receive any kind of training for that
12  job?
13  A   Other than, I guess, showing me how their
14  register worked and basically the different parts, just
15  basic, which I already knew how the majority of the
16  things worked anyway.
17  Q   That was, according to the application, from
18  around March of '98 until February of '99?
19  A   Right.
20  Q   Was that a full-time job?
21  A   Yes.  I think it was full time.  I actually
22  started off as part time and I moved on to full time.
23  Q   And I see a note here that you left that

Page 27

1  particular job because of the problems you were having
2  with your pregnancy?
3  A   Exactly, with Brandon.
4  Q   And the next job I see is the Junior League
5  Shop?
6  A   Right.
7  Q   Is that a kind of a thrift store?
8  A   A secondhand store, exactly.
9  Q   And, basically, your job would be sales?
10  A   Basically sales.
11  Q   Ringing up the customer sales and making sure
12  your inventory is in and that kind of stuff?
13  A   Yes.  I was going to say sorting through.
14  Q   And that was a full-time job?
15  A   Yes.
16  Q   I see a gap from 1999 until you took the job
17  at the Junior League in '02?
18  A   That's right.
19  Q   Was that to stay home with your child?
20  A   Yes.
21  Q   You had no other jobs in between?
22  A   No.  I didn't trust day care.
23  Q   You had a big job taking care of a child?

Page 28

1  A   Yes.  And, actually, when I went to work for
2  the Junior League, my grandmother started watching him
3  for me.
4  Q   Who is your grandmother?
5  A   Her name is Addie Lee Fentroy.  She is
6  deceased.
7  Q   And was the job at the Junior League Shop the
8  last full-time job you had before you were hired by
9  ALDOT?
10  A   Yes.  Well, I did work for Bernard's painting.
11  I think that should be on there.
12  Q   It is not.  What did you do for them?
13  A   I did --
14  Q   Bernard's Painting, is that your husband?
15  A   That is my husband, yes.  I answered the
16  phone, ran errands, kept his books.
17  Q   And so you ran his office, basically?
18  A   Exactly.
19  Q   How many employees -- Did he have other
20  employees besides himself?
21  A   He had other office employees and he had some
22  employees which were like the guys that would go work.
23  Q   His crews?

7  (Pages 25 to 28)

LASHUNDRA JACKSON - 3/12/2008

Page 29

1    A   Exactly.
2    Q   Can you give me a ballpark of how many people
3   he had working in the office?
4    A   Besides myself, it was two others.
5    Q   What kind of work did they do?
6    A   They also did some errands and basically
7   answered the phones.
8    Q   And then he had work crews that would go out
9   and do assignments or jobs?
10    A   That's correct.
11    Q   How many crews did he normally have, if you
12   know?
13    A   I can just count the trucks.  Actually, they
14   count them as different crews because they all went
15   together.
16    Q   How many trucks did he have running?
17    A   He had two trucks running.
18    Q   And this is a painting operation?
19    A   Yes.
20    Q   Residential, commercial, or both?
21    A   Both.
22    Q   Did you receive any kind of salary for your
23   work?

Page 30

1    A   Yes.
2    Q   Besides that, can you think of any other jobs
3   you might have had before you took the job with ALDOT?
4    A   Besides -- I have a company, and I think I
5   opened it in '05, I think.  I think I did.  I'm not sure
6   of the date.
7    Q   Is that Yellow Brick Road Entertainment?
8    A   That's correct.
9    Q   Tell me a little bit about that company, if
10   you will.
11    A   It is light and sound or we bring different
12   artists to the Mobile area or the different areas, like
13   Mississippi or Florida or wherever.
14    Q   Is that like a promoter?
15    A   Yes, that is like a promoter, also.
16    Q   And you say that company was formed in --
17    A   I want to say '05.  I'm not for sure.
18    Q   Is it still in existence?
19    A   Yes.  I make sure I keep my license current.
20    Q   And have you worked in connection with that
21   particular endeavor?
22    A   Off and on, whenever we do shows or whatever,
23   or if I have a guy just go do the lights and sounds for

Page 31

1   someone else, or we might loan out our speakers or
2   mikes, just different little things like that.
3    Q   During the time that you worked for the
4   Department of Transportation and after, up to today,
5   have you engaged in business on behalf of Yellow Brick
6   Road Entertainment?
7    A   During the time I was working for ALDOT, I did
8   a show -- I am terrible with the dates.
9    Q   I am not going to hold you to any particular
10   dates.
11    A   I want to say it was -- I did a show while I
12   was working there.  I know that much.
13    I have just recently done one in January, and I did
14   one in February; January and February of this year.
15    Q   Let me ask it this way:  How do you make money
16   on these kinds of shows?  Do you get a percentage of the
17   take or the gross?  Or do you just get a flat fee for
18   promotion?  How do you get any profit or money for
19   promoting shows?
20    A   Well, actually, if I go in with someone, as in
21   partnership, we will put our monies together to get the
22   artist here.  We have ticket sales, which is a regular
23   fee just to get in, and then we have the VIP sales,

Page 32

1   which is higher than the regular fee.  And afterwards,
2   we split the money.
3    Q   After you have paid everybody off?
4    A   Right.
5    Q   Where would you put these shows on?  Would
6   they be like at local nightclubs?
7    A   Yes, local nightclub.
8    Q   Do you have an estimate of how much profit you
9   may have made on the shows that you put on while you
10   were working for transportation or afterward?
11    MR. SIMON:  Objection to form.
12    THE WITNESS:  Excuse me?
13    MR. SIMON:  You can answer.
14    Q   You can answer.  He is reserving an objection
15   for later.
16    A   Well, the first show that I did, it was almost
17   like just breaking even, and I have done another one
18   where we actually lost.  I think the one in January, I
19   like made maybe -- I think maybe -- I don't know.
20    Q   Let me ask it this way:  Based on the shows
21   you might have promoted during the time you worked for
22   ALDOT and afterward, do you think you have made more
23   than five thousand dollars in profit?

8  (Pages 29 to 32)

LASHUNDRA JACKSON - 3/12/2008

Page 33

1    A    In all, with three shows, yes.
2    Q    Over ten thousand dollars?
3    A    No, huh-uh.
4    Q    Do you have any business partners in
5    connection with this particular enterprise?
6    A    Yes, my sister-in-law.
7    Q    Your sister-in-law?
8    A    Sister-in-law, yes.
9    Q    Who would that be?
10   A    Her name is Kiata Alexander.
11   Q    And she lives in the Mobile area?
12   A    Yes.
13   Q    How old is she? Do you know?
14   A    She is twenty-three.
15   Q    And after you were dismissed from ALDOT,
16   besides what work you might have done with Yellow Brick
17   Road Entertainment, have you worked at any other jobs?
18   A    No.
19   Q    Have you ever been fired from a job other than
20   the Department of Transportation?
21   A    No.
22   Q    All right. You started to work at the
23   Department of Transportation after having filed an

Page 34

1    employment application with the State?
2    A    That's correct.
3    Q    Did you have to take any kind of test?
4    A    Yes. I took the first test. I had to do the
5    examination, and then I had to do -- I can't think of
6    the name of it. Whenever it was, it was on Water
7    Street. That might have been an examination, and then I
8    had to take a test when I actually worked that day,
9    which was July 3rd.
10   Q    I am talking about tests before you were
11   actually offered a job, an examination through the State
12   personnel department?
13   A    Not the State personnel department, but
14   through ALDOT itself.
15   Q    But that was before you ever took the job;
16   correct?
17   A    Yes.
18   Q    That was to get you on a register to be
19   considered for a job?
20   A    Right.
21   Q    And then after that, you took some tests, but
22   I will talk about that in a minute.
23   A    Okay.

Page 35

1    Q    What prompted you to file an application for
2    employment with ALDOT?
3    A    Well, I was actually looking for a full-time
4    job with some stability and insurance.
5    Q    Of the state jobs that might be available out
6    there, I am just curious as to what prompted you to file
7    application with transportation?
8    A    Well, I would always go to the government
9    plaza, which is where you get the application from. I
10   would always go there and read the board and see what
11   was open.
12   Q    Besides the application with the Department of
13   Transportation, did you file applications with other
14   State agencies?
15   A    With the county.
16   Q    At the time you filed the application, did you
17   have any relatives that worked for ALDOT?
18        I know Ms. Alexander, who was --
19   A    She was working there.
20   Q    -- your then boyfriend's mother? I called him
21   boyfriend, I guess, for lack of a better term.
22   A    Actually --
23   Q    She worked there?

Page 36

1    A    She worked there, and I like to say,
2    technically, she was like my mother-in-law, either way,
3    simply because of common-law marriage. Me and Bernard,
4    we have been together for eleven years.
5    Q    She was your child's grandmother?
6    A    Yes.
7    Q    So she worked for ALDOT. Anybody else that
8    worked there that maybe recommended you try to get a job
9    with ALDOT?
10   A    No. Actually, the others that I know that is
11   there now, I met after I started working there.
12   Q    Now, you started going into some tests and
13   all, but when you came to work, I think your first
14   actual day was July 3rd of '06?
15   A    Uh-huh.
16   Q    And there is an orientation period, I guess,
17   when you first come to work that you go through, where
18   you are advised of rules and regulations and things of
19   that nature; is that right?
20   A    Yes.
21   Q    You were given such an orientation on your
22   first day on the job; right?
23   A    Right.

LASHUNDRA JACKSON - 3/12/2008

Page 37

1    Q    And do you remember who would have instructed
2    you on rules and regulations and policies?
3    A    In there was Jay Palmer, and I think her name
4    is Katrina. I am not for sure, but there was a young
5    lady in there.
6    Q    And did they give you the package of rules and
7    policies for you to review?
8    A    I can't say that I remember a package of rules
9    and policies. I can't even actually remember what they
10   were actually saying that day.
11   Q    Do you remember signing some forms that
12   indicated that you had, at least, been shown those rules
13   and regulations?
14   A    I can't say exactly what I signed on that day.
15   I can't actually remember what they were.
16   Q    Did you receive any kind of orientation on
17   what kind of work you would be required to do while
18   working for ALDOT?
19   A    Yes. And actually before I went in on July
20   3rd, there was a guy that called from ALDOT and he was
21   telling me the kind of job that I would be doing and he
22   asked me if I still wanted the job.
23   Q    Do you remember who that was?

Page 38

1    A    Frankie. His name was Frankie.
2    Q    Did he tell you where he worked?
3    A    For ALDOT, yes.
4    Q    Did he tell you whether he worked in Mobile at
5    the division office?
6    A    Well, he actually called me on my cell phone,
7    and I knew it was Mobile from the area code. All I did
8    was lock the number in along with his name, because he
9    told me I could also call him if I had anymore
10   questions.
11   Q    But before you actually arrived to start work
12   your first day, Frankie called and kind of explained to
13   you what kind of work you would be doing?
14   A    Yes. He was kind of like, you are going to be
15   outside. Do you still want the job? You are going to
16   have to walk through a lot of trees and bushes. Do you
17   still want the job? And I was like, yes.
18   Q    Anything else he described to you?
19   A    No.
20   Q    Did he describe that you might have to drive a
21   vehicle?
22   A    No, he didn't say that.
23   Q    Did he describe that you might have to use

Page 39

1    instruments to take measurements?
2    A    No. He was just basically telling me I would
3    have to work outside and I would have to walk through
4    trees and bushes.
5    Q    It was basically outdoor work?
6    A    Exactly.
7    Q    Did you know that when you signed up for the
8    position?
9    A    Actually, I kind of -- the description of the
10   job, which had surveying, I knew that related to
11   outdoors.
12   Q    And the position that you had actually applied
13   for was Engineering Assistant 1?
14   A    Correct.
15   Q    After you actually came to work, after your
16   first day, did anyone other than Frankie describe to you
17   what you would be required to do, what kind of work you
18   would be doing, and the nature of what you would be
19   required to do while you were working?
20   For instance, Mr. Palmer, did he tell you what the
21   job would be?
22   A    He may have said it that day, which was July
23   3rd, but I can't remember exactly what was said. I know

Page 40

1    there was three of us in there.
2    Q    You, Palmer, and Katrina?
3    A    Well, it was two other hirees.
4    Q    Who were they? Do you remember who came on
5    when you did?
6    A    One guy's name was Darrien and the other guy's
7    name was John.
8    Q    Do you have an inkling of last names or
9    anything on that one?
10   A    I know Darrien, he is a black guy. And John,
11   he is a white guy. I am not good with their last names
12   because they didn't actually go where I went.
13   Q    But they were EAs, as far as you know?
14   A    Yes, sir.
15   Q    And they were, as far as you know, hired at
16   the same time you were?
17   A    Yes, we were all in there together.
18   Q    All three of you were new people?
19   A    Yes.
20   Q    The first day on the job, as far as you know?
21   A    Yes.
22   Q    Did you receive any instruction on any courses
23   that you would have to take and pass in order to

334.262.7556          REAGAN REPORTERS, LLC          334.262.4437
www.reaganreporters.com

LASHUNDRA JACKSON - 3/12/2008

Page 41

1  complete the requirements of an EA job?
2      A  Yes.  I know while we were in there, that is
3  where they gave us the test at.
4      Q  They gave you what, a math assessment test?
5      A  Yes.
6      Q  Were the other two given that same test?
7      A  I believe so.
8      Q  How did you do on the math assessment test?
9      A  Not good at all.
10     Q  And it has a basic math component and an
11 algebra component, if I am not mistaken?
12     A  That's correct.
13     Q  How did you do on the basic math?
14     A  I didn't do well on neither one of them.
15     Q  Let me backtrack a little bit.
16     In high school, did you take the normal mathematic
17 courses that are offered in public schools?
18     A  I took the basic math, I took pre-algebra,
19 algebra, Algebra II with trig, geometry and
20 pre-calculus.
21     Q  How did you fare on those courses?  Was that a
22 strong point or a weak point for you in your education?
23     A  Math, it was a strong point.

Page 42

1      Q  What kind of grades did you get on, say,
2  algebra and trigonometry in high school?
3      A  On trig, I got a C.  I know that for a fact.
4      Q  But on the math assessment course you took at
5  ALDOT, you didn't fare too well?
6      A  I didn't do well at all.  I didn't pass it.  I
7  should say that.
8      Q  And were you told the completion of these
9  courses was a requirement in order to become an
10 engineering assistant?
11     A  I know that they said we would be given a math
12 assessment test, like you said, and if we fail, we would
13 have to take it during the time that we are there and
14 they will schedule it whenever it was available.
15     Q  Were you given to understand that you would be
16 given training on basic math and algebra at any time?
17     In other words, would you be given the opportunity
18 to have math courses?  Or was it just basically a test
19 you had to go take?
20     A  Well, after -- yes, it was class, yes.
21     Q  I mean, the assessment was to determine
22 whether or not you needed some remedial study in the
23 course?

Page 43

1      A  Right.
2      Q  And if you did, they would schedule you a
3  course?
4      A  A class, that is correct.  So, yes, it was a
5  training class, also.
6      Q  So you understood then at some point in time
7  you would be scheduled for class in algebra?
8      A  Yes.
9      Q  At some point in time, you passed the basic
10 math; am I right?
11     A  Yes.
12     Q  You complete that all right, but there was
13 still algebra that you had to complete?
14     A  Yes.
15     Q  Were you given any kind of orientation on
16 other courses of training that you would receive during
17 your probationary period or while you were an EA?
18     A  The concrete course, the asphalt course, the
19 plan reading course, storm water.
20     Q  I won't hold you to all of them, but whatever
21 ones you can recall as we sit here today, if you will,
22 just tell me.
23     A  Those are the ones that I can recall right

Page 44

1  now.
2      Q  In your prior educational experience, had you
3  received any course work that is similar to what you
4  just said:  Concrete work, storm water drainage courses,
5  asphalt courses?
6      A  No.
7      Q  Had you ever received any kind of training or
8  any experience in that kind of work before you came to
9  work at ALDOT?
10     A  No.
11     Q  Now, after the orientation, and I am assuming
12 -- Did you do that in Mr. Palmer's office?
13     A  No.  We actually did it in the front.  I guess
14 that was a conference room.
15     Q  The conference room in front of the
16 administrative building in the division office?
17     A  Yes.
18     Q  And after the orientation period, did you
19 report to a supervisor that same day?
20     A  I think I did, yes.  Yes, I think so.
21     Q  Were you assigned to a supervisor?
22     A  Yes.  I was assigned to Harville.
23     Q  Austin Harville?

11 (Pages 41 to 44)

Page 45

1    A    Yes.
2    Q    And do you know what Mr. Harville's job title
3    was?
4    A    Project engineer. Okay. I don't know.
5    Q    Is that what you understood it to be, project
6    engineer?
7    A    Yes.
8    Q    And do you know what a project engineer is
9    within ALDOT, or what do you believe it to be?
10   A    I believe the project engineer is over the EAs
11   1 and 2. Actually, he is over everyone that is in that
12   little department where he is at.
13   Q    And I am assuming, just by the name, that
14   there may be a particular project on a highway or
15   somewhere and that would be the person who was actually
16   over that project?
17   A    Over that particular project, correct.
18   Q    And the EAs who were assigned to that project
19   would respond to him?
20   A    Yes.
21   Q    So Mr. Harville was your first supervisor when
22   you came to work?
23   A    Yes.

Page 46

1    Q    Did he have a regular office?
2    A    Yes.
3    Q    Sometimes they have project offices that are
4    not at the division or the district offices.
5    Where did you report to him, there on the division
6    complex?
7    A    Yes. On the premises there.
8    Q    When you reported to Mr. Harville, were
9    you given any instructions on what you would be doing or
10   where you would be working or who you would be working
11   with?
12   A    No. He told me to read the ALDOT book, the
13   green book.
14   Q    And what is the green book?
15   Well, I will ask you, first, did you read it?
16   A    Yes. It is a real thick book, the book that
17   they give everybody, I gather.
18   Q    And I won't hold you to everything that is in
19   there, but what does it basically contain? Rules and
20   regulations?
21   A    No.
22   Q    Or is it a technical manual on what kind of
23   work you would be performing and how to perform it, or

Page 47

1    both?
2    A    I know there wasn't any rules in there, but it
3    was like terminology. Basically pertaining to the kind
4    of work, yes.
5    Q    So it might have a page or a section on how to
6    run a survey line or what you need to do to get a proper
7    survey line or how to use a piece of measuring
8    equipment, things of that nature?
9    A    Yes.
10   Q    More of a technical manual?
11   A    Yes, I think so.
12   Q    So he gave you a copy of this green book, told
13   you to read it?
14   A    Yes.
15   Q    What then? Were you immediately assigned to a
16   project? I doubt you were assigned --
17   A    Not that particular day, because that was the
18   first day. The second day, it was actually a holiday.
19   So when I did go back, I went to, I guess it was, the 98
20   project. I am not for sure.
21   Q    That would be the U.S. Highway 98?
22   A    Yes. We were doing surveying, actually.
23   Q    What portion of 98 were y'all actually working

Page 48

1    on? Toward Mississippi?
2    A    Yes.
3    Q    Can you think of any of the small little towns
4    that 98 runs through that y'all might have been close
5    to?
6    A    I guess closer to Wilmer.
7    Q    So that was the first -- Do you know if it had
8    a name?
9    A    I have it written down.
10   Q    I know I came across a Natchez Highway
11   project. Is that a different project?
12   A    Yes, Natchez is further from where I first
13   started doing work at.
14   Q    Let's just call the first one the "Wilmer" for
15   lack of any better terminology, because that is close to
16   where you were working.
17   Your first day on that job, where did you actually
18   report to the morning that your actual work began?
19   A    You mean after July 3rd?
20   Q    Yes.
21   A    To the trailer in the back where Austin was.
22   Q    And that is at the division office there?
23   A    Right.

Page 49

1    Q    And would y'all go out in an ALDOT vehicle to
2  the job site?
3    A    Yes.
4    Q    So a truck?
5    A    Yes.
6    Q    And you and how many other people would go to
7  that site?
8    A    Three others.
9    Q    And do you remember who they were, by name?
10    A    Aaron, Adam -- I can't remember the other
11  guy's name, the third one.
12    Q    Were they EAs?
13    A    No.  They were actually summer help.
14    Q    You went out to the job site in a truck and
15  when you got to the job site, were you instructed on
16  what your job or task would be while on that job?
17    A    Well, Aaron, he had some papers, and he had
18  some marked stations.
19    Q    Tell me what that means.
20    A    We were instructed to get some machetes and go
21  through the bushes or the trees or whatever and go out
22  so many feet and tie the little orange ribbon on a tree
23  or some landmark where it could be found.

Page 50

1    Q    So you were given specific instructions on
2  what to do with that?
3          Would it say, Go ten feet off the right-of-way,
4  clear postmarker, something to that nature?
5    A    It would be a sheet of paper with the
6  stations, like you might have station 178, 177, and so
7  on, and you might need to go out 260 feet, 180 feet, and
8  so on.
9    Q    But it was described what you would be doing?
10    A    Yes.
11    Q    And what other tasks were you assigned out on
12  that particular project?
13    A    That is about it.
14    Q    Is that pretty much what you were doing on
15  that, marking stations?
16    A    On that one, yes.
17    Q    Besides Aaron, Adam, and the other fellow and
18  you, were there any other ALDOT employees working on
19  that project?
20    A    I really can't say, because there is so many
21  different sides to that project.  I mean, there could
22  have been someone else out there besides us, but they
23  could have been on a further side and we not know that

Page 51

1  they are actually there.
2    Q    So this project would encompass a length of
3  road which could be miles?
4    A    Yes.
5    Q    And you may have other ALDOT people five miles
6  from you working on that same project?
7    A    Yes.
8    Q    Was Mr. Harville ever out there?
9    A    He would pop up out there every now and then.
10    Q    Was there any other ALDOT supervisor that
11  would maybe come and go that you would remember?
12    A    No.
13    Q    Are you familiar with, as it relates to ALDOT,
14  consultants?
15    A    Am I familiar with them?
16    Q    Yes.
17    A    Yes, I know they have consultants.
18    Q    And what are consultants or who are
19  consultants?
20    A    I know Chris Burdette is a consultant, a guy
21  named J.B., I think he is a consultant, and Donald.
22    Q    Do you understand these consultants to be,
23  although not merit employees of the Department of

Page 52

1  Transportation, they are paid by the Department of
2  Transportation to oversee work that is being done for
3  the department?
4    A    I know they work in there with them, yes.
5    Q    Do you recall any consultants in and around
6  this Wilmer project while you were working there?
7    A    No.
8    Q    How long did you actually work on that
9  particular project, if you remember?  Days?  Weeks?
10    A    I don't have it with me.  I can't actually
11  remember.
12    Q    Do you recall it being a long period of time,
13  as much as a month, or maybe a couple of weeks?
14    A    I really can't recall, because although I was
15  sent out there, when I first made it there, I was also
16  sent out there like different other times.
17    Q    So you might be assigned there periodically?
18    A    Yes.
19    Q    Not continuously?
20    A    Yes.
21    Q    Do you remember any other assignments that you
22  may have had or tasks that you were required to perform
23  while working on the Wilmer project, besides the station

13  (Pages 49 to 52)

LASHUNDRA JACKSON - 3/12/2008

Page 53

1  posts?
2    A   No, that was it.
3    Q   But that is basically what you were doing on
4  that project?
5    A   Basically.
6    Q   While under the supervision of Mr. Harville,
7  were you assigned any other projects or any other work
8  sites?
9    A   Yes. I did Natchez with Harville.
10   Q   Natchez?
11   A   Natchez Highway.
12   Q   And for the sake of my ignorance, which
13  highway is that? Does it have a number?
14   A   I am pretty sure it does.
15   Q   Just don't know it?
16   A   Exactly.
17   Q   It is commonly known as the Natchez Highway?
18   A   Natchez Highway, yes.
19   Q   When do you first recall being assigned to do
20  any kind of work on the Natchez Highway? Do you
21  remember the month?
22   A   No, I can't remember right off.
23   Q   What were your tasks and assignments while

Page 54

1  working on the Natchez Highway project?
2    A   Sometimes I would have to take measurements of
3  the sod.
4    Q   Let me stop you there and just ask what that
5  entailed. What did you have to do?
6    A   From station to station, I would have a
7  measuring tape, how far it is out, and the topsoil.
8  That is the only way I can explain it.
9    Q   Are you measuring the soil from the side of
10  the existing highway to a point?
11   A   Yes. To where it stops. I can draw it.
12   Q   But I mean, it is basically the taking of a
13  measurement from a point near the highway to somewhere
14  over on the right-of-way?
15   A   Right.
16   Q   Where maybe -- I am trying to think of the
17  proper term. Where the grass or cut areas, as I call
18  it, the clear area is, is that where you are talking
19  about?
20   A   Yes.
21   Q   So that is basically just taking a tape
22  measure and going from point to point and putting down
23  your measurements and making sure that gets reported to

Page 55

1  somebody?
2    A   Right.
3    Q   Did you have to input that into any kind of a
4  machine or a computer?
5    A   No, I actually just write it up.
6    Q   Did you keep it in an orange book or a piece
7  of paper?
8    A   Piece of paper.
9    Q   Were you given instructions on how to do that?
10  I mean, did somebody tell you what you needed to be
11  doing?
12   A   Besides measure it, the way they were actually
13  pointing, I mean, I just knew in my head, okay, this
14  way.
15   Q   That was not a difficult task to comprehend?
16   A   No, not at all.
17   Q   That is sod measurement. What other tasks
18  were you required to perform on the Natchez Highway
19  project?
20   A   Tack coat.
21   Q   Explain that to me.
22   A   The tack coat, it goes with asphalt. The tack
23  coat is what they put down to make the asphalt stick.

Page 56

1    Q   And this is done by a contractor, normally?
2    A   Yes.
3    Q   And your job is to perform some kind of an
4  inspection on what he has done?
5    A   Yes. You have to make sure it is a certain
6  amount of degrees. Like, you walk to the truck and you
7  look, and it will tell you if it is 150 or 200.
8    Q   So you have to make sure that the coating that
9  is going down is being placed on the roadbed at a
10  certain temperature?
11   A   Exactly.
12   Q   And other than reading the temperature off the
13  gauge at the back of the asphalt truck and putting that
14  down on a log or a note, or whatever, is there any other
15  thing that you had to do with respect to that?
16   A   Yes. Make sure that the asphalt was hot
17  enough. I had to take the depth, take up the tickets,
18  mark the stations, run the rates.
19   Q   Is all of this related to the tack coat?
20  I want to stick to that just to make sure I
21  understand exactly what you had to do.
22   A   The tack coat goes with the asphalt. I mean,
23  whenever the tack coat is being laid, you always have an

14 (Pages 53 to 56)

LASHUNDRA JACKSON - 3/12/2008

Page 57

```
 1   asphalt truck right behind it.  So it is all rolling
 2   together, actually.
 3      Q    So you check the temperature and you have to
 4   check the thickness of the tack coat?
 5      A    Yes.
 6      Q    How do you measure that?  Is there a gauge you
 7   use?
 8      A    Yes.  You can call it that, yes.
 9      Q    And I am just trying to get the picture in my
10   mind's eye.  Do you basically put the gauge into the
11   tack coat and measure how far it went in?
12      A    Yes.
13      Q    And take that reading and put that on a piece
14   of paper and keep that measurement?
15      A    Yes.
16      Q    And it has a range that it should fit in?
17      A    Yes.
18      Q    In other words, it should be a half inch,
19   quarter inch, or whatever?
20      A    Yes.
21      Q    And if it is above that or below that, then
22   you report?
23      A    Yes.
```

Page 58

```
 1      Q    And that is the tack coat?
 2      A    No, that is not the tack coat.  That is
 3   actually the asphalt what I am telling you about.
 4      Q    The tack coat is thin?
 5      A    The tack coat is just like oil.  It actually
 6   looks like oil.
 7      Q    And then the asphalt is placed on top of
 8   that?
 9      A    It is placed on top of it.
10      Q    And you have to measure the thickness of the
11   asphalt?
12      A    Yes, and the width.  You go from station to
13   station with the wheel, and it will tell you if they are
14   putting down too much or not enough.  You have to make
15   sure that you get the ticket from every truck.  I have
16   to make sure that I am marking the stations.
17      Q    By "ticket," do you mean when a truck comes up
18   to replace asphalt in the asphalt layer, you have to get
19   a ticket from that truck driver indicating he has
20   delivered a load of asphalt?
21      A    Yes.
22      Q    So that is taking up tickets?
23      A    Yes.
```

Page 59

```
 1      Q    Or any other supplies that might be issued to
 2   that particular job?
 3      A    You just take the ticket, sign your name, put
 4   ALDOT, and give them their copy.
 5      Q    That is so we can keep a record of how much
 6   materials they are using?
 7      A    Exactly.
 8      Q    We have got sod measure, checking that tack
 9   coat temperature, making sure the asphalt is the width
10   and thickness that it should be?
11      A    Yes.
12      Q    You take tickets for supplies that are
13   delivered on site to make sure we are getting what we
14   are paying for, as far as supplies?
15      A    Exactly, yes.
16      Q    What other tasks or functions did you perform
17   on the Natchez Highway project?
18      A    The clearing.  When the -- I can't think of
19   that company's name.  The trees that have to be removed.
20      Q    Like ASPLUNDH, did they ever do any work?
21      A    Yes.  Yes.
22      Q    So they are given a task of removing a certain
23   number of trees, what, a certain number of feet from the
```

Page 60

```
 1   right-of-way?
 2      A    Exactly.
 3      Q    And you have to go make measurements to
 4   determine whether or not they have done that?
 5      A    No.
 6      Q    What do you do?
 7      A    I don't have to measure it.  You have a piece
 8   of paper, and actually, it tells you which ones and like
 9   -- how can I put it?  Say if you have like a tree
10   hanging over, I guess it is so many feet that it is
11   supposed to be out.
12      Q    They give a distance?
13      A    Yes.
14      Q    And there should not be any trees in there and
15   you are there to make sure ASPLUNDH or whoever has
16   removed trees for that distance?
17      A    Right.
18      Q    More or less.  And you make a report that they
19   have completed the task, or whatever, on a log of some
20   kind?
21      A    Right.
22      Q    Are there any other tasks that you remember
23   having to perform?
```

15 (Pages 57 to 60)

LASHUNDRA JACKSON - 3/12/2008

Page 61

1    A    That is all I can remember right now.
2    Q    Now, did you have any particular difficulty
3  with performing any of these tasks? And when I ask
4  that, I am discounting right now that there might have
5  been a lot of tasks that had to be done quickly and you
6  might have been, perhaps, overwhelmed with the number of
7  tasks. My question is, though, did you understand and
8  were you able to do the tasks?
9    A    Yes, I was able to do some of them, but not
10  all of them. Because the marking of the stations, I
11  have to go from like one side of the street to the
12  other, and in the course of me taking the tickets,
13  checking the temperatures, running the rates, and by the
14  time I am like further up the road with marking the
15  stations or doing what I am doing, then there is more
16  trucks coming, and it was really stressful.
17        And besides the fact when I was there alone anyway,
18  I actually had to call someone to come out because I had
19  read in the book that you have to use the tack coat,
20  unless you are actually laying hot asphalt on top of hot
21  asphalt.
22    Q    Correct me if I am wrong, but what you have
23  just described to me appears that you knew how to do the

Page 62

1  jobs, you just didn't have enough time to do all of the
2  jobs that were required; is that a fair statement?
3    A    Yes.
4    Q    So it was a matter of too much, rather than
5  not knowing how?
6    A    Yes.
7    Q    And you indicated that, basically, a lot of
8  times it was just you out there?
9    A    Yes.
10    Q    And no other ALDOT employee or consultant?
11    A    No, there wasn't.
12    Q    How many days do you remember or think that
13  you were out there on the Natchez project yourself?
14    A    I am not for sure. I actually kept a record
15  of it.
16    Q    Ballpark?
17    A    I don't want to give you a wrong ballpark.
18    Q    Was it more than two weeks? Ten days?
19    A    I don't remember.
20    Q    How long did this project last? How long was
21  that project? How long were you on that project?
22    A    I am not for sure. I would actually have to
23  be looking at the book, because I write everything down.

Page 63

1    Q    Did you keep -- I have seen some of them that
2  are orange, a daily logbook that the EAs keep. Did you
3  have one of those?
4    A    Yes.
5    Q    Did you keep yours?
6    A    Yes. I had a personal book, and I had like a
7  book that I would write specifics down in and that was
8  kept in the office.
9    Q    But you still have your personal book at home?
10    A    No. My attorney actually has it.
11    Q    And that would have a record of the days that
12  you were actually working on the Natchez Road project?
13    A    Yes. It will have a lot of different projects
14  in there.
15    Q    But it would include that one?
16    A    Yes.
17    Q    Did you indicate by date the days that you
18  were alone on a project?
19    A    Yes. I have the dates written down and
20  alongside of each date, I have which project I was at or
21  if I was at class, or whatever.
22    Q    When did you first start indicating by the day
23  you worked that you were alone on the project?

Page 64

1    A    I guess the first day I was alone.
2    Q    Why did you think it would be necessary to put
3  on your logbook, your personal logbook, that you were
4  alone on the project?
5    A    Well, actually, I write down almost anything.
6  Like even in that logbook, you will actually see dates
7  highlighted or you might see a "P" by a particular date
8  because that is actually my menstrual cycle. I just
9  write things down.
10    Q    We will ask you to produce that logbook that
11  is available with your lawyer, and I will put that in a
12  formal request.
13        But as we sit here today, you just have no idea and
14  don't want to hazard a guess as to how many days you
15  actually worked on the Natchez project by yourself?
16    A    I would rather not guess, so you can have it
17  correct.
18    Q    And when you say "by yourself," you are
19  referring to your immediate area of work, as opposed to
20  the entire project, because you said there may have been
21  other people down the road who were working that were
22  ALDOT employees, but you were not directly working with
23  them?

16 (Pages 61 to 64)

LASHUNDRA JACKSON - 3/12/2008

Page 65

1    A   Well, Natchez is a long stretch. If a person
2  is working on Natchez, you would actually see them on
3  Natchez. What I was referring to was like in what you
4  referred to as the Wilmer project, because that is like
5  a real wooded area.
6    Q   But you just don't recall any other ALDOT
7  employees working on the Natchez project when you were
8  working?
9    A   Not when I was alone, there wasn't any there.
10   Q   Now, we were talking about the projects that
11 you worked on while you were under Mr. Harville's
12 supervision. Are there any others that you recall while
13 you were actually working under Harville?
14   A   Yes. I worked on -- I am not going to
15 remember the numbers, but it was Dauphin Island Parkway.
16   Q   Let me stop you with that one. What were you
17 doing on Dauphin Island Parkway?
18   A   Actually, I would be picked up and taken to
19 the tunnel office with Skip.
20   Q   Skip?
21   A   Yes.
22   Q   Do you know a last name?
23   A   Skip Vines.

Page 66

1    Q   And you would be picked up and taken to the
2  tunnel office?
3    A   To the tunnel office, yes.
4    Q   Talking about the Bankhead Tunnel?
5    A   Yes.
6    Q   What would y'all do?
7    A   We first started off doing the milling.
8    Q   Milling?
9    A   Yes.
10   Q   What is that?
11   A   Which is the removal of, I guess, the old
12 surface.
13   Q   And that is being performed by a contractor?
14   A   Yes. And then the laying of the -- well,
15 resurfacing, I guess they would call it.
16   Q   So this was a resurface project?
17   A   Yes.
18   Q   What responsibility or task did you have
19 assigned to you with respect to the milling?
20   A   To make sure they were milling it deep enough;
21 Making sure they are staying within the stations that is
22 required on the sheet.
23   Q   And you would have an instrument of some type

Page 67

1  in order to gauge how far they were milling down?
2    A   Yes.
3    Q   And during this time, were you working with
4  any other ALDOT employees?
5    A   Yes. I was actually working with a young lady
6  from over at the tunnel office.
7    Q   And was she able to give you any assistance on
8  what your job would be and what you were supposed to be
9  doing?
10   A   Yes.
11   Q   How long did you work on that particular
12 project?
13   A   I am not for sure.
14   Q   Was it more than a week?
15   A   I am not for sure.
16   Q   Did you have any responsibilities with respect
17 to the actual resurfacing after the milling had been
18 done? Did you have to check on anything that the
19 contractor was doing on the resurfacing portion of the
20 job?
21   A   Yes. You always keep the stations, because
22 that lets you know how far along they have gotten that
23 particular day.

Page 68

1    Q   So back to my question: You would check how
2  far they went on a given day?
3    A   Yes.
4    Q   Did you have any responsibility for doing any
5  inspections of depth?
6    A   Yes, with the milling.
7    Q   What about with the -- I am assuming they are
8  milling down whatever the surface is, asphalt or
9  whatever?
10   A   Right.
11   Q   And they are coming back over with another
12 coat of asphalt?
13   A   The tack coat and then asphalt.
14   Q   So you had the same responsibilities as you
15 had had on the Natchez project?
16   A   Right.
17   Q   Anything different that you were required to
18 do on the Dauphin Island Parkway?
19   A   Nothing different. I just was there with
20 another worker.
21   Q   Did that, in your opinion, enable you to
22 perform all of the tasks that you were required to do
23 more efficiently?

17  (Pages 65 to 68)

Page 69

1      MR. SIMON: Object to the form.
2      Q   Strike that. Let me put it this way.
3      You didn't have the time problem, because of the
4   additional help, on this Dauphin Island project that you
5   had encountered on the Natchez project, did you?
6      MR. SIMON: Object to the form. You can
7         answer.
8      A   It wasn't so much as the time. It was so much
9   as getting everything done. With this other person
10  there along with me on the Dauphin Island project,
11  everything got done. There wasn't anything left undone.
12     Q   Do you know whether or not that project had
13  been in progress before you were assigned to work over
14  there? In other words, had they started it before you
15  ever got there?
16     A   No. I don't think so.
17     Q   Or did you start at the very beginning?
18     A   I would say that was the beginning.
19     Q   Do you understand what I am asking?
20     A   You mean like from start to finish?
21     Q   Right.
22     A   When they started --
23     Q   I mean, you started at a certain station when

Page 70

1   you were assigned there and your responsibilities would
2   have gone to another station when you were done with
3   that project?
4      A   Right.
5      Q   But do you know what had been done before you
6   came on board?
7      A   I believe I was there at the start.
8      Q   That is all I am asking. Were you there when
9   the project was completed?
10     A   Yes.
11     Q   And during that time, there was an assistant
12  or another ALDOT employee with you doing similar work
13  the entirety of the time?
14     A   Yes.
15     Q   Let me back up to this Natchez project. Were
16  you assigned to that project when it first began, if you
17  know?
18     A   I don't think so.
19     Q   Did you replace anybody, I guess?
20     A   It is like during certain parts, I was there
21  when it first began. But when I was there alone, it
22  wasn't like it had just started that particular day.
23     Q   Do you know who did the job that you were

Page 71

1   doing before you got there?
2      A   No.
3      Q   Do you know whether it was one person or more
4   than one person?
5      A   No.
6      Q   Did that project continue after you no longer
7   worked on that project, if you know?
8      A   I would guess so.
9      Q   Do you know if anyone was assigned to perform
10  the job that you had done?
11     A   Well, when I said something about it, they
12  sent someone out there with me.
13     Q   That would have been, correct me if I am
14  wrong, around the latter part of August of '06, when you
15  made some complaints about a problem you were having on
16  that particular assignment?
17     A   I can't call out the exact date, but it was
18  during the Natchez project.
19     Q   I think you had told Mr. Harville that you
20  were having problems on that job; is that right?
21     A   Well, yes, I guess. I had another problem.
22  During the time I was there alone, the contractors, they
23  wanted to do something that was out of code, and I

Page 72

1   actually had to use my phone to call Austin because they
2   were like still going to do it, and I had to get him out
3   there just to stop them.
4      Q   So the contractors were doing something
5   contrary to what the job called for?
6      A   What the specs called for. Exactly.
7      Q   So you had to call Mr. Harville and tell him
8   about it?
9      A   Yes.
10     Q   What happened with that?
11     A   He came out there, and Dianna was supposed to
12  be out there with me.
13     Q   Dianna?
14     A   Yes. Her name is Dianna Rook. So when he
15  made it out there, he was like, Where is Dianna? I was
16  like, Well, I don't know. He was like, You-all are
17  supposed to be out here together. I said, Well, I don't
18  know where she is at.
19     Q   So part of the time on the Natchez project,
20  you were supposed to have some assistance?
21     A   Yes. I was told there would be more than one
22  person on the project.
23     Q   At least part of the time, Dianna was supposed

LASHUNDRA JACKSON - 3/12/2008

Page 73

1  to be working with you?
2      A   Yes.
3      Q   And she wasn't there that day?
4      A   She wasn't there.
5      Q   What happened when Mr. Harville came on the
6  job site?
7      A   He went over and spoke to the contractors, and
8  what they were trying to do, they no longer was trying
9  to do it wrong. They started doing it right.
10     Q   I am assuming you told them that they were
11 doing it wrong?
12     A   Yes.
13     Q   And what did they tell you?
14     A   Nothing, actually. They just looked at me.
15     Q   They ignored you?
16     A   Yes.
17     Q   You did what you were supposed to do?
18     A   Exactly.
19     Q   And when that didn't help, you called your
20 boss and he came and rectified it?
21     A   Yes.
22     Q   That's how it should work; correct?
23     A   Yes.

Page 74

1      Q   Was there any other time under Mr. Harville
2  that you made a complaint to him that you were having
3  problems with the job?
4      A   Yes. I told him that I felt like no one
5  actually wanted to work with me, and I asked him, since
6  I would be out on a project alone, could I at least get
7  a radio instead of using my personal cell phone, which I
8  paid, and I was never given that.
9          And I had a problem with someone scratching on my
10 car.
11     Q   I understand that, and we will get to that
12 later. Right now, I am just asking about any problems
13 you had with the work you were doing on that Natchez
14 project or while you were under the supervision of Mr.
15 Harville.
16         It sounds like your chief complaint is, basically,
17 you were left out there on the job by yourself without
18 any other ALDOT employees or supervision?
19     A   Not actually no supervision, but without any
20 help, because I was told it would be more than one
21 person on the project doing any project.
22     Q   So it is, then, that you were left alone on
23 the projects to do the work required of the project

Page 75

1  without any assistance, rather than supervision?
2          In other words, you didn't have any help to do what
3  all you had to do during that day?
4      A   Exactly. I didn't have any help.
5      Q   And you told Mr. Harville this?
6      A   Yes.
7      Q   And did he try to provide some assistance for
8  you at any time?
9      A   Well, Floyd was sent out a day or two.
10     Q   Floyd, is that Hansworth?
11     A   Yes, Hansworth.
12     Q   What does he do? Is he an EA? Do you know
13 what his job was?
14     A   He was there before I was, actually. I think
15 he is an EA, but I don't know if he is a 1 or 2.
16     Q   So Floyd came out to help you with the work?
17     A   Yes.
18     Q   How many days did Floyd come out and help?
19     A   I think probably like a day or two.
20     Q   After Floyd came to help, at any time were you
21 alone on the job again?
22     A   Yes.
23     Q   Do you recall how many days?

Page 76

1      A   Not exactly how many days.
2      Q   I think at some point in time, correct me if I
3  am wrong, the asphalt company ceased that part of the
4  project and went to something else, and would you have
5  been taken off the Natchez job at that point in time?
6      A   Yes.
7      Q   In other words, you didn't have to do that for
8  a while?
9      A   When they stopped.
10     Q   And that was about a month or so that you
11 didn't have to go back out to that project?
12     A   Huh, I don't think so. Well, even when they
13 stopped, I checked the rain gauges. I want to say even
14 at finish, I guess the leveling.
15     Q   So you had other tasks that you performed on
16 that project?
17     A   Yes.
18     Q   Were you able to complete those tasks without
19 difficulty?
20     A   Yes. Because during the leveling, it was
21 another person also there.
22     Q   And who was there?
23     A   Marion.

19 (Pages 73 to 76)

Page 77

1    Q    Is that an ALDOT employee?
2    A    Yes. I don't know her last name.
3    Q    Do you know what her title was?
4    A    She was an EA, and I'm not for sure if it was
5    1 or 2.
6    Q    And did she continue to work out there on that
7    project until you were taken off that project?
8    A    I can't say how long she was out there,
9    because we also did the striping. I can't say what
10   Marion actually did.
11   Q    And the striping, you would have to do some
12   inspections to make sure striping was properly applied?
13   A    Yes. To make sure it is broken, solid, or
14   both, and take the measurements so they could be paid
15   properly.
16   Q    Is that a job that you understood how to do
17   and could perform that task without difficulty?
18   A    Yes, because, actually, it was just like from
19   one station to the next.
20   Q    You would see if it had a solid center line or
21   broken white line, or whatever?
22   A    Like, if they start at Station 63 and end at
23   Station 263, if they have solid, you write that down; if

Page 78

1    they have broken, you write that.
2    Q    You just annotate it in that book and turn
3    that notebook in to whoever takes care of those
4    projects?
5    A    Yes.
6        (Thereupon, a break was taken.)
7        MR. REDD: We are back on the record.
8    Q    When we broke, I was asking you questions
9    concerning your supervision by Mr. Harville and projects
10   that you had worked on while he was your supervisor.
11       Besides the one you had mentioned, can you remember
12   any other projects that you worked on while Harville was
13   your supervisor?
14   A    I was working on the Dog River Bridge with --
15   I know his name -- Walter Crowe.
16   Q    Is that another ALDOT employee?
17   A    Yes.
18   Q    And did you have any difficulty performing the
19   tasks and assignments that you had on that particular
20   project?
21   A    No. Actually, I was just observing.
22   Q    Any other projects while Harville was your
23   supervisor?

Page 79

1    A    I think that is it.
2    Q    Okay. I may have asked this: You have
3    described to me that you had talked to Mr. Harville
4    about the problems you were having on the job, and I
5    think you said Mr. Hansworth came out a couple of days
6    to help you with the job over at Natchez Parkway, or
7    Natchez Highway?
8    A    Yes.
9    Q    At any other time, did you make any complaints
10   or express any problems you were having with Mr.
11   Harville concerning the job or the projects you were
12   working on?
13   A    Yes. I had told him that I felt like no one
14   really actually wanted to work with me because of my
15   race, and also I told it to, I think -- what is his
16   name? I can see his face but I just can't call his name
17   right now.
18   Q    What kind of job did this person do?
19   A    He sits in the front.
20   Q    One of the engineers?
21   A    Huh-uh. I cannot call his name.
22   Q    Let's just stick to Mr. Harville. You
23   indicated that you told Mr. Harville nobody didn't want

Page 80

1    to work with you. I think, one, you told him they
2    didn't want to work with you because of your
3    mother-in-law?
4    A    Yes. They actually kept calling her my
5    mother, which, I mean...
6    Q    And when you say "they," can you give me the
7    names of the people that you are talking about?
8    A    That is like -- I can't think of his name. It
9    is almost like I have got a brain freeze. I cannot
10   think of his name.
11   Q    Was this a co-worker?
12   A    He sits up there in the office with Vince.
13   Q    Fresolone?
14   A    That's his name, yes.
15   Q    But you told Mr. Harville that folks didn't
16   want to work with you because, I think you said, they
17   thought you were Bertha Alexander's daughter?
18   A    Yes, because I was her daughter. And we had
19   -- I spoke with Fresolone, and I told him that I felt
20   like I was being discriminated against because of my
21   race.
22   Q    Let me back up about you being thought to be
23   Ms. Alexander's daughter.

LASHUNDRA JACKSON - 3/12/2008

Page 81

1  A  Yes.
2  Q  Now, can you tell me the names of any persons
3  that didn't want to work with you because they thought
4  you were her daughter?
5  A  Huh.
6  Q  How did you come to reach that conclusion?
7  A  Well, they kept calling her my mother. They
8  were like, your mother, and I was like, no, that is my
9  mother-in-law. And when I brought it to their
10  attention, it was like, I am pretty sure that is not the
11  case because everyone loves your mother, and I am like,
12  you know, that is not my mother.
13  Q  Let me stop you right there. You indicate
14  that when you would talk about that, the people would
15  say, well, everybody loves your mother?
16  A  Yes.
17  Q  Meaning Ms. Alexander?
18  A  Meaning Ms. Alexander.
19  Q  Okay.
20  A  And I was like, well, that isn't my mother. --
21  Q  Why would they not want to work with you --
22  And we are talking about co-workers; right?
23  A  Right.

Page 82

1  Q  Why would they not want to work with you if
2  they thought so highly of Ms. Alexander?
3  A  I can't even begin to imagine why not.
4  Q  Have you ever specifically heard anyone say, I
5  don't want to work with her because she is Bertha's
6  daughter?
7  A  No.
8  Q  But you told Mr. Harville that you thought
9  people didn't want to work with you on account of that?
10  A  Right.
11  Q  And you told Mr. Fresolone that people didn't
12  want to work with you on account of that?
13  A  On account of that.
14  Q  Let me back up. Did you ever indicate to
15  Mr. Harville that you thought they didn't want to work
16  with you because of your race?
17  A  Yes.
18  Q  How did you express that to him? What did you
19  say to him?
20  A  Well, like I told him the part of me being
21  alone on a project, and when someone did come to help
22  me, it was Hansworth, which Hansworth is black. And out
23  of everyone that was there, I was being sent over to the

Page 83

1  tunnel office to work. I didn't get a ride over there.
2  They would send someone to pick me up, which just so
3  happened to be a black person. And when I started
4  working with the young lady on the DIP project, she was
5  black. It is more whites there than blacks. It is like
6  everyone should have been working together, but it
7  wasn't.
8  Q  Do you know how assignments are made?
9  A  Assignments are made according to the project
10  engineer, which is everyone who works up under him,
11  which included me working up under Austin. Myself, I am
12  black, and the other workers were white.
13  Q  On the Natchez project, do you know whether or
14  not the person who you replaced was white or black?
15  A  The person that I was what?
16  Q  The person that you replaced?
17  A  Well, I can't really say that. Yes, I can,
18  because Dianna was out there. She was supposed to be
19  out there. She is white, but she didn't show up.
20  Q  But she was assigned to be there?
21  A  Yes. And, actually, the reports that I had to
22  do on those, I would do the reports and she would get
23  the privilege to sign them. It was almost as if she was

Page 84

1  being there, but she wasn't actually there.
2  Q  Was she senior to you?
3  A  I would guess. She has been there longer than
4  I have.
5  Q  Was she an EA-1 or an EA-2?
6  A  Well, since I was a 1, I guess she would have
7  had to have been something a little higher, I guess.
8  Q  So she would have been the senior party on
9  that particular task at that particular time?
10  A  Yes.
11  Q  As far as you know?
12  A  Yes.
13  Q  What about the Dog River Bridge project? Who
14  worked with you on that?
15  A  I was there with Walter Crowe. He actually
16  worked for Skip.
17  Q  White or black?
18  A  He is white.
19  Q  What about the Wilmer project?
20  A  Those three guys, they were white, and those
21  were like the seasonal.
22  Q  What did you do -- I don't think I asked this.
23  What did you say to Fresolone about the discrimination

21 (Pages 81 to 84)

LASHUNDRA JACKSON - 3/12/2008

Page 85

1  on account of your race? How did you express that to
2  him?
3      A  Well, I told him that no one wanted to work
4  with me because I was black, and I explained to him the
5  same thing I am explaining to you. Someone had to come
6  from the tunnel office to pick me up. I couldn't get a
7  ride. There was a lot of trucks available. There was
8  trucks that were just still parked out there that I
9  probably could have driven.
10     Q  But the person that came to get you was black?
11     A  He was black.
12     Q  And you mentioned the name of -- Who was the
13 person that you worked with on the Dauphin Island
14 Parkway? Did you mention her name?
15     A  Shannon.
16     Q  White or black?
17     A  She is black. She worked for Skip, also.
18     Q  Is Skip white or black?
19     A  He is white.
20     Q  Other than what you have said about race being
21 a factor to Fresolone, did you give him any further
22 specifics about your allegation? In other words, did
23 you furnish him with the names of anyone whom you had

Page 86

1  heard make statements about you, derogatory?
2      A  No one I have heard make statements, but to
3  me, it was evident. I mean, I could see it.
4      Q  Harville and Fresolone, that you have talked
5  to about race and Bertha Alexander. Anyone else?
6      A  Besides like other co-workers or people that I
7  know personally?
8      Q  Let's talk about co-workers. Who have you
9  discussed your belief that people didn't want to work
10 with you because of Bertha Alexander? Can you give me
11 the names of any?
12     A  I spoke with Floyd about it.
13     Q  Floyd Hansworth?
14     A  Yes. And I think I spoke with Carlon. His
15 name is Carlon.
16     Q  Carlon?
17     A  Carlon, C-A-R-L-O-N. I think that is how you
18 spell his name.
19     Q  What did you tell either one of these people?
20     A  I basically told them that I felt like no one
21 actually wanted to work with me because I was black. I
22 told them that.
23     Q  And did they offer any opinions that they

Page 87

1  might have as to whether you were right or wrong?
2      A  No. They actually asked me why I thought so
3  or why did I feel like that and I explained it.
4      Q  And did you tell them what you just told me?
5      A  Yes. I explained it to them.
6      Q  Anybody else? Co-workers?
7      A  Besides my mother-in-law.
8      Q  Did Mr. Harville ever speak to you in terms
9  you might believe to be derogatory?
10     A  Meaning?
11     Q  Did he ever talk down to you, use racial slurs
12 against you, make any statements regarding your sex?
13     A  No. Actually, Harville never actually said
14 anything. Although he was my project engineer, whenever
15 I would walk to the door and say, Harville, what do you
16 have for me today? He would actually turn and he would
17 say, Josh, and then Josh would tell me what to do.
18     Q  Is that McElhenney?
19     A  Yes.
20     Q  So he worked for Harville at the time?
21     A  No. Josh was actually a project engineer,
22 also.
23     Q  Do you have any complaints about Harville?

Page 88

1      A  Well, actually --
2      Q  Other than not assigning other people to work
3  on projects with you?
4      A  When I was speaking to -- what is his name? I
5  do not know why I can't remember this man's name.
6  Fresolone. When I was speaking to Fresolone, I told him
7  about when I would ask Austin for my assignment, he
8  would ask Josh and Josh would tell me. And he was like,
9  that is because Harville actually don't talk that much.
10     And my response was that, well, if he is a project
11 engineer, then he has to talk to his EAs and so forth.
12     Q  Did you have any particular problem with
13 receiving assignments from Josh McElhenney as opposed to
14 Harville?
15     A  No. He would actually say, Shun, go to the 98
16 project, and I was, okay.
17     Q  You didn't have a problem with that?
18     A  No, huh-uh.
19     Q  At some point in time, Mr. Harville ceased
20 being your supervisor and Mr. Paulk became your
21 supervisor?
22     A  Yes.
23     Q  Would that have been sometime in mid

22 (Pages 85 to 88)

---

Page 89

September, if you recall, of '06?

A   Yes, I guess.

Q   Now, had you known -- let me strike that for a moment and go back to Mr. Harville.

Do you remember what your chain of command was when Mr. Harville was your supervisor?

In other words, you answered to Harville. Do you know who his immediate supervisor was?

A   I would guess and say Jay.

Q   Palmer?

A   Yes.

Q   And do you know who Palmer answered to?

A   Do I know who his supervisor is?

Q   Yes.

A   I would guess Vince.

Q   Calametti?

A   Yes. And then Poiroux.

Q   Back to Paulk. Sometime in mid September of 2006, you were assigned to Mr. Paulk?

A   Yes.

Q   Had you known him before he became your supervisor, at all?

A   No.

---

Page 90

Q   Had you ever had to deal with him before on your job?

A   No. I actually assumed he had come from another department, another -- well, not over at that division. Probably like the tunnel or somewhere else.

Q   Had you seen him around?

A   No.

Q   So he is a fresh face to you?

A   Fairly new.

Q   And he was fairly new to the department as well, was he not?

A   I don't know.

Q   He's a relatively young fellow, as I recall?

A   Yes, he appears young.

Q   Do you have any idea how long he had been out of college or whether he was even out of college at the time he supervised you?

A   No. I don't know him personally.

Q   When Paulk became your supervisor, what was the chain of command? Paulk answered to whom?

A   Jay. I think it went the same way.

Q   You substitute Harville for --

A   Exactly.

---

Page 91

Q   -- I mean, Paulk for Harville, and the same chain of command applies?

A   Exactly.

Q   And so the first month you worked for Paulk, do you remember what assignments you were given by Mr. Paulk? I mean, where were you assigned to work? What projects were you on?

A   No. I know that I had class soon after he became the project engineer, because I think I had class in October, I want to say.

Q   What kind of class did you have?

A   It was the basic math class.

Q   And how long was that course?

A   It was supposed to be a week, but seeming that I think Monday was a holiday, I think I was only here for like four days.

Q   So you came to Montgomery?

A   Yes.

Q   And you finished that course and completed it?

A   Yes.

Q   After that class, do you remember the actual first job assignment you got from Mr. Paulk, where you were assigned to work or what you were required to do?

---

Page 92

A   No.

Q   Did you have to go out and do work on roads with Mr. Paulk?

A   Yes, I did.

Q   Do you remember any of the places that you were required to work?

A   I know I worked Coleman Dairy Road up under Paulk.

Q   Coleman Dairy Road?

A   C-O-L-E-M-A-N.

Q   Dairy?

A   Yes.

Q   On the Coleman Dairy Road project, what were your job duties?

A   That were widening the -- actually, in addition, was the turning lane. And the soil -- well, the topsoil. What else did I do out there?

Q   Let me ask it this way: Did that involve excavation of right-of-way?

A   Yes.

Q   Did you have any duties or responsibilities with respect to the excavation work?

A   I don't think so.

---

LASHUNDRA JACKSON - 3/12/2008

Page 93

1    Q   In other words, did you have to take any
2   measurements or keep any records of the excavation
3   portion of that work?
4    A   No.
5    Q   I mean, your best recollection. If you don't
6   remember, that is fine.
7    A   Okay.
8    Q   You can't remember whether or not you had any
9   duties or responsibilities on excavation of the dirt or
10   the right-of-way?
11    A   No.
12    Q   What about in laying up the actual road there
13   or taking up the existing roadbed and replacing the
14   roadbed? Did you have any responsibility --
15    A   Actually, when I made it there, it wasn't a --
16   I guess they had already done everything they were going
17   to do and the only thing that was there was like the
18   soil. I had to work the nuclear gauge.
19    Q   Soil density?
20    A   Yes.
21    Q   Did you know how to work that device?
22    A   Not at first, I didn't.
23    Q   Was there any other ALDOT employee that was

Page 94

1   working on that particular job with you?
2    A   Yes.
3    Q   Who was that?
4    A   Actually, Ray was out there first.
5    Q   Ray?
6    A   Yes. Ray Ingram. He was out there first, and
7   I was sent there with Ray.
8    Q   Ray, what was his job title?
9    A   He was there before I was. So he was either
10   an EA-1 or 2.
11    Q   And he instructed you or showed you how to use
12   the soil density device?
13    A   Well, actually, Bret had to come out there and
14   show us, because Ray didn't know how to use it either.
15    Q   So both you and Mr. Ingram were instructed on
16   how to use this soil density apparatus?
17    A   Yes.
18    Q   Is Ray white or black?
19    A   He's white.
20    Q   Did you feel that you understood how to use
21   that device and were you able to use that device?
22    A   I was able to use it after I was shown maybe
23   the first or maybe two times or so.

Page 95

1    Q   And were you required to pick up and handle
2   the device?
3    A   Yes.
4    Q   Describe it for me, if you can? Is it a heavy
5   instrument?
6    A   Well, actually, Ray would check it out and I
7   would actually -- It is a big box. It is very heavy.
8   So I had to help Ray put it in the truck. And when we
9   get there, once you open it up, it is pieces. You have
10   like a long little rod, I would call it, and I don't
11   know the specific names of the different items that were
12   actually in there. You would have this -- you have to
13   make sure that the surface is even before you actually
14   sit the device down.
15    Q   It would give you a measurement; correct?
16    A   Would it give me a measurement?
17    Q   I mean, you are checking the density of the
18   soil, as I recall, to make sure it was compacted
19   correctly?
20    A   Yes.
21    Q   And that device would tell you the density, in
22   some numerical format?
23    A   Once you pushed the button, numbers will pop

Page 96

1   up.
2    Q   They come up. And do you have to take those
3   down or is it a print-out?
4    A   You have to write them down. It is a sheet
5   that we would have and you write it on the sheet and you
6   figure it out straight down the road.
7    Q   And you would do that at certain points along
8   the area that you were checking?
9    A   Yes.
10    Q   When you were working on that project, were
11   you ever required to either take the machine -- well,
12   you put it in the back of the truck, don't you?
13    A   Well, we actually put it inside the truck. It
14   had to be safe.
15    Q   I mean, you had to lift it up in the truck and
16   you had to lift it out of the truck in order to use it?
17    A   Yes.
18    Q   Did you ever have to do that by yourself?
19    A   No, huh-uh.
20    Q   As far as you recall, you always had
21   assistance?
22    A   With Ray. I was there to help Ray.
23    Q   So that is the soil density or the nuclear

24 (Pages 93 to 96)

LASHUNDRA JACKSON - 3/12/2008

Page 97

1  density device?
2      A   Yes.
3      Q   Other than that, did you have to do any other
4  tasks or assignments?
5      A   Besides the -- They had like erosion control
6  around the -- I can't remember the terminology.  Well, I
7  would say, hay bales then.  That is what they were.
8      Q   Places where water would rush off, they would
9  be required to put bales of hay or maybe a screen down
10 there to trap it?
11     A   Yes.  Around like the culverts, yes.
12     Q   And you would have to check and make sure that
13 was done?
14     A   Exactly.  Make sure what they say is out there
15 is actually out there.
16     Q   And you would put that in a book or on a log,
17 to say, yes, or somehow indicate that they were properly
18 performing the job?
19     A   Yes.
20     Q   Any other functions or tasks that you had to
21 perform?
22     A   Like all of the jobs that I had to actually
23 perform, you actually have to always have the count of

Page 98

1  the men that are actually with the contractors.
2      Q   Make sure you have got a full crew?
3      A   Exactly.  You have to know like who is who,
4  how many hours that they are working.
5      Q   Make sure if they are billing eight hours,
6  they are working eight?
7      A   Right.  If they are only doing two, they get
8  two.
9      Q   So those are things you observe and you
10 annotate on a file or a record book?
11     A   Exactly.
12     Q   And were you able to do that sufficiently?
13     A   Yes.
14     Q   Any other things that jump out at you that you
15 were having to do?
16     A   On that particular job?
17     Q   Let me put it this way:  Were there any jobs
18 that you were required to do that you were incapable of
19 doing?
20     A   Actually, because I have never had any
21 experience, if I could read it and get directions or
22 something like that, then it wouldn't take me long to
23 actually know how to do it.

Page 99

1      Q   You could catch on pretty quick?
2      A   Exactly.
3      Q   You didn't have to be shown fifty times on how
4  to do the nuclear density or what to look for with the
5  hay bales?
6      A   No.  And even if I did forget, I always had
7  what I call a little "cheat sheet."
8      Q   So you had no particular problems on that
9  particular project.  Any other projects that you
10 remember working on while -- and this would carry you, I
11 think, through the end of your employment.  Paulk was
12 your supervisor from September of '06 until you were
13 dismissed from service?
14     A   No.
15     Q   Was he not?
16     A   No, he wasn't.  I was actually moved to Tony
17 Cooper.
18     Q   Well, let's get to that later then.
19     While Paulk is your supervisor, any other projects
20 you remember?
21     A   Not right off.
22     Q   I am sure there were some?
23     A   I am pretty sure.

Page 100

1      Q   Does any particular difficulty you had with
2  any of those projects come to mind?
3      A   No.
4      Q   As we sit here today, can I assume then that
5  you were able to perform the functions of those jobs
6  sufficiently?
7      A   Yes.  I was also sent to the relocation 98,
8  and that was pile-driving.
9      Q   Where is that particular project going on?
10     A   Around in there by Jones Road.  That is still
11 Wilmer, but you get to it in different ways.
12     Q   That was, I am assuming, in anticipation of
13 building a bridge or an overpass?
14     A   Yes.
15     Q   And that was done by a contractor, I am
16 assuming?
17     A   Of course, except for like pile-driving and
18 shooting elevations on the different parts.  But with
19 the pile-driving, you have to -- I call it a hole.  You
20 actually have to climb down into it and hold a little
21 rod while another person shoots the elevation.
22     Q   You have to make sure the distance is correct?
23     A   Yes.

LASHUNDRA JACKSON - 3/12/2008

Page 101

1  Q  The depth is correct?
2  A  Yes.
3  Q  And width of the hole you are digging is
4  proper, or the diameter?
5  A  Right.
6  Q  And that is something that you would do, climb
7  down on a ladder?
8  A  Well, actually, that particular time, I had
9  refused to climb down in there because I was pregnant.
10  Q  And did someone else do the job?
11  A  I asked the contractor. I asked one of his
12  workers if he could just climb down in there and hold it
13  for me.
14  Q  While you were working on this 98 relocation
15  pile-driving work, was any other ALDOT employee working
16  with you?
17  A  Yes.
18  Q  Who?
19  A  What is that guy's name? His last name -- I
20  think his last name is Fresolone, too.
21  Q  Fresolone?
22  A  Yes. Joe.
23  Q  Related to the other Fresolone, I would

Page 102

1  assume?
2  A  I assume so.
3  Q  With a name like Fresolone?
4  A  Yes.
5  Q  What was his function? Was he an EA? Or an
6  EA-2? Do you know?
7  A  I don't know. He had come from somewhere
8  else. He wasn't even there when I first started.
9  Q  Just for the record, this Fresolone is white?
10  A  Yes, uh-huh.
11  Q  So he is working along with you?
12  A  Well, actually, I was sent out there with him
13  and another guy named Andy. They were already there
14  when I was sent there.
15  Q  Andy. Any last name come to mind?
16  A  Hopper, I think.
17  Q  Hopper?
18  A  Yes.
19  Q  White or black?
20  A  He is white.
21  Q  Do you know what his job was? Was he an EA or
22  do you know?
23  A  No. He was a GE.

Page 103

1  Q  Graduate Engineer?
2  A  Uh-huh. Now, I do know he was in school.
3  Q  In the work study program with the department,
4  if you know?
5  A  I don't know.
6  Q  Do you know anything about the GE program?
7  A  All I know is he was in school. That is all I
8  know.
9  Q  But he is out there and Fresolone is out
10  there, and are they doing similar jobs to what you are
11  doing?
12  A  Yes, because that is what they were doing
13  anyway when I came there. I had to kind of like find
14  them.
15  Q  And were you ever made to climb down into the
16  -- I think it is a caisson, but I am not sure?
17  A  I wasn't actually made, because like I said, I
18  asked the contractor, one of his workers to do it for
19  me. What I did was, I walked up to him, I said, Hey, if
20  you will excuse me, could you do me a favor? He was
21  like, What is it? I was like, I am pregnant. Could you
22  just climb down there for me and hold the rod? He was
23  like, Sure. No problem.

Page 104

1  Q  So you didn't have any particular difficulty
2  in getting that accomplished?
3  A  No, because I didn't climb down there.
4  Q  Were there any other tasks on that particular
5  project that you could not perform due to pregnancy?
6  A  No. I mean, standing there looking, that --
7  Q  I mean, you are not having to lift heavy
8  machinery or heavy devices or things of that nature, are
9  you?
10  A  No. I didn't have to lift anything heavy, not
11  on that project, no.
12  Q  Let's finish with that one and then we will go
13  on to the next one.
14  So on that project, you were able to do what you
15  needed to do with assistance, on account of pregnancy,
16  and complete what tasks you were assigned?
17  A  Yes.
18  Q  And you made reference to another project.
19  Could you tell me what that project was?
20  A  That project was -- it was like the other side
21  of it.
22  Q  The other side of the 98?
23  A  Yes. And on that side, they were like doing

26 (Pages 101 to 104)

LASHUNDRA JACKSON - 3/12/2008

Page 105

1  the concrete.  I had to perform the sample on the
2  concrete.  So what I had to do was catch some concrete
3  in a wheelbarrow and wheel it over and perform the test.
4      Q    So you have to do an analysis of the concrete
5  to make sure it is properly consistent and meets certain
6  specifications?
7      A    Yes.
8      Q    Is there a device that you use to do that?
9      A    Yes.  I don't know the name of the device.
10      Q    But it is some kind of machinery or electrical
11  thing that takes a sample?
12      A    Well, you scoop it up and you put it in there
13  and you twist the top back on and you hit it, you know.
14      Q    You knew how to do that function?
15      A    Yes.
16      Q    How much of a sample did you have to take in
17  order to complete that job?  You said you had to put
18  concrete in a wheelbarrow?
19      A    Yes.
20      Q    How much did you actually have to use?
21      A    It wasn't all the way full, but it was, I
22  guess, like half of it, I would say, I guess.
23      It was heavy enough that -- I had to push it.  It

Page 106

1  was heavy, though.  To me, it was heavy.  To you, it
2  might not be as heavy.
3      Q    On average, how far would you have to move the
4  concrete from where you took the sample to where you
5  tested the sample?
6      A    I had to catch it on the truck.
7      Q    It is coming out of the mixer; right?
8      A    Right.  I had to catch it from there.  Then I
9  had to push it out of the way.  Shoot.
10      Q    More than fifty feet?
11      A    Maybe, maybe not.
12      Q    Twenty-five to fifty feet maybe?
13      A    Maybe.
14      Q    And when you were performing that particular
15  job or when you moved over to that particular project, I
16  should say, were there other ALDOT employees or
17  consultants who were working on that same project?
18      A    There were actually consultants out there.
19      Q    Do you remember any names?
20      A    J.B. and Donald.
21      Q    J.B.?
22      A    Yes.
23      Q    And Donna?

Page 107

1      A    Donald.
2      Q    Any last names?
3      A    I don't know their last names.
4      Q    White or black?
5      A    White and black.
6      Q    Which is which?
7      A    J.B. is white; Donald is black.
8      Q    And they were ALDOT consultants, as far as you
9  know?
10      A    Yes.
11      Q    Were there any other ALDOT employees such as
12  EAs, TTs, or any of those type classifications?
13      A    I think one day Carlon came out there.  He is
14  black.  That is it.
15      Q    That is all you know?
16      A    Yes.
17      Q    Did you make any request for assistance in
18  moving the wheelbarrow with concrete in it to the
19  examination station?
20      A    Well, after I had wheeled it over, I think I
21  told Carlon or -- I told one of them that I wasn't going
22  to be able to move it again.  It was too heavy.
23      Q    Did they help you, as you remember?

Page 108

1      A    Yes.  I left it there.
2      Q    How many times did you actually have to do
3  that particular task?
4      A    Well, after the first day when I actually
5  pushed it and I discovered it was too heavy, I didn't
6  push it again, but I would participate by just scooping
7  it.  I just didn't lift it anymore.
8      Q    So you didn't actually push the wheelbarrow,
9  but you could take the samples out of it and do the
10  test?
11      A    After the first time, I didn't push it
12  anymore.
13      Q    Were there other tasks that you had to do on
14  that particular project that required any lifting?
15      A    No, not that I can think of, no.
16      Q    Any strenuous activity?
17      A    No.
18      Q    Were your other basic tasks doing inspections,
19  tickets, things of that nature?
20      A    Yes, but that wasn't strenuous.
21      Q    That is checking a load and making sure it
22  was --
23      A    Or just walking here or walking there.

27  (Pages 105 to 108)

LASHUNDRA JACKSON - 3/12/2008

Page 109

1    Q    And you didn't have any particular difficulty
2  with walking or standing on your feet?
3    A    No, not at all.
4    Q    Do you know when you were on that project
5  whether or not there would be an ALDOT truck on that
6  project?
7    A    Well, actually, I had driven one there.
8    Q    And that is the way you got out there to the
9  job site?
10   A    Right.
11   Q    That was your vehicle to use to get back to
12 work or back to your --
13   A    To and from the project.
14   Q    Would you come into the district or division
15 in the morning and pick up the truck to drive to the
16 project and then come back and park it?
17   A    Yes.  Later during my employment, I was
18 actually assigned a truck.
19   Q    So that would be available to you?
20   A    Yes.
21   Q    Do you know when you were working on either of
22 these two projects, the pile-driving project or the
23 concrete?

Page 110

1    A    I don't know the specific dates.  I have it
2  all written down.
3    Q    That is two projects that you were working on
4  while you were working for Paulk?
5    A    Yes.
6    Q    Are there any others?
7    A    Not that I can think of.  I am more than
8  certain I was doing something, but I just can't think of
9  it right now.
10   Q    As we sit here today, covering the time period
11 where you worked under Bret Paulk as your supervisor,
12 can you recall making any complaints to either he, Mr.
13 Paulk that is, or other persons about not being able to
14 perform the functions and tasks of your job because of
15 your pregnancy?
16   A    I had actually gone and -- wait a minute.  Let
17 me take you back, because it is kind of like some stuff
18 that is missing.  My complaint when I was here, like I said, in
19 racism., Simply because I was here, like I said, in
20 October in class, and Bret Paulk actually thought that I
21 was late and he called my cell phone.  He was like --
22   Q    And I am going to get to that.  I am just
23 asking you now about whether or not you made any

Page 111

1  complaints to Paulk or anyone else in the supervisory
2  chain, making complaints that you could not perform your
3  job because of your pregnancy?
4    A    It wasn't so much as I couldn't perform my
5  job.  It was just that -- In fact, I didn't make a
6  complaint about performing my job.  I actually brought a
7  doctor's excuse.  My first excuse I gave to them in
8  January.  I gave it to Bret.
9    Q    If you bear with me for one minute.  And I
10 apologize for the copy, but that is all I have.
11   A    That's okay.  I know what they are.
12      MR. REDD:  If you will put Exhibit 1 on that
13      one, please, ma'am.
14      (Thereupon, Defendant's Exhibit No. 1
15      was marked for identification.)
16   Q    Let me let you take a look at it.  This looks
17 to be --
18   A    1/3.
19   Q    -- January 3rd of '07.  It says, No heavy
20 lifting during pregnancy?
21   A    During pregnancy, right.
22   Q    So that --
23   A    That looks like it is self-explanatory.  So I

Page 112

1  didn't have to actually say it.
2    Q    And based upon what I understand, on the 98
3  relocation job, you didn't have any heavy lifting and
4  you were able to receive assistance to do a measurement
5  you had which would require climbing down into an
6  expression hole?
7    A    Yes.  That I got from the contractor.
8    Q    And then the other '98 project where they were
9  laying concrete, one time you carried a load of concrete
10 to the test instrument, but after that, you were not
11 able or you didn't have to do that or you didn't do
12 that?
13   A    I didn't do it.
14   Q    And there were no other jobs either in the
15 relocation job or the concrete job that required heavy
16 lifting?
17   A    No, not that I know of.
18   Q    So that is the first note that Mr. Paulk has
19 that they should have some concerns with your pregnancy
20 with respect to your job?
21   A    Yes, no heavy lifting.
22   Q    Before that, January 3rd, had you come to Mr.
23 Paulk and told him you were having any problems with

28 (Pages 109 to 112)

LASHUNDRA JACKSON - 3/12/2008

Page 113

1  your pregnancy?
2    A  No.
3    Q  Or asked for any kind of a --
4    A  Actually, he never knew I was pregnant until I
5  gave him this note.
6    Q  And, then, January 3rd, you were instructed
7  not to do any heavy lifting?
8    A  Right.
9    Q  And then after that -- Well, let me ask it
10  this way: Can you tell me which -- Were either of these
11  projects underway when that note came in?
12    A  I'm not for sure. I don't want to say it was;
13  I don't want to say it wasn't. I would actually have to
14  look.
15    Q  Let me put it this way: After you presented
16  that note to Mr. Paulk, can you remember any assignments
17  that you were given by Mr. Paulk to any other projects
18  or this project?
19    A  No. But after I gave him the note, he was
20  like, Could you tell me what this says? I was like, No
21  heavy lifting during pregnancy. And, actually, the
22  excuse that he had was the original form. So to me, it
23  is legible, but maybe not to him. And I told him what

Page 114

1  it said. I had also given Calametti a copy. I had
2  given -- I don't know if I gave Fresolone a copy or not.
3    I also mailed some copies to Montgomery. And I had
4  to go up and speak with Vince. Vince asked me to get
5  another excuse specifying what I could and couldn't
6  lift.
7    Q  Did you do that?
8    A  Well, I had to go back to the doctor, and I
9  told her what he said. So she was like, Well, you know,
10  you can't lift anything heavy. Like a folder, that is
11  not heavy. A book, that is not heavy. So what she did
12  was she just restricted me to office duties until
13  delivery.
14        MR. REDD: And I want to mark this as
15        Defendant's Exhibit 2.
16        (Thereupon, Defendant's Exhibit No. 2
17        was marked for identification.)
18    Q  Defendant's Exhibit 2, is that what your
19  doctor sent on February -- it looks like 1st. Does that
20  sound about right?
21    A  That is February 1st, yes.
22    Q  So this, Allow Ms. Jackson to work in the
23  office until delivery --

Page 115

1    A  Call with questions. Right.
2    Q  So between January 3rd and February 1st, do
3  you remember what kind of projects you were working on?
4    A  I did go back out to the field. I am not for
5  sure of the exact projects, but I have them all down.
6    Q  Did you do any heavy lifting or were you
7  forced or made to do any heavy lifting during that
8  month's interval?
9    A  No. I didn't lift anything heavy.
10    Q  Now, this second doctor's note, the
11  instruction, did you give that to Mr. Paulk?
12    A  Yes. I gave him a copy, and I also had to
13  give Vince a copy because he is the one that initially
14  wanted it.
15    Q  Let me ask you about what your doctor -- Which
16  one of the doctors did you routinely see?
17    A  Jennifer Cunningham.
18    Q  Did Dr. Cunningham give you any instructions
19  on what you could and could not do?
20    A  No.
21    Q  Did you tell her the kind of work that you
22  were involved in every day?
23    A  She asked me where did I work, and I told her

Page 116

1  I worked for the Department of Transportation.
2    Q  Did you tell her the nature of the job you
3  perform?
4    A  She never asked specifics.
5    Q  Do you know why -- Well, she says, restrict to
6  office work. Did you tell her whether or not there was
7  any office work available for somebody who worked in
8  your job?
9    A  She never asked. I mean, I didn't ask her to
10  write it. I went to her. I said, while I am here, I
11  said, the people that I work for, they want you to
12  specify what I can and cannot lift.
13    Q  Would you agree with me that this note from
14  the doctor does not specify what you can and cannot do?
15    A  No, it doesn't. I mean, but the first note
16  says no heavy lifting. I mean, that is like
17  self-explanatory.
18    Q  True. And as we have established, except for
19  the one time when you were required to move a
20  wheelbarrow with concrete, you were not required to do
21  any heavy lifting?
22    A  Exactly. That is the main reason why, to me,
23  it didn't make any sense to actually ask what I could

29 (Pages 113 to 116)

Page 117

1    and couldn't lift.
2        Q    Let me ask you this: Did you believe that
3    your pregnancy was going to prevent you from doing most
4    of the tasks that you had performed out in the field?
5        A    No.
6        Q    You could do most of those, even being
7    pregnant?
8        A    I mean, bending and --
9        Q    Walking?
10       A    They encourage walking.
11       Q    Yeah, I know.  Exercise during pregnancy?
12       A    Yes.
13       Q    Taking notes, making measurements, your
14   pregnancy would not have had any marked effect on those?
15       A    No.
16       Q    And it did not, did it, the work itself?
17       A    No.  I was able to perform my job.
18       Q    But Mr. Paulk gets this, and I think one of
19   the things you allege in your complaint, even after
20   receiving this, you continued to be assigned to jobs on
21   the highway?
22       A    To outside the office, that's right.
23       Q    None of those outside assignments were beyond

Page 118

1    your physical capabilities, even considering the
2    pregnancy, were they?
3        A    No.
4        Q    Now, after February 1st, can you recall what
5    assignments you may have had or where?
6        A    Not right off.
7        Q    But would they have been similar to the other
8    projects that you had worked on?
9        A    I guess similar, yes.
10       Q    Replacing roadbed, resurfacing roadbed,
11   construction on roadsides, soil compaction, things of
12   that nature?
13       A    Yes.
14       Q    Nothing extraordinary or nothing that you had
15   not already experienced?
16       A    No.
17       Q    Let's backtrack a little bit.
18       At some point in time, you had a problem with your
19   motor vehicle; is that right?
20       A    Yes.
21       Q    And as I understand, correct me if I am wrong,
22   but at some point in time, you noticed that there were
23   scratches on the vehicle that you drove to work?

Page 119

1        A    Yes.
2        Q    Now, from my understanding, when you first
3    noticed these scratches, where had you been parking your
4    car?
5        A    Where they told me to park, on the premises,
6    behind the iron gate.
7        Q    And this is at the division area?
8        A    Yes.
9        Q    Now, I understand there is parking in the
10   front when you come into that complex?
11       A    But that is not behind the gate.
12       Q    But you would have gone in the gate and
13   behind, where general employee parking is?
14       A    Well, behind the gate is where they park.
15   When you turn in to the gate, to your right, is parking
16   for regular vehicles.  If you drive further back, to the
17   left, is --
18       Q    ALDOT vehicles?
19       A    No. -- parking for your regular vehicles,
20   also.
21       Q    So there are two parking areas?
22       A    It is two.
23       Q    You park in the nearer or the further?

Page 120

1        A    The nearer.
2        Q    Is it paved or graveled?
3        A    I guess gravel.  It is not smooth.
4        Q    Do you understand what I am talking about?
5        A    I know you mean if it is smooth, like this,
6    and if it is gravel, it would be like rocks and all?
7        Q    Yeah.
8        A    It is rocks out there.  I would say gravel.
9        Q    But you had parked there.  How long had you
10   been parking in that particular area when you first
11   noticed that there were scratches on your car?
12       A    When I first started there, I was parking --
13   well, not July the 3rd, but July the 5th, that is where
14   I was parking.
15       Q    And July 5th is when you first started
16   noticing scratches on your car?
17       A    No.  I also have that marked down, also, the
18   different scratches.  I am not for sure exactly what
19   date.
20       Q    Can you give me an estimation of how long you
21   had actually been working for ALDOT when these started
22   showing up on your car?
23       A    I cannot say that, because I would have to

LASHUNDRA JACKSON - 3/12/2008

Page 121

1  have the date in front of me.
2      Q   Because it went for sometime before you made
3  any kind of report to your supervisors, did it not?
4      A   Yes, it had been going on.
5      Q   And during the course of time that this had
6  been going on, as I understand, you would see a scratch
7  on your car and you would check your car frequently,
8  daily, and then you would see another and then perhaps
9  another?
10     A   Exactly.
11     Q   Can you describe the scratches?
12     A   One mark is actually a key mark. Another mark
13  is like someone sat something on my trunk and just drug
14  it off. It is little scratches here and scratches
15  there.
16     Q   How do you know the one scratch is a key mark?
17  Have you ever seen a key mark done before?
18     A   Yes.
19     Q   And as we sit here today, do you have any idea
20  who put scratches on your car?
21     A   I actually don't know who did it. I can't
22  really just say a particular person did it, because I
23  didn't even know them.

Page 122

1      Q   Where do you park your car at home?
2      A   At home, behind the gate. Well, actually, it
3  isn't a gate. It is a privacy fence, actually.
4      Q   So it is not on the street, it is not an open
5  carport, it is not in a driveway?
6      A   It is in my driveway, and the privacy fence
7  goes all the way around. And if you close my privacy
8  fence, you can actually park a car or two there. And
9  once you pull it all the way back, you can park cars
10  there.
11     Q   Do you close the gate behind you?
12     A   Yes.
13     Q   Would you check your car in the morning before
14  you went to work for scratches or any kind of problems?
15     A   No. Actually, when I checked my car, it would
16  be after I clocked out at the job site. After I clock
17  out.
18     Q   When did you first make this problem known to
19  any of your supervisors?
20     A   I can't recall the date.
21     Q   Do you remember who you first made a report
22  to?
23     A   To Austin.

Page 123

1      Q   And how did you present this to Mr. Harville?
2      A   That someone is scratching my car.
3      Q   How did you tell him that? Did you say,
4  Mr. Harville, I think somebody is messing with my car?
5  Or I noticed some scratches that weren't there this
6  morning?
7      A   No.
8      Q   How did you tell him?
9      A   More like, Austin, whenever I get off, it is
10  like a scratch on my car. He asks like the same
11  question you asked. Like, is it like when I make it
12  home or when I clock out, and it is like when I clock
13  out.
14     Q   So he may made an inquiry as to when?
15     A   Exactly.
16     Q   And what else did Mr. Harville do to respond
17  to your complaint?
18     A   I guess there wasn't much to say, I guess.
19     Q   What did you expect him to do?
20     A   Actually, I expected for him to probably like
21  make a suggestion that no one should scratch anybody's
22  car, not just mine, but anybody's.
23     Q   I mean, you know, it would strike me as common

Page 124

1  sense that people know they shouldn't key somebody's
2  car?
3      A   Actually, that is common sense, but some
4  people act like they don't have any.
5      Q   Or to scratch it in any other way?
6      A   Exactly. Especially like sitting something on
7  someone's trunk. I don't even set things on my own car.
8      Q   But you anticipated or expected that
9  Mr. Harville would go and make some public announcement
10  or --
11     A   Not some public announcement.
12     Q   But to whom? I mean, you have no idea who is
13  doing this to your car. Who should he direct any
14  comments to?
15     A   Well, the reason why I said it to Austin is
16  because I noticed that the cars that I was actually
17  parking by are the majority of the people that are
18  actually in the same trailer that I was in.
19     Q   Okay. How many people are we talking about?
20     A   I am going to guess about maybe six or seven,
21  I guess.
22     Q   And how many are black? How many are white?
23  How many men? How many women?

31 (Pages 121 to 124)

LASHUNDRA JACKSON - 3/12/2008

Page 125

1    A   Well, all of them were white and about two
2  females and four males.
3    Q   And of any of the people in the trailer, do
4  you have any reason to believe that any of them had any
5  personal animosity towards you?
6    A   They shouldn't, but honestly, I can't actually
7  tell you what they were feeling. But they shouldn't.
8    Q   Had there been any overt gestures?
9    A   No kind of disagreements; no nothing.
10    Q   And you don't know, as we sit here today,
11  whether it was them or somebody else or who might have
12  been involved in messing with your car?
13    A   Well, actually someone at that job, because
14  like I say, whenever I would clock out and I looked my
15  car over, that is when I would discover a scratch.
16    Q   But as we sit here today, can you think of any
17  other persons who would have any personal animosity
18  towards you to do that?
19    A   Even if someone did have personal animosity
20  towards me, my car at home is parked behind my fence.
21    Q   I am talking about at work.
22    A   I can't say.
23    Q   So you have spoken of this with Mr. Harville

Page 126

1  and you have described what he did or didn't do.
2    Did you speak with anyone else about this matter?
3    A   No one else up until the scratches continued,
4  and then I said something to Josh.
5    Q   And that is McElhenney?
6    A   Yes.
7    Q   And at that time, was Josh in your supervisory
8  chain?
9    A   No. Bret actually was. He had just come
10  there, I guess.
11    Q   So why did you tell Josh anything about your
12  car?
13    A   Because Josh had been there longer than Bret,
14  and he was more familiar with the people that were
15  actually in that particular trailer.
16    Q   And how did you describe this or what did you
17  say to Josh McElhenney about the car?
18    A   Well, I told him that I was tired of someone
19  scratching on my car and I would come back to the office
20  and try to see if I could catch the person scratching on
21  my car and it really didn't make any sense.
22    Q   What did McElhenney say or do in response to
23  your complaint?

Page 127

1    A   Well, he was like, Well, I didn't scratch your
2  car. It wasn't me. And I said, Well, right. I said,
3  Josh, I am not even upset with you, and I said, I do
4  apologize for screaming at you. I said, But someone
5  keeps scratching my car and I don't think it is right
6  and it is unfair.
7    Q   So you had raised your voice to him?
8    A   Yes, I did.
9    Q   You were mad; right?
10    A   I was angry.
11    Q   Nobody was doing anything about taking care of
12  protecting your car and you were mad, so you screamed at
13  Josh; is that about right?
14    A   Yes. I was loud, yes.
15    Q   Anybody else present when this happened?
16    A   Yes.
17    Q   Who?
18    A   Bret, and the people that were in the trailer,
19  they heard me.
20    Q   During this meeting with McElhenney or this
21  conversation with McElhenney, did you make any
22  statements about what you would do to somebody if you
23  caught them messing with your car?

Page 128

1    A   Well, I didn't actually say if I caught
2  someone messing with my car. I actually said, "And I am
3  pretty sure no one wants to get hurt for putting
4  scratches on someone's car."
5    Q   And Mr. Paulk overheard that conversation?
6    A   Yes, he was standing there.
7    Q   And do you understand that Mr. Paulk reported
8  that conversation to someone else?
9    A   Yes. I was told that he told it to Jay.
10    Q   Palmer?
11    A   Yes.
12    Q   And subsequent to the conversation, you had a
13  meeting with Palmer?
14    A   I had a meeting with Palmer and Bret, yes.
15    Q   And your car was discussed and the statements
16  you had made about no one wanting to get hurt over
17  scratching a car was also brought up; correct?
18    A   Yes.
19    Q   Did they explain to you that that was or could
20  be interpreted as a threat?
21    A   Well, he --
22    Q   Yes or no?
23    A   No.

32 (Pages 125 to 128)

LASHUNDRA JACKSON - 3/12/2008

Page 129

1    Q   What did they explain to you?
2    A   He said that it wasn't a direct threat, but he
3    said that violence will not be tolerated and people get
4    terminated for violence.
5    Q   And you understood that, didn't you?
6    A   Yes.
7    Q   I mean, you had read the violence in the
8    workplace policy?
9    A   No, I hadn't read it at that time. What I was
10   told was that a guy came up there and was fighting his
11   girlfriend or something, and they passed the picture
12   around and he had to be escorted off the premises and he
13   was not allowed back there.
14   Q   So before the meeting with Palmer and Paulk
15   about your conversation with McElhenney and the car, you
16   were not aware of the violence in the workplace policy
17   at all?
18   A   Let me just say, I will not say I wasn't aware
19   at all, because, actually, I know that there shouldn't
20   be violence in a workplace, period, whether it is there
21   or anywhere else.
22   Q   Do you understand how what you actually said
23   could have been construed as a threat of violence?

Page 130

1    A   Yes, someone could have taken it personally.
2    Q   Because you were mad when you said it?
3    A   I was upset.
4    Q   You were loud?
5    A   Yes.
6    Q   And that could have readily been construed as
7    a threat to do harm to somebody?
8        MR. SIMON: Objection to form.
9    Q   You can answer.
10   A   Well, what was done, they told me they were
11   going to ask if anyone felt threatened. So I am
12   assuming no one felt threatened, because the only thing
13   I was given was a document of counseling and I was given
14   a phone number of Jeremiah Taylor.
15   Q   He is an EAP coordinator?
16   A   Yes.
17   Q   Employee Assistance Program; is that right?
18   A   I guess so. I just know his name, Jeremiah
19   Taylor.
20   Q   And do you know where Mr. Taylor works?
21   A   Where he was?
22   Q   Where he works?
23   A   He works for the Department of Transportation

Page 131

1    here in Montgomery, because I called and spoke with him.
2    Q   So he doesn't work down in the Mobile area?
3    A   No.
4    Q   Do you know whether or not he works in the
5    central office?
6    A   I actually didn't question him. I just dialed
7    the number.
8    Q   So when you met with Mr. Palmer and Mr. Paulk,
9    you discussed your car?
10   A   Yes.
11   Q   Discussed what they indicated to you was
12   inappropriate remarks?
13   A   Yes.
14   Q   They counseled you that you could voluntarily
15   seek assistance through the EAP program, Mr. Taylor,
16   that is?
17   A   Yes.
18   Q   What else was talked about at that particular
19   meeting?
20   A   He told Jay to also instruct me that I should
21   be at work at seven o'clock.
22   Q   Is that your normal work hours?
23   A   Yes. And I replied, I asked, Well, Bret, have

Page 132

1    I been late? He said, No. I said, I haven't been late?
2    He said, No, you haven't, but just in case it should
3    become a problem in the future.
4    Q   And you were offended by that because you had
5    never been late?
6    A   Not actually offended. I just asked him, I
7    said, Well, are you a psychic?
8    Q   And do you think it was inappropriate for him
9    to have said that?
10   A   Actually, yes.
11   Q   Any why?
12   A   Because I haven't ever been late and there
13   wasn't any indication that it would become a problem in
14   the future.
15   Q   Did you at your meeting with Paulk and Palmer
16   tell them that you wanted McElhenney to tell all of his
17   people not to touch your car or to instruct them that
18   they should leave your car alone?
19   A   No. I didn't say all of McElhenney's people.
20   No, I didn't.
21   Q   Now, you indicated that you called Mr. Taylor?
22   A   Yes.
23   Q   Do you remember when you called him or how

33 (Pages 129 to 132)

LASHUNDRA JACKSON - 3/12/2008

Page 133

1  soon after this meeting you called him?
2  A  If not that day, it was probably the next day.
3  I also had that written down.
4  Q  And do you remember what you told him and what
5  he told you?
6  A  Well, I spoke with him about the counseling
7  paper, and he hadn't received anything at that time. He
8  asked me to explain everything that had happened, and I
9  started to do so. I told him I was instructed to sign
10  the counseling paper or I could lose my job. He was
11  like, that wasn't Jay's job to recommend counseling;
12  that he was supposed to speak with me; that he should
13  have been called or made aware.
14  Q  So it was Jay that recommended --
15  A  That I seek counseling.
16  Q  Did he recommend you seek it or did he tell
17  you that that there was somebody that could help you
18  with problems with anger?
19  A  Well, he said, I recommend you speak with
20  Jeremiah Taylor.
21  Q  That is it; right?
22  A  And I had to sign the counseling paper.
23  Q  Did he explain or say anything else?

Page 134

1  A  He said, This is not a disciplinary action.
2  This is a piece of paper stating that you have been
3  counseled on this matter and you should contact Jeremiah
4  Taylor, here is his telephone number.
5  Q  And that was just a referral, basically?
6  A  I took it as it was someone I should have been
7  seeking counseling from. That is why I called.
8  Q  When you talked to Taylor, tha was sometime in
9  early October? Would that be about right?
10  A  Yes. Because I did go to class in October.
11  MR. REDD: Let's mark this as Defendant's
12  Exhibit 3.
13  (Thereupon, Defendant's Exhibit No. 3
14  was marked for identification.)
15  Q  I am going to just let you look at that. This
16  appears to be an unsigned document created by you to Jay
17  Palmer. Do you recognize that?
18  A  Yes.
19  Q  And it is dated October 5th, 2006, and it
20  references the October 4th, 2006, discussion concerning
21  damages to your car; is that right?
22  A  Give me one minute. Yes.
23  Q  So the discussion you had with Palmer and

Page 135

1  Paulk, basically, was on October 4th --
2  A  Uh-huh.
3  Q  -- according to the document?
4  Down at the bottom of this document, you indicated
5  that you would be forced to ask the department to
6  reimburse you for the cost of restoring your paint job
7  to your car?
8  A  Yes.
9  Q  Why did you think the department owed you any
10  money for repairing that?
11  A  Because it is private property.
12  Q  Now, did you receive any kind of -- Well, you
13  indicated you got a counseling session?
14  A  Yes.
15  MR. REDD: Let me mark that as 4.
16  (Thereupon, Defendant's Exhibit No. 4
17  was marked for identification.)
18  Q  I will show you what is marked as Defendant's
19  4. Do you recognize this document as the counseling
20  session issued to you by Samuel J. Palmer, Junior, on
21  October 6th, 2006?
22  A  Yes.
23  Q  And it describes disruptive behavior in the

Page 136

1  project office, while also advising a supervisor of the
2  possibility of threatening and physical action toward
3  others; is that correct?
4  A  That is what it says.
5  Q  Have you ever been arrested for any activity
6  which could be construed as assault, menacing, or
7  disorderly conduct or any other crimes or misdemeanors?
8  MR. SIMON: Object to form.
9  Q  You can answer.
10  A  Which one?
11  Q  Any of them? Anything involving assault or
12  disorderly conduct?
13  A  For domestic violence.
14  Q  That you have personally been arrested for?
15  A  Yes.
16  Q  Would you please describe for me when that
17  occurred and what the nature of the charge was?
18  A  I don't know the exact date. It was with my
19  husband.
20  Q  Did he swear out a warrant on you?
21  A  Yes. Well, no, he didn't actually go down.
22  The thing is, you know, if the police be called out
23  and it looks as if a struggle or something has happened,

LASHUNDRA JACKSON - 3/12/2008

| Page 137 | Page 139 |
|---|---|

**Page 137**

1 then one person has to go to jail. He didn't go to
2 court. It was actually thrown out, along with some
3 others that was domestic violence.
4 Q   Was there more than one?
5 A   Yes. With him.
6 Q   With you being arrested?
7 A   Yes.
8 Q   And would this have been by the Mobile Police
9 Department?
10 A   Yes, the Mobile Police Department.
11 Q   And is it your testimony that all of these
12 various arrests involving domestic violence have been
13 dismissed against you?
14 A   Yes.
15 Q   Do you understand the difference between
16 dismissal and paying a fine?
17 A   Wait a minute. Dismissed is like thrown out?
18 Q   Thrown out, no charge.
19 A   Right. It was thrown out.
20 Q   Have there been any of those where you
21 actually paid a fine but were not required to serve any
22 jail time or probation?
23 A   Well, I have harassment.

**Page 138**

1 Q   And you were charged and found guilty of that
2 or pled guilty to that?
3 A   Well, it was -- they gave me six months good
4 behavior, and I had to pay a fine.
5 Q   And what was the nature of that harassment
6 charge? Was it involving your husband?
7 A   No. It was involving another woman. It was
8 probably actually more so like harassing communication,
9 I would say, because I never touched her.
10 Q   What were you accused of doing?
11 A   I was accused of telling her that I would beat
12 her up.
13 Q   And what was this other woman's name?
14 A   Charla Williams.
15 Q   Was she a neighbor or an associate?
16 A   No. She is a teacher.
17 Q   Is this the teacher at the school where your
18 son was at?
19 A   She is a teacher at the school where my son
20 was in -- where he was.
21 Q   And was this a teacher who was at the school
22 when you were having problems with that particular
23 school?

**Page 139**

1 A   She was there. Yes, I guess she was there. I
2 really didn't notice her because she had not ever been
3 my son's teacher and, actually, she started saying
4 little things to him. She was like at my car and she
5 yelled at me once.
6 Q   And you threatened to beat her up and were
7 charged with that?
8 A   Yes.
9 Q   Was that the Mobile City Police Department?
10 A   Mobile Police Department, yes.
11 Q   Have there been any other occurrences where
12 you have been charged with attempted assault or
13 harassment or domestic violence?
14 A   I was charged with, I guess it was menacing.
15 I think that is what you call it. That was with my
16 husband.
17 Q   Tell me about that.
18 A   I hit him with some glasses.
19 Q   Were you found guilty or did you plead guilty
20 to that charge of menacing?
21 A   He never showed up. It was dismissed.
22 Q   So there would be no record of any type of
23 conviction or adjudication of that particular menacing

**Page 140**

1 charge?
2 A   It wouldn't be a conviction. It would just be
3 listed on my arrest record.
4 Q   Did you pay any fine?
5 A   No. He didn't come to court.
6 Q   Any others that you might have?
7 A   Traffic tickets?
8 Q   No. I am not worried about traffic tickets.
9 A   Just harassing and menacing and of that
10 nature?
11 Q   Domestic violence?
12 A   Yes, sir.
13 Q   Is that all you can think of?
14 A   Well, domestic violence with my uncle and that
15 was dismissed.
16 Q   Tell me about that.
17 A   We got into a fight. We were fighting.
18 Q   Physically fighting?
19 A   Yes.
20 Q   Striking each other?
21 A   Yes.
22 Q   Any weapons or any kind of objects involved?
23 A   I hit him with a telephone.

35 (Pages 137 to 140)

LASHUNDRA JACKSON - 3/12/2008

Page 141

1    Q   And he filed a complaint against you?
2    A   Yes.
3    Q   And how was that adjudicated?  Dismissed?
4    A   Dismissed, because he didn't come to court.
5    Q   You didn't have to pay a fine or anything?
6    A   No.
7    Q   What is your uncle's name?
8    A   Ira.
9    Q   Ira Yates?
10   A   Yes.
11   Q   Does he live down in Mobile?
12   A   Yes.
13   Q   Any others?
14   A   That would be it.
15   Q   So we are back to the last question I
16   basically asked, about the counseling session that you
17   received.
18       MR. REDD:  We are at noon.  I am at y'all's
19           convenience as to lunch or anything like
20           that but I am going to be a few more
21           hours.
22       THE WITNESS:  I just want to use the
23           restroom.

Page 142

1        MR. REDD:  We probably need to break for
2            lunch.  I have got quite a few more
3            questions that I am going to ask you,
4            which will extend into the afternoon.  If
5            we want to eat lunch, this would be a
6            good time to break for an hour.
7            We are breaking for lunch.  It is
8            approximately 12:05.  We will rejoin this
9            at one o'clock.
10           (Thereupon, a lunch break was taken.)
11       MR. REDD:  We are back on the record with the
12           deposition of LaShundra Jackson.
13   Q   When I last asked you questions, you were
14   giving me information about any criminal charges that
15   you had had.
16       Have you thought of any others that might be out
17   there?
18   A   No.
19   Q   Of any type or any nature?
20   A   Like, what do you mean?  Like outside of
21   domestic violence?
22   Q   Outside of violence and assaults or anything
23   of that nature?

Page 143

1    A   Like traffic tickets?  You said you didn't
2    want traffic tickets.
3    Q   I don't want traffic tickets.  But anything
4    else?
5    A   That I have been convicted of?
6    Q   Right.
7    A   No, huh-uh.
8    Q   We had been talking about the conference that
9    you had had with Mr. Palmer and Mr. Paulk concerning
10   what they perceived to be a threat and you had a
11   discussion with that.  And I think we introduced a
12   counseling session that you had had that was signed off
13   on by Mr. Palmer concerning that incident.
14       Now, you were scheduled, I think, to take an
15   algebra course in connection with your work in late
16   October or early November of 2006.  Does that sound
17   about right?
18   A   Yes.  I think so.
19   Q   Let me show you what is marked as Defendant's
20   Exhibit 5 and ask you if you can identify that
21   particular document.  And if so, tell me what that is.
22       (Thereupon, Defendant's Exhibit No. 5
23           was marked for identification.)

Page 144

1    A   I will not be able to attend algebra.
2    (Witness perusing document.)
3    Q   Do you recognize that as a document that you
4    signed on October 16th of 2006?
5    A   Yes.
6    Q   And I understand from the document that you
7    were requesting to be excused from attending the October
8    30th, '06, through November 3rd, '06, algebra class
9    because of two doctor's appointments that you had?
10   A   Right.
11   Q   And your initial six-month probationary period
12   would have ended sometime in January of '07?
13   A   Uh-huh, I think so.
14   Q   And you were scheduled for this algebra course
15   during the first six months?
16   A   Right.
17   Q   But because of the doctor's appointments, you
18   asked to have it changed or rescheduled?
19   A   Yes.
20   Q   Did you have any discussions with either
21   Mr. Paulk or Mr. Palmer or any other supervisor
22   concerning the fact that, if you had to reschedule this
23   algebra class, you might be required to have your

36 (Pages 141 to 144)

LASHUNDRA JACKSON – 3/12/2008

Page 145

1 probationary period extended for a time?
2    A   Yes.  Bret said that and I spoke with
3 Mr. Poiroux about that.  Mr. Poiroux told me that he
4 didn't see a reason for me not to make probation whether
5 or not I attended that algebra class.
6    Q   And when did Mr. Poiroux make that statement
7 to you?
8    A   He made that statement to me the day that I
9 had the meeting with him.  I am not for sure of the
10 exact date.  I have that written down also.
11   Q   Mr. Paulk didn't express that same idea about
12 the class, did he?
13   A   No, he didn't.  But since Mr. Poiroux was over
14 that division, I naturally assumed that he had the last
15 word.
16   Q   When you talked to Mr. Paulk, did you go to
17 Mr. Paulk's supervisor first concerning this matter?
18   A   No.
19   Q   The two doctors' appointments, did you make
20 any attempt to have those rescheduled for days that did
21 not conflict with your algebra training class?
22   A   No, I didn't try to get those rescheduled.  It
23 was a hard time getting those as it was.

Page 146

1    Q   So you made no attempt to call your doctor and
2 see if they could put one before, one after, or make
3 some arrangements so that you could go both to your
4 training with ALDOT and keep your appointments?
5    A   No, because one them I actually -- it was
6 imperative that I did attend it, because I had to get
7 medication.
8    Q   Was this in connection with your pregnancy?
9    A   No.  In connection with my diabetes and high
10 blood pressure.
11   Q   Did you use your OB/GYN doctors to --
12   A   No, not for my pressure and my diabetes.
13   Q   So this is a completely different set of
14 doctors?
15   A   Exactly.
16   Q   Who were these two appointments with?  What
17 group or doctor did you use for non-pregnancy related
18 issues?
19   A   What is her name?  I can't think of her name.
20 One that was at the Stand(phonetic) Road Clinic, and
21 another was with Dr. Washington.
22   Q   Would you have any documents that reflect the
23 names of those two medical groups that you saw on either

Page 147

1 October 30th of '06 or November 1st of '06?
2    A   No.  Because anytime I actually had a doctor's
3 appointment, they never asked for any excuses.
4    Q   I guess what I am asking:  Do you have any
5 evidence or identification of the two doctors so that I
6 would know who they were and where I could locate them?
7    A   I don't have their addresses.  I could give
8 them to you later.
9    Q   That is fine, and I will ask you to present
10 those to your attorney at your earliest convenience so
11 that he can forward them to me.
12       It appears you were approved to miss the course?
13   A   Yes.
14   Q   And you did.  And I don't think you ever
15 undertook to take the algebra course, or it may not have
16 been offered during the time span you were employed
17 other than at the time listed; is that correct?
18       MR. SIMON:  Objection to form.
19   Q   I will rephrase it and ask it another way.
20 Did you ever take the algebra course?
21   A   No.
22   Q   Let's see.  At some point in time, you were
23 scheduled to take the basic concrete course?

Page 148

1    A   Yes.
2    Q   Is that a course that is required for your
3 job?
4    A   I guess.  I think so.  It was a lot of
5 different classes that come up that everyone had to
6 take, I guess.
7    Q   I will ask you to look at the document
8 presented to you and just ask you if you recognize the
9 document.
10       (Thereupon, Defendant's Exhibit No. 6
11       was marked for identification.)
12   A   Basic concrete, yes.
13   Q   Basically, this says you have been scheduled
14 for a class on January 5th at eight o'clock scheduled to
15 end on the same day at 4:00 p.m., and it says,
16 Registration begins thirty minutes before the class
17 starts and training will begin promptly at eight.  Do
18 you see that?
19   A   Right.
20   Q   And you received this document?
21   A   Yes.
22   Q   Now, during the course of your job with ALDOT,
23 you were given, while you were on probation, a

37  (Pages 145 to 148)

LASHUNDRA JACKSON - 3/12/2008

Page 149

1  probationary evaluation; is that correct?
2      A   Yes.
3      Q   Let me show you what is marked as 7, I guess.
4  If you will just look at this document and I will just
5  ask you: Does that appear to be an employee performance
6  probationary evaluation that was given to you by rating
7  supervisor, Bret Paulk, and reviewing supervisor, R.F.
8  Poiroux?
9          (Thereupon, Defendant's Exhibit No. 7
10         was marked for identification.)
11     A   I am assuming that is his signature.  He don't
12  normally be in there with us.
13     Q   Who, Mr. Poiroux?
14     A   No, he don't be in there.  The only person
15  that is present is --
16     Q   Mr. Paulk?
17     A   Yes, and myself.
18     Q   And it appears that you signed this
19  probationary evaluation on December 20th of '06?
20     A   Yes.
21     Q   During the course of being given this
22  evaluation, did Mr. Paulk go over with you your tasks
23  and assignments?

Page 150

1      A   On this page here?
2      Q   I'm just asking about what you remember about
3  the meeting you had with him.
4      You went over what your duties and responsibilities
5  were?
6      A   Yes.
7      Q   And he went over your scores with you, and it
8  appears that you received a score of 20, which falls
9  within the meets standards range; is that correct?
10     A   Yes.
11     Q   In your pleadings, in documents that you have
12  submitted, you claim that the score was changed from a
13  22 to a 20; is that right?
14     A   Yes.
15     Q   And I do note on one of the responsibility
16  items under Number 2, there is the initials "B.P." and
17  it is marked as a 2, but I have no idea what it was
18  marked to begin with.  Is that the change that you are
19  talking about is?
20     A   That is one of the changes.  There are also
21  changes on the first page, and the ones below that reads
22  "responsibility score."
23     Q   The 20 was a 22, and the appraisal score final

Page 151

1  is a 20 and appears to have been a 22, and even on the
2  back page, it looks like there is a couple of entries
3  that are initialed by Mr. Paulk.  Is that what you are
4  talking about by having your score changed?
5      A   Yes.
6      Q   Now, Mr. Paulk was your rating supervisor,
7  correct?
8      A   Yes.
9      Q   And are you indicating that he did not have
10  authority to change the scores on your evaluation?
11         MR. SIMON:  Objection to form.
12     Q   Did you understand my question?
13     Do you contend that he did not have the authority
14  or amend or change the score?
15     A   That is not what I meant by that, no.
16     Q   What did you mean by "he changed your scores"?
17     A   The first paper that I actually have, it
18  wasn't like this.  Actually, a copy of this was given to
19  me after I made the complaint.  And my complaint was,
20  also, he gave me a 1 for performs, and I asked him how
21  could I get a 1 for performs if he hasn't really been
22  there to really know how I perform.
23     Q   Let me see if I understand this correctly.

Page 152

1  Mr. Paulk became your supervisor midway through your
2  probationary period or thereabouts.  Is it your
3  contention that he did not have enough information about
4  your work and performance to evaluate you?
5      A   Exactly, yes.
6      Q   Do you know whether or not Mr. Paulk conferred
7  with any other employees, supervisors, in order to
8  formulate his opinion as to what your performance was?
9      A   Not for a fact, but I was told so.  And I had
10  also worked for Skip Vines.
11     Q   Told that he had conferred or told that he had
12  not conferred?
13     A   Told that he had conferred.
14     Q   With others?
15     A   With others.  But when I spoke with one of
16  them, he told me that he had not asked them anything.
17     Q   Who was that?
18     A   Skip Vines.
19     Q   And do you know whether or not Mr. Paulk
20  conferred with Mr. Harville in considering your
21  evaluation?
22     A   I was told that he did, but seeming that
23  Mr. Harville was gone at the time, I couldn't ask him.

LASHUNDRA JACKSON - 3/12/2008

Page 153

1    Q    Gone, meaning gone from work? No longer
2    employed?
3    A    Well, he was no longer employed with ALDOT.
4    Q    Do you know when his tenure with ALDOT was
5    over?
6    A    No. I don't know his exact date, because I
7    think they were saying he was trying to use up his
8    leave.
9    Q    You were not satisfied with your score, I
10   understand?
11   A    Scores.
12   Q    Your final score?
13   A    Yes.
14   Q    Calculated by adding and computing
15   responsibility scores; correct?
16   A    Right.
17   Q    In other words, your total of 20 is by being
18   rated in various aspects of your job responsibilities
19   and then a calculation was done in order to get an
20   average?
21       Let me ask you this: Which of the responsibilities
22   that are listed on page 2 of your evaluation before you
23   do you disagree with?

Page 154

1    A    I disagree with the "communicates."
2    Q    That is Number 1?
3    A    Yes.
4    Q    You got a 3?
5    A    Uh-huh.
6    Q    And you feel you should have gotten a 4?
7    A    Yes, because I made sure I asked questions if
8    I didn't know, if I wasn't for sure. That was the only
9    way to find out.
10   Q    What about "draws and plots"? Do you think
11   you deserved or earned more than a 2?
12   A    Actually, that should have been zero, because
13   that was one of the things that was not being taught to
14   me.
15   Q    Was it an item, though, that was part of the
16   EA's position?
17   A    Yes, it is.
18   Q    What about "operates"?
19   A    It should have been higher.
20   Q    How high? You got a 2. What do you think you
21   should have gotten?
22   A    It should have been 3.
23   Q    "Inspects"?

Page 155

1    A    It should have been 3.
2    Q    "Completes reports"?
3    A    That should have been 3, but seeming that my
4    name was never on the reports, seemingly that is how I
5    figured I got a 2.
6    Q    You mentioned "performs" before.
7    A    "Performs" should have been 4.
8    Q    "Calculates"?
9    A    3 would be fine, simply because they would
10   argue the point that I failed my math assessment when I
11   first got there.
12   Q    Did you ever have any problems with
13   calculations or readings that you did out in the field?
14   A    No, because you use a calculator anyway.
15   Q    Well, I mean, I guess I am asking if anyone
16   ever had to send back work to you and say, How about
17   rechecking this, this may be off, or something similar
18   to that?
19   A    No, not that I am aware of.
20   Q    "Reads and interprets," you got a 2. What do
21   you think you should have gotten?
22   A    I should have gotten a 4. I can read and I
23   can interpret.

Page 156

1    Q    "Attends and passes," you got a 1.
2    A    Well, seeming that I had to cancel the algebra
3    class, it should have been met, because I didn't have a
4    chance to take it so that they would know whether or not
5    I passed it.
6    Q    You should have got a 2 rather than a 1?
7    A    Yes.
8    Q    And what do you think your overall evaluation
9    should have been? Do you think it should have been
10   "exceeds standards"?
11   A    Yes.
12   Q    And did you initially refuse to sign this
13   evaluation?
14   A    No, not this one. This is my first one. Not
15   the first one. I didn't initially decline to sign the
16   first one; not the first one.
17   Q    This is the first one where you had any kind
18   of a score on it, wasn't it? I mean, you had a
19   preliminary probationary evaluation which had no score.
20   This is the first one I saw in your files.
21       What did you get on your first evaluation?
22   A    This is the first one. The second -- He gave
23   me another one.

39 (Pages 153 to 156)

LASHUNDRA JACKSON - 3/12/2008

Page 157

1    Q    Later than December 20th?
2    A    I have it written down.
3    Q    Are you talking about one that came just
4 before your dismissal?
5    A    That one that was actually mailed to me, I had
6 never seen that one until I got it in the mail.
7    Q    And we have this one, which you say is the
8 first evaluation you got?
9    A    Uh-huh.
10   Q    And are you indicating you got another
11 evaluation between those two?
12   A    I thought -- maybe I didn't.
13   Q    I don't find one, is the reason I asked.  This
14 is the only one I was able to locate other than the
15 final one, which was mailed to you.
16   A    If it was this one and I did decline to sign
17 it at first, it would probably be simply because of the
18 scores, because I felt like he wasn't knowledgeable of
19 my work.
20   Q    And you did understand that your signing of
21 this did not denote that you agreed with it, just merely
22 that you had had this discussed with you and you
23 acknowledge that you were given this evaluation?

Page 158

1    A    Well, actually, that was explained to me when
2 we went to Palmer's office.
3    Q    Of course, right under the heading of this, it
4 says, "Appraisal signatures, signatures denote
5 supervisor and employee discussion and receipt of form,
6 not agreement.  All signatures are mandatory."
7        Did you know that or did you understand that when
8 you initially refused to sign the evaluation?
9        MR. SIMON:  Object to the form.
10   Q    It is on the form.  I am just asking you, if
11 you read the form, why didn't you understand the --
12   A    No, I didn't read the form.
13       MR. SIMON:  Wait.  Wait.  I want to object.  I
14           think it mischaracterizes her prior
15           testimony.  You may answer the question.
16   A    I didn't read the form.  When he sat down to
17 go over the form, he strictly stated that this was a
18 performance appraisal and I am going to be going over
19 your performances and that was that.
20   Q    When did you ultimately sign this form?
21   A    If I am not mistaken, it was while we were
22 there speaking with Jay.
23   Q    Palmer?

Page 159

1    A    Uh-huh.
2    Q    Did you have any further discussions with any
3 of your supervisors concerning this evaluation and your
4 disagreement with the score that you received?
5    A    Yes.  I spoke with Poiroux again and I also
6 wrote him a letter.
7    Q    So what was your conversation with
8 Mr. Poiroux?  Basically, what you just told me, that you
9 thought you should have gotten better grades in certain
10 grade areas?
11   A    That, and also about discrimination against
12 race, and about the pay scale, how they were paying.
13   Q    Now, I think we have indicated that January
14 3rd, according to the doctor's note, was the first date
15 that your employer and your supervisor were put on
16 notice of your pregnancy?
17   A    That is the date that I went to the doctor, on
18 January 3rd.  I went there on January 3rd.
19   Q    And when did you submit the note?
20   A    The note was actually given, I want to say, on
21 January 5th, I think.  I am totally not sure.  I have it
22 written down, everything.  I have it all written down.
23   Q    Now, on January 5th, you had a meeting with

Page 160

1 Bret Paulk, didn't you?
2    A    Uh-huh.
3    Q    What was the reason for that particular
4 meeting?
5    A    It was about the -- what is the -- it is a
6 form, a policy.
7    Q    Was it --
8    A    The tape recording policy.
9    Q    Was there any other reason for that meeting,
10 that you know of?
11   A    No.  Because I actually didn't have to meet
12 with him to give him my doctor's note.  I just handed
13 that to him and that be it.
14       MR. REDD:  Let's mark this as 8.
15       (Thereupon, Defendant's Exhibit No. 8
16           was marked for identification.)
17   Q    I ask you to take a look at that document and
18 ask you if you recognize it.
19   A    Yes.
20   Q    And do you recognize this as being the policy
21 that Mr. Paulk presented to you and required you or
22 directed you to sign?
23   A    On recording devices, uh-huh.

Page 161

1    Q    You recognize it?
2    A    Yes.
3    Q    And that is the policy that we are talking
4    about with Mr. Paulk?
5    A    Yes.
6    Q    Were you given time to read the policy?
7    A    Yes, I read over it.
8    Q    And did you tell Mr. Paulk you weren't going
9    to sign that policy?
10   A    I told him that I disagreed with the policy.
11   Q    Did he tell you that signing this expressed
12   neither agreement or disagreement with the policy, but
13   merely acknowledgement that it had been presented to
14   you?
15   A    No. He asked me why not, and I told him that
16   I disagreed with the policy. He stated, What don't you
17   agree with? So I started explaining to him what I
18   didn't agree with.
19   Q    What did you not agree with on the policy?
20   A    The same thing that I don't agree with now. A
21   supervisor may, however, tape record a disciplinary
22   proceeding or meeting without the employee's consent, as
23   long as the employee has knowledge that a tape recording

Page 162

1    is being made of the meeting or proceeding. So I asked
2    him, I said, Can I object to that taping? He was like,
3    No. And I said, Well, then, I am not going to sign the
4    policy because I don't agree with it. So he started
5    yelling that I was going to sign that policy and I was
6    going to sign that policy today.
7    Q    Let me back up and ask you: You understood
8    what the first paragraph meant, did you not? It meant
9    that your supervisor -- I mean, you could not tape
10   anybody else's conversation without their knowledge, but
11   the supervisors could tape a disciplinary proceeding
12   without your permission as long as you knew about it?
13   You understood that? It is fairly simple.
14   A    On the top, "by any means, any other
15   individual without that individual's knowledge and
16   written consent."
17   Q    That means that you couldn't tape somebody
18   without them knowing and without giving your permission?
19   A    A written consent.
20   Q    And they couldn't tape you?
21   A    Exactly.
22   Q    An individual?
23   A    Exactly.

Page 163

1    Q    But then it also gives the supervisors the
2    permission or the authority to tape a disciplinary
3    proceeding or a meeting without the employee's consent
4    as long as the employee knows about it. You understood
5    that, too?
6    A    I understand that, and I still disagree with
7    that, because then it becomes a problem with if they are
8    asking you some kind of questions along the line that
9    you really don't have to answer. It is all about
10   knowing your rights. A lot of people are not aware of
11   their rights.
12   Q    Do you contend that you had a right to refuse
13   to adhere to this policy?
14   A    Yes.
15   Q    And what right is that?
16   A    That I don't agree with it.
17   Q    Well, not agreeing with something -- you might
18   not agree that smoking marijuana is bad, but there is
19   certainly a law against it. Do you understand that?
20   A    I think it is bad because it has something to
21   do with your brain cells. So, yes, it is bad.
22   Q    You can that a policy of the department has
23   something to do with the operation of the department, do

Page 164

1    you not? There is a lot of policies in the Department
2    of Transportation that you may not agree with. Are you
3    saying that it is your right not to follow them? Do you
4    have a right not to follow those policies?
5         MR. SIMON: Objection. That mischaracterizes
6         her prior testimony.
7    Q    Do you have a right to disregard the policies
8    of the Department of Transportation?
9         MR. SIMON: She hasn't said that she has that
10        right, and she is not trying to assert
11        that. What she is saying is she is
12        objecting; she didn't want to be bound by
13        this policy.
14   Q    I am asking you another question: Do you have
15   a right to fail to follow the Department of
16   Transportation's policies and directives without some
17   punitive action being taken?
18   A    I don't have a right not to follow their
19   policies or procedures, but I feel as if I have a right
20   not to sign a document that I do not believe in that
21   will hold me to this document. By me signing this
22   document and I come into a place with you and you say, I
23   am recording you and you turn on that player, and I say,

41 (Pages 161 to 164)

LASHUNDRA JACKSON - 3/12/2008

Page 165

1  I don't want to be recorded, well, you hold this paper
2  up and you say, well, here you go; you signed this. You
3  have no choice but to go along with this meeting,
4  regardless if I wanted to or not. I have signed this
5  paper so that means that, okay, I will go along with
6  this meeting.
7      Q   That is not what it means, though, is it?
8      A   Yes, it is.
9      Q   That means that you acknowledge that you
10 received this?
11     A   No, sir, it does not.
12     Q   Now, whether you want to disobey it at some
13 later time is your choice at that time?
14         MR. SIMON: Hang on. Hang on. This is --
15     Q   Right?
16         MR. SIMON: Hang on. This is getting into
17            badgering. I don't appreciate you
18            pointing at my client. I am not going to
19            let this go on. I am just telling you.
20         MR. REDD: I just want a straightforward
21            answer on why --
22         MR. SIMON: She has given you a
23            straightforward answer. You may not

Page 166

1            agree with it, but she has given it to
2            you.
3         MR. REDD: That's fine.
4      Q   You say you disagree with the policy, but you
5  have provided no precedent to say that it is illegal?
6      A   I felt as if it was illegal.
7      Q   What you felt is not a basis for not adhering
8  to a policy or not acknowledging that you received a
9  copy of a policy.
10         Didn't you also tell them that you wanted to talk
11 to your lawyer?
12     A   Yes, because I wanted to make sure that it was
13 legal, because I felt as if it was illegal.
14     Q   And didn't you also tell them at some point in
15 time that you weren't going to sign because of how mean
16 Mr. Paulk was to you?
17     A   Exactly. He was yelling at me, also.
18     Q   And what Mr. Paulk -- Well, also, I think you
19 provided the excuse that you weren't going to sign it
20 because the deadline wasn't up either, didn't you?
21     A   Well, he had given me a deadline. He gave me
22 until four o'clock. That was the end of the shift.
23     Q   Initially, though, did you not tell them that

Page 167

1  you weren't going to sign it until the 16th because that
2  is what the memo said about this policy?
3      A   I also told them that.
4      Q   So during the course of this day, you offered
5  how many excuses for not signing it? Five, that I count
6  right now?
7      A   All excuses I think were related to this
8  particular document.
9      Q   Now, after you spoke with Paulk and he
10 initially told you to sign the policy and you didn't
11 sign it when he initially told you, did you tell Mr.
12 Paulk that he could not make you sign that policy?
13     A   No, I didn't.
14     Q   Did you get loud with him?
15     A   No, I didn't.
16     Q   Did you fuss at him in any way or raise your
17 voice in any fashion?
18     A   No, I didn't. And, actually, I left that
19 office crying.
20     Q   And when you left the office, where did you
21 go?
22     A   I went to Fresolone's office.
23     Q   And you were supposed to be at the concrete

Page 168

1  basic training course for registration at 7:30 that
2  morning, because the class started promptly at eight,
3  but instead, you went to Mr. Fresolone's office?
4      A   It says registration begins thirty minutes
5  before the class starts. Now, registration consists of
6  you being there and signing your name on the sheet. You
7  can also walk in there between 7:30 and eight o'clock.
8      Q   Is it your testimony that you arrived at eight
9  o'clock for the class?
10     A   I didn't arrive exactly at eight o'clock. It
11 was like a few minutes before eight o'clock, I think.
12     Q   But instead of going to your assigned
13 responsibility for that day, the class, you went to
14 Fresolone's office?
15     A   I was still there on time. The training class
16 will begin promptly at eight.
17     Q   I understand that. But instead of going there
18 first, to where you were assigned, you went to
19 Fresolone's office?
20     A   Exactly, because I felt as if I was being
21 mistreated.
22     Q   Did Mr. Paulk try to reach you on your cell
23 phone?

42 (Pages 165 to 168)

LASHUNDRA JACKSON - 3/12/2008

Page 169

1    A   Yes, he did try to call my cell phone.
2    Q   And did you return his call or go back to his
3  office?
4    A   No, I did not. I didn't even answer the
5  telephone.
6    Q   Did you know it was him calling you?
7    A   It was on my personal cell phone.
8    Q   So you could tell who was calling you?
9    A   Yes.
10   Q   And you didn't respond to your supervisor's
11 request?
12   A   Actually, I was in someone's office who was
13 like over him. So I was already speaking to
14 Mr. Fresolone. And besides, he had just gotten through
15 yelling at me, so what he could have possibly wanted, I
16 couldn't even imagine.
17   Q   So your answer is, no, I didn't respond to the
18 telephone call --
19   A   I did not answer my personal cell phone, no, I
20 didn't.
21   Q   -- from my supervisor?
22   A   I did not answer my personal cell phone.
23   Q   Now, in connection with this incident, were

Page 170

1  you disciplined?
2    A   I am going to say no. But after like two
3  weeks later, after this incident, I got a -- what is it?
4    Q   Letter of reprimand?
5    A   That's right.
6    Q   Please take a look at the document that is
7  before you. And I will just ask you: Is that the
8  letter of reprimand you received from Bret Paulk?
9        (Thereupon, Defendant's Exhibit No. 9
10       was marked for identification.)
11   A   Yes, it is.
12   Q   And he describes disruptive behavior and
13 insubordination on your part; correct?
14   A   That is what he claimed.
15   Q   And you left your job station without
16 permission during the incident?
17   A   I did not leave without permission, because I
18 was supposed to actually be reporting to that class.
19   Q   Did you have any meetings with any of your
20 supervisory chain of command, aside from Paulk,
21 concerning this policy and your failure to initially
22 sign the policy? You met with Fresolone; right?
23   A   Yes.

Page 171

1    Q   And who else?
2    A   Leon Malone was in there. Charlie Jones was
3  in there. Linda Hunter was in there.
4    Q   Mr. Malone is the EEO officer for that
5  division?
6    A   Yes.
7    Q   What does Ms. Hunter do?
8    A   Materials and tests. I'm not for sure what
9  her title is.
10   Q   What about Charlie Jones?
11   A   He works in the front. I am not for sure what
12 his title is.
13   Q   Did they just happen to be in the office or
14 were they summoned to the office?
15   A   Actually, as I was walking to Fresolone's
16 office, crying, Charlie Jones noticed that I was crying,
17 and he came out and asked me what was wrong. I told him
18 that Bret Paulk had just gotten through yelling at me
19 and being demanding and I was going to speak with
20 Fresolone about him. So he followed me into Fresolone's
21 office.
22   Q   During this particular meeting, did you say to
23 any of these people that Palmer and Poiroux are liars?

Page 172

1    A   Palmer and Poiroux?
2    Q   Yes. Did you ever call them liars to any
3  other Department of Transportation employees?
4    A   I said that Bret was lying.
5    Q   What about Palmer? Did you call him a liar or
6  say he had lied?
7    A   I don't think so, because I never asked him
8  for anything.
9    Q   What about Poiroux? Did you ever call
10 Mr. Poiroux a liar?
11   A   I never asked him for anything.
12   Q   Well, I am asking you if you ever called him a
13 liar, yes or no?
14   A   No.
15       MR. REDD: Let's mark this.
16       (Thereupon, Defendant's Exhibit No. 10
17       was marked for identification.)
18   Q   Take a look at the exhibit placed before you
19 and I ask you to identify that.
20       Is that your rebuttal to Mr. Paulk's written letter
21 of reprimand?
22   A   Yes.
23   Q   And in that rebuttal to the letter of

43  (Pages 169 to 172)

LASHUNDRA JACKSON - 3/12/2008

Page 173

1   reprimand, did you spell out all of the items which you
2   thought were inappropriate in the issuance of that
3   letter of reprimand?
4       A   I pointed out the things that he wrote inside
5   of his letter of reprimand.
6       Q   I guess I am asking you, though, did you point
7   out to Mr. Paulk all of the errors he had made in either
8   a fax or interpretation with respect to his reprimand of
9   you?
10      A   You mean, this reprimand that Bret wrote me
11  here?
12      Q   Right.
13      A   I --
14      Q   I mean, you told him all you had concerns
15  with?
16      A   About this particular letter, yes.
17      Q   The reprimand over the policy?
18      A   Yes.  The disruptive behavior, the
19  insubordination, and the leaving a job station without
20  permission, those are the things he pointed out in this
21  letter of reprimand.
22      Q   And are the items contained in your rebuttal
23  to Mr. Paulk the same issues that you expressed to

Page 174

1   Mr. Fresolone when you met with him shortly after the
2   January 5th, '07, meeting with Paulk?
3       A   No.  This, he hadn't written this letter of
4   reprimand before January the 5th.  When I went to
5   Fresolone's office, it was about him yelling at me.
6       Q   Did you have any discussions with Fresolone
7   about your rebuttal letter to Paulk or anything?
8       A   I only -- this right here, I gave all of these
9   people copies of what I was actually giving Bret.  I
10  gave them copies.
11      Q   Aside from the initial meeting with Fresolone
12  and the others that you listed, on January 5th of '07,
13  did you have any other meetings with any other
14  supervisors between the time of January 5th and the date
15  of the reprimand letter, which is January 18th, '07?
16      A   I met with Poiroux between the 5th and before
17  I received this letter of reprimand.
18      Q   And did you tell Mr. Poiroux what you felt was
19  wrong about the issuance of the reprimand?
20      A   Yes, I did.
21      Q   You filed, I think, an internal complaint -- I
22  think they call it a "complaint" as opposed to
23  "grievance" -- within the department at some point in

Page 175

1   time?
2       A   Yes.
3       Q   I ask you to take a look at this.  There are
4   several documents in there.  I ask you to look at those.
5   Do you recognize those documents?
6           (Thereupon, Defendant's Exhibit No. 11
7            was marked for identification.)
8       A   Uh-huh.
9       Q   You, in previous testimony today, stated that
10  at some point in time you had called Mr. Taylor, the EAP
11  coordinator?
12      A   Yes.
13      Q   And you spoke with him on the phone, and I
14  don't think you recalled the exact date of the telephone
15  conversation?
16      A   Right.
17      Q   If you will turn over to the third page from
18  the end of this set of documents, there is a memorandum
19  that appears to be directed to Jeremiah Taylor, dated
20  October 14th, 2006, signed by you?
21      A   Yes.
22      Q   What prompted you to send a complaint or
23  series of allegations to Mr. Taylor?

Page 176

1       A   The scratches to my car.
2       Q   Let me rephrase that.
3           Why did you send this memo to Mr. Taylor instead of
4   utilizing a complaint format through your supervisors or
5   through Ms. Dietz, who ultimately got this document?
6       A   Well, I didn't know anything about her.
7       Q   Did you not know the department had a
8   complaint policy whereby employees could register
9   complaints to a party outside of their immediate
10  supervisory chain?
11      A   No.  And, actually, the form that I was
12  writing on, when I finally spoke with her, she told me
13  that it was the wrong form, and I told her I had gotten
14  it from them.
15      Q   This is dated October 14th, 2006?
16      A   Yes.
17      Q   On the second page, there is an asterisk
18  footnote.  It says, "As per conversation on December
19  27th, 2006, with Sandi Dietz, this is the second copy of
20  my complaint and I am awaiting the copy of the first
21  that was allegedly messed up due to poor fax machines at
22  the Sixth Division."
23      A   Uh-huh.

LASHUNDRA JACKSON - 3/12/2008

Page 177

1    Q   First, were you attempting to fax this memo to
2 Taylor to the Sixth Division?
3    A   I don't know. I have those papers along with
4 a copy of the paper that she mailed me back that was
5 actually messed up. I'm not for sure what the number
6 is, but it is on there?
7    Q   What I am trying to establish is the time
8 frame when your paperwork was received by either
9 Mr. Taylor or Ms. Dietz.
10    The last page of this document, which is dated by
11 you as 10/16/06, bears in the upper right-hand corner a
12 notation received -- R-E-C, apostrophe D, period --
13 1/29/07, SD. Do you see that?
14    A   Yes.
15    Q   Do you know whether or not Ms. Dietz received
16 this form any earlier than January 29th of '07?
17    A   I thought she did. I had mailed it.
18    Q   Do you have any verification or proof that she
19 received it prior to January 29th?
20    A   No, I have no verification that she did.
21    Q   The same question concerning the memorandum to
22 Mr. Taylor. Do you know when Mr. Taylor actually
23 received a copy, either original or fax, of this

Page 178

1 particular document?
2    A   Well, I kind of like have it written down,
3 because, actually, after I mailed this to him, she
4 actually called me over the telephone and asked me to
5 send her a copy.
6    Q   This document?
7    A   Of this that I sent to him.
8    Q   The one that has the asterisk footnote with
9 the date of December 27th?
10    A   Yes.
11    Q   So this document that we are looking at today,
12 this one here could have been received on December 27th
13 or later, but you have no idea if or whether the first
14 copy that you claim to have sent was ever received?
15    MR. SIMON: Objection, calls for speculation.
16    Q   Do you know?
17    MR. SIMON: Object to the form. You can
18        answer.
19    A   There is no way for me to actually know when
20 she received it, but I can just about say I know when he
21 received it, when I look at my book, because she called
22 me back and she wanted her own copy of this. And I am
23 referring to Sandi.

Page 179

1    Q   Would that have been around October of '06 or
2 over into January of '07?
3    A   This would have been more than likely, I am
4 guessing, October. I have it written down. If I had my
5 book with me, I would be able to tell you exactly when
6 she called me.
7    Q   As we sit here today, you don't have any idea
8 when the first copy of your claim went?
9    A   No.
10    Q   And you don't have anything to dispute that
11 Ms. Dietz received this second one, this part of the
12 form and these two pages, any earlier than January 29th,
13 do you?
14    A   I don't know. No. Right now, I don't know
15 when she received them.
16    Q   You don't know when she got them?
17    A   If I look at my book, I can possibly tell you
18 because she called me.
19    Q   As we sit here today, you don't have a clue?
20    A   As of right now.
21    Q   The same answer with respect to Mr. Taylor,
22 you have no clue when he actually got a copy of this?
23    A   No.

Page 180

1    Q   Look to the last page, if you will, the form,
2 the complaint form. You were listing the reasons why
3 you felt you had problems, or whatever your complaints
4 were against the department, and you referenced, as you
5 have in your previous testimony, that everybody thought
6 you were Bertha Alexander's daughter and didn't want to
7 work with you?
8    A   Right.
9    Q   Is there anything you can add to what you have
10 already testified to with respect to problems that you
11 felt were caused by the misperception that you were her
12 daughter?
13    A   That was caused by me being her daughter?
14    Q   Of the misperception by other people that you
15 were her daughter?
16    MR. SIMON: Object to form, vague.
17    Q   Can you think of anything else that you
18 haven't told me already that pertains to problems you
19 were having on account of Ms. Alexander --
20    MR. SIMON: Objection, vague and overbroad.
21    Q   -- and people believing you were her daughter?
22    A   That was directly related to her, no.
23    Q   Well, all I am asking is, you testified that

45 (Pages 177 to 180)

LASHUNDRA JACKSON - 3/12/2008

Page 181

1  you felt like people were not working with you or maybe
2  that you were not being treated fairly because everybody
3  thought you were her daughter. I just want to know if
4  you have told me all you can tell me about that.
5      MR. SIMON: Objection, vague and overbroad.
6      Q  You can answer.
7  Can you think of anything?
8      A  Not about her.
9      Q  Okay. On down in that same paragraph, you
10  make a reference that says, I was also sent on projects
11  with Chris in his vehicle, see attachment. Do you know
12  what attachment we are talking about?
13      A  No. More than likely, it is with my other
14  documents.
15      Q  I didn't find an attachment other than --
16      A  I kind of figured it wouldn't be in there.
17      Q  -- what was the October 14th memo to Taylor.
18  Tell me what was the reason for you indicating that
19  you were sent on projects with Chris in his vehicle?
20  What is the significance of that?
21      A  That is due to the other employees not wanting
22  to work with me.
23      Q  Who is Chris?

Page 182

1      A  Chris is a consultant.
2      Q  Do you remember his last name?
3      A  Burdette.
4      Q  Burdette. You mentioned his name before.
5  And you were sent on projects with him, and are you
6  saying that is because nobody else would work with you?
7      A  Exactly.
8      Q  Was Chris helpful to you in your work?
9      A  Actually, I was observing. When I first rode
10  with him, he went to -- I can't think of the name of
11  that street. We went to a project, and he was making
12  sure that the culverts were right. Someone had
13  complained about someone had backed up and broke one of
14  them. So just basically out looking at the culverts.
15      Q  And you were just following along to observe
16  and find out what he did and what he was supposed to do
17  with that particular type of job?
18      A  Yes.
19      Q  Is he white or black?
20      A  He is white.
21      Q  You didn't have a problem with Chris, did you?
22      A  No. It is just that they told me when I was
23  hired that we shouldn't be in no other vehicle besides a

Page 183

1  State vehicle, which Chris Burdette's vehicle is a
2  consultant vehicle, which is Thompson Engineer.
3      Q  But Chris is a consultant paid for by the
4  Department of Transportation? Do you know that to be
5  true?
6      A  I always say it is like a subcontractor.
7      Q  But he is hired by the Department of
8  Transportation to do work and protect the department's
9  interest; correct?
10      A  I would guess so.
11      Q  I mean, he is inspecting work like you would
12  inspect work?
13      A  Yes.
14      Q  You indicate down further, I feel intimidated
15  and threatened working under Bret Paulk and Joe Palmer.
16  I feel it would be to my advantage to be moved
17  elsewhere.
18  You have described meetings and incidents with both
19  of these gentlemen. Is there anything that you have not
20  told me that you felt was intimidating and threatening
21  by either one of those individuals?
22      A  Them being hostile and being threatened by
23  Jay's position, because I knew he was higher than Bret.

Page 184

1      Q  So you are not talking about with respect to
2  Jay, him yelling at you or being demanding towards you?
3      A  No. He didn't yell at me, Jay didn't.
4      Q  It is just the fact that he was a higher up in
5  the management range that intimidated you?
6      A  Yes. And like I said...
7      Q  Anything else you want to add to Jay?
8      A  Yes. Well, to Bret. You didn't let me tell
9  you about him calling my cell phone. This was during
10  October, also.
11      Q  And that is Bret Paulk?
12      A  Yes.
13      Q  So he called your cell phone?
14      A  Yes.
15      Q  That is on your retaliation claim on this
16  document; right?
17      A  So you are reading it?
18      Q  I am going to get to that. I am just talking
19  about Palmer right now.
20      A  Yes. And Palmer telling me that they would
21  not pay for someone scratching on my car, and he
22  instructed me to park in front, which I actually didn't
23  feel comfortable with my car parked in front, because it

46 (Pages 181 to 184)

LASHUNDRA JACKSON - 3/12/2008

Page 185

1    was not behind the iron gate.
2        Q    Didn't you tell Mr. Palmer that you were
3    satisfied with attempting to resolve the car problem by
4    parking in front?
5        A    No, because I can move my car, but that
6    doesn't stop anyone from going somewhere. Jay, he told
7    me he would be in his office and that he would do his
8    best to look, but he also has a job. So I know he just
9    can't sit there and watch my car.
10       Q    But he couldn't watch your car at all if it
11   was parked in the back; right?
12       A    Right. He could barely watch it there because
13   he has to work also. He just don't sit in the office
14   all day.
15       Q    So you are saying now that you were not
16   satisfied with the suggestion to park your car out front
17   so it could at least be monitored more than it was in
18   the back?
19       A    That is what he said, but like I am saying, I
20   know that he couldn't watch my car like that because he
21   also has a job to do.
22       Q    Let me ask you this: Did you, in fact, park
23   your car in the front for a time?

Page 186

1        A    I parked it in the front for like two or three
2    days.
3        Q    And how many scratches did you get on your car
4    during that two or three days?
5        A    None.
6        Q    How did, other than what you have already
7    described, Mr. Paulk intimidate or threaten you?
8        A    Well, when he called my cell phone, like I was
9    trying to tell you, when I was actually in class.
10       Q    That is in October?
11       A    That is in October. And he called my cell
12   phone to tell me I was late, which it was a white girl
13   that was working there and she would be late, and
14   needless to say, she wouldn't even show up sometimes,
15   without calling them. They never called her. They
16   never wrote her up. They never gave her a disciplinary
17   action, period.
18       Q    What is her name?
19       A    Liz, Elizabeth. I am not for sure what her
20   last name is. I don't even think she is there anymore.
21       Q    Do you know how or why she left the department
22   if she did, in fact, leave the department?
23       A    Well, I heard she had a nervous breakdown

Page 187

1    because they said she was stressed out trying to do the
2    work.
3        Q    What job did she perform?
4        A    She was in school.
5        Q    Was she an EA?
6        A    She was a PCET.
7        Q    You were talking about Paulk. He called you
8    on the cell phone?
9        A    Uh-huh, to tell me that I was late.
10       Q    Were you late?
11       A    I was in class. I was in Montgomery.
12       Q    Was that the gist of the conversation or the
13   complete conversation, calling you and saying, Hey,
14   LaShundra, you are late to work?
15       A    Yeah.
16       Q    Did you tell him, Well, Mr. Paulk, I am in
17   class today in Montgomery?
18       A    No, I didn't, because he gave me the -- let me
19   see. There is a little thing like you gave me that
20   tells you -- here it is, a memorandum, just like this.
21   These always go to him first and he hands them to his
22   EAs, or whoever. So he knows. He has a calendar where
23   it is all marked on there.

Page 188

1        Q    And as we sit here today, there is any number
2    of items that you could not remember concerning your
3    claim. Do you think that could have been a slip of the
4    memory by Mr. Paulk?
5        A    No.
6        Q    Why do you say that?
7        A    Because he had just given me the papers. I
8    had to even ask him for directions.
9        Q    So he told you that you were late, and you
10   didn't tell him where you were?
11       A    No.
12       Q    What did you say to him when he said that?
13   Did you just say, I am not late?
14       A    Actually, he left a message on my phone
15   saying, Hey, Shun, you are late. You need to be giving
16   me a call.
17       Q    So you didn't actually talk to him?
18       A    No.
19       Q    All you got was a message?
20       A    Uh-huh, which he admits to calling my phone.
21       Q    Did you call him back?
22       A    No.
23       Q    Are there any other actions on the part of

47   (Pages 185 to 188)

LASHUNDRA JACKSON - 3/12/2008

Page 189

1   Mr. Paulk that you would contend to be threatening or
2   intimidating?
3       A   Yes. When I finally gave him my second note
4   that restricted me to office duties --
5       Q   The one we talked about at length before?
6       A   Yes. And I was also being moved from up under
7   his supervision, and he asked me if I really wanted to
8   be moved, and I told him, yes. He told me that, Well, I
9   really can't go forward in my condition no way.
10      Q   Do you remember when this was?
11      A   No, but I have it written down.
12      Q   But this was before you were transferred to
13  Cooper's crew?
14      A   Yes.
15      Q   Do you remember when that transfer took place?
16  Was it after the reprimand?
17      A   It was in February. It was in February.
18      Q   And this was -- What is Mr. Cooper's name?
19      A   Tony Cooper.
20      Q   And what is his job title?
21      A   Tony Cooper?
22      Q   Yes.
23      A   I would guess that he is a project engineer.

Page 190

1       Q   Is he white or black?
2       A   He is white.
3       Q   And how long did you work under Mr. Cooper's
4   supervision until the time you were dismissed from
5   service?
6       A   I am not for sure what date in February that I
7   reported to him, but I also have that written down. But
8   after I reported to Tony Cooper, I was only there until
9   March the 9th.
10      Q   So maybe a month, at the most, you worked for
11  Cooper?
12      A   I don't even think it was a month.
13      Q   Three weeks?
14      A   Maybe.
15      Q   Same question regarding supervisory chain.
16  Who was Cooper's immediate supervisor?
17      A   I would guess Jay Palmer.
18      Q   The same as had been with Mr. Paulk?
19      A   Right.
20      Q   Did you have any problems with Mr. Cooper?
21      A   Were there any promises?
22      Q   Problems?
23      A   No problem at all with Mr. Cooper.

Page 191

1       Q   Did Mr. Cooper assign you to jobs out on the
2   highway?
3       A   No, he didn't.
4       Q   Did you work on the highway while you were
5   under his supervision for that short period of time?
6       A   No, not Cooper, no.
7       Q   Where did you work?
8       A   Inside his office.
9       Q   Doing what?
10      A   I was typing up -- it was different things
11  about electrical.
12      Q   So you were doing office work?
13      A   Yes.
14      Q   Let me show you this.
15          MR. REDD: Let's mark this as 12.
16          (Thereupon, Defendant's Exhibit No. 12
17          was marked for identification.)
18      Q   Let me ask you to read over that, and if you
19  can identify that document, let me know.
20          Is that a document that you sent to Mr. Poiroux?
21      A   To Mr. Poiroux, yes.
22      Q   And it is dated January 2nd of '07?
23      A   Yes.

Page 192

1       Q   The first paragraph indicates you want to make
2   a complaint against Mr. Palmer and Mr. Paulk, and you
3   reference your six-month probation was denied. Are you
4   saying that you should have been taken off of probation
5   after the six months?
6       A   Yes.
7       Q   And not had it extended?
8       A   Yes.
9       Q   And then we have already talked about
10  Mr. Paulk or someone reducing the score from 22 to 20?
11      A   Yes.
12      Q   Anything else you want to add to that?
13      A   No.
14      Q   I mean, that we haven't already talked about
15  during the course of the deposition. Is there any other
16  information that I need to know about or that you have
17  about decreasing the score?
18          MR. SIMON: Objection, vague and overbroad.
19      Q   Or does this first paragraph fairly well sum
20  up your position on your evaluation and probation?
21          MR. SIMON: Objection to form.
22      Q   Is that a yes? You can answer.
23      A   Yes. It basically summarized the evaluation

334.262.7556      REAGAN REPORTERS, LLC      334.262.4437
www.reaganreporters.com

LASHUNDRA JACKSON - 3/12/2008

Page 193

1  and of the scores and them not being high enough.
2      Q   The second paragraph, and I think you have
3  testified to this before, that Mr. Paulk had not been
4  your supervisor long enough to know or properly evaluate
5  and give you a score on your performance.
6      Is there anything that you want to add that is not
7  contained in what you have already told me or contained
8  in this letter?
9          MR. SIMON:  Objection, vague and overbroad.
10     Q   You can answer.
11     Anything further --
12         MR. SIMON:  Same objection.
13     Q   -- that you would like to add to that
14  paragraph?
15         MR. SIMON:  Same objection.
16     Q   Do you understand what I am asking you?  Is
17  there anything else that you haven't already told me?
18         MR. SIMON:  Same objection.
19     A   The only thing it is, if I had my documents in
20  front of me, I can tell you like everything that I have
21  written down.  I don't want to say that is it and that
22  is really not it.
23     Q   In the deposition notice that I submitted to

Page 194

1  your lawyer, I requested that you bring all the
2  documents that you relied on to make your claims.  So,
3  apparently, you have not done that.  So I am stuck with
4  your recollection at this point in time.
5          MR. SIMON:  And let me tell you, that document
6          request was untimely as to this
7          deposition.  It was submitted fewer than
8          thirty days before the deposition.  She
9          has not had an opportunity within the
10         time provided by the Federal Rules of
11         Civil Procedure to gather up all of those
12         documents.
13         MR. REDD:  That is fine.  Your objection is
14         noted, but I think we had discussed this
15         deposition a long time before that.
16             Anyway, you don't have the documents
17         and I will reserve the right, when I do
18         receive her notebook, to renotice her
19         deposition and ask her additional
20         question.
21         MR. SIMON:  And we are not agreeing to that.
22         MR. REDD:  We will take it up with the Court,
23         but I am holding that open since I don't

Page 195

1          have any documents that she is relying on
2          today.  All I can ask is her memory,
3          which is not sufficient.
4      Q   In the same second paragraph, you say, I feel
5  as I am being punished due to a complaint that I filed
6  October 16th, 2006.  Are we referring to that complaint
7  document there that was either submitted to Ms. Dietz or
8  Mr. Taylor?
9      A   More than likely, yes.
10     Q   I just want to make sure we are talking about
11  the same document.
12     A   Actually, when I did mail this one, I only
13  addressed it to ALDOT Human Resources Bureau.  So I am
14  not for sure who it actually went to, but I addressed it
15  to that department.
16     Q   What do you understand as to Ms. Dietz's role
17  within ALDOT?
18     A   I don't know.  I didn't send it specifically
19  to her.
20     Q   I am just asking you if you know anything
21  about Sandi Dietz.
22     A   No, I don't know her.
23     Q   That is fine.  The third paragraph, you

Page 196

1  reference, if classes are mandatory, then how can I meet
2  standards with a score of 22 that was changed to a 20
3  without taking the algebra test.  Then you reference,
4  there are employees that didn't even pass the algebra
5  test before they made probation.
6      Can you give me the names of parties that you
7  contend finished their initial probation without having
8  completed the algebra course?
9      A   Well, John, the guy who was hired with me, he
10  just overheard me talking to someone else, and he just
11  voluntarily told me he made his probation without even
12  taking the algebra class.
13     Q   Do you remember John's last name?
14     A   McJersey.
15     Q   Besides John McJersey, do you know of any
16  others?
17     A   Not right off.
18     Q   Further down in the paragraph, you complain or
19  ask, Why was my starting salary lower than a fellow EA-1
20  who had no experience prior to employment but is related
21  to other employees of ALDOT?  Who are we talking about?
22     A   Trenton Lowery.
23     Q   Trenton?

Page 197

1    A    Lowery, L-O-W-E-R-Y.
2    Q    Let me go back to McJersey.  Is he white?
3    A    Yes.
4    Q    What about Lowery?
5    A    He is white.
6    Q    And who is he related to in ALDOT that you
7    know of?
8    A    I don't know his first name.  I just know he
9    was a project engineer, also, the other Lowery.
10   Q    What is his first name?
11   A    I don't know his first name.
12   Q    But the last name is Lowery?
13   A    Yes.
14   Q    What do you know about Trenton Lowery's prior
15   experience and employment?
16   A    Well, he said that he didn't have no
17   experience in being an EA.  He said that himself.
18   Q    Did he discuss with you at all any prior jobs
19   that he had had which might have included tasks and
20   assignments that are similar to an EA?
21   A    Related to that job, no.
22   Q    He didn't talk to you about it or he said he
23   didn't have any?

Page 198

1    A    He just said he never worked on a job like the
2    one he was doing, which he is an EA.  So I am just
3    taking it as he hadn't ever done anything in an EA
4    listing, what it consists of.
5    Q    You, as a requisite for filing your lawsuit,
6    filed a charge with EEOC; is that correct?
7    A    Yes.
8         (Thereupon, Defendant's Exhibit No. 13
9         was marked for identification.)
10   Q    Take a look at the document that has been
11   presented to you that is entitled Equal Opportunity
12   Employment Commission Intake Questionnaire, and if you
13   will look through that, tell me if this is a form that
14   you filled out.
15   A    That is my handwriting.
16   Q    And toward the back, after the fourth page of
17   the actual form, there is a copy of the reprimand from
18   Paulk, the rebuttal from you on the reprimand.  There
19   appears to be one of the doctor's notes, and I can't
20   make it out and this is the best copy I could get from
21   the EEOC, but it looks like the January 3rd note from
22   the doctor.
23   A    I can't see anything on here.

Page 199

1    Q    I can barely see it myself.  And, of course,
2    the last page is an EEOC document.  Is this something
3    you sent along with your questionnaire, these three
4    items that I have spoken about?
5    A    Yes.
6    Q    This form, this questionnaire, bears your
7    signature and a date of January 19th, 2007.  Look on the
8    fourth page.  Does that appear to be correct?
9    A    What page are you on?
10   Q    The fourth page of the questionnaire.
11   A    What are you asking about it?
12   Q    I am asking you if you signed this and dated
13   it January 19th, 2007?
14   A    I am guessing whatever that date right there
15   is.  I am not for sure, because I can barely see it
16   myself.
17   Q    And let me ask you:  When did you actually
18   file a complaint with the EEOC?  This shows, received
19   this questionnaire --
20   A    It says received on the 23rd of January.
21   Q    Does that appear to be the time frame in which
22   you filed it?
23   A    Apparently so.  I see here what appears to be

Page 200

1    a 9.  So my guess is that it says the 19th.
2    Q    Looking on page 2, under Item 6, you were
3    asked:  What happened to you that you believe was
4    discriminatory?  Do you see that?
5    A    Yes.
6    Q    And you list several items.  The first being
7    the 10/6/06 counseling paper from Jay Palmer?
8    A    Yes.
9    Q    And we have already discussed that; correct?
10   A    Yes.
11   Q    And you have told me what your complaint is
12   about that counseling paper?
13   A    Yes.
14   Q    That was an alleged threat, we will call it;
15   am I right?
16   A    Yes.
17   Q    And the next one is 12/20/06, and that is
18   referring to the evaluation, and you disagree with
19   Mr. Paulk about what you should have received on that
20   evaluation; correct?
21   A    Yes.
22   Q    January 5th, 2007, relates to the situation
23   where Mr. Paulk was requiring you to sign the policy

LASHUNDRA JACKSON - 3/12/2008

Page 201

1  statement; correct?
2      A   States when he was yelling at me.
3      Q   But that is when he had brought you to the
4  office to sign that policy statement that you had
5  already taken; correct?
6      A   Yes.
7      Q   That is what we are talking about there, okay.
8  1/18 is when he gave you a written reprimand;
9  correct?
10     A   Yes.
11     Q   7/3/06, that refers back to your date of
12  employment?
13     A   Yes.
14     Q   And another EA was hired on at a pay rate
15  higher than yours?
16     A   I guess.
17     Q   That is Mr. Lowery that you are talking about?
18     A   That would be who I was referring to.
19     Q   Then you also added, No one wanted to work
20  with me. And we have discussed that at length; correct?
21     A   Yes.
22     Q   And that has to do with the idea amongst other
23  employees that Bertha Alexander was your mother? That

Page 202

1  is what you are talking about there; correct?
2      A   Not only just that with her.
3      Q   I think you mentioned that you thought no
4  others wanted to work with you because of your race, as
5  well?
6      A   Yes.
7      Q   And have you described for or given me all of
8  the information that you have concerning that
9  allegation?
10     A   I think I have.
11     Q   We are closing down the final --- just a few
12  minutes and then we can go home.
13  You filed a complaint --
14     MR. REDD: I said I wasn't going to mark this,
15          but I am going to mark this.
16          (Thereupon, Defendant's Exhibit No. 14
17          was marked for identification.)
18     Q   Let me give you that and let you take a look
19  at it. I don't know if you have read it or not. That
20  is the complaint that was filed in federal court which
21  initiated this lawsuit. Have you seen that before?
22     A   Yes.
23     Q   Did you go over it with your counsel?

Page 203

1      A   Yes.
2      Q   Before I get into that, let me ask you one
3  more question.
4  Who is Mr. Boone?
5      A   Mr. Boone is an attorney that I spoke with at
6  first. I was speaking to him about the situation.
7      MR. SIMON: Wait. Let me just tell you this:
8          Since he was your attorney, anything that
9          you talked about with him is subject to
10          the attorney-client privilege, and you
11          shouldn't tell Mr. Redd any conversations
12          that you had with Mr. Boone.
13     Q   I do not want to know the nature of the
14  conversations. I just wondered who he was. You listed
15  him as somebody you consulted.
16     A   Okay, yes.
17     Q   And if he was not an attorney, if he was
18  someone else, I wanted to know that.
19  I don't think the privilege applies. But he is an
20  attorney in the Mobile area?
21     A   Yes.
22     Q   Had he represented you on any other matters?
23  I don't want to know what they are. But has he?

Page 204

1      A   Yes.
2      Q   Complaint, let me go through this fairly
3  quickly because I think we have covered most of the
4  ground.
5  Paragraph 9, we have gone over the fact that you
6  allege that you would be the only one working on a
7  project at times when you were working for the
8  department. I won't go into that again.
9  You also say you received no training from ALDOT
10  during these assignments; is that correct?
11     A   Right.
12     Q   Did you not receive any kind of on-the-job
13  training from co-workers or other workers who would
14  instruct you on how to do a certain task?
15     MR. SIMON: Objection to form.
16     Q   Did you?
17     A   Well, I was given a paper on how to do the
18  rates. And like anything else when I was there,
19  actually, the contractors were telling me how to do the
20  leveling and different little things.
21     Q   Was what they were telling you, did it conform
22  with what you were supposed to be doing according to
23  ALDOT?

51  (Pages 201 to 204)

LASHUNDRA JACKSON - 3/12/2008

Page 205

1    A   Yes.
2    Q   And I think you mentioned at one time, I
3    think, Mr. Paulk came out and showed you how to do use
4    the density machine?
5    A   That was on a different project.
6    Q   And on part of one of the projects, you would
7    have been given a piece of paper telling you what you
8    needed to measure, which was readily understandable?
9    A   Right.
10   Q   What lack of training are you complaining
11   about?
12       MR. SIMON:  Objection to form.
13   A   Well --
14   Q   Did you understand my question?  Do I need to
15   ask it again?
16   A   Yes.
17   Q   When you say you received no training from
18   ALDOT during those assignments, can you tell me what
19   assignments did you not receive training on?
20   A   It was during the Natchez project.
21   Q   While you were under Harville's supervision?
22   A   Yes.
23   Q   And you have indicated that you were able to

Page 206

1    ask contractors what you needed to measure and what you
2    needed to do and that was satisfactory according to your
3    performance of the job?
4    A   Yes.
5    Q   Number 16, you state that similarly situated
6    white and male employees -- I will start with them first
7    -- have engaged in conduct similar to that of which you
8    were accused and have not been terminated.
9        Can you give me the names of any white males who
10   are similarly situated to you?
11   A   Well, I told you --
12       MR. SIMON:  Objection, calls for legal
13       conclusion.
14   A   As I told you, John McJersey.
15   Q   That is Mr. McJersey, who you indicate had not
16   passed algebra but had gotten off probation anyway?
17   A   Right.
18   Q   You mentioned Trent Lowery, who you believe to
19   have had no more experience than you but was brought in
20   at a higher pay rate?
21   A   Right.
22   Q   Any other male whites?
23   A   Not that I know of right now.

Page 207

1    Q   What about white males who have engaged in
2    misconduct similar to yours, alleged misconduct, that
3    were not terminated?
4        MR. SIMON:  I need to object, to the extent
5        that we do not know exactly what the
6        misconduct is that she has been accused
7        of that led to her termination.
8    Q   Insubordination, failure to sign a document as
9    directed by your supervisor, disruptive conduct.  Do you
10   know of other white males who have engaged in that type
11   conduct but, yet, have not been fired?
12   A   I don't know.  I didn't ask them.
13   Q   What about similarly situated employees who
14   were not pregnant?  That would include males?  Or are we
15   referring to other women who were pregnant but who were
16   treated differently than you?
17   A   We are referring to the women that were
18   pregnant but were treated differently.
19   Q   Can you give me the names and circumstances of
20   any female employees of ALDOT?
21   A   She is a former employee.
22   Q   Her name?
23   A   Her name is Mary Weaver.

Page 208

1    Q   And what was her job?
2    A   EA-1.
3    Q   And what do you contend or how do you contend
4    Ms. Weaver was treated differently than you were when it
5    became known that she was pregnant?
6    A   When she told them that she was pregnant, she
7    was brought in out of the field.  Whereas, when I told
8    them that I was pregnant, they were like, oh, this has
9    never happened to me.  Let me send it up the ladder and
10   see what we can do.
11   Q   So in essence, Ms. Weaver got an office job
12   while she was pregnant, whereas you were required to go
13   back and do fieldwork?
14   A   Yes.  And they seemingly couldn't find
15   anything for me to do.
16   Q   Anybody besides Ms. Weaver that you recall?
17   A   No, but there was some employees there that
18   was pregnant during the time that I was pregnant, but I
19   don't think they were working in the field.
20   Q   It might have been administrative staff or
21   clerical workers?
22   A   One of them was also an EA-1.
23   Q   What was her name?

LASHUNDRA JACKSON - 3/12/2008

Page 209

1    A    Shannon Lee.
2    Q    And had she been working in fieldwork before
3    she became pregnant and was brought in off fieldwork?
4    A    I can't say because she was actually there
5    before me. So I am not for sure what all she had
6    worked.
7    Q    So she might have already been inside as part
8    of her job and her pregnancy didn't change that?
9    A    Right.
10   Q    Any others?
11   A    Not that I know that became pregnant while I
12   was there.
13   Q    You mentioned you had your OB/GYN doctor?
14   A    Yes.
15   Q    You had a doctor that --
16   A    That is for my diabetes and high blood
17   pressure.
18   Q    A couple of doctors you referenced that
19   treated you for diabetes and high blood pressure?
20   A    Uh-huh.
21   Q    Any other doctors that you see or have seen?
22   A    Not that I can think of, no.
23   Q    Are you seeing a psychiatrist?

Page 210

1    A    No.
2    Q    Are you seeing a psychologist?
3    A    No.
4    Q    Are you getting any mental health counseling?
5    A    No.
6    Q    Do you take medication for your diabetes?
7    A    Yes.
8    Q    I don't want to be nosy, but what type do you
9    have?
10   A    Type 2.
11   Q    So you don't have to take shots, do you?
12   A    I did, but now I don't.
13   Q    You are controlling it with diet and
14   medication?
15   A    Diet and medication.
16   Q    That's good. What about your blood pressure?
17   Are you taking blood pressure medications?
18   A    Yes.
19   Q    Besides those meds, are you taking any other
20   kinds of medication?
21   A    No, not at this time.
22   Q    Subsequent or during the time that you were
23   with the Department of Transportation and after, up to

Page 211

1    the present day, have you taken any other medications
2    besides diabetic medications and blood pressure
3    medications?
4    A    When I started there, I was on
5    anti-depressants.
6    Q    When you started at ALDOT?
7    A    When I started at ALDOT, I was on
8    anti-depressants.
9    Q    And I think you mentioned the stress from
10   marriage?
11   A    No. Anti-depressants were after my first
12   daughter passed.
13   Q    And which of your doctors prescribed that
14   anti-depressant?
15   A    What is her name? It wasn't my OB/GYN. I can
16   tell you that much.
17   Q    One of your other doctors?
18   A    Yes.
19   Q    Do you remember what anti-depressant you were
20   taking?
21   A    No. I can't think of the name of it.
22   Q    Have you only taken the one type of
23   anti-depressant?

Page 212

1    A    Whatever it was, I got it during that time.
2    Q    Do you know how long you were on that?
3    A    Maybe somewhere around, I think, I want to
4    say, August or September, I guess.
5         MR. REDD:  Give me about five minutes. I
6         think I am done.
7         (Thereupon, a break was taken.)
8    Q    I have just a couple of more questions
9    regarding your diabetic condition. Have you ever been
10   referred to an endocrinologist by your regular treating
11   physician?
12   A    What is that?
13   Q    Well, it is a person who --
14        MR. TRIPPE:  I can explain it.
15        MR. REDD:  You can explain it better.
16        MR. TRIPPE:  An endocrinologist is a gland
17        doctor. They generally treat -- their
18        specialty is diabetes.
19   A    No. The only person I have ever seen was a
20   nutritionist and that is it.
21   Q    Were you ever referred by your regular doctor
22   to an endocrinologist, whether you went to one or not?
23   A    No, never.

53 (Pages 209 to 212)

Page 213

1    MR. REDD: I am done.
2    MR. SIMON: I will reserve my questions for
3        the time of trial, as they say in Texas.
4    MR. REDD: Thank you for your time and for
5        your patience.
6        END OF DEPOSITION
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 214

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA
3    MONTGOMERY COUNTY
4        I, Kimberly B. Faucette, Certified Court
5    Reporter and Notary Public for the State of Alabama at
6    Large, do hereby certify that the foregoing
7    transcript, pages 1 through 213, is a true and correct
8    transcript of the testimony and proceedings taken at
9    said times and place; and that the same was taken down by
10   me in stenograph shorthand, and transcribed by me
11   personally or under my personal supervision.
12       I further certify that I have no interest in
13   this matter, financial or otherwise, or how it may
14   develop or what its outcome may be. I further certify
15   that I am not of counsel or litigants or associated with
16   anyone connected with this cause to my knowledge.
17       Witness my hand this 26th day of March,
18   2008.
19
20
21       _____
         Certified Court Reporter and Notary
22       Public, State at Large
23       ACCR-309

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON,                )
                                  )
        Plaintiff,                )
                                  )
v.                                )
                                  )   CASE NO. 2:07-cv-645-MEF
STATE OF ALABAMA DEPARTMENT OF    )
TRANSPORTATION, JOE MCINNES, etc.,)
                                  )
        Defendant.                )

STATE OF ALABAMA   )
                   )
COUNTY OF MOBILE   )

## AFFIDAVIT

Before me, the undersigned Notary Public, personally appeared **Ronnie Poiroux**, who is known to me, and who being first duly sworn by me, deposes and states as follows:

"My name is Ronnie Poiroux. I am a resident of Mobile County, Alabama, am over the age of 19 years, and am competent to testify as to the matters contained in this affidavit.

"I was employed by the Alabama Department of Transportation's Ninth Division in Mobile, Alabama, as the Division Engineer during Ms. Jackson's employment. Ms. Jackson was an EA I employed by ALDOT's Ninth Division from July 2006 until March 2007. I was in Ms. Jackson's supervisory chain of during her employment.

"I received a memorandum from Ms. Jackson dated January 2, 2007, in which she expressed her desire to file a complaint. Ms. Jackson also notified me that she disagreed with her probationary performance appraisal score and the Department's decision to extend her probation. She also alleged that her previous supervisor was not consulted on her appraisal. Ms. Jackson alleged that she was being punished as a result of a complaint filed on October 16,

2006, and that her starting salary was lower than another employee's. I informed Ms. Jackson of the Department's policy of filing a formal complaint and that neither I nor her supervisors were aware of any formal complaints she had filed. I also informed Ms. Jackson that her probationary performance score included input from all supervisors and that her job performance warranted the score. (See also, letter to LaShundra Jackson from Ronnie Poiroux dated January 22, 2007, attached hereto.)

"I also reminded Ms. Jackson that she had refused to take the required algebra test. Further, I mentioned that she had accepted the salary offered to her and that the salary was in accordance with the Rules of the State Personnel Board. (See also, letter to LaShundra Jackson from Ronnie Poiroux dated January 22, 2007, attached hereto.)

"On February 23, 2007, I requested the termination of Ms. Jackson's employment based on violations of employee work rules, disruptive behavior, threatening language, and insubordinate behavior. (See also, letter to Ron Green from Ronnie Poiroux dated February 23, 2007, attached hereto.) In particular, I recommended the termination of her employment based on incidents on October 4 though 6, 2006, November 2, 2006, and January 5, 2007. Prior to requesting the termination of Ms. Jackson's employment, I reviewed the information provided to me by her supervisors. I also reviewed her personnel file. I was aware of the incidents that led to the termination of Ms. Jackson's employment and used those as a basis for requesting her termination."

_____
Ronnie Poiroux

SWORN TO AND SUBSCRIBED before me on this 27th day of May, 2008.

_____
Notary Public, State at Large
My Commission Expires: 12/7/10

2

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LASHUNDRA JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:07-cv-645-MEF |
| STATE OF ALABAMA DEPARTMENT OF | ) |
| TRANSPORTATION, JOE MCINNES, *etc.*, | ) |
| Defendants. | ) |
| | ) |

STATE OF ALABAMA   )
                                  )
COUNTY OF MOBILE   )

### AFFIDAVIT

Before me, the undersigned Notary Public, personally appeared **Vincent E. Calametti**,
who is known to me and who, being first duly sworn by me, deposes and states as follows:

"My name is Vincent E. Calametti. I am a resident of Mobile County, Alabama, am over
the age of 19 years, and am competent to testify as to the matters contained in this affidavit.

"I am employed by the Alabama Department of Transportation's Ninth Division in
Mobile, Alabama, as the Division Engineer. During Ms. Jackson's employment, I was the
Construction Engineer for the Ninth Division. I held that position for fifteen years. Ms. Jackson
was an EA I employed by ALDOT's Ninth Division from July 2006 until March 2007. I was in
Ms. Jackson's supervisory chain of during her employment. Prior to beginning actual work,
Ms. Jackson was informed that her employment consisted of outside work.

"The first incident with Ms. Jackson was when I received notice that Ms. Jackson was
working on a project by herself. This incident was on August 31, 2006. (See also,
Memorandum to file dated August 31, 2006, attached hereto.) I was made aware by some people

in my office that Ms. Jackson was having some problems at the work site. I contacted Samuel Palmer and Austin Harville about these issues. Mr. Harville informed me that he had directed Floyd Hansworth to assist Ms. Jackson. I then went to the job site, and Ms. Jackson voiced her concerns to me. Ms. Jackson informed me that the felt overwhelmed when she was the only inspector at the spreader. I asked her if she was happy with the changes made with current assignments. Ms. Jackson indicated that she was. (See also, Memorandum to file dated August 31, 2006, attached hereto.) It appeared that her issues had been resolved by the time I got there. At that time, I advised Ms. Jackson of the chain of command for any questions or concerns that she might have.

"I told Ms. Jackson I had been advised she was concerned because she had not been sent to any training classes. I told Ms. Jackson that, during her probation, she needed to concentrate on passing the basic math and algebra classes and on-the-job training. (See also, Memorandum to file dated August 31, 2006, attached hereto.) I asked Ms. Jackson if she any more questions and she said 'No.' It is not uncommon for employees in the EA position to work by themselves at a particular spot within a work project. Construction projects can cover long stretches of roadway, and ALDOT employees are spread along the project. Most training for new EA hires is on-the-job training with specific courses being taken as they become available. New EA hires are required to pass a basic math and Algebra course during probation. Ms. Jackson failed her basic math course. I was unaware of any complaints made by Ms. Jackson about Brett Paulk or Jay Palmer to EAP Jeremy Taylor until speaking with my attorneys about this case. I did receive a doctor's note from Ms. Jackson restricting her to office duty. Shortly thereafter, I approved her moving to an inside office position.

2

"It is common to extend an employee's probation if the employee has not met all of the requirements to achieve permanent status. When I received the recommendation from Jay Palmer to terminate Ms. Jackson's employment, I reviewed the information provided by Mr. Palmer, including Ms. Jackson's personnel file. I was aware of Ms. Jackson's probationary status and the incidents that had occurred during that time. I made the determination that, based on the events during probation, the Department should terminate Ms. Jackson's employment."

_____
Vincent E. Calametti

SWORN TO AND SUBSCRIBED before me on this 27th day of May, 2008.

_____
Notary Public, State at Large
My Commission Expires: 12/7/10

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LASHUNDRA JACKSON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )    **CASE NO. 2:07-cv-645-MEF** |
| STATE OF ALABAMA DEPARTMENT | ) |
| OF TRANSPORTATION, JOE MCINNES, | ) |
| etc., | ) |
| **Defendants.** | ) |

STATE OF ALABAMA  )
                  )
COUNTY OF MOBILE  )

## AFFIDAVIT

Before me, the undersigned Notary Public, personally appeared **Samuel J. Palmer**, Jr. who is known to me, and who being first duly sworn by me, deposes and states as follows:

"My name is Samuel J. Palmer, Jr. I am a resident of Mobile County, Alabama, am over the age of 19 years, and am competent to testify as to the matters contained in this affidavit.

"I am employed by the Alabama Department of Transportation's Ninth Division, District One, in Mobile, Alabama, as the District Engineer. I have held this position for six years. Ms. Jackson was an EA I employed by ALDOT's Ninth Division from July 2006 until March 2007. I was in Ms. Jackson's supervisory chain of during her employment. Prior to beginning actual work, Ms. Jackson was informed that her employment would consist of outside work.

"The first incident with Ms. Jackson was when I became aware that Ms. Jackson had complained about having to work on a project by herself. It is not uncommon for employees in a position such as Ms. Jackson's to be on a work site by themselves at a particular spot. Construction projects sometimes cover long stretches of roadway, and employees are spread

along the project. Most training for new EA hires is considered on-the-job training as courses become available.

"On October 4, 2006, Ms. Jackson came to my office to complain about someone scratching her vehicle. See also, Memorandum to file dated October 6, 2006 attached hereto. I asked Ms. Jackson if she knew who scratched her car. Ms. Jackson was not certain who damaged her vehicle. I asked to see the scratches on the car and Ms. Jackson showed me. The "scratches" Ms. Jackson showed me appeared to be from normal use. I offered to allow her to park her car near my office in the front where it would be better monitored. On October 5, 2006, Brett Paulk advised me that Ms. Jackson had become very angry in the office during a discussion with Josh McElhenney about her car. I asked Mr. Paulk to have her meet with me again. Ms. Jackson had become very disruptive. On the morning of October 6, 2006, I met with Ms. Jackson about her car. I asked her if she was content with parking her vehicle up front and she said 'yes.' I then asked her about her disruptive conduct in the project office the day before. Ms. Jackson told me she had been upset about her car and that she wanted McElhenney to tell his people not to touch her car if they did not want to get hurt. I told her such comments were inappropriate and reminded her of ALDOT's workplace violence policy and that any such actions could be grounds for dismissal. Ms. Jackson told me that she understood.

"On December 20, 2006, Brett Paulk informed me that Ms. Jackson had refused to sign her appraisal until she met with me. I agreed to meet with Ms. Jackson to address her concerns. Ms. Jackson told me that she thought it was not fair that her probation was extended. She told me that Brett Paulk was not qualified to make that decision. Brett and I informed Ms. Jackson that Brett had previously consulted with Austin Harville about her progress and performance. Vince Calametti immediately arrived, and Ms. Jackson finally signed her evaluation. We

2

explained to her that signing the evaluation did not indicate agreement with it. Rather, it simply meant that she had received it.

"I have no knowledge of anyone not wanting to work with Ms. Jackson because of her race. I am only aware of two other pregnant females, Shannon Lee and Mary Weaver, employed by ALDOT's Ninth Division. However, it is my recollection that Ms. Lee and Ms. Weaver were already working an inside position when they became pregnant. I am unaware of any request for accommodation because of Ms. Jackson's pregnancy. I was not aware of any complaints made by Ms. Jackson about me to the EAP coordinator, Jeremy Taylor."

"On February 22, 2007, I recommended the termination of Ms. Jackson's employment based on violations of employee work rules, disruptive behavior, threatening language, and insubordinate behavior during her probationary period. (See also, letter to Vince Calametti from Samuel J. Palmer dated February 22, 2007, attached hereto.) In particular, I recommended the termination of her employment based on incidents on October 4 though 6, 2006, December 20, 2006, and January 5, 2007."

_____
Samuel J. Palmer

SWORN TO AND SUBSCRIBED before me on this 27th day of May, 2008.

_____
Notary Public, State at Large

My Commission Expires: 12/7/10

3

**IN THE UNITED STATES DISTRICT COURT FOR THE
«Litigation Federal District: Uppercase» DISTRICT OF ALABAMA
«Litigation Division: Uppercase» DIVISION**

| | |
|---|---|
| **LASHUNDRA JACKSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) **CASE NO. 2:07-cv-645-MEF** |
| **STATE OF ALABAMA DEPARTMENT OF** | ) |
| **TRANSPORTATION, JOE MCINNES, etc.,** | ) |
| | ) |
| **Defendant.** | ) |

**STATE OF ALABAMA**   )
                                          )
**COUNTY OF MOBILE**   )

### <u>AFFIDAVIT</u>

Before me, the undersigned Notary Public, personally appeared **Josh McElhenney**, who is known to me, and who being first duly sworn by me, deposes and states as follows:

"My name is Josh McElhenney.  I am a resident of Mobile County, Alabama, am over the age of 19 years, and am competent to testify as to the matters contained in this affidavit.

"I was employed by the Alabama Department of Transportation's Ninth Division, District One, office in Mobile, Alabama, as a Civil Engineer Graduate from December 2004 until September 2007.  During Ms. Jackson's employment, I was a project engineer on various projects.  Ms. Jackson was an EA I employed by ALDOT's Ninth Division from July 2006 until March 2007.  Before, during, and after that time, I had no knowledge of anyone not wanting to work with Ms. Jackson because of her race.

"On October 5, 2006, Ms. Jackson came into my office and was very loud.  She stated that she needed to talk to me.  She told me that someone was scratching her car and she was tired of it.  She explained that this had been going on for about a month.  I asked her why this was the

first time it was being reported, but she did not respond. She thought someone working in our trailer was responsible. I told her that I would speak with everyone who worked in the trailer about her allegations. During this time Ms. Jackson steadily raised her voice and became disruptive. I asked her to calm down, but she refused. She told me that she would not calm down because she was mad. I informed her that this type of disruptive behavior would not be tolerated in my office.

"On January 5, 2007, I sat in on a meeting between Ms. Jackson and Brett Paulk. They were discussing ALDOT's tape-recording policy. Ms. Jackson did not want to sign the policy because she felt the policy was illegal. Ms. Jackson got upset and loud and did not want to sign the policy. Ms. Jackson told Mr. Paulk that she would sign the form at the end of the day and that he could not make her sign it. Mr. Paulk gave Ms. Jackson until the end of the day to sign the policy."

Josh McElhenney

SWORN TO AND SUBSCRIBED before me on this 29th day of May, 20 08.

Notary Public, State at Large

My Commission Expires: 4/13/10

2

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON,            )
                                       )
      Plaintiff,              )
                                       )
v.                                   )  CASE NO. 2:07-cv-645-MEF
STATE OF ALABAMA DEPARTMENT OF  )
TRANSPORTATION, JOE MCINNES, *etc.*,  )
      Defendants.        )

STATE OF ALABAMA   )
                       )
COUNTY OF MOBILE   )

## AFFIDAVIT

Before me, the undersigned Notary Public, personally appeared **Bret A. Paulk**,

who is known to me and who, being first duly sworn by me, deposes and states as

follows:

"My name is Bret A. Paulk. I am a resident of Mobile County, Alabama, am over

the age of 19 years, and am competent to testify as to the matters contained in this

affidavit.

"I was employed by the Alabama Department of Transportation's Ninth Division,

District One, office in Mobile, Alabama, as a Civil Engineer Graduate from December

2004 until September 2007. During Ms. Jackson's employment, I was a project engineer

on various projects. Ms. Jackson was an EA I employed by ALDOT's Ninth Division

from July 2006 until March 2007. I was Ms. Jackson's direct supervisor from September

2006 until January 2007. Before, during, and after that time, I had no knowledge of

anyone not wanting to work with Ms. Jackson because of her race.

"I did not know Ms. Jackson prior to her coming under my supervision. I did not know of any of her complaints and did not know that Bertha Alexander was her mother-in-law prior to my supervision. I did not learn that Bertha Alexander was Ms. Jackson's mother-in-law until after I had supervised Ms. Jackson for several months. I primarily supervised Ms. Jackson on the Natchez and Coleman Dairy projects. During my supervision, I informed Ms. Jackson that she was required to pass algebra in order to achieve permanent status. Ms. Jackson told me that she was not going to take the algebra test due to medical appointments.

"In October 2006, I overheard Ms. Jackson complaining loudly to Josh McElhenney about someone scratching her car. Ms. Jackson stated that someone would get hurt for messing with her vehicle. I immediately reported this to Jay Palmer. I personally inspected Ms. Jackson's car and only noticed what appeared to be minor wear and tear. I was aware that she received a counseling session for her outburst. Her mid-appraisal reflected this incident.

"In December 2006 I gave Ms. Jackson her first performance appraisal. It was one of the first performance appraisals that I filled out. During my final review of Ms. Jackson's appraisal, I noticed an error or two that needed to be corrected. I made some changes and noted those changes. Those errors had nothing to do with Ms. Jackson's actions or job performance. When Ms. Jackson was assigned to me, I discussed her progress and performance with her previous supervisor, Austin Harville. I discussed each responsibility rating and areas of improvement with Ms. Jackson. Ms. Jackson understood her responsibility score but disagreed with my recommendation to extend her probation. I informed her that she must pass an algebra class. Ms. Jackson

did not agree with my appraisal of her performance and refused to sign it. In my attempts in getting her to sign the evaluation, I read her the policy that was written on the form. After much discussion and meeting with my supervisor, she signed the appraisal.

"On January 5, 2007, Ms. Jackson came to my office, and I asked her to sign the Department's tape-recording policy. I requested that all employees under my supervision sign the tape recording policy. Ms. Jackson refused to sign the acknowledgement of receipt of the policy and began raising her voice in an angry tone. Ms. Jackson stated that the policy was illegal. I asked Ms. Jackson if she needed more time to read the policy and told her that signing the document did not indicate she agreed with it. I again asked her to sign the policy and advised her that she would receive a verbal warning if she refused. Ms. Jackson began to speak louder and stated that she did not want to sign the policy at that time because she was not given a time frame in which to sign it. Ms. Jackson's demeanor became disruptive as she was talking loudly and distracting other employees from working. I gave Ms. Jackson until the end of the day to sign the policy. I again told her that she would receive a verbal warning if it was not signed. At no point did I threaten her or curse at her. Ms. Jackson stormed out of my office.

"Ms. Jackson returned to my office at approximately 3:15 p.m. on January 5, 2007. Ms. Jackson told me that she thought she had until January 16 2007, to sign the policy. My instructions were to collect signed policies and submit them no later than January 16, 2007. January 5, 2007, was a rainy day, so all of my employees were in the office that day. Ms. Jackson wanted us to meet with Joseph Fresolone in his office with a witness. Leon Malone and Gwenda Hunter joined our meeting. In the meeting I informed everyone one that I had given Ms. Jackson until the end of the day to sign the

policy.  Ms. Jackson stated that she did not agree with the policy and thought I was trying to get her fired.  I told her that I was not trying to get her fired.  Rather, I just wanted her to sign the policy like everyone else.  Mr. Fresolone and Mr. Malone explained that, by signing the policy, she was only acknowledging that she had received and understood it.  Mr. Fresolone offered to explain the policy, but Ms. Jackson stated that she needed a lawyer to read over the policy before signing anything.  Mr. Fresolone informed Ms. Jackson that she could have a lawyer review the policy but that it must be signed by the deadline given to her.  Mr. Malone stated that the policy was legal and that she did not need a lawyer.  Ms. Jackson became aggravated with Mr. Malone and complained about his job performance.  Mr. Fresolone intervened and again asked Ms. Jackson to sign the policy.  Ms. Hunter asked to speak with Ms. Jackson privately.  After approximately five minutes Ms. Jackson and Ms. Hunter returned.  Ms. Jackson stated that she was not happy working for me.  I told her that she could come complain to me directly.  Ms. Jackson stated that the real problem was my attitude and not the policy.  Ms. Jackson then proceeded to sign the policy.

"I met with Joseph Fresolone and Ms. Jackson on January 19, 2007, to discuss a written reprimand I was giving her based on the January 5, 2007, incident.  Ms. Jackson disagreed with the reprimand, and I explained that her demeanor was insubordinate.  Mr. Fresolone explained to Ms. Jackson that her actions on January 5, 2007, were disruptive, and she had given several different reasons for not signing the policy.  I advised Ms. Jackson to write a rebuttal to Mr. Ronnie Poiroux if she did not agree with the reprimand.  She refused.

"In January 2007 Ms. Jackson brought me a note from her doctor stating that she could not perform heavy lifting.  Her position did not require any heavy lifting, and I am unaware of any heavy lifting performed by Ms. Jackson.  I conformed with any and all requests made by Ms. Jackson's doctor.  I never made any reference about Ms. Jackson's ability to work because of her pregnancy.  I was unaware of any complaints or grievances filed against me to EAP Jeremy Taylor or anyone until after her performance appraisal in December 2006."

_____
Bret A. Paulk

SWORN TO AND SUBSCRIBED before me on this ___27ᵗʰ___ day of __MAY__, 20_08_.

_____
Notary Public, State at Large

My Commission Expires: _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 27, 2012
BONDED THRU NOTARY PUBLIC UNDERWRITERS

5

IN THE UNITED STATES DISTRICT COURT FOR THE
«Litigation Federal District: Uppercase» DISTRICT OF ALABAMA
«Litigation Division: Uppercase» DIVISION

LASHUNDRA JACKSON,                          )
                                            )
    Plaintiff,                           )
                                            )
v.                                          )
                                            )    CASE NO. 2:07-cv-645-MEF
STATE OF ALABAMA DEPARTMENT OF              )
TRANSPORTATION, JOE MCINNES, *etc.*,        )
                                            )
    Defendant.                           )

STATE OF ALABAMA   )
                   )
COUNTY OF MOBILE   )

## AFFIDAVIT

Before me, the undersigned Notary Public, personally appeared **Jeannette Brown**, who is known to me and who, being first duly sworn by me, deposes and states as follows:

"My name is Jeannette Brown. I am a resident of Mobile County, Alabama, am over the age of 19 years, and am competent to testify as to the matters contained in this affidavit.

"I am employed by the Alabama Department of Transportation's Ninth Division in Mobile, Alabama, as Transportation Office Manager and as such am familiar with the personnel files of the employees who have and are presently working for this Division.

"Ms. LaShundra Yates, now Jackson, began work in this Division as an Engineering Assistant I ('EA') probationary employee on July 3, 2006, at a starting salary of $765.80 biweekly. Upon beginning work, Ms. Jackson was required to take a math placement which tested both basic math skills and algebra. Probationary EAs are required to take and pass both the basic math and algebra tests during their initial six months' probationary period. Ms. Jackson did not initially pass either the basic math or the algebra test and was required to

take and pass both during her initial probationary period. Ms. Jackson passed the basic math test and was scheduled to take the algebra course/test in October 2006. Ms. Jackson declined to take the algebra course/test, citing a conflict with medical appointments. Consequently, at the end of her initial probationary period, she had not completed and passed the algebra course and test. Her probation was therefore extended an additional three month in order for her to complete the algebra course/test. (See attached math placement documents.)

"John Majercik (WM) was hired by ALDOT as an EA I and began work on the same date as Ms. Jackson. Mr. Majercik was required to take the same math and algebra placement tests as was Ms. Jackson. Mr. Majercik passed the basic math but did not pass the algebra portion of the testing. He was scheduled to take the algebra course and test and passed the algebra portion in November 2006. At the end of his initial six-month probationary period, Mr. Majercik had taken and completed both the basic math and algebra courses and was given permanent status. (See attached math placement documents.)

"Trenton Lowery (WM), a person identified by Ms. Jackson as having been hired as an EA at a higher wage than she, began employment with ALDOT in March 2006 at a starting salary of $882.90 biweekly, which is higher that the starting salary of Ms. Jackson. This increased starting salary was requested by then-Division Engineer Ronnie Poiroux because of Mr. Lowery's prior experience in the construction field performing inspection work of subcontractors using various tools and due to his prior educational courses. (See attached letter from Poiroux dated March 2, 2006, and Lowery's job application.)

"Ms. Jackson's prior work experience did not include any construction-type work. Her prior work experience was primarily retail sales work, and her prior education training was in paramedical services. (See Ms. Jackson's attached job application.)

2

"Shannon Lee was hired by ALDOT as an EA I on May 31, 2005, and is presently an ALDOT employee. Ms. Lee became pregnant during her employment with ALDOT, but at the time of her pregnancy, Ms. Lee was already working an inside job.

"Mary Weaver was hired by ALDOT as an EA I in August 2002. During the course of her employment with ALDOT, Ms. Weaver became pregnant. During the time of her pregnancy, Ms. Weaver was performing outside work and continued to perform this work up to the time she took pregnancy leave."

_Jeannette Brown_
Jeannette Brown

SWORN TO AND SUBSCRIBED before me on this 27th day of May, 2008.

_Betty A. Dean_
Notary Public, State at Large

My Commission Expires: 03/21/09

3

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LASHUNDRA JACKSON, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:07-cv-645-MEF |
| STATE OF ALABAMA DEPARTMENT OF | ) |
| TRANSPORTATION, JOE MCINNES, *etc.*, | ) |
| Defendants. | ) |

STATE OF ALABAMA    )
                    )
COUNTY OF MOBILE    )

## AFFIDAVIT

Before me, the undersigned Notary Public, personally appeared **Joseph Fresolone**, who is known to me and who being first duly sworn by me, deposes and states as follows:

"My name is Joseph 'Joey' Fresolone. I am a resident of Mobile County, Alabama, am over the age of 19 years, and am competent to testify as to the matters contained in this affidavit.

"I am employed by the Alabama Department of Transportation's Ninth Division in Mobile, Alabama, as the Assistant Construction Engineer. I have held this position for five years. During the course of my work, I was in the supervisory chain of LaShundra Jackson. I interviewed Ms. Jackson and recommended her for employment. Ms. Jackson was an EA I employed by ALDOT's Ninth Division from July 2006 until March 2007.

"I have no knowledge of anyone not wanting to work with Ms. Jackson because of her race. Prior to January 5, 2007, I was unaware of any complaints by Ms. Jackson of any discrimination based on race, gender, or retaliation for her mother-in-law, Bertha Alexander. The first time Ms. Jackson informed me of any type of discrimination was on January 5, 2007.

"On January 5, 2007, Ms. Jackson came to my office visibly upset complaining of her stomach hurting from job stresses. (See also, Memorandum to file dated January 9, 2007, attached hereto.) Ms. Jackson, along with Charley Jones, was in my office from approximately 7:30 a.m. until 8:00 a.m. Ms. Jackson complained that 'it was something every day' and that 'they are just trying to make [her] quit.'

"Ms. Jackson told me that she thought the stressful work environment was created because of dislike of her mother-in-law. Ms. Jackson told me that she came into my office because of a tape recording policy she was asked to sign. She told me that she received a verbal warning from Brett Paulk when she refused to sign the policy. Ms. Jackson also complained about someone scratching her car but provided no specifics as to who had scratched it. At that time, Ms. Jackson complained of discrimination but informed me that it was not based on race or gender. Ms. Jackson told me she knew she was being discriminated against. However, she did not know what type of discrimination. Ms. Jackson did not complain to me about any inequities in wages. She also complained about an extension of her probation, claiming that another employee, Mr. Majercik, had not had his probation extended even though he had not completed the required math courses. Ms. Jackson complained of lack of training and being left on projects without assistance. (See also, Memorandum to file dated January 9, 2007, attached hereto.) Ms. Jackson also complained about some letters that were attached to her performance appraisal.

"During the afternoon of January 5, 2007, I met with Ms. Jackson on two more occasions. At approximately 3:00 p.m., I met with Ms. Jackson in Leon Malone's office. Ms. Jackson complained about the Department's tape recording policy, calling it illegal. Mr. Malone and I explained that signing the letter did not mean that she agreed with it. This made Ms. Jackson argumentative and uncooperative. Ms. Jackson again complained of unfair

treatment. (See also, Memorandum to file dated January 9, 2007, attached hereto.) Later that day, at Brett Paulk's request, I met with Ms. Jackson, Leon Malone, Gwenda Hunter, and Brett Paulk. Ms. Jackson brought Ms. Hunter in as a witness.

"Ms. Jackson's primary complaint was a tape-recording policy she was asked to sign by her supervisor. Ms. Jackson provided multiple excuses for not signing the policy. Those excuses included: she did not understand the policy; the policy was illegal; she wanted to show it to an attorney; and, she felt she had until January 16, 2007, to sign the document. Ms. Jackson's employment status was never threatened for not signing the document. I asked her to sign the memo and reiterated that, by signing the memo, she was not agreeing to its contents. Ms. Jackson eventually signed the tape recording policy.

"On January 22, 2007, I was asked to be a witness in a meeting between Bret Paulk and Ms. Jackson. The purpose of this meeting was to give Ms. Jackson a letter of reprimand for her actions on January 5, 2007. (See also, Memorandum to file, dated January 22, 2007, attached hereto.) Brett Paulk read Ms. Jackson her letter of reprimand. Ms. Jackson asked why she was being reprimanded. I explained to her that she had initially refused to sign the tape recording policy and her excuses for not signing the policy changed throughout the day. (See also, Memorandum to file dated January 22, 2007, attached hereto.)"

Joseph Fresolone

SWORN TO AND SUBSCRIBED before me on this 28th day of May, 2008.

Notary Public, State at Large

My Commission Expires: 12/7/10



# ALABAMA
## DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8200
Fax: (251) 473-3624



JOE MCINNES
TRANSPORTATION DIRECTOR

BOB RILEY
GOVERNOR
June 20, 2006

Lashundra Yates

| | |
|---:|:---|
| Job Classification: | Engineering Assistant I |
| Semi- Monthly Entrance Salary: | $765.80 |
| Salary Range: | $765.80 - $1138.20 |
| Number of Vacancies: | 4 |
| Rank: | 12 Alternate |

Dear Ms. Yates:

I am pleased to inform you that upon recommendation of this office and approval by Mr. D. J. McInnes, Transportation Director, you have been certified for appointment in the Classification of Engineering Assistant I in the Ninth Division of the Alabama Department of Transportation effective **July 3, 2006**. Your salary will be $765.80 biweekly. You should report to Mrs. Debra Hadley to complete your new employee paper work, review video material and receive your math placement test. You may bring a scientific calculator if you choose. Upon completion of the new employee information you will report to Mr. Austin Harville, Civil Engineer Graduate to receive your job assisgment.

You will serve in the Engineering Assistant I Classification on a probationary (trial) basis for a period of six months during which time your work habits and job responsibilities will be carefully observed. If, during the probationary period, your services are satisfactory, you will receive full merit system status at the end of the six months.

Congratulations on your appointment.

Sincerely,

Jeannette Brown
Transportation Office Manager

JB/jb
c:    Mr. Vincent E. Calametti
      Mr. Monte Harville
      Mr. Samuel J Palmer
      Ms. Debra Hadley
      Personnel File
      (1926900)



DEFENDANT'S
EXHIBIT





**ALABAMA**
**DEPARTMENT OF TRANSPORTATION**

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX (251) 473-3624

BOB RILEY
GOVERNOR

JOE MCINNES
TRANSPORTATION DIRECTOR

## ACKNOWLEDGEMENT OF RECEIPT OF
## ALDOT GRIEVANCE PROCEDURES
## ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of ALDOT Grievance
Procedures.

_LaShundra Yates_
Employee Signature

_LaShundra Yates_
Employee Printed Name

_7/03/06_
Date

ALDOT WPVF-2
12/ /01

## ALABAMA DEPARTMENT OF TRANSPORTATION
## WORKPLACE VIOLENCE POLICY

I acknowledge that I have received and read the Alabama Department of

Transportation Workplace Violence Policy. I have full knowledge of the contents of this

policy and understand that I am subject to and shall be expected to comply with this

policy.

_LaShundra Yates_
Employee's name (Print)

_LaShundra Yates_
Employee's signature

_7/03/06_
Date

_Debra Hadley_
Witness

_7/3/06_
Date

cc: File

## DIRECTIVES FOR ATTENDING TRAINING CLASSES

Thank you for your interest in training. In order to ensure that this training is conducted in a good environment and to avoid confusion, please read the following directives:

(1) Decisions about whether you will drive back and forth to classes or be allowed to spend the night will be made by your supervisor in conjunction with the division engineer/bureau chief.

(2) These training classes are considered part of your work duties, and you will be expected to be on time and stay for the entire course unless excused by your training coordinator for your division/bureau or division/bureau designated representative. Roll will be taken several times during the day, and it will be your responsibility to sign every roll and sign only for yourself. Employees absent from the class will be disciplined as being absent without leave from your job.

(3) It has been reported that during some of the training classes, some of our employees were disruptive while the instructors were teaching the class. This results in not only those employees not learning the materials but also interfering with those around them. If an employee becomes disruptive to the class, the instructor will report this behavior to ALDOT and appropriate disciplinary action will be initiated.

(4) If you are disruptive or reported for cheating, you will be removed from the class and also be ineligible to attend any other accelerated university courses, EDP classes or other training provided by ALDOT. This behavior will be noted on your annual performance appraisal. After a six month period, the division engineer/bureau chief may consider reinstatement in ALDOT training activities.

(5) During your career at ALDOT, if you have signed up for a class that you have already taken, you will not be allowed to take the class again. However, if you are participating in ALDOT's EDP program your division engineer/bureau chief may request class retakes. If at any time you believe that you were inadvertently not scheduled for a class, please contact your training coordinator and have them verify.

(6) Cell phones, pagers, southern link etc. will not be permitted in a classroom.

I have read and understand the directives on expected behavior for attending training classes and understand I must follow these directives. I understand that I will receive a copy of this directive after I sign it.

_____     _____
Employee                              7/03/06
                                      Date



**BOB RILEY**
**GOVERNOR**

**ALABAMA**
**DEPARTMENT OF TRANSPORTATION**

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX (251) 473-3624



**JOE MCINNES**
**TRANSPORTATION DIRECTOR**

## ACKNOWLEDGEMENT OF RECEIPT OF
## POLICIES AND RULES OF EMPLOYEE CONDUCT AND WORK HABITS
## NINTH DIVISION OFFICE
## ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of the Policies and Rules of Employee Conduct and Work Habits, Ninth Division Office, Alabama Department of Transportation signed by the Division Engineer.

_____
Employee Signature

_____
Employee Printed Name

_____7/03/06_____
Date



**BOB RILEY**
**GOVERNOR**

### ALABAMA
### DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX (251) 473-3624



JOE MCINNES
TRANSPORTATION DIRECTOR

### ACKNOWLEDGEMENT OF RECEIPT OF
### EMPLOYEE WORK RULES: 670-x-19
### ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of Employee Work Rules:
670-x-19.

_____
Employee Signature

_____
Employee Printed Name

7/03/06
_____
Date



**BOB RILEY
GOVERNOR**

**ALABAMA
DEPARTMENT OF TRANSPORTATION**

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX (251) 473-3024



JOE MCINNES
TRANSPORTATION DIRECTOR

## ACKNOWLEDGEMENT OF RECEIPT OF
## PRINCIPLES OF BUSINESS CONDUCT
## ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of Principles of Business Conduct, Alabama Department of Transportation.

_____
Employee Signature

_____
Employee Printed Name

7/03/06
_____
Date



**BOB RILEY
GOVERNOR**

### ALABAMA
### DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX (251) 473-3624



**JOE MCINNES
TRANSPORTATION DIRECTOR**

### ACKNOWLEDGEMENT OF RECEIPT OF
### POLICIES AND RULES OF EMPLOYEE CONDUCT AND WORK HABITS
### NINTH DIVISION OFFICE
### ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of the Policies and Rules of
Employee Conduct and Work Habits, Ninth Division Office, Alabama Department of
Transportation signed by the Division Engineer.

_____
Employee Signature

_____
Employee Printed Name

7/03/06
_____
Date





**BOB RILEY**
**GOVERNOR**

**ALABAMA**
**DEPARTMENT OF TRANSPORTATION**

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE (251) 470-8200
FAX (251) 473-3624

**JOE MOINNES**
**TRANSPORTATION DIRECTOR**

### ACKNOWLEDGEMENT OF RECEIPT OF
### POLICIES AND RULES OF EMPLOYEE CONDUCT AND WORK HABITS
### NINTH DIVISION OFFICE
### ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of the Policies and Rules of Employee Conduct and Work Habits, Ninth Division Office, Alabama Department of Transportation signed by the Division Engineer.

_____
Employee Signature

_____
Employee Printed Name

7/03/06
_____
Date



**BOB RILEY**
**GOVERNOR**

# Alabama
# Department of Transportation

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1100
Telephone: (251) 470-0200
Fax (251) 473-3624



**JOE McINNES**
**TRANSPORTATION DIRECTOR**

## ACKNOWLEDGEMENT OF RECEIPT OF
## EMPLOYEE WORK RULES: 670-x-19
## ALABAMA DEPARTMENT OF TRANSPORTATION

By my signature below, I certify that I have received a copy of Employee Work Rules:
670-x-19.

_LaShundra Yates_
Employee Signature

_LaShundra Yates_
Employee Printed Name

_7/03/06_
Date

Revised 1/2006

Alabama Department of Transportation
Ninth Division
New Employee Check List

Every new employee will be given a new employee packet. Ensure that all of the following are given to the
employee and/or received from the employee.

NAME: *LaShundra Gates-Jackson*

CLASSIFICATION: *EA 1*

| IDENTIFICATION OF FORM / PROCEDURE / STATEMENT | Completed |
|---|---|
| Miscellaneous Employment Information from Mr. R. F. Poiroux -- To Employee | ✓ |
| State Employee Benefits -- To Employee | ✓ |
| State of Alabama Dept of Industrial Relations New Hire Reporting Form (NH-1/ Rev 9/97) | ✓ |
| US Department of Justice Immigration and Naturalization Service OMB 1115-0136 Employment Eligibility Verification | ✓ |
| Form W-4 and A-4 (Federal and State tax withholding statements) | ✓ |
| Health Insurance Enrollment Form | ✓ |
| Non-Tobacco User Discount Form (SEIB) | ✓ |
| Employees Retirement System Form 100 | ✓ N/A |
| Salary Reduction Agreement (Cafeteria Plan) | ✓ |
| Driver's License/Changes in Driver's License Status Statement -- Copy To Employee | ✓ N/A |
| Direct Deposit Request | ✓ |
| RSA-1 Offer / PEBSCO Offer | ✓ |
| Procedures for Accidents Involving State Vehicles Statement -- Copy To Employee | ✓ |
| Compensatory Time Statement -- Copy To Employee | ✓ |
| Hard Hat Statement -- Copy To Employee | ✓ N/A |
| Selective Service Registration Statement /OFFICE MANAGER/Asst check status prior to employment | ✓ |
| Military Credit Statement -- To Employee | ✓ |
| Relatives Employed by DOT | ✓ |
| Family Disclosure Guideline -- To Employee | ✓ |
| Principles of Business Conduct ALDOT -- To Employee | ✓ |
| DRUG FREE WORKPLACE Statement -- Copy To Employee | ✓ |
| Policies and Rules of Employee Conduct & Work Habits 9th DOT -- To Employee | ✓ |
| State Personnel Employee Work Rules 670-x-19 -- To Employee | ✓ |
| Departmental Examination Security Policy -- To Employee | ✓ |
| Grievance Procedure / Notice to Applicants -- To Employee | ✓ |
| Violence in the Workplace Policy -- To Employee | ✓ |
| Directives for Attending Training Classes -- To Employee | ✓ |
| Sexual Harassment Policy -- To Employee | ✓ |
| Racial Harassment Policy -- To Employee | ✓ |
| Signed Receipt of Acknowledgement of Policies and Rules of Employee Conduct/Work Habits | ✓ |
| Signed Receipt of Acknowledgement of Principles of Business Conduction ALDOT | ✓ |
| Signed Receipt of Acknowledgement of Employee Work Rules 670-x-19 | ✓ |
| Signed Receipt of Acknowledgement of Departmental Examination Security Policy | ✓ |
| Signed Receipt of Acknowledgement of Grievance Procedures | ✓ |
| Signed Receipt of Acknowledgement of Violence in the Workplace Policy | ✓ |
| Signed Receipt of Acknowledgement of Directives for Training Classes | ✓ |
| Signed Receipt of Acknowledgement of Sexual Harassment Policy | ✓ |
| Signed Receipt of Acknowledgement of Racial Harassment Policy | ✓ |
| Copy of Driver's License | |
| Copy of Social Security Card | |

Copies Given to Employee by: *Debra A Hadley* Date: *8/3/06*

New Employee Packet Completed by: *Debra A Hadley* Date: *7/3/06*



# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX: (251) 473-3624



BOB RILEY
GOVERNOR

JOE MCINNES
TRANSPORTATION DIRECTOR

## M E M O R A N D U M

DATE:   July 3, 2006

TO:     LaShundra Yates

FROM:   Debra A. Hadley
        EDP/Training Coordinator

RE:     Math Placement Assessment

Recently you completed the math placement assessment to determine your current skill level in various content areas. Based on your performance in those areas, you may be required to complete one or more courses.

Listed below are your results from the math placement assessment process. If you elected not to attempt one or more sections you will be presumed to need the course (if required).

| Content Area | Performance | | Course required |
|---|---|---|---|
| Basic Math | Successful: | ☐ | Yes ☒ |
| | Unsuccessful: | ☒ | No ☐ |
| Algebra | Successful: | ☐ | Yes ☒ |
| | Unsuccessful: | ☒ | No ☐ |
| | Not Attempted: | ☐ | |
| Geometry | Successful: | ☐ | Yes ☐ |
| | Unsuccessful: | ☒ | No ☐ |
| | Not Attempted: | ☐ | May be required in future: ☒ |
| Trigonometry | Successful: | ☐ | Yes ☐ |
| | Unsuccessful: | ☒ | No ☐ |
| | Not Attempted: | ☐ | May be required in future: ☒ |

If you have any questions, please contact me at (251) 470-8203. You will be scheduled for the required courses as soon as possible.

c:  Mrs. Jeannette Brown
    Mr. S. J. Palmer, Jr.
    Mr. M. A. Harvill
    Training/EDP Bureau
    Training File
    File

DEFENDANT'S
EXHIBIT
2



RECEIVED
JUN 1 3 2006
ALDOT Ninth Division
Office Manager

Form 3 – Revised February 2002

**APPLICATION FOR EXAMINATION**

| DO NOT WRITE IN THIS SPACE | | General Instructions |
|---|---|---|

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

General Instructions

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

**Title of Examination (one per application)**   Option (if applicable)
*Engineering Assistant (20116)*

Full Name   *LaShundra*   *Michelle*   *Yates*
First   Middle   Last

Address   *P.O. Box 66651*
House or Apartment Number   Street

*Mobile*   *AL*   *36660*
City   State   County   Zip Code

Telephone Number: Home *(251) 645-8363*   Work ( )
Area Code   Area Code

The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth *10   27   1976*   Sex (check one) 1. ( ) Male   2. (✓) Female
(Month) (Day) (Year)

Race (check one) 1. ( ) White   2. (✓) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native   6. ( ) Other

**EDUCATION:**   CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.
High School Diploma or GED? (✓) Yes ( ) No   1  2  3  4  5  6  7  8  9  10  11  12  College ①  2  3  4

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Paramedical Services Educational Program  Mobile AL | 4/2001 | 4/2001 | | | ✓ | | Certificate 4/8/01 | Phlebotomy |
| University of South Alabama  Mobile AL | 1/1996 | 1/1997 | | | | ✓ | | Pre-Med |
| Williamson High  Mobile AL | 9/1991 | 6/1995 | | | ✓ | | Advanced Diploma | |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| Paramedical Services Educational Program | Phlebotomy | Z-701081 | 4/8/2001 | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheet

**DEFENDANT'S EXHIBIT**
3

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, or to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature _____   Date *Feb. 8, 2003*

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

SOCIAL SECURITY NUMBER :

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| Bertha Jackson | 570 Swartz Street 4757793 | D.O.T |
| Sally Brown | 2459 Karagan Street 471 3249 | Wilmer Hall |
| Cynthia Lewis Washington | 433 2639 | USA Hospital |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?   ( ) Yes  (✓) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?   (✓) Yes  ( ) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

traffic tickets

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer The Junior League Shop | Your Official Job Title Sales Rep. |
|---|---|

Address 85 N Sage St.

Type of Business Sales Rep. Retail

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | | | |
| 1 | 2002 | 8 | 2002 | 6 | 30 | $5.50 Per hour | $5.50 Per hour | (✓) Yes  ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis  None

Equipment You Operated  Cash Register, calculator

Name, Title and Telephone Number of Supervisor  Gail Tart  471 3349

Reason for Leaving

Describe Your Duties in Detail  pricing clothes, customer service, and answering the phone

SOCIAL SECURITY NUMBER : ███████████

| 2. Employer Discount Auto Parts | Your Official Job Title Cashier |
|---|---|
| Address 710 Dauphin Island Pkwy | Type of Business Auto Parts Store |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 3 | Year 1998 | Month 2 | Year 1999 | 11 | | $ 6.00 Per hour | $ 6.25 Per hour | (L) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis NONE
Equipment You Operated Computers, Cash Register
Name, Title and Telephone Number of Supervisor Chris Simms 4788580
Reason for Leaving High Risk Pregnancy
Describe Your Duties in Detail Assist customers and take inventory.

| 3. Employer Montgomery Wards. | Your Official Job Title Sales Rep. |
|---|---|
| Address Bel Air Mall | Type of Business Retail |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 8 | Year 1997 | Month 2 | Year 1998 | 6 | | $ 5.50 Per hour | $ 5.50 Per hour | (L) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis none
Equipment You Operated Cash Register
Name, Title and Telephone Number of Supervisor Mr. Williams
Reason for Leaving Seasonal
Describe Your Duties in Detail Assist Customers

| 4. Employer | Your Official Job Title |
|---|---|
| Address | Type of Business |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | ( ) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis
Equipment You Operated
Name, Title and Telephone Number of Supervisor
Reason for Leaving
Describe Your Duties in Detail

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

SOCIAL SECURITY NUMBER . ███████████

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.
2 ( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.
3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.
4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.
5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City    3 ( ) Birmingham    5. ( ) Dothan    7 ( ) Linden    9 ( ) Montgomery    12 ( ) Tuscaloosa
2 ( ) Andalusia    4 ( ) Decatur    6 ( ) Jacksonville    8 ( |) Mobile    10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this Job? (check all that apply)

1 ( ) State Employment Service    5 (✓) Friend/Relative    9 ( ) Legislative Representative    13 ( ) TV/Radio Commercial
2 (✓) Job Announcement Notice    6 ( ) Dept. News Bulletin    10 ( ) State Recruiter/Counselor    14 ( ) Other _____
3 ( ) Newspaper    7 ( ) Rehabilitation Services    11 ( ) State Personnel Dept. Information Board    15 ( ) State Personnel Dept. Website
4 ( ) College Placement/Career Office    8 ( ) High School Counselor    12 ( ) Outreach Program (i.e. Church)    16 ( ) Other Website

## AVAILABILITY



81 - Northwest Alabama
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

82 - Huntsville/
Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

83 - Northeast Alabama
10 Cherokee
25 DeKalb
28 Etowah

84 - Jasper/
Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

85 - Tuscaloosa Area
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

86 - Birmingham Area
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

87 - East Central Alabama
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

88 - Southwest Alabama
12 Choctaw
13 Clarke
46 Marengo
65 Washington

89 - Selma/Clanton Area
11 Chilton
24 Dallas
53 Perry
66 Wilcox

90 - Montgomery Area
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

91 - Phenix City/
Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

92 - Mobile Area
02 Baldwin
49 Mobile

93 - South Central Alabama
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

94 - Dothan Area
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

95 - Statewide
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment. You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work    49 _____ _____

If you want to be considered for appointment by only certain state agencies, indicate here _____

Will you accept work involving overnight travel? ( ) Yes (✓) No    Will you accept part-time work? (✓) Yes ( ) No

Will you accept temporary work? (✓) Yes ( ) No

Which shifts are you willing to work?  0.( ) all shifts  1.( ) 1st only  2.( ) 2nd only  3.( ) 3rd only  4.(✓) 1st and 2nd only  5.( ) 1st & 3rd only  6.( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)  2  10  03
                                                                                                                           Month  Day  Year

NOTE:    Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

714 S. Cedar Street

# Lashundra Yates

| | | |
|---|---|---|
| **Objective** | To establish a secure future with a lucrative company. | |

| | | | |
|---|---|---|---|
| **Experience** | 2003-2004 | Bernard's Contracting | Mobile, AL |

**Secretary**
* Answered multiple phone lines.
* Data entry updates.
* Typed and faxed estimates and weekly payroll.

| | | | |
|---|---|---|---|
| | 2002-2003 | The Junior League Shop | Mobile, AL |

**Retail Sales Associate**
* Assist in daily customer service.
* Sort, price and stock merchandise.
* PT cashier.

| | | | |
|---|---|---|---|
| | 1998-1999 | Discount Auto Parts | Mobile, AL |

**Cashier/Head Team Member**
* Assist in daily customer service.
* Receiving and inventory.
* Increased daily sales of merchandise.

| | | | |
|---|---|---|---|
| | 1998-1998 | Montgomery Wards | Mobile, AL |

**Sales Representative**
* Customer service and inventory of the electronics department.
* Developed excellence in sales training course.

| | | | |
|---|---|---|---|
| **Education** | 2001 | Paramedical Services<br>Educational Program | Mobile, AL |

* I received a certificate in Phlebotomy. License #2701080.

**Interests**   Running, reading and helping others.

**Honors**   I am currently a volunteer at the Franklin Primary Health Center. I assist in the lab by performing venipunctures and various test on urine samples.

References upon request.



**BOB RILEY**
**GOVERNOR**

# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
**OFFICE OF DIVISION ENGINEER**
1701 I-65 WEST SERVICE ROAD N
**MOBILE, ALABAMA 36618-1109**
TELEPHONE: (251) 470-8200
FAX (251) 473-3624



**JOE MCINNES**
TRANSPORTATION DIRECTOR

September 18, 2006

Mrs. LaShundra Jackson
EA
Alabama Department of Transportation
1701 I-65 West Service Road N
Mobile, Alabama 36618-1109

Dear Mrs. Jackson:

RE:    **Personnel Transfer**

Effective immediately you are being reassigned to Mr. Bret Paulk as your Project Engineer.
His office will be, what it now Mr. Austin Harvill's office. Please report to Mr. Paulk for your job
assignment.

Sincerely,

Vincent E. Calametti
Division Construction Engineer

VEC/dlb

c:    Mr. R. F. Poiroux, P.E.
      Ms. Jeannette Brown
      Mr. Austin Harville
      Mr. S. Jay Palmer
      Mrs. Mary Jordan
      Mrs. Faye Bozone
      Mr. Leon Malone
      Mr. Frankie L. Smith
      Ms. Janet Fresolone
      Mr. Charly Jones
      Ms. Deborah L. Browning
      Ms. Debra Hadley
      File





**DEFENDANT'S EXHIBIT**
**4**



# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION — DISTRICT ONE
OFFICE OF DISTRICT ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8209
Fax: (251) 479-9773



BOB RILEY
GOVERNOR

JOE McINNES
TRANSPORTATION DIRECTOR

This is (a)    [ X ]    Counseling

                  [   ]    Warning

                  [   ]    Reprimand

Employee Name: __Lashundra Yates – Jackson__

State the facts of the performance or work conduct problem:____On October 5, 2006, Ms. Yates exhibited a disruptive behavior in the project office, while also advising a supervisor of the possibility of threatening and physical action toward others.

State what actions have been taken with the employee prior to this step of discipline (including counseling, coaching, and/or any disciplinary step):____No previous disciplinary actions are noted

If an action plan is developed in conjunction with the discipline, include the time frame that is being monitored for change in performance and the follow-up meeting date:

Supervisor's Signature: ____Samuel Palmer Jr.____

Employee's Signature: ____L. Jackson____

Date of Meeting: ____10-6-06____

Employee's signature denotes discussion not necessarily agreement. The employee may add comments that must be attached to this form. The form is kept in the formal employee file.



DEFENDANT'S
EXHIBIT
5

*Mrs, Brown*

## Alabama Department of Transportation
## Course Cancellation/Declination/Extension/Suspension Form

### Section 1 (of 3): Completed by Employee and Supervisor OR Training Coordinator

I *LaShundra Jackson* , (Print Employee Name)

☑ will not be able to attend OR ☐ failed to show OR ☐ failed to successfully complete *(check one)*

the following training course *Algebra*

scheduled for *10/30/06 - 11/3/06* for the following reason(s) *I have two doctor's appointments one on 10/30/06 + another on 11/1/06*

☐ I choose to decline this class. ☑ I would like to be rescheduled for the class at a later date. If the course is required for an EDP module currently in progress, I understand the module will be extended for six months to allow time to reschedule the course within the deadline.

*Jackson*          *10/16/06*          *BM Durell*          *10-17-06*
Employee Signature          Date          Supervisor Signature          Date

### Section 2 (of 3): Completed by Training Coordinator in Division or Bureau:

Cancellation ☒ OR Failure to Show ☐ *(check one)* is excused ☒ OR not excused ☐ *(check one)*

☐ Course not required for a current EDP module in progress.

*BF Boudreux /th*          *10/19/06*
Division/Bureau Authorized Signature          Date

BUREAU Coordinator: Complete sections 1 and 2 above and forward to Training Bureau for data entry.

### Section 3 (of 3): Completed by EDP Coordinator in Training Bureau or Division

EDP module deadline was ☒ OR was not ☐ *(check one)* extended for six months.

**Second Occurrence:** cancellation ☐ OR failure to show ☐ OR failure to successfully complete ☐ *(check one)*

Course status (in EDP) changed to Suspended as of _____.

*Velma A. Hadley*          *10/19/06*
EDP Coordinator Signature          Date

c: Training Bureau (Bureaus only)
Employee File
Training File          (form updated 061506)

*Pers. File*

EDP Procedures Manual, June, 2006

DEFENDANT'S
EXHIBIT
6

**Brown, Jeannette**

| | |
|---|---|
| **From:** | Calametti, Vince |
| **Sent:** | Thursday, October 19, 2006 10:17 AM |
| **To:** | Hadley, Debra; Poiroux, R.F.; Palmer, Jay; Paulk, Bret |
| **Cc:** | Brown, Jeannette |
| **Subject:** | RE: Basic Math Results (Oct. 10-13, 2006) |

She should be advised her probation period will be extended if she does not attend this class.

---

**From:** Hadley, Debra
**Sent:** Thursday, October 19, 2006 9:55 AM
**To:** Poiroux, R.F.; Calametti, Vince; Palmer, Jay; Paulk, Bret
**Cc:** Brown, Jeannette
**Subject:** Basic Math Results (Oct. 10-13, 2006)

Lashundra Jackson passed the Basic Math class held in Montgomery October 10-13, 2006.

She was scheduled to attend Algebra class October 30, 2006 through November 3, 2006 in Tuscaloosa but has submitted a form to be rescheduled due to having 2 doctor's appointments during this week.

This is the last class prior to her probation being up in January 2007. I am not sure when the next Algebra class will be scheduled or where it will be held.

Thanks ☺

Debra A. Hadley
EDP/Training Coordinator - 9th Division
Alabama Department of Transportation
1701 West I-65 Service Road North
Mobile, Alabama 36618
(251) 470-8203 Work
(251) 473-3624 Fax Number
hadleyd@dot.state.al.us
Southern Link - 9072



DEFENDANT'S
EXHIBIT
7

**Hadley, Debra**

---

**From:**    Brown, Jeannette
**Sent:**    Thursday, October 19, 2006 11:47 AM
**To:**      Hadley, Debra
**Cc:**      Paulk, Bret; Palmer, Jay
**Subject:** RE: Lashundra Jackson - Algebra Class

The probationary information is to be completed by the immediate supervisor.  He will need to decide, talk with DE, and indicate on the form that probationary is to be extended and a memorandum of explanation along with the time to extend.


*Jeannette Brown*
*Transportation Office Manager*
*Alabama Department of Transportation*
*Ninth Division*
*(251)470-8218*
*brownjea@dot.state.al.us*

**From:** Hadley, Debra
**Sent:** Thursday, October 19, 2006 11:33 AM
**To:** Brown, Jeannette; Calametti, Vince; Palmer, Jay
**Subject:** Lashundra Jackson - Algebra Class

Mr. Paulk just called me and advised that he informed Mrs. Jackson that if she couldn't attend the Algebra class October 30 -- November 3, 2006, that her probation would be extended 3 months and she stated that she had two doctor's appointments during this week and could not change them.

Mrs. Brown -- will you all submit the paperwork to Montgomery to extend her probation 3 months?  I will notify the Training Bureau so they can adjust her EDP Module Deadlines by 3 months from 1/3/07 to 4/3/07.

Thank you ☺

Debra A. Hadley
EDP/Training Coordinator - 9th Division
Alabama Department of Transportation
701 West I-65 Service Road North
Mobile, Alabama 36618
251) 470-8203 Work
251) 473-3624 Fax Number
hadleyd@dot.state.al.us
Southern Link - 9072

**WORK HABITS:** Provide a check i. .ne appropriate space to document that (. policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

_____✓_____  Attendance

_____✓_____  Punctuality

_____✓_____  Cooperation with Coworkers

_____✓_____  Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee:_____8/3/06_____

Employee Signature: (denotes discussion and receipt of form, not agreement) _____

Rater Signature: (denotes discussion and employee receipt of form) _____

Reviewer Signature: _____

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

EMPLOYEE COMMUNICATES WITH CONTRACTOR AND IS KNOWLEDGEABLE OF CURRENT PROJECT ACTIVITIES.
INSPECTING PLACEMENT OF ASPHALT. ATTENDED AND PASSED BASIC MATH CLASS.

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

EMPLOYEE NEEDS TO ATTEND AND PASS NEXT AVAILABLE ALGEBRA CLASS. NEEDS TO BECOME
MORE FAMILIAR WITH STANDARD SPECIFICATIONS AND STANDARD DRAWINGS. SPOKE WITH
EMPLOYEE ABOUT CONDUCTING HERSELF IN A PROFESSIONAL MANNER IN AN OFFICE SETTING.

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

A Midappraisal session has been held on this date and performance has been discussed:_____11-2-06_____

Employee Signature:_____ Initial if comments attached:_____

Rater Signature:_____ Initial if comments attached:_____

Reviewer Signature:_____ Initial if comments attached:_____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

DEFENDANT'S EXHIBIT
8

**Form 13P**
**Revised (06/2005)**

**EMPLOYEE PERFORMANCE *PREAPPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: ___LASHUNDRA JACKSON___    Social Security Number: ___█████████___

Agency: ___ALDOT___    Division: ___9th___

Classification: ___EA-1___    Class Code: ___2011___

Period Covered From: ___7-3-06___ To: ___10-3-06___    Position Number: ___19269100___

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

COMMUNICATES orally with individuals such as supervisors, co-workers, contractors, Office/field personnel, project superintendent, general public, property owners, federal and County agencies and utility personnel using equipment such as telephones and documents,

DRAWS/PLOTS cross-sections, profile, drainage sections and take profiles using sources such as plans, field and level notes following instructions from supervisors in order to produce a legible record in the form of plans and reports.

OPERATES equipment such as nuclear density machines, transits, levels, copier, and computers following instructions from supervisors so that accurate records may be located when needed.

INSPECTS job site, concrete and asphalt using visual observation following instructions from supervisors and documents such as Special and Standard Drawings, Construction Manuals, Standard and Supplemental Specifications in order to determine suitability and conformity of construction materials, workmanship and safety.

COMPLETES REPORTS- Complete and enters data into documents, field and level books, DWR's forms, sample cards, estimates sheets, etc., so that accurate records may be located.

PERFORMS and obtain inspections and tests on concrete, paint, compaction test, soil analysis, slump, leak, flow cone, specific gravity and aggregate test using instruments such as scales, gauges, slump cones, roll-a-meters and sieves in order to determine suitability of materials and conformity to specifications and standards.

CALCULATES and measures quantities and values such as earthwork volume, asphalt rates, drainage, compaction, moisture and density, curve data, and elevations in order to determine cost and quantities, design values, and to check for compliance with contract specifications.

READS/INTERPRETS plans, specifications, special provisions, contracts, memos and letters from supervisors, contractors, ECT so that job duties are carried out as requested without complications.

ATTENDS/PASSES training courses so that certifications can be kept up to date and to learn new ALDOT procedures.



**BOB RILEY**
**GOVERNOR**

# ALABAMA
# DEPARTMENT OF TRANSPORTATION

### NINTH DIVISION
### OFFICE OF DIVISION ENGINEER
### 1701 I-65 WEST SERVICE ROAD N
### MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8200
Fax: (251) 473-3624



**JOE McINNES**
**TRANSPORTATION DIRECTOR**

December 14, 2006

MEMORANDUM

TO:       Lashundra M Jackson
          Division 9

FROM:     Maxine Wheeler, Chief *mw*
          Training Bureau

SUBJECT:  Basic Concrete

This is to confirm that you have been scheduled to attend the above-referenced training class.
This class is scheduled for 01/05/2007 at 8:00 AM, at 9th Division, Room-Auditorium, 1701 I-65
West Service Road North, Mobile, AL. The class is scheduled to end on 01/05/2007 at 4:00 PM.

**Registration begins 30 minutes before the class starts. The training class will begin
promptly at 8:00 AM.**

Please inform your immediate supervisor of this training. If you have questions or need further
clarification, please call Debra Hadley at 251/470-8203  ATTNET 665-3203.

MW/

cc: Training Coordinator of the Division / Bureau
    Bureau Chief / Division Engineer
    File

DEFENDANT'S
EXHIBIT
9
tabbies

This class will be held in
the Pavilion Building H.

Form 13F
Revised (01/2006)

**EMPLOYEE PERFORMANCE *PROBATIONARY***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: LASHUNDRA M JACKSON

Agency: 012/TRANSPORTATION

Classification: ENGINEERING ASSISTANT I

Period Covered From: 07/03/2006 To: 01/02/2007

Social Security Number:

Division: 0080/9TH DIVISION - MOBILE

Class Code: 20111

Position Number: 1926900

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form, not agreement. All signatures are mandatory.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN | | SSN |
| _Brad Purvill_ SJP | _(signature)_ | _R F Pinoy_ |
| Rater Signature | Employee Signature | Reviewer Signature |
| BRET PAULK | 12-20-06 | R F Pinoy, P.C. |
| Rater Printed Name | Date | Reviewer Printed Name |
| 12-20-06    djp | | 12/22/06 |
| Date    Initial if comments attached | Initial if comments attached | Date    Initial if comments attached |

It is recommended that the employee be:
- **xx** Continued in the probation (reason stated in Disciplinary Actions Area)
- _____ Given permanent status in the position. Probationary Increase to $_____ Step ____ Effective _____
- _____ Separated before or at the end of the probationary period (reason stated in Disciplinary Actions Area)

_(signature) DJM-1 mm_        _(signature)_        12/29/06

APPOINTING AUTHORITY Signature                              Date

---

***PROBATIONARY PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score. Documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 20.0 | − | 0.0 | = | 20.0 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Probationary Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | xx Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

---

***WORK HABITS:*** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | _____ | x | _____ |
| Punctuality | _____ | x | _____ |
| Cooperation with Coworkers | _____ | x | _____ |
| Compliance with Rules | _____ | x | _____ |

**DEFENDANT'S EXHIBIT** 10

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Probationary period.  Record the appropriate rating in the box for each responsibility.  Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                      **Rating**

1. COMMUNICATES                                                          | 3 |

2. DRAWS/PLOTS                                                           | 2 | &P

3. OPERATES                                                             | 2 |

4. INSPECTS                                                             | 2 |

5. COMPLETES REPORTS                                                    | 2 |

6. PERFORMS                                                             | 1 |

7. CALCULATES                                                           | 3 |

8. READS/INTERPRETS                                                     | 2 |

9. ATTENDS/PASSES                                                       | 1 |

10. _____                        |   |

---

**RESPONSIBILITY SCORE:**

| 18 | ÷ | 9 | = | 2.00 &P | X | 10 | = | 20.0 &P |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

---

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below.  Provide the number of disciplinary actions and steps taken with the employee during the appraisal year.  If no disciplinary action has been taken, a "0" should be marked in each blank provided.  Attach a copy of the warning(s), reprimand(s), or suspension(s) to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** |
|---|---|---|
| 0 | 0 | 0 |

---

**DISCIPLINARY SCORE:**  This section should include the use of the discipline steps of reprimand, and suspension only.  The Disciplinary Score does not include scores for counseling and warnings.  To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period.  If the most severe step was one or more reprimands, the Disciplinary Score will be 7.  If the most severe step was one or more suspensions, the Disciplinary Score will be 17.  Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**        0



# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8200
Fax: (251) 473-3624



**BOB RILEY**
GOVERNOR

**JOE MCINNES**
TRANSPORTATION DIRECTOR

December 22, 2006

Mr. Ron Green
Personnel & Compliance Bureau Director
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

Dear Mr. Green:

RE:    LaShundra Jackson – EA I
       Ninth Division

I am requesting a three-month probation extension on Ms. Jackson due to the fact that she failed to pass the initial math placement test in Algebra, and has failed to complete the training course in the first six months.

Ms. Jackson was scheduled to attend the class October 30 – November 3, 2006; but cancelled due to the fact she had a doctor's appointment.

The next Algebra Class will be available in 2007 (possibly February) and Ms. Jackson is on the list to be scheduled to attend the training class.

Please advise if additional information is needed.

Sincerely,

R. F. Poiroux, P.E.
Division Engineer

RFP/JB
c:    Mr. Vincent E. Calametti
      Mr. Jay Palmer
      Mr. Bret Paulk
      Mrs. Debra Hadley
      Personnel File

DEFENDANT'S
EXHIBIT
11

*Part 2*



## ALABAMA DEPARTMENT OF TRANSPORTATION
1409 Coliseum Boulevard
Montgomery, Alabama 36110

Telephone: 334/242-6311 • Fax No.: 334/262-8041



*Joe McInnes*
*Transportation Director*

*Bob Riley*
*Governor*

December 29, 2006

Ms. Jackie Graham, Director
State Personnel Department
64 North Union Street
Montgomery, AL 36130

RE: Lashundra M. Jackson

Probationary Period Extension

Dear Ms. Graham:

This is to request a three-month extension of the probationary period for the employee listed above. Ms. Jackson's probation score indicates that she meets standards. Hopefully, the extended probationary period will allow more time and training to better perform her duties.

Thank you for your consideration in this matter.

Sincerely,

Ronald J. Green
Director of Personnel and Compliance

Attachment

RJG/dg      Approved: _____      Date: _____
                    Jackie Graham, Director
                    State Personnel Department

          Disapproved: _____      Date: _____
                    Jackie Graham, Director
                    State Personnel Department

DEFENDANT'S
EXHIBIT
12

DATE:   January 2, 2007

TO:    Mr. R. F. Poiroux
       Division Engineer

FROM:  _[signature]_ Jackson
       Engineering Assistant I

RE:    RETAILIATION/DISCRIMINATION/EVALUATION REBUTTAL

Dear Mr. Poiroux,

I want to make a complaint against Mr. Samuel J. Palmer, District I Engineer and Mr. Bret Paulk, my Project Engineer. My six month probation was denied and my score was decreased from 22 to 20 after Mr. Paulk visited Mr. Palmer's office prior to our meeting on 12/20/06. Also, I do not agree totally with my evaluation because of several of my performance scores, and the extension of my probation for three additional months, due to me not attending algebra class. When I inquired about the next available algebra class, Mr. Palmer replied that it will be in January of 2007. I was informed by Mrs. Hadley, Training Coordinator, that there was no algebra class scheduled for January, 07.

The first three months that I was employed with ALDOT, Mr. Bret Paulk was not my Project Engineer. He really didn't know the extent of my training or my capability of performing each task so I didn't think it was fair for him to judge me nor perform my three month evaluation. I don't think anyone told him of my performance on the Natchez Project while during the widening of the road alone. My performance score should have been higher. I cannot help it if I am only being sent to one particular project, because I go where I'm assigned. I feel as if I am being punished due to a complaint that I filed October 16, 2006.

If these classes are mandatory, then how can I meet standards with a score of 22 that was changed to a 20 without taking the algebra class? There are employees that didn't even pass the algebra class before they made probation. As for Draws/Plots, that is only being taught to the PCET's because they are in the office every day. If it was being taught to everyone, then why am I always asked to take a leave when it's raining instead of being taught Draws/Plots? There is a serious problem within 9th Division Construction Office that is going unaddressed. Also, why was my starting salary lower than a fellow EA I who had no experience prior to employment but is related to other employees of ALDOT? This is an unfair advantage to me or any other individual that might seek an Engineering Assistant positions here.

DEFENDANT'S
EXHIBIT

13

When I spoke with you on 12/22/06 at 10:00 a.m. regarding my extended probation you replied "Sometimes they do that," Why was it alright for this to be done to me? Does Mr. Palmer have the authority to make final decisions regarding an employee passing/not passing probation at the 9th Division?  Is this really an equal opportunity?

Respectfully,

LYJ

# Alabama Department of Transportation
## Ninth Division
## Policy on Recording Devices

It is the policy of Alabama Department of Transportation, Ninth Division that no individual may record, by any means, any other individual without that individual's knowledge and written consent. Any violation of this policy will result in disciplinary action up to and including termination.

A supervisor, may, however, tape record a disciplinary proceeding or meeting without the employee's consent, as long as the employee has knowledge that a tape recording is being made of the meeting or proceeding.

I, _LaShundra M. Jackson_ hereby acknowledge that I have received and understand the policy on recording devices. Such acknowledgment will be placed in my personnel file.

Approved by: R. F. Poiroux, P.E.
Division Engineer

Signature of Employee                    Witness

Date _1/05/06_

DEFENDANT'S
EXHIBIT
14

MOBILE BAY OB-GYN CENTER, P.C.
JAMES R. BENTLEY, M.D.
L. J. CARPENTER, JR., M.D.
ERIN C. DAWKINS, M.D.
JENNIFER A. CUNNINGHAM, M.D.
W. O. JEANSONNE, M.D.
3 MOBILE INFIRMARY CIRCLE, SUITE 221
MOBILE, AL 36607

(251) 433-7827
(251) 432-3266

LIC. #_____ DEA #_____

NAME _____ DATE _____ PAGE _

ADDRESS _____

Rx ILLEGAL IF NOT SAFETY BLUE BACKGROUND

Refill _____ times

☐ Label

PRODUCT SELECTION PERMITTED    DISPENSE AS WRITTEN

6705002886557

**DEFENDANT'S EXHIBIT**
15
tabbies



# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
**OFFICE OF DIVISION ENGINEER**
1701 I-65 WEST SERVICE ROAD N
**MOBILE, ALABAMA 36618-1109**
Telephone: (251) 470-8200
Fax: (251) 473-3624



BOB RILEY
GOVERNOR

JOE McINNES
TRANSPORTATION DIRECTOR

January 18, 2007

Ms. Lashundra Jackson
1701 North Beltline Highway
Mobile, Alabama  36618

Dear Ms. Jackson:

This is a letter of reprimand in regards to your disruptive behavior and insubordination for refusal to complete the policy form on recording devices as requested from your supervisor.

On January 5, 2007, I gave you instruction to read and complete the policy form and return it to me, your insubordinate demeanor and disruptive behavior was unacceptable and is in defiance of the Department's Employee Work Rules. It was also noted that you left your job station without permission during this incident. These actions are unacceptable.

Your performance appraisal will reflect this incident. If you have any questions or need additional information, please advise.

Sincerely,

*Bret Paulk*

Bret Paulk
Project Engineer

C:  Ms. Jeanette Brown
Mr. Vince Calametti
File

DEFENDANT'S EXHIBIT
16



DEFENDANT'S
EXHIBIT

17



**BOB RILEY
GOVERNOR**

### ALABAMA
### DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX (251) 473-3624



**JOE MCINNES
TRANSPORTATION DIRECTOR**

# MEMORANDUM

**DATE:**      February 13, 2007

**TO:**      Mr. S. Jay Palmer
District I Engineer

**FROM:**      
Vincent E. Calametti, P.E.
Division Construction Engineer

**RE:**      Mrs. LaShundra Jackson

Attached please find temporary work restriction on Mrs. LaShundra Jackson.
Mrs. Jackson shall be assigned these temporary duties throughout her pregnancy.

Please revise her Form 13P and Form 40 to reflect her new duties and new supervisor.

Sincerely

VEC/dlb
Attachment
c: Mr. Anthony Cooper
Mrs. Jeannette Brown *for personal file*
File



**DEFENDANT'S
EXHIBIT**
*18*



RECEIVED
FEB 1 3 2007
ALDOT Ninth Division
Office Manager



# ALABAMA
## DEPARTMENT OF TRANSPORTATION

NINTH DIVISION — DISTRICT ONE
OFFICE OF DISTRICT ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8209
Fax: (251) 479-9773



BOB RILEY
GOVERNOR

JOE McINNES
TRANSPORTATION DIRECTOR

February 22, 2007

Mr. Vince Calametti
Division Construction Engineer — Ninth Division
1701 N. Beltline Hwy.
Mobile, Alabama 36618

Dear. Mr. Calametti:

RE: **Lashundra Jackson – Engineering Assistant I**

This office recommends Ms. Jackson be terminated for violations of employee work rules, disruptive behavior, threatening language and insubordinate demeanor.

- On October 6, 2006, Ms. Jackson was counseled on her disruptive behavior and threatening comments while working on the job which is in violation of employee work rule 670-X-19.01(1)(g), disruptive conduct, and employee work rule 670-X-19.01(2)(e), use of abusive or threatening language
- On November 2, 2006, Ms. Jackson was advised of conducting herself in a professional manner during her mid-appraisal review.
- On January 18, 2007, Ms. Jackson was giving a written reprimand for her disruptive behavior and insubordinate demeanor on January 5, 2007. These incidents are in violation of employee work rule 670-X-19.01(1)(g), disruptive conduct, and employee work rule 670-X-19.01(2)(b), insubordination. (See Attached)

Ms. Jackson has received disciplinary notices and has demonstrated unacceptable conduct and a continued inappropriate behavior during her probationary period. This behavior has a negative impact on the functioning of the department and has warranted said recommendation.

If you have any questions or need additional information, please advise.

Sincerely,

Samuel J. Palmer Jr.
District Engineer

Attachments

SJP/jp
C: Ms Jeannette Brown
   File

*Recommend approval*
*VcC*

DEFENDANT'S
EXHIBIT
19



**ALABAMA**
**DEPARTMENT OF TRANSPORTATION**

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1102   2007 FEB 28  P 1: 57
Telephone: (251) 470-8200
Fax: (251) 473-3624

BOB RILEY
GOVERNOR

JOE McINNES
TRANSPORTATION DIRECTOR

February 23, 2007

Mr. Ron Green
Personnel Director
Personnel & Compliance Bureau
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36130

Dear Mr. Green:

RE:   Termination Request
      LaShundra Jackson - Engineering Assistant
      Ninth Division

I am requesting termination of Ms. Jackson based on Ms. Jackson's violation of employee work rules, disruptive behavior, threatening language and insubordination. Ms. Jackson is currently on an extended three-month probation period..

Since Ms. Jackson's Initial Employee Performance Probationary report, she has received a written reprimand, January 18, 2007, for insubordination for refusal to complete an acknowledgement of receipt of "Policy regarding Recording Devices." Prior to the January 18th incident, Ms. Jackson was counseled on October 6, 2006, regarding her disruptive behavior and threatening comments. She was again counseled during a mid-appraisal, November 2, 2006, regarding her work habits. Ms. Jackson has continued with inappropriate behavior during her extended probationary period. (See attached documentation.)

Attached is a completed final Employee Performance Probationary report completed for mid-point appraisal during the extension. (It has been completed by the District Engineer after consulting all of Ms. Jackson's supervisors and file.) After deduction of the disciplinary score, Ms. Jackson's final score is 9.7.

We have attached a Form 11 to reflect termination with no effective date shown.

If additional information is required, please advise.

Sincerely,

R. F. Poiroux, P. E.
Division Engineer

RFP/JB
Attachments (Supporting Documentation)

c:    Mrs. Jeannette Brown
      Personnel File
      Legal Bureau

DEFENDANT'S
EXHIBIT
20



**ALABAMA DEPARTMENT OF TRANSPORTATION**
1409 Coliseum Boulevard
Montgomery, Alabama 36110

Telephone: 334/242-6311 • Fax No.: 334/262-8041



Joe McInnes
*Transportation Director*

Bob Riley
Governor

March 8, 2007

Ms. Lashundra Jackson
Alabama Department of Transportation
Ninth Division
1701 I-65 West Service Road North
Mobile, AL 36618

Re: Separation from Employment

Dear Ms. Jackson:

As was explained at the commencement of your employment, you are currently serving in a probationary status as an Engineering Assistant with the Alabama Department of Transportation. It has been determined that your services are no longer required. You will be separated from employment with this Department effective at the end of the normal work day Friday, March 9, 2007.

We wish you much success in your future endeavors.

Sincerely,

D. J. McInnes
Transportation Director

DJM/RJG/CM
c:     Mr. Ronald J. Green
       Mr. R. F. Polroux
       Legal Bureau
       State Personnel Department

DEFENDANT'S
EXHIBIT
21

**ALDOT Ninth Division**
**Basic Math and Algebra Class Results**
**January 2002 - February 27, 2008**

| ID | Name | Course | Title | Start Date | Grade |
|---|---|---|---|---|---|
| 000997 | Hunter,Gwenda K | 000168 | Basic Mathematics | 2002-12-02 | P |
| 000997 | Hunter,Gwenda K | 000104 | Algebra | 2003-07-14 | FL |
| 033631 | Isaac,George C | 000168 | Basic Mathematics | 2007-07-09 | P |
| 033631 | Isaac,George C | 000104 | Algebra | 2007-08-20 | FL |
| 033631 | Isaac,George C | 000104 | Algebra | 2007-10-22 | P |
| 084812 | Jackson,Lashundra M | 000168 | Basic Mathematics | 2006-10-10 | P |
| 001479 | Jackson,Melvin | 000104 | Algebra | 2003-02-10 | P |
| 001765 | Johns,Joshua R | 000104 | Algebra | 2003-07-14 | P |
| 084024 | Johnson,Kenneth M | 000168 | Basic Mathematics | 2007-07-09 | P |
| 084024 | Johnson,Kenneth M | 000104 | Algebra | 2007-08-20 | P |
| 000684 | Johnston,Richard A | 000104 | Algebra | 2003-02-10 | P |
| 095006 | Jones,Rafael A | 000168 | Basic Mathematics | 2007-09-24 | P |
| 095006 | Jones,Rafael A | 000104 | Algebra | 2007-10-22 | FL |
| 036458 | Kelley,Gary M | 000104 | Algebra | 2003-02-10 | P |
| 001777 | Landrum,Larry R | 000104 | Algebra | 2003-07-14 | FL |
| 000967 | Lee,Joseph B | 000168 | Basic Mathematics | 2002-12-02 | P |
| 000967 | Lee,Joseph B | 000104 | Algebra | 2003-02-10 | FL |
| 000967 | Lee,Joseph B | 000104 | Algebra | 2003-07-14 | FL |
| 084101 | Lee,Shannon N | 000104 | Algebra | 2006-05-01 | P |
| 084293 | Lopez Jr,Victor Raul | 000168 | Basic Mathematics | 2007-02-26 | P |
| 084293 | Lopez Jr,Victor Raul | 000104 | Algebra | 2007-03-26 | P |
| 084636 | Lowery,Trenton E | 000168 | Basic Mathematics | 2006-08-07 | P |
| 084636 | Lowery,Trenton E | 000104 | Algebra | 2006-08-28 | P |
| 084811 | Majercik,John C | 000104 | Algebra | 2006-08-28 | FL |
| 084811 | Majercik,John C | 000104 | Algebra | 2006-10-30 | P |
| 084458 | Malone,Jason Leebaron | 000168 | Basic Mathematics | 2007-07-09 | P |
| 084458 | Malone,Jason Leebaron | 000104 | Algebra | 2007-08-20 | P |
| 000906 | Manuel,Beatrice C | 000168 | Basic Mathematics | 2002-12-02 | P |
| 000906 | Manuel,Beatrice C | 000104 | Algebra | 2003-02-10 | FL |
| 000906 | Manuel,Beatrice C | 000104 | Algebra | 2003-07-14 | FL |
| 000906 | Manuel,Beatrice C | 000104 | Algebra | 2005-06-07 | P |
| 084268 | McNorton Jr,Samuel Todd | 000168 | Basic Mathematics | 2006-08-07 | P |
| 084268 | McNorton Jr,Samuel Todd | 000104 | Algebra | 2006-08-28 | P |
| 041835 | Mitchell,Edward L | 000104 | Algebra | 2003-02-10 | FL |
| 020647 | Molsbee,Tommie J | 000104 | Algebra | 2003-02-10 | FL |
| 020647 | Molsbee,Tommie J | 000104 | Algebra | 2003-07-14 | FL |
| 020647 | Molsbee,Tommie J | 000104 | Algebra | 2005-06-07 | P |
| 000804 | Nash,Lawrence F | 000168 | Basic Mathematics | 2002-12-02 | P |
| 000804 | Nash,Lawrence F | 000104 | Algebra | 2003-02-10 | P |
| 001644 | O'Rourke,Dianna W | 000104 | Algebra | 2003-02-10 | FL |
| 001644 | O'Rourke,Dianna W | 000104 | Algebra | 2003-07-14 | P |
| 083731 | Pettway,Rickey | 000168 | Basic Mathematics | 2005-05-16 | P |
| 050433 | Poiroux Jr,Joseph A | 000104 | Algebra | 2003-02-10 | P |
| 000999 | Presley,Phillip D | 000168 | Basic Mathematics | 2002-12-02 | P |
| 000999 | Presley,Phillip D | 000104 | Algebra | 2003-02-10 | P |

DEFENDANT'S
EXHIBIT
tabbies
22



## ALABAMA
## DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
**OFFICE OF DIVISION ENGINEER**
1701 I-65 WEST SERVICE ROAD N
**MOBILE, ALABAMA 36618-1109**
Telephone: (251) 470-8200
Fax: (251) 473-3624



BOB RILEY
GOVERNOR

JOE MCINNES
TRANSPORTATION DIRECTOR

January 3, 2007

Mr. John Majercik
District I
Mobile, Alabama

Dear Mr. Majercik:

I am pleased to inform you that upon the recommendation of your Supervisor and the Division Engineer, you have been given permanent status in the position of Engineering Assistant I. The State Personnel Department has approved an increase in your semi-monthly rate of pay. This increase will become effective January 16, 2007 to a salary of $844.90 and should be included on your pay warrant of February 16, 2007.

Sincerely,

Jeannette Brown
Transportation Office Manager

JB/Jm
c:    Mr. A. Havard
       Payroll Clerk
       File

**DEFENDANT'S
EXHIBIT
23**



**BOB RILEY**
**GOVERNOR**

## ALABAMA
## DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8200
Fax: (251) 473-3624



JOE MCINNES
TRANSPORTATION DIRECTOR

March 17, 2006

Trenton E Lowery
4850 Wilmer Rd
Mobile, AL 36587

Dear Mr. Lowery:

I am pleased to inform you that upon recommendation of this office and approval by
Mr. D. J. McInnes, Transportation Director, you have been certified for appointment in the
Classification of Engineering Assistant I in the Ninth Division of the Alabama Department of
Transportation effective March 20, 2006. Your salary will be $956.50 semi-monthly. You
should report on Monday, March 20, 2006 at 7:30 a.m. at the above address to the District
Building (D) to complete your new employee paperwork. After the completion of your new
employee paper work you should report to Mr. Victor Hoover and your job assignment will
be given to you at that time.

You will serve in the Engineering Assistant I Classification on a probationary (trial) basis for
a period of six months during which time your work habits and job responsibilities will be
carefully observed. If during the probationary period your services are satisfactory, you will
receive full merit system status at the end of the six months.

Congratulations on your appointment.

Sincerely,

Jeannette Brown
Transportation Office Manager

JB/jb
c:      Mr. R. F. Poiroux
        Mr. Jay Palmer
        Mrs. Debra Hadley
        Personnel File
        File (1924800)

**DEFENDANT'S EXHIBIT**
24

**ALABAMA**

**DEPARTMENT OF TRANSPORTATION**

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 NORTH BELTLINE HWY.
MOBILE, ALABAMA 36618-1109
Telephone: (251) 470-8200
Fax: (251) 479-3624



BOB RILEY
GOVERNOR

JOE McINNES
TRANSPORTATION DIRECTOR

*K 71*

March 2, 2006

Mr. L. D. Morris
Assistant Transportation Director
Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36130

Dear Mr. Morris:

RE:    **Request for Above-the-Minimum Entrance Salary**
       **Name:  Trenton E. Lowery**
       **SS#:** ▓▓▓▓▓▓▓▓▓
       **Class Title/Code:  Engineering Assistant I / 20111**
       **Amount/Step:  $882.90 / Step 13**

Mr. Lowery has interviewed for an Engineering Assistant I position with ALDOT. He is currently working in the construction field with Ben Radcliff Contractor, Inc., with a salary of $11.00 per hour. Mr. Lowery has two years experience in the construction field inspecting sub-contractors' work using engineering tools such as a laser level to set grades for concrete work, etc. Mr. Lowery also has 96 hours of college courses which include math classes that would be beneficial to the Department.

Based on Mr. Lowery's experience and his current salary in a competitive field, I am requesting his entrance salary to be at $11.04 per hour, $882.90 biweekly, Step 13 of the Engineering Assistant I pay range. *956.50 semi-monthly*

Your approval of this request will be appreciated.

If additional information is needed, please advise.

Sincerely,

R. F. Polroux, P.E.
Division Engineer

RFP/jb
Attachment
c:    Mrs. Jeannette Brown

Approved                              Disapproved
Mr. Ron Green                         Mr. Ron Green
Personnel & Compliance Director

*salary*  Approved  3/9/06            Disapproved
Doug Lunsford                         Doug Lunsford
State Personnel Department

*3-6-06*

RECEIVED
MAR 8 2006
STATE PERSONNEL
DEPARTMENT

STATE PERSONNEL DEPT
PAYROLL AUDIT
2006 MAR -9 A 10: 55

Form 3 - Revised March 2000

**DO NOT WRITE IN THIS SPACE**

## APPLICATION FOR EXAMINATION

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not properly completed will be returned. Photocopied and facsimile applications will be accepted.

ENTER SOCIAL SECURITY NUMBER BELOW.

**Examination For Which You Are Applying** (one per application)          Option (if applicable)

Engineering Assistant I - 20111

Full Name   Trenton          Earl          Lowery
            First            Middle        Last

Address   _____   Street   Mobile      36587
          House or Apartment Number                                Zip Code

City   Wilmer      State   AL      County

Telephone Number: Home _____   Area Code      Work ( 251 ) 666 - 7252
                                                       Area Code

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth   11 (Month)   04 (Day)   1981 (Year)      Sex (check one)   1. (✓) Male   2. ( ) Female

Race (check one)   1. (✓) White   2. ( ) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native   6. ( ) Other

**EDUCATION:**

High School Graduate or GED? (✓) Yes  ( ) No

CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.

1  2  3  4  5  6  7  8  9  10  11  12   College  1  (2)  3  4

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Mary G. Montgomery H.S. | 9/96 | 5/00 | | | ✓ | | Adv Diploma | Gen. Studies |
| Faulkner State Comm. College | 8/00 | 5/02 | 16 | 4 | | ✓ | | Gen. Studies |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| | | | | |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature   Trent Lowery          Date   12/04/05

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

SOCIAL SECURITY NUMBER : ███████████

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|------|--------------------------|----------|
| Ronald Curtis | ████████████ | Self Employed |
| Mike Moore | ████████████ | Self Employed |
| Steve Booker | ████████████ | BMR Ben M. Radcliff |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?   ( ) Yes  (✓) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?   (✓) Yes  ( ) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions. If necessary, you may use a separate sheet or sheets and attach to application.

Complicity - 8/2002 in Gulf Shores
DWI - 1/2003 New Orleans (pending expungement)

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION. CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION. FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

1. Current or Last Employer  Ben M. Radcliff  Contractors

Your Official Job Title  Carpenter's help

Address  Halls Mill Rd  Mobile AL  36609

Type of Business  Construction

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|------|------|------|------|------|------|------|------|------|
| Month | Year | Month | Year | | | | | |
| 11 | 03 | Present | | 25 | 40 | $ 10 Per hr | $ 11 Per hr | (✓) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis

Equipment You Operated  backhoe, forklift, laser level, transit

Name, Title and Telephone Number of Supervisor  Darrell Pitts Superintendant (251) 331-7957

Reason for Leaving

Describe Your Duties in Detail  Concrete form work, pour concrete, trim work, hang fascia board, hang metal door frames, put down plywood decking on roof, general carpenter duties





**ALABAMA DEPARTMENT OF TRANSPORTATION**
1409 Coliseum Boulevard, Montgomery, Alabama 36110: 02
2007 FEB 20  A 9:



*Bob Riley*
*Governor*

*Joe McInnes*
*Transportation Director*

February 16, 2007

Ms. Lashundra Jackson
714 South Cedar Street
Mobile, AL 36603

      RE:   Complaint #DOT 146

Dear Ms. Jackson:

I have reviewed the results of the investigation concerning your complaint #**DOT** 146 (copy attached). Based on my review, your claim that you have been retaliated against in your job assignments and/or duties appears to be without merit. I have reached this conclusion based on the following:

(1)    You complained that no one wanted to work with you or teach you, and you were assigned to (a) observe (i.e., ride with a consultant), rather than participate in, some of the project work, and (b) work alone on a project.

    These are common assignments as part of on-the-job training for most Engineering Assistants at ALDOT. Therefore, you have not been mistreated or treated differently, as the assignments would have occurred regardless of whether you are, or are not, related in any way to Ms. Alexander.

(2)    There was no evidence of retaliation, as defined by Title VII of the Civil Rights Act of 1964, as amended, based on the following:

    (a)    You have not previously participated in a protected activity during your employment with ALDOT, and

    (b)    You did not suffer any adverse employment action in, or as a result of, any of the incidents you described in your complaint.

Sincerely,

L. Daniel Morris
Assistant Transportation Director

**DEFENDANT'S EXHIBIT**
25

LaShundra Jackson
February 16, 2007
Page 2

Attachment

cc:    Jim Ippolito
       R. F. Poiroux

February 14, 2007

**COMPLAINANT:**    LaShundra Jackson

**DOCKET NUMBER:**    DOT 146



## INVESTIGATIVE DETERMINATION

The following determination is hereby issued on the merits of the charge as is hereinbelow stated. The complainant alleged as follows:

A. That, "No one wanted to work with me nor teach me anything," and "I was also sent out on a project alone with no help on several different [occasions]."

B. That, her complaint is based upon retaliation.

In view of the aforementioned charge, an investigation, including an examination of pertinent official records and interviews with appropriate personnel, was conducted by the Personnel and Compliance Bureau of the Alabama Department of Transportation. As a result of said investigation, the following facts were ascertained:

A. Ms. Jackson explained that, during her first month of employment in July 2006, she was not assigned to do any specific project work, as were other Engineering Assistants (EAs). Instead, she was instructed to accompany Chris Burdette (consultant) to various projects. At that time, her supervisor was Austin Harville, Project Engineer. She stated she was also sent to work on a project alone, and she was uncomfortable with trying to keep up with several different job tasks alone. As a result, she called the office and requested assistance.

Later, she was assigned to work under the supervision of Bret Paulk (Project Engineer). She said on several occasions she reported for work at the office, and either Mr. Paulk or Josh McElhenney (Project Engineer) called the Engineering Assistants (who were already at the various job sites) and asked them if they needed help on the job site. They responded, no.

Ms. Jackson stated she assumed no one wanted to work with her based on the above-mentioned incidents, and because her coworkers mistakenly thought she was Bertha Alexander's (Administrative Support Assistant) daughter. However, she provided no further explanation.

Complaint, L. Jackson, DOT 146
February 14, 2007
Page 2



According to Vince Calametti (Division Construction Engineer), Jay Palmer
(District Engineer), and Bret Paulk (Project Engineer), it is common for new,
inexperienced EAs to be assigned to observe various job tasks being performed on
different project sites, as part of on-the-job training. Therefore, assigning Ms.
Jackson to accompany Mr. Burdette to different project sites was not improper. It
is also common to assign EAs to work on projects where their assistance is
actually needed, rather than on projects where there are enough personnel to
perform the required work. Likewise, it is also common for an EA to occasionally
work alone (i.e., without other state employees present) inspecting a contractor's
work on a project.

Mr. Calametti and Ms. Jackson both stated Ms. Jackson received assistance on the
same day she called the Division Office about working alone on a project.

**SUMMARY:**

Based on the above information, it does not appear Ms. Jackson has been
mistreated, or treated differently than other EAs. In addition, it appears the
incidents described by Ms. Jackson would have occurred regardless of whether she
was, or was not, related to Ms. Alexander.

B. In a memo to Jeremiah Taylor (Employee Assistance Program Coordinator), dated
October 14, 2006, Ms. Jackson wrote, "this constant harassment and intimidation
is a direct form of retaliation against my mother-in-law (Bertha Alexander, ASA I,
age 53) for filing a complaint." She did not provide any further explanation
or information. (See **Attachment 1**).

Based on the following, there was no evidence of retaliation, as defined by Title
VII of the Civil Rights Act of 1964, found in this investigation:

* Ms. Jackson has not previously participated in a protected activity during her
employment with ALDOT.

* Ms. Jackson did not suffer any adverse employment action in any of the
incidents she described in her complaint.

Complaint, L. Jackson, DOT 146
February 14, 2007
Page 3



In view of the investigation, its premises, and the aforementioned findings as a result thereof, no recommendations are offered at this time.

Respectfully submitted,

*Sandra M. Dietz,*
Sandra M. Dietz, Investigator

*2/14/07*
February 14, 2007

**Documentation Attached:**

Attachment 1: Memo from L. Jackson to J. Taylor, dated 10/14/06.

Approved: R. Feno
15 FEB 07

cc:    Mr. Jim Ippolito
       Mr. R. F. Poiroux

Rec'd. 1/16/07
SD

FYI
Sandi Dietz

DATE:    October 14, 2006

TO:    Jeremiah Taylor, EAP Coordinator

FROM:    _Jackson_
         Engineering Assistant I

RE:    RETAILIATION/HARASSMENT/STRESS

Dear Mr. Taylor,

I want to make a complaint against Jay Palmer and Bret Paulk (Project Engineer). I first want to start off telling you that I am having the worst experience ever in this department. No one wanted to work with me because they thought that I was Bertha Alexander's, Administrative Assistant I, currently employed at 9th Division, daughter.

When Austin Harville was working for the ALDOT as my project engineer I spoke with him about this problem and it didn't change anything. I have constantly been sent out to project sites alone. This started on August 22, 2006 and I became so stressed out with trying to do the work on Natchez Hwy alone I spoke with Austin Harville on August 31, 2006 and then Jay Palmer, District I Engineer and Vince Calametti, Division Construction Engineer came out to Natchez Hwy to speak with me. I received help that day and also on September 1, 2006 from Floyd Hansworth, EA L The second day I was back on the above-referenced project site alone until prime contractor, Mobile Asphalt, had to go somewhere else for a month and then returned October 9, 2006.

On September 7, 2006 I noticed a deep scratch on my Mercedes Benz. I thought nothing of the scratch at first until a different scratch showed up later. So, I started looking my car over at the end of each work day and there would be a different scratch sure enough. I tried to find out who was scratching on my car by talking to a couple of people and even hoping to catch someone by returning to the office early. After that didn't work I spoke with Jay Palmer, District I on October 5, 2006 and he suggested that I park in the front near his office so my care could be watched closely. I also spoke with Joshua McElhenney, Project Engineer in same office on October 6, 2006 and asked him to make employees aware about the scratches on my car and that it must stop. While I was talking to Josh I said "I'm pretty sure no one wants to get hurt about putting scratches on a car." During the time that I made that remark Bret Paulk, my present project engineer, was present and he told Jay Palmer. I had to meet with Jay Palmer and Bret Paulk twice on October 6, 2006. The first meeting Jay Palmer asked me about my comment and the second meeting he told me that I should seek counseling and he had a document for me to sign about counseling, which I signed because I felt intimidated by his position. I thought that if I didn't sign that document that I would be fired. Leon Malone, EEO was also

Page (2)
October 14, 2005
Re: **RETAILIATION/HARASSMENT/STRESS**

present in the second meeting. Jay Palmer didn't write up a document about the scratches
that have been appearing on my car. He was more worried about my comment. While in
the second meeting Bret Paulk asked him to tell me that all employees should be at work
for 7:00a. m. - I was not late for work that day and no other day. I asked him, "When
have I been late". He replied, "No you haven't been late, but if it should become a
problem in the future." I don't think he can see through the future. When I was leaving
the meeting Bret Paulk came behind me saying, "Shun, I didn't say anything." I also had
to work on October 9, 2006 and I had class from October 10, 2006 to October 13, 2006.
Bret Paulk called my personal cell phone October 10, 2006 at 7:00 a. m. stating that it is
7:00 and I need to call him. I feel that this constant harassment and intimidation is a
direct form of retaliation against my mother-in-law (Bertha Alexander, ASA I, age 53)
for filing a complaint of violation of the consent decree, who was removed from the same
project office I'm assigned to with similar issues. This is too stressful. It seems to me that
they are looking for any reason to harass me. This is not acceptable behavior in any
normal work place especially for a new employee.

Cordially,

LYJ
Attachment

*As per conversation on Dec. 27, 2006 with Sandi Dietz, EEO: This is the second copy
of my complaint and I am awaiting the copy of the first that was allegedly "messed up,
due to poor fax machines at the 6th Division."

Rec'd. 11/29/07
SD

ALABAMA DEPARTMENT OF TRANSPORTATION

Complaint Form

Original

| Name | | Address | | |
|---|---|---|---|---|
| LaShundra Jackson | | 714 S. Cedar Street | Mobile | 36603 |

| SSN | Race/Sex | Division/Bureau | District/Section | Job Classification |
|---|---|---|---|---|
| | B/F | 9th | | EA-1 |

| Signature | Date Submitted |
|---|---|
| LaShundra Jackson | 10/16/06 |

**Date (HR Bureau use only)** **Docket # (HR Bureau use only)**

If your complaint is **not** based on discrimination, please check here: None ___

If your complaint **is** based on discrimination, please check one of the following:

Age ___     Consent Decree Violation ___     Disability ___     National Origin ___

Race ___     Religion ___     Retaliation ✓     Sex/Gender ___

Area in Which You Were Affected (You must check one):

Compensation ___     Disciplinary Action ___     Hiring ___     Job Assignment/Duties ✓

Retaliation ___     Training ___     Transfer ___

Other (explain) _____

Date of Incident: 8/1/06 – present

Summary of Complaint (Including the name of the employee against whom this complaint is being filed):

It all started when I was hired under Austin Harvill. Everyone thought that I was the daughter of Bertha Alexander. No one wanted to work with me nor teach me anything. I complained to Austin about this problem along with another problem. I was also sent out on a project alone with no help on several different occasions. I was also sent on projects with Chris in his vehicle & attachment

Names of Witnesses: Floyd Hansworth, Vince Calametti, Jay Palmer, Austin Harvill, message on my personal cell phone.

Your Suggested Resolution:
I still feel intimidated and threaten working under Bret Paulk and Jay Palmer. I really feel that it would be to my advantage to be moved elsewhere.

Please return to:     (1) Your immediate Supervisor or
                      (2) Your Division EEO Representative or
                      (3) ALDOT Human Resources Bureau (Attention: Title 7 Coordinator)
                      1409 Coliseum Blvd. Montgomery, AL 36130          Revised 1/11/02