IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA JACKSON | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CASE NO.: 2:07-CV-645-MEF |
| | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION, JOE MCINNES, IN HIS | § | |
| OFFICIAL CAPACITY AS DIRECTOR OF THE | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted
ROSS | MELTON, P.C.
1104 San Antonio Street
Austin, Texas 78701
Telephone: 512/474-7677
Facsimile: 512/474-5306

s/ Kell A. Simon
Kell Simon
Alabama State Bar No.: ASB-0214-O77K

## I.    Statement of Facts

### 1.    Hiring and initial employment

LaShundra Jackson was hired by ALDOT on July 3, 2006 as an Engineering Assistant (sometimes referred to herein as "EA"). Exh. 1 to Defendant's Motion for Summary Judgment. Engineering Assistant is an entry level position, requiring no prior experience in the field of engineering. Exh. 4 (job announcement for Engineering Assistant). The only qualification for the position is a high school diploma or GED. *Id.*

Engineering Assistants at ALDOT perform a wide variety of jobs, involving both indoor and outdoor work. *Id.* The position "represents the entry level for engineering positions in design, construction, traffic surveying, and materials testing." *Id.* Examples of Engineering Assistant duties include performing "simple tasks in the field, office, or laboratory, such as serving as rodman or targetman on a survey crew, inspecting simple construction project activities, computing quantities, areas, and project costs, counting and classifying motor vehicles, performing simple materials testing, acting as a recorder with a road inventory party and assisting in the inspection of bridges and bridge structures." *Id.*

New Engineering Assistants take a basic math and algebra test when they are hired. *See* Affidavit of Ronnie Poiroux. The majority of new Engineering Assistant hires do not pass one or both of these tests. Exh. 10.

LaShundra Jackson's mother-in-law, Bertha Alexander, is an Administrative Support Assistant with the Alabama Department of Transportation in the Ninth Division. *See* Declaration of Bertha Alexander, attached hereto as Exhibit 3. One of Ms. Alexander's duties is to schedule interviews for Engineering Assistant applicants. *Id.* at ¶3. When Ms. Jackson applied, Alexander told Vince Calametti, the

1

Construction Engineer who interviewed candidates for EA positions, that Ms. Jackson was her daughter-in-law. *Id.* They discussed whether it would be appropriate for Mr. Calametti to interview Ms. Jackson, and Ms. Alexander said she would prefer that he not. *Id.* Ms. Alexander had recently filed an internal complaint alleging race discrimination. *Id.* at ¶9; Exh. 11.

Ms. Jackson was hired on July 3, 2006, and she was assigned to field inspection work on construction projects. Her first supervisor was Austin Harville, and then she was moved to the supervision of Bret Paulk in September 2006. Deposition of LaShundra Jackson (hereinafter "Jackson depo.") at 47:15-48:6 (attached to Defendant's Motion for Summary Judgment); Def. Exh. 4[1].

### 2.    Ms. Jackson's performance review

On December 20, 2006, Ms. Jackson received her six month performance review. Def. Exh. 10. Ms. Jackson's overall performance was rated as "meets standards." *Id.* As this performance review occurred at the end of Ms. Jackson's initial six month probationary period, her managers were required to state whether Ms. Jackson was to be given permanent status, continued on probation, or terminated. *Id.* Ms. Jackson's review recommended that she be "continued in the probation", and though the review form instructs the supervisor to put the "reason stated in Disciplinary Actions Area," no reason was stated in that area. *Id.*

Ms. Jackson was told that her probationary period was extended because she had not passed the algebra course. However, she had been approved to miss the course by her supervisors. Jackson depo. at 147:12-13. Ronnie Poiroux, the Ninth Division Engineer, told Ms. Jackson he saw no reason for her not to have made probation whether or not she attended the class. Jackson depo. at 145:3-5. White

---

[1]  References to exhibits attached to Defendant's Motion for Summary Judgment are cited as "Def. Exh."

employees, such as Lisa Champagne, passed their probationary periods and were made permanent without having passed algebra. *See* Exh. 10 (list of 9ᵗʰ Division Engineering Assistant hires, showing Champagne not passing class); Declaration of Gwenda Hunter (hereinafter "Hunter decl.") at ¶14.

### 3.    January 5, 2007

On January 5, 2007, Ms. Jackson informed Bret Paulk, her supervisor that she was pregnant. She gave him a doctor's note that stated "no heavy lifting during pregnancy." Def. Exh. 15. Just after Ms. Jackson gave Mr. Paulk the note, Mr. Paulk came back out of his office and asked Ms. Jackson to come in. Declaration of LaShundra Jackson (hereinafter "Jackson decl.")(attached hereto as Exh. 1) at ¶2. Ms. Jackson went in his office and he closed the door. *Id.* Josh McElhenney, who shared the office with Mr. Paulk, was there too. *Id.* Paulk handed Ms. Jackson a document to sign. *Id.*

Ms. Jackson looked at the document, which contained the 9ᵗʰ Division's new taping policy, and said that she did not want to sign it because she thought it was not legal. *Id.* at ¶3. Ms. Jackson then asked Mr. Paulk if it would be ok if she called an attorney she knew to ask him about the policy, and he agreed. *Id.* Ms. Jackson called the attorney from her cell phone in Mr. Paulk's office, but he did not answer. *Id.* Ms. Jackson told Mr. Paulk that he did not answer, and asked if she could wait until she spoke with him to sign the policy. *Id.* There was an attachment to the policy that said that the policy did not have to be turned back in until January 16, so she thought she had plenty of time. *Id.*

At that point, Mr. Paulk began to get angry. *Id.* at ¶4. He said "you're gonna sign this policy," and began raising his voice, yelling and hitting the desk with his fingers and repeating "you're gonna sign this policy. You're gonna sign this policy today!" *Id.* He had an angry expression on his face, and his face was red. *Id.*

3

At some point during Mr. Paulk's yelling, Ms. Jackson began to cry, because she felt very intimidated. *Id.* at ¶5. Then her cell phone rang, and she answered it. *Id.* It was Bertha Alexander on the phone. *Id.* Ms. Jackson was trying to answer Ms. Alexander's questions about where she was and who was yelling, and Mr. Paulk continued to tell Jackson that she was going to sign the policy. *Id.* at ¶6. Alexander could hear Paulk yelling at Ms. Jackson through the phone. Alexander decl. at ¶5. Ms. Jackson did not raise her voice or object to anything that Paulk or McElhenney said. *Id.* at ¶7. She was not insubordinate. *Id.*

Mr. Paulk told Ms. Jackson that she had until the end of the day to sign the policy, and Ms. Jackson, still crying, left his office and walked to the Division Office. *Id.* The meeting in Mr. Paulk's office lasted approximately fifteen or twenty minutes. *Id.* When she entered the Division Office building, she was still crying, and Charly Jones, another ALDOT employee, saw her and came into Joey Fresolone's office with her. Jackson decl. at ¶5; Exh. 9.

In Fresolone's office, Jackson, who was "very upset and in tears" according to Charly Jones, told Fresolone that she did not understand what the policy document meant, and that she felt Paulk was treating her unfairly. Exh. 9. Neither Fresolone nor Jones had ever seen the taping memo[2], so they arranged to discuss the matter with Leon Malone, and Ms. Jackson left Fresolone's office to go to her training class. *Id.* The meeting in Fresolone's office lasted approximately fifteen minutes. Jackson depo. at 167:23-168:16.

---

[2] The memo states: "no individual may record, by any means, any other individual without that individual's knowledge and written consent. Any violation of this policy will result in disciplinary action up to and including termination. A supervisor may, however, tape record a disciplinary proceeding or meeting without the employee's consent, as long as the employee has knowledge that a tape recording is being made of the meeting or proceeding." Def. Exh. 14.

That afternoon, Ms. Jackson met again with Mr. Fresolone and Mr. Paulk regarding the policy. Also present in that meeting were Gwenda Hunter, an Engineering Assistant, and Leon Malone, the Division EEO officer. When Hunter arrived at the meeting, she did not know what it was about. Hunter decl. at ¶5. Fresolone started the meeting by reading a document that contained a lot of legal terminology, and neither Hunter nor Ms. Jackson could understand it. *Id.* When Ms. Hunter asked Mr. Fresolone what the document was about, he told her curtly "I will get to that." *Id.* He then started reading again, and Ms. Hunter understood that it was a taping policy that she had heard about that employees were being asked to sign. *Id.* She had not seen the policy before the meeting. *Id.*

Both Paulk and Malone acted in a very intimidating manner toward Ms. Jackson during the meeting. *Id.* at ¶6. They then left the room, and Ms. Jackson and Ms. Hunter discussed the policy without them present, and Ms. Jackson agreed to sign it. *Id.* When Paulk returned to the meeting, he was again belligerent toward Ms. Jackson. *Id.* at ¶7. Ms. Jackson signed the policy, and the meeting lasted a total of approximately 10 minutes. *Id.*; Jackson decl. at ¶9. Paulk told Samuel Palmer, the district engineer, about the meetings in a memorandum dated January 5, 2007. Exh. 5.

According to Ms. Hunter, Ms. Jackson was not insubordinate, offensive, or disruptive during the meeting. *Id.* at ¶8. Hunter thought Ms. Jackson seemed confused a lot of the time, because the men in the room were saying things that she could not understand. *Id.* They never mentioned to her that this was a new policy that everyone would have to sign. *Id.*

Ms. Jackson did not hear anything else about the policy until on January 18, 2007, Paulk gave her a written reprimand stating that she had engaged in "disruptive behavior" and had been "insubordinate." Def. Exh. 16. The letter further stated "[y]our performance appraisal will reflect this incident."

5

**4.**    **Ms. Jackson's termination**

     **a.**    **After receiving the reprimand for the January 5 meetings, Ms. Jackson engages in two forms of protected conduct.**

       **1.**    **The January 29 complaint**

On January 29, 2007, Ms. Jackson filed a formal complaint with ALDOT's Human Resources Bureau that she was being retaliated against because her mother-in-law, Bertha Alexander, had previously complained of race discrimination. Def. Exh.25 at 3-5. On February 14, 2007, Investigator Sandra M. Dietz denied Ms. Jackson's grievance; her findings state that she spoke with Calametti, Palmer, and Paulk about the grievance. *Id.*

       **2.**    **The second doctor's note.**

In early February 2007, Ms. Jackson's doctor wrote her a second note, stating that she was restricted to inside work. When she gave the note to Bret Paulk, he told her that he did not have any work she could do inside, and that she would not move forward in her "condition." Jackson testified as follows regarding her conversation with Paulk:

> A   When I finally gave him my second note that restricted me to office
> duties --
> Q   The one we talked about at length before?
> A   Yes. And I was also being moved from up under his supervision, and
> he asked me if I really wanted to be moved, and I told him, yes. He told
> me that, Well, I really can't go forward in my condition no way.

Jackson depo. at 189:3-9.

Ms. Jackson also gave the note to Vince Calametti, (Jackson decl. at ¶7), and on February 13, 2007, Calametti sent it to Samuel Palmer, the District Engineer who was Bret Paulk's supervisor, with a memorandum stating "Attached please find temporary work restriction on Mrs. LaShundra Jackson." Def.

Exh. 18. Palmer, however, denies ever having received any request for accommodation because of Ms. Jackson's pregnancy. Palmer affidavit (attached to Def. Motion for Summary Judgment) at 3.

Nine days later, on February 22, 2007, Mr. Palmer recommended that Ms. Jackson be terminated from her employment at ALDOT. Def. Exh. 19. Ms. Jackson was not accused of any misconduct between February 13 and February 22 (or, for that matter, between January 5 and February 22). *Id.*

### b.    ALDOT's inconsistent justifications for terminating Jackson

Ronnie Poiroux, who was the highest ranking employee in the Ninth Division (holding the position of Division Engineer), recommended Ms. Jackson's termination to ALDOT's Director after receiving Palmer's termination recommendation. Poiroux testified in his affidavit he recommended Ms. Jackson's termination based on "incidents on October 4 through 6, 2006, November 2, 2006, and January 5, 2007." Poiroux affidavit at 2 (attached to Defendant's Motion for Summary Judgment). Samuel Palmer, however, testified that Ms. Jackson was not terminated for any incident occurring on November 2, 2006. Exh. 6 at 15.

Palmer testified in his affidavit submitted with Defendant's Motion for Summary Judgment that *he* recommended Ms. Jackson's termination "based on incidents on October 4 through 6, 2006, December 20, 2006, and January 5, 2007." However, in his letter recommending Ms. Jackson's termination, Mr. Palmer states that his recommendation was based on incidents occurring on October 6, 2006 November 2, 2006 and January 18, 2007. Def. Exh. 19.

The letter terminating Ms. Jackson's employment, dated March 6, 2007, does not state the reason she was being terminated - it simply states "[i]t has been determined that your services are no longer required." Def. Exh. 21.

7

There is no consistent evidence in the record showing which incidents on which dates were the alleged cause of Ms. Jackson's termination.

## II.    Summary Judgment Standard

The Eleventh Circuit has cautioned:

> Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of ***any need*** for factual determinations are disposed of by summary judgment.

*Tippers v. Chelates Corp.*, 805 F.2d 949, 952-53 (11th Cir. 1986)(emphasis added).

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993). The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d at 919 (quoting *Anderson*, 477 U.S. at 255). To prove that no genuine factual issues exist, the party moving for summary judgment must present a factual scenario without any "unexplained gaps." *Adickes, supra,* 90 S.Ct. at 1609.

## III.    Argument

### A.    Plaintiff has stated a *prima facie* case of pregnancy discrimination

Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of

8

such individual's race, color, religion, sex, or national origin...." 42 U.S.C. 2000e-2(a)(1). In 1978, Congress amended Title VII of the Civil Rights Act of 1964 to include the Pregnancy Discrimination Act (PDA), expanding the Act to encompass pregnancy-based discrimination. Thus, the terms "because of sex" or "on the basis of sex" include because or on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. §§ 2000e(k). Analysis of pregnancy discrimination claims mirrors that of Title VII sex discrimination claims. *Maddox v. Grandview Care Center, Inc.,* 780 F.2d 987, 989 (11th Cir.1986); *see also Hunter v. Mobis Alabama, LLC* 2008 WL 2267192, 5 (M.D.Ala. 2008).

In pregnancy discrimination cases such as this one, courts in this district have applied the Eleventh Circuit's general formulation of a *prima facie* case, requiring the plaintiff to show that the plaintiff (1) was in a protected group, (2) that she was qualified for her position at the time of her termination, and (3) evidence from which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of plaintiff's membership in the protected category. *Hunter*, 2008 WL 2267192 at *7 (M.D.Ala.,2008)(*citing Corbin v. Southland Int'l Trucks, Inc.,* 25 F.3d 1545 (11th Cir.1994)).

Defendant appears to challenge Ms. Jackson's ability to meet the third prong of the test - providing evidence from which the jury could conclude that ALDOT intended to discriminate against Ms. Jackson on the basis of her pregnancy. Def. Brief at 21-23.

There is substantial evidence of ALDOT's intent to discriminate against Ms. Jackson because of her pregnancy. First, Bret Paulk's comment to Ms. Jackson that would not move forward in her condition is direct evidence of Mr. Paulk's intent to discriminate against Ms. Jackson. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). It is also powerful circumstantial evidence of his bias against her simply because of her pregnancy. Defendant argues that Mr. Paulk's comments constitute

9

"stray remarks." Def. Brief at 22. They do not fall under this doctrine, however, because they are close in time to the decision, related directly to the decision at issue, and because Paulk was a decisionmaker on Ms. Jackson's termination. Exh. 6 at p. 29[3].

Second, the timing of Ms. Jackson's termination is also sufficient to establish a *prima facie* case of pregnancy discrimination. Ms. Jackson gave Vince Calametti her note regarding her doctor's restrictions that she work inside during her pregnancy on February 13, 2007. Calametti sent those restrictions to Palmer on February 13, and Palmer recommended her termination (and Calametti concurred) only nine days later, on February 22, 2007. Def. Exh. 18, 19. This is sufficient to establish a *prima facie* case of pregnancy discrimination. *Asmo v. Keane, Inc.* 471 F.3d 588 (6th Cir. 2006)( two-month temporal proximity between time when employer learned of pregnancy and its decision to terminate employee demonstrated nexus between pregnancy and termination for purpose of *prima facie* case)[4]. Under the law

---

[3]  Malone testified as follows:

| | |
|---|---|
| Simon: | Who were the people who decided to terminate Ms. Jackson? |
| Malone: | That determination would have been made by her immediate supervisor, with agreement by the division engineer. |
| Simon: | Ok her immediate supervisor was who? |
| Malone: | Bret Paulk |

Exh. 6 at 29.

[4]  Though the Eleventh Circuit has not squarely addressed the issue of temporal proximity establishing a *prima facie* case in the pregnancy discrimination context, it has done so in the context of retaliation. Other Circuits, such as the Sixth, have held that temporal proximity satisfies the nexus requirement in pregnancy cases. *DeBoer v. Musashi Auto Parts, Inc.,* 124 Fed. Appx. 387, 391 (6th Cir.2005). Other courts in this Circuit have also found temporal proximity to satisfy the *prima facie* case in a pregnancy discrimination case. *See, e.g., McCullen v. R D R, LLC,* 2007 WL 2071362, 6 (M.D.Fla., 2007)("close temporal proximity between when the Plaintiff announced her pregnancy and when her hours began to drop is sufficient to establish an inference that . . . [the] policy . . . was applied more severely to the Plaintiff because of her pregnancy.")

of this Circuit, a nine day gap between protected activity and the discriminatory act creates an inference of discrimination sufficient to state a *prima facie* case. *See Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1457 (11th Cir.1998)(one month between the protected activity and the adverse action is not too protracted to establish the causal nexus for the *prima facie* case). Temporal proximity may be used to demonstrate a causal nexus between the protected activity, here, becoming pregnant and notifying her employer of her pregnancy-related work restrictions, and her termination. As the court in *Hargett v. Delta Automotive, Inc.* 765 F.Supp. 1487 (N.D.Ala.,1991) recognized, "if pregnancy plays any role whatsoever in the adverse employment decision, the legislative intent was to prevent it." *Id.* at 1493.

The lack of an intervening event between Palmer and Calametti being notified of the restrictions on February 13 and their recommending her termination on February 22 would also allow a jury to infer that Mr. Calametti recommended the termination because of Ms. Jackson's pregnancy. It is particularly suspicious that Palmer and Calametti had to reach back to the January 5, 2007 incident to attempt to justify Ms. Jackson's termination. Ms. Jackson had already been reprimanded for the January 5 incident (on January 18), and had been told that it would affect her performance appraisal. However, it was not until after Palmer read the pregnancy note that it was decided that the January 5 incident somehow became a terminable offense.

Thus, both the temporal proximity and the reaching back to an incident that had been resolved to justify Ms. Jackson's termination together would allow a reasonable jury to infer that Defendant decided to terminate her employment because her pregnancy.

---

**B.    Plaintiff has presented a *prima facie* case of retaliation based on the January 29 grievance.**

To state a *prima facie* case of retaliation, Ms. Jackson must show that (1) she engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004). For the first prong, Ms. Jackson made a formal complaint of retaliation on January 29, 2007, to ALDOT's Human Resources Bureau. Def. Exh. At 3-5.[5] Ms. Jackson also complained on January 5, 2007, that she felt she was being discriminated against because she is female. *See* Exh. 5 at 2. (Paulk's notes stating "Ms. Jackson also stated that she felt threatened and that I harassed and discriminated against her due to the fact that she was female.") That was just after she told Bret Paulk that she was pregnant, and he blew up at her about her not wanting to sign the taping policy.

The law in this Circuit is that to satisfy the causal connection element, the plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). Here, Ms. Jackson proves a *prima facie* case simply through the temporal proximity of her complaints to her termination. "A plaintiff satisfies this [causation] element if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir.2004). Under Circuit law, a period as much as one month between the protected activity and the adverse action is not too protracted to establish the causal nexus for the *prima facie* case. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998). As such,

---

[5] Though the Complaint Form states that it was submitted on October 16, 2006, it was not received by ALDOT until January 29, 2007. Def. Exh. 25 at 3..

the three week interval between when Ms. Jackson's formal complaint was received by ALDOT and her termination establishes her *prima facie* case. That Paulk, Calametti, and Poiroux knew about the complaint is indisputable, as the investigative findings, dated February 14, 2007, regarding the complaint mention that the investigator spoke with all of them about it. Def. Exh. 29 at 3-5.

Ms. Jackson's *prima facie* case of retaliation is also established by the inconsistencies and incoherencies found in Defendants' justification for terminating her. *See* §III(E)(3), *infra*. Defendant's lack of a coherent justification for terminating Ms. Jackson's employment also raises the inference that her termination and her grievances are not "completely unrelated." A reasonable jury could conclude that it was not really Ms. Jackson's actions in October 2006 and January 5, 2007 that motivated the Defendant to terminate her, and that the true reason was, at least in part, her complaints of discrimination. That Ms. Jackson's alleged misconduct was remote in time from the termination decision also supports this conclusion.

Defendant argues that Ms. Jackson's written complaint of January 29, 2007, cannot constitute protected activity because it complains of retaliation based on Ms. Jackson's mother-in-law's participation in protected activity. Def. Brief at 24.

Ms. Jackson's good faith belief that she was being retaliated against for her mother-in-law's complaints is sufficient to allow her grievance to be considered protected activity under Title VII. While Defendant states in its brief that "ALDOT is unaware of any jurisdiction that has held that a person may establish a Title VII or §1981 retaliation claim for the acts of another employee person, or relative," Section 8-II of the EEOC Compliance Manual states:

> The retaliation provisions of Title VII, the ADEA, the EPA, and the ADA
> prohibit retaliation against someone so closely related to or associated
> with the person exercising his or her statutory rights that it would
> discourage or prevent the person from pursuing those rights.

EEOC Compliance Manual, §§ 8-II, December 5, 2002. Though the Eleventh Circuit has not ruled on

the issue, numerous court have held that employees are protected against retaliation for complaints made

by close relatives[6]. The issue here is not whether Ms. Jackson's grievance had merit, but only whether Ms.

Jackson had "a good faith, reasonable belief that the employer was engaged in unlawful employment

practices." *Little v. United Technologies, Carrier Transicold Division,* 103 F.3d 956, 960 (11th

Cir.1997). As discrimination against relatives who have complained of discrimination is a recognized cause

of action, a reasonable jury could find that Ms. Jackson had a good faith, reasonable basis for her January

29, 2007 complaint that she was retaliated against for Ms. Alexander's complaints of discrimination.

ALDOT contends further that there is no evidence that the decisionmakers knew of Ms. Jackson's

relationship to Ms. Alexander, but this is belied both by the testimony of Ms. Alexander, who spoke with

---

[6]*Equal Employment Opportunity Commission v. Ohio Edison Co.,* 7 F.3d 541, 544 (6th
Cir.1993) ("We thus reject the conclusion of the district court in the present case that third parties, who
have not actually engaged in protected activities themselves, can never sue under" 42 U.S.C. § 2000e-
3(a)"); *McKenzie v. Atlantic Richfield Co.,* 906 F.Supp. 572, 575 (D.Colo.1995) ("the anti-reprisal
provision of Title VII precludes an employer from discriminating against an individual because that
person's spouse has engaged in protected activities"); *Murphy v. Cadillac Rubber & Plastics, Inc.,*
946 F.Supp. 1108, 1118 (W.D.N.Y.1996) (valid cause of action where plaintiff alleged that a close
relative had engaged in protected activity, his employer took a disadvantageous employment action
against him, and the time frame indicated a causal connection); *Equal Employment Opportunity
Commission v. Nalbandian Sales, Inc.,* 36 F.Supp.2d 1206, 1210 (E.D.Ca.1998) ("[a] construction
that requires standing only where the employee himself has participated in activity giving rise to unlawful
retaliation would leave all the other retaliated against employees without a remedy").

Mr. Calametti regarding her relationship with Ms. Jackson before Ms. Jackson was hired, and ALDOT's grievance investigation, which indicates that the investigator spoke with Mr. Paulk, Mr. Calametti, and Mr. Palmer about Ms. Jackson's grievance.  Def. Exh. 25 at 3-5.

Taken together, the evidence before this Court establishes an issue of fact as to whether Ms. Jackson has raised an inference that she was terminated because of her complaints of discrimination and retaliaton.  As such, summary judgment should be denied.

### C.     Ms. Jackson has set forth a *prima facie* case of race discrimination.

To establish a *prima facie* case of race discrimination with respect to her termination, Ms. Jackson must show: (1) she was a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Maynard v. Bd. of Regents of the Div. of Univ. of Fla. Dep't of Educ.,* 342 F.3d 1281, 1289 (11th Cir.2003). Here, Plaintiff meets all of the elements - she is African-American; she was hired for the position, having met the minimum qualifications, and Defendant has not claimed that she was terminated because of a lack of qualifications; she was terminated; and an individual hired as an Engineering Assistant in the Ninth Division directly after her termination - Lisa Champagne - is white. Exh. 10 (showing Champagne hire date); Exh. 3 at ¶14.  Champagne worked directly under Bret Paulk. Exh. 7 at 6.

Ms. Jackson also states a *prima facie* case of race discrimination with respect to the treatment of Mary Weaver, a white Engineering Assistant who ALDOT learned was pregnant shortly after she was hired. Ms. Weaver, who worked in the Ninth Division under Calametti and Poiroux, told ALDOT of her pregnancy while she was assigned to work outside in the field.  Hunter declaration at ¶12.  ALDOT then

15

reassigned Weaver to work inside for the duration of her pregnancy, and then assigned her back outside after she returned from maternity leave. *Id.*. ALDOT, on the other hand, terminated Ms. Jackson's employment after she sought the same restriction - inside work until after her maternity leave. The fact that Ronnie Poiroux and Jeanette Little both testified in their affidavits submitted with Defendants' Motion for Summary Judgment that Weaver was never brought inside while she was pregnant is further indication that they are attempting to cover up the fact that Ms. Weaver was given the accommodation that Ms. Jackson was denied.

### D.    Defendant has failed to articulate a legitimate, nondiscriminatory reason for Ms. Jackson's termination

Once the plaintiff has established his prima facie case of discrimination, "the defendant must clearly set forth, through the introduction of *admissible evidence*, the reason for its adverse  employment decision, and that reason 'must be legally sufficient to justify a judgment for the defendant." *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998)(emphasis supplied).  This reason must be articulated by the individual who made the decision to take the adverse action.  *Id.* at 1181 &n.8 ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision.").  The articulation must also include evidence of what the decisionmaker knew and when he knew it. *Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)("The evidence must include facts which show *what the decision-maker knew at the time when the decision was made*")(emphasis supplied); *Turnes v. AmSouth Bank NA*, 36 F.3d 1057 (11th Cir. 1994).  The reason must also be the reason that was "actually relied on" by the decisionmaker in deciding to discharge the plaintiff. *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990).  As held in *Lee v. Russell County*

*Board of Education*, 684 F.2d 769, 775 (11th Cir. 1982), "[i]f there was no evidence that asserted reasons for discharge were actually relied on, the reasons are not sufficient to meet defendant's rebuttal burden." *Id.*

Here, Defendant has not produced evidence to show who made the final decision to terminate Ms. Jackson's employment. Defendant's interrogatory responses indicate that the decision to terminate Ms. Jackson was made by Samuel Palmer, Vincent Calametti, R.F. Poiroux, L. D. Morris, and D.J. "Joe" McInnes. *See* Exhibit 7 at 5. As the Director of ALDOT, McInnes was the highest ranking individual in that chain. Yet Defendant has produced no evidence of the factors that motivated Mr. McInnes, of what information he considered in making his decision to terminate Ms. Jackson, or why he decided to terminate her. The same is true for L.D. Morris, who was the Assistant Transportation Director, and for Calametti. Though Calametti gave an affidavit in support of Defendant's Motion for Summary Judgment, it does not offer any evidence concerning his reason for terminating Ms. Jackson. *See* Calametti affidavit, attached to Defendant's Motion for Summary Judgment. Nor did Calametti prepare any documents that purport to justify Ms. Jackson's termination.

The fact that the justifications offered by Palmer and Poiroux are inconsistent both with themselves and with each other also prevents Defendants having met their burden to articulate a legitimate, nondiscriminatory reason. *See* §III(D), *supra*.

Long-standing Supreme Court precedent requires the defendants' articulation to be "clear and reasonably specific." *Texas Dept. of Community Affairs v. Burdine*, 101 S.Ct. 1089, 1096 (1981)("[T]he defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff be afforded a 'full and fair opportunity' to demonstrate pretext"). The managers who

17

recommended Ms. Jackson's termination cited different events as their purported justifications, and there is no evidence as to which of these motivated the final decisionmaker. Without this information, Ms. Jackson can only guess as to which of the allegations motivated him. As such, defendants have not satisfied their burden of articulating a legitimate, nondiscriminatory reason for Ms. Jackson's termination, and summary judgment should be denied.

###    E.    Evidence of Pretext

Assuming *arguendo* that defendants have articulated a legitimate, non-discriminatory or retaliatory reason for Ms. Palmer's termination, the burden then shifts back to Ms. Palmer to demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence.'" *Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998)(*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)*, cert. denied*, 522 U.S. 1045 (1998)). As the Eleventh Circuit held in *Hairston*:

> The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext, and that the action taken was in retaliation for engaging in the protected activity. Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue.

*Hairston* at 921. Plaintiff has satisfied that burden here.

The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the

employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Butler v. Alabama Dept. of Transp.* 512 F.Supp.2d 1209, 1224 (M.D.Ala.,2007)(Fuller, J.)(*citing Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997)). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id. (citing Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 148 (2000)). Both forms of proof exist in the record.

In this case, pretext is shown by:

- Bret Paulk's statement that Ms. Jackson would not move forward in her condition

- The lack of any indication that Ms. Jackson's alleged misconduct would result in her termination until *after* she complained to Human Resources and *after* she provided the "inside duties" note to Mr. Calametti

- Blatant inconsistencies in the justifications for Ms. Jackson's termination

- The testimony of witnesses who say that Ms. Jackson's conduct on January 5, 2007, was not in any way disruptive, and that it was Bret Paulk who was disruptive.

- ALDOT's management's misrepresentations concerning their treatment Mary Weaver

Cases such this one are "only infrequently resolved on summary judgment because the credibility of the witnesses and the weight of the evidence, quintessential jury questions, are so central to any ultimate determination." *Strickland v. Prime Care of Dothan,* 108 F.Supp.2d 1329, 1332 (M.D.Ala.2000) *(citing Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993); *see also Hunter,* 2008 WL 2267192, 9 (M.D.Ala. 2008).

### 1.   Bret Paulk's comments establish an issue of fact as to pretext

Bret Paulk's comment to Ms. Jackson that she would not move forward in her "condition"

constitutes evidence of Paulk's bias against Ms. Jackson on account of her pregnancy. As discussed above, this cannot be considered a "stray remark," as Defendants posit, because it was made by someone identified as a decisionmaker on Ms. Jackson's termination. *See supra* at p. 9. Thus, this remark satisfies Jackson's burden of establishing a fact issue pretext. *See Ashe v. Aronov Homes, Inc,* 354 F. Supp.2d 1251 (M. D. Ala 2004)(Fuller, J.); *Herawi v. State of Alabama Dept. of Forensic Sciences,* 311 F.Supp.2d 1335 (M. D. Ala. 2004)(Fuller, J.). "Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext." *Herawi* at 1347 (citing *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1362 (11th Cir.1999); *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir.1998)). In *Herawi,* the Court concluded that the comments made by the decision maker might lead a reasonable jury to disbelieve the defendant's proffered reason for firing the plaintiff, rendering summary judgment inappropriate. *Id.* The comment in question here demonstrates conclusively Paulk's bias against pregnant employees, in effect his belief that they cannot progress as employees of ALDOT.

### 2. There is no connection between Ms. Jackson's termination and her behavior on January 5, 2007.

The second factor establishing pretext is the evidence showing that no one considered terminating Ms. Jackson for the incidents occurring on January 5 or in October (or the other dates in November and December 2006 offered by Calametti and Poiroux) until *after* she requested the inside duties assignment and *after* she filed a complaint with ALDOT Human Resources. All of Ms. Jackson's alleged misconduct had occurred by the end of the day on January 5. Paulk, Palmer, and Calametti knew of this conduct on January 5, and all they did was to issue her a written reprimand on January 18. Def. Exh. 16. The statement in the reprimand that "your performance appraisal will reflect this incident," as well as the fact

20

that there no evidence of any discussion of termination at that time, indicates that the January 18 reprimand concluded ALDOT's discipline of Ms. Jackson for the incident. Ms. Jackson worked without incident from January 5 until her termination on March 6, so there was no new misconduct on the part of Ms. Jackson that could have spurred her termination. Paulk, Palmer, and Calametti's resurrection of this incident as a basis for terminating Ms. Jackson *after* her grievance and her pregnancy restrictions would allow a reasonable jury to conclude that they were simply looking for a reason to get rid of Ms. Jackson after she engaged in protected activity.

A plaintiff may establish pretext if the employer's reason for the discharge "was something so far removed in time from the discharge itself that it is unlikely to have been the whole cause, even if a part of it." *La Montagne v. Am. Convenience Prods., Inc.,* 750 F.2d 1405, 1415 (7th Cir.1984). *See also Larios v. McLane Co., Inc.* 2008 WL 1925036, 3 (D.Or.,2008)("defendants' delay in commencing the termination proceedings shows pretext. Plaintiff worked several days after arriving late on July 22, and was not told he was being terminated until after he filed his workers compensation claim."); *Podkovich v. Glazer's Distributors of Iowa, Inc.* 446 F.Supp.2d 982, 1015 -1016 (N.D.Iowa,2006)("Glazer's purported nondiscriminatory reason is unsound and supports a finding of pretext. This is so, primarily based on the fact that Podkovich's termination did not even remotely coincide with the Diageo contract finalization, which had occurred two months prior to the date Podkovich was terminated.")

As the Administrative Hearing Officer with the Alabama Department of Industrial Relations found after Ms. Jackson's unemployment hearing:

> The employer has alleged that the claimant's termination resulted from her disruptive and disrespectful behavior toward supervisory personnel and coworkers. However, the claimant was discharged after warning for an incident that occurred significantly prior to the termination day. *No cause*

*or relationship has been established between the incident and termination.* There was no disregard for the employer's interests shown. This does not constitute misconduct connected with work.

Exh. 8.

So, here, a reasonable jury could conclude that ALDOT's purported justification for terminating Ms. Jackson was a pretext for their intent to get rid of her because of her complaint and her work restrictions.

> **3.** **ALDOT's justification for terminating Ms. Jackson is rife with inconsistencies and incoherencies that would allow a reasonable jury to conclude that it was pretextual.**

Inconsistencies in an employer's articulated reason may also serve as evidence of pretext. *See, McGaughy v. Kitchens Express* 2007 WL 1266862, 5 (M.D.Ala.,2007)(Fuller, J.)(*citing Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1298-99 (11th Cir.2006) ("We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."); *Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1550 (11th Cir.1994). As the Supreme Court held in *Reeves v. Sanderson Plumbing Products, Inc.*, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive." 530 U.S. 133, 147 (2000).

> **a.** **Management gave inconsistent justifications regarding the incidents that led to Ms. Jackson's termination.**

> **1.** **Inconsistencies regarding the overall reason for termination**

Ronnie Poiroux, the highest ranking employee in the Ninth Division (holding the position of Division Engineer), recommended Ms. Jackson's termination to ALDOT's Director. Poiroux testified in his affidavit he recommended Ms. Jackson's termination based on "incidents on October 4 through 6, 2006,

November 2, 2006, and January 5, 2007." Poiroux affidavit at 2 (attached to Defendant's Motion for Summary Judgment). Samuel Palmer, however, testified that Ms. Jackson was *not* terminated for any incident occurring on November 2, 2006.   Exh. 6 at 15.

Palmer, on the other hand, testified in his affidavit submitted with Defendant's Motion for Summary Judgment that *he* recommended Ms. Jackson's termination "based on incidents on October 4 through 6, 2006, December 20, 2006, and January 5, 2007." However, in his letter recommending Ms. Jackson's termination, Mr. Palmer states that it is based on incidents occurring on October 6, 2006 November 2, 2006 and January 18, 2007.   Def. Exh. 19.

Thus, the officials who recommended Ms. Jackson's termination could not even agree on the incidents for which Ms. Jackson would be terminated. There is no evidence concerning any incident of misconduct on Ms. Jackson's part on November 2, 2006, and Samuel Palmer denied during Ms. Jackson's unemployment hearing that she was terminated for any incident occurring on November 2, 2006 (though he had earlier said in his termination recommendation that it was). Exh. 6 at 15. Furthermore, though Palmer swears in his affidavit that he recommended Ms. Jackson's termination based on an incident occurring on December 20, 2006, this is not one of the incidents referenced in his own letter recommending the termination of Ms. Jackson's employment. *See* Def. Exh. 19. In the letter, he states that he is recommending her termination based on incidents occurring on October 6, November 2, and January 18 (the written reprimand). This letter contradicts his affidavit testimony regarding December 20, and is contradicted by his denial that November 2 played a role in the termination decision. Such inconsistencies establish an issue of fact as to pretext.

        **2.**    **Inconsistencies regarding the specific incidents referenced by Defendant.**

With regard to the October 4 incident, at the time, this did not even rise to the level of misconduct that would affect Ms. Jackson's probationary performance review. Ms. Jackson was rated only two months later on that review as being satisfactory (the highest rating possible) in the categories of "Cooperation with Coworkers" and "Compliance with Rules." Def. Exh. 10. Nor is there any reference to any conduct on October 4-6 in the "disciplinary notes" section of the review - she was not even disciplined for her alleged misconduct. *Id.*

An additional basis for finding pretext exists in Palmer's contention in his affidavit that he never received any request for accommodations for Ms. Jackson's pregnancy. Palmer affidavit at 3. This statement is shown to be untrue by Calametti's February 13, 2007, letter to Palmer, attaching Ms. Jackson's "temporary work restriction." Def. Exh. 18. Palmer's ineffective attempt to defeat the causal connection between Ms. Jackson's request for accommodations and the decision, only nine days later, to terminate her relates directly to the central issue of pregnancy discrimination in this case, and should be considered as further evidence of pretext.

a.    **The meetings on January 5, 2007**

Another glaring inconsistency is the Defendant's contention that Ms. Jackson was insubordinate during the January 5 meetings, when the testimony of witnesses to those meetings establishes the opposite - that Paulk and the other managers were "belligerent," intimidating, and loud. Defendant contends in its brief that Ms. Jackson was terminated, in part, because she "disrupted the office for nearly an entire day until she finally signed the form, a form that all employees were required to sign." Def. Brief at 29. This blatant exaggeration of what amounted to, at the most, an hour of meetings during which Ms. Jackson was belittled, berated, and made to cry, is further evidence of pretext. First, Plaintiff did not "disrupt the office

for nearly an entire day" as Defendant contends. The first two meetings regarding the policy - in Bret Paulk's office and then in Joey Fresolone's - lasted less than an hour altogether. The first one started at approximately 7:15 in Mr. Paulk's office, and went for approximately 20 minutes, until Ms. Jackson left and went to Joey Fresolone's office, where she arrived at approximately 7:40. Exh. 9. She then arrived at her training class several minutes before it started at 8:00. There was a third meeting in the afternoon, again in Joey Fresolone's office, which lasted approximately ten minutes. Jackson decl. at ¶9. Three meetings, none of which lasted more than twenty minutes, surely cannot constitute disruption of the office "for nearly an entire day" as Defendants contend.

Furthermore, Bret Paulk's justifications for the reprimand changed completely between January 5 and January 23. On January 5, Mr. Paulk wrote that "Ms. Jackson's demeanor became disruptive due to the fact that she was talking loudly and distracting other employees from working." Exh. 5. However, the door was closed, so none of the other employees could have heard Ms. Jackson. Jackson dec. at ¶25. Defendants have produced no evidence of a single employee who claimed that his or her work was disrupted by Ms. Jackson. Nor did Paulk speak with anyone to try to determine whether his closed-door meeting with Jackson disrupted the work of anyone in the office:

> Simon:    . . . did you talk with anybody to find out whether their
>           work had been disrupted?
> Paulk:    No sir.

Exhibit 6 at 21-22.

That Paulk's initial blow-up at Ms. Jackson during the first meeting followed directly after Ms. Jackson informed him for the first time that she was pregnant would also allow a jury to conclude that Paulk's bias against pregnant employees caused his temper to flare, and that that was the true cause of any

disruptions in Mr. Paulk's day. A jury could reasonably conclude that screaming at an employee and then writing her up for insubordination when she left your office in tears does not justify terminating that employee two months later for her conduct on that day.

Furthermore, the evidence shows that the policy was confusing - even Leon Malone, the EEO Officer, and Bret Paulk could not agree on whether signing it meant an agreement to the terms or simply an acknowledgement that the employee had reviewed the policy. *Compare* Exh. 6 at 25 (Malone: "I tried to explain that it wasn't a reference to an agreement, it was acknowledging that it had been received") with Exh. 6 at 19-20 (Paulk: "The policy . . . stated that by signing this your acknowledging that you received and understood the policy and agreed with.")

Finally, the testimony of witnesses who were present with Ms. Jackson on January 5, both by phone and in person, establish that it was Bret Paulk and other managers whose conduct was inappropriate, with Paulk yelling at Ms. Jackson, beating the table, and acting, in the words of Gwenda Hunter, "belligerently" toward Ms. Jackson. And Jackson signed the policy by the deadline given to her by Mr. Paulk that morning, even though the policy was not due to be turned back in until January 16, 2007. Jackson dec. at ¶3.

Given the foregoing, a reasonable jury could conclude that Defendant's allegedly legitimate reason(s) for terminating Ms. Jackson were a pretext for their desire to get rid of her after she complained to Human Resources, after she sought duties that restricted her to inside work, and because of her race. As such, summary judgment should be denied, and this case permitted to move forward to trial.

### 4.    Evidence of race discrimination.

With respect to Ms. Jackson's claims that Defendants discriminated against her based on her race, there are two pieces of evidence, in addition to that listed above, that show pretext. First, ALDOT treated Mary Weaver, a white female Engineering Assistant, more favorably than Jackson when management learned that she was pregnant. Ms. Weaver was assigned from the field to inside work for the duration of her pregnancy, while Ms. Jackson was terminated. Furthermore, Samuel Palmer testified in his affidavit that Ms. Weaver was "already working an inside position when she became pregnant." Palmer affidavit at 3 (attached to Def. Summary Judgment Motion). However, Jeanette Brown's affidavit states that "during the time of her pregnancy, Ms. Weaver was performing outside work and continued to perform this work up to the time she took pregnancy leave." Jeannette Brown affidavit (attached to Def. Summary Judgment Motion). These two statements are not only inherently contradictory, but they are both contradicted by the testimony of Gwenda Hunter, who worked with Weaver and testified that Weaver moved from an outside to an inside position for the duration of her pregnancy. This is just the kind of inconsistency or incoherency that supports a finding that Defendant's justification for its treatment of Ms. Jackson was pretextual.

Finally, there is evidence in the record that Defendant treated white probationary Engineering Assistants differently from how it treated Ms. Jackson. Ms. Jackson was told that her probationary period was extended because she had not passed the algebra course. Def. Exh. 11. White employees, such as Lisa Champagne, passed their probationary periods and were made permanent without having passed algebra. *See* Exh. 10 (list of 9th Division Engineering Assistant hires, showing Champagne not passing class); Declaration of Gwenda Hunter (hereinafter "Hunter decl.") at ¶14. Furthermore, Ms. Jackson had

been approved to miss the algebra course by her supervisors, and Poiroux, the highest ranking employee in the Ninth Division, told Ms. Jackson he saw no reason for her not to have made probation whether or not she attended the class. Jackson depo. at 145:3-5; 147:12-13.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted

ROSS | MELTON, P.C.
1104 San Antonio Street
Austin, Texas 78701
Telephone: 512/474-7677
Facsimile: 512/474-5306

s/ Kell A. Simon
Kell Simon
Alabama State Bar No.: ASB-0214-O77K

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification to the following:

Jim R. Ippolito, Jr.
Andrew W. Redd
Jason A. Trippe
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

s/ Kell A. Simon
Of counsel

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA JACKSON | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO.: 2:07-CV-645-MEF |
| | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION, JOE MCINNES, IN HIS | § | |
| OFFICIAL CAPACITY AS DIRECTOR OF THE | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S APPENDIX TO RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.**

| | |
|---|---|
| Exhibit 1 | Declaration of Lashundra Jackson |
| Exhibit 2 | Declaration of Gwenda Hunter |
| Exhibit 3 | Declaration of Bertha Alexander Jackson |
| Exhibit 4 | Engineering Assistant Job Announcement |
| Exhibit 5 | January 5, 2007 Memorandum to file by Bret Paulk |
| Exhibit 6 | Unemployment Hearing Transcript |
| Exhibit 7 | Defendant's Responses to Plaintiff's First Set of Interrogatories and First Request for Production of Documents |
| Exhibit 8 | Unemployment Findings |
| Exhibit 9 | January 5, 2007 Charly Jones Letter |
| Exhibit 10 | List of 9th Division EA Hires Test Passage Information |
| Exhibit 11 | Bertha Alexander Grievance |

Respectfully submitted
Ross | Melton, P.C.
1104 San Antonio Street
Austin, Texas 78701
Telephone: 512/474-7677
Facsimile: 512/474-5306


s/ Kell A. Simon
Kell Simon
Alabama State Bar No.: ASB-0214-O77K

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification to the following:

Jim R. Ippolito, Jr.
Andrew W. Redd
Jason A. Trippe
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

s/ Kell A. Simon
Of counsel

# Plaintiff's Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON                            §
                                            §
    Plaintiff,                              §
                                            §
                                            §        CASE NO.: 2:07-CV-645-MEF
                                            §
STATE OF ALABAMA DEPARTMENT OF              §
TRANSPORTATION, JOE MCINNES, IN HIS         §
OFFICIAL CAPACITY AS DIRECTOR OF THE        §
STATE OF ALABAMA DEPARTMENT OF              §
TRANSPORTATION                              §
                                            §
    Defendants.                             §

## DECLARATION OF LASHUNDRA JACKSON

Under penalty of perjury, LaShundra Jackson states as follows:

1.    My name is LaShundra Jackson. I have personal knowledge of the following facts, and can testify to these facts in court.

2.    On January 5, 2007, at around 7:05 or 7:10, right after I got to work, I gave Bret Paulk the first doctor's note regarding my pregnancy. Mr. Paulk and I were together in the project trailer and I handed him the note. He turned around and went back in his office. Then he came back out and said "what's this word right here?" I said "pregnancy." He went back in the office. Then he came back out and said "come in here a minute I need you to sign this policy." It was the tape recording policy. I went in his office and he closed the door behind us. He went around his desk and sat down. I sat down too. Josh McElhenney shared the office with Mr. Paulk at the time, and he was in there when we went in.

3.    I looked at the policy and said that I did not want to sign it because I thought it was not legal. I asked Mr. Paulk if it would be ok if I called an attorney I knew to ask him about the



PLAINTIFF'S
EXHIBIT

1

ALL-STATE LEGAL®

policy. Mr. Paulk said this would be ok. I called him from my cell phone in Mr. Paulk's office, but he did not answer. I told Mr. Paulk that he did not answer, and asked if I could wait until I spoke with him to sign the policy. There was an attachment to the policy that said that the policy did not have to be turned back in until January 16, so I thought I had plenty of time.

4.    At that point, Mr. Paulk began to get angry. He said "you're gonna sign this policy," and began raising his voice, yelling and hitting the desk with his fingers and repeating "you're gonna sign this policy. You're gonna sign this policy today!" He had an angry expression on his face, and his face was red.

5.    At some point during his yelling, I began to cry, because I felt very intimidated. Then my cell phone rang. I answered it. It was Bertha Alexander on the phone. I was trying to answer Bertha's questions about where I was and who was yelling. Then there was a knock on the door, and Josh said "come in" several times. The person who knocked could not hear Josh say "come in", so Josh got up and opened the door. He stood in the doorway and spoke to the person who had knocked, who was Marion Stragner. When he was done speaking with her, he stepped back, closed the door, and went back to his desk.

6.    Mr. Paulk continued to tell me that I was going to sign the policy. I was still crying, and Mr. Paulk said "you have until the end of this day to sign this policy." I left his office and I went out the back door and walked to the Division Office. The meeting in Mr. Paulk's office lasted approximately fifteen or twenty minutes.

7.    When I entered the Division Office building, I was still crying, and Charly Jones saw me and came into Joey Fresolone's office with me. We met there with Mr. Fresolone for approximately ten minutes.

8.    I did not raise my voice when I was talking to Mr. Paulk in his office. I was not able

to say much during the time I spent in his office, because he and Josh McElhenney were doing most of the talking.

9.    After the morning meeting in Mr. Fresolone's office, I was in a training class for the rest of the work day until we met in Mr. Fresolone's office again that afternoon. After the class ended, Mr. Fresolone called Bret Paulk and asked him and me to go to his office again. The afternoon meeting in Mr. Fresolone's office last approximately ten minutes. I signed the policy during the meeting, and I left work at approximately 4 p.m. that day.

10.    In early February 2007, I brought Vince Calametti a note from my doctor stating that I was restricted to inside work during my pregnancy. During the meeting with Mr. Calametti, he told me that I was going to be transferred to work under Tony Cooper.

11.    When I gave Mr. Paulk the second note from my doctor, after I had given it to Mr. Calametti, I walked into his office and gave him the note. He then came out of his office, and said to me "what is this word." I told him it was "delivery." Then we walked to his office. He said to me "when are you due?" I told him July or August. Then he said "well, you know, we really don't have anything for you to do in the office." I said: "don't worry about it Bret, I'm being transferred to Tony Cooper anyway." Bret said "oh I haven't heard that." I said "I spoke with Vince about it." That is when he made the comment about me not making going far in my condition that I testified about in my deposition.

12.    When I went and worked with Tony Cooper, I performed office work that was not engineering work. The only work that could be considered engineering work that I did while in the office was some calculations on some work that the people working in the field had done. I only did this two days. The rest of the time, I was given notes and told to type them up. This was secretarial work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __16th__ day of __June__, 2008.

LaShundra Jackson

# Plaintiff's Exhibit 2

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| LASHUNDRA JACKSON | § |
| | § |
| Plaintiff, | § |
| | § |
| | §   CASE NO.: 2:07-CV-645-MEF |
| | § |
| STATE OF ALABAMA DEPARTMENT OF | § |
| TRANSPORTATION, JOE MCINNES, IN HIS | § |
| OFFICIAL CAPACITY AS DIRECTOR OF THE | § |
| STATE OF ALABAMA DEPARTMENT OF | § |
| TRANSPORTATION | § |
| | § |
| Defendants. | § |

### DECLARATION OF GWENDA HUNTER

Under penalty of perjury, Gwenda Hunter states as follows:

1.  My name is Gwenda Hunter. I have personal knowledge of the following facts, and can testify to these facts in court.

2.  I have worked at the Alabama Department of Transportation for almost seven years. I started out there as an Engineering Assistant. I currently hold the position of Engineering Assistant II/III.

3.  I met LaShundra Jackson when she worked at the Alabama Department of Transportation.

4.  She told me that she wanted to pass her probationary period, but the project office she was in was making it difficult. I told her that it is difficult sometimes for women in construction, because they don't get the t aining. I told her that on wash out days she could come to the materials lab if her supervisor allowed her to, and she could come and train with me in the Materials Lab. On

1

PLAINTIFF'S
EXHIBIT
2
ALL-STATE LEGAL®

several occasions, she would come in and talk to me about the manuals she had to use on her job and would ask me questions. She seemed genuinely interested in learning the job of an Engineering Assistant. She would always tell me that she was going to make her probation and become a permanent employee.

5.     In January of 2007, Ms. Jackson called me and asked me if I would come up to Joey Fresolone's office where she was, and I got permission from my supervisor to go. When I got there, at first I did not know what the meeting was about. Joey Fresolone started the meeting by reading something that was very confusing. It was a document that contained a lot of legal terms that I could not understand, and I could tell that Ms. Jackson could not understand it either. I had to stop him and ask him what was this about. He told me curtly "I will get to that." He then started reading again, and I understood that it was a taping policy that I had heard about that we would all have to sign. I had not seen the policy before the meeting.

6.     At one point, Ms. Jackson asked a question, and Brett Paulk answered her in a very intimidating manner. Leon Malone was also acting in a very intimidating manner. After talking for a few minutes, everyone except for myself and Ms. Jackson left the room. When they left, I explained to her that everyone would have to sign the document. Ms. Jackson agreed with me that she should sign the document, and so everyone else came back into the room at that point.

7.     When they came in, everything was calm at first, but then Mr. Malone started talking in a way that was very confusing. Brett Paulk was also still speaking belligerently to Ms. Jackson. Ms. Jackson then told them "I'm going to sign the paper." Joey Fresolone pushed the paper at her and she signed it.

8.     Throughout the meeting, instead of explaining the policy, the men in the room were

2

talking to Ms. Jackson as if she were an attorney, and she should know what they were talking about.

9.    Ms. Jackson was not insubordinate, offensive, or disruptive during the meeting. She seemed confused a lot of the time, because the men in the room were saying things that she could not understand. They never mentioned to her that this was a new policy that everyone would have to sign.

10.    They did not tell her that what they wanted her to sign was something that everyone would have to sign. This was something that everyone did not know about yet - Mr. Paulk took it to her before anyone else knew about it.

11.    When I bought a new car around April 12, 2008, within three days of parking at ALDOT, in the same place where Ms. Jackson parked her car, there were scratches that appeared on my car.

12.    I worked with Mary Weaver when she worked at ALDOT. We both worked out in the field as inspectors on construction projects, and we rode in a car together every day to the projects. Then Ms. Weaver started getting sick when she was working outside, so ALDOT allowed her to work inside. She was getting sick because she was pregnant. She was approximately four months pregnant when she was transferred to work inside. This occurred in approximately 2002. She was allowed to work inside through the rest of her pregnancy. Ronnie Poiroux was the Division Engineer at that time, and Vince Calametti was the Construction Engineer, just like they were when Ms. Jackson was terminated.

13.    I have never seen a policy in the Ninth Division that a probationary Engineering Assistant has to pass Algebra before they can be made permanent.

14.    Lisa Champagne is a white female Engineering Assistant. I am aware that she has

3

passed her probation, because she has rotated through my area (Materials and Tests) and new Engineering Assistants rotate through there after they pass their probationary period.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __13__ day of __June__, 2008.

_Gwenda Hunter_
Gwenda Hunter

4

# Plaintiff's Exhibit 3

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA JACKSON | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CASE NO.: 2:07-CV-645-MEF |
| · | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION, JOE MCINNES, IN HIS | § | |
| OFFICIAL CAPACITY AS DIRECTOR OF THE | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION | § | |
| | § | |
| Defendants. | § | |

### DECLARATION OF BERTHA ALEXANDER JACKSON

Under penalty of perjury, Bertha Alexander Jackson states as follows:

1.      My name is Bertha Alexander Jackson. I have personal knowledge of the following facts, and can testify to these facts in court.

2.      I am African-American. I am currently employed by the Alabama Department of Transportation as an Administrative Support Assistant. I have worked there since 2000. I have worked with Vince Calametti, Samuel Palmer, and Joey Fresolone.  I am the office secretary/receptionist for the Ninth Division Construction Office. Vince Calametti was my direct supervisor from approximately July 2004 until March 2008.

3.      As the Office Secretary for construction, I had to schedule interviews for Engineering Assistant applicants.  When LaShundra Jackson applied for work at ALDOT, I had to schedule her interview. I went to Mr. Calametti and told him that Ms. Jackson is my daughter-in-law. Mr. Calametti asked me whether I would prefer him interview her, or someone else. I told him I would rather someone else interview her.



PLAINTIFF'S EXHIBIT
3
ALL-STATE LEGAL®

4.    On January 5, 2007, I was at home sick. I called Ms. Jackson early in the morning, because I knew everyone would be in the office because it was raining that day. When she answered the phone, I could hear that she was upset - she was crying. I asked her what the matter was, and she told me that Bret and Josh were making her cry. She told me about a taping policy that Bret and Josh McElhenney were trying to get her to sign.

5.    During the call, I could hear voices in the background that I recognized as Bret Paulk and Josh McElhenney. While I was employed at ALDOT, I had communicated with Mr. Paulk and Mr. McElhenney on a regular basis, so I knew their voices. I could hear Bret yelling at Ms. Jackson "You have to sign this document right now."

6.    I asked Ms. Jackson if there was anyone there she could contact, and she said she did not know. She then left Mr. Paulk's office. I could hear that she was still crying and I talked to her while she walked to Joey Fresolone's office. We hung up with each other shortly before she got to Mr. Fresolone's office.

7.    During the time we were on the phone, Ms. Jackson did not raise her voice or object to anything that Mr. Paulk or Mr. McElhenney said. She was not insubordinate in any way.

8.    While I worked at ALDOT, I parked my car in the same place where Ms. Jackson parked hers. In about 2004, someone put tar on the hood of my car - I could tell that it was done on purpose because there were handprints in it. I reported these things to Mark Hocutt, who was my direct supervisor. He had me take pictures of the car, but he told me that "you're in the parking lot, and you park on your own." ALDOT would not pay for the car to be cleaned. During the next year, my car got scratched and keyed just like Ms. Jackson's did.

9.    I filed several grievances against ALDOT claiming that I had been discriminated against because of my race. A hearing was held on my grievances in October 2006. Under

ALDOT's grievance procedure, a non-ALDOT hearing officer named Wes Romine was brought in
to hear the grievance. Attached to this declaration is a copy of Mr. Romine findings.

10.     I know Lisa Champagne from seeing her at work. She is white.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of _____, 2008.

Bertha Alexander Jackson

Plaintiff's
Exhibit 4

**Announcement Date: May 2, 2007**
**Revision Date: September 1, 2007**

**State of Alabama**
**Personnel Department**
**64 North Union Street**
**P. O. Box 304100**
**Montgomery, AL 36130-4100**
**(334) 242-3389**
**Internet:** http://www.personnel.state.al.us

## Announcement of Continuous Merit System Examination

# ENGINEERING ASSISTANT - 20111
# $23,181.60 - $35,256.00

---

**Engineering Assistant (20111)**                    **Salary: $23,181.60 - $35,256.00**

**Department:** Transportation
**Location:** Statewide

### TYPE OF EXAMINATION

An **open-competitive** register will be established. The register will be established based on applicant's scores on a written examination. Scores from this examination *(plus Veteran's Preference Points)* will count as 100% of an applicant's final score. **Examples of the types of items on the examination and the specific knowledge and abilities to be examined are detailed in a "How to Prepare" booklet which is available on our web site listed above. Please Contact State Personnel if you wish to have a guide mailed to you.**

### QUALIFICATIONS NEEDED TO APPLY

**You must have the following to qualify:**

- **High School Diploma or GED**

### KIND OF WORK

This is work of limited skill in assisting on engineering projects and related activities. This class represents the entry level for engineering positions in design, construction, traffic surveying, and materials testing. Employees perform simple tasks in the field, office or laboratory such as serving as rodman or targetman on a survey crew, inspecting simple construction project activities, computing quantities, areas and project costs, counting and classifying motor vehicles, performing simple materials testing, acting as recorder with a road inventory party and assisting in the inspection of bridges and bridge structures.

### HOW TO APPLY

Use an Application for Examination form. You can get the form at this office or at an Alabama Career Center office. It can also be downloaded from our web site. You must send your application to the State Personnel Department. Photocopied applications are accepted. Facsimile applications are also accepted. Our fax number is 334-242-1110. Applications will be accepted **until further notice.**

*Individuals currently on the register MUST reapply to remain eligible for employment*

**THE STATE OF ALABAMA IS AN EQUAL OPPPORTUNITY EMPLOYER**

*Please refer to the back of this announcement or the State Personnel Department web site for complete information on our policy for accepting post-secondary and advanced degrees.

PLAINTIFF'S
EXHIBIT
4

ALL-STATE LEGAL®

Except for pretest information provided by State Personnel to all applicants, you should not directly or indirectly obtain information about examinations. If you do, the State Personnel Director may do several things. One, you may not be given an examination. Two, you may be disqualified after an examination. Three, your name may be removed from a register. Or four, your name may not be certified from the register. (Rules of the State Personnel Board, Chapter 670-x-9). According to the Code of Alabama, 36-26-47, a willful violation of exam security is a misdemeanor. Any person who is convicted of this type of misdemeanor will not get a state job. If they are officers or employees of the state, they will be required to forfeit their office or position for five years.

If you know of anyone who has violated this policy, you should contact the Examination Manager at the State Personnel Department.

### *State of Alabama Personnel Department
### Policy on Accepting College Coursework, Post-Secondary and Advanced Degrees

1.      Specific college coursework required for a job, as well as Bachelor's, graduate, post graduate, and doctoral degrees will be accepted from the schools accredited by any of the six regional accreditation associations in the United States. These associations are listed below.

- Southern Association of Colleges and Schools (SACS)
- Middle States Association of Colleges and Schools (MSA)
- Northwest Commission on Colleges and Universities (NWCCU)
- North Central Association of Colleges and Schools – The Higher Learning Commission (NCA-HLC)
- New England Association of Schools and Colleges – Commission on Institutions of Higher Education (NEASC-CIHE)
- Western Association of Schools and Colleges – Accrediting Commission for Senior Colleges and Universities (WASC-ACSCU)

2.      Coursework or degrees from schools that have not been accredited by a regional accreditation association will be accepted if a regionally accredited school considers the coursework or degree to be an acceptable prerequisite for admission to an advanced degree program. For example, if a regionally accredited school accepts an applicant's bachelor's degree for admittance into a graduate degree program, State Personnel will accept the degree. In the case of required college coursework (but no degree requirement), State Personnel will accept the college coursework if a regionally accredited school accepts the coursework towards a post-secondary degree (e.g., a bachelor's degree). *__This must be documented by a letter of acceptance from the regionally accredited school.__* State Personnel will review such requests on a case-by-case basis.

Note:   This policy is subject to change. Certain state agencies may have additional requirements.

# Plaintiff's Exhibit 5

| Transportation Office Manager | | | |
|---|---|---|---|
| Section | Info | Action | File |
| Accounting | | | |
| Personnel | | | ✓ |
| Personnel File | | | |
| Training | | | |
| Route | | | |
| Action Requested: | | | |

# MEMORANDUM

Date:       January 5, 2007

To:         File

From:       *Bret Paulk* (signature)
            Bret Paulk
            Project Engineer

RE:         LaShundra Jackson -- Recording Policy

I spoke with LaShundra Jackson in my office trailer at approximately 3:15 p.m. and Mrs. Jackson stated that she had until Jan. 16th to sign the policy after I advised her it needed to be signed by the end of the day. Mrs. Jackson stated that she talked to Joey Fresolone on the phone and that today was only Jan. 5th and that she was going to wait until the 16th. She stated that if I would like to talk to Mr. Fresolone that we could go meet him in his office. I stated that would be fine. When we met Mr. Fresolone in his office, Mrs. Jackson stated that she would like a co-worker as a witness during the meeting. Mr. Fresolone told her to call the co-worker she would like to have witness the meeting and Mrs. Jackson called Gwenda Hunter. The meeting started once Mrs. Hunter and Leon Malone arrived in Mr. Fresolone's office. I stated to the group that Mrs. Jackson was given until the end of the day to sign the policy and that she told me in my office before the meeting started that she had until Jan. 16th to sign the policy. Mr. Fresolone asked Mrs. Jackson if she had anything she would like to say and Mrs. Jackson stated that she did not agree with the portion of the policy which stated that a supervisor did not need employees consent before recording a disciplinary meeting. Mrs. Jackson also added that because I knew she didn't want to sign the policy I was forcing her into positive progressive discipline and that I wanted her dismissed from ALDOT. I reminded Mrs. Jackson that I was not trying to get her dismissed and that I only wanted her to sign the policy today. Mr. Fresolone and Mr. Malone explained that by signing the policy she was only acknowledging that she had received and understood it. Signing didn't mean that she agreed with the policy. Mrs. Jackson then stated that she did not understand the policy; therefore she did not have to sign. Mr. Fresolone stated that he would offer to help her understand and read and explained the entire policy to Mrs. Jackson. Mrs. Jackson stated that she needed a lawyer to read over the policy before she signed anything. Mr. Fresolone stated that this would be fine but she still had to sign the policy.



PLAINTIFF'S EXHIBIT
5
ALL-STATE LEGAL®

by the deadline established by her supervisor. Mr. Malone stated the policy was legal and advised her there was no need for a lawyer to look over such a policy. Shun became aggravated when Mr. Malone stated his opinion on this matter. Mrs. Jackson directed her attention to Mr. Malone by bringing up an informal complaint which occurred in the past. Shun criticized Mr. Malone's job performance and became very sarcastic in stating that he did not handle this informal complaint in a timely manner. Mr. Fresolone intervened due to the fact that Mrs. Jackson was getting off subject and not talking about the situation at hand. Mr. Fresolone, once again, asked Mrs. Jackson to sign the policy and then Mrs. Hunter intervened and asked if she and Mrs. Jackson could have a moment of privacy. Mr. Fresolone, Mr. Malone, and I stepped into the hall for approximately 5 minutes and returned when they were ready to talk. Mrs. Jackson started the conversation by telling Mr. Fresolone that I spoke to her in a demanding way this morning. Mrs. Jackson also stated that she felt threatened and that I harassed and discriminated against her due to the fact that she was female. Mr. Malone advised her that she should read over policies and definitions that pertain to such claims. Mrs. Jackson stated that she wanted to file a grievance or complaint against me due to the tone of my voice and how she was treated this morning in my office. She stated that she was not happy working for me and that the atmosphere in my office was one of a hostile work environment. I told Mrs. Jackson that I did not agree with any of her previous accusations and that she should have come to me before now if she had any complaints. Mrs. Jackson now stated that she didn't have a problem with the policy, but the real problem was my demanding attitude this morning. I asked Mrs. Jackson if she still needed a lawyer to read over the policy before she signed. Mrs. Jackson stated that she would sign the policy. Mr. Fresolone advised her to sign the policy and she complied. Mr. Fresolone dismissed Mrs. Jackson and Mrs. Hunter from his office.

C:    Mr. Joey Fresolone
      Mr. Leon Malone
      Mr. Jay Palmer
      Mrs. LaShundra Jackson
      File

# Plaintiff's Exhibit 6





| | |
|---|---|
| Moore: | Telephone hearing scheduled for 8:30, May 5, 2007 Case 053248207, Plaintiff Lashundra Jackson, employer State of Alabama Department of Transportation. This is an employer appeal and employer contact Leon Malone has provided the number 2514708228 at 8:32. |
| Malone: | ALDOT, Leon speaking. |
| Moore: | Good morning Mr. Malone my name is Beth Moore, I'm with the Alabama Department of Industrial Relations, Hearings and Appeal Division, sir and I'm calling in reference to a scheduled appeal hearing concerning employee Lashundra Jackson. Are you available to discuss that matter this morning sir? |
| Malone: | Uh yes I am, and uh I have uh Mr. Jay Palmer uh with me also along with Mr. Bret Paulk, who is the private engineer and I'm gonna put you on speaker phone. |
| Moore: | Well I'm gonna, I'm gonna put you on hold for just a moment sir while I include Ms. Jackson and her legal representative in our hearing, so hopefully that will give you an opportunity to take whatever action you need sir. |
| Malone: | Ok, thank you. |
| Moore: | Yes sir. |
| Moore: | The claimant has provided the number 2514418933. |
| Jackson: | Hello. |
| Moore: | Good morning may I speak with Ms. Lashundra Jackson please? |
| Jackson: | This is she. |
| Moore: | My name is Beth Moore, I'm with the Alabama Department of Industrial Relations, Hearings and Appeal Division, and I'm calling in reference to a scheduled appeal hearing concerning your unemployment claim, mam. Are you available to discuss that matter today? |
| Jackson: | Yes mam, I am. |
| Moore: | If you'll hold I do need to include the other parties in our conversation mam, hold the line please. |
| Jackson: | Ms. Moore. |

1

| | |
|---|---|
| Moore: | Yes. |
| Jackson: | I wanted to also know that uh if you received a telephone number of uh my attorney. |
| Moore: | Mr. Simon? |
| Jackson: | Yes mam. |
| Moore: | I do, and I'll include him in our conversation. Hold the line please. |
| Jackson: | Ok, thank you. |
| Moore: | Uh huh. (Pause) The legal representative for the claimant Kell Simon has provided the number 2027721155. |
| Simon: | Kell Simon |
| Moore: | Hello, Mr Simon, my name is Beth Moore. I'm with the Alabama Department of Industrial Relations, Hearings and Appeal Division. |
| Simon: | Yes, how are you? |
| Moore: | Good morning sir, I'm calling in reference to an appeal hearing concerning Ms. Lashundra Jackson. |
| Simon: | Yes. |
| Moore: | Are you available to discuss that matter this morning sir? |
| Simon: | I most, I most certainly am. |
| Moore: | Ok, if you'll just a moment, I do need to include Ms. Jackson as well as the employer representatives in our conversation. Hold the line please. |
| Simon: | Ok, can I mention one thing to you? |
| Moore: | What is that sir? |
| Simon: | I have a meeting that starts at uh 9:30 central time, so I'm gonna have to uh drop off the call at the time if its, if its still going on. |
| Moore: | Right, we would hope that this hearing would be completed by that time sir. We |

normally allow 45 minutes.

Simon:      Ok I just wanted to warn you in case I had to drop off.

Moore:      Alright. Thank you, just a moment please. Mr. Malone are you still available sir?

Malone:     Yes, I am.

Moore:      And Ms. Jackson, can you hear me mam?
Jackson:    Yes, I can.

Moore:      Mr. Simon are you still online sir?

Simon:      Yes

Moore:      Okay. I do wanna take a moment to clarify our procedures briefly, before we continue Mr. Malone, you indicated that you had other parties present representing the employer can you identify the other parties please?

Malone:     These other employees are representing the department. That is gonna be Mr. Jay Palmer along with Mr. Bret Paulk.

Moore:      I first of all need to clarify your position in today's hearing Mr. Malone, do you plan to provide testimony, as well as Mr. Palmer and Mr. Paulk.

Malone:     Uh, yes.

Moore:      Ok, sir we would normally exclude the other parties from our hearing until their information is requested, so I'm gonna ask that exclude Mr. Palmer as well as Mr. Paulk from our proceedings and just ask that they remain on standby and we will hear from them and call them to the hearing when their information is requested.

Malone:     Ok, Ms. Moore, Mr. Palmer has a little bit more information he may be able to share, so I will let him take the lead role and I will step away from my desk.

Moore:      Alright.

Malone:     Mr. Paulk

Moore:      Mr. Paulk. Can you hear me sir?

3

| | |
|---|---|
| Paulk: | Yes. |
| Moore: | I need you to move closer to the phone sir. I can not hear you. |
| Paulk: | Yes, I can hear you. |
| Moore: | Ok, sir I need for you to state your position with the employer please. |
| Paulk: | Um, project engineer, I was her immediate supervisor. |
| Moore: | Ok and your name again sir? |
| Paulk: | Bret Paulk |
| Moore: | And as I understand Mr. Malone and Mr. Palmer have left the room. Is that correct? |
| Paulk: | Uh, no we are in the process of leaving. |
| Moore: | Alright, just let me know when that's been accomplished Mr. Paulk. |
| Palmer: | I'm sorry, I think your confused, uh I'm probably gonna take the lead on this. |
| Moore: | Who are you sir? |
| Palmer: | Mr. Palmer |
| Moore: | Alright, well whoever takes the lead needs to step forward and the other ones need to leave as soon as possible so we can proceed. |
| Palmer: | Ok, that has been done. |
| Moore: | Alright, and I need for you to state your name and your position with the employer. |
| Palmer: | My name is Samuel Palmer and I'm the district engineer with the Department of Transportation. |
| Moore: | Alright, so noted sir. And I'm sorry your first name is Samuel? |
| Palmer: | Yes ma'am. |
| Moore: | I was thinking that Mr. Malone referred to you as Jay. |

4

Palmer:     That's my middle name Samuel Jason Palmer.

Moore:     Ok and what name do you normally use on the job sir?

Palmer:     Jay

Moore:     Alright, that is so noted. I do wanna take a moment to explain our procedures briefly. First of all I'd like to introduce myself again, my name is Beth Moore. I am an Administrative Hearing Officer with the Alabama Department of Industrial Relations, Hearings and Appeal Division. We are here today for a telephone hearing. Our case number is 053248207, claimant is Ms. Lashundra Jackson is present today, represented by her legal counsel Mr. Kell Simon this morning. The employer State of Alabama Department of Transportation is represented at this time by Mr. Samuel Jay Palmer. The record shows that Ms. Jackson filed a claim for unemployment benefits effective April 15, 2007. Based on the information available to the examiner Ms. Jackson was determined eligible for unemployment benefits. The records show that she was discharged after warning because the employer sided that she refused to follow reasonable instructions, however the information provided showed that she performed her job as instructed. There was no evidence presented at any disregard for the employer's interest to constitute miss conduct connected with work. We do however show the that the employer filed a timely appeal to that decision on the issue that Ms. Jackson was discharged after warning for insubordination and violation of work rules. This resulted in our hearing today. The purpose of this hearing is to verify the reason for Ms. Jackson's job separation. If it's determined that she was discharged for any violation of employer rules or policies. We must verify if that violation does constitute misconduct. Within the meeting of the state unemployment law. And finally we must verify if there is any record of prior warning or the actions that resulted in Ms. Jackson's discharge. We will consider the facts under the provisions of state unemployment law Section 25-4-78 3B. This section of the law provides for an indefinite disqualification if its determined that an individual was discharged for misconduct with work repeated after prior warning to the individual. Disqualification under this section results in an indefinite disqualification until the individual returns to work and earns wages of at least ten times her weekly benefit amount and other insured employment and she is separated from that employment for non-disqualifying reason. We normally being testimony with the party who initiated the separation and the discharge. We will begin with the employer representative. We would ask that the employer representative state the facts concerning Ms. Jackson's separation. After that statement, the claimant or her legal representative will have an opportunity to ask questions of that employer statement. We will then hear from any other employer witness who has relevant information in this matter. We would allow the primary employer representative to ask questions of their witness. We will then allow each witness to be questioned by the Plaintiff's legal counsel or by the claimant also. After all employer representatives and witnesses have been heard, we will allow

5

the claimant to make a statement of facts or respond to questions from her legal counsel or after the claimant make her statement of facts the primary employer represented will be granted an opportunity to ask questions of the claimant's statement as well. I do alert that I will also ask questions throughout the proceedings today in an effort to clarify information. I will then allow both parties to make any additional summarizing or clarifying statement for the record. Then I will close today's hearing. Then I will issue a written decision in a matter of days. I do alert you that all parties do have appeal rights to my decision and those rights are explained in the decision, so we do ask that you read it carefully. The primary issue is under consideration today is the section of law that I've already identified, but I do alert you that if any new issue is identified in the course our discussion today, I will pause to note the section of the law that pertains to that issue. And if the parties are prepared to discuss that issue and attempt to resolve it today. We will attempt to do so. But anytime I do introduce any new issues that is not on the notice of our original hearing then each party does have an opportunity if they feel they do need additional time to request a postponement of a hearing on that issue until another day, and the only way that we would be allowed to discuss that issue in attempt to resolve it today would be if all parties do wave their right for the further postponement. Do either you have any questions about our procedures up to this point?

Jackson:    No

Palmer:    No we don't.

Simon:    I don't

Moore:    I do want to alert you that by law this hearing is tape recorded and also by law any testimony presented in this hearing today must be presented of your oath of record. I will state the oath of record and I ask that you please verbally respond Mr. Palmer as well as Ms. Jackson. Do you solemnly swear our firm that the testimony you provide is the truth, the whole truth, and nothing but truth as you know it?

Palmer:    I do.

Moore:    And I'm sorry Ms. Jackson I need to hear from you as well ma'am.

Jackson:    I said I do.

Moore:    I'm sorry. I must of spoken at the same time and overlapped there. I do also need to verify the addressed of record for the mailing in my decision for the State of Alabama Department of Transportation. I have ALDOT Legal Bureau 1409 Colosseum Blvd, Montgomery Alabama 36110, is that correct Mr. Palmer?

6

Palmer:     Uh, yes it is.

Moore:      Ms. Jackson, I have you address of record as 714 South Cedar Street, Mobile
            Alabama 36603. Is that correct?

Jackson:    Yes

Moore:      Mr. Palmer I would ask that you begin your testimony sir, by stating for the record the
            dates that Ms. Jackson was employed. Do you have that information sir?

Palmer:     I'm sorry I do not have that starting date.

Moore:      At the time Mr. Jackson filed her initial claim, she suggested that she began work on or
            about July 3, 2006, does that sound reasonable sir?

Palmer:     That sounds close, yes that's correct.

Moore:      If you have no reason to believe otherwise sir, we will consider that the most accurate
            information available. Do you have a last day of work or date of termination available,
            Mr. Palmer?

Palmer:     Uh, yes I do.

Moore:      State that for the record sir.

Palmer:     March 6, 2007 was the separation from the employment date.

Moore:      Would that also be her last date of performed services sir?

Palmer:     She completed work. She maked it back to the end of a normal work day Friday,
            March 9, 2007.

Moore:      Alright then let me clarify sir, what was her termination day. Would it be March the 6th
            or March the 9th?

Palmer:     March 6th was the letter of termination, but she was able to, her affect of end of normal
            work day was Friday, March 9th.

Moore:      Alright, that is so noted sir. What was her position at the time of separation.

Palmer:     Jackson was a engineering assistant one.

Moore:        And as an engineering assistant one sir, basically what were her primary duties.

Palmer:       Her primary duties were to inspect and document all contractor activities on active construction clauses within the division.

Moore:        And was there any specific final incident that resulted in Ms. Jackson's termination sir?

Palmer:       Uh, yes ma'am, there sure was. On January 18, 2007, Ms. Jackson was given a red-reprimand for a disrupt behavior insubordinate demeanor

Moore:        Excuse me sir, let me interrupt and make sure you understand my question. I need to know the final incident prior to March 9th that prompter her termination on that date rather than any other date sir. The final incident.

Palmer:       The final incident.

Moore:        Yes sir.

Palmer:       That would be her. On January 5th, she was given instructions to read and complete policy form and return it to her supervisor. She refused to sign that form, so it would be on January 5, 2007.

Moore:        Ok, let me interrupt just long enough to ask this sir. Why would there be a delay from January 5th to March 9th? If the final incident occurred on March 5th, why was the a delay until March 9th when her termination was effected sir?

Palmer:       The request for termination was written in February 26th, the division letter to Mr. Ron Green, our of our state personnel was written in February 23rd and the directors was written on March 26th, so I really don't know why the delay was that, March 22nd and March 6th, of February 23rd to March 6th.

Moore:        But is your testimony today sir that the final incident that prompted her termination occurred on January 5th?

Palmer:       Uh, yes.

Moore:        And did she continue in her normal job duties for the interim period from January 5th until March 9th sir?

Palmer:       Yes mam.

Moore:        Did her duties change in any way sir?

8

| | |
|---|---|
| Palmer: | She was moved to the office due to her being pregnant. She was given office work. |
| Moore: | And when did that happen sir? |
| Palmer: | I don't know the exact date on that, but that was probably sometime in January as well. |
| Moore: | Did this transfer have anything to do with any reprimand or job performance issues sir? |
| Palmer: | No ma'am, she presented a doctor's excuse which stated office work I believe, so we moved her out of the field and into the office to accommodate her restrictions. |
| Moore: | Tell me more about this incident that allegedly occurred on January the 5th sir. |
| Palmer: | On January 5th her supervisor gave her instructions to read and complete the policy form and on the devices as required for all division employees. Her refusal was insubordinate and created a disruptive behavior environment and was acceptable in defiance of the departments employee work rules. |
| Moore: | Sir was this a policy form that all employees were required to complete? |
| Palmer: | That's correct |
| Moore: | Sir, as far as Ms. Jackson's action did she offer any explanation for her reason to declining to sign the form? |
| Palmer: | She said she felt it was illegal. |
| Moore: | Was that addressed? What was the response to that comment sir? |
| Palmer: | I did not address that. Mr. Joe Freslone, in our assistant division construction was present at that time and her immediate supervisor. |
| Moore: | And what action was taken at the time sir, if any? |
| Palmer: | At the time of her refusal? |
| Moore: | Yes sir. |
| Palmer: | I might need to bring in the supervisor to answer that question, I wasn't present. |
| Moore: | Well sir, since this appears to be the issue that resulted in her termination two months later, we need to clarify what action was taken at the time concerning her refusal |

Palmer:     I think immediate progressive discipline was implied.

Moore:      And what did that involve sir?

Palmer:     I'm sorry?

Moore:      What did that involve? What was the immediate progressive discipline sir?

Palmer:     Let me get that memo.

Moore:      We do need to move forward as soon as possible sir.

Palmer:     I'm trying to find the memo.

Simon:      Was it the memo dated January 18th?

Moore:      Excuse me sir, hold your comments please.

Simon:      I'm sorry, just trying to help him find what he is looking for.

Moore:      Well, ideally we would need any documentation that irrelevant to this hearing to be made available and be ready for this hearing today. That's why advance notice was made available for this hearing. Now we do need to move forward, if that information is not available then we'll move forward without it. Do you have records what action was taken sir? Do you have any record of any disciplinary action taken at the time on January 5th sir, at the time of Ms. Jackson's refusal?

Palmer:     A letter of reprimand was issued on January 18th from her project engineer Bret Paulk.

Moore:      And what did that letter of reprimand indicate sir?

Palmer:     Uh, it indicated a insubordinate demeanor of disruptive behavior.

Moore:      And did it indicate any further action or any corrective necessary action on Ms. Jackson's part?

Palmer:     Uh, your performance per appraisal will reflect this incident.

Moore:      And on the former question sir, was she allowed to continue in her normal and regular duties without signing the document?

Palmer:     No, eventually she did sign the document.

Moore:        When did she do that sir?

Palmer:       She signed the document, I believe on January. On that day January 5th.

Moore:        Alright so although she initially declined to sign the form on January 5th, she openly
              changed her mind and signed all the necessary documents on that same day, is that
              correct sir?

Palmer:       I believe that is correct.

Moore:        Anything else that you would like to add sir?

Palmer:       Just due to the fact that her was being disruptive during this event, during this entire day..

Moore:        How was she disruptive sir?

Palmer:       My understanding is she stormed out of the office, left her job station without permission,
              created a. I'm sorry.

Moore:        Go ahead sir.

Palmer:       Created a disruptive environment for both offices here.

Moore:        Anything else sir?

Palmer:       No, that'd be it.

Moore:        Mr. Simon, do you have any questions of the testimony provided by Mr. Palmer?

Simon:        I just have a couple questions. You said she stormed out of the office, did you see her
              storm out of the office?

Palmer:       No.

Simon:        And did you see her leave the jobsite without permission.

Palmer:       No.

Simon:        On whose word do you base your contention that she stormed out of the office?

Palmer:       Mr. Bret Paulk, her supervisor.

Simon:    And he told you that she stormed out of the office?

Palmer:    That's correct.

Simon:    Ok, and Mr. Paulk also told you she left the jobsite without permission?

Palmer:    That's correct.

Simon:    Ok, and again the reason she's being terminated is that she refused to sign the form?

Palmer:    That's one of them, yes.

Simon:    Ok, what's the other reason?

Palmer:    November 2, 2006, Ms. Jackson was advised...

Moore:    Excuse me, excuse me sir, let me interrupt just a moment. My last question to you sir if the was anything else that you wish to add concerning Ms. Jackson's job separation and you indicated no. Are you now relaying a different event sir.

Palmer:    Yes mam, I thought you were...

Moore:    Well sir, anything that is relevant to her termination should of been discussed in our initial statement sir. Now, again.

Palmer:    I thought it was final...

Moore:    Well we need to clarify anything that was relevant to the final termination. Now you may respond to Mr. Simon's question sir, but again this question was asked to you directly and you indicated a no response to any additional information. So I would ask at this time sir that you know any information that was considered in the decision to terminate Ms. Jackson employment and state it in full sir.

Palmer:    Yes, ma'am I do.

Moore:    Go ahead sir.

Palmer:    On October 6, Ms Jackson was counseled on her disrupt behavior, threatening comments while working on the job which is violation of employee work rule: disruptive conduct and employee work rule use of abusive and threatening language. On November 6th Ms. Jackson..

12

| | |
|---|---|
| Moore: | Excuse me sir, excuse me sir. Disruptive behavior is a general term. You need to be more specific sir as far as what the allegation was on October 6th. |
| Palmer: | Ok. |
| Moore: | What did she allegedly do on October the 6th that was termed to be disruptive behavior sir? |
| Palmer: | I'm looking for that memo. |
| Moore: | Again sir we need to move forward, if you don't have the information we would approve at a later time that whoever does have the information sir. |
| Palmer: | Ms. Jackson was counseled by myself for disruptive behavior and threatening language on October 5th. |
| Moore: | What happed sir, what did she say or do that was termed disruptive on October 5th? |
| Palmer: | She came into my office complaining about her car being scratched in the public parking lot. She also said that in her office to her coworkers and Mr. McElhenney's office trailer, the words of... |
| Moore: | Be careful sir we don't need to be getting into any profane language here but . . . |
| Palmer: | Yes ma'am. |
| Moore: | What did she allegedly say sir? |
| Palmer: | She basically said the statement in the office that if no one wanted to get hurt they best leave her car alone. Was basically her comments to the office personnel |
| Moore: | And what action was taken to those comments sir? |
| Palmer: | We brought her in and counseled her on our policy on the threatening and physical actions she made that day. |
| Moore: | Alright, and what corrected action was requested of her at this time sir? |
| Palmer: | That if she had any more issues regarding her that she need to come to me to address the issue with her car. |
| Moore: | Go ahead sir. Anything else? |

13

Palmer:      On November 2nd, Ms. Jackson's employee performance mid-appraisal, it was addressed in her mid-appraisal about conducting herself in a professional manner in an office setting.

Moore:       Again sir, I would ask what corrected action, if any was requested.

Palmer:      I don't believe there was any, I'd have to talk to the supervisor on that.

Moore:       In response to Mr. Simon's question sir do you have any other information that you'd like to add concerning any issues that resulted in the termination in Ms. Jackson's employment.

Palmer:      I do not believe so, not at this time.

Moore:       I apologize for intervening Mr. Simon, but again there was some confusion as to what Mr. Palmer's statement was as far as the issue to Ms. Jackson's separation. I will refer to you sir if you have any further question in Mr. Palmer's statement.

Simon:       Ok, on the October 5th, 2006 incident, she didn't actually threaten anyone did she?

Palmer:      She made the statement to people in the trailer.

Simon:       Who did she make the statement to?

Palmer:      McElhenney, Mr. Josh Mackelhaney's office, I'm not familiar with everybody in that office.

Simon:       Yea I know who she said that too, and she didn't get anything in writing regarding that incident did she?

Palmer:      Yes she did.

Simon:       What did she get?

Palmer:      She got a counseling statement that she actually signed.

Simon:       Ok, I would ask that since these are new issues being injected into this hearing that we be provided copies of those. I don't have any documentation of those if this is something that's going to figure into the hearing officer's determination.

Moore:       We will hear testimony and we will determine after the testimony if that would be necessary sir. Go ahead.

14

| | |
|---|---|
| Simon: | Ok, and that time on October 5th... |
| Moore: | I'm sorry sir your voice faded out, I did not hear that complete question. |
| Simon: | I'm sorry for the incident on October 5th there was no decision to terminate her at that time was there? |
| Palmer: | That's correct. |
| Moore: | Sir I would caution you if you would Mr. Simon. Be careful about leading questions. We ask that you ask direct simple questions rather than leading questions then have a question mark at the end sir. So be very careful sir. |
| Simon: | Ok |
| Moore: | Didn't you would not be a proper end to your question. |
| Simon: | Ok was there anything about the incident about November 2nd that caused anyone to decide to terminate her? |
| Palmer: | Was there anything? |
| Simon: | About the incident of November 2nd regarding the performance mid-appraisal that caused anyone to decide to terminate her? |
| Palmer: | No |
| Simon: | All I have. |
| Moore: | Sir, was there any corrective action in response to the mid-appraisal on November the 2nd. Was there any determination to place Ms. Jackson on any corrective action, as a result of that mid-appraisal. |
| Palmer: | There was not. |
| Moore: | Alright I would ask at this time Mr. Palmer, you've indicated that you do have other witnesses available and I do alert you that there is no need to duplicate information that is already sworn testimony in our hearing, but if you do have a witness who you feel has additional relevant information to add to our hearing, I would allow you to present that witness and again one at a time sir. Do you wish to hear from any of your witnesses at this point sir? |

| | |
|---|---|
| Palmer: | Yes I do. |
| Moore: | And who would be your witness sir? |
| Palmer: | I would like to bring in Mr. Bret Paulk, our immediate supervisor. |
| Moore: | Alright, you need to make Mr. Paulk available as soon as possible sir and you need to remain in the proceedings as well. |
| Palmer: | Ok, Mr. Paulk is available. |
| Moore: | Mr. Paulk can you hear me sir? |
| Paulk: | Yes mam. |
| Moore: | Again sir, I encourage you to move closer to the telephone we do have a little interference on a speaker phone system and to cut down on the echo effect I ask that you move as close to the receiver as you can sir. |
| Paulk: | That better? |
| Moore: | That is better, thank you sir. You briefly stated sir your position as project engineer. It's my understanding that you were Ms. Jackson's immediate supervisor would that be correct sir? |
| Paulk: | That's correct. |
| Moore: | I do alert you sir that any testimony provided in our hearing today must be provided under oath of record and I will state the oath of record and ask that you respond verbally. Do you solemnly swear our firm that the testimony you present today is the truth, the whole truth, and nothing but the truth as you know it? |
| Paulk: | I do. |
| Moore: | Mr. Palmer do you have any questions of your witness sir? |
| Palmer: | Uh yes I do. |
| Moore: | Go ahead sir. |
| Palmer: | Bret, on January 5th, there was an incident concerning Ms. Jackson and her refusal to sign the policy regarding recording devices. Can you tell me roughly why she refused to |

sign?

| Paulk: | She did not believe that is was legal. She wanted to talk with her attorney and I believe that basically covers she just refused to sign it she didn't believe that it was legal. |

Palmer:    Does everybody in the division, did everybody have to sign that in your office?

Paulk:    That's correct.

Palmer:    Did anybody else have any issues with that policy.

Paulk:    No.

Palmer:    And that policy was presented to you from the division engineer, is that correct?

Paulk:    That's correct.

Palmer:    What was her behavior when she refused to sign it?

Paulk:    She became disruptive. She said that she would not sign the policy.

Palmer:    And then after that did she leave her job station.

Paulk:    She left without my knowledge, but she said that she went to talk with Leon Malone.

Palmer:    But she didn't have permission to leave her job station correctly?

Paulk:    That is correct.

Palmer:    On November 2nd, that was Ms. Jackson's mid-appraisal, and in your mid-appraisal you addressed her conducting herself in a professional manner in an office setting?

Paulk:    That's correct.

Palmer:    Tell what would you be addressing that for?

Paulk:    That refers to the incident when she came in one morning and became disruptive again about her car being scratched in the parking lot.

Palmer:    And that was the incident as of October 5th.

Paulk:    That's correct.

17

Palmer:     With the car issue, so you addressed that during the mid-appraisal period.

Paulk:      I did.

Palmer:     The incident on October 5th, concerning her car where she come in the office, and she exhibited some disruptive behavior. Was she upset in the office?

Paulk:      She was.

Palmer:     Did she disrupt the entire work office?

Paulk:      She did.

Palmer:     Were there any comments made from Ms. Jackson concerning her car to other co-workers.

Paulk:      She said something to the effect she would hate for someone to have to be get hurt over something like that.

Palmer:     More or less that's a more of a threat to everybody in the office then not to touch her car.

Simon:      Object to leading.

Moore:      I agree sir, simple questions only Mr. Palmer

Palmer:     How did you take that question that comment?

Paulk:      It was a blanket

Simon:      (Word over-lapping) to the answer

Moore:      You'll have an opportunity to question the witness sir. He may answer the question. Go ahead Mr. Paulk.

Paulk:      Can you say it again.

Moore:      Please answer the question again Mr. Paulk.

Paulk:      I said it was a blanket generalized statement threatening the all the employees in the office.

| | |
|---|---|
| Palmer: | Did these scratches on her car, did they appear to be purposely done? |
| Paulk: | They did not. |
| Palmer: | Did it look like it was just normal wear/tear? |
| Paulk: | That's correct. |
| Palmer: | On the.. |
| Simon: | Still leading |
| Palmer: | How do you think the scratches got there. |
| Paulk: | Everyday use of the vehicle. |
| Palmer: | I think that's all the questions I have now at this time. |
| Moore: | Sir was there any corrective action taken after the incident or immediately following the incident of October 5th. |
| Paulk: | I believe she was counseled for her disrupted behavior and threatening workplace violence, yes mam. |
| Moore: | Did you participate in that counseling sir? |
| Paulk: | I did, I was present. |
| Moore: | And when did that occur sir? |
| Paulk: | October 6th, I believe. |
| Moore: | Sir let me ask one other question if I may, you've indicated that there was a policy regarding recording device, what was this new policy that everyone had to sign sir? What did that policy involve that Ms. Jackson found issue with? |
| Paulk: | I'm sorry, I didn't? |
| Moore: | What did this policy, this new recording device policy involve sir that Ms. Jackson found issue with? What did it involve? What was the policy? |
| Paulk: | The policy stated that in a disciplinary meeting that the meeting could be taped with the |

employee's knowledge and the policy stated that by signing this your acknowledging that you received and understood the policy and agreed with.

| | |
|---|---|
| Moore: | So basically this policy indicated that during a disciplinary hearing that what's notice was provided to the employee that the employer was authorized to tape record the hearing, is that? |
| Paulk: | That's correct and we didn't have to ask the employee's consent. |
| Moore: | Alright. |
| Paulk: | As long as they are made, it was made known the meeting was being recorded. |
| Moore: | Alright. Thank you. Mr. Simon do you have any questions over this witness? |
| Simon: | I have just a couple of questions. Was the October 5th incident, did that constitute on of the reasons Ms. Jackson was terminated? |
| Paulk: | I believe it established a pattern of disruptive behavior, yes sir. |
| Simon: | Ok, the November 2nd incident was that one of the reasons she was terminated? |
| Paulk: | November 2nd was that mid-appraisal? |
| Simon: | Right. |
| Paulk: | I don't believe so. I believe I made note of that, that we had talked about it and that she was counseled on that incident from October 5th. |
| Simon: | Did you see the scratches on her car? |
| Paulk: | I did. |
| Simon: | Did you see them on consecutive days or just that one day? |
| Paulk: | One day. |
| Simon: | Just were increased as the days went on? |
| Paulk: | Yes she said that it had been happening over a period of a couple weeks I believe. |
| Simon: | And you understand she was upset about the scratches correct? |

Paulk:      Yes, it was made known to me that morning, or the day before.

Simon:      Um now, the tape recording policy, did she sign the policy?

Paulk:      She did.

Simon:      She signed it on the day it was given to her correct?

Paulk:      That's correct.

Simon:      And did she sign it within the time frame that you gave her to sign it?

Paulk:      By the end of business day, yes sir.

Simon:      Ok, you said that she became disruptive when she would not sign it. Where did she initially tell you that she would not sign the policy?

Paulk:      In my office.

Simon:      Ok. Who was in your office when she told you that?

Paulk:      Another worker. Another project engineer.

Simon:      What was that person's name?

Paulk:      Josh McElhenney.

Simon:      Ok, so was it just the two of you that she was disruptive to you claim?

Paulk:      Well she was loud and it spread throughout the office. I mean those offices are, I guess you should have to see the layout, but.

Simon:      Was your door open or closed?

Paulk:      It was closed initially.

Simon:      And uh did you talk to anybody after that meeting with her to see whether anybody elses work had been disrupted?

Paulk:      Yes, I mean, it was disrupted.

Simon:      No that's not, what I asked you was did you talk with anybody to find out whether their

21

work had been disrupted?

| | |
|---|---|
| Paulk: | No sir. |
| Simon: | Ok. |
| Moore: | Any other questions Mr. Simon? |
| Simon: | Uh, no. |
| Moore: | Thank you. If I may sir, you commented that Ms. Jackson left her job station, left her work area on the dated question January 5th, that upon further question she indicated she had gone to speak with Mr. Leon Malone. What is Mr. Malone's position with the Department sir? |
| Paulk: | He is the EEO Officer for the division. |
| Moore: | Ok. Would he in fact be the representative to provide counsel concerning any questions concerning policies or procedures in the department? |
| Paulk: | That's correct. |
| Moore: | Ok let me ask this sir. Did she return to her work area after speaking with Mr. Malone? |
| Paulk: | I believe she had a class that she was enrolled in that day and after she'd met with Leon and I believe she met with Joey Freslone also. |
| Moore: | How long was she away from her work area? Can you estimate that for me sir? |
| Paulk: | I would say probably estimate thirty minutes to an hour. |
| Moore: | Ok, and during that time she was speaking with a policy representative of the department, is that correct? |
| Paulk: | That's the information I found out after the fact, yes ma'am. |
| Moore: | What would be the normal procedure sir, if an employee found it necessary to address an issue concerning policy and procedures with Mr. Malone. What would be the normal accepted for her to follow in order to do that? |
| Paulk: | They would follow the chain of command, which would be her, me, a supervisor, myself, and we would go to my supervisor, Jay Palmer, and then Lance Calamity, and Leon |

Malone.

| | |
|---|---|
| Moore: | And was Ms. Jackson aware of this policy sir? |
| Paulk: | Yes ma'am, I believe we had made clear around her employment here that we would follow the chain of command after the fact we spoke with her the day we had that counsel session about the car that we would follow the chain of command. |
| Moore: | Alright. Mr. Simon, do you have any other questions of this witness? |
| Simon: | Ummm. |
| Moore: | If not Mr. Palmer I would ask if you have any other questions of your witness, Mr. Paulk. |
| Palmer: | Yes, I do. Mr. Paulk in your work environment your basically set up in a mobile home between two project office during this time, is that correct? |
| Paulk: | That's correct. |
| Palmer: | How many people do you have in that mobile home? |
| Paulk: | Maybe fifteen. |
| Palmer: | Fifteen people. So one door shut in that uh, could that be heard throughout the entire trailer? |
| Paulk: | Yes |
| Palmer: | Ok. |
| Paulk: | Very easily. |
| Palmer: | And Mr. Paulk, also with the chain of command, do all employees, are they aware of what the chain of command is? |
| Paulk: | They are. |
| Simon: | Objection. There's no way for him to know that. |
| Palmer: | Mr. Paulk, does that know that, am I right Mr. Paulk? |

| | |
|---|---|
| Paulk: | We've stated in project office meetings, they explained in there. |
| Palmer: | Yea, on the incident of October 5th, did Ms. Jackson use the appropriate chain of command? |
| Paulk: | She did not. |
| Palmer: | She'd not go to you first with the car scratches? |
| Paulk: | She did. |
| Palmer: | And then who'd she come to after that? |
| Paulk: | I believe you. |
| Palmer: | That's correct. So she is aware of the chain of command. |
| Paulk: | Yes. |
| Palmer: | That's all my questions at this time. |
| Moore: | Ok, and do you have any other questions in response to this additional information? |
| Simon: | I don't. |
| Moore: | Mr. Paulk, you are dismissed from our hearing sir. Thank you very much for your testimony. |
| Paulk: | Thank you. |
| Moore: | Mr. Palmer, I would ask as this time do you have any other witness who has relevant information sir? |
| Palmer: | I have Mr. Leon Malone. |
| Moore: | And what additional information would he have to add to our hearing sir? |
| Palmer: | Concerning the incident January 5th, her disruptive behavior. |
| Moore: | Make him available as soon as possible sir. |
| Palmer:: | Ok. Mr. Malone is present. |

Moore:      Again, gentlemen, you need to move closer to the telephone receiver.

Malone:     Ok.

Moore:      Mr. Malone, please state your name and position with the department.

Malone:     My name is Leon Malone. I am the division EEO Officer.

Moore:      Mr. Malone, I alert you that any testimony provided in this hearing must be provided
            under oath of record and I will state the oath of record as follows sir and ask that you
            please respond verbally. Do you solemnly swear our firm that the testimony you provide
            is the truth, the whole truth, and nothing but the truth as you know it?

Malone:     Yes.

Moore:      And I do alert you by law that this hearing is tape recorded. Do you have any questions
            of your witness Mr. Palmer>

Palmer:     Yes, I do. Mr. Malone on the incident of January 5th, concerning Ms. Jackson's refusal
            to sign the policy on recording devices. Apparently, did she come see you?

Malone:     Uh, yes she did.

Palmer:     And what was her demeanor?

Malone:     She was somewhat upset up to a point in reference to having to sign the agreement in
            reference to acknowledging that she had received a copy of the memo.

Palmer:     Was she argumentative?

Malone:     Yes, she was. She was in refusal to sign the agreement.

Palmer:     And what did she say she refused to sign it?

Malone:     If I can recall correctly, she indicated that she was in disagreement with it. I was at a
            point where I tried to explain that it wasn't a reference to an agreement, it was
            acknowledging that it had been received.

Palmer:     And in her meeting how long did that last?

Malone:     That meeting was several minutes, approximately thirty minutes.

25

Palmer:      Ok then, and did she have permission to come see you?

Malone:      I'm not aware of whether or not she had received prior approval to see or come visit.

Palmer:      What is normal policy and procedures regarding people or personnel that has issues such as anything such as this?

Malone:      Normal procedure is for the individual to inform their supervisor of the circumstance and where they are headed, or who they want to meet with.

Palmer:      And if they can't get the answers answered at their level then what would be the next step?

Malone:      If they can't get an answer at that level, the chain of command would be the next procedure.

Palmer:      Do you know if Ms. Jackson followed that?

Malone:      Uh, no, I'm not aware whether or not she followed that procedure, but she did make reference that she had acknowledged that she was in a disagreement with her supervisor.

Palmer:      Ok. Tell me the incident of October 5th regarding Ms. Jackson's and scratches her car, were you aware of that incident.

Malone:      Uh yes, I was made aware of that incident, and I also went to view her vehicle and took a walk around to examine the scratches that were indicated.

Palmer:      What do you think played cause to those scratches?

Malone:      In my opinion, the scratches appeared to be just normal road scratches.

End of Side A

Moore:       We are back on record, case number 053248207. We were hearing testimony from employer/witness Mr. Malone when our tape ended unexpectedly. I've now reversed the tape and we're back on record. Before we continue though I do need to verify for the record and I do need a verbal response from all parties that I discussed this case with anyone or have any further testimony in this matter after I announced that the tape had ended. And I do need a response from you Mr. Malone. Did I accept any further testimony from you after I announced that the tape had ended sir?

26

Malone:     Yes.

Moore:      Sir, listen to the question please. Did I accept any further testimony from you after I announced that the tape had ended? That's a yes or no question sir.

Malone:     I was in the middle of answering a question.

Moore:      Did you make any further statement after I announced the tape had ended sir?

Malone:     No I did not.

Moore:      Thank you sir. Mr. Palmer did you make any further statement after I announced the tape had ended sir?

Palmer:     No I did not.

Moore:      And Ms. Jackson did you make any further statement in this matter after I announced the tape had ended.

Jackson:    No I didn't.

Moore:      Thank you, I apologize for that interruption. Please continue Mr. Malone.

Malone:     Ok as I was stating there were some scratches on the trunk. Those scratches did not appear to be any malicious type scratches. It appeared as though a bottle or maybe a package had been placed on the rear end removed and had light evidence where something had been pulled off of the trunk. Those were the only observations I had noticed on the car. Again there didn't appear to be any malicious intent as far as those scratches.

Moore:      And did you notify Ms. Jackson of that?

Malone:     Yes, I did.

Moore:      What was her response sir?

Malone:     She was in disagreement with it. She pretty much indicated that it had been done intentionally.

Moore:      And what action if any was taken in response to her complaint?

Malone:     At that point she was advised to move to another location where her car could be

27

viewed on a regular basis. This was near the district office.

Moore: Did she do that? Did she follow those instructions?

Malone: Uh yes she did. For several days she did park in the designated location.

Moore: Mr. Palmer, any other questions of your witness sir?

Palmer: No I do not.

Moore: Mr. Simon do you have any questions of this witness?

Simon: Just a couple. Mr. Malone, what was the final event that caused Ms. Jackson to be terminated?

Malone: In my recollection on that it was the incident in which there were constant outbursts. The last was of the one of January 5th in reference to signing the memo in reference to recording devices.

Simone: Ok, was she terminated because she refused to sign the memo?

Malone: No she was not terminated because she refused to sign the memo, that was accumulative list of incidents that precipitated Ms. Jackson being terminated.

Simon: And so what was she terminated for?

Malone: Ms. Jackson was terminated for just uh counts on disruptions and uh if I'm not mistake, not following procedure.

Simon: Ok and one of the procedures that she didn't follow was that she went to see you correct?

Malone: Not that I'm aware of. If anything it would've been listed as leaving her assigned work post without permission or acknowledgment.

Simon: Ok, and had she left her workstation to go see you?

Malone: That I could not determine on that particular given day. I was just visited by Ms. Jackson. I was not informed by her whether or not she had gotten permission to visit my office.

Simon: Were you one of the people who decided to terminate Ms. Jackson ?

| | |
|---|---|
| Malone: | No I was not. |
| Simon: | Who were the people who decided to terminate Ms. Jackson? |
| Malone: | That determination would have been made by her immediate supervisor, with agreement by the division engineer. |
| Simon: | Ok her immediate supervisor was who? |
| Malone: | Bret Paulk |
| Simon: | The October 5th incident were you present in Mr. Paulk's office when Ms. Jackson went to see him about the recording policy? |
| Malone: | No I was not present in Mr. Paulk's office. |
| Simon: | Did she go see you after talked to Mr. Paulk? |
| Malone: | Uh no if I can recall correctly she went to Mr. Palmer, and discussed the issue with Mr. Palmer. |
| Simon: | Ok and so she went to see you after she went to see Mr. Palmer. |
| Malone: | Somewhere within that sequence. |
| Simon: | Ok Was there anything improper about her going to see you? |
| Malone: | No, as far as I recall there isn't anything improper in reference to her coming to see me. The only requirement would be for her to acknowledge/make her supervisor aware of her presence. |
| Simon: | And was she to be in a training class the day she went to see you? |
| Malone: | As far as I can recall, I can't recall that she was scheduled to be in a training class or not. I know there was an issue that had come about in reference to her having to be at training and that was an issue where this may have been an incident in which there was an outburst in her supervisor's office. |
| Moore: | Sir we would address that you address only the information that you have personal knowledge of. We don't want you to guess or conjecture if you would sir so just respond according to your personal knowledge. |

29

Simon:      Two more questions. What training do you have that would allow you to assess the reasons why scratches had appeared on Ms. Jackson's vehicle?

Malone:     Would you repeat that again.

Moore:      That's not a relevant question for this hearing, sir.

Simon:      I have nothing further then.

Moore:      Mr. Palmer do you have any other questions of your witness?

Palmer:     Uh. No I do not.

Moore:      Thank you sir, you are dismissed Mr. Malone.

Malone:     Thank you.

Moore:      Thank you sir. I would refer to you Mr. Simon as far as any questions you have for Ms. Jackson in this matter.

Simon:      I have a few questions for Ms. Jackson. Starting the incident of October 5th, can you explain how you processes by which you discovered the scratches on your car?

Jackson:    Well the scratches were appearing on my car over a period of time. And I actually had spoken with Josh Meckelhaney and not Bret Paulk, because Bret Paulk had just come into that office as a new project engineer. My old project engineer which was Austin, can't think of his last name. His name was Austin, um, but he left, so at that point everyone was up under Josh Mekelhaney and Bret Paulk came in and uh no one actually really knew him so I just discussed the (*inaudible*) with Josh Mekelhaney and after discussing this (*inaudible*) with Josh Mekelhaney, there, um Bret Paulk went to Jay Palmer's office and told him both my conversation with Josh Mekelhaney and then I had to go to Jay Palmer's office with Bret Paulk.

Simon:      Were you upset about those scratches on your car?

Jackson:    Yes sir. I was I had just gotten my car last year, and it's a 2000 Mercedes Benz and those were not regular wear and tear scratches on my car.

Simon:      Did, um you were accused, you heard earlier of disrupting the office with being upset about the scratches on your car. Can you describe how you disrupted the office?

Jackson:    Honestly, when I was seeking for Josh Mekelhany about the scratches on my car, I was

loud, but it didn't, well I-can't say if it disrupted anyone or not because I didn't ask them to be honest. I was just concerned about the scratches on my car and I was telling him that I'm having to come in from work early just to try and catch whose scratching on my car. And no one wanted to look at my car. Mr. Palmer also told me that they wouldn't pay for my car and Mr. Austin told me right before he left along with several other employees that they had cameras out there in the parking lot. It is not a public parking lot, it's a parking lot for employees only because it's behind.

Moore:    Excuse me ma'am we need to move forward as far as your actions. Lets discuss your actions in this incident please ma'am.

Simon:    Yes, I have just a couple of follow up questions. Now on the January 5th incident, how did you initially approach Mr. Paulk about the tape recording policy?

Jackson:    Well I didn't approach him, he called me into his office and asked me to close the door. He asked me why didn't I sign the tape recording policy, and I told him that I didn't believe it was legal. So he started yelling and hollering telling me that I'm gonna sign that policy today. You're gonna sign the policy today is what he was saying. So I was like since I think it's illegal can I have a chance to call my attorney. So while I was on the phone trying to call my attorney, he and Josh were talking amongst themselves. So when I hung up the phone he was still hollering and yelling how I was going to sign that policy today. So I left from out of his office and apparently my crying interrupted everyone because that's the only thing that they seen or heard of me and that was crying. And I had a class that started at 8:00, which stated to be there at 7:30 which is 30 minutes prior to class starts. So on my way going to class, I decided that I go up and speak Joey Freslone. When I entered Joey Freslone's office, Mr. Charlie Jones followed me in there.

Simon:    Ok, so that was all after you were in Mr. Paulk's office, correct?

Jackson:    That was immediately after I left Mr. Paulk's office.

Simon:    Were you insubordinate to Mr. Paulk?

Jackson:    No I wasn't. No I wasn't.

Simon:    And the meeting in Mr. Paulk's office was behind a close door correct?

Jackson:    Yes sir it was.

Simon:    Um, we're you argumentative later on with Mr. Malone?

31

| | |
|---|---|
| Jackson: | I didn't, I didn't, I think I spoke with Mr. Malone awhile about, awhile about, *(inaudible)* I wanna say when they gave us a break. Mr Freslone asked me if I could come back up once I receive a break and speak with him and Mr. Malone, and I told him yes I could. And my thing is when I was telling them about several incidents in October when Mr. Paulk called my cellphone at 7:01 to tell me that I was late and I was in class. Mr. Malone, he did make me upset because asked me if I was sure that Mr. Paulk wasn't just calling to say good morning or how I was doing and I replied to Mr. Malone telling him that this man is not Bernard, which is my husband, and I'm not having an affair. |
| Simon: | I'm sorry, but I want to speak to the incidents of January 5th. You were in Mr. Malone's office because one of the other project engineers asked you to go there with him? |
| Jackson: | I'm not for sure which office that Mr. Fresolone holds but that's who I spoke with, Joey Fresolone. I'm not for sure his position but he's higher up. I think, I think he's over Mr. Jay Palmer. |
| Simon: | Ok, so Mr. Fresolone is one of the supervisors? |
| Jackson: | Yes, he is. |
| Simon: | And was it Mr. Fresolone who brought you to see Mr. Malone? |
| Jackson: | Yes. |
| Simon: | And you did sign the tape recording policy before the end of the day correct? |
| Jackson: | Yes, I did. |
| Moore: | Any other questions? |
| Simon: | I don't have any other further questions. |
| Moore: | I have several Ms. Jackson. At any time in your conversation with Mr. Malone or any other department representative on January 5th did you make any statement that you would consider to be disrespectful or insubordinate ma'am? |
| Jackson: | No ma'am I don't. |
| Moore: | Did anyone accuse you of doing so that day, ma'am? |

32

Jackson:    No, no ma'am.

Moore:      Was there any disciplinary action taken in response to your actions that day ma'am?

Jackson:    No ma'am

Moore:      When did you first hear of any problem concerning your actions that day ma'am?

Jackson:    Um, January the 19th, that's when I was called back to Joey Freslone's office with Mr. Bret Paulk and he handed me and envelope with a bunch of papers in there including his letter of reprimand.

Moore:      Ma'am, as far as your employment. Mr. Palmer indicated that your duties were changed somewhat as result of your doctor's limitations is that correct?

Jackson:    It's correct that I had to be brought inside the office.

Moore:      When did that happen ma'am? When did that happen?

Jackson:    It happened on February the 16th and I was moved from Mr. Brett Paulk's office to Mr. Charlie Cooper.

Moore:      Was this a result of your request ma'am on your doctor's orders?

Jackson:    No, it was not on the doctor's orders. No ma'am it wasn't.

Moore:      What was the reason for that transfer ma'am?

Jackson:    Mr. Vince Calametti transferred me because he told me that he had spoken to Mr. Bret Paulk about the situation and that he wanted all the letter writing to stop and that he wanted both of us to have a fresh start so he won't have to worry about writing letters backwards and forwards so he...

Moore:      Ma'am, did your doctor restrict your activities in any way?

Jackson:    Yes ma'am, she did.

Moore:      And what were those restrictions?

Jackson:    Those restrictions were to do office duties until after delivery.

Moore:      Alright, so it would be correct that your doctor restricted you to office work would that

be correct?

Jackson:    Yes ma'am, that's correct.

Moore:    And was your transfer to a desk job in response that medical report ma'am?

Jackson:    The desk job or office work was due to her requesting, yes ma'am.

Moore:    Alright, and that occurred in February ma'am?

Jackson:    February the 16th.

Moore:    Are those restrictions still in effect ma'am?

Jackson:    Yes ma'am.

Moore:    When is your baby due ma'am?

Jackson:    My baby is due August the 27th, between the 27th and 29th they changed the date.

Moore:    Have you informed the claims office of your pregnancy ma'am?

Jackson:    Well when I filed the claim I told them that I was pregnant and I sent him a letter from my doctor also.

Moore:    Is it your testimony ma'am that you provided a doctor's certificate to the claims department?

Jackson:    Yes ma'am I did.

Moore:    Has your doctor restricted your activities or abilities to work a full time job ma'am?

Jackson:    Well no, not since I told them that I'd been fired, so I mean..

Moore:    Mam are you able to work a full time job? Has your doctor restricted you from working a full time job?

Jackson:    No ma'am.

Moore:    Are you actively looking for full time work ma'am?

Jackson:    Yes ma'am, every week.

34

Moore:      Alright. I have no further questions. Mr. Palmer do you have any questions of Ms. Jackson.

Palmer:     No I do not.

Moore:      At this time, Mr. Palmer, do you have any additional information you would like to add to the record sir?

Palmer:     Yes I would like to submit memo to file from Mr. Joe Fresolone on meeting of dated January 9th concerning the meeting of January 5th.

Moore:      Sir, any memo that is introduced in this hearing sir, must be information that was available to Ms. Jackson and her legal counsel. If this was an internal memo, that was not available to Ms. Jackson then it will not be considered as evidence in this hearing sir.

Palmer:     I believe she did receive a copy of this.

Moore:      And when would she have received such a copy sir?

Palmer:     She'd of received it the day it was written, January 9th.

Moore:      And how would this document be identified sir?

Palmer:     Um, I'm not sure what do you mean identify>

Moore:      How would I identify sir, I have a stack of probably fifty pages in this file. How would I identify this piece of paper your talking about?

Palmer:     The uh. It's a memo to file dated January 9th from Joe Fresolone, assistant division construction engineer. I do not believe that is in that packet that you have.

Moore:      Sir, I am looking through the paperwork. I have a document that has Alabama Department of Transportation letterhead, state seal on both side at the top right and top left hand and is identified as memorandum date January 9th to file from Mr. Joe Fresolone, assistant division construction engineer. This memo is to document the events that took place in my office throughout the day on January 5th, is this the document you have reference to sir?

Palmer:     Yes, you have a copy of that...

Moore:      I have. Hey. Sir. Excuse me sir. Let me clarify what I have and we'll move forward.

| Palmer: | Alright. |
|---|---|

Moore: I have three pages, the first page begins with the comments this memo is to document the events. It continues with page two of the memorandum dated January 9th, it begins with a comment over a 30 minute period Ms. Jackson spoke of several incidents where Ms. Jackson felt she was being treated unfairly It continues with page three. Ms. Jackson left and no progress has been made of her signing the memo. Are these the three pages you have in question sir? Mr. Palmer?

Palmer: Yes ma'am.

Moore: At this time I need to clarify for the record Ms. Jackson, Mr. Simon are you familiar with the document in question?

Simon: Yes ma'am.

Moore: Do you have access to this document? Have you had an opportunity to read it? That's a yes or no question.

Simon: I have.

Moore: Ok. Ms. Jackson have you read the document in question sir, ma'am, excuse me?

Jackson: Yes ma'am, I'm holding it in front of me right now.

Moore: Alright. I would need to clarify for the record if Mr. Simon or Ms. Jackson has any objections to this document being entered as evidence in our hearing today?

Jackson: Mr. Simon do you have a copy of it?

Simon: I do have a copy of it, um I think a lot what's in it is hearsay and since Mr. Fresolone was not present during this hearing, I would ask that it not be considered.

Jackson: Ok.

Moore: That objection is noted. Um, Mr. Fresolone was not a witness in this hearing to provide first hand testimony. We will not consider his document as testimony in our hearing today. Mr. Palmer, anything else you'd like to add sir?

Palmer: Is it a possibility I can get Mr. Fresolone?

Moore: No sir, not at this time, no sir.

| | |
|---|---|
| Palmer: | *(inaudible)* |
| Moore: | Beg your pardon? |
| Palmer: | He's available right now. |
| Moore: | No sir. No sir. There will be no further witnesses heard in this hearing sir. Do you have any other documentation you'd wish to consider? |
| Palmer: | No ma'am. |
| Moore: | Ok, is there any other information you'd like to add sir? |
| Palmer: | No ma'am. |
| Moore: | My only question to you at this point Mr. Palmer, again if you have any information concerning the delay from the incident you stated occurred on January 5th and the action to terminate Ms. Jackson's employment on March the 9th sir. Do you have any further information that you'd like to add concerning the length of this delay sir? |
| Palmer: | No ma'am. |
| Moore: | Ok. Mr. Simon do you have any additional information that you'd like to add to the record sir? |
| Simon: | No ma'am. |
| Moore: | Alright. I thank you all for your testimony today and I certainly will consider this information and issue a written decision within days. Thank you all. We are adjourned for today. |

Plaintiff's
Exhibit 7

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON,                    )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   )        CASE NO.:2:07-CV-645-MEF
                                      )
STATE OF ALABAMA DEPARTMENT )
OF TRANSPORTATION;                    )
JOE MCINNES; *etc.*,                  )
                                      )
        Defendants.                   )

## DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST INTERROGATORES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

COME NOW Defendants, by and through undersigned counsel, and in response to

Plaintiff's First Interrogatories and Requests for Production to Defendants, state as follows:

### Requests for Production

1.      Provide all personnel files of the plaintiff, including the
Division, District, Central Office, and State Personnel Department
files, and all documents and recordings related to her employment
including but not limited to all documents related to the decision to
terminate plaintiff's employment.

**RESPONSE: Plaintiff's personnel files, maintained by ALDOT, will be made available for
inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually
agreed upon by the parties. Said inspection is to be conducted where the materials are
maintained in the normal course of business. Any files maintained by the State Personnel
Department may be requested from that agency.**

2.      Provide a copy of any notes, calendar entries or diary
entries created by Bret Paulk, Vince Calametti, Jeremiah Taylor,
Josh McElhenney, Charly D. Jones, Joseph Fresolone, Leon
Malone, Ronnie Poiroux, Samuel Palmer, L. Daniel Morris, or J.D.
McInnes that in any way relate to the plaintiff.

PLAINTIFF'S
EXHIBIT
7
ALL-STATE LEGAL®

RESPONSE: To the extent that such materials exist and are not privileged, the same will be made available for inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties, said inspection is to be conducted where the materials are maintained in the normal course of business.

> 3.    Provide the complete personnel file of the following individuals: Bret Paulk, Vince Calametti, Jeremiah Taylor, Josh McElhenney, Charly D. Jones, Joseph Fresolone, Leon Malone, Ronnie Poiroux, Samuel Palmer

RESPONSE: To the extent that such documents do not contain privileged or private information, such will be made available for Plaintiff's inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties. Such inspection is to be conducted where such documents are maintained in the normal course of business.

> 4.    Provide a copy of all documents sent to and received from any agency such as the EEOC or the Department of Industrial Relations related to the plaintiff, her employment with the defendant(s), her unemployment compensation or benefits, or the termination of her employment.

RESPONSE: To the extent that such documents do not contain privileged or private information, such will be made available for Plaintiff's inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties. Such inspection is to be conducted where such documents are maintained in the normal course of business.

> 5.    Provide the personnel files of all employees of the Ninth Division who were disciplined, whether by verbal or written reprimand, suspension, termination, or some other form of discipline, for violating the same personnel rules that Plaintiff was terminated for violating from January 1, 2002 until the present.

RESPONSE: Suspensions and dismissals are "tracked" and the personnel files of employees who were suspended or dismissed for violating the same personnel rules as the

2

Plaintiff will be made available for Plaintiff's review and copying, at Plaintiff's prepaid

expense, on a date and at a time as mutually agreed upon by the parties. such inspection to

be conducted where such files are maintained in the normal course of business. Lesser

disciplinary or employment actions are maintained in the personnel files located at the

Division and are not "tracked." personnel files will be made available at the Division for

Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as provided above.

> 6.    Provide the defendant's file relating to any investigation of
> plaintiff's termination performed by any ALDOT employee,
> including but not limited to any memoranda concerning the
> plaintiff's proposed termination and any document showing
> concurrence or disagreement by anyone with the decision to
> terminate the plaintiff's employment.

RESPONSE: To the extent that such file(s) exist and do not contain privileged or

confidential materials, such will be made available for Plaintiff's inspection and copying, at

Plaintiff's prepaid expense, on a date and at a time as mutually agreed upon by the parties.

Such inspection is to be conducted where such documents are maintained in the normal

course of business.

> 7.    Provide all documents actually relied upon by the
> individual or individuals who made the decision to terminate the
> plaintiff's employment in reaching that decision.

RESPONSE: Documents relied upon by ALDOT personnel are contained in the Plaintiff's

personnel files, which will be made available to the Plaintiff as indicated above.

> 8.    Provide all documents showing the passage of an algebra
> course or test or satisfaction of the algebra requirement (including
> by passage of the placement exam) for probationary Engineering
> Assistants in the Ninth Division from January 2002 until the
> present.

RESPONSE: To the extent that such documents exist are not privileged, such will be made

available for plaintiff's inspection and copying, at Plaintiff's prepaid expense as indicated

above.

9.    Provide copies of all Form 11 documents relating to the plaintiff, including copies of all such documents received by the State Personnel Department.

**RESPONSE: Form 11s, as relate to the Plaintiff, which are in Defendants' possession, will be made available for inspection and copying as indicated above.**

10.    Provide any and all documents relating to the termination of plaintiff's employment, including recommendations for termination, reviews of such recommendations, documents reflecting concurrence in or disagreement with such a recommendation, and all documents discussing the facts underlying the termination decision or the plaintiff's employment history.

**RESPONSE: To the extent that such documents exist and are not privileged, such will be made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as indicated above.**

11.    Provide all electronic mail sent or received by Bret Paulk, Vince Calametti, Jeremiah Taylor, Josh McElhenney, Charly D. Jones, Joseph Fresolone, Leon Malone, Ronnie Poiroux, Samuel Palmer, L. Daniel Morris, or J.D. McInnes that references the plaintiff, including but not limited to by the name Jackson, LaShundra, or Shun.

**RESPONSE: To the extent that such documents exist and are not privileged, such will be made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as indicated above.**

12.    Provide the personnel files of all Ninth Division employees of ALDOT who have become pregnant while employed by ALDOT from January 1, 2002 until the present.

**RESPONSE: To the extent that there are such employees and the files do not contain privileged or confidential information, such will be made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as indicated above.**

13.    Provide the personnel files of all Ninth Division employees of ALDOT who have taken maternity leave from January 1, 2002 until the present.

RESPONSE: To the extent that there are such employees and the files do not contain

privileged or confidential information, such will be made available for Plaintiff's inspection

and copying, at Plaintiff's prepaid expense, as indicated above.

> 14.    Provide copies of all charges or complaints of race or sex
> discrimination retaliation, including internal grievances,
> administrative charges, or lawsuits, filed by Ninth Division
> employees between January 2005 and the present.

RESPONSE: To the extent that such documents exist such will be made available for

Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as indicated above.

### Interrogatories

> 1.    Identify all individuals who made the decision to terminate
> the plaintiff's employment.

RESPONSE: Samuel F. Palmer, Vincent Calametti, R.F. Poiroux, L.D. Morris, D.J. "Joe"

McInnes.

> 2.    Identify all individuals who participated in the decision to
> terminate the plaintiff's employment and identify each such
> person's role in the decision-making process.

RESPONSE: Samuel F. Palmer, District Engineer, made recommendation to terminate

probation based upon information and documentation received from subordinates.

Vincent Calametti, reviewed and concurred with the recommendation of Palmer.

R.F.Poiroux, Division Engineer, reviewed recommendation of Palmer, made independent

assessment of matter and requested termination action. Ron Green, Personnel Director,

reviewed request from Palmer, concurred and processed termination action. D.J. "Joe"

McInnes, State Transportation Director and appointing authority, reviewed and executed

termination action.

> 3.    Identify all individuals employed by the defendant who had
> the responsibility of assigning the plaintiff her job tasks.

**RESPONSE:** Brett Paulk, Austin Harville, Tony Cooper, Richard Johnston, Mark Batchelor, Jay Palmer, Andy Hoppes, Vince Calametti, Marion Stagner, Chris Burdette, Skip Vines, Larry Hayes, Josh McElhenney.

> 4.    Identify all documents actually relied upon by the individual or individuals who made the decision to terminate the plaintiff's employment in reaching that decision.

**RESPONSE:** Plaintiff's personnel file, including performance appraisal, record of counseling of October 6, 2006 and November 2, 2006 and written reprimand of January 18, 2007.

> 5.    Identify all individuals employed by the defendant who had the responsibility of training the plaintiff in her job duties as and Engineering Assistant.

**RESPONSE:** Brett Paulk, Austin Harville, Skip Vines, Larry Hayes, Tony Cooper, Richard Johnston, Josh McElhenney.

> 6.    Identify all individuals who took over the plaintiff's job duties following her termination.

**RESPONSE:** Job assignments were and are subject to change, often daily: however the following employees performed duties and assignments that the Plaintiff performed: Marion Stagner, Andy Hoppes, Raymond Ingram, Adam Spence.

> 7.    Identify all probationary Engineering Assistants assigned to Bret Paulk between January 2001 and the present.

**RESPONSE:** John Majercik, George Issac, Lisa Champagne, Lashundra Jackson.

Defendants expressly reserve the right to seasonably amend and/or modify their responses above as additional information may be received during the course of this litigation.

6

RESPECTFULLY SUBMITTED,

Jim R. Ippolito, Jr. (IPP 001)
Assistant Attorney General
Chief Counsel

Andrew W. Redd (RED001)
Jason A. Trippe (TRI012)
Assistant Attorneys General
Assistant Counsel

**ADDRESS OF COUNSEL:**

Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110
Telephone: (334) 242-6350
Fax: (334) 264-4359
redda@dot.state.al.us
trippej@dot.state.al.us

7

## CERTIFICATE OF SERVICE

I hereby certify that on this _8th_ day of _Nov._, 20_07_, I served the foregoing

on counsel of record by electronic mail and/or by placing a copy of same in the United States

Mail, postage prepaid and addressed as follows:

>Mr. Kell Simon, Esq.
>ROSS MELTON
>1104 San Antonio Street
>Austin, Texas 78701

>_____
>Andrew W. Redd (RED001)

## ADDRESS OF COUNSEL:

Alabama Department Of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110
Telephone: (334) 242-6350
Fax: (334) 264-4359
redda@dot.state.al.us

# Plaintiff's
# Exhibit 8

AT-108

*Jason  Harry  Mike*

**SCANNED** 6/11 p7

**STATE OF ALABAMA**
**DEPARTMENT OF INDUSTRIAL RELATIONS**
**HEARINGS AND APPEALS DIVISION**
**MONTGOMERY, ALABAMA   36130**

## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

LASHUNDRA M JACKSON
714 S CEDAR STREET
MOBILE AL 36603

**EMPLOYER**

STATE OF AL DEPT OF TRANSPORT
ALDOT LEGAL BUREAU
1409 COLISEUM BLVD
MONTGOMERY AL 36110

| | |
|---|---|
| **APPELLANT** : EMPLOYER | **DATE MAILED** : 06/08/07 |
| **LOCATION** : MONTGOMERY (TELEPHONE) | **CASE   NO.** : 05324-AT-07 |
| | **S. S. NO.** : 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 |
| **OC  NO.** : 00-68 | **HEARING DATE** : 06/05/07 |

**APPEARANCES AT THE HEARING:** Claimant with attorney and employer representative with two witnesses

**ISSUE(S):** Discharge from most recent bona fide work for actual or threatened deliberate misconduct committed in connection with work after previous warnings. Section 25-4-78(3)(b) Code of Alabama 1975

**FINDINGS:** This employer, with whom the claimant had most recent bona fide work, appealed an Examiner's determination on a claim for unemployment benefits.

The claimant worked for the listed employer from July 3, 2006, until March 9, 2007, as a full-time engineering assistant. The employer issued a written warning to the claimant on October 6, 2006, concerning her inappropriate and disruptive comments to coworkers and supervisory personnel regarding unexplained scratches on her personal vehicle. On January 5, 2007, the claimant was asked to sign an acknowledgment form, along with all other employees, concerning the new recording device policy. This policy provided for the taping of disciplinary meetings by the employer with notice to the employee involved. The claimant initially refused to sign the form and suggested to her supervisor that she questioned the legality of the policy. The supervisor responded by informing the claimant that she must sign the acknowledgment form by the end of the business day. While in route to a scheduled training meeting later that morning, the claimant sought additional information in this matter from the assistant division engineer. He suggested that the claimant return during her break to discuss the matter with the division EEOC officer. The claimant met with the EEOC officer briefly during her break that day as instructed. The claimant signed the acknowledgment form in question later that same day. On January 18, 2007, the claimant received a reprimand for insubordination and disruptive behavior concerning her actions on January 5, 2007. The claimant continued her assigned duties without any further incidents until March 9, 2007, at which time she was informed of her discharge based on insubordination and disruptive behavior after warning.

**CONCLUSIONS:** Section 25-4-78(3)(b) of the Law provides that an individual shall be disqualified for total or partial unemployment if she was discharged from her most recent bona fide work for actual or threatened misconduct committed in connection with work repeated after previous warning.

**PLAINTIFF'S EXHIBIT**

*8*

"Misconduct" is defined as a deliberate, willful, or wanton disregard of the employer's interests or of the standards of behavior which the employer has the right to expect of his employees. An employer has the right to expect an employee to communicate with supervisory personnel and others in a respectful and courteous manner in the work place. The employer has alleged that the claimant's termination resulted from her disruptive and disrespectful behavior toward supervisory personnel and coworkers. However, the claimant was discharged after warning for an incident that occurred significantly prior to the termination day. No cause or relationship has been established between the incident and termination. There was no disregard for the employer's interests shown. This does not constitute misconduct connected with work. Therefore, the claimant is not subject to the disqualifying provisions of this section of the Law.

**DECISION:** The Examiner's determination is affirmed. The claimant is eligible for benefits.

**APPEAL RIGHTS:** This decision becomes final unless an application for leave to appeal to the Board of Appeals is received in writing at the Department address above or by fax at 334-242-0539 on or before the **FINAL DATE OF June 25, 2007.**

Beth C. Moore
Administrative Hearing Officer

BCM/dma

# Plaintiff's Exhibit 9



# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
OFFICE OF DIVISION ENGINEER
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE: (251) 470-8200
FAX: (251) 473-3624



BOB RILEY
GOVERNOR

JOE McINNES
TRANSPORTATION DIRECTOR

| Transportation Office Manager | Info: | Action: | File |
|---|---|---|---|
| Section | | | |
| Accounting | | | |
| Personnel | | | |
| Personnel File | | | ✓ |
| Training | | | |
| Route | | | |
| Action Requested: | | | |

## MEMORANDUM

DATE:     January 5, 2007

TO:       File

FROM:     _Charly D. Jones, Jr._
          Charly D. Jones, Jr.

This memorandum is in reference to a meeting held with Joey Fresolone, LaShundra Yates Jackson and myself this morning at approximately 7:40am on the above date. Ms. Lashundra Yates Jackson came into the Construction Office to speak with Mr. Joey Fresolone about issues she was having in the Project Office with her Supervisor (Bret Paulk). When she came into the building she was very upset and in tears; so I followed her into Joey's office, whereas she started explaining that she was being treated unfairly. She stated that she had been given a warning for not signing an inner-office document which gives the Supervisor authority to tape record any conversations that are held with her. She said that she told him she did not understand what the document meant and that she needed time to sign it -- and that she should have until 4:00p to sign it. Joey and I tried to calm her down and insisted that we would have to converse with Mr. Leon Malone about this issue (since we have not seen the memo on this tape recording issue). We listened to the rest of LaShundra's comments about issues she was having on the job and she became calm after talking about the incidents and was calm when she left Joey's office to go to her training class. She is due to come to Mr. Malone's office to discuss this situation some time today. She also made reference to other instances such as her car being vandalized, being left on the job site alone and no one wanting to work with her and feels that she is being "picked on".



PLAINTIFF'S EXHIBIT
9
ALL-STATE LEGAL®

# Plaintiff's Exhibit 10

**ALDOT Ninth Division**
**Math Placement Test Results**
**January 2002-February 27, 2008**

| ID | Name | DOE | Descr | Test Date | Passed |
|----|------|-----|-------|-----------|--------|
| 001279 | Fuller,Anthony M | 8/12/2002 | Basic Math Placement Test | 2002-09-19 | N |
| 001279 | Fuller,Anthony M | | Algebra Placement Test | 2002-09-19 | N |
| 001279 | Fuller,Anthony M | | Geometry Placement Test | 2002-09-19 | N |
| 001279 | Fuller,Anthony M | | Trigonometry Placement Test | 2002-09-19 | N |
| 001422 | Ganey,Patrisha J | 8/12/2002 | Basic Math Placement Test | 2002-09-19 | Y |
| 001422 | Ganey,Patrisha J | | Algebra Placement Test | 2002-09-19 | N |
| 001422 | Ganey,Patrisha J | | Geometry Placement Test | 2002-09-19 | N |
| 001422 | Ganey,Patrisha J | | Trigonometry Placement Test | 2002-09-19 | N |
| 001424 | Nicholas III,Warren H | 8/12/2002 | Basic Math Placement Test | 2002-09-19 | Y |
| 001424 | Nicholas III,Warren H | | Algebra Placement Test | 2002-09-19 | Y |
| 001424 | Nicholas III,Warren H | | Geometry Placement Test | 2002-09-19 | N |
| 001424 | Nicholas III,Warren H | | Trigonometry Placement Test | 2002-09-19 | N |
| 001425 | Weaver,Mary K | 8/12/2002 | Basic Math Placement Test | 2002-09-19 | Y |
| 001425 | Weaver,Mary K | | Algebra Placement Test | 2002-09-19 | Y |
| 001425 | Weaver,Mary K | | Geometry Placement Test | 2002-09-19 | Y |
| 001425 | Weaver,Mary K | | Trigonometry Placement Test | 2002-09-19 | N |
| 001522 | Brown,Joel W | 9/23/2002 | Basic Math Placement Test | 2002-10-21 | Y |
| 001522 | Brown,Joel W | | Algebra Placement Test | 2002-10-21 | N |
| 001522 | Brown,Joel W | | Geometry Placement Test | 2002-10-21 | N |
| 001522 | Brown,Joel W | | Trigonometry Placement Test | 2002-10-21 | N |
| 001501 | Fletcher,Debra | 9/21/2002 | Basic Math Placement Test | 2002-10-21 | Y |
| 001501 | Fletcher,Debra | | Algebra Placement Test | 2002-10-21 | N |
| 001501 | Fletcher,Debra | | Geometry Placement Test | 2002-10-21 | N |
| 001501 | Fletcher,Debra | | Trigonometry Placement Test | 2002-10-21 | N |
| 001479 | Jackson,Melvin | 9/23/2002 | Basic Math Placement Test | 2002-10-29 | Y |
| 001479 | Jackson,Melvin | | Algebra Placement Test | 2002-10-29 | N |
| 001479 | Jackson,Melvin | | Geometry Placement Test | 2002-10-29 | N |
| 001479 | Jackson,Melvin | | Trigonometry Placement Test | 2002-10-29 | N |
| 001633 | Allison,Avery V | 12/16/2002 | Basic Math Placement Test | 2002-12-16 | N |
| 001633 | Allison,Avery V | | Algebra Placement Test | 2002-12-16 | N |
| 001633 | Allison,Avery V | | Geometry Placement Test | 2002-12-16 | N |
| 001633 | Allison,Avery V | | Trigonometry Placement Test | 2002-12-16 | N |
| 020747 | Frazier,William A | 12/16/2002 | Basic Math Placement Test | 2002-12-16 | N |
| 020747 | Frazier,William A | | Algebra Placement Test | 2002-12-16 | N |
| 020747 | Frazier,William A | | Geometry Placement Test | 2002-12-16 | N |
| 020747 | Frazier,William A | | Trigonometry Placement Test | 2002-12-16 | N |

PLAINTIFF'S EXHIBIT 10 — ALL-STATE LEGAL®

## ALDOT Ninth Division
## Math Placement Test Results
## January 2002-February 27, 2008

| ID | Name | DOE | Descr | Test Date | Passed |
|----|------|-----|-------|-----------|--------|
| 001644 | O'Rourke,Dianna W | 12/16/2002 | Basic Math Placement Test | 2002-12-16 | Y |
| 001644 | O'Rourke,Dianna W | | Algebra Placement Test | 2002-12-16 | N |
| 001644 | O'Rourke,Dianna W | | Geometry Placement Test | 2002-12-16 | N |
| 001644 | O'Rourke,Dianna W | | Trigonometry Placement Test | 2002-12-16 | N |
| 001639 | Skipper,Earston E | 12/16/2002 | Basic Math Placement Test | 2002-12-16 | N |
| 001639 | Skipper,Earston E | | Algebra Placement Test | 2002-12-16 | N |
| 001639 | Skipper,Earston E | | Geometry Placement Test | 2002-12-16 | N |
| 001639 | Skipper,Earston E | | Trigonometry Placement Test | 2002-12-16 | N |
| 020647 | Molsbee,Tommie J | 1/25/2003 | Basic Math Placement Test | 2003-01-27 | Y |
| 020647 | Molsbee,Tommie J | | Algebra Placement Test | 2003-01-27 | N |
| 020647 | Molsbee,Tommie J | | Geometry Placement Test | 2003-01-27 | N |
| 020647 | Molsbee,Tommie J | | Trigonometry Placement Test | 2003-01-27 | N |
| 001700 | Burroughs,Randell L | 2/10/2003 | Basic Math Placement Test | 2003-02-10 | N |
| 001700 | Burroughs,Randell L | | Algebra Placement Test | 2003-02-10 | N |
| 001700 | Burroughs,Randell L | | Geometry Placement Test | 2003-02-10 | N |
| 001700 | Burroughs,Randell L | | Trigonometry Placement Test | 2003-02-10 | N |
| 001777 | Landrum,Larry R | 3/24/2003 | Basic Math Placement Test | 2003-03-24 | Y |
| 001777 | Landrum,Larry R | | Algebra Placement Test | 2003-03-24 | N |
| 001777 | Landrum,Larry R | | Geometry Placement Test | 2003-03-24 | N |
| 001777 | Landrum,Larry R | | Trigonometry Placement Test | 2003-03-24 | N |
| 001765 | Johns,Joshua R | 4/7/2003 | Basic Math Placement Test | 2003-04-07 | Y |
| 001765 | Johns,Joshua R | | Algebra Placement Test | 2003-04-07 | N |
| 001765 | Johns,Joshua R | | Geometry Placement Test | 2003-04-07 | N |
| 001765 | Johns,Joshua R | | Trigonometry Placement Test | 2003-04-07 | N |
| 001816 | West,Andrew D | 4/7/2003 | Basic Math Placement Test | 2003-04-07 | Y |
| 001816 | West,Andrew D | | Algebra Placement Test | 2003-04-07 | N |
| 001816 | West,Andrew D | | Geometry Placement Test | 2003-04-07 | N |
| 001816 | West,Andrew D | | Trigonometry Placement Test | 2003-04-07 | N |
| 001831 | Stagner,Marian L | 4/21/2003 | Basic Math Placement Test | 2003-04-21 | N |
| 001831 | Stagner,Marian L | | Algebra Placement Test | 2003-04-21 | N |
| 001831 | Stagner,Marian L | | Geometry Placement Test | 2003-04-21 | N |
| 001831 | Stagner,Marian L | | Trigonometry Placement Test | 2003-04-21 | N |
| 001845 | Ferguson,Kathie H | 5/5/2003 | Basic Math Placement Test | 2003-05-08 | N |
| 001845 | Ferguson,Kathie H | | Algebra Placement Test | 2003-05-08 | N |
| 001845 | Ferguson,Kathie H | | Geometry Placement Test | 2003-05-08 | N |
| 001845 | Ferguson,Kathie H | | Trigonometry Placement Test | 2003-05-08 | N |

**ALDOT Ninth Division**
**Math Placement Test Results**
**January 2002-February 27, 2008**

| ID | Name | DOE | Descr | Test Date | Passed |
|----|------|-----|-------|-----------|--------|
| 074999 | Campbell,Michael G | 6/16/2003 | Basic Math Placement Test | 2003-06-16 | Y |
| 074999 | Campbell,Michael G | | Algebra Placement Test | 2003-06-16 | Y |
| 074999 | Campbell,Michael G | | Geometry Placement Test | 2003-06-16 | N |
| 074999 | Campbell,Michael G | | Trigonometry Placement Test | 2003-06-16 | N |
| 075008 | Cotton,Thomas S | 6/16/2003 | Basic Math Placement Test | 2003-06-16 | N |
| 075008 | Cotton,Thomas S | | Algebra Placement Test | 2003-06-16 | N |
| 075008 | Cotton,Thomas S | | Geometry Placement Test | 2003-06-16 | N |
| 075008 | Cotton,Thomas S | | Trigonometry Placement Test | 2003-06-16 | N |
| 074990 | Hansworth,Floyd J | 6/16/2003 | Basic Math Placement Test | 2003-06-16 | N |
| 074990 | Hansworth,Floyd J | | Algebra Placement Test | 2003-06-16 | N |
| 074990 | Hansworth,Floyd J | | Geometry Placement Test | 2003-06-16 | N |
| 074990 | Hansworth,Floyd J | | Trigonometry Placement Test | 2003-06-16 | N |
| 001254 | Yarbrough,Blakely Thomas | 6/14/2003 | Basic Math Placement Test | 2003-06-16 | N |
| 001254 | Yarbrough,Blakely Thomas | | Algebra Placement Test | 2003-06-16 | N |
| 001254 | Yarbrough,Blakely Thomas | | Geometry Placement Test | 2003-06-16 | N |
| 001254 | Yarbrough,Blakely Thomas | | Trigonometry Placement Test | 2003-06-16 | N |
| 075088 | Brinkman Jr,Allen W | 6/30/2003 | Basic Math Placement Test | 2003-06-30 | Y |
| 075088 | Brinkman Jr,Allen W | | Algebra Placement Test | 2003-06-30 | N |
| 075088 | Brinkman Jr,Allen W | | Geometry Placement Test | 2003-06-30 | N |
| 075088 | Brinkman Jr,Allen W | | Trigonometry Placement Test | 2003-06-30 | N |
| 075132 | Little,Sharon A | 7/14/2003 | Basic Math Placement Test | 2003-07-14 | Y |
| 075132 | Little,Sharon A | | Algebra Placement Test | 2003-07-14 | N |
| 075132 | Little,Sharon A | | Geometry Placement Test | 2003-07-14 | N |
| 075132 | Little,Sharon A | | Trigonometry Placement Test | 2003-07-14 | N |
| 001020 | Andrews,Roger Dale | 8/9/2003 | Basic Math Placement Test | 2003-08-11 | Y |
| 001020 | Andrews,Roger Dale | | Algebra Placement Test | 2003-08-11 | N |
| 001020 | Andrews,Roger Dale | | Geometry Placement Test | 2003-08-11 | N |
| 001020 | Andrews,Roger Dale | | Trigonometry Placement Test | 2003-08-11 | N |
| 075562 | Newsome,Kenneth W | 2/9/2004 | Basic Math Placement Test | 2004-02-09 | Y |
| 075562 | Newsome,Kenneth W | | Algebra Placement Test | 2004-02-09 | N |
| 075562 | Newsome,Kenneth W | | Geometry Placement Test | 2004-02-09 | N |
| 075562 | Newsome,Kenneth W | | Trigonometry Placement Test | 2004-02-09 | N |
| 075653 | Powell,Belinda J | 6/14/2004 | Basic Math Placement Test | 2004-06-16 | Y |
| 075653 | Powell,Belinda J | | Algebra Placement Test | 2004-06-16 | Y |
| 075653 | Powell,Belinda J | | Geometry Placement Test | 2004-06-16 | N |
| 075653 | Powell,Belinda J | | Trigonometry Placement Test | 2004-06-16 | N |

**ALDOT Ninth Division**
**Math Placement Test Results**
**January 2002-February 27, 2008**

| ID | Name | DOE | Descr | Test Date | Passed |
|----|------|-----|-------|-----------|--------|
| 083762 | Clement,Diana L | 11/1/2004 | Basic Math Placement Test | 2004-11-01 | Y |
| 083762 | Clement,Diana L | | Algebra Placement Test | 2004-11-01 | N |
| 083762 | Clement,Diana L | | Geometry Placement Test | 2004-11-01 | N |
| 083762 | Clement,Diana L | | Trigonometry Placement Test | 2004-11-01 | N |
| 083765 | Duke,Timothy A | 11/1/2004 | Basic Math Placement Test | 2004-11-03 | Y |
| 083765 | Duke,Timothy A | | Algebra Placement Test | 2004-11-03 | Y |
| 083765 | Duke,Timothy A | | Geometry Placement Test | 2004-11-03 | N |
| 083765 | Duke,Timothy A | | Trigonometry Placement Test | 2004-11-03 | N |
| 001648 | Havard,Joshua Owen | 3/7/2005 | Basic Math Placement Test | 2005-03-07 | Y |
| 001648 | Havard,Joshua Owen | | Algebra Placement Test | 2005-03-07 | Y |
| 001648 | Havard,Joshua Owen | | Geometry Placement Test | 2005-03-07 | N |
| 001648 | Havard,Joshua Owen | | Trigonometry Placement Test | 2005-03-07 | N |
| 075113 | Drakes,Carlon | 4/16/2005 | Basic Math Placement Test | 2005-04-18 | N |
| 075113 | Drakes,Carlon | | Algebra Placement Test | 2005-04-18 | N |
| 075113 | Drakes,Carlon | | Geometry Placement Test | 2005-04-18 | N |
| 075113 | Drakes,Carlon | | Trigonometry Placement Test | 2005-04-18 | N |
| 083959 | Griffin,Patricia A | 3/7/2005 | Basic Math Placement Test | 2005-04-18 | N |
| 083959 | Griffin,Patricia A | | Algebra Placement Test | 2005-04-18 | N |
| 083959 | Griffin,Patricia A | | Geometry Placement Test | 2005-04-18 | N |
| 083959 | Griffin,Patricia A | | Trigonometry Placement Test | 2005-04-18 | N |
| 084101 | Lee,Shannon N | 5/31/2005 | Basic Math Placement Test | 2005-05-31 | Y |
| 084101 | Lee,Shannon N | | Algebra Placement Test | 2005-05-31 | N |
| 084101 | Lee,Shannon N | | Geometry Placement Test | 2005-05-31 | N |
| 084101 | Lee,Shannon N | | Trigonometry Placement Test | 2005-05-31 | N |
| 084108 | Watson,Ronto D | 5/31/2005 | Basic Math Placement Test | 2005-05-31 | N |
| 084108 | Watson,Ronto D | | Algebra Placement Test | 2005-05-31 | N |
| 084108 | Watson,Ronto D | | Geometry Placement Test | 2005-05-31 | N |
| 084108 | Watson,Ronto D | | Trigonometry Placement Test | 2005-05-31 | N |
| 084434 | Chapple III,Mose | 11/14/2005 | Basic Math Placement Test | 2005-11-14 | N |
| 084434 | Chapple III,Mose | | Algebra Placement Test | 2005-11-14 | N |
| 084434 | Chapple III,Mose | | Geometry Placement Test | 2005-11-14 | N |
| 084434 | Chapple III,Mose | | Trigonometry Placement Test | 2005-11-14 | N |
| 084306 | Crocker,Travis H | 11/15/2005 | Basic Math Placement Test | 2005-11-15 | Y |
| 084306 | Crocker,Travis H | | Algebra Placement Test | 2005-11-15 | N |
| 084306 | Crocker,Travis H | | Geometry Placement Test | 2005-11-15 | N |
| 084636 | Lowery,Trenton E | 3/20/2006 | Basic Math Placement Test | 2006-03-21 | N |

## ALDOT Ninth Division
### Math Placement Test Results
### January 2002-February 27, 2008

| ID | Name | DOE | Descr | Test Date | Passed |
|---|---|---|---|---|---|
| 084636 | Lowery,Trenton E | | Algebra Placement Test | 2006-03-21 | N |
| 084636 | Lowery,Trenton E | | Geometry Placement Test | 2006-03-21 | N |
| 084636 | Lowery,Trenton E | | Trigonometry Placement Test | 2006-03-21 | N |
| 084632 | Pettway,Randy | 3/20/2006 | Basic Math Placement Test | 2006-03-21 | Y |
| 084632 | Pettway,Randy | | Algebra Placement Test | 2006-03-21 | Y |
| 084632 | Pettway,Randy | | Geometry Placement Test | 2006-03-21 | N |
| 084632 | Pettway,Randy | | Trigonometry Placement Test | 2006-03-21 | N |
| 084634 | Robinson,Dejuan P | 3/20/2006 | Basic Math Placement Test | 2006-03-21 | N |
| 084634 | Robinson,Dejuan P | | Algebra Placement Test | 2006-03-21 | Y |
| 084634 | Robinson,Dejuan P | | Geometry Placement Test | 2006-03-21 | N |
| 084634 | Robinson,Dejuan P | | Trigonometry Placement Test | 2006-03-21 | N |
| 084268 | McNorton Jr,Samuel Todd | 4/1/2006 | Basic Math Placement Test | 2006-04-11 | N |
| 084268 | McNorton Jr,Samuel Todd | | Algebra Placement Test | 2006-04-11 | N |
| 084268 | McNorton Jr,Samuel Todd | | Geometry Placement Test | 2006-04-11 | N |
| 084268 | McNorton Jr,Samuel Todd | | Trigonometry Placement Test | 2006-04-11 | N |
| 084812 | Jackson,Lashundra M | 7/3/2006 | Basic Math Placement Test | 2006-07-03 | N |
| 084812 | Jackson,Lashundra M | | Algebra Placement Test | 2006-07-03 | N |
| 084812 | Jackson,Lashundra M | | Geometry Placement Test | 2006-07-03 | N |
| 084812 | Jackson,Lashundra M | | Trigonometry Placement Test | 2006-07-03 | N |
| 084811 | Majercik,John C | 7/3/2006 | Basic Math Placement Test | 2006-07-03 | Y |
| 084811 | Majercik,John C | | Algebra Placement Test | 2006-07-03 | N |
| 084811 | Majercik,John C | | Geometry Placement Test | 2006-07-03 | N |
| 084811 | Majercik,John C | | Trigonometry Placement Test | 2006-07-03 | N |
| 084805 | Reed,Darrin D | 7/3/2006 | Basic Math Placement Test | 2006-07-03 | Y |
| 084805 | Reed,Darrin D | | Algebra Placement Test | 2006-07-03 | N |
| 084805 | Reed,Darrin D | | Geometry Placement Test | 2006-07-03 | N |
| 084805 | Reed,Darrin D | | Trigonometry Placement Test | 2006-07-03 | N |
| 020690 | Ferrell,Dennis Ray | 9/1/2006 | Basic Math Placement Test | 2006-09-19 | Y |
| 020690 | Ferrell,Dennis Ray | | Algebra Placement Test | 2006-09-19 | N |
| 020690 | Ferrell,Dennis Ray | | Geometry Placement Test | 2006-09-19 | N |
| 020690 | Ferrell,Dennis Ray | | Trigonometry Placement Test | 2006-09-19 | N |
| 085070 | Dees,Monica | 11/1/2006 | Basic Math Placement Test | 2006-11-01 | Y |
| 085070 | Dees,Monica | | Algebra Placement Test | 2006-11-01 | N |
| 085070 | Dees,Monica | | Geometry Placement Test | 2006-11-01 | N |
| 085070 | Dees,Monica | | Trigonometry Placement Test | 2006-11-01 | N |
| 084293 | Lopez Jr,Victor Raul | 11/1/2006 | Basic Math Placement Test | 2006-11-01 | N |

ALDOT Ninth Division
Math Placement Test Results
January 2002-February 27, 2008

| ID | Name | DOE | Descr | Test Date | Passed |
|---|---|---|---|---|---|
| 084293 | Lopez Jr,Victor Raul | | Algebra Placement Test | 2006-11-01 | N |
| 084293 | Lopez Jr,Victor Raul | | Geometry Placement Test | 2006-11-01 | N |
| 084293 | Lopez Jr,Victor Raul | | Trigonometry Placement Test | 2006-11-01 | N |
| 085161 | Porter,Deborah L | 1/16/2007 | Basic Math Placement Test | 2007-01-16 | N |
| 085161 | Porter,Deborah L | | Algebra Placement Test | 2007-01-16 | N |
| 085161 | Porter,Deborah L | | Geometry Placement Test | 2007-01-16 | N |
| 085161 | Porter,Deborah L | | Trigonometry Placement Test | 2007-01-16 | N |
| 085186 | Fletcher,Jay M | 1/16/2007 | Basic Math Placement Test | 2007-02-01 | N |
| 085186 | Fletcher,Jay M | | Algebra Placement Test | 2007-02-01 | N |
| 085186 | Fletcher,Jay M | | Geometry Placement Test | 2007-02-01 | N |
| 085186 | Fletcher,Jay M | | Trigonometry Placement Test | 2007-02-01 | N |
| 085211 | Roberts,Charles A | 3/1/2007 | Basic Math Placement Test | 2007-03-01 | Y |
| 085211 | Roberts,Charles A | | Algebra Placement Test | 2007-03-01 | Y |
| 085211 | Roberts,Charles A | | Geometry Placement Test | 2007-03-01 | N |
| 085211 | Roberts,Charles A | | Trigonometry Placement Test | 2007-03-01 | N |
| 058389 | Champagne,Lisa S | 4/2/2007 | Basic Math Placement Test | 2007-04-02 | N |
| 058389 | Champagne,Lisa S | | Algebra Placement Test | 2007-04-02 | N |
| 058389 | Champagne,Lisa S | | Geometry Placement Test | 2007-04-02 | N |
| 058389 | Champagne,Lisa S | | Trigonometry Placement Test | 2007-04-02 | N |
| 094852 | Naugle,Kevin E | 4/2/2007 | Basic Math Placement Test | 2007-04-02 | N |
| 094852 | Naugle,Kevin E | | Algebra Placement Test | 2007-04-02 | Y |
| 094852 | Naugle,Kevin E | | Geometry Placement Test | 2007-04-02 | N |
| 094852 | Naugle,Kevin E | | Trigonometry Placement Test | 2007-04-02 | N |
| 094886 | Blan JR,Gene N | 5/1/2007 | Basic Math Placement Test | 2007-05-01 | Y |
| 094886 | Blan JR,Gene N | | Algebra Placement Test | 2007-05-01 | N |
| 094886 | Blan JR,Gene N | | Geometry Placement Test | 2007-05-01 | N |
| 094886 | Blan JR,Gene N | | Trigonometry Placement Test | 2007-05-01 | N |
| 033631 | Isaac,George C | 6/1/2007 | Basic Math Placement Test | 2007-05-01 | N |
| 033631 | Isaac,George C | | Algebra Placement Test | 2007-05-01 | N |
| 033631 | Isaac,George C | | Geometry Placement Test | 2007-05-01 | N |
| 033631 | Isaac,George C | | Trigonometry Placement Test | 2007-05-01 | N |
| 084458 | Malone,Jason Leebaron | 6/1/2007 | Basic Math Placement Test | 2007-05-01 | N |
| 084458 | Malone,Jason Leebaron | | Algebra Placement Test | 2007-05-01 | N |
| 084458 | Malone,Jason Leebaron | | Geometry Placement Test | 2007-05-01 | N |
| 084458 | Malone,Jason Leebaron | | Trigonometry Placement Test | 2007-05-01 | N |
| 084024 | Johnson,Kenneth M | 7/1/2007 | Basic Math Placement Test | 2007-07-03 | N |

ALDOT Ninth Division
Math Placement Test Results
January 2002-February 27, 2008

| ID | Name | DOE | Descr | Test Date | Passed |
|---|---|---|---|---|---|
| 084024 | Johnson,Kenneth M | | Algebra Placement Test | 2007-07-03 | N |
| 084024 | Johnson,Kenneth M | | Geometry Placement Test | 2007-07-03 | N |
| 084024 | Johnson,Kenneth M | | Trigonometry Placement Test | 2007-07-03 | N |
| 095006 | Jones,Rafael A | 7/2/2007 | Basic Math Placement Test | 2007-07-03 | N |
| 095006 | Jones,Rafael A | | Algebra Placement Test | 2007-07-03 | N |
| 095006 | Jones,Rafael A | | Geometry Placement Test | 2007-07-03 | N |
| 095006 | Jones,Rafael A | | Trigonometry Placement Test | 2007-07-03 | N |
| 095057 | Cunningham,Morrius A | 8/16/2007 | Basic Math Placement Test | 2007-08-22 | Y |
| 095057 | Cunningham,Morrius A | | Algebra Placement Test | 2007-08-22 | N |
| 095057 | Cunningham,Morrius A | | Geometry Placement Test | 2007-08-22 | N |
| 095057 | Cunningham,Morrius A | | Trigonometry Placement Test | 2007-08-22 | N |
| 084922 | Clement,Kyle William | 11/16/2007 | Basic Math Placement Test | 2007-11-16 | N |
| 084922 | Clement,Kyle William | | Algebra Placement Test | 2007-11-16 | Y |
| 084922 | Clement,Kyle William | | Geometry Placement Test | 2007-11-16 | N |
| 084922 | Clement,Kyle William | | Trigonometry Placement Test | 2007-11-16 | N |
| 095164 | Wright,Michael F | 11/16/2007 | Basic Math Placement Test | 2007-11-16 | N |
| 095164 | Wright,Michael F | | Algebra Placement Test | 2007-11-16 | N |
| 095164 | Wright,Michael F | | Geometry Placement Test | 2007-11-16 | N |
| 095164 | Wright,Michael F | | Trigonometry Placement Test | 2007-11-16 | N |
| 095175 | Farrell,Brandy A | 12/3/2007 | Basic Math Placement Test | 2007-12-03 | Y |
| 095175 | Farrell,Brandy A | | Algebra Placement Test | 2007-12-03 | N |
| 095175 | Farrell,Brandy A | | Geometry Placement Test | 2007-12-03 | N |
| 095175 | Farrell,Brandy A | | Trigonometry Placement Test | 2007-12-03 | N |
| 095173 | Henry,Jennifer H | 12/3/2007 | Basic Math Placement Test | 2007-12-03 | Y |
| 095173 | Henry,Jennifer H | | Algebra Placement Test | 2007-12-03 | N |
| 095173 | Henry,Jennifer H | | Geometry Placement Test | 2007-12-03 | N |
| 095173 | Henry,Jennifer H | | Trigonometry Placement Test | 2007-12-03 | N |
| 084181 | Holland,Travis Jay | 1/16/2008 | Basic Math Placement Test | 2008-01-16 | N |
| 084181 | Holland,Travis Jay | | Algebra Placement Test | 2008-01-16 | N |
| 084181 | Holland,Travis Jay | | Geometry Placement Test | 2008-01-16 | N |
| 084181 | Holland,Travis Jay | | Trigonometry Placement Test | 2008-01-16 | N |
| 084591 | Houston,Dustin Leigh | 1/1/2008 | Basic Math Placement Test | 2008-01-16 | N |
| 084591 | Houston,Dustin Leigh | | Algebra Placement Test | 2008-01-16 | N |
| 084591 | Houston,Dustin Leigh | | Geometry Placement Test | 2008-01-16 | N |
| 084591 | Houston,Dustin Leigh | | Trigonometry Placement Test | 2008-01-16 | N |
| 195728 | Riley Jr,Robert James | 1/1/2008 | Basic Math Placement Test | 2008-01-16 | N |

**ALDOT Ninth Division**
**Math Placement Test Results**
**January 2002-February 27, 2008**

| ID | Name | DOE | Descr | Test Date | Passed |
|----|------|-----|-------|-----------|--------|
| 195728 | Riley Jr,Robert James | | Algebra Placement Test | 2008-01-16 | N |
| 195728 | Riley Jr,Robert James | | Geometry Placement Test | 2008-01-16 | N |
| 195728 | Riley Jr,Robert James | | Trigonometry Placement Test | 2008-01-16 | N |
| 000997 | Hunter,Gwenda K | Before 2002 | Basic Math Placement Test | 2002-10-21 | N |
| 000997 | Hunter,Gwenda K | | Algebra Placement Test | 2002-10-21 | N |
| 000997 | Hunter,Gwenda K | | Geometry Placement Test | 2002-10-21 | N |
| 000997 | Hunter,Gwenda K | | Trigonometry Placement Test | 2002-10-21 | N |
| 000906 | Manuel,Beatrice C | Before 2002 | Basic Math Placement Test | 2002-10-21 | N |
| 000906 | Manuel,Beatrice C | | Algebra Placement Test | 2002-10-21 | N |
| 000906 | Manuel,Beatrice C | | Geometry Placement Test | 2002-10-21 | N |
| 000906 | Manuel,Beatrice C | | Trigonometry Placement Test | 2002-10-21 | N |
| 000759 | Matthews,Paul T | Before 2002 | Basic Math Placement Test | 2002-10-21 | Y |
| 000759 | Matthews,Paul T | | Algebra Placement Test | 2002-10-21 | N |
| 000759 | Matthews,Paul T | | Geometry Placement Test | 2002-10-21 | N |
| 000759 | Matthews,Paul T | | Trigonometry Placement Test | 2002-10-21 | N |
| 000710 | Smith,Marcus E | Before 2002 | Basic Math Placement Test | 2002-10-21 | Y |
| 000710 | Smith,Marcus E | | Algebra Placement Test | 2002-10-21 | N |
| 000710 | Smith,Marcus E | | Geometry Placement Test | 2002-10-21 | N |
| 000710 | Smith,Marcus E | | Trigonometry Placement Test | 2002-10-21 | N |
| 000731 | Stinson,Hank C | Before 2002 | Basic Math Placement Test | 2002-10-21 | Y |
| 000731 | Stinson,Hank C | | Algebra Placement Test | 2002-10-21 | N |
| 000731 | Stinson,Hank C | | Geometry Placement Test | 2002-10-21 | N |
| 000731 | Stinson,Hank C | | Trigonometry Placement Test | 2002-10-21 | N |
| 000684 | Johnston,Richard A | Before 2002 | Basic Math Placement Test | 2002-10-29 | Y |
| 000684 | Johnston,Richard A | | Algebra Placement Test | 2002-10-29 | N |
| 000684 | Johnston,Richard A | | Geometry Placement Test | 2002-10-29 | N |
| 000684 | Johnston,Richard A | | Trigonometry Placement Test | 2002-10-29 | N |
| 000914 | Langham,Shaster R | Before 2002 | Basic Math Placement Test | 2002-10-29 | N |
| 000914 | Langham,Shaster R | | Algebra Placement Test | 2002-10-29 | N |
| 000914 | Langham,Shaster R | | Geometry Placement Test | 2002-10-29 | N |
| 000914 | Langham,Shaster R | | Trigonometry Placement Test | 2002-10-29 | N |
| 000999 | Presley,Phillip D | Before 2002 | Basic Math Placement Test | 2002-11-12 | N |
| 000999 | Presley,Phillip D | | Algebra Placement Test | 2002-11-12 | N |
| 000999 | Presley,Phillip D | | Geometry Placement Test | 2002-11-12 | N |

**ALDOT Ninth Division**
**Math Placement Test Results**
**January 2002-February 27, 2008**

| ID | Name | DOE | Descr | Test Date | Passed |
|---|---|---|---|---|---|
| 000999 | Presley,Phillip D | | Trigonometry Placement Test | 2002-11-12 | N |
| 054381 | Reddick,Jerome A | Before 2002 | Basic Math Placement Test | 2005-03-14 | Y |
| 054381 | Reddick,Jerome A | | Algebra Placement Test | 2005-03-14 | Y |
| 054381 | Reddick,Jerome A | | Geometry Placement Test | 2005-03-14 | Y |
| 054381 | Reddick,Jerome A | | Trigonometry Placement Test | 2005-03-14 | Y |

# Plaintiff's
# Exhibit 11

ALABAMA DEPARTMENT OF TRANSPORTATION

Complaint Form

| Name | Address |
|---|---|
| Bertha W. Alexander | P O Box 6983 Mobile, Alabama  36660-0983 |

| SSN | Race/Sex | Division/Bureau | District/Section | Job Classification: |
|---|---|---|---|---|
| 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 | B/Female | 9th | District 1 | ASA 1 |

| Signature | Date Submitted |
|---|---|
| Bertha W Alexander | May 24, 2005 |

Date (HR Bureau use only): 5/24/05     Docket # (HR Bureau use only): 269

If your complaint is not based on discrimination, please check here:    None ___

If your complaint is based on discrimination, please check one of the following:

Age ___    Consent Decree Violation **X**    Disability ___    National Origin ___

Race **X**    Religion ___    Retaliation ___    Sex/Gender ___

Area in Which You Were Affected (You must check one):

Compensation ___    Disciplinary Action **X**    Hiring ___    Job Assignment/Duties ___

Retaliation ___    Training ___    Transfer ___

Other (explain) **Being forced to maintain good work habits in a hostile work environment.**

Date of Incident: **May 20, 2005 @ 7:45 a.m.**

Summary of Complaint (including the name of the employee against whom this complaint is being filed):

**Samuel J. Palmer, District 1**

**In a meeting with Mr. Palmer, District 1 and Mr. Mark Hocutt, Project Engr./ Supervisor at Mr. Palmer's office, I was confronted with several questions (1)  Why are you being late the past several days? (A) I'm on medications which I take first morning.  This was discussed with Supv. and informed I would work late to repay the 10 to 15 etc. minutes. Mr. Hocutt replied he was O.K. with this.  (2)  Whats up with your office time being late? I had to call you Wednesday, 5/18/05 & Thursday, 5/19/05.  (A) On 5/18/05 Mark Hocutt checked my files and time was sent to Lisa Owens 5/18/05 @ 7:22 a.m. On 5/19/05 time was not received by Lisa Owens due to a minor technical issue with the data saving process. (3) What about this statement you made "I'm tired of Jay harassing me" (A)  Yes, I said**

Names of Witnesses: **Mark Hocutt, Supervisor**

Your Suggested Resolution: **That Mr. Palmer be reprimanded for the mental stress he has imposed on me personally.  This stress has caused a fear of my reporting to work due to the his state of "It's my job to harass you".  Mark Hocutt, Supervisor said not one word in my defense.  Nor did he share our agreement on my being late with Mr. Palmer.**

Please return to:    (1) Your immediate Supervisor or
(2) Your Division EEC Representative or
(3) ALDOT Human Resources Bureau (Attention: Title 7 Coordinator)
1409 Coliseum Blvd. Montgomery, AL 36130

PLAINTIFF'S EXHIBIT
11
ALL-STATE LEGAL®

CONTINUE FROM SUMMARY OF COMPLAINT

every time you see me pass by your office after 7:00 a.m. you call back and ask Mark Hocutt why is BJ late and never ask if I had reported my arrival time to the office etc.  (4)  What about this statement you made on the time sheet you sent "Sorry human error" (A)  The reply directed to you was "I was sorry for getting the office time up after 8:00 I'm human, I made an error.

Now, the statement "I tired of Jay harassing me over the least small error I made" was conveyed to Mark Hocutt in the project office.  Samuel J. Palmer stated to my face that it was his job to harass me if I was not doing my job.

Since the meeting at District 1 with Mr. Palmer and Mr. Hocutt fear has been inflicted upon me as to my future with ALDOT due to Mr. Palmer statement of reprimand.  At present I am prescribed Alprazolam 3x per day by Dr. Daniel Polansky.

Note*** Mark Hocutt has assigned to his office more active construction project than any other project engineer at ALDOT.  I'm performing my assigned task to the best of my ability considering the process of (OJT).  I command myself for having endured the stress of working in such an hostile environment and performing as well as I have.



ALABAMA DEPARTMENT OF TRANSPORTATION

*Complaint Form*

| Name<br>Bertha W. Alexander | Address<br>P. O. Box 6983    Mobile, AL  36660 | | | |
|---|---|---|---|---|
| SSN<br>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 | Race/Sex<br>Black/F | Division/Bureau<br>Nine | District/Section<br>Dist 1<br>Construction | Job Classification<br>Administrative Assistant |
| Signature<br>*Bertha Alexander* | | | Data Submitted<br>June 27, 2005 | |

Date (HR Bureau only)                                    Docket # (HR Bureau only)

If your complaint is **not** based on discrimination, please check here:        None ____

If your complaint **is** based on discrimination, please check one of the following:

Age __XX__        Consent Decree Violation __X__        Disability ____        National Origin ____

Race __XX__        Religion ____        Retaliation __XX__        Sex/Gender ____

**Area in Which You Were Affected (You must check one):**

Compensation ____        Disciplinary Action __XX__        Hiring ____        Job Assignment/Duties ____

Retaliation __XX__        Training ____        Transfer ____

Other (explain) _____

Date of Incident:    June 24, 2005

Summary of Complaint (*Including the name of the employee against whom this complaint is being filed*):

At my work station, going about my daily task of checking contractor's payrolls

on the above date in the a.m., I was confronted by Mr. Hocutt, my supervisor in a

a very unpleasant state of anger adamant in his accusation of my making false

statements against him.  I question his motive for such out bursts.  He then put a

e-mail in face for viewing.  Mr. Hocutt's on going accusations regarding the e-mail

allowed no time for explanation.  I then contacted Mr. Malone, EEO, in an effort to

Names of Witnesses: Mr. Eddie Kerr, Thompson Engineering

Your Suggested Resolution: Due to the unfair treatment of former black employees under

Mr. Hocutt's supervision, I feel that my continue assignment under the construction

umbrella, in a hostile work environment, and being in the second stage of an

Please return to:    (1) Your immediate Supervisor or
                     (2) Your Division EEO Representative or
                     (3) ALDOT Human Resources Bureau (Attention: Title 7 Coordinator)
                     1409 Coliseum Blvd. Montgomery, AL 36130                    Revised 1/11/02

June 27, 2005
Page 2

SUMMARY OF COMPLAINT CONTINUED —

defuse Mr. Hocutt's rage of anger. Mr. Hocutt then questioned Mr. Malone's reason for
the e-mail and said false statements was being made against him. Mr. Hocutt then
requested to meet in Mr. Malon's office, he agreed. Prior to leaving for Mr. Malone's
office after a few minutes of conversation over the telephone, Mr. Hocutt's statement
directed to me was "your mental stress is all in your head". The degree of my stress
is a medical diagnosis determined by my treating physician, Dr. Daniel Polansky.
Mr. Hocutt is not qualified to make such an accusation regarding my health.

SUGGESTED RESOLUTION CONTINUED —

harassment complaint which was filed against Mr. Hocutt's supervisor and associate,
Mr. Samuel J. Palmer, I strongly feel would progress my stress and medication level to
a higher degree. At present my stress relief Rx is ALPRAZOLAM 0.25MG 3 x daily.
Daniel Polansky, MD, treating physician.

Also, see attached e-mails for record.