IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LASHUNDRA JACKSON | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CASE NO.: 2:07-CV-645-MEF |
| | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION, JOE MCINNES, IN HIS | § | |
| OFFICIAL CAPACITY AS DIRECTOR OF THE | § | |
| STATE OF ALABAMA DEPARTMENT OF | § | |
| TRANSPORTATION | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S SUPPLEMENTAL EVIDENTIARY SUBMISSION
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff submits the following supplemental evidence in support of her Response in Opposition to Defendant's Motion for Summary Judgment:

1.      Exhibit 12 - Deposition of Bret Paulk

2.      Exhibit 13 - Deposition of Samuel Palmer.

This information was obtained by the undersigned counsel on June 18 and 19, 2008, and thus was not submitted with Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment when it was filed on June 17, 2008. Defendant does not oppose the submission of this supplemental evidence. This supplemental evidence is submitted for the purpose of providing additional evidence in support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment. The additional evidence on which Plaintiff relies, and the argument or point that evidence supports are as follows:

a.      Deposition of Bret Paulk ("Paulk depo.") at 82:21-83:8, 100:11-101:4 (Paulk admits

to raising his voice during the meeting on January 5, 2008, with Jackson, and Jackson cried during that meeting; Paulk admits that "I probably shouldn't have done it."); *see* Plaintiff's Response in Opposition at pp. 24-26.

> b.     Paulk depo. at 87:14-16 (Paulk was unable to identify anyone whose work had been disrupted by the meeting in his office with Ms. Jackson); *see* Plaintiff's Response in Opposition at pp. 24-26.

> c.     Paulk depo. at 104:2-4 (Jackson signed the taping policy memo by the deadline established by Paulk); *see* Plaintiff's Response in Opposition at 26.

> d.     Deposition of Samuel Palmer ("Palmer depo.") at 84:17-85:3, 86:14-19 (L. Daniel Morris made the decision to terminate Ms. Jackson, and Palmer does not know why he made that decision.)  There is no evidence in the record as to the reason Mr. Morris decided to terminate Ms. Jackson.  *See* Plaintiff's Response in Opposition at 17.

> e.     Palmer depo. at 135:14-18 (Palmer does not know which incidents were the basis for Ms. Jackson's termination.)  *See* Plaintiff's Response in Opposition at 17, 22-23.

> f.     Palmer depo. at 165:2-11 (Palmer does not know why there was such a long delay between the last incident of alleged misconduct by Ms. Jackson and the recommendation to terminate her.)  *See* Plaintiff's Response in Opposition at 20-22.

<div style="margin-left:40%">

Respectfully submitted
Ross Law, P.C.
1104 San Antonio Street
Austin, Texas 78701
Telephone: 512/474-7677
Facsimile: 512/474-5306

s/ Kell A. Simon_____
Kell Simon
Alabama State Bar No.: ASB-0214-O77K

</div>

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 24th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification to the following:

Jim R. Ippolito, Jr.
Andrew W. Redd
Jason A. Trippe
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

s/ Kell A. Simon_____
Of counsel

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF ALABAMA
2                   NORTHERN DIVISION

3

        LASHUNDRA
4       JACKSON,

5           Plaintiff,
                            CIVIL ACTION NO.
6       vs.                 2:07-CV-645-MEF

7       STATE OF ALABAMA
        DEPARTMENT OF
8       TRANSPORTATION,
        JOE McINNES, in
9       his official
        capacity as
10      DIRECTOR OF THE
        STATE OF ALABAMA
11      DEPARTMENT OF
        TRANSPORTATION,
12
            Defendants.
13

14          *    *    *    *    *    *

15

16      **DEPOSITION OF BRET PAULK,**

17      taken pursuant to notice and
        stipulation on behalf of the
18      Plaintiff, in the Ninth Division
        Office of the Alabama Department of
19      Transportation, 1701 I-65 West Service
        Road North, Mobile, Alabama, before
20      Karen Reagan Drinkard, AL-CCR #005,
        Certified Court Reporter and Notary
21      Public in and for the State of Alabama
        at Large, on June 18th, 2008,
22      commencing at 2:45 p.m.

23

1                     A P P E A R A N C E S

2

3

4        FOR  THE  PLAINTIFF:

5

6                **KELL  A.  SIMON,  ESQUIRE**

7                Ross,  Melton,  PC

8                Attorneys  at  Law

9                1104  San  Antonio  Street

10               Austin,  Texas  78701

11

12

13       FOR  THE  DEFENDANTS:

14

15               **ANDREW  REDD,  ESQUIRE**

16                        and

17               **JASON  A.  TRIPPE,  ESQUIRE**

18               State  of  Alabama  Department  of

19                    Transportation

20               1409  Coliseum  Boulevard

21               Montgomery,  Alabama  36110

22

23

BRET PAULK -- June 18th, 2008

1                    S T I P U L A T I O N S

2

3              It is stipulated and agreed

4        by and between counsel representing

5        the parties that the deposition of

6        **BRET PAULK** may be taken before Karen

7        Reagan Drinkard, AL-CCR #005,

8        Certified Court Reporter and Notary

9        Public in and for the State of Alabama

10       at Large, without the formality of a

11       commission; and all formality with

12       respect to other procedural

13       requirements is waived; that

14       objections to questions, other than

15       objections as to the form of the

16       questions need not be made at this

17       time, but may be reserved for a ruling

18       at such time as the deposition may be

19       offered in evidence or used for any

20       other purpose by either party as

21       provided by the Federal Rules of Civil

22       Procedure.

23              It is further stipulated and

BRET PAULK -- June 18th, 2008

1         agreed by and between the parties

2         hereto and the witness, that the

3         signature of the witness to this

4         deposition is hereby waived.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                          I N D E X

2

3       **E X A M I N A T I O N**                          **Page**

4         MR. SIMON........................  7

5

6       **E X H I B I T S**                                **Page**

7         PX-4    Letter to LaShundra         16
                  Jackson from D.J.
8                 McInnes Re: Separation
                  from Employment, 3/8/07
9
          PX-5    Employee Performance        31
10                Mid-Appraisal, 11/2/06

11        PX-6    Form 13F, Employee          41
                  Performance
12                (Probationary), 12/29/06

13        PX-7    ALDOT 9th Division          74
                  Policy on Recording
14                Devices, 1/5/07

15        PX-8    Memo to File from Charly    97
                  Jones, 1/5/07
16
          PX-9    Form 13F, Employee          133
17                Performance
                  (Probationary), 3/6/07
18
          PX-10   Form 13F, Employee          139
19                Performance
                  (Probationary), no
20                appointing authority
                  signature date
21
          PX-11   Memo to Jay Palmer from     141
22                Vincent Calametti,
                  2/13/07
23

1          PX-12    Memo to File from Bret      149
                    Paulk, 1/5/07
2
           PX-13    Memo to LaShundra           159
3                   Jackson from Maxine
                    Wheeler, Training
4                   Bureau, 12/14/06

5          PX-14    Memo to File from Bret      162
                    Paulk, 1/5/07
6
           PX-15    Letter to LaShundra         165
7                   Jackson from Bret Paulk,
                    1/18/07
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                MR. REDD:  Usual stipulations?

 2                MR. SIMON:  That's fine.

 3                MR. REDD:  Can we have a

 4                     stipulation in addition

 5                     to this that whenever a

 6                     document may refer to

 7                     LaShundra Yates, that we

 8                     are talking about

 9                     LaShundra Jackson?

10                MR. SIMON:  Yes.

11                MR. REDD:  All right.  That's

12                     all.

13

14           BRET PAULK, of lawful age,

15      having first been duly sworn,

16      testified as follows:

17

18                  EXAMINATION

19      BY MR. SIMON:

20 Q.   Mr. Paulk, my name is Kell Simon.  I

21      represent Ms. Jackson in her lawsuit

22      against the Alabama Department of

23      Transportation.
```

BRET PAULK -- June 18th, 2008

```
 1   A.      Nice to meet you.

 2   Q.      Good to meet you.  You received a

 3           subpoena to appear here at 9 o'clock

 4           this morning; is that right?

 5   A.      That's right.

 6   Q.      Okay.  And you didn't appear at

 7           9 o'clock, did you?

 8   A.      No, I did not.

 9   Q.      What was the reason for you not

10           appearing at 9 o'clock?

11   A.      Basically I was under the impression

12           that under the law, I wasn't properly

13           served my subpoena.

14   Q.      Okay.  How did -- what gave you that

15           impression?

16   A.      Well, for one, I never saw anybody or

17           signed for it until yesterday late,

18           and I went to the post office and

19           signed for it.  And also I never

20           received compensation for my mileage

21           or time spent here today.

22   Q.      Okay.  What was your mileage to get

23           here today?
```

```
 1   A.     I'm not sure.  But basically I'm
 2          volunteering.  I'm here now.
 3   Q.     I know you're here now.  Did anybody
 4          tell you that you didn't need to
 5          appear here today?
 6   A.     No.  I just -- I mean --
 7                 MR. REDD:  I told him what the
 8                     law was.
 9   A.     You know --
10                 MR. SIMON:  You told him what
11                     the law was?
12                 MR. REDD:  I told him it was
13                     his choice.
14   A.     -- to be here.
15   Q.     Okay.
16   A.     And so basically I'm cooperating.
17   Q.     And I appreciate that.  When did
18          Mr. Redd tell you what the law was?
19   A.     Monday.
20   Q.     On Monday?  Of this week?
21   A.     Uh-huh.
22   Q.     Okay.  What did you do to get ready
23          for your deposition?
```

```
 1   A.     We met, and basically I kind of
 2          referred and read back over some of
 3          the documents all in the file
 4          pertaining to this and kind of just
 5          freshened my memory, because it's been
 6          a year and a half since a lot of it
 7          has taken place.
 8   Q.     Who did you meet with?
 9   A.     Andy Redd and Jason Trippe.
10   Q.     How long was --
11   A.     Well, Jason wasn't here Monday.
12   Q.     How long was the meeting that you had
13          with Mr. Redd?
14   A.     I met -- I met with them twice.
15   Q.     Okay.  When was the first time you met
16          with them?
17   A.     Two weeks ago, three weeks ago.
18   Q.     Okay.  And then when was the second
19          meeting?
20   A.     Monday.
21   Q.     How long did you meet with them two or
22          three weeks ago?  How long was the
23          meeting?
```

BRET PAULK -- June 18th, 2008

```
 1   A.      Approximately an hour.
 2   Q.      And then how long was your meeting
 3           with him on Monday?
 4   A.      Maybe 30 minutes.
 5   Q.      Now, you used to be employed at the
 6           Alabama Department of Transportation;
 7           correct?
 8   A.      Yes.
 9   Q.      Okay.  What was your job there?
10   A.      I was a project engineer.
11   Q.      How long were you a project engineer
12           at DOT?
13   A.      Approximately a year.
14   Q.      Did you have any previous employment
15           before that?
16   A.      Within the DOT?
17   Q.      No.  Anywhere else.
18   A.      No.
19   Q.      Okay.  Did you serve in another
20           capacity at the DOT before you were a
21           project engineer?
22   A.      I was an assistant project engineer.
23           I was a graduate of civil engineering
```

BRET PAULK -- June 18th, 2008                    12

```
 1          the whole -- you know, my full time
 2          here.  And then I was -- my last year
 3          here, I was project engineer.
 4     Q.   Okay.  And when did you leave the DOT?
 5     A.   Last September of -- yeah, September
 6          of '07.
 7     Q.   And why did you leave?
 8     A.   Better job opportunity.
 9     Q.   Who are you working for now?
10     A.   Hosea Weaver & Sons.
11     Q.   Okay.  And what are you doing for
12          them?
13     A.   I'm a project manager and estimator.
14                    THE REPORTER:  Tell me the
15                      name again.
16                    THE WITNESS:  Hosea Weaver &
17                      Sons, Hosea, H-O-S-E-A,
18                      Weaver, W-E-A-V-E-R, &
19                      Sons.
20     Q.   (By Mr. Simon:)  And are you -- are
21          you assigned to construction projects
22          that are being run by the DOT?
23     A.   I am.
```

BRET PAULK -- June 18th, 2008                    13

```
 1   Q.    Are you doing the same thing for
 2         Weaver that you were doing for the
 3         DOT?
 4   A.    Somewhat.  I'm more watching
 5         production and scheduling
 6         subcontractors and solving problems on
 7         jobs, and also estimating.  I didn't
 8         do anything like that here,
 9         estimating, bidding work.
10   Q.    And who is your supervisor?
11   A.    Johnny Murphy.
12   Q.    And is he a Hosea Weaver employee?
13   A.    He is.
14   Q.    So you became a project engineer in
15         September of 2006 at DOT?
16   A.    Yes, sir, roughly.
17   Q.    Okay.  Did you take Austin Harville's
18         place?  Is that right?
19   A.    I did.
20   Q.    Okay.  Had you done any project
21         engineering before that?
22   A.    No.
23   Q.    Had you supervised anybody before
```

BRET PAULK -- June 18th, 2008                                    14

```
 1        that?
 2   A.   A little bit.  I was assistant project
 3        engineer on a couple of jobs, but I
 4        wasn't the project engineer.
 5   Q.   Okay.  And as an assistant project
 6        engineer, did you supervise employees?
 7   A.   Somewhat, on -- on that particular
 8        job.
 9   Q.   Who did you supervise before you
10        became a project engineer?
11   A.   Brandy Pettway.  There was a
12        consultant, David Cox.  I worked with
13        him real close.  He doesn't -- he
14        doesn't work for DOT, but he works for
15        a consulting firm, Geotechnical
16        Engineering, I think.  I can't think
17        of anybody else out there off the top
18        of my head.
19   Q.   And then when you took over
20        Mr. Harville's position, who -- who
21        did you become the supervisor of?
22   A.   LaShundra, Raymond Ingram, and I
23        believe Adam Spence.
```

```
 1   Q.    Why was Ms. Jackson terminated from
 2         the DOT?
 3   A.    How do -- what particular event are
 4         you asking?
 5   Q.    What was the reason she was
 6         terminated?
 7   A.    I believe just her -- her conduct,
 8         her -- I guess, maybe pattern of her
 9         conduct, behavior.
10   Q.    How do you know that?
11   A.    That's just -- I don't -- I don't know
12         the specific reason for why.  I didn't
13         terminate her.
14   Q.    I know you didn't terminate her, but
15         why -- how do you know the reasons
16         that she was terminated?
17   A.    That's just my opinion.
18   Q.    Okay.  So you don't really know that
19         she was terminated because of her
20         pattern of behavior?
21   A.    I mean, I would have to look at, I
22         guess, her letter, which is above me.
23         I don't terminate people.
```

```
 1    Q.    Her termination letter?

 2    A.    Yes.

 3                (Off-the-record discussion.)

 4    Q.    Let me show you what I've marked as

 5          Plaintiff's Exhibit 4.

 6                MR. SIMON:  I'm just going to

 7                    go in order with these

 8                    exhibits.  We used 1

 9                    through 3 at

10                    Mr. McElhenney's

11                    deposition.

12    Q.    (By Mr. Simon:)  Is that Ms. Jackson's

13          termination letter?

14                (The referred-to document was

15                    marked for identification

16                    as Plaintiff's Exhibit No. 4.)

17    A.    Yes.

18    Q.    Okay.  Can you tell from that why she

19          was terminated?

20    A.    Does this state why?  No.

21    Q.    So can you tell from this letter why

22          she --

23    A.    I know --
```

1   Q.      -- was terminated?

2   A.      Because she was still under

3           probationary status.  She was an EA-1.

4   Q.      She was terminated because she was

5           still under a probationary status?

6   A.      Well, she was under a probationary

7           status as an EA-1, and they decided

8           that they didn't require her services

9           anymore.  So I guess, point being they

10          didn't -- a reason wasn't required of

11          her since she was under probation

12          still.

13  Q.      So there was no -- they didn't have a

14          reason to terminate her?

15                  MR. REDD:  Object to the form.

16                      That's not what he said.

17  A.      What are you asking?

18  Q.      I'm asking you -- you said a reason

19          wasn't required, and I asked you, so

20          they didn't have a reason to terminate

21          her?

22                  MR. REDD:  Form.

23  A.      I'm sure, yes, they had a reason, but

```
 1          this letter doesn't state that reason.
 2   Q.     It doesn't?  Let's go back to my
 3          previous question then.  I had asked
 4          you what were the reasons she was
 5          terminated, and you said you could
 6          tell if you looked at the letter.  You
 7          really can't tell from the letter, can
 8          you?
 9   A.     I said I would have to look at the
10          letter, because I've never seen it.
11   Q.     Okay.  Now that you've --
12   A.     It's above my head.
13   Q.     Now that you've seen it, you can tell
14          that the letter does not explain why
15          she was terminated; correct?
16   A.     That's correct.
17   Q.     So you testified earlier that she was
18          terminated for her pattern of behavior
19          and conduct.  What is your basis for
20          saying that?
21   A.     I've got a whole file that -- that
22          states her pattern of conduct, her --
23          her -- all the events that took place
```

1        while me and LaShundra worked

2        together.

3    Q.    And where is that file?

4    A.    It's -- I'm assuming the office

5        manager has it, or whoever keeps up

6        with the personnel files.

7    Q.    Okay.  So that's not something you

8        have in your personal possession?

9    A.    No.

10   Q.    Okay.  Did -- did anybody ever tell

11       you the reason that Ms. Jackson was

12       being terminated?

13   A.    Not that I recall.

14   Q.    Okay.  When you say she was being

15       terminated for a pattern of behavior,

16       is that just a guess on your part?

17   A.    Yes.

18   Q.    Were you one of the people that

19       recommended that she be fired?

20   A.    No.

21   Q.    Did you ever recommend to anybody that

22       Ms. Jackson be fired?

23   A.    No.

```
 1   Q.     So after the incident on January 5th
 2          about the taping policy, you didn't
 3          recommend to anybody that she be
 4          fired?
 5   A.     No.
 6                 (Off-the-record discussion.)
 7   Q.     And you didn't recommend to anybody,
 8          after the October 6th thing about
 9          scratches on her car, that she be
10          fired; right?
11   A.     No.
12   Q.     So if somebody at ALDOT testified that
13          you were the one who made the
14          recommendation to terminate her, that
15          would be false?
16   A.     Yes.
17   Q.     For a probationary engineering
18          assistant, who would be the person to
19          recommend that that -- that person not
20          finish out their probation and be
21          terminated instead?
22   A.     I'm not sure if -- if that would be --
23          I'm not sure who is over -- probably
```

BRET PAULK -- June 18th, 2008

```
 1          the district engineer --
 2   Q.     Okay.
 3   A.     -- I would imagine, would have a
 4          say-so in it.
 5   Q.     Would have had a say-so, but who --
 6          who would be the direct supervisor
 7          that would make the initial
 8          recommendation for termination of a
 9          probationary EA?
10   A.     I'm not sure.  I never had to -- this
11          is -- this is it.  I mean, I've never
12          been in this circumstance before, so
13          I'm not sure I can answer that
14          question.
15   Q.     Did you have the authority to
16          recommend termination of an inspector
17          under you?
18   A.     No.  I mean, I could probably make a
19          recommendation.  Whether or not that
20          recommendation is taken -- I don't
21          have the authority to recommend that.
22   Q.     Okay.
23   A.     I can -- I can say anything, but --
```

BRET PAULK -- June 18th, 2008                    22

```
 1   Q.    You could -- you could say to the

 2         district engineer, I think this person

 3         ought to be terminated; I don't think

 4         that she's doing a good job; right?

 5   A.    Yeah.  I mean, you could say that.  I

 6         mean, anybody could say that.

 7   Q.    But as the person's direct supervisor,

 8         that's something that you really could

 9         go to the district engineer and say;

10         right?

11   A.    Right.

12   Q.    And did you ever do that with regard

13         to Ms. Jackson?

14   A.    No.

15   Q.    Why did you never recommend that she

16         be terminated when you have a file

17         full of documents showing a pattern?

18   A.    Well, they -- they were aware of all

19         the situations, because it went to my

20         direct supervisor and his supervisor,

21         and so everybody was aware of the

22         situation that was going on.  And

23         basically all I did was try to carry
```

```
 1            on -- I still had an office to run and
 2            day-to-day activities and
 3            responsibilities, and I didn't have
 4            time to, you know, meet about this all
 5            day every day.
 6    Q.      Meet about what?
 7    A.      But you're asking why didn't I go to
 8            them and tell them.  Basically I
 9            documented all these events with
10            LaShundra, and they made their own
11            decision whether or not they wanted to
12            terminate LaShundra.
13    Q.      Okay.  But you never recommended to
14            them that she be terminated --
15    A.      No.
16    Q.      -- even though you had the authority
17            to do that?
18                  MR. REDD:  Objection.  I don't
19                        think he said he had the
20                        authority.
21    Q.      You didn't have the authority to go to
22            Mr. Palmer and say --
23    A.      Well, I mean, I could say that.  But
```

```
 1              whether or not it's an authority thing

 2              or not -- I'm not following you, I

 3              guess.

 4    Q.        Okay.  Let me try -- let me try to say

 5              it in a different way.  It was within

 6              your job as a project engineer to

 7              supervise the inspectors under you;

 8              right?

 9    A.        Yes.

10    Q.        Okay.

11    A.        But that's why we have these

12              evaluations too.  And how my bosses

13              interpret that evaluation, then they

14              can make their own decisions based on

15              that.

16    Q.        So --

17    A.        And in this case, all the events that

18              took place that -- that went before

19              them.

20    Q.        That went before the evaluation?

21    A.        Such as the car or -- Lashundra's car

22              got scratched, that -- that whole

23              event that Jay and Leon Malone and
```

BRET PAULK -- June 18th, 2008

```
 1            everyone was aware of that.  So stuff
 2            like that wasn't -- necessarily would
 3            just come up during evaluations.
 4   Q.       So the supervisors having -- the
 5            district engineer, the construction
 6            engineer, them having the performance
 7            evaluations, that's not going to be
 8            what makes them decide whether to
 9            terminate somebody; right?
10   A.       One more time?
11   Q.       There could be lots of other kinds of
12            information that they would need
13            before they decided to terminate
14            somebody?
15   A.       Yes.
16   Q.       Okay.  So you as the -- as the -- you
17            were the project engineer, so you
18            supervised the EAs who were
19            inspectors; right?
20   A.       Yes.
21   Q.       Okay.  And at any time, as the
22            supervisor of one of those inspectors,
23            if you thought that they were doing a
```

```
 1          bad job or that they had some kind of
 2          issues, you could have gone to the
 3          district engineer and said --
 4   A.     That's right.
 5   Q.     -- I think this person needs to be
 6          terminated; right?
 7   A.     That's right.
 8   Q.     Okay.  And -- and the district
 9          engineer is the person you would have
10          gone to in that situation?
11   A.     That's correct.
12   Q.     And while you were supervising
13          Ms. Jackson, you never went to
14          Mr. Palmer and recommended
15          termination?
16   A.     No.  I never had a problem with
17          LaShundra Jackson's performance.  I
18          mean...
19   Q.     And if you were supervising an
20          engineering assistant who, say, got
21          into a fight with another employee,
22          and you saw it happen and that person
23          had picked the fight --
```

```
 1   A.      Yes.

 2   Q.      -- you could go to Mr. Palmer --

 3   A.      Yes.

 4   Q.      -- and say, this person needs to be

 5           out of here right now; right?  You

 6           could do that; right?

 7   A.      I could say that.  Whether or not -- I

 8           don't know really what your point is

 9           that you're getting at, but yeah, that

10           would be one of my responsibilities.

11           If somebody was picking fights and

12           beating up other employees, yeah, I

13           mean --

14   Q.      And if somebody was being --

15   A.      -- that's a problem.

16   Q.      Okay.  And if somebody was being

17           insubordinate to you, you could go to

18           Mr. Palmer and say, this person is out

19           of control; I need -- I need him

20           terminated; right?

21   A.      I could say that, yes.  I mean, I'm

22           able to say that.

23   Q.      Did Mr. Palmer ever ask your opinion
```

1    as to whether you thought Ms. Jackson
2    should be terminated?
3  A.    Not that I can recall.  I can't
4    remember.
5  Q.    Did Mr. Calametti ever ask you that?
6  A.    I can't recall.
7  Q.    Did anybody at the DOT ever ask you
8    that?
9  A.    I mean, we -- basically I told them,
10    when we would have meetings on all
11    these events, what happened.  My -- I
12    guess my documentation showed that to
13    them.  And you know, they -- they
14    would form, I guess, their own
15    opinions on what course of action to
16    take.
17  Q.    All right.  So as far as Ms. Jackson
18    was concerned, you pretty much left it
19    up to them what they wanted to do with
20    it; is that right?
21  A.    Yes, sir.
22  Q.    Now, you testified a minute ago that
23    you never had a problem with

```
 1          Ms. Jackson's performance?
 2    A.    (Nods head.)
 3    Q.    Did you work with her on a consistent
 4          basis?
 5    A.    Yes, sir.
 6    Q.    Okay.  How often would you -- would
 7          you work with her every week?
 8    A.    You know, a couple -- maybe, once a
 9          week, two times a week.
10    Q.    Okay.  And what kind of things would
11          y'all do together, work-wise?
12    A.    Just kind of on-the-job training, you
13          know, stuff that she was inspecting
14          and trying to teach her what to look
15          for, you know, making sure it was
16          within compliance of specifications
17          and how to measure something and
18          things like that.
19    Q.    Okay.  So you saw her while she was
20          working out on projects?
21    A.    Yeah.
22    Q.    Did she ask you questions about stuff?
23    A.    Sometimes, yeah.
```

```
1    Q.    Okay.  Did she seem like she was

2          interested in the work that you were

3          wanting her to learn?

4    A.    Uh-huh.

5    Q.    Is that a yes?

6    A.    Yes.

7    Q.    Okay.  And was that true the whole

8          time that she worked under you?

9    A.    Yes.

10   Q.    I'm going to show you what I have

11         marked as Exhibit 5 to your

12         deposition, which is Ms. Jackson's

13         mid-appraisal --

14              THE REPORTER:  What appraisal?

15              MR. SIMON:  Mid-appraisal -- I

16                   believe -- I'm sorry.  I

17                   might have said that

18                   wrong.

19   Q.    (By Mr. Simon:) Can you tell me what

20         this document is that I marked as

21         Exhibit 5?

22              (The referred-to document was

23                   marked for identification
```

```
 1                 as Plaintiff's Exhibit No. 5.)
 2   A.    I believe this is her performance
 3         appraisal.
 4   Q.    Okay.
 5   A.    No, no.  This is her mid-appraisal.
 6   Q.    Okay.  And her mid-appraisal was done
 7         by you --
 8   A.    Uh-huh.
 9   Q.    -- it looks like, if you look at the
10         second page, November 2nd, 2006; is
11         that right?
12   A.    That's right.
13   Q.    Okay.  And you sat down with
14         Ms. Jackson at that time and went over
15         how her performance was?
16   A.    Uh-huh.
17   Q.    Okay.
18   A.    Well, I missed the pre-appraisal, and
19         this was my mid-appraisal.
20   Q.    Okay.  And the pre-appraisal, what --
21         what does -- what happens at the
22         pre-appraisal time?
23   A.    Basically her supervisor -- and I --
```

```
 1            it looks like I signed off on it.  But
 2            basically at the beginning, the direct
 3            supervisor goes over all of these
 4            responsibilities and duties with
 5            the -- with LaShundra in this case.
 6    Q.      Okay.  And how often are the
 7            mid-appraisals done for probationary
 8            employees?
 9    A.      How often?
10    Q.      Yeah.
11    A.      For --
12    Q.      For somebody who is on probation.
13    A.      They're done, I think, every --
14            probation is six months, so you try to
15            do it halfway -- at the halfway point.
16            So once.
17    Q.      And someone whose probation gets
18            extended like Ms. Jackson's did, do
19            they -- do they get another
20            mid-appraisal before they learn
21            whether they're going to get done with
22            their probation or not?
23    A.      I'm not sure.
```

```
 1    Q.    Okay.  And when you did your
 2          mid-appraisal with Ms. Jackson, did
 3          you go over the responsibilities and
 4          tell her how she was doing on each of
 5          them?
 6    A.    Yes.
 7    Q.    Okay.  And as far as you can remember,
 8          you know, what kind of job was she
 9          doing on each of the different
10          responsibilities?
11    A.    Well, she was doing that average --
12          you know, average on -- on some.  And
13          she had some strengths and some things
14          which I listed there, and also some
15          areas that needed improving.
16    Q.    Right.  And -- and there's a section
17          on the form where you have to write
18          down something the employee needs to
19          improve on; right?
20    A.    Yes, sir.
21    Q.    And how long would you say your
22          discussion about the mid-appraisal was
23          with Ms. Jackson?
```

1    A.       Maybe 20 minutes.

2    Q.       And did you do one of these for all of

3             your engineering assistants that you

4             supervised?

5    A.       Yeah.

6    Q.       And Ms. Jackson got a copy of this;

7             right?

8    A.       Yes.

9    Q.       Okay.

10             (Off-the-Record discussion.)

11   Q.       By the time -- by the time you got --

12            sorry.  I totally forgot my question

13            right there.

14                   By the time you gave

15            Ms. Jackson this mid-appraisal, you

16            had been supervising her for a couple

17            months; is that right?

18   A.       Yes.

19   Q.       Okay.  And did you talk at all with

20            her former supervisor about how her

21            performance was?

22   A.       Yes.

23   Q.       You did?  So you talked to

BRET PAULK -- June 18th, 2008

```
 1         Mr. Harville?
 2    A.   Yes.
 3    Q.   Okay.  What did Mr. Harville tell you
 4         about her job performance?
 5    A.   I think that, you know -- I -- I can't
 6         remember exactly what he said, to be
 7         honest with you.
 8    Q.   Do you remember if he had any
 9         particular criticisms of Ms. Jackson's
10         performance?
11    A.   No, I don't remember that either.
12    Q.   Okay.
13    A.   I remember she was new, and she didn't
14         know a whole lot about that type of
15         work.
16    Q.   She hadn't done any engineering
17         work --
18    A.   No.
19    Q.   -- before she got to the DOT, had she?
20    A.   Not that I'm aware of.
21    Q.   And do you know if she had any
22         schooling in engineering like you did?
23    A.   Not that I'm aware of.
```

```
 1   Q.    And at the time that you gave her this
 2         mid-appraisal, she hadn't been
 3         disciplined for anything, had she?
 4   A.    I believe she had a counseling.
 5   Q.    She had a counseling for the day that
 6         she complained that her car was
 7         vandalized; is that right?
 8   A.    (Nods head.)
 9   Q.    Is that considered a form of
10         discipline?
11   A.    Yeah.  I would think so.  We had a
12         meeting on it.
13   Q.    You had a meeting on it?
14   A.    Uh-huh -- yes.
15   Q.    All right.
16              MR. REDD:  You need to speak
17                  up.
18   Q.    (By Mr. Simon:)  Now, Ms. Jackson
19         didn't pass her probationary period in
20         December of '06, did she?
21   A.    No.
22   Q.    Okay.  And what was the reason for
23         that?
```

```
 1   A.     Because she hadn't completed algebra
 2          class.
 3   Q.     Was it a policy at the DOT that every
 4          probationary engineering assistant had
 5          to complete -- had to pass the algebra
 6          test and the basic math test before
 7          they could get off their probation?
 8   A.     Yeah.  I think locally here, the
 9          division engineer, that was one of his
10          criteria.
11   Q.     And what makes you think that?
12   A.     Based on -- I believe Debra Hadley,
13          our training coordinator, told me
14          that.
15   Q.     Do you know if there's any written
16          policy that says that an employee has
17          to pass math and --
18   A.     No.
19   Q.     Let me finish my question.  Do you
20          know if there's any written policy
21          that a probationary engineering
22          assistant has to pass basic math and
23          algebra before they can get off
```

BRET PAULK -- June 18th, 2008

```
 1        probation?
 2   A.   Not that I'm aware of.
 3   Q.   You never saw a policy like that?
 4   A.   No, sir.
 5   Q.   Did Ms. Hadley ever tell you that it
 6        was within the discretion of the
 7        supervisor as to whether the employee
 8        would get off probation or not, even
 9        if they hadn't passed the class?
10   A.   No, sir.
11   Q.   So the way she told it to you was, if
12        you don't pass, you don't get off
13        probation?
14   A.   That's correct.
15   Q.   How did it come to your attention that
16        Ms. Jackson's probation would not be
17        extended?
18   A.   I'm sorry?
19   Q.   How did -- how did you learn that
20        Ms. Jackson's probation -- I'm sorry.
21        I asked that wrong.  How did you learn
22        that Ms. Jackson's probation was going
23        to be extended?
```

1   A.    I'm not -- I'm not sure I remember.  I
2         believe a letter was written.
3   Q.    Okay.  Did you read the letter?
4   A.    No, sir.
5   Q.    Okay.  Was it a letter to Ms. Jackson
6         that said that her probation was going
7         to be extended?
8   A.    I'm not sure.
9   Q.    Was it your decision to extend her
10        probation?
11  A.    No.  I made a recommendation.
12  Q.    You made a recommendation that her
13        probation --
14  A.    Based on not completing the algebra
15        class.
16  Q.    And who did you make that
17        recommendation to?
18  A.    My boss, Jay Palmer.
19  Q.    And who told you that you had the
20        authority to make that recommendation?
21  A.    They asked to -- based on the -- based
22        on she didn't complete the algebra
23        class.  I believe the mid-appraisal

```
 1              states if you recommend -- or the
 2              performance appraisal states that if
 3              you make a recommendation to extend
 4              it, you have to have a reason why, and
 5              that's why I submitted that.  And I
 6              don't have the performance -- you
 7              know, the -- the final evaluation in
 8              front of me, but I believe it states
 9              that on there.
10   Q.   So somebody told you that you had to
11              write a letter recommending that
12              Ms. Jackson's probation be extended?
13   A.   No.  I think if you have a copy of it,
14              it says, you know, recommend to become
15              permanent status or recommend to
16              extend, and that's the box I think I
17              checked.  And then it said give an
18              explanation and state your reason why.
19              But, you have that; you have that
20              letter also.
21   Q.   I do.
22              (Off-the-record discussion.)
23                   MR. SIMON:  I've handed
```

BRET PAULK -- June 18th, 2008

```
 1                        Mr. Paulk what I've
 2                        marked as Exhibit 6 to
 3                        the deposition.
 4              (The referred-to document was
 5               marked for identification
 6               as Plaintiff's Exhibit No. 6.)
 7   Q.    (By Mr. Simon:)  Do you recognize that
 8         document?
 9   A.    Yes.
10   Q.    Okay.  And I think the section that
11         you're referring to is in the middle
12         of the page; right?
13   A.    Yes.
14   Q.    It is recommended that the employee
15         be -- and then there's a space for
16         typing there?
17   A.    Uh-huh.
18   Q.    And there's two Xs typed on the little
19         line before it says "continued in
20         probation?"
21   A.    Yes.
22   Q.    And did you type that on there?
23   A.    I had someone in my office type it.
```

```
1    Q.    Okay.  And then it says, reason stated
2          for disciplinary action; right?
3    A.    Yes.
4    Q.    Okay.  Is there any reasons stated in
5          the disciplinary action section on
6          this appraisal?
7    A.    No.
8    Q.    All right.  Where's the reason --
9    A.    It's an attached letter.
10   Q.    There was a letter attached to this
11         performance appraisal?
12   A.    (Nods head.)
13   Q.    Okay.  What did the letter say?
14   A.    It said that I recommend that her
15         probation be extended based on the
16         incompletion of the algebra class.
17   Q.    Okay.  And was it your decision to
18         recommend that?
19   A.    That was our -- our policy, which was
20         explained to me, so in order to uphold
21         that policy, yes, I made that
22         recommendation.
23   Q.    Did you have any discussions with
```

```
 1          anybody about the need to recommend
 2          that?
 3   A.     Yes.
 4   Q.     Who did you talk to about it?
 5   A.     My boss, Jay Palmer.
 6   Q.     Okay.  Where was that conversation
 7          held?
 8   A.     I'm not sure.  Probably his office.
 9   Q.     And tell me what that conversation
10          was.
11   A.     I'm sorry?
12   Q.     Tell me what you guys talked about
13          during that conversation.
14   A.     I don't recall.
15   Q.     But at some point Mr. Palmer told you
16          that you were going to have to write a
17          letter recommending extension of
18          probation?
19   A.     Yes.
20   Q.     Did Mr. Palmer tell you whether he had
21          been instructed by anybody to extend
22          Ms. Jackson's probation?
23   A.     I don't recall if he had been told
```

```
 1          that.
 2   Q.     When you were talking about it with
 3          Mr. Palmer, did he say whether there's
 4          any discretion of the supervisors,
 5          either you or him, to recommend giving
 6          permanent status even though they
 7          hadn't passed the test?
 8   A.     No.
 9   Q.     So it was always talked about that it
10          was just a done deal, since she hadn't
11          passed, she would have to extend the
12          probation?
13   A.     Yes.
14   Q.     And did you talk about that when
15          preparing this performance appraisal?
16   A.     Yes.
17   Q.     Okay.  Did Mr. Palmer assist you in
18          preparing Ms. Jackson's performance
19          appraisal?
20   A.     Yes.
21   Q.     He did?
22   A.     Well, I mean, we -- we talked about
23          that prior to preparing this.  And
```

```
 1              that's why I attached a letter.
 2   Q.    Okay.  Did -- did you and Mr. Palmer
 3         talk about what ratings Ms. Jackson
 4         was going to get on her performance
 5         score?
 6   A.    Yes.
 7   Q.    Did he tell you what ratings to give
 8         her?
 9   A.    No.
10   Q.    Okay.  Did you recommend to him what
11         ratings you thought she should get?
12   A.    Yes.
13   Q.    And did he agree with your
14         recommendations?
15   A.    Uh-huh, yes.
16              (Off-the-record discussion.)
17   Q.    Let's look at the second page of the
18         performance appraisal.  Those are
19         Ms. Jackson's ratings on each of her
20         responsibilities; correct?
21   A.    Yes.
22   Q.    And did you discuss each of those with
23         Mr. Palmer before you gave Ms. Jackson
```

BRET PAULK -- June 18th, 2008

```
1          the performance review?

2    A.    Yes.

3    Q.    I notice that on the second line

4          "draws, slash, plots" she was given a

5          2 rating.  It looks like a 2, and then

6          it looks like your initials are next

7          to it.  Can you tell me --

8    A.    It was a clerical error from Chris

9          Burdette.

10   Q.    Who is Chris Burdette?

11   A.    He was the office manager --

12   Q.    Okay.

13   A.    -- and office engineer.  And he

14         typed -- we had these -- they type

15         them on the typewriter, and he types

16         on the typewriter, so I got him to

17         fill this out.  And he made an error.

18         And we went back over it with, I

19         think, some whiteout, and it just

20         looked bad, and they had me initial

21         it --

22   Q.    Okay.

23   A.    -- at that line.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    Did you do a handwritten copy of the
 2         performance review to give to Chris
 3         Burdette?
 4   A.    Yes.
 5   Q.    Okay.  That's how he knew what to type
 6         in the boxes?
 7   A.    Yeah.
 8   Q.    Okay.  And you think your handwritten
 9         one had a 3 -- or a 2 in the box that
10         says "draw, slash, plots?"
11   A.    I can't remember.
12   Q.    Okay.  So you don't remember what --
13         what you originally had wanted to rate
14         her at in that section?
15   A.    That's what I originally wanted to
16         rate her at.
17   Q.    A 2 or a 3?
18   A.    Whatever that says.  If it's a 2, it's
19         a 2.
20   Q.    Okay.
21   A.    He typed the wrong thing, and we had
22         to go back and correct it.
23   Q.    Okay.  So you think that on your
```

BRET PAULK -- June 18th, 2008

```
 1        handwritten version, there's going to
 2        be a 2 in that box --
 3   A.   Yes.
 4   Q.   -- if we get that out and look at it?
 5   A.   Yes.
 6   Q.   Okay.  Do you know where that -- that
 7        document is right now?
 8   A.   No.
 9   Q.   When you would do a handwritten draft
10        like that, did -- did those drafts go
11        in the employee's personnel file?
12   A.   No.  I think it was destroyed.  I
13        think I probably threw it away.
14   Q.   Let's see.  Now, you gave Ms. Jackson
15        a rating of 3 under the responsibility
16        of "communicates."  Can you -- can you
17        tell me why she got a 3 on that?
18   A.   I thought she did a good job of
19        talking with the contractor.
20             (Off-the-Record discussion.)
21   Q.   And I see you also give her a 3 rating
22        which is "exceeds standards" on the
23        responsibility of "calculates;" right?
```

```
 1   A.     Yes.
 2   Q.     Can you tell me why you gave her a 3
 3          for "calculates?"
 4   A.     Obviously at the time I thought she
 5          did a good job.
 6   Q.     Okay.
 7   A.     I mean, I don't remember all the
 8          little details.
 9   Q.     Sure.  What kind of calculating would
10          probationary employees -- engineering
11          assistants have to do?
12   A.     On measuring up the A items or
13          entering it in the field book, you
14          know, calculating items in the field
15          book.
16   Q.     Okay.  So she was doing a good job on
17          that?
18   A.     Yes.
19   Q.     Now, as far as Number 2, "draws and
20          plots," you gave her a rating of 2
21          which is "meets standards;" correct?
22   A.     Yes.
23   Q.     And what kind of drawing and plotting
```

1       did Ms. Jackson do as a probationary

2       assistant?

3   A.  None, zero.

4   Q.  She didn't do any?

5   A.  At this point in time, no.

6   Q.  Okay.  What was the reason that she

7       didn't do any?

8   A.  Because we didn't have any to do in

9       the office, and I thought, you know,

10      she would be meeting standards.  She

11      wouldn't -- I couldn't hold that

12      against her just because at the time

13      we didn't have jobs that required

14      plotting and drawing.

15  Q.  Did -- did Ms. Jackson ever get the

16      opportunity to do any drawing and

17      plotting?

18  A.  Yes.

19  Q.  Okay.  When -- when did she?

20  A.  After this, I believe, we started

21      working on plotting some -- and -- and

22      she was working with another PCET in

23      the office.

BRET PAULK -- June 18th, 2008

```
 1   Q.     Okay.  Who is that?
 2   A.     Adam Smith, in order to provide her
 3          training in that area.
 4   Q.     Okay.  So he was training her on
 5          her -- he was training her on drawing
 6          and plotting?
 7   A.     Yes, uh-huh.
 8   Q.     What time frame was that?
 9   A.     I don't -- I don't remember.
10   Q.     Okay.  But it was sometime after this
11          performance review?
12   A.     I believe so.
13   Q.     Okay.
14   A.     It might have been close to time to do
15          this that we got her started on it.
16   Q.     Oh, okay.  And how was she doing on
17          that?
18   A.     I felt -- I felt like she was doing --
19          I mean, well for not knowing anything
20          about it.  I mean, she was watching
21          Adam mostly, and he was trying to
22          teach her how to plot.
23   Q.     And she hadn't had any previous
```

```
 1              experience doing that; right?
 2    A.        No.  Not that I'm aware of.
 3    Q.        So if you had to rate her now on how
 4              she was doing with drawing and
 5              plotting when Adam was training with
 6              her, what kind of score do you think
 7              you would give her?
 8    A.        I would say she met standards.  She --
 9              she had average -- had average skill
10              in that area.
11    Q.        All right.  Let's talk about Number 3,
12              "operates."  What kinds of things was
13              Ms. Jackson operating by the time you
14              gave her this performance review?
15    A.        Nuclear gauge.  I remember I went out
16              there with her one day on one job and
17              tried to teach her and Andy Hoppes, I
18              believe --
19                   THE REPORTER:  Tell me the
20                       name again.
21                   THE WITNESS:  Andy Hoppes, I
22                       believe, H-O-P-P-E-S.
23    A.        -- and instruct them how to use the
```

BRET PAULK -- June 18th, 2008

```
 1          nuclear gauge to determine compaction.
 2          I believe she was also assisting Andy
 3          and, I believe, Raymond in concrete
 4          tests, slump tests.
 5   Q.     Is that -- is that -- would that be
 6          under "operates?"
 7   A.     Yes.
 8   Q.     And what kind of a job did she do on
 9          all of those tasks?
10   A.     At the time I felt like she met
11          standards.
12   Q.     Okay.  It doesn't sound like you have
13          any -- any problems with how she was
14          doing that; is that right?
15   A.     That's correct.
16              (Off-the-record discussion.)
17   Q.     And what would Ms. Jackson have to
18          have done in order to get rated in the
19          "exceeds standards" or "consistently
20          exceeds standards" category on
21          "operates?"
22   A.     You would just have to be consistently
23          exceeding standards.  If you're asking
```

```
 1            for an example, I'm not sure off the

 2            top of my head.

 3   Q.       Okay.  I mean, I guess I'm going to

 4            try to -- is it -- is it a matter that

 5            if she had more -- the more experience

 6            she got, the better she would do at

 7            it, or was there something she could

 8            have done especially to exceed

 9            standards?

10   A.       Well, a lot of, you know, operating

11            stuff like nuclear gauge and running

12            the transit level and things like

13            that, you do get better over time with

14            practice.  You become better at it.

15   Q.       And did you observe Ms. Jackson

16            improving as she got more

17            experience --

18   A.       I mean, we didn't do any of this stuff

19            long enough to -- you know, there's

20            guys here that's been doing that for

21            years, and this all took place in

22            three months.  So to answer your

23            question, no.  I mean, I -- to know
```

BRET PAULK -- June 18th, 2008

```
 1          what she would be doing today on this
 2          or during that time frame, I don't
 3          think -- and I think it's normal that
 4          she didn't just make a huge, huge
 5          improvement in that sort of a time
 6          span.
 7    Q.    Okay.  And let's -- even talking
 8          about, like, the period of time after
 9          you gave her this appraisal but while
10          you were still supervisor, advising
11          her before she got transferred, did
12          she show improvement in this kind of
13          thing -- this kind of stuff in
14          operating equipment?
15    A.    I believe after -- shortly after this,
16          she was in the office, or she had
17          light duty.  She couldn't do a lot of
18          stuff, which she never really --
19          nuclear gauge and stuff like that, the
20          guys usually carried that and toted
21          that around because it's kind of
22          heavy.
23    Q.    Is that just in general or is that --
```

1    A.    Yeah, in general.  So to answer your

2          question, I think she was in the

3          office a good bit.

4    Q.    And in the office she wouldn't be

5          operating equipment as much?

6    A.    No.

7    Q.    Was there any equipment for her to

8          operate in the office?

9    A.    Computer, I guess.  That's the only

10         thing that comes to mind --

11   Q.    Okay.

12   A.    -- off the top of my head.

13   Q.    Okay.  But as far as -- as far as you

14         can remember with Ms. Jackson

15         operating equipment, she was --

16   A.    She was fair.  I mean, I don't know

17         how much more in detail I can go on

18         that.

19   Q.    Let's talk about Number 4, "inspects."

20         She also got a 2 rating on that,

21         "meets standards."  What kind of

22         things was she inspecting?

23   A.    Off the top of my head, seeding,

```
 1          mulching, asphalt placement --
 2                  THE REPORTER:  What were the
 3                      first two you said?
 4                  THE WITNESS:  Seeding and
 5                      mulching.
 6                  MR. REDD:  Is that S-E-A-T or
 7                      S-E-E-D?
 8                  THE WITNESS:  Seeding --
 9                      S-E-E-D.
10   A.     And, you know, concrete pours, you
11          know, minor structures, drainage
12          structures like head walls or junction
13          boxes.
14   Q.     And how was she learning to inspect
15          those things?
16   A.     I would come out, you know, every now
17          and then and try to help her on
18          certain things, or the people around
19          her -- she would learn it from the
20          people around her.
21   Q.     And who were some of the people around
22          her?
23   A.     Andy Hoppes and Raymond Ingram and
```

```
 1        Mary Ann Stagner.
 2   Q.   Who was --
 3              THE REPORTER:  Mary Ann --
 4              THE WITNESS:  Stagner,
 5                   S-T-A-G-N-E-R.
 6   Q.   (By Mr. Simon:)  So you kind of
 7        counted on those folks to show her the
 8        ropes as far as inspecting?
 9   A.   Yes, yes.
10   Q.   But you also observed her doing some
11        inspection work; right?
12   A.   Yes.
13   Q.   Okay.  And to your -- as far as you
14        could tell, she was meeting standards
15        on her inspecting?
16   A.   Yes.
17   Q.   Okay.  As an inspector, do you have
18        to -- well, I guess the next one
19        answers my question.  As an inspector,
20        do you have to complete reports?
21   A.   Yes.
22   Q.   Okay.  And you also rated her as
23        meeting standards on completing
```

```
 1        reports?
 2    A.  Yes.
 3    Q.  Did you review some of the reports
 4        that she completed while she was
 5        inspecting?
 6    A.  Yes.
 7    Q.  And she did a petty good job of that?
 8    A.  Yes.
 9    Q.  When was Ms. Jackson moved into the
10        office?
11    A.  It seemed like after the first of the
12        year.
13    Q.  Was it -- was she moved into the
14        office under your supervision, or was
15        that when she was moved to Tony
16        Cooper?
17    A.  I believe she was official --
18        officially in the office under Tony
19        the only -- that's all.  But while she
20        was still in that transition period
21        from my office to Tony's office, she
22        was inside most of the time.  And I
23        think there's two letters that came
```

```
 1            out.  The first one said no heavy
 2            lifting.  And so, you know, I enforced
 3            that.  You know, she doesn't have to
 4            lift anything heavy; she's on kind of
 5            light duty.  And Vince Calametti
 6            wanted clarification on that, you
 7            know, more detail.  And then it came
 8            back with another letter stating
 9            office only.
10   Q.      All right.  So after the
11            no-heavy-lifting letter, was she still
12            going out in the field?
13   A.      After the what?
14   Q.      The -- the letter that said no heavy
15            lifting, the first letter.
16   A.      I can't remember.  She might have gone
17            out a little bit.
18   Q.      Do you think mostly she was working in
19            the office after that?
20   A.      I believe so.
21   Q.      Did her -- when she was working in the
22            office, was she -- before she
23            transferred to Tony Cooper, when she
```

```
 1          was working in the office, was she
 2          still working up under you?
 3   A.     Yeah.
 4   Q.     Okay.  And so did you -- did you have
 5          the opportunity to observe her work
 6          behavior in the office?
 7   A.     Yes, somewhat.
 8   Q.     Okay.  And how did she do on the stuff
 9          she got assigned to in the office?
10   A.     She was -- she was doing fine.
11   Q.     Okay.  What kind of tasks was she
12          assigned to when she was in the
13          office?
14   A.     I can't -- I can't remember exactly.
15          I believe she was checking for errors
16          in the field books and catching up on
17          paperwork, stuff like that, correcting
18          errors made out in the field, also
19          helping Adam Spence plot some, you
20          know, get her some training on that.
21   Q.     Okay.  Was it engineering work?  I
22          mean, was it work of an engineering
23          assistant that she was doing?
```

```
 1    A.    Yes.

 2    Q.    And it was in compliance, as far as

 3          you could tell, with her Form 40 and

 4          all that stuff?

 5    A.    Yeah.  I mean, this was only a few

 6          weeks, so yeah, as far as I know, as

 7          far as I remember.

 8    Q.    Let's look at Number 6, "performs."

 9          You rated her as only partially

10          meeting standards on that task -- on

11          that responsibility.  What does that

12          term "performs" -- what does that

13          encompass?

14    A.    I'm reading back over it.  I think

15          that had to do -- I don't see it here,

16          but I believe that was reflected in

17          the algebra class, performance.

18    Q.    Wouldn't that be under Line 9 where it

19          says attends/passes?

20    A.    That -- that would be.  You're right.

21    Q.    So why would she get a 1 under

22          performance?

23    A.    I don't remember exactly at that time.
```

BRET PAULK -- June 18th, 2008

```
 1          I must have felt like she needed

 2          improvement in that area.  She didn't

 3          quite meet standards, but she needed

 4          to --

 5   Q.     Did you talk about that with her, what

 6          she needed to improve on as far as

 7          performance?

 8   A.     At the time, yeah.  I mean, I'm sure I

 9          did.

10   Q.     Do you remember what you told her?

11   A.     No, not exactly.

12   Q.     So -- so as far as attends and passes

13          where she got a 1 on that

14          responsibility, that was for the

15          algebra class?

16   A.     Maybe she -- concrete, it seemed

17          like -- I don't know if she had been

18          certified in -- in concrete, whatever

19          they call the concrete certification,

20          ACI certification.  And she was

21          lacking a little bit in that area

22          because she wasn't certified to

23          perform a concrete test.
```

1   Q.    Okay.  Was there a concrete class that
2         she was supposed to --
3   A.    I believe so.  I believe -- maybe she
4         had just recently been certified or
5         just after this, she got through the
6         ACI class.
7   Q.    So she did try to get her
8         certification?
9   A.    Yes.
10  Q.    Do you know if she got it?
11  A.    I'm not sure.  I think so, but I'm not
12        a hundred percent.
13  Q.    But as far as -- as far as performing
14        her job duties, there's nothing on --
15        there's nothing that sticks out in
16        your mind that she didn't meet
17        standards on?
18  A.    I believe it's -- I think it was just
19        because she, you know, hadn't been
20        able to perform.  I was trying to
21        teach her some of these items, but as
22        far as going out there and performing,
23        she was mainly more like an observer,

```
 1            instead of actually hands-on.  You

 2            know, I'm going to do it, and I don't

 3            need any assistance doing it.

 4    Q.      And that was mostly because she

 5            probably was new at it?

 6    A.      Yes.

 7    Q.      Would you expect somebody that had

 8            been an EA for four months to go out

 9            there and say, I don't need any

10            assistance; I'm going to be hands-on

11            with this?

12    A.      Well, to a certain point, you know,

13            they need some help and training and

14            all.  But I felt like at the time that

15            she needed some improvement in that

16            area, in performing those tests.

17    Q.      The concrete test?

18    A.      That would be one example, yes.

19    Q.      And then as far as reading and

20            interpreting, you found that she met

21            standards in that area?

22    A.      Uh-huh, yes.

23                (Off-the-Record discussion.)
```

BRET PAULK -- June 18th, 2008

```
 1    Q.    And she also got rated on her work
 2          habits; right?
 3    A.    I thought -- repeat that.
 4    Q.    Look at the first page of the
 5          performance appraisal.  Ms. Jackson
 6          also got rated on her work habits on
 7          the appraisal; right?
 8    A.    Yes.
 9    Q.    Okay.  And she was satisfactory in all
10          of those areas; right?
11    A.    Yes.  At this time, yes.
12    Q.    Okay.  And so you found her attendance
13          was satisfactory?
14    A.    Yes.
15    Q.    And her punctuality was satisfactory?
16    A.    Well, we -- we went over those --
17          those items.  And, you know, you've
18          got some stuff here and there along
19          the way that you need to talk about,
20          but overall I felt like she did a
21          satisfactory job.
22    Q.    And that would include the
23          cooperation --
```

```
1    A.    And this was after the blowup in the

2          office over the car scratches.

3    Q.    Yes.

4    A.    That had already been addressed in the

5          mid-appraisal.

6    Q.    Right.  Well, even with that, you

7          still felt like she was overall --

8    A.    Well, that was addressed and talked

9          about in the mid-appraisal.

10   Q.    Right.

11   A.    I felt like since that point in time,

12         that she had improved, so I marked her

13         satisfactory.

14   Q.    Okay.  Now, the -- the probationary

15         appraisal that we've been looking at

16         is Exhibit 6.  It covers the period

17         from July, from the first date she was

18         hired, up until she gets this

19         appraisal; right?

20   A.    Right.

21   Q.    So that -- that incident with the car

22         scratches, that's included in this

23         time period of the -- of the
```

BRET PAULK -- June 18th, 2008

```
 1        performance review; correct?
 2   A.   That's correct.
 3   Q.   So when you're rating her as compliant
 4        with rules and cooperating with
 5        co-workers, that covers the whole
 6        period from July of '06 up until
 7        January of --
 8   A.   Yes.  Because that -- that -- you
 9        know, that had been addressed, the
10        car, or warning or counseling or
11        whatever it was -- I would have to
12        look back -- at the time.  And -- and
13        since that point in time which was --
14        what's the date of this, the 20th?
15   Q.   There's some different dates on there.
16   A.   At the time this was signed was the
17        20th.  The mid-appraisal was on the
18        2nd, so you're looking at a month and
19        a half -- almost two months had gone
20        by with a satisfactory performance.
21   Q.   Did you ever find out that there were
22        some other African-American employees
23        who were having the same problems with
```

BRET PAULK -- June 18th, 2008

```
 1        their cars?
 2   A.   No.
 3   Q.   You never heard that about Gwenda
 4        Hunter?
 5   A.   No.
 6   Q.   And Bertha Alexander?
 7             (Off-the-Record discussion.)
 8   A.   No.  Today, that's the first time I've
 9        heard of it.
10   Q.   Was this the last performance review
11        that you conducted for Ms. Jackson?
12   A.   Yes.
13   Q.   Now, this review covers the period, as
14        we said, from July 3rd of 2006, to
15        January 2nd, 2007?  And at the end of
16        that time period --
17   A.   Well, no.  It covers from December --
18        it covers through December 20th.
19   Q.   Well, at the top it says period
20        covering --
21   A.   That's -- that's the six months.  Any
22        time around six months, they get --
23        they want these back in the office.
```

BRET PAULK -- June 18th, 2008

```
 1    Q.      Okay.

 2    A.      So this, as you can tell, was

 3            conducted about two weeks prior to

 4            that date.

 5    Q.      Okay.  So this only includes her

 6            performance up to December 20th?

 7    A.      Yeah.  Do you see that date under her

 8            signature?

 9    Q.      Yeah.

10    A.      That's the date we went over it.

11    Q.      Okay.  And then you continued to

12            supervise her for some time after you

13            did this performance review; right?

14    A.      Yes.

15    Q.      Okay.  And that was until she got

16            transferred to Tony Cooper?

17    A.      That's correct.

18    Q.      Okay.  Did you have any other problems

19            with -- or did you have any problems

20            with Ms. Jackson from the time that

21            you did this performance appraisal up

22            until she got transferred to

23            Mr. Cooper?
```

BRET PAULK -- June 18th, 2008

```
 1   A.     I believe we had a problem getting
 2          this signed, if I'm not mistaken.
 3   Q.     Okay.  What kind of problem did you
 4          have with that?
 5   A.     I would have to go back and look
 6          through my memos in the file.  This
 7          document, we had a problem getting
 8          LaShundra to sign it, even though it
 9          states on there, which I went over
10          with her, that she didn't have to
11          agree, that the signature just, you
12          know, denoted receipt of this form.
13          And also when the -- those policies
14          came out around the first of the year
15          about the tape recorder.  That was --
16          that was another problem for
17          Ms. Jackson.
18   Q.     Okay.  Any other problems that you had
19          with her?
20   A.     Not that I recall.  I would have to
21          look through my notes again.
22   Q.     Okay.  And where are those notes?  Are
23          you talking about all those --
```

```
 1   A.     They're in the file.  Everything is
 2          turned in, and I think you have a copy
 3          of everything too.  So you probably
 4          read through it more times than I
 5          have.
 6   Q.     Let's talk about her refusing to sign
 7          the appraisal.  Did -- did you write
 8          her up for that?
 9   A.     I don't remember.
10   Q.     Okay.  Did she -- did she actually
11          refuse to sign it?
12   A.     I don't recall.  I'd have to go back
13          and look through my memos to file.  I
14          remember she didn't want to, and it
15          was one of those all-day processes, I
16          think, to get to where that -- finally
17          that evening before we went home for
18          work, we had to meet in Jay Palmer's
19          office, and we had to get Vince
20          Calametti to come in, and he asked her
21          to sign the form.
22   Q.     He asked her to sign her performance
23          appraisal?
```

BRET PAULK -- June 18th, 2008

```
 1   A.      Yes.
 2   Q.      Okay.  And that was something you guys
 3           were dealing with the whole day?
 4   A.      I think so.
 5   Q.      Were you also -- is that something --
 6   A.      Maybe only -- maybe that afternoon.  I
 7           mean, don't hold me to all day.  I'm
 8           trying to remember something that
 9           happened December 20th of '06.
10   Q.      I know.  And did you -- do you recall
11           whether you disciplined Ms. Jackson in
12           any way for what she did with her
13           performance appraisal?
14   A.      I don't recall.  I'd have to look.
15   Q.      You did discipline her about the tape
16           recording policy?
17   A.      Yes.
18   Q.      Okay.  Let's talk about that for a
19           minute.  What -- do you recall what
20           day that occurred on?
21   A.      No.
22   Q.      Okay.  How did you get copies of the
23           tape recording policy?
```

1    A.    They were handed out by my supervisor,

2          I guess, or they were put in our box,

3          I think, or maybe by Jeanette Brown.

4          I'm not sure.  I can't remember who

5          handed them to us.

6    Q.    Okay.  That was a new -- a new policy

7          for the 9th Division; right?

8    A.    For the State, I believe.

9                (Off-the-Record discussion.)

10   A.    I believe it was a statewide policy.

11   Q.    Just to make sure we get that clear,

12         let me show you Exhibit 7.  Is that a

13         copy of the tape recording policy?

14               (The referred-to document was

15                 marked for identification

16                 as Plaintiff's Exhibit No. 7.)

17   A.    Yes.

18   Q.    And at the top it says 9th Division

19         Policy on Recording Devices; right?

20   A.    Uh-huh, yes.

21   Q.    And the policy actually says it is the

22         policy of the Alabama Department of

23         Transportation, 9th Division, that an

```
 1          individual may record --

 2   A.     Yes.

 3   Q.     -- et cetera, right?

 4   A.     Yes.

 5   Q.     So as far as I can tell from this

 6          document, it is a 9th Division policy.

 7   A.     Yes.

 8   Q.     Do you have any evidence that you

 9          think supports your idea that it was a

10          department-wide policy?

11   A.     No, sir.

12   Q.     How many copies of this policy did you

13          get in your box?

14   A.     I don't remember that.

15   Q.     Okay.  Did -- did you get enough

16          copies for all of the inspectors under

17          you to sign?

18   A.     Yes.

19   Q.     Okay.  So you were responsible for

20          making sure that there were copies for

21          your inspectors to sign?

22   A.     Yes.

23   Q.     Had you heard about this policy before
```

```
 1         it appeared in your box?
 2  A.     No.
 3  Q.     And there was a letter with it that
 4         discussed getting the policy signed;
 5         right?
 6  A.     Directed towards me, yes.
 7  Q.     Yeah.  And did you give this policy to
 8         Ms. Jackson?
 9  A.     Yes.
10  Q.     Okay.  Do you remember where you were
11         when you gave it to her?
12  A.     I was in the office, or I might have
13         put it in her box, but I was in the
14         office.
15  Q.     Okay.  But at some point in time, you
16         guys had a conversation about it;
17         right?
18  A.     Yes.
19  Q.     Okay.  And it was pretty early in the
20         morning?
21  A.     That's right.
22  Q.     All right.  What time did y'all
23         usually get to work?
```

BRET PAULK -- June 18th, 2008

```
 1    A.      Usually 7 -- by 7.

 2    Q.      Okay.  So you were there by 7?

 3    A.      Oh, yeah, I was there.

 4    Q.      And Ms. Jackson was there by 7 too?

 5    A.      I believe so.  I think so.

 6    Q.      And pretty early that morning, she --

 7            she -- you and she had a conversation

 8            about the tape recording policies;

 9            right?

10    A.      Yes.

11    Q.      And where did that conversation occur?

12    A.      In my office.

13    Q.      Okay.  Did she go in your office to

14            talk to you about it?

15    A.      Yes.

16    Q.      Okay.  Were you already in there, or

17            were -- did you guys go in there

18            together?

19    A.      I believe I was sitting in there.

20    Q.      Okay.

21    A.      You would have to look in my memo

22            though.

23    Q.      Okay.  I'm just asking to the best of
```

```
 1        your recollection, just -- just
 2        sitting here thinking about the events
 3        of that day.  Ms. Jackson goes in your
 4        office.  Did she go in there with the
 5        tape recording policy in her hand?
 6   A.   I think so.
 7   Q.   Okay.  What did she say to you?
 8   A.   To the best of my recollection, you
 9        would have to -- she didn't want to
10        sign it.  And she said that she felt
11        like it was illegal and that she would
12        have to seek legal counsel in order
13        for her to sign that document.
14   Q.   Okay.  And what did you say to her at
15        that time?
16   A.   I explained to her that -- I read it
17        to her, you know, in case she didn't
18        understand what it meant, and
19        explained to her by signing it you
20        didn't necessarily agree that you --
21        you know, necessarily agree with it,
22        but that you understood it, or
23        whatever that statement says at the
```

```
 1              bottom, that you understand the

 2              policy, that you have received and

 3              understood it.

 4    Q.   Okay.  And that's kind of different

 5              from what the performance appraisal

 6              says, that by signing it doesn't mean

 7              that you agree with it; right?

 8    A.   I -- I think it's -- it's the same

 9              statement.

10    Q.   Okay.  Take a look at Exhibit 6.

11    A.   Okay.

12    Q.   Exhibit 6 on the line where it says

13              appraisal signatures.  (As read:)

14              Signatures denote supervisor and

15              employee discussion on the receipt of

16              form, not agreement; right?

17    A.   Right.

18    Q.   Okay.  It doesn't say anywhere on the

19              policy on recording devices not

20              agreeing with it or that employee

21              doesn't --

22    A.   Acknowledge that I've received and

23              understand it, that she comprehends
```

```
 1          this policy.

 2    Q.    All right.

 3    A.    By her signature, it doesn't mean that

 4          she necessarily has to agree with it.

 5    Q.    But it doesn't actually say that

 6          anywhere on the document, does it?

 7    A.    No.

 8    Q.    What did you -- what was your response

 9          when -- when she said that she didn't

10          think it was legal and she wanted to

11          communicate with her attorney?

12    A.    I told her I needed to have it -- I

13          had set a deadline for turning it in

14          today because so many of those

15          policies were coming out.  And this --

16          that was one of my -- you know, in

17          order to keep up, for me not to get

18          into trouble and miss my deadline to

19          turn them in, I wanted everybody --

20          which I signed them.  Everybody in the

21          office signed them, and we got them

22          turned in.  But LaShundra didn't want

23          to sign it, and I asked her repeatedly
```

```
 1            to sign it, and she refused to sign
 2            it.  She didn't -- she didn't want to
 3            sign it.
 4    Q.      Okay.  And did you have that
 5            conversation with her -- the whole
 6            conversation that was in your office,
 7            the initial conversation about it?
 8    A.      Yeah.
 9    Q.      Okay.  So you asked her repeatedly to
10            sign it.
11    A.      Uh-huh.
12    Q.      Did you tell her that everybody was
13            going to have to sign one of those
14            policies?
15    A.      Yes.
16    Q.      Okay.  And did you tell her that you
17            had already signed it?
18    A.      Yeah.
19    Q.      What was your deadline to get all the
20            policies back in?
21    A.      I don't remember.
22    Q.      If the letter says it was
23            January 16th, would you have any
```

```
 1          reason to disagree with that?
 2   A.     No.
 3   Q.     Okay.  Does that square with your
 4          recollection that you had maybe
 5          approximately two weeks and 11 days,
 6          to get the policies back in?
 7   A.     I mean, we -- we didn't get all the
 8          policies at the same time.
 9   Q.     No, no.  I'm talking about the taping
10          policy.  All the copies of the taping
11          policy had to --
12   A.     If that's what the letter says, then
13          that's what it is.
14   Q.     Okay.  But Ms. Jackson had some
15          time -- or you had some time to get
16          those policies turned in; right?  You
17          didn't have to get them turned in on
18          the very day that you got them in your
19          box; right?
20   A.     Right.
21   Q.     Did you raise your voice at
22          Ms. Jackson during that meeting that
23          morning?
```

1    A.    I mean, my volume increased along with

2          hers.

3    Q.    Did Ms. Jackson become upset during

4          the meeting?

5    A.    Yes.

6    Q.    Did she cry?

7    A.    She may have.  I can't remember

8          exactly.

9    Q.    Would -- did she make any phone calls

10         during the meeting?

11   A.    I think so.

12   Q.    Who do you think she called?

13   A.    I don't remember right now, but I

14         think I wrote it down in one of my

15         memos.

16   Q.    Do you remember her asking to call her

17         attorney -- an attorney that she knew

18         during the meeting?

19   A.    She may have.

20   Q.    And do you remember her making that

21         call?

22   A.    No, I don't remember.  I'm just saying

23         that could be a possibility.

BRET PAULK -- June 18th, 2008

```
1    Q.     Do you remember her receiving any
2           calls during that meeting?
3    A.     I'd have to look back.  I don't
4           recall.  I believe -- I think she did.
5           I think she received a call from
6           somebody.
7    Q.     Okay.  Do you know who it was?
8    A.     No.
9    Q.     Okay.  At the time that she received
10          the call --
11   A.     I mean, I don't recall.  At the time
12          she might have stated somebody's name
13          and I could have wrote that down, but,
14          you know, I don't -- I don't remember.
15   Q.     Okay.  You said you raised your voice
16          along with hers.  Why did you -- why
17          did your tone get louder during that
18          meeting?
19   A.     I think it's just -- you know -- you
20          know, she was hollering at me, so I
21          raised my voice in order for us to --
22          for her to hear me.  You know, I mean,
23          there was so much -- I think it was
```

```
 1          just a natural thing.  I didn't -- you
 2          know, I'm not saying I started
 3          screaming at her.  But I'm being
 4          honest.  My voice probably increased,
 5          volume increased.
 6   Q.     Do you remember banging your hand on
 7          the table when you were talking to
 8          her?
 9   A.     No.
10   Q.     How did you guys end the meeting?
11   A.     She -- basically I told her that I
12          needed the policy signed and then
13          asked her repeatedly if she was going
14          to sign it, and she said no.  And I
15          think she was on the phone -- and she
16          got on the phone.  I don't know
17          whether she called somebody or
18          somebody called her, but she left the
19          office.
20   Q.     She left the office?  And was she in
21          tears when she left the office?
22   A.     I'm not sure.  I can't remember.
23   Q.     Might she have been?
```

```
 1   A.      Yeah.  It's possible.

 2   Q.      And about how long did that meeting

 3           last?

 4   A.      Maybe 15 minutes, 10, 15 minutes.

 5   Q.      Was there anybody else present?

 6   A.      Josh McElhenney was present.

 7   Q.      Did he participate in the meeting?

 8   A.      No, I don't think he did.

 9   Q.      Okay.  Do you recall him saying

10           anything during the meeting?

11   A.      I don't recall.

12   Q.      Do you recall whether he -- you could

13           tell whether he was paying attention

14           to what was going on during the

15           meeting?

16   A.      No, I don't recall.

17   Q.      You guys shared an office; right, you

18           and Josh?

19   A.      Yeah.  I mean, it -- it couldn't have

20           been that hard to -- to miss what was

21           going on, you know.  But I don't

22           recall if he was necessarily paying

23           attention to it.
```

1    Q.    And was the door open or closed during
2          the meeting?
3    A.    I don't remember.  I think -- I think
4          initially it was closed.
5    Q.    When you say initially, do you think
6          at some point the door was open?
7    A.    When LaShundra left, it was open.
8    Q.    Did anybody ever come and tell you
9          that their work had been disrupted
10         because of that meeting?
11   A.    Yeah.  People were talking about it.
12         I mean, everybody -- it was a
13         disruption.
14   Q.    Okay.  Who -- who told you that their
15         work was disrupted?
16   A.    I don't remember.  It wasn't a big
17         official statement saying my work was
18         being disrupted.  It was just kind of
19         the talk.  You know, around the office
20         you've got 15 people trapped in a
21         trailer, you know, confined spaces.
22         And those walls are paper thin.  You
23         can hear it, you know.  And you can

```
 1            hear somebody talking in an office

 2            next to you.  So when they were all in

 3            there getting their reports downloaded

 4            and everything from the next -- from

 5            the previous day, you know, I could

 6            tell it had become a distraction.  You

 7            know, it's not something that happens

 8            every day.

 9   Q.       Sure.  You and Ms. Jackson hollering

10            at each other was a distraction?

11   A.       Well --

12                   MR. REDD:  Object to the form.

13                   That's not what he

14                   testified to.

15   A.       I didn't say I was hollering at her.

16   Q.       After Ms. Jackson left, where did she

17            go?

18   A.       I didn't know at the time.

19   Q.       Now do you know where she went?

20   A.       I believe she went to Leon Malone's

21            office.

22   Q.       Who is Mr. Malone?

23   A.       He is an EEO officer.
```

```
1    Q.     Okay.  What makes you think that she
2           went to his office?
3    A.     I believe she told Mr. Fresolone when
4           she showed up at his office that Leon
5           wasn't in yet.  He didn't come in
6           until 8.  And she bypassed his office
7           and went to Joey Fresolone's office.
8    Q.     Okay.  And who was Mr. Fresolone?
9    A.     He was the construction -- division
10          construction assistant engineer, I
11          guess.
12   Q.     And what makes you think that
13          Ms. Jackson told somebody that
14          Mr. Malone wasn't in, that he didn't
15          get there until 8, so she went to
16          Fresolone?
17   A.     I think Joey told me.
18   Q.     Okay.  So you talked about that --
19   A.     Yeah.  We talked about it all day.
20   Q.     You talked about that with
21          Mr. Fresolone?
22   A.     We had meetings all day.  We were tied
23          up all day.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    Okay.  You were tied up in meetings
 2         all day about Ms. Jackson?
 3   A.    Yes.
 4   Q.    And --
 5   A.    Well, now, we're to the point where
 6         she's up there.  I mean, I hadn't -- I
 7         still don't know where she went.
 8   Q.    Okay.  And she was supposed to take a
 9         concrete class or something that day;
10         right?
11   A.    I think so.
12   Q.    Okay.  Do you know if she made it to
13         the class on time?
14   A.    I think she might have been a little
15         late.
16   Q.    What makes you think that?
17   A.    I just have that -- I don't know.  I
18         think --
19   Q.    Did you ever look at the sign-in
20         sheet?
21   A.    No, no.
22   Q.    Did anybody ever tell you she was
23         late?
```

```
 1   A.      No.
 2   Q.      That's just something that you think
 3           in your mind?
 4   A.      Well, I thought that she was up there,
 5           because when I called Joey's -- Joey
 6           called me and wanted me to come up to
 7           the office to talk about this.  And he
 8           instructed me that LaShundra had just
 9           left to go to her concrete class, and,
10           you know, I felt like it was after the
11           point in time or it was close to the
12           start of the class.  That's why I say
13           she might have been a little late.
14   Q.      And the class had a registration
15           period before the class was actually
16           supposed to start; right?
17   A.      If you say so.
18   Q.      Do most classes normally have a
19           registration period?
20   A.      I think so.  I think they do.
21   Q.      And do you have to be there for the
22           whole duration of the registration
23           period?
```

```
 1   A.      (Shakes head.)
 2   Q.      You just have to get there before the
 3           class actually starts; right?
 4   A.      Yes.
 5   Q.      And do you know what time that class
 6           actually started?
 7                   (Off-the-Record discussion.)
 8   A.      No.
 9   Q.      If there was testimony that
10           Ms. Jackson made it there before the
11           class started, would you have any
12           reason to actually dispute that?
13   A.      No.
14   Q.      Did Ms. Jackson do the wrong thing by
15           going and talking to Mr. Malone and
16           Mr. Fresolone?
17   A.      I think she could have told me where
18           she was going.  I mean, you know, when
19           somebody just walks out like that --
20           and I think I even wrote it in -- you
21           know, in a letter about leaving the
22           work station and not letting your
23           direct supervisor know where you're
```

```
 1          going.
 2                    No, it's not wrong to go
 3          talk to Leon Malone or Joey Fresolone,
 4          but the way she went about it, yes.
 5   Q.     And what you have -- what you take
 6          issue with is that she didn't tell you
 7          where she was going?
 8   A.     Yes.
 9   Q.     Did you try to contact her to find out
10          where she had gone?
11   A.     I might have tried to call her, I
12          think.
13   Q.     Okay.  And did you call her with the
14          purpose of trying to figure out where
15          she was?
16   A.     Yes.
17   Q.     Okay.  You knew she was supposed to go
18          to the concrete class that morning;
19          right?
20   A.     Yeah.  I mean, I had her training
21          schedule, but that -- that might not
22          have been on my mind right at that
23          second.  But I knew at some point she
```

```
 1          had the concrete class.
 2   Q.     Okay.  Where should she have gone when
 3          she left your office?
 4   A.     I don't know.  I'm not saying where
 5          she should have gone.  Where she
 6          should -- she should have gone to the
 7          concrete class, but I just have a
 8          problem with the way she left, you
 9          know, and I didn't know -- because I
10          believe when she left, it was maybe --
11          those classes usually don't start
12          until 8 or 8:30, and I believe when
13          she left, it was around, say, 7:30, so
14          I had no clue where she went.
15   Q.     Did you usually know of her
16          whereabouts during the day?
17   A.     Yes.  I knew what job she was on.
18   Q.     Okay.  And what -- do you remember if
19          there was a job that she was supposed
20          to be on that day apart from the
21          training class?
22   A.     I don't remember.
23   Q.     And I think you testified earlier that
```

```
 1          she might have been crying when she

 2          left your office; is that right?

 3   A.     I said it's a possibility.

 4   Q.     Yeah.  If she had questions about the

 5          policy and if she thought that she

 6          needed some clarification that you

 7          hadn't been able to give her, who is

 8          the person that she should have gone

 9          to, to see about that?

10   A.     Maybe Jay Palmer, my -- my supervisor.

11   Q.     And you testified a minute ago that

12          you didn't think that there was

13          anything wrong with her going to see

14          Malone or Fresolone; is that right?

15   A.     That's right.

16   Q.     Okay.  So those are also people that

17          she could go and talk to when she had

18          concerns?

19   A.     Yeah.  I don't have a problem with

20          that.  That -- that's no problem.

21   Q.     Okay.  So really the only problem you

22          have about her leaving is how she went

23          about telling you?
```

```
 1   A.      Yeah.
 2   Q.      And after Ms. Jackson went to her
 3           class, you spoke with Mr. Fresolone;
 4           correct?
 5   A.      Yes.
 6   Q.      Okay.  Did he call you?
 7   A.      Yes.
 8   Q.      Okay.  What did he say on the phone
 9           call?
10   A.      He said he wanted to meet with me
11           about the events that took place that
12           morning, that he had just gotten
13           through talking with LaShundra.
14   Q.      Okay.  And did you go up there and
15           meet with him?
16   A.      Uh-huh.
17   Q.      How many people were in the office?
18   A.      I don't recall right offhand.  I want
19           to say -- it was a lot of people
20           involved that day.  But that morning,
21           the first thing was me and Joey and
22           maybe Charly Jones.
23   Q.      Okay.  And Mr. Jones had gone in the
```

```
 1          office with Ms. Jackson; right?
 2   A.     I think so.  I mean, later -- I found
 3          that out later.  I think they were in
 4          there.
 5   Q.     Let me show you what I've marked as
 6          Exhibit 8 to your deposition.  Do you
 7          recognize that document?
 8                 (The referred-to document was
 9                  marked for identification
10                  as Plaintiff's Exhibit No. 8.)
11   A.     Yes.
12   Q.     Is this one of the documents in your
13          file about Ms. Jackson?
14                 MR. REDD:  In his file?
15   A.     No.  It wouldn't have been in mine.
16          This is a memo from Charly Jones.
17          It's a memo to file.
18   Q.     Okay.  So you didn't collect memos
19          from other people about this incident?
20   A.     Right.
21   Q.     You just had what you wrote up about
22          it?
23   A.     Well, I had it -- I had that.
```

BRET PAULK -- June 18th, 2008

1   Q.    Okay.  Look at Mr. Jones' memo.  It

2         says (as read:) When she came into the

3         building, she was very upset and in

4         tears, so I followed her into Joey's

5         office where she started explaining

6         that she was being treated unfairly.

7                   Do you see that?

8   A.    Yes.

9   Q.    Okay.  So by the time she got to

10        Mr. Fresolone's office, or by the time

11        she got to the building where his

12        office was, she was in tears; is that

13        right?

14                  MR. REDD:  Object to the form.

15                       He doesn't know that from

16                       personal knowledge.

17  Q.    Is that right?

18  A.    Well, I mean, going off of -- I don't

19        know that a hundred percent.  But

20        going off of this -- that's what this

21        memo states, that when Charly Jones

22        saw her in the office, she was crying.

23  Q.    Okay.  And do you know how -- do you

```
 1          know from your own personal knowledge
 2          how Charly Jones got involved in this
 3          whole situation?
 4    A.    No.
 5    Q.    Did anybody ever ask you that?
 6    A.    No.
 7    Q.    So you went to meet with Mr. Fresolone
 8          and with Charly Jones; right?
 9    A.    Yes.  I'm pretty sure.  You would have
10          to look back through my memo, but I
11          believe he was in there.
12    Q.    And what did y'all talk about during
13          that meeting?
14    A.    The events that took place that
15          morning.
16    Q.    Okay.  What did Mr. Fresolone ask you
17          about?
18    A.    He asked me what had happened.
19    Q.    And you told him --
20    A.    Basically what I just told you.
21    Q.    Okay.  How long did that meeting with
22          Mr. Fresolone last?
23    A.    I don't recall.
```

```
 1   Q.    Was it more than an hour?

 2   A.    Yeah, essentially.

 3   Q.    Did you document that meeting with

 4         Mr. Fresolone?

 5   A.    Yeah, I believe I did.

 6   Q.    When you were done meeting with -- did

 7         you mention to Mr. Fresolone during

 8         that meeting that you had raised your

 9         voice at Ms. Jackson?

10   A.    Yes.

11   Q.    And did Mr. Fresolone say that that

12         was inappropriate?

13   A.    Yes.  I mean, that's just a natural

14         reaction.  I mean, I just wanted to

15         increase the volume of my voice.  I

16         was not screaming at her or hollering

17         at her or banging my fist on the

18         table.  I mean, I probably shouldn't

19         have done it, but it probably -- I'll

20         be honest with you, it probably

21         happened.

22   Q.    And Fresolone told you not to let that

23         happen again, didn't he?
```

```
 1   A.      Yes.

 2   Q.      He didn't write you up for it though,

 3           did he?

 4   A.      As far as I know, he didn't.

 5   Q.      Okay.  Do you know if he -- if he ever

 6           gave you -- gave a documentation on

 7           that?

 8   A.      I think he just gave me a verbal

 9           warning on it.

10   Q.      Okay.  So after you met with

11           Mr. Fresolone, what was the next thing

12           during the course of that day that

13           happened as far as the taping policy

14           that Ms. Jackson did not want to sign?

15   A.      I think I went back to the office, and

16           I know we met again that afternoon.

17   Q.      Is that the meeting where she signed

18           the policy?

19   A.      Yes.

20   Q.      Did you do anything with respect to

21           the taping policy between the time

22           that that meeting with Mr. Fresolone

23           ended and when you met again with
```

```
 1            Ms. Jackson that afternoon?

 2   A.    Did I do anything with it?

 3   Q.    Yeah.  I mean, did you look up

 4         anything or talk to anybody about it?

 5   A.    Not that I know of.

 6   Q.    Okay.

 7   A.    Not that I recall.

 8   Q.    Okay.  So you went about your regular

 9         other work duties for the rest of the

10         day?

11   A.    No.  I mean, I came back and was

12         writing memos and -- I'm not sure if

13         we had another meeting with -- with

14         someone else.  I would just have to

15         look at my letter, but it took up a

16         lot of time that day.

17   Q.    Okay.  And part of the time that was

18         taken up was from you having to write

19         memos documenting what had happened?

20   A.    Yes, yes.

21   Q.    Okay.  Had anybody instructed you to

22         do that?

23   A.    No.  That was just from my -- I mean,
```

BRET PAULK -- June 18th, 2008

```
 1          that was just something that I needed

 2          to do, because it was getting hard to

 3          remember.

 4   Q.     Okay.

 5   A.     So I mean, they said, you know, when

 6          you come in as being a project

 7          engineer, it's good to take good notes

 8          and have something to go back to.

 9   Q.     And so the last -- the last meeting

10          that day was again in Mr. Fresolone's

11          office; right?

12   A.     Yes.

13   Q.     Okay.  And that was you and

14          Mr. Fresolone, Ms. Jackson and, I

15          guess, Gwenda Hunter was in there too;

16          is that right?

17   A.     And Leon Malone.

18   Q.     Mr. Malone was in there too.  And at

19          the end of that meeting, she signed

20          the policy; right?

21   A.     Yes.

22   Q.     Okay.  So she did sign it by the

23          deadline that you --
```

BRET PAULK -- June 18th, 2008

```
 1   A.      She did sign it.

 2   Q.      She signed it by the deadline you gave

 3           her; right?

 4   A.      Yes.

 5   Q.      What was the discussion like in that

 6           final meeting?

 7   A.      I don't recall.  I know she was upset,

 8           I think, and she had Gwenda in there

 9           with her as a witness, I believe.  I

10           remember it got pretty heated between

11           her and Leon Malone.  I would have to

12           go back and look at my file.

13   Q.      Okay.  Did Ms. Jackson -- during that

14           meeting, did she say she thought you

15           were discriminating against her

16           because she was a woman?

17   A.      I think -- I think she did.  I think

18           she -- not necessarily those words,

19           but maybe that I was discriminating

20           against her, didn't like her, wanted

21           her fired or something.

22   Q.      Okay.  If she had said or if there was

23           testimony that she had said that she
```

```
 1          felt you were discriminating against

 2          her because she was female, would you

 3          have any reason to dispute that?

 4               MR. REDD:   Object to the form.

 5   Q.     You can answer.

 6   A.     What's that?

 7   Q.     I asked you if there was testimony

 8          that she said during that final

 9          meeting --

10   A.     That somebody said that she said that

11          in that meeting?

12   Q.     Yeah, yeah.  That --

13   A.     No, I mean, I wouldn't --

14   Q.     You wouldn't dispute that; right?

15   A.     No.

16   Q.     After that last meeting where she

17          signed the policy, what was the next

18          action that you took with respect to

19          Ms. Jackson not signing the policy?

20   A.     I think I wrote her a reprimand for

21          her demeanor that day and in the

22          office and the whole process it took

23          in order for her to sign that
```

```
 1          document.

 2    Q.    Did you discuss with anybody that you

 3          were going to give her a written

 4          reprimand?

 5    A.    Yes.

 6    Q.    Who did you discuss that with?

 7    A.    My supervisor and Joe Fresolone.

 8    Q.    Both of them?

 9    A.    Yeah.

10    Q.    Okay.  Did either of them instruct you

11          to give her the reprimand?

12    A.    Yes.

13    Q.    Who instructed you to give her the

14          reprimand?

15    A.    I don't recall exactly who.  So many

16          people were involved at this point in

17          time.

18    Q.    Okay.  But it was either Fresolone

19          or --

20    A.    I was meeting with them a lot, but I

21          don't remember who exactly said it.

22    Q.    Okay.  But it was either -- you think

23          it was either Fresolone or Palmer who
```

```
 1           told you to give her the reprimand?
 2  A.       I think so.  I'm not a hundred percent
 3           sure though.
 4  Q.       You say you were meeting with them a
 5           lot.  How many times would you say you
 6           met with them about Ms. Jackson and
 7           the policy?
 8  A.       I can't recall.
 9  Q.       Okay.  And it took you about two weeks
10           before she actually got the writeup;
11           right?
12  A.       Yeah.  It took a while.  A lot of
13           people were talking about the events
14           that happened that day and, you know,
15           what course of action would be best to
16           take on this.  And, you know,
17           everybody from -- I spoke to everybody
18           from Mr. Poiroux to Jay Palmer.
19  Q.       Okay.  You spent a good bit of time
20           doing that?
21  A.       Yes.
22  Q.       Okay.  And who was instructing you on
23           who to talk to and what to do as far
```

BRET PAULK -- June 18th, 2008

```
 1        as gathering the stuff up for the
 2        reprimand?
 3   A.   I was -- I was submitting -- I was --
 4        we would meet and discuss what took
 5        place and who was involved at this
 6        meeting or who was involved in this
 7        meeting, you know, what all -- just
 8        gathering of the facts, what -- what
 9        happened.
10   Q.   Okay.  And who was kind of leading
11        that process of gathering the facts?
12   A.   I'm not sure who exactly, but it was
13        either Jay or Joey or Vince Calametti
14        or Mr. Poiroux.  I'm not sure.
15   Q.   Okay.  And was it your job in that
16        whole deal to kind of be the person
17        who collected the statements and
18        gathered the facts?
19   A.   No.
20   Q.   Okay.  What was your role in gathering
21        the facts?
22   A.   I just presented, I guess, my memos to
23        file on what had happened and met
```

BRET PAULK -- June 18th, 2008

```
 1          about it and talked about it.
 2    Q.    Okay.  And again, you said it was
 3          either Fresolone, Palmer --
 4    A.    I said I didn't recall, but it could
 5          possibly be anybody, Jay Palmer, Joey
 6          Fresolone, Vince, Ronnie Poiroux.  I'm
 7          not --
 8    Q.    Okay.  And when was the decision made
 9          to actually give her the written
10          reprimand?
11    A.    I don't recall.
12    Q.    Okay.  And --
13    A.    Probably around the time she got it,
14          or the day before.
15    Q.    And you just had to make sure that you
16          had all the support?
17    A.    And I just carried out the official
18          reprimand letter.
19    Q.    Did you write the official reprimand
20          letter?
21    A.    Yeah.
22    Q.    You wrote it because you were
23          instructed to do that by either
```

BRET PAULK -- June 18th, 2008

```
 1        Calametti, Fresolone, Palmer, or
 2        Poiroux; is that right?
 3   A.   (Nods head.)
 4   Q.   Yes?
 5   A.   Yes.
 6   Q.   And who -- who was the principal
 7        person whose job it was to collect all
 8        of the supporting documentation for
 9        the reprimand?
10   A.   I don't know who -- if that's even an
11        official job or not.
12   Q.   Okay.  But you did have to -- but
13        somebody had to get all of the
14        supporting documentation in place so
15        that the reprimand could be given;
16        right?
17   A.   Yes.
18   Q.   Okay.
19   A.   I believe somebody did do that, either
20        Jeanette Brown or Jay Palmer.
21   Q.   Okay.  And you have to have all those
22        written memos and everything to
23        support the written reprimand; right?
```

BRET PAULK -- June 18th, 2008

```
 1   A.    Yeah.  As far as I know.  I mean,
 2         that's -- that's what I was doing, you
 3         know, giving everything I had on the
 4         subject.
 5   Q.    And did you agree that the written
 6         reprimand was what Ms. Jackson should
 7         get for that particular incident?
 8   A.    I felt that it was -- it was accurate,
 9         yes.
10   Q.    Okay.  You felt that was the
11         appropriate level of discipline?
12   A.    Appropriate.  That's the word I --
13   Q.    Appropriate level of discipline?
14   A.    Yes, sir.
15   Q.    Taking into account all the level of
16         conduct and all that had occurred that
17         day?
18   A.    Taking into account that day and, you
19         know, between all the whole process to
20         get her to sign that document.  And
21         also I think I even mentioned her
22         leaving the office that morning, you
23         know, without -- without letting me
```

BRET PAULK -- June 18th, 2008

```
 1          know where she was going.  All of that

 2          taken into account that day, I

 3          believe, was inappropriate.

 4   Q.     All right.  Do you think that her

 5          previous complaints with regard to the

 6          vandalism of the car -- do you think

 7          if she -- if that hadn't happened, do

 8          you think that she still would have

 9          gotten the reprimand for the

10          January 5th incident?

11               MR. REDD:  Object to the form.

12   A.     I couldn't -- I don't know.

13   Q.     Do you know if -- if whoever

14          instructed you to give her the written

15          reprimand, do you know if they took

16          that into account when they instructed

17          you to give it to her?

18   A.     No, I don't know that.  Well, it is --

19          no, I mean, I don't know.  I couldn't

20          say.

21   Q.     And she was still working under you

22          when she got the reprimand; right?

23   A.     I believe so.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    Okay.  And do you think that was
 2         around the time when she started doing
 3         office work instead of working
 4         outside?
 5   A.    Yeah, around that time.
 6   Q.    And let me just understand again.  Did
 7         she -- did she start doing the inside
 8         work because of the doctor's note that
 9         restricted her to inside work?  Was
10         that the reason for it?
11   A.    No.  She was -- I think there was two
12         letters, two doctor's letters.  The
13         first one came out and said no heavy
14         lifting.  And I said no problem, you
15         know.  You don't -- you can do office
16         work, and when you're in the field,
17         don't lift anything heavy.  And then I
18         believe Vince Calametti wanted a
19         clarification on that.  You know, a
20         week or so later, or however long
21         whenever he got the note, he wanted a
22         weight limit.  You know, what is heavy
23         lifting, because heavy lifting to me
```

BRET PAULK -- June 18th, 2008

```
 1          might not be the same to you.  And
 2          that's when the second note came out
 3          and stated office work only, if I'm
 4          not mistaken.
 5   Q.     Okay.  And when the second note came
 6          out, is that when you decided to bring
 7          her inside and not assign her outside
 8          anymore?
 9   A.     Yes.
10   Q.     When did you talk to Vince Calametti
11          about that first note?
12   A.     I don't remember.
13   Q.     Okay.
14   A.     Sometime shortly after I received it.
15   Q.     Did you bring the note to him?
16   A.     Yeah.
17   Q.     You did?
18   A.     Yeah.
19   Q.     Okay.  And so you had that --
20   A.     A copy of it or the note, yeah.
21   Q.     Okay.  And you had a conversation
22          about it with him in his office?
23   A.     I believe I talked to Jay Palmer about
```

```
 1              it first, and then we went to Vince's

 2              office.

 3    Q.        Okay.  So you all went together.  And

 4              what was the conversation that you had

 5              with Jay Palmer?  How did that go?

 6    A.        You know, basically what does that

 7              mean, you know.  He -- he wanted to

 8              know what -- what Vince thought about

 9              it.  So we went over there, and that's

10              when Vince wanted clarification.

11    Q.        Okay.  Did he want just a -- just a

12              weight limit?  Is that what he wanted

13              or --

14    A.        I just used that as an example.  I

15              don't know exactly what he wanted, but

16              he wanted something, you know, that --

17              no heavy lifting is so gray that he

18              wanted to know what she could and

19              couldn't do.

20    Q.        Okay.  And who communicated back to

21              Ms. Jackson that that was needed?

22    A.        He may have or I may have.  I'm not

23              sure.
```

```
 1   Q.    Okay.  And then she got -- and that
 2         was the second doctor's note that just
 3         said no outside work?
 4   A.    Yes.
 5   Q.    Did that answer your -- did that
 6         answer his question as to what was the
 7         lifting restriction?
 8   A.    Yes.
 9   Q.    It did?
10   A.    He felt satisfied with that, yes.
11   Q.    I mean, there's some possibly heavy
12         lifting that a person could do even
13         working inside; right?
14   A.    Well, I think, you know, you'd have
15         to -- I believe that was right around
16         the time that she was transferred to
17         Tony, and he may have had -- might
18         have had some conversations with him
19         directly on what she could and
20         couldn't lift and all.  But nobody was
21         going to require her to lift anything
22         in the office.  Now, whether she chose
23         to or not, that's up to LaShundra.
```

BRET PAULK -- June 18th, 2008

```
 1    Q.     Okay.   Is there a lot of heavy lifting
 2           done out on the inspection sites?
 3    A.     No.
 4    Q.     Do you think even with the lifting
 5           restriction, a project inspector
 6           can -- can still work out on the job
 7           site?
 8    A.     I believe so.
 9    Q.     Was -- Mr. Calametti, was he -- was
10           he -- did he seem frustrated at all
11           that she was having these restrictions
12           put on her?
13    A.     No.
14    Q.     He was just trying to work with her to
15           do exactly what the doctor was saying?
16    A.     Yes.
17    Q.     Okay.
18    A.     And at the time I think one of the
19           main reasons she went to Tony's office
20           was because he had more office work
21           for her to do.
22                 MR. SIMON:   All right.   Why
23                      don't we take a quick
```

```
1                    break?

2              (Brief recess was taken.)

3   Q.   (By Mr. Simon:)  When Ms. Jackson

4        brought you that first note, the

5        no-heavy-lifting note, did you have

6        any conversation with her about what

7        job duties she could or couldn't do?

8   A.   I think briefly I discussed with her,

9        you know, use your best judgment.  And

10       if you don't feel like you can lift

11       something, don't lift it.  You know,

12       I'm not going to hold you responsible

13       or any kind of -- take disciplinary

14       action over something like that.  I

15       mean, that's ridiculous.  I mean, I

16       just told her to -- to use her best

17       judgment.  If she couldn't lift

18       something, get somebody to lift it for

19       her --

20  Q.   Uh-huh.

21  A.   -- which you don't encounter much,

22       like I said earlier.  I mean, that's

23       not a common thing.  But then you get
```

BRET PAULK -- June 18th, 2008

```
 1              into the kind of gray area, it's just
 2              something might be heavy to her might
 3              not be heavy to me.  So I just told
 4              her to use her best judgment.
 5    Q.   Okay.  And I think we said earlier
 6              that typically the guys will carry the
 7              heavy stuff anyway?
 8    A.   Yes.
 9    Q.   When she brought you that second
10              note that restricted her to inside
11              duties --
12    A.   You know, I can't remember if she
13              brought that to me or not, but I know
14              that -- that Vince did ask for
15              clarification, and he did receive
16              clarification on it.  And I'm not sure
17              what -- you know, through what means
18              how he received that note, but he did
19              receive it.
20    Q.   And did she give you a copy of that
21              note too?
22    A.   I think I saw it.  I think we had
23              another meeting on it, and we might
```

```
 1        have discussed that.
 2   Q.   And basically what was your discussion
 3        on that?
 4   A.   Basically informed me that she was,
 5        you know, confined to the office, that
 6        she needed to do office work.  And
 7        that's when we got into the discussion
 8        about how much office work I had at
 9        the time, and maybe Tony Cooper would
10        have been a better fit to accommodate
11        that.
12   Q.   Okay.  Did you say you got into a
13        discussion about that?
14   A.   (Nods head.)
15   Q.   How did the discussion start?
16   A.   You know, if she was going to be
17        limited to office work, would I have
18        enough office work to keep her busy
19        every day, all day, I think.
20        Something to that effect.
21   Q.   Okay.  And was that a question from
22        her to you, or was she --
23   A.   No.  She wasn't involved in that.
```

BRET PAULK -- June 18th, 2008

1   Q.    Oh, okay.  This was a conversation
2         that you had with somebody other than
3         Ms. Jackson?
4   A.    Vince.
5   Q.    Okay.  So you and Mr. Calametti were
6         talking about whether she could be in
7         the office -- about whether you had
8         enough office work for her?
9   A.    Well, yes, yes.  I think me and Jay
10        and Vince discussed that.
11  Q.    Okay.  And did you guys reach a
12        decision during that conversation
13        about what was going to happen?
14  A.    I think I could keep her busy checking
15        field books, as much stuff as I could
16        come up with, plotting.  You know, in
17        the meantime I think they were
18        deciding, you know, who would -- you
19        know, Tony Cooper would be a better
20        fit, you know, and the process that it
21        takes to transfer somebody to Tony
22        Cooper.
23  Q.    Okay.  By the end of the meeting was

```
 1          it decided that she was going to be

 2          transferred?

 3   A.     No, no.  There was just -- that was on

 4          the table, you know.  In the meantime

 5          I would try to, you know, carry on

 6          like normal.  I mean, I would

 7          accommodate that doctor's note.

 8   Q.     Okay.  How long after you had that

 9          meeting with Calametti and Palmer was

10          it decided that she was going to be

11          transferred to Tony Cooper?

12   A.     I don't remember.  A couple weeks, a

13          few weeks.  I don't remember off the

14          top of my head.

15   Q.     Okay.  And did you ever have any

16          meetings with Ms. Jackson about her

17          inside duties?

18   A.     I don't think we had anything

19          official, but, you know, let's sit

20          down and talk about it.  I would just

21          try to keep her busy in the office,

22          you know.

23   Q.     Okay.  And which --
```

BRET PAULK -- June 18th, 2008

```
1   A.      And also, even I think she was helping
2           out on another job, helping Adam.
3           Because sometimes -- me and Josh
4           McElhenney's office worked pretty
5           close together.  And sometimes the
6           PCETs which were part-time, they would
7           be in and out of class at school
8           there.  They were in school half of
9           the time.
10  Q.      Uh-huh.
11  A.      And they would come in and do some
12          plotting.  It was hard for them, once
13          they got to the office to go out
14          there.  By the time they got there,
15          they would have to come back and go
16          back to school, and so they stayed
17          somewhat in the office the majority of
18          the time.  And they did a lot of
19          plotting, and that was one of the ones
20          I talked to you earlier about, Adam
21          Spence, who was doing some plotting
22          for Josh, I believe, and she helped
23          out with that.
```

```
 1   Q.     Okay.  Did you ever tell Ms. Jackson
 2          that she wouldn't move forward at
 3          ALDOT in her condition?
 4                (Off-the-Record discussion.)
 5   A.     No.
 6   Q.     Did you ever make any comments to her
 7          about her chances for progress, her
 8          being pregnant?
 9   A.     No.
10   Q.     If she testifies that you did make a
11          comment like that, then that would
12          just be untrue?
13   A.     Yes.  That would be a lie.
14   Q.     When she was transferred to Tony
15          Cooper, were you aware of anybody
16          having made a decision to recommend
17          her for termination?
18   A.     I don't recall.
19   Q.     When did you first become aware that
20          someone had recommended that she be
21          terminated?
22   A.     I don't remember.
23   Q.     How did you become aware of that?
```

```
 1   A.    Maybe in a meeting of some sort, I'm
 2         sure.  Maybe talking with Tony.  Maybe
 3         he talked about it.
 4   Q.    Tony Cooper told you she was being
 5         terminated?
 6   A.    Yes.
 7   Q.    Were you surprised to hear that when
 8         he told you that?
 9   A.    No, I wasn't surprised.
10   Q.    Why not?
11   A.    Because after all the chain of events
12         that took place in six months, I mean,
13         I wasn't surprised at that.
14   Q.    Okay.  She hadn't done anything wrong
15         though after January 5th, had she?
16   A.    Not to my knowledge.
17   Q.    So even after a month and a half had
18         gone by with no problems, you still
19         thought it was reasonable to terminate
20         her?
21   A.    Yes.
22   Q.    Okay.  But again, you didn't recommend
23         to anybody that she be terminated?
```

```
 1   A.     No.
 2   Q.     Were you ever in any meetings with
 3          Mr. Poiroux or Mr. Calametti or
 4          Mr. Palmer where they were discussing
 5          the possibility of terminating
 6          Ms. Jackson?
 7   A.     I don't -- I don't think I was with
 8          them.  At that point in time she --
 9          she was already in Tony Cooper's
10          office, so, you know, I had stuff to
11          do.  I had work, you know, so I kind
12          of lost contact at that point.
13   Q.     Okay.  Did y'all have meetings, the
14          project engineers and the management,
15          about where you talked about how the
16          inspectors were doing?
17   A.     No.  I wouldn't ever meet with
18          another -- any of the project engineer
19          meetings to discuss, you know, say, an
20          EA-1, their performance in my office.
21   Q.     Okay.  Do you know whether --
22   A.     I mean, that was something between me
23          and, say, my direct supervisor.
```

```
 1   Q.    Do you know if Ms. Jackson got any
 2         more performance appraisals after the
 3         one that you gave her in September?
 4   A.    I'm not aware.
 5   Q.    Okay.  Did anybody ever consult with
 6         you about how her performance was from
 7         the last performance appraisal that
 8         you gave her until the time of her
 9         termination?
10   A.    What?
11   Q.    Did anyone ever consult with you about
12         the quality of Ms. Jackson's job
13         performance when you supervised -- I'm
14         sorry.  Let me ask it in a little bit
15         different way.  Did anybody -- first,
16         are you aware of anybody doing a
17         performance review for Ms. Jackson --
18         a performance appraisal for
19         Ms. Jackson after the one you did in
20         December?
21   A.    No.
22   Q.    Okay.  We'll call that one the
23         December performance appraisal, okay?
```

```
 1   A.      Okay.

 2   Q.      After you gave her the December

 3           performance appraisal, did anyone ever

 4           come to you and ask you how her

 5           performance was for the purpose of

 6           doing another performance appraisal

 7           for her?

 8   A.      For that purpose?

 9   Q.      Yeah.

10   A.      No.

11   Q.      Okay.  Did anyone ever come to you and

12           ask you how her job performance was

13           after you did that performance

14           appraisal in December?

15   A.      Well, I believe -- I mean, going off

16           of that performance appraisal along

17           with when she transferred to Tony

18           Cooper, you know, we had a brief

19           discussion about where she was at on

20           different levels, you know, on

21           different duties, and he kind of took

22           it from there.

23   Q.      Okay.  Were those conversations that
```

BRET PAULK -- June 18th, 2008

```
 1          you had with Tony Cooper?
 2   A.     Yes.
 3   Q.     Okay.  Did -- so did Mr. Poiroux ever
 4          come to you and say, hey, how's --
 5          how's LaShundra Jackson's job
 6          performance?
 7   A.     No -- at what point in time?
 8   Q.     After you did the December 20th
 9          appraisal.
10   A.     No.
11   Q.     Did Vince Calametti ever come to you
12          and say, hey, how's Ms. Jackson's
13          performance after you did the December
14          performance appraisal?
15   A.     I don't recall.  I'm not sure.
16   Q.     Okay.
17   A.     And -- and I've said all along, you
18          know, that her job performance wasn't
19          the issue.  I mean, I think she did a
20          decent job here.  It was -- you know,
21          the outburst and she would get upset
22          about all these different things that
23          we've been talking about here today,
```

BRET PAULK -- June 18th, 2008

```
 1          and that was mainly my main -- what I
 2          documented, you know.
 3    Q.    Right.  I understand that.  Did Samuel
 4          Palmer ever come to you and ask you
 5          how was her job performance after that
 6          December 20th appraisal?
 7    A.    He -- he may have.  I don't recall.
 8    Q.    Okay.  Do you ever recall telling
 9          anybody -- do you recall ever telling
10          Mr. Palmer, Mr. Calametti, or
11          Mr. Poiroux that any of Ms. Jackson's
12          task responsibilities, that she was
13          doing them in such a way that was
14          substandard?
15    A.    Do I recall telling them that --
16    Q.    Yeah.
17    A.    -- that she was doing her duties
18          substandard?
19    Q.    Yes.
20    A.    I don't recall that.
21    Q.    When -- did you ever have any other
22          probationary engineering assistants
23          working under you?
```

BRET PAULK -- June 18th, 2008

```
 1   A.    I don't think so.
 2   Q.    Okay.  Did Lisa Champagne work under
 3         you?
 4   A.    Yes, she was one.
 5   Q.    Okay.  Was she a probationary?
 6   A.    Yes.
 7   Q.    Okay.  Did she make permanent status
 8         while she was under your supervision?
 9   A.    I believe she did.
10   Q.    Okay.  Do you know if she passed the
11         algebra and the basic math before she
12         did?
13   A.    Yes.
14   Q.    Okay.
15   A.    I was just trying to think of when she
16         started and if I was gone, but I think
17         I was still here when she received
18         her -- I'm pretty sure.
19   Q.    What makes you think that --
20   A.    I kind of remember her doing the
21         performance thing.
22   Q.    What makes you think that she passed
23         the basic math and algebra?
```

1    A.    I think -- usually how that deal works

2          is you get an e-mail from Debra

3          Hadley, from the training coordinator

4          here.

5                (Off-the-Record discussion.)

6    Q.    Do you remember getting that e-mail

7          from Debra Hadley about Ms. Champagne?

8    A.    I think so.

9    Q.    And to your recollection, did

10         Ms. Champagne pass basic math and

11         algebra when she was first hired or

12         did she pass it later on?

13   A.    No.  I think she had to take it later

14         on.

15   Q.    Okay.

16   A.    She might have passed one and not the

17         other.  I'm not sure.  She might have

18         passed basic math and had to take

19         algebra.  I know she had to take some

20         math classes.

21   Q.    So you're not aware that Ms. Jackson

22         got a review that said she partially

23         met standards after the December 20th

BRET PAULK -- June 18th, 2008

```
 1          review that you gave her?
 2    A.    No.
 3               (Off-the-Record discussion.)
 4    Q.    And are you aware that Ms. Jackson
 5          received work habit ratings that said
 6          that she was unsatisfactory in
 7          cooperation with co-workers and
 8          compliance with rules?
 9    A.    Would that be in the review that you
10          just asked me if I remember?
11    Q.    Yeah.
12    A.    No.
13    Q.    Let me show you what -- what I've
14          marked as Exhibit 9 to your
15          deposition.
16               (The referred-to document was
17                marked for identification
18                as Plaintiff's Exhibit No. 9.)
19               MR. SIMON:  I don't have
20                   another copy of that.
21               MR. REDD:  That's okay.  I'll
22                   look on.
23    Q.    (By Mr. Simon:)  Take a look at this.
```

```
 1          Do you recognize --
 2    A.    I think I --
 3    Q.    Do you recognize this document?
 4    A.    Yeah, I recognize it.
 5    Q.    You do?
 6    A.    (Nods head.)
 7    Q.    What is it?
 8    A.    It's another performance appraisal.
 9              (Off-the-Record discussion.)
10    Q.    Another performance appraisal?
11    A.    (Nods head.)
12    Q.    And what's the date on it?
13    A.    March -- no.  That's the --
14          February 23rd.
15    Q.    Okay.  Have you ever seen this
16          document before?
17    A.    Yeah, I have.  I don't remember it,
18          but I've obviously seen it.  I
19          initialed it.
20    Q.    Where did you initial it?
21    A.    Under the ratings supervisor.
22    Q.    Okay.  The signature on there is
23          Samuel Palmer; right?
```

BRET PAULK -- June 18th, 2008

```
 1   A.      That's correct.
 2   Q.      Okay.  And there's -- I think I see
 3           your initials, BP; correct?
 4   A.      That's correct.
 5   Q.      And there's something above that.  Do
 6           you know what that is?
 7   A.      That's Vince Calametti.
 8   Q.      Because Vice Calametti signed off as
 9           Ms. Jackson's rating supervisor as
10           well?
11   A.      I think we initialed -- I think Jay
12           Palmer signed it as the rating
13           supervisor.
14   Q.      And you and Vince Calametti signed off
15           under the ratings supervisor also?
16   A.      Yes.
17   Q.      What does that mean putting your
18           initials there?
19   A.      I'm not sure.  I don't recall what --
20           why we initialed that.
21   Q.      Okay.  Looking at this now, did --
22   A.      I take it that this takes into account
23           the reprimand that came after the --
```

BRET PAULK -- June 18th, 2008

```
 1        you stated a while ago that nothing
 2        had happened since the first
 3        performance appraisal, which that
 4        reprimand was between the performance
 5        appraisal of December, if that's what
 6        you're talking about, and February.
 7        And this takes that into account.
 8                  When I was a part of
 9        that, they wanted me to review this
10        and initial off on it --
11   Q.   Okay.
12   A.   -- since I was involved at that point.
13        I currently wasn't her direct
14        supervisor, but I was involved through
15        the whole reprimand process.
16   Q.   Okay.  Did you -- did you provide any
17        input on the numerical scores that she
18        was given on her performance?
19   A.   No, sir.  I don't believe I did.
20   Q.   When you initialed this document, did
21        you know what her final score was
22        going to be?
23   A.   I may have.  I don't recall.  I was
```

BRET PAULK -- June 18th, 2008

```
 1         just involved -- do you see under this
 2         disciplinary section -- that
 3         reprimand?
 4    Q.   Okay.  Do you remember where you were
 5         when you signed this document?
 6    A.   I think I was in Jay's office.
 7    Q.   And at the time that you signed it,
 8         did you know that Ms. Jackson was
 9         going to be terminated?
10    A.   I don't recall if I did or not.
11    Q.   What did you go to Jay's office for
12         when you were in there?  Was it just
13         to sign this document?
14    A.   I think he called me up there, yeah,
15         to talk about, you know, the
16         reprimands and to go over that.
17    Q.   Okay.  She had -- she had already been
18         given the reprimand about a month
19         before; right?
20    A.   Yeah.
21    Q.   And he was -- he was involved in the
22         process of that reprimand; right?
23    A.   Yeah.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.     Okay.  So he called you up to his

 2          office to talk to you again about the

 3          reprimand?

 4   A.     Something to that effect.

 5   Q.     Okay.  And I'm not trying to be

 6          melodramatic, but it seems like that

 7          was pretty much done to death at that

 8          point.

 9   A.     (Nods head.)

10   Q.     Was he -- did he ask you any

11          questions?

12   A.     I don't -- I don't remember.

13   Q.     Did --

14   A.     I mean, yes, I'm sure he did.  But

15          what questions?  I don't -- I don't

16          have a clue.

17   Q.     At the time that you initialed this

18          document, did it already have the X in

19          the space that says (as read:)

20          Separated before or at the end of the

21          probationary period?

22   A.     I don't remember if it did or not.

23                 (Off-the-Record discussion.)
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    And that one has McInnes' signature on
 2         it; right?
 3   A.    Yes.
 4   Q.    Okay.  And let me show you what I have
 5         marked as Exhibit 10 to your
 6         deposition.  It's another copy of that
 7         without McInnes' signature; right?
 8             (The referred-to document was
 9              marked for identification
10              as Plaintiff's Exhibit No. 10.)
11   A.    Uh-huh.
12   Q.    And it looks like even before
13         Mr. McInnes signed it, that X is still
14         on that line for separated before and
15         after; right?
16   A.    Right.
17   Q.    Okay.  Does that --
18   A.    Do you need this back?
19   Q.    No.  Hold onto that.  Does that help
20         you remember whether that X was on
21         there at the time you initialed it
22         when you were with Mr. Palmer?
23   A.    No, I don't remember.
```

```
 1   Q.    Did Mr. Palmer tell you during that
 2         meeting where you put your initials on
 3         this that he was considering
 4         terminating Ms. Jackson?
 5   A.    Yeah.  I think I knew at this point,
 6         through conversations with Tony or
 7         through Jay, that -- that they were
 8         going -- decided that course of
 9         action.
10   Q.    Okay.  So you -- you basically knew
11         you were initialing something that was
12         going to be given to her in support of
13         her termination?
14   A.    Yes, basically, I mean.
15   Q.    When -- before you initialed it, did
16         you review the numerical ratings
17         scores?
18   A.    No.
19   Q.    Okay.  So you didn't look to see how
20         she had been rated during this time
21         period?
22   A.    No.  I didn't -- I didn't -- I don't
23         recall.  I'm not going to say I a
```

```
1              hundred percent did not look at the

2              ratings.

3     Q.       Okay.

4     A.       I'm not sure.

5     Q.       And let's look at the -- at the on

6              Exhibit 10.  What's the time period

7              that this performance appraisal

8              covers?

9     A.       12/21/06 through February 23rd, '07,

10             which sounds correct since that last

11             one was the 20th of December.

12    Q.       Okay.  Do you recall what date

13             Ms. Jackson was transferred to Tony

14             Cooper?

15    A.       No, I don't.  I want to say it was the

16             end of January, the beginning of

17             February.

18    Q.       Okay.  I want to show you what I've

19             marked as Exhibit 11.  Do you

20             recognize that document?

21                    (The referred-to document was

22                     marked for identification

23                     as Plaintiff's Exhibit No. 11.)
```

```
1    A.     Yeah, I think so.

2    Q.     And can you tell me what it is?

3    A.     It's a transfer letter --

4    Q.     Okay.

5    A.     -- for Ms. Jackson.

6    Q.     It actually doesn't say anything about

7           a transfer, does it?

8    A.     Oh, maybe I need to read it.

9    Q.     That would probably be good.

10   A.     (Witness reviewing document.)

11                    Okay.  No, I never

12          received a copy of this.  Tony Cooper

13          and Jeanette Brown did.

14   Q.     Okay.  When an employee is

15          transferred --

16                 (Off-the-Record discussion.)

17   Q.     When an employee is transferred from

18          one project engineer to another, they

19          get a letter saying they're being

20          transferred; right?

21   A.     Right.

22   Q.     Did you ever see a letter like that

23          for Ms. Jackson --
```

BRET PAULK -- June 18th, 2008

```
 1   A.      I think I did.
 2   Q.      -- saying that she was being
 3           transferred to Tony Cooper?
 4   A.      Yes.
 5   Q.      And based on the date in that letter,
 6           it looks like she was being
 7           transferred to Tony Cooper around the
 8           13th of January; correct?
 9   A.      Yes.  It appears that way.
10   Q.      And she was supposed to get a new
11           Form 40 around that date,
12           February 13th?
13   A.      I think this is referring to that --
14           that transfer and, you know, her
15           new -- well, it says, due to her
16           pregnancy, you're going to have to
17           revise her Form 40 to reflect her new
18           duties, I guess, as office engineer.
19   Q.      So given this letter, it looks like
20           you supervised Ms. Jackson after her
21           first performance appraisal; you
22           supervised her until around the middle
23           of February; is that right?
```

BRET PAULK -- June 18th, 2008

```
1   A.    I wasn't thinking it was that long.

2   Q.    Okay.  So a shorter period of time?

3   A.    I was thinking the end of

4         January maybe -- maybe six weeks.

5   Q.    Maybe six weeks?  On her -- on this

6         performance appraisal that's

7         Exhibit 10, it shows her being rated

8         from December 21st to February 23rd;

9         right?

10  A.    Yes.

11  Q.    And yet you, as her direct supervisor,

12        had no input on what her ratings

13        scores were going to be on that

14        appraisal?

15  A.    No.

16  Q.    You did not?

17  A.    I think it was a transition period

18        there where she went from me to Tony,

19        and she had new office duties.  And

20        between, I think, Jay, I think,

21        handled the ratings, but I think I

22        might have had some input.  Maybe Tony

23        might have had some input.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    But Jay was the one who came up with
 2         this -- by Jay, I mean Mr. Palmer.  He
 3         was the one that came up with the
 4         numerical ratings scores, as far as
 5         you know?
 6   A.    Yes, as far as I know.
 7   Q.    And do you know what he based those
 8         scores on?
 9   A.    I think just through discussions with
10         me and Tony.
11   Q.    Okay.  So now you think Mr. Palmer did
12         talk to you about Ms. Jackson's work
13         performance?  Earlier you said you
14         didn't.  Are you changing your mind
15         about that now?
16   A.    No.  I mean, I don't think I ever said
17         I was a hundred percent positive that
18         he talked -- that he didn't talk to me
19         about her performance.  I don't
20         remember saying that.
21   Q.    Okay.  And so when you talked to
22         Mr. Palmer about her work performance,
23         did you tell him the same thing that
```

BRET PAULK -- June 18th, 2008

```
 1        you told me, which was that you never

 2        had a problem with her work, that you

 3        thought her work was fine?

 4   A.   Yeah.  I thought her work was decent.

 5   Q.   Okay.

 6   A.   I think it was average.  You know,

 7        she -- like everybody, some people

 8        need to improve in some areas; some

 9        people meet standards; some people

10        exceed standards.

11   Q.   So how do you explain the really poor

12        ratings that she got on Page 2 of her

13        performance appraisal?

14   A.   I don't -- I don't intend to explain

15        it.

16   Q.   Can you explain how she got such low

17        ratings in her various

18        responsibilities?

19   A.   I would have to go back and see what

20        kind of classes she had and what she

21        took and if she did pass them.  That

22        would explain the 1 on training

23        courses.
```

```
 1                 (Off-the-Record discussion.)
 2    Q.    I mean, you would agree with me that
 3          her ratings went down considerably
 4          from the December 20th review to
 5          the -- to this review in February,
 6          wouldn't you?
 7    A.    Oh, yes.
 8    Q.    I mean, she is getting 3s and 2s and a
 9          couple of 1s in December, and now
10          she's getting nothing but 1s and 2s;
11          right?
12    A.    That's right.
13    Q.    Okay.  And then you testified earlier,
14          I think, that you didn't think her
15          work performance got any worse during
16          that time?
17    A.    No, I don't think it got worse.
18    Q.    Okay.  So do you have any explanation
19          for how her scores went down so much?
20    A.    No.
21    Q.    Are you aware that Ms. Jackson filed
22          for unemployment after she was
23          terminated?
```

```
 1   A.    No.
 2   Q.    You're not aware of that?  You don't
 3         remember doing the unemployment
 4         hearing over the phone?
 5   A.    I don't think so.  What kind of
 6         hearing?
 7   Q.    There was a telephone hearing with the
 8         Alabama Department of Industrial
 9         Relations where you testified under
10         oath that --
11   A.    I do.  With Leon Malone and Jay
12         Palmer, yes.
13   Q.    Okay.  You do recall that?
14   A.    Yes.
15   Q.    And just a few more about the
16         January 5th incident.  How many calls
17         do you think Ms. Jackson made during
18         the initial meeting in your office?
19   A.    Do I recall?
20   Q.    Yeah.
21   A.    One or two.
22               (Off-the-Record discussion.)
23   Q.    One or two?  Okay.
```

BRET PAULK -- June 18th, 2008

```
 1   A.      I'm talking about outgoing and
 2           incoming --
 3   Q.      Yeah.
 4   A.      -- either/or.  I just remember her
 5           being on the phone.
 6   Q.      Okay.  Let me show you what I've
 7           marked as Exhibit 12 to your
 8           deposition.  Do you recognize this
 9           document?
10               (The referred-to document was
11                marked for identification
12                as Plaintiff's Exhibit No. 12.)
13   A.      Yes.
14   Q.      And this is your memo to the file
15           about the morning meeting; correct?
16   A.      Yes.
17   Q.      Is this your memo to the file about
18           the morning meeting?
19   A.      Yes.
20   Q.      Okay.  And in this memo toward --
21           about five lines up from the bottom,
22           it says (as read:) Ms. Jackson once
23           again called someone on her cell phone
```

BRET PAULK -- June 18th, 2008

```
 1       and left the office without my
 2       knowledge.
 3                   Is that right?
 4  A.   Yes.
 5  Q.   Okay.  Do you know -- are you certain
 6       that she called somebody once again on
 7       her cell phone?
 8  A.   Yes.
 9  Q.   Okay.  So she --
10  A.   Because about midway up it says that
11       she called Mr. Boone in Montgomery --
12  Q.   Right.
13  A.   -- and left him a message --
14  Q.   So as far as you can --
15  A.   -- then asked me if Mr. Malone was at
16       work.
17  Q.   Okay.  So she made two -- two outgoing
18       phone calls from her cell phone during
19       the meeting with you?
20  A.   She -- she -- I mean, that's what I'm
21       observing.  She -- she might have been
22       checking her voice mail.  She could
23       have been doing anything.  But she had
```

BRET PAULK -- June 18th, 2008

| | |
|---|---|
| 1 | that phone up to her ear.  I don't |
| 2 | know if she called somebody or |
| 3 | somebody called her. |
| 4 | Q.  Okay.  So when you say in this memo -- |
| 5 | A.  She was on the phone doing something |
| 6 | instead of in our meeting. |
| 7 | Q.  Right.  But where you say in this |
| 8 | memo, Ms. Jackson once again called |
| 9 | someone on her cell phone, you're not |
| 10 | really sure that that's true? |
| 11 | A.  Well, I mean, this -- I feel like this |
| 12 | would probably be more accurate than |
| 13 | my memory. |
| 14 | Q.  Okay.  So then you think it's accurate |
| 15 | that she probably called two people |
| 16 | from her cell phone during the |
| 17 | meeting? |
| 18 | A.  Sure.  Yes. |
| 19 | Q.  Okay.  And then the second to the last |
| 20 | sentence says (as read:) I called |
| 21 | Ms. Jackson on her cell phone and left |
| 22 | her a message saying that I needed to |
| 23 | speak to her again before her class |

BRET PAULK -- June 18th, 2008

```
 1         started.
 2   A.    Uh-huh.
 3   Q.    What -- what was the reason that you
 4         needed to speak to her again before
 5         class started?
 6   A.    Probably to continue our conversation
 7         that she walked out on.
 8   Q.    Okay.  So you were still wanting to
 9         talk to her more about signing the
10         memo?
11   A.    Yeah.
12   Q.    Okay.  What else did you have to say
13         to her about it at that time?
14   A.    Trying to see if she wanted to sign
15         the thing.  I mean, basically in the
16         middle of our meeting, all this phone
17         conversation started going on where
18         she was wanting to talk on the phone
19         or -- and -- and she left, and that
20         was the end of it.
21   Q.    So she leaves your office, possibly in
22         tears as you testified to earlier, and
23         you call her because you want to keep
```

BRET PAULK -- June 18th, 2008

```
 1            talking to her about the memo?
 2  A.   I mean, you asked me what I called her
 3       about, what I wanted to speak to her
 4       about, and that's a possibility of
 5       what I wanted to speak to her about.
 6  Q.   So you don't remember exactly right
 7       now?
 8  A.   No.  And this memo don't say anything
 9       about why I wanted to talk to her, so
10       that's not going to jog my memory
11       about it.
12  Q.   All right.  About 10 lines from the
13       top, you say (as read:) I asked
14       Ms. Jackson if she needed more time to
15       read the policy and told her that
16       signing this document does not mean
17       that she agreed with it.
18                    Is that right?
19  A.   Uh-huh.
20  Q.   Did she say that she needed more time
21       to read the policy at that point?
22  A.   I don't -- I don't know.  She -- she
23       said that she wasn't going to sign it
```

```
1          at that point.

2     Q.   Okay.  Now, you say in here that she

3          asked you if Leon Malone was at work,

4          and you told her that he wouldn't be

5          there until 8; right?

6     A.   (Nods head.)

7     Q.   Okay.  Did she tell you at any point

8          that she wanted to go and talk to him,

9          or did she just ask if he was in?

10    A.   I don't know.  She might have just

11         asked if he was in.

12    Q.   Okay.

13    A.   But, I mean, I probably would have

14         assumed at the time that she wanted to

15         go speak with somebody, but I mean, he

16         wasn't at work yet.

17    Q.   Okay.  When she got up and left --

18         when she got up and left your office,

19         she had -- she had to go physically

20         open the door; right, to get out of

21         your office?

22    A.   Uh-huh.

23    Q.   Is that right?
```

```
 1   A.      Yes.

 2   Q.      Okay.  Did you ask her to come back in

 3           at that time?

 4   A.      I think she was on the phone when she

 5           walked out.

 6   Q.      Okay.  Did you ask her to come back

 7           in?

 8   A.      Yeah.

 9   Q.      Okay.  Did you ask her to hang up the

10           phone?

11   A.      Yes.  I mean, if you're in a

12           meeting -- say right now I started

13           talking on my cell phone, I

14           mean that's -- that's common sense.  I

15           know that you probably want me to get

16           off the phone; right, and continue

17           this meeting?  That's kind of what

18           took place that morning.

19   Q.      Okay.  Did you ever ask her to hang up

20           her phone?

21   A.      Yeah, I think I did.  I mean, I --

22   Q.      Does it say in there that you ever

23           asked her that?
```

```
1    A.      I don't know.  I haven't read the

2            whole thing.

3    Q.      Go ahead and read it and tell me if it

4            says it in there, that you asked her

5            to get off the phone.

6    A.      (Witness reviewing document.)

7                        All right.  (As read:)

8            Ms. Jackson once again called someone

9            on her cell phone and left my office

10           without my knowledge at approximately

11           7:30.

12                        She walked out of the

13           meeting of our office -- my office on

14           the phone.  All right.  She was

15           walking around on the other end of the

16           office, back in Chris Burdette's

17           office, and I saw her leave out of

18           that door at around 7:30.  So no, I

19           didn't have a chance to say, you know,

20           where are you going; stop.  I walk

21           out, and I see her heading up to

22           division office.

23    Q.      When she got up to leave your office
```

BRET PAULK -- June 18th, 2008

```
 1          and open the door, did she do that for
 2          the purpose of continuing her phone
 3          conversation --
 4    A.    Yeah.
 5    Q.    -- or did she do that because your
 6          meeting was over?
 7    A.    No.  For the purpose of continuing her
 8          phone conversation.
 9    Q.    Did you give her permission to do
10          that?
11    A.    No.
12    Q.    Did you tell her she couldn't do that?
13    A.    I didn't give her permission to leave.
14    Q.    Did you tell her she couldn't do that?
15    A.    No.  But I mean, you -- you can't just
16          leave and -- and go off.
17    Q.    Right.  You had already given her to
18          the end of the day to sign the memo;
19          right?
20    A.    Yeah.
21    Q.    And that was the issue that you guys
22          were discussing was, you know, you
23          were telling her she needed to sign
```

```
1            it, and she essentially didn't want
2            to; right?
3    A.      Yes.  She said she wasn't going to.
4    Q.      Okay.  So then you gave her some
5            closure, saying, you've got to sign by
6            the end of the day, and that was it;
7            right?
8    A.      I think so.
9    Q.      Okay.  Was there anything more to
10           discuss about the memo with her after
11           you gave her that ultimatum?
12   A.      Maybe find out where she went.
13   Q.      No.  I asked you was there anything
14           more to discuss about the memo after
15           you gave her that ultimatum.
16   A.      About what memo?
17   Q.      About the taping -- taping policy?
18   A.      The policy?  I'm not sure.  I mean,
19           there might have been at that point in
20           time.
21   Q.      If there was, you don't remember what
22           it is right now?
23   A.      No.  I think I, more than anything,
```

BRET PAULK -- June 18th, 2008

```
 1          just wanted to know why she left
 2          and -- and where she was going.
 3    Q.    But she had a class to go to; right?
 4    A.    Right.  But like this says, she
 5          stormed out at about 7:30, which is
 6          not what time class is.
 7    Q.    Okay.  But that is the time that the
 8          registration for the class started;
 9          right?
10    A.    I don't know.  I would have to go back
11          and look.  I mean, if you're going to
12          show me that the class registration
13          started at 7:30, I'll take your word
14          for it.
15    Q.    Okay.  Well, you don't have to take my
16          word for it because you can look at
17          the memo.
18              (The referred-to document was
19               marked for identification
20               as Plaintiff's Exhibit No. 13.)
21    A.    Okay.
22    Q.    Okay.  So she was -- she was perfectly
23          reasonable in leaving your office at
```

```
1          that point in time to -- in leaving
2          your office, because that's when the
3          registration started; right?
4    A.    Not like --
5                MR. REDD:  Object to the form.
6    A.    Not the way she went about leaving.
7    Q.    Not the way she went about leaving?
8          Okay.  Do you think it would be
9          unreasonable for her to leave like
10         that because she was upset and in
11         tears?
12   A.    Repeat the question.
13   Q.    Okay.  You testified earlier that she
14         may have been in tears at the time she
15         left your office; right?
16   A.    Well, she was on the phone, I mean, on
17         the other end of the office at this
18         point when she left.  I -- I don't
19         know --
20   Q.    Okay.  I think we're getting confused
21         about what leaving the office --
22         you're talking about when she actually
23         physically walked out of the trailer?
```

BRET PAULK -- June 18th, 2008

```
 1   A.    Yes, that's what I'm exactly talking
 2         about.
 3   Q.    Okay.  So your objection was not to
 4         her getting up and opening the door
 5         and leaving your office; right?
 6   A.    No.  Well, I mean, it wasn't very
 7         appropriate when we're in the middle
 8         of a meeting taking a cell phone call,
 9         you know.  But we never did, I feel
10         like, get a closure on that meeting
11         before she left.
12   Q.    Okay.  Even though you told her she
13         had until the end of the day to sign
14         the policy?
15   A.    Yes.
16   Q.    So the next conversation that you had
17         with Ms. Jackson about that -- I keep
18         calling it the memo; it's really the
19         taping policy -- on January 5th was
20         the meeting in the office of
21         Mr. Malone at about 3:15; right?
22   A.    Right.
23   Q.    And I've marked as Exhibit 14 what I
```

BRET PAULK -- June 18th, 2008

```
1          think is your memo about that meeting;
2          is that right?
3                  (The referred-to document was
4                   marked for identification
5                   as Plaintiff's Exhibit No. 14.)
6    A.    Yes.
7    Q.    Ms. Jackson came back to your office
8          first at that time; right?
9    A.    Uh-huh, yes.
10   Q.    Okay.  And she invited you to go talk
11         with Mr. Fresolone about the policy
12         with her; correct?
13                 (Off-the-Record discussion.)
14                  MR. REDD:  That's a strange
15                   choice of words, invited,
16                   but I don't have an
17                   objection to it.
18   A.    She stated that she talked to Joey
19         Fresolone on the phone and that she
20         was going to wait until the 16th to
21         sign it.  Well, that was my deadline
22         to turn it in.  And I'm trying to read
23         where you're saying that she invited
```

BRET PAULK -- June 18th, 2008

```
 1        me to go --
 2   Q.   Read the next sentence (as read:) She
 3        stated if I would like to go to talk
 4        to Mr. Fresolone, that we could meet
 5        him in his office.
 6                      And you stated that would
 7        be fine.
 8   A.   Okay.
 9   Q.   Okay.  So you agreed that it would be
10        appropriate to go talk to
11        Mr. Fresolone at that time; right?
12   A.   Uh-huh.
13   Q.   Is that right?
14   A.   Yes.
15   Q.   You didn't have any objection to going
16        to talk to Mr. Fresolone?
17   A.   No.
18   Q.   Earlier I had asked you some questions
19        about Ms. Jackson's allegations during
20        the meeting that she thought that you
21        were discriminating against her
22        because she was female.
23                      If you look at Page 2,
```

1       right in the middle of the page there,

2       it says (as read:) Ms. Jackson also

3       stated that she felt threatened and

4       that I had harassed and discriminated

5       against her due to the fact that she

6       was female.

7                    Does that refresh your

8       memory about her saying that now?

9   A.  Uh-huh.  I never said that she didn't

10      say it.

11  Q.  I know.  I'm just making sure that

12      this is an accurate description of the

13      conversation.

14                   What was the discussion

15      about -- about that?  Was there more

16      discussion about why she thought you

17      were discriminating against her as a

18      female?

19  A.  I don't recall.  If it's not here,

20      then I don't guess it was.  If we went

21      in depth on why I was discriminating

22      against her, I'm not sure.

23  Q.  Okay.  I want to show you what I have

```
 1        marked as Exhibit 15 to your
 2        deposition.  Just so we have that on
 3        the record, is that the reprimand that
 4        you gave Ms. Jackson?
 5              (The referred-to document was
 6               marked for identification
 7               as Plaintiff's Exhibit No. 15.)
 8    A.  Yes.
 9    Q.  And you copied Jeanette Brown and
10        Vince Calametti on it; correct?
11    A.  Yes, sir.
12    Q.  Okay.  Do you know if Mr. Palmer also
13        saw this reprimand before you gave it
14        to Ms. Jackson?
15    A.  I think he did.
16    Q.  Okay.  And basically --
17    A.  I'm -- yeah, he -- he did.
18    Q.  He did see it?
19    A.  (Nods head.)
20    Q.  Okay.  Did he approve it before you
21        gave it to her?
22    A.  Yes.  I mean, after all that -- you
23        know, after that day, everybody --
```

```
 1        we -- we mentioned, I guess, touched
 2        on earlier about how we all met, and I
 3        basically gathered all the facts
 4        together.  And since I was her direct
 5        supervisor, that was my job to issue
 6        this letter of reprimand.
 7   Q.   What was the purpose for gathering all
 8        those facts?
 9   A.   Because there was so many people
10        involved.
11   Q.   What was the -- what did you think the
12        outcome of gathering all those facts
13        was going to be?
14   A.   I wasn't in charge of the operation.
15        I just -- you know, these are my
16        bosses telling me, hey, we need to --
17        everybody from Leon Malone and me,
18        myself, and Charly Jones and Joey
19        Fresolone -- I mean, there was four or
20        five people involved in there.
21   Q.   All right.  But at some point you
22        figured out that they wanted you to
23        gather all of these facts so you could
```

BRET PAULK -- June 18th, 2008

```
 1        issue her a reprimand; right?
 2  A.    Yes.
 3  Q.    Okay.
 4  A.    I thought that was -- you know,
 5        everybody talked about it, what
 6        happened that day, all the -- you
 7        know, that whole chain of events that
 8        happened that day --
 9  Q.    Uh-huh.
10  A.    -- and what would be the course of
11        disciplinary action taken that would
12        best be --
13  Q.    So everybody -- everybody knew pretty
14        early on that they wanted to take some
15        kind of disciplinary action for what
16        happened on January 5th; right?
17  A.    Yes.
18  Q.    Okay.  And so far as you know, nobody
19        ever talked about terminating her for
20        January 5th; right?
21  A.    No.
22  Q.    Was Ms. Jackson insubordinate on
23        January 5th?
```

1   A.      Her demeanor --

2   Q.      Okay.

3   A.      -- was insubordinate, yes.

4   Q.      Okay.  What was it about her demeanor

5           that was insubordinate?

6   A.      Her disruptive behavior.

7   Q.      What, to your understanding,

8           constitutes insubordination?  What

9           does that word mean?

10  A.      Basically refusing to, in this case,

11          sign a policy that everybody else had

12          to sign --

13  Q.      Okay.

14  A.      -- and the whole demeanor, her

15          attitude, you know, everything that

16          happened that day, all the meetings,

17          basically her -- her conduct in the

18          office that morning, stating that, you

19          know, she wasn't going to sign it.

20          And it took until the end of that day,

21          I think.  We were meeting even after

22          hours, I know after we were supposed

23          to get off, until finally Joey finally

```
 1            got her to sign.
 2    Q.      How did he do that?
 3    A.      After a day's worth of meetings and
 4            talking with her, I believe, a couple
 5            times and then that afternoon, that
 6            meeting, finally she was -- I remember
 7            she was upset, and finally it got
 8            turned around to where she was upset
 9            with me more than anything and that
10            she didn't have a problem with the
11            policy, which totally went against
12            what she stated earlier in the day.
13            So she signed the policy.
14    Q.      And that was at the end of the day
15            when she realized that she didn't have
16            a problem with the policy?
17    A.      Yes.
18    Q.      And that was after people had been
19            talking to her about it and explaining
20            it to her?
21    A.      Uh-huh.
22    Q.      Was she insubordinate during that last
23            meeting that you had in Fresolone's
```

```
 1        office?
 2   A.   Basically I was observing most of that
 3        meeting.
 4   Q.   Okay.  Was she insubordinate during
 5        that meeting?
 6   A.   But, I mean, you could read through it
 7        and -- and depending on who you ask,
 8        maybe -- but I think the end result
 9        was, yes, she signed the -- she signed
10        the document --
11   Q.   Right.  But was she insubordinate
12        during that meeting?
13   A.   To a point, yes.  I mean, if you ask
14        me, if you're my supervisor,
15        seven hours out of the day to do
16        something and I don't do it, and at
17        the end of the day it gets done, am I
18        insubordinate or not?  I mean, my
19        attitude, yeah.  And at the time, when
20        I ask you to -- or when you asked me
21        to do something and I didn't do it, I
22        was insubordinate.  But the end
23        result, say 5 o'clock, I get it done,
```

BRET PAULK -- June 18th, 2008

```
1          I mean, that's just a kind of a tough
2          question to answer.
3    Q.    I mean, you're the one who issued the
4          written reprimand saying she was
5          insubordinate; right?
6    A.    Yes.
7    Q.    Okay.
8    A.    And I felt like and everybody else
9          felt like her demeanor was
10         insubordinate that day.
11   Q.    Okay.  Was she insubordinate during
12         the meeting, that last meeting in
13         Mr. Fresolone's office?
14              MR. REDD:  I think he answered
15                   that already.
16                   Exceptional
17                   circumstances.
18              MR. SIMON:  Okay.
19   Q.    To what extent was she insubordinate
20         in Mr. Fresolone's office?
21   A.    Well, the meeting lasted a couple
22         hours, an hour and a half, and she
23         signed it, and the meeting was over.
```

```
 1            I mean, if -- to a certain extent, I
 2            guess it would be the first hour we
 3            met.
 4   Q.   The first hour you met?
 5   A.   When he was requesting that she sign
 6            this document that everybody else in
 7            the whole division had to sign.
 8   Q.   So that last meeting in
 9            Mr. Fresolone's office lasted an hour?
10   A.   I'm using that as an example.  I don't
11            know.
12   Q.   You don't know how long it lasted?
13   A.   I don't remember.  It might say -- we
14            went to Joey's office, say, shortly
15            after she came back to my office at
16            3:30, say -- and it doesn't say what
17            time the meeting ended.
18   Q.   Okay.  So --
19   A.   But, you know, from what I recall, it
20            lasted at least an hour, hour and a
21            half.
22   Q.   Okay.  And that was the meeting that
23            Gwenda Hunter and Leon Malone were
```

BRET PAULK -- June 18th, 2008

```
1        also in?
2   A.   Yeah.
3   Q.   Was it insubordinate of Ms. Jackson to
4        go and talk to Mr. Fresolone that
5        morning?
6   A.   I feel that that probably wasn't
7        insubordinate for her to go and talk
8        to Joey.
9   Q.   It was -- it was not insubordinate or
10       it was?
11  A.   I don't think that it probably was.
12       But you've got to take into account
13       that whole day.  You're trying to
14       break it down into each individual
15       encounter, and you've got to take into
16       account that whole day.  We -- we met
17       and decided on two weeks on this, we
18       decided on, and the course of action
19       that took place that whole day
20       resulted in this letter.
21  Q.   I understand that, and in the letter
22       you say she was insubordinate, and I'm
23       trying to figure out why you say she
```

BRET PAULK -- June 18th, 2008

```
 1          was insubordinate.
 2    A.    Well, I mean, everybody felt that way.
 3    Q.    And I understand that.  But I still
 4          didn't understand the answer to the
 5          question, was going to talk to
 6          Mr. Fresolone insubordinate?
 7    A.    I don't think it was insubordinate,
 8          because I never said, you know, don't
 9          go talk to Joey Fresolone.
10    Q.    Okay.  So insubordination is something
11          where you refuse to follow a direct
12          command --
13                   MR. REDD:  Objection to the
14                      form.
15    Q.    -- is that correct?
16    A.    I mean, I feel like -- insubordination
17          through her demeanor that day was --
18          you know, I -- if you said that
19          individual event, if I was to say to
20          her -- which I never received a chance
21          to because she left her work station,
22          which is a whole different issue, how
23          she did that.  But I had no idea she
```

```
 1              was even going to see Joey.  But her
 2              going normal -- under normal
 3              circumstances, if she wanted to go see
 4              Joey, there's not a problem with that.
 5    Q.        Okay.  So her actually going to see
 6              Joey Fresolone that morning you don't
 7              think was insubordinate?
 8    A.        Huh-uh.
 9    Q.        But her leaving the building was
10              insubordinate?
11    A.        I felt like that was leaving her work
12              station at the time.
13    Q.        Okay.  So that -- that wasn't an act
14              of insubordination --
15    A.        Until I found out, you know, after
16              everything that happened that morning,
17              and then also it kind of fit in the
18              time frame with her concrete class.
19    Q.        Was it insubordinate for her to ask to
20              call her lawyer during the meeting in
21              the morning with you?
22    A.        I don't -- I don't guess that would be
23              insubordinate.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    Was it insubordinate of her to take a
 2         call on her cell phone during a
 3         meeting?
 4   A.    I felt like it was inappropriate.
 5   Q.    Inappropriate, but not necessarily
 6         insubordinate?
 7   A.    I think you can break this down
 8         however you want to.
 9   Q.    That's what I'm trying to do.
10   A.    And you can't do that.
11               (Off-the-Record discussion.)
12   Q.    Your contention that she was
13         insubordinate was based on your
14         feeling about her, the way she
15         conducted herself over the whole
16         course of the day; is that right?
17   A.    Yes.  Her conduct that day and
18         refusing to sign it several hundred
19         times.
20   Q.    Okay.  And you would agree with me
21         that Ms. Jackson did a lot of things
22         on January 5th that were not
23         insubordinate; right?
```

|    |    |    |
|----|----|----|
| 1  | A. | No.  I mean -- |
| 2  | Q. | She went to her concrete class and -- |
| 3  | A. | -- half the day -- half the day she |
| 4  |    | wasn't even around.  She was in her |
| 5  |    | concrete class. |
| 6  | Q. | Yeah. |
| 7  | A. | Mainly that morning her disruptive |
| 8  |    | behavior in the office -- trailer, |
| 9  |    | disrupting other people from work, |
| 10 |    | refusing to sign this policy, I would |
| 11 |    | say, yes, was definitely insubordinate |
| 12 |    | behavior. |
| 13 | Q. | Okay.  So those were insubordinate. |
| 14 |    | What about in the afternoon?  Was she |
| 15 |    | insubordinate during the meeting in |
| 16 |    | Mr. Fresolone's office? |
| 17 | A. | She ended up signing it.  I mean -- |
| 18 | Q. | Okay.  To what extent was she |
| 19 |    | insubordinate during the meeting -- |
| 20 | A. | I don't know how to answer that |
| 21 |    | question. |
| 22 | Q. | Okay.  Was she insubordinate when she |
| 23 |    | wanted a witness to be in there with |

BRET PAULK -- June 18th, 2008

```
 1        her?
 2   A.   No.  Nobody had a problem with her
 3        having a witness.
 4   Q.   Okay.  Was she insubordinate --
 5   A.   She was insubordinate when it took
 6        Joey Fresolone an hour and a half to
 7        get her to sign that policy.
 8   Q.   So now the meeting took on hour and a
 9        half?
10   A.   I'm using that as an example.  I don't
11        know exactly how long it took.  I
12        mean, do you know, so I can say the
13        correct time from now on?
14   Q.   You can't ask questions during the
15        deposition.  I'm the one asking
16        questions.
17   A.   Okay.
18   Q.   Was she insubordinate when she said in
19        Mr. Fresolone's office that the policy
20        is illegal?
21   A.   As a reason, you know, to not sign
22        that, yes, that was insubordinate to
23        Joey.
```

```
1   Q.    Okay.  Was it insubordinate --

2   A.    After -- after Leon Malone -- I'm

3         sorry to cut you off.  But after Leon

4         Malone was sitting there and the EEO

5         explained to her that this policy was

6         legal, you know, this was a perfectly

7         legal document; you're not signing

8         anything that is illegal.  And she

9         still said that she -- you know, this

10        is illegal; I'm not signing it.

11  Q.    Is Mr. Malone a lawyer?

12  A.    No.

13  Q.    Okay.  He works for the DOT; right?

14  A.    Yes.

15  Q.    He's the EEO officer?

16  A.    Yes.

17  Q.    Was -- was it insubordinate of

18        Ms. Jackson to say that she thought

19        you were forcing her into positive

20        progressive discipline and that you

21        wanted her dismissed from ALDOT?

22  A.    Was that insubordinate, her stating

23        that?
```

```
 1   Q.    Right.  Was that insubordinate?

 2   A.    That's -- that's her opinion.

 3   Q.    Was it insubordinate of her to state

 4         that at that time?

 5   A.    No.  I don't see why it would be.

 6   Q.    Okay.  Was it insubordinate of

 7         Ms. Jackson to say that she didn't

 8         understand the policy?

 9   A.    No, not at all.

10   Q.    And it wasn't insubordinate of her to

11         say that she needed a lawyer to read

12         over it; right?

13   A.    I mean, I don't -- that's fine.  And I

14         think they even explained to her at

15         that time that you can get all the

16         lawyers you want to read over this,

17         but we need your signature, you know.

18   Q.    Okay.  And it wasn't insubordinate

19         when she said that she felt threatened

20         and harassed by you, was it?

21   A.    No.  That's her opinion.

22   Q.    Okay.  And was it insubordinate of her

23         to express that opinion during that
```

BRET PAULK -- June 18th, 2008

```
 1        meeting?
 2   A.   To say that?
 3   Q.   Right.
 4   A.   To express and to state that?
 5   Q.   Yes.
 6   A.   No.
 7   Q.   And it wasn't insubordinate of her to
 8        say that she felt you discriminated
 9        against her, was it?
10   A.   Huh-uh.
11   Q.   I'm sorry.  Is that a no?
12   A.   No.
13   Q.   Was it insubordinate of Ms. Jackson to
14        say that she wanted to file a
15        complaint against you because of the
16        tone of your voice and how you treated
17        her that morning?
18   A.   No.
19   Q.   And Ms. Jackson actually signed the
20        policy after she met privately with
21        Gwenda Hunter; correct?
22   A.   Yes.
23   Q.   Did -- was January 5th also the day
```

1       that she gave you the first note about

2       her pregnancy?

3  A.    I don't recall.  No.  If that's the

4       day that the -- this took place, the

5       recording policy, I don't believe so.

6  Q.    Okay.  Do you know -- do you remember

7       whether she gave you that first

8       pregnancy note before or after the day

9       of this recording policy issue?

10  A.    I don't recall.

11  Q.    Did you know that Ms. Jackson is

12       related to Bertha Alexander?

13  A.    At the time, no.

14  Q.    Okay.  When did you learn that?

15  A.    I don't recall when I found out.

16  Q.    Okay.  How did you find out?

17  A.    Just through -- I think through

18       LaShundra stating that, that we were

19       retaliating against her because that

20       was her aunt or related to her or

21       something.

22  Q.    Okay.  When did -- when did she say

23       that?

```
 1   A.      I'm not sure.

 2   Q.      Was that before or after the incident

 3           on January 5th?

 4   A.      It was around then.  I mean, it might

 5           have been around the performance

 6           appraisal or that event, or maybe in

 7           her rebuttal for her reprimand.  I'm

 8           not sure.

 9   Q.      Okay.  Was Ms. Jackson the only person

10           that you ever gave a written reprimand

11           to at DOT?

12   A.      Yes.

13   Q.      Okay.  Did -- did anyone from ALDOT's

14           Human Resources Bureau contact you to

15           talk about Ms. Jackson's grievance?

16   A.      I don't recall.

17   Q.      Do you recall talking to a woman named

18           Sandy Deitz about it?

19   A.      I think she came down, but I don't

20           know when.

21   Q.      Okay.  Do you recall the conversation

22           that you had with her?

23   A.      I think it was about -- I think it was
```

```
 1            about the performance appraisal maybe.

 2    Q.      Did you meet with Ms. Deitz privately,

 3            or was there other people there?

 4    A.      There were other people there.  Vince

 5            Calametti and Jay Palmer were there.

 6    Q.      Okay.  So you all met together.  Was

 7            there anybody else there?

 8    A.      Not that I recall.

 9    Q.      Did the issue of Ms. Palmer -- did the

10            issue of Ms. Jackson being terminated

11            come up at any time during that

12            meeting with Ms. Deitz?

13    A.      I don't recall.

14    Q.      Is it possible that it did and you

15            just don't remember it?

16    A.      I don't think it did.

17    Q.      How long was that meeting with

18            Ms. Deitz?

19    A.      I don't remember.  Maybe 30 minutes.

20    Q.      Okay.  Did she explain to you then

21            that Ms. Jackson had filed a

22            grievance?

23    A.      I think so.
```

BRET PAULK -- June 18th, 2008

```
 1   Q.    Did she say what the grievance was
 2         about?
 3   A.    I don't -- I don't know if she did.  I
 4         don't recall what it was about.  I
 5         don't know.
 6   Q.    Did you ever see Ms. Deitz's
 7         investigative findings about the
 8         grievance?
 9   A.    No.
10   Q.    Did you play any part in preparing the
11         new Form 40 for her inside duties?
12   A.    No, sir.
13   Q.    Do you know who prepared that?
14   A.    I believe Tony Cooper along with Vince
15         Calametti.
16   Q.    I believe that's all I have.  Let's
17         take five minutes.
18               (Off-the-record discussion.)
19
20         (The deposition of BRET PAULK
21         concluded at approximately 5:47 p.m.,
22         on June 18th, 2008.)
23
```

BRET PAULK -- June 18th, 2008

1              *   *   *   *   *   *   *   *

2              R E P O R T E R ' S   C E R T I F I C A T E

3              *   *   *   *   *   *   *   *

4

5    STATE OF ALABAMA

6    COUNTY OF MONTGOMERY

7              I, Karen Reagan Drinkard,

8    AL-CCR #005, Certified Court Reporter

9    and Notary Public in and for the State

10   of Alabama at Large, do hereby certify

11   that on June 18th, 2008, pursuant to

12   notice and stipulation on behalf of

13   the Plaintiff, I reported the

14   deposition of **BRET PAULK**, who was

15   first duly sworn by me to speak the

16   truth, the whole truth, and nothing

17   but the truth, in the matter of

18   LASHUNDRA JACKSON, Plaintiff, versus

19   STATE OF ALABAMA DEPARTMENT OF

20   TRANSPORTATION, JOE McINNES, in his

21   official capacity as DIRECTOR OF THE

22   STATE OF ALABAMA DEPARTMENT OF

23   TRANSPORTATION, Defendants, Civil

1          Action Number 2:07-CV-645-MEF, now

2          pending in the United States District

3          Court for the Middle District of

4          Alabama, Northern Division; that the

5          foregoing 186 typewritten pages

6          contain a true and accurate

7          transcription of the examination of

8          said witness by counsel for the

9          parties set out herein; that the

10         reading and signing of said deposition

11         was waived by witness and counsel for

12         the parties.

13                   I further certify that I am

14         neither of kin nor of counsel to the

15         parties to said cause, nor in any

16         manner interested in the results

17         thereof.

18                   This 21st day of June, 2008

19

20                   _____

21         Karen Reagan Drinkard, ACCR #005
           Reporter and Notary Public

22         State of Alabama at Large

23

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF ALABAMA
2                  NORTHERN DIVISION

3

      LASHUNDRA
4     JACKSON,

5             Plaintiff,
                          CIVIL ACTION NO.
6     vs.                 2:07-CV-645-MEF

7     STATE OF ALABAMA
      DEPARTMENT OF
8     TRANSPORTATION,
      JOE McINNES, in
9     his official
      capacity as
10    DIRECTOR OF THE
      STATE OF ALABAMA
11    DEPARTMENT OF
      TRANSPORTATION,
12
              Defendants.
13

14          *     *     *     *     *     *

15

16          **DEPOSITION OF JAY PALMER,**

17    taken pursuant to notice and
      stipulation on behalf of the
18    Plaintiff, in the Ninth Division
      Office of the Alabama Department of
19    Transportation, 1701 I-65 West Service
      Road North, Mobile, Alabama, before
20    Karen Reagan Drinkard, AL-CCR #005,
      Certified Court Reporter and Notary
21    Public in and for the State of Alabama
      at Large, on June 19th, 2008,
22    commencing at 8:32 a.m.

23

1                    A P P E A R A N C E S

2

3

4        FOR THE PLAINTIFF:

5

6                    **KELL A. SIMON, ESQUIRE**

7                    Ross, Melton, PC

8                    Attorneys at Law

9                    1104 San Antonio Street

10                   Austin, Texas 78701

11

12

13       FOR THE DEFENDANTS:

14

15                   **ANDREW REDD, ESQUIRE**

16                             and

17                   **JASON A. TRIPPE, ESQUIRE**

18                   State of Alabama Department of

19                        Transportation

20                   1409 Coliseum Boulevard

21                   Montgomery, Alabama 36110

22

23

<pre>
 1

 2                    S T I P U L A T I O N S

 3

 4              It is stipulated and agreed

 5        by and between counsel representing

 6        the parties that the deposition of **JAY**

 7        **PALMER** may be taken before Karen

 8        Reagan Drinkard, AL-CCR #005,

 9        Certified Court Reporter and Notary

10        Public in and for the State of Alabama

11        at Large, without the formality of a

12        commission; and all formality with

13        respect to other procedural

14        requirements is waived; that

15        objections to questions, other than

16        objections as to the form of the

17        questions need not be made at this

18        time, but may be reserved for a ruling

19        at such time as the deposition may be

20        offered in evidence or used for any

21        other purpose by either party as

22        provided by the Federal Rules of Civil

23        Procedure.
</pre>

1            It is further stipulated and

2       agreed by and between the parties

3       hereto and the witness, that the

4       signature of the witness to this

5       deposition is hereby waived.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                              INDEX

2

3       **EXAMINATION**                                **Page**

4         MR. SIMON........................  7

5

6

7       **EXHIBITS**                                   **Page**

8

        PX-16   E-mail chain between          27
9               Jeanette Brown and Debra
                Hadley, cc'g others,
10              10/19/06

11      PX-17   Document entitled             43
                "Relatives Employed with
12              the Department of
                Transportation", signed
13              7/3/06

14      PX-18   ALDOT Complaint Form,         72
                date submitted 10/16/06
15
        PX-19   Investigative                 88
16              Determination Re:
                LaShundra Jackson,
17              Docket # DOT146, 2/14/07

18      PX-20   Memo to File from Joe         95
                Fresolone, 1/9/07
19
        PX-21   Form 40 Position              113
20              Classification
                Questionnaire, signed by
21              Appointment Authority
                3/5/07

22

23

1

2          PX-22    Letter to Vince              126
                    Calametti from Jay
3                   Palmer, 2/22/07

4          PX-23    Affidavit of Samuel J.       133
                    (Jay) Palmer, Jr.,
5                   signed 5/27/08

6          PX-24    E-mail between Nita          160
                    Jernigan and Debra
7                   Hadley Re: Concrete Test
                    Results, 2/22/07
8
           PX-25    Document Entitled            161
9                   "Decision on
                    Unemployment
10                  Compensation Claim",
                    hearing date 6/5/07
11

12

13

14         (The following exhibits were
           previously marked in this case and
15         referred to at the following pages:)

16

17

18         PX-2.............................. 97

19         PX-4..............................166

20         PX-5..............................128

21         PX-6.............................. 16

22         PX-8.............................. 47

23

1        PX-9...........................155

2        PX-10..........................145

3        PX-11..........................111

4        PX-14.......................... 68

5        PX-15.......................... 49

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

JAY PALMER -- June 19th, 2008

```
 1                    JAY PALMER, of lawful

 2      age, having first been duly sworn,

 3      testified as follows:

 4

 5                    EXAMINATION

 6      BY MR. SIMON:

 7  Q.  Could you state your full name for the

 8      record, please?

 9  A.  Samuel Jason Palmer, Jr.

10  Q.  And what's your position here,

11      Mr. Palmer?

12  A.  I'm the district engineer here in

13      Mobile.

14  Q.  Okay.  We met before.  My name's Kell

15      Simon, and I represent LaShundra

16      Jackson in her lawsuit again the DOT.

17                    What did you do to get

18      ready for your deposition?

19  A.  I met with Mr. -- Mr. Redd, Monday.

20  Q.  You met with him just one time?

21  A.  We met previously two, three weeks ago

22      prior to that.

23  Q.  Okay.  And how long was your meeting
```

JAY PALMER -- June 19th, 2008

```
 1        two or three weeks ago?
 2   A.   I can't recall.
 3   Q.   How about Monday?  How long did you
 4        meet for on Monday?
 5   A.   30 minutes at most.
 6   Q.   Have you reviewed any documents to
 7        prepare for your deposition?
 8   A.   I think we looked at some Monday.
 9   Q.   All right.  What were they?
10   A.   I don't recall them.
11   Q.   Were they documents that you had
12        written?
13   A.   Yes.
14   Q.   When did you first meet LaShundra
15        Jackson?
16   A.   I don't recall the date.  It was when
17        she was hired.
18   Q.   Okay.  And you were the district
19        engineer at that time?
20   A.   That's correct.
21   Q.   What position was she hired into?
22   A.   She was hired as an Engineer
23        Assistant I.
```

JAY PALMER -- June 19th, 2008                    10

```
 1   Q.    And who was she assigned to work

 2         under?

 3   A.    I believe it was Austin Harville.

 4   Q.    And he was a project engineer; is that

 5         right?

 6   A.    That's correct.

 7   Q.    And he left the Department at some

 8         point; is that correct?

 9   A.    Yes.

10   Q.    And was Ms. Jackson reassigned at that

11         time?

12   A.    Yes.

13   Q.    Okay.  And who was her new supervisor?

14   A.    Bret Paulk.

15   Q.    And Mr. Paulk was also a project

16         engineer; correct?

17               (Off-the-record Discussion.)

18   A.    Yes.

19   Q.    And had Mr. Paulk taken Mr. Harville's

20         place?

21   A.    That's correct.

22   Q.    When Mr. Paulk became the project

23         engineer, did Ms. Jackson continue
```

JAY PALMER -- June 19th, 2008

```
 1           doing the same duties that she was
 2           doing when she was under Mr. Harville?
 3      A.   I believe so.
 4      Q.   How often did you see Ms. Jackson
 5           performing her engineering assistant
 6           duties?
 7      A.   Rarely.
 8      Q.   You say rarely.  Do you recall any
 9           occasion when you actually saw her
10           working?
11      A.   Yes.
12      Q.   Okay.  What occasions do you recall
13           when you actually saw her working?
14      A.   She was out on the Natchez Road
15           project.
16      Q.   When was that?
17      A.   I don't know the specific date.
18      Q.   What had you gone out there for?
19      A.   Just to review the project, the
20           process, and the -- where the status
21           of it was.
22      Q.   Okay.  And what was -- what was
23           Ms. Jackson doing on the project that
```

```
 1        day?

 2   A.   I don't recall.

 3   Q.   Did you have any problem with how she

 4        was doing her job that day?

 5   A.   I wasn't aware of any problems.

 6   Q.   Do you recall approximately what

 7        season that was in?  Was it in the

 8        fall, the winter, or the spring?

 9   A.   It was probably late summer, early

10        fall maybe.

11   Q.   Of 2006?

12   A.   I'd -- I don't know.  I believe so.

13   Q.   It was about right after she started

14        working?

15   A.   Yes, uh-huh.

16   Q.   Apart from that time, did you ever

17        observe Ms. Jackson doing her job on

18        any other occasion?

19   A.   Doing what?

20   Q.   Doing her job.

21   A.   Yes.

22   Q.   When was that?

23   A.   Another project, Coleman Dairy Road
```

```
 1        project.
 2                (Off-the-record Discussion.)
 3   Q.   How do you spell that?
 4                (Off-the-record Discussion.)
 5   A.   C-O-L-E-M-A-N, D-A-I-R-Y, Road.
 6   Q.   And approximately what time frame was
 7        that?
 8   A.   Oh, I don't know.  I can't recall.
 9   Q.   Okay.  What was she doing out there
10        that day?
11   A.   I believe they were taking some
12        elevations.
13   Q.   And what had you gone out there for?
14   A.   They had a conflict with a junction
15        box grade.
16   Q.   Who is they?
17   A.   Bret Paulk, Andy Hoppes.
18   Q.   Okay.  So you didn't go out there for
19        anything relating to Ms. Jackson?
20   A.   No.
21   Q.   And did you observe her doing her work
22        that day?
23   A.   No.
```

```
 1   Q.    All right.  But you did see her out

 2         there on the project?

 3   A.    Yes, correct.

 4   Q.    Did she seem to be doing her work and

 5         doing it well?

 6   A.    When I was out there, they were

 7         waiting for me to -- to make it out on

 8         the job site to take a look at this.

 9   Q.    All right.  Did --

10   A.    So they weren't really doing anything

11         but waiting for me to take a look at

12         this junction box.

13   Q.    Okay.  Was she in -- was she involved

14         in that situation with the junction

15         box?

16   A.    I believe she was helping Mr. Hoppes

17         with the elevations, shooting grades.

18   Q.    Okay.  Okay.  Were there any other

19         times when you had occasion to see

20         Ms. Jackson doing her -- doing her

21         work?

22   A.    I don't recall any.

23   Q.    Who gave Ms. Jackson her performance
```

```
 1          rating scores on her first performance
 2          appraisal?
 3   A.     Mr. Paulk.
 4   Q.     Did you guys meet to discuss what
 5          those scores were going to be?
 6   A.     Yes.
 7   Q.     Did you discuss scores for all the EAs
 8          that he was rating at the time?
 9   A.     I may have not; I may have.  I don't
10          know.
11   Q.     Okay.
12   A.     If I was available, yes, we would; if
13          not, then no.
14   Q.     So you guys met especially to discuss
15          Ms. Jackson's scores?
16   A.     No.  She was just due for appraisal.
17   Q.     Okay.  So what was the -- where was
18          that meeting held, you and Mr. Paulk
19          talking about her scores?
20   A.     I don't recall.
21   Q.     Let's take a look at that appraisal.
22          It's been marked as Exhibit 6.  Do you
23          recognize that document?
```

```
 1                 (Plaintiff's Exhibit 6 was
 2                  previously marked and is
 3                  not attached hereto.)
 4    A.    Yes.
 5    Q.    Okay.  And are those your initials
 6          next to Mr. Paulk's?
 7    A.    It is.
 8    Q.    And Ms. Jackson's work was rated as
 9          meeting standards on this appraisal;
10          is that correct?
11    A.    That's right.
12    Q.    And she was rated as being
13          satisfactory in all her work habits?
14          The work habits are on the first page.
15    A.    (Witness reviewing document.)
16                    Yes.
17    Q.    Okay.  So she was satisfactory in her
18          compliance with ALDOT's rules?
19              (Off-the-record Discussion.)
20    A.    As far as attendance, punctuality,
21          cooperation with co-workers,
22          compliance with rules, she was more
23          than satisfactory.
```

```
1   Q.      Okay.  So at that time, you guys felt
2           that Ms. Jackson has -- had complied
3           with ALDOT's rules enough to get a
4           satisfactory rating on this appraisal?
5   A.      Based on Mr. Paulk, yes.
6   Q.      So did Mr. Paulk say what ratings he
7           thought she should get, and then he
8           ran those by you?
9   A.      We reviewed the items,
10          responsibilities and the ratings.
11  Q.      Who determined that she should be
12          rated as satisfactory and in
13          compliance with the rules?
14  A.      That would be Mr. Paulk.
15  Q.      And by signing off on this performance
16          appraisal, putting your initials next
17          to his, are you saying that you agree
18          with that rating?
19  A.      No.
20  Q.      Did you disagree with it?
21  A.      No.
22  Q.      And did Mr. Paulk determine the
23          numerical ratings that Ms. Jackson
```

JAY PALMER -- June 19th, 2008

```
 1          would get on Page 2 of the appraisal?

 2  A.      Yes.

 3  Q.      Do you know why -- Ms. Jackson didn't

 4          draw or plot anything; is that right?

 5  A.      I don't know.

 6  Q.      Okay.  We heard testimony from

 7          Mr. Paulk yesterday that she didn't.

 8          Do you know why she was rated as a 2

 9          in "draws and plots?"

10  A.      No.

11  Q.      Do you know why she was rated as a 1

12          on the category of "performs?"

13  A.      No, I'm not -- I'm not familiar.  I

14          don't recall.

15  Q.      And do you know why she was rated as a

16          1 in the category of "attends/passes?"

17  A.      I believe she didn't pass her -- a

18          course.

19  Q.      Which course was that?

20  A.      Either math -- algebra course, math --

21          one of the two courses there.

22  Q.      Okay.

23  A.      Either math or algebra.
```

JAY PALMER -- June 19th, 2008

```
1   Q.    Did she take other courses during the

2         time she was employed there before

3         this performance appraisal?

4   A.    I'm not aware.  I don't know.

5   Q.    Okay.  On the first page of the

6         appraisal in the section where it

7         starts, it is recommended that the

8         employee be, there's two Xs in front

9         of the line that says "continued in

10        the probation."  Do you see that?

11  A.    Yes.

12  Q.    What was the reason that those two Xs

13        were placed there?

14  A.    I don't know.  They weren't placed by

15        me.

16  Q.    Okay.  Was Ms. Jackson continued on

17        probation after this performance

18        appraisal?

19  A.    Yes.

20  Q.    Okay.  And this performance appraisal

21        was done at the end of her first six

22        months as an engineering assistant;

23        right?
```

1   A.      Just prior to it.

2   Q.      And the normal procedure is at the end

3           of six months of an engineering

4           assistant's first six months, there's

5           a determination made as to whether

6           they are going to become permanent

7           employees or whether they're going to

8           stay on probation, or whether they are

9           going to be let go; right?

10  A.      It's prior to the six-month period.

11  Q.      How much prior to?

12  A.      Personnel forwards these documents to

13          the supervisors a couple weeks in

14          advance, if I remember.  I believe.

15  Q.      Like on this one, she was rated on --

16          Bret Paulk signed it on December 20th;

17          right?

18  A.      Yes.

19  Q.      Do you know if you initialed it that

20          same day?

21  A.      I do not know.

22  Q.      And Ms. Jackson also signed it on the

23          20th; right?

JAY PALMER -- June 19th, 2008

```
 1   A.      Yes.

 2   Q.      Is it likely that you would have

 3           initialed it before Mr. Paulk signed

 4           it?

 5   A.      Typically that's how we do that, yes.

 6   Q.      First you initial it, and then he

 7           signs it?

 8   A.      First he signs it -- oh, I'm sorry.

 9           First I initial it, then they meet

10           with them and then they sign it.

11   Q.      All right.  Do you recall whether you

12           initialed it before the day when they

13           met and got this thing signed?

14   A.      No, I don't recall.

15   Q.      Do you know how long before -- before

16           Mr. Paulk signed this that this

17           document was transmitted to him?

18   A.      I'm sorry.  Say again?

19   Q.      Do you know how much time elapsed

20           between when this document was

21           transmitted to Mr. Paulk by personnel

22           and when he signed off on it?

23   A.      No.
```

```
 1   Q.    And you say it's typically a couple
 2         weeks?
 3   A.    Weeks, yes.
 4   Q.    Okay.  And I'm sorry.  I think you
 5         said specifically a couple weeks
 6         between the end of probationary period
 7         and when they forward the documents;
 8         is that right?
 9   A.    He gets it; the supervisors receive
10         the appraisal, the 13P, prior to
11         the -- prior to their coming off
12         probation.
13   Q.    Okay.  Now, Ms. Jackson's probation
14         was extended because she didn't pass
15         the -- one of the math classes; is
16         that right?
17   A.    I believe that's correct.
18   Q.    Is that reflected anywhere on this
19         document?
20   A.    No.
21   Q.    Okay.  It's supposed to state their
22         reasons in the discipline -- excuse
23         me -- the "disciplinary actions" area
```

JAY PALMER -- June 19th, 2008

1       why she is being continued on

2       probation; right?

3   A.  If there's disciplinary actions

4       applicable.

5               (Off-the-record Discussion.)

6   Q.  Okay.  So on this performance

7       appraisal, there weren't any

8       disciplinary actions applicable;

9       right?

10  A.  No.

11  Q.  Okay.  So where was it stated the

12      reason that Ms. Jackson was being

13      extended in her probation?

14  A.  I believe there was a memo.

15  Q.  Do you know where that memo would have

16      been?

17  A.  It would be in the personnel files.

18  Q.  Was it attached to the performance

19      appraisal?

20  A.  Oh, I don't know.

21  Q.  Is there a written policy in the

22      9th Division that an employee that

23      doesn't pass their math automatically

JAY PALMER -- June 19th, 2008                              24

```
 1          gets their probation extended?
 2   A.     I don't know.
 3   Q.     Is there, in fact, a policy in the
 4          9th Division, whether written or not,
 5          that an employee that doesn't pass
 6          math or algebra gets their probation
 7          extended?
 8   A.     At that time, yes.
 9   Q.     Okay.  When was that policy put into
10          place?
11   A.     I -- I do not know.
12   Q.     Was it a long time before Ms. Jackson
13          started?
14   A.     I don't recall.  I don't know when it
15          was.
16   Q.     Is that policy still in effect today?
17   A.     No.
18   Q.     When did it stop?
19   A.     I don't recall.
20   Q.     Where did you hear about that policy?
21   A.     Which policy?
22   Q.     The policy that said that engineering
23          assistants who don't pass basic math
```

JAY PALMER -- June 19th, 2008

```
1          or algebra don't get to pass their
2          probationary period.
3   A.     Who or when?
4   Q.     When.
5   A.     I don't recall.
6   Q.     How did you hear about it?
7   A.     From our division engineer.
8   Q.     Did he say it in a meeting?
9   A.     Yes.
10  Q.     Okay.  Did he ever issue any memos
11         about it?
12  A.     I don't recall.
13  Q.     And who was the division engineer at
14         that time?
15  A.     Mr. Ronnie Poiroux.
16  Q.     And he is no longer the division
17         engineer; right?
18  A.     That's correct.
19  Q.     How did you hear that that policy was
20         being eliminated?
21  A.     I don't think it was eliminated.
22  Q.     Okay.  You told me a minute ago that
23         that policy is not still in effect
```

JAY PALMER -- June 19th, 2008

```
1          today; right?

2    A.    Yes.

3    Q.    Okay.  When did it stop being in

4          effect?

5    A.    That particular policy, I don't

6          recall.

7    Q.    And how did you hear that it was not

8          in effect anymore?

9    A.    Through an e-mail.

10   Q.    Who was the e-mail from?

11   A.    Ms. Jeanette Brown.

12   Q.    What did the e-mail say?

13   A.    I -- I'd have to look at the e-mail.

14   Q.    Do you have it on your computer?

15   A.    Probably.

16   Q.    Is that computer in the building?

17   A.    Yes.

18   Q.    Who made the decision to have

19         Ms. Jackson continue on probation in

20         December of 2006?

21   A.    I can -- I -- I'd have to look at the

22         memo.

23   Q.    Okay.  But it was something that a
```

| | | |
|---|---|---|
| 1 | | decision had to be made about? |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  She -- she could have been made |
| 4 | | permanent at that time; right? |
| 5 | A. | Not in accordance with our policy. |
| 6 | Q. | Okay.  Then there's not really any |
| 7 | | decision that would have needed to be |
| 8 | | made then? |
| 9 | A. | There shouldn't have been one, yeah. |
| 10 | Q. | I'm going to show you what I'm marking |
| 11 | | as Exhibit 16. |
| 12 | | MR. SIMON:  I'm sorry.  I |
| 13 | | don't have another copy |
| 14 | | of it. |
| 15 | Q. | If you will, look at the highlighted |
| 16 | | portion of it.  First, can you tell me |
| 17 | | what that document is? |
| 18 | | (The referred-to document was |
| 19 | | marked for identification |
| 20 | | as Plaintiff's Exhibit No. 16.) |
| 21 | A. | It's an e-mail. |
| 22 | Q. | And it's an e-mail you were copied on; |
| 23 | | right? |

JAY PALMER -- June 19th, 2008

```
 1   A.      Yes.

 2   Q.      Okay.  And it says that somebody is

 3           going to have to decide whether

 4           Ms. Jackson was made permanent or not;

 5           right, in the highlighted portion?

 6   A.      Yes.

 7   Q.      Okay.  And who is it talking about

 8           there?

 9   A.      Who is -- what, now?  Say again?

10   Q.      Who is it referring to that's going to

11           have to decide whether she gets made

12           permanent?

13   A.      It appears to be the supervisor.

14   Q.      Okay.  So that would be Mr. Paulk?

15   A.      It may be.

16   Q.      Okay.  If there was a policy in effect

17           that it was automatic that if she

18           didn't pass, she would stay on

19           probation, why was he having to decide

20           anything?

21   A.      Well, I think -- I think it's

22           discussions regarding the extension of

23           probation.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    It doesn't say discussions.  It says
 2         decide there; right?
 3   A.    Yeah.  This is to our training
 4         coordinator.
 5   Q.    All right.  And to you also; right?
 6   A.    She cc'd me.
 7   Q.    All right.  So it's talking about
 8         somebody having to make a decision
 9         about whether she is going to be made
10         permanent or not; right?
11   A.    In Jeanette's e-mail to Ms. Brown,
12         that's what she thinks.
13   Q.    And Jeanette is --
14   A.    The person -- the office engineer for
15         the division.
16   Q.    Okay.  Did she just get it wrong, that
17         there was going to have to be a
18         decision made?
19   A.    She may have.  I don't know.
20   Q.    Who did make the decision to have
21         Ms. Jackson's probation be extended?
22   A.    I'd have to look at the memo or the
23         recommendation.  I think there was
```

```
 1          one.
 2                    THE  REPORTER:   I didn't hear
 3                    you.
 4                    THE  WITNESS:   There was a
 5                    recommendation.
 6    Q.    Who made the recommendation?
 7    A.    I don't recall.
 8    Q.    Might it have been you?
 9    A.    I don't remember.  I would have to
10          look at the files.
11    Q.    Okay.  Might it have been Mr. Paulk?
12    A.    It could have been.
13    Q.    How long have you been the district
14          engineer?
15    A.    Approximately six years.
16    Q.    Okay.  Was that -- was the policy that
17          we've been talking about, was it in
18          effect when you became the district
19          engineer?
20    A.    I don't know.
21    Q.    As the district engineer, did any of
22          the inspectors who worked in your
23          chain of command ever not pass their
```

```
 1        basic math and algebra by the end of
 2        their probationary period like
 3        Ms. Jackson did?
 4   A.   I don't recall.
 5   Q.   Do you recall an employee named
 6        Trenton Lowery?
 7   A.   Yes.
 8   Q.   Do you know whether Mr. Lowery passed
 9        his basic math and algebra before he
10        got made permanent?
11   A.   I do not know.
12   Q.   How about Dianna O'Rourke?  Do you
13        know her?
14   A.   Yes.
15   Q.   Do you know if she passed those before
16        she was made permanent?
17   A.   I don't know.
18   Q.   Do you know Diana Clement?
19   A.   Yes.
20   Q.   Did she pass both before she was made
21        permanent?
22   A.   I don't know.
23   Q.   How about Debra Fletcher?
```

```
 1   A.      I know Debbie.
 2   Q.      Did she pass both before she was made
 3           permanent?
 4   A.      I don't know.
 5   Q.      Belinda Powell?
 6   A.      Yes.
 7   Q.      Did she pass both?
 8   A.      I don't know.
 9   Q.      Blakely Yarbrough?
10   A.      I don't know.
11   Q.      Did he pass both before he was made
12           permanent?
13   A.      I don't know.
14   Q.      Do you know Lisa Champagne?
15   A.      Yes.
16   Q.      Did she pass both of those before she
17           was made permanent and was rehired?
18   A.      I do not know.
19   Q.      Do you know Kyle Clement?
20   A.      Yes.
21   Q.      Do you know if he passed both before
22           he was made permanent?
23   A.      I do not know.
```

JAY PALMER -- June 19th, 2008

```
 1    Q.      Do you know Brandy Farrell?

 2    A.      Yes.

 3    Q.      Do you know if Brandy passed both

 4            before she was made permanent?

 5    A.      I don't know.

 6    Q.      How about Samuel McNorton?

 7    A.      Yes.

 8    Q.      Did he pass both?

 9    A.      I don't know.

10    Q.      Travis Crocker?

11    A.      I don't know him.

12    Q.      Do you know Phillip Presley?

13    A.      Yes.

14    Q.      Do you know if he passed both?

15    A.      I don't know.

16    Q.      Do you know Gene Blan?

17    A.      Who.

18    Q.      Gene Blan?  B-L-A-N?

19    A.      No, I don't think so.

20    Q.      Do you recall ever having a request to

21            extend anybody's probation because

22            they didn't pass one of those courses,

23            besides Ms. Jackson?
```

```
 1   A.      I don't recall.

 2   Q.      But you do recall Ms. Jackson getting

 3           her probation extended; right?

 4   A.      Yes.

 5   Q.      Prior to December of 2006 -- around

 6           December 20th of 2006, had you had any

 7           problems with Ms. Jackson's work

 8           performance?

 9   A.      She did not work for me, so I wasn't

10           her immediate supervisor.

11   Q.      Okay.  Prior to December 20th, 2006,

12           were you aware of any problems with

13           Ms. Jackson's work performance?

14   A.      No.

15   Q.      Prior to December 20th, 2006, were you

16           aware of any problems with

17           Ms. Jackson's attendance?

18   A.      No.

19   Q.      Prior to her -- prior to

20           December 20th, 2006, were you aware of

21           any problems with Ms. Jackson's

22           punctuality?

23   A.      I don't believe I recall any.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    Prior to December 20th of 2006, were
 2         you aware of any problems with
 3         Ms. Jackson's cooperation with
 4         co-workers?
 5   A.    Yes.
 6   Q.    Okay.  What problems were you aware
 7         of?
 8   A.    She had an incident when she blew up
 9         in the -- in the office with another
10         supervisor.
11   Q.    Who was that?
12   A.    Josh McElhenney.
13   Q.    What was she concerned about at that
14         time?
15   A.    It stemmed around her car.
16   Q.    Getting scratched up?
17   A.    Yes.
18   Q.    And she claimed it had been
19         vandalized; is that right?
20   A.    She said someone had scratched it
21         purposely.
22   Q.    How did you get involved in that
23         situation?
```

```
 1   A.      She'd come to see me.

 2   Q.      What did -- what did she say when she

 3           came to see you?

 4   A.      That her car was being scratched --

 5           had been scratched.

 6   Q.      What did you do about the situation?

 7   A.      I looked at the car.

 8   Q.      Did you conclude that it had been

 9           scratched?

10   A.      No.

11   Q.      There -- there were no scratches on

12           it?

13   A.      It looked like normal -- normal wear

14           and tear.

15   Q.      Normal wear and tear, okay.  Did

16           Ms. Jackson get a written reprimand

17           for that, what you called a blowup?

18   A.      No.

19   Q.      When did that happen?

20   A.      I don't recall the day.  I would have

21           to look at the memos.

22   Q.      Do you recall what month it happened?

23   A.      October maybe.
```

1   Q.    Was it within the time period of this
2         performance appraisal?
3   A.    Yes.
4   Q.    Okay.  And even with that, what you
5         called a blowup, she was still rated
6         as having been satisfactory in her
7         cooperation with co-workers?
8   A.    Yes.
9   Q.    During the period of time encompassed
10        within this appraisal, did Ms. Jackson
11        exhibit any other problems with
12        cooperation with co-workers?
13  A.    I'm not aware of any.
14  Q.    She was -- during the period of her
15        employment up until December 20th,
16        2006, are you aware of any problems
17        with Ms. Jackson being compliant with
18        rules?
19  A.    That one incident.
20  Q.    She was not compliant with rules in
21        that one incident?
22  A.    No.
23  Q.    Which rules was she not compliant

JAY PALMER -- June 19th, 2008

```
 1         with?

 2    A.   Disruptive behavior.

 3    Q.   Anything else?

 4    A.   Violence in the workplace.

 5    Q.   Was she violent in the workplace?

 6    A.   She exhibited a violent tendency

 7         during that event.

 8    Q.   What violent tendency was that?

 9    A.   Made the statement that if no one

10         wanted to get hurt, they'd better

11         leave her car alone, if I recall.

12    Q.   Did she threaten anyone personally?

13    A.   I don't know.

14    Q.   To your knowledge, she didn't; right?

15    A.   I don't know.

16    Q.   You don't know of her making any

17         personal threats, do you?

18    A.   That was pretty personal.

19    Q.   Who was she personal to?

20    A.   She made it to -- to Josh McElhenney.

21         She advised all his office staff.

22    Q.   She threatened Josh McElhenney with

23         that statement?
```

JAY PALMER -- June 19th, 2008

```
1    A.     She had made it clear that Josh should
2           make it perfectly clear that he should
3           advise all of his personnel.
4    Q.     Did Josh feel threatened by that
5           statement?
6    A.     I do not know.
7    Q.     Did you ask him?
8    A.     No.
9    Q.     Okay.  And despite that incident,
10          Ms. Jackson was still rated as being
11          satisfactory in compliance with rules
12          for that time period; right?
13   A.     Apparently.
14   Q.     And she wasn't given any warnings for
15          that particular incident, was she?
16   A.     She was given a counseling statement.
17   Q.     Okay.  Look on --
18   A.     That one.
19   Q.     Look on Page 2 of the performance
20          appraisal.  Your lawyer just showed
21          you the counseling statement, but I'm
22          asking you to look at the performance
23          appraisal.  Under disciplinary
```

JAY PALMER -- June 19th, 2008

40

```
 1        actions, there's a zero under the
 2        category of warnings; right?
 3   A.   Yes.
 4   Q.   Would that indicate that she got no
 5        warnings during this probationary
 6        period?
 7   A.   Yes.
 8   Q.   Okay.  And there's no reprimands
 9        either; right?
10   A.   That's correct.
11   Q.   So she had no reprimands during this
12        probationary period?
13   A.   Yes.
14   Q.   Okay.  And she wasn't suspended;
15        right?
16   A.   No.
17   Q.   She did get a written counseling about
18        her behavior on October whatever it
19        was, 4th, 5th, or 6th or something;
20        right?
21   A.   Yes.
22   Q.   Who wrote that counseling form?
23   A.   I did.
```

JAY PALMER -- June 19th, 2008                                41

```
 1   Q.    And after you counseled her on that,
 2         did she ever display any more
 3         disruptive behavior?
 4   A.    I don't recall any additional
 5         incidents.
 6   Q.    Since you've been the district
 7         engineer, have there been any other
 8         probationary engineering assistants
 9         who have displayed disruptive behavior
10         that you know of?
11   A.    I don't recall any.  I really don't
12         know.
13   Q.    Since you have been the district
14         engineer, to your knowledge, have
15         there been any other engineering
16         assistants besides Ms. Jackson who
17         have violated the work rule on
18         violence in the work place?
19   A.    I don't remember.
20   Q.    Are you aware that Ms. Jackson is
21         related to Bertha Alexander?
22   A.    I believe by marriage.
23   Q.    She's not married to her, is she?
```

```
 1   A.     No.
 2   Q.     How -- do you know how they are
 3          related?
 4   A.     Daughter-in-law, I believe.
 5   Q.     When did you find out that they were
 6          related?
 7   A.     I don't know.
 8   Q.     Was it during her first probationary
 9          period up to December?
10   A.     I don't recall.
11   Q.     Do you recall how you found out?
12   A.     No.
13   Q.     And employees have to fill out a form
14          that says who they're related to at
15          the time they're hired; right?  They
16          have to fill out a form that says who
17          they're related to at the DOT?
18   A.     Which form are you talking about?
19   Q.     I'm handing you what I've marked as
20          Exhibit 17.  Do you recognize that
21          document?
22               (The referred-to document was
23                marked for identification
```

JAY PALMER -- June 19th, 2008                    43

```
1                    as Plaintiff's Exhibit No. 17.)

2    A.   I believe it's in the new employees

3         document packets.

4    Q.   And that's Ms. Jackson's copy of that

5         form; right?

6    A.   I don't know if it's her copy or not.

7         I don't know.

8    Q.   I'm sorry.  I asked that poorly.

9         That's the relatives employed with the

10        Department of Transportation form for

11        Ms. Jackson; right?

12   A.   It appears to be, yes.

13   Q.   Okay.  And on there, she identified

14        Bertha Alexander as her mother -- as

15        her mother-in-law?

16   A.   Yes.

17   Q.   And she dated that form July 3rd,

18        2006?

19   A.   Yes.

20   Q.   Is that the day she started?

21   A.   I believe it is.

22   Q.   Have you ever seen that form before?

23   A.   I've seen the form, yes.
```

JAY PALMER -- June 19th, 2008

| | | |
|---|---|---|
| 1 | Q. | Have you seen the one filled out by |
| 2 | | Ms. Jackson before? |
| 3 | A. | I don't recall seeing it, no. |
| 4 | Q. | Shortly after Ms. Jackson received her |
| 5 | | first probationary performance |
| 6 | | appraisal, there was an incident that |
| 7 | | happened about the tape recording |
| 8 | | policy; is that right? |
| 9 | A. | There is documentation on it, yes. |
| 10 | Q. | When did you first become aware that |
| 11 | | there was an issue about that? |
| 12 | A. | That day. |
| 13 | Q. | How did you become aware of it? |
| 14 | A. | I believe -- I believe Mr. Paulk had |
| 15 | | informed me. |
| 16 | Q. | And how did he inform you? |
| 17 | A. | I believe it was via telephone or |
| 18 | | SouthernLINC. |
| 19 | Q. | Where -- what did he tell you? |
| 20 | A. | That Ms. Jackson was refusing to sign |
| 21 | | the policy. |
| 22 | Q. | Was that in the morning of |
| 23 | | January 5th? |

```
 1   A.     I don't know.
 2   Q.     Do you remember where you were when
 3          you got that call?
 4   A.     I do not.
 5   Q.     What did you tell Mr. Paulk when he
 6          told you that Ms. Jackson was refusing
 7          to sign the policy?
 8   A.     I believe I was tied up, either
 9          meeting or training, and I couldn't
10          attend to -- I couldn't address it,
11          and he needed to see Mr. Calametti to
12          discuss it.
13   Q.     What kind of training were you tied up
14          in?
15   A.     I don't recall.  It may have not been
16          training.
17   Q.     Was that the end of the conversation,
18          you telling him to go see Calametti?
19   A.     It wasn't much more after that.  I
20          think I was tied up with other issues,
21          other appointments, meetings, or
22          training.  I was tied up that day when
23          this incident occurred.
```

1   Q.    Did he tell you at that time the

2         reason that she was refusing to sign

3         the policy?

4   A.    I don't recall.

5   Q.    Did he tell you anything about the

6         meeting that they had had about it?

7   A.    The meeting that morning?

8   Q.    Yeah.

9   A.    I don't recall.

10  Q.    What was the next thing that you heard

11        about what had gone on that day with

12        regard to the policy and Ms. Jackson?

13  A.    That Mr. Fresolone and a lot of

14        individuals had gotten involved

15        through this process the entire day.

16  Q.    How did you hear about that?

17  A.    I don't recall.

18  Q.    All right.  Let's back up a little

19        bit.  On that day you get a call from

20        Bret Paulk saying that she had refused

21        to sign the policy, and you tell him

22        to talk to Calametti; right?

23  A.    Yes.  Because I was busy.

```
 1   Q.    Okay.  What was the next thing that
 2         you heard form anybody about what had
 3         gone on that day?
 4   A.    That there was a lot of individuals
 5         involved in trying to resolve this
 6         matter.
 7   Q.    Okay.  Did you hear about -- did you
 8         hear anything more about it on that
 9         particular day?
10   A.    I don't recall.
11   Q.    Did you meet with anybody about it on
12         that day?
13   A.    I don't remember.
14   Q.    Okay.  That day -- that day was
15         January 5th of 2007; right?
16   A.    I don't know.  I don't know what day
17         it was really without the memos.
18   Q.    Let's see.  Here's one of the memos.
19         That's Plaintiff's Exhibit 8.  Do you
20         recognize that document?
21             (Plaintiff's Exhibit 8 was
22              previously marked and is
23              not attached hereto.)
```

JAY PALMER -- June 19th, 2008

```
 1   A.      No, I do not.

 2   Q.      You never saw that document before?

 3   A.      I have never seen this document

 4           before.

 5   Q.      I want you to look over it for a

 6           minute and tell me if you can tell

 7           what it is.

 8   A.      (Witness reading document.)

 9                          What was the question

10           again?

11   Q.      Can you look at it and tell me what it

12           is?

13   A.      It's a memorandum from Mr. Charly

14           Jones.

15   Q.      Who is Mr. Jones?

16   A.      Mr. Jones is -- he is currently one of

17           the assistant construction engineers

18           in the construction section.

19   Q.      And it talks about some things that

20           happened on January 5th of 2007;

21           right?

22   A.      That's correct.

23   Q.      Does that refresh your recollection
```

JAY PALMER -- June 19th, 2008

```
 1          that that was the day that the taping

 2          policy incidents happened?

 3   A.     I don't know if that was the date that

 4          he wrote the memo or -- I don't --

 5          that's the first time I've seen this

 6          memo.

 7   Q.     Take a look at Exhibit 15, if you

 8          would, and tell me what that is.

 9                   (Plaintiff's Exhibit 15 was

10                    previously marked and is

11                    not attached hereto.)

12   A.     (Witness reviewing document.)

13                            It's a letter of

14          reprimand.

15                   (Off-the-record Discussion.)

16   Q.     And who's it to?

17   A.     Ms. Jackson.

18   Q.     And it's for the taping incident --

19          the taping policy incident; right?

20   A.     It's for disruptive behavior,

21          insubordination, and refusal to

22          complete the policy form.

23   Q.     Okay.  And it says that that happened
```

JAY PALMER -- June 19th, 2008

```
 1        on what day?
 2   A.   On January 5th.
 3   Q.   Does that refresh your recollection
 4        now that that's the day that that
 5        happened?
 6   A.   I don't know if that was the day it
 7        happened.  I wasn't involved in that
 8        day.  So I'm assuming, based off this
 9        document, that was the day it had
10        occurred.
11   Q.   Okay.  Who wrote that letter of
12        reprimand?
13   A.   Mr. Paulk.
14   Q.   Did you have a hand in writing it?
15   A.   I don't -- I don't recall.
16   Q.   Did he run it by you before he gave it
17        to Ms. Jackson?
18   A.   I believe he -- we had discussed the
19        letter of reprimand, but as far as him
20        running the letter by me, I don't
21        recall.
22   Q.   What had y'all discussed about the
23        letter of reprimand?
```

```
1    A.    I believe he was going to write the
2          letter of reprimand.
3    Q.    Did you know what Ms. Jackson was
4          being reprimanded for?
5    A.    Yes.
6    Q.    What was she reprimanded for?
7    A.    For disruptive behavior and
8          insubordination.
9    Q.    Did you know that before the letter of
10         reprimand was written?
11   A.    Did I know what before?
12   Q.    Did you know that those were the
13         things that she was being reprimanded
14         for before that letter was written?
15   A.    Yes.
16   Q.    And who made the decision to reprimand
17         Ms. Jackson for the two things,
18         disruptive behavior and
19         insubordination?
20   A.    I believe Mr. Calametti made that
21         decision.
22   Q.    What makes you think that?
23   A.    I believe we had discussed this --
```

```
 1              this incident with Mr. Calametti.
 2    Q.    Who is we?
 3    A.    Mr. Paulk, myself, Mr. Calametti.
 4    Q.    Did you participate in the process of
 5              reaching the decision that Ms. Jackson
 6              would be reprimanded for disruptive
 7              behavior and insubordination?
 8    A.    Did I what, now?
 9    Q.    Did you participate in the process?
10    A.    I was in the discussions.
11    Q.    What was your opinion about the
12              discipline that Ms. Jackson should get
13              as a result of the incidents on that
14              day, January 5th?
15    A.    My opinion?
16    Q.    Yeah.
17    A.    Whether it was warranted or not?
18    Q.    What was your opinion about what level
19              of discipline she should get for that
20              day?
21    A.    I thought it was appropriate.
22    Q.    So you agreed with Mr. Calametti's
23              decision to give her a written
```

```
 1        reprimand?
 2   A.   I don't know if I agreed to it or not
 3        at that time.
 4   Q.   But in principle you agreed with it;
 5        right?
 6   A.   I thought it was appropriate.
 7   Q.   How long did y'all meet to discuss
 8        what discipline was going to be given
 9        to Ms. Jackson as a result of the
10        January 5th incidents?
11   A.   I don't recall.
12   Q.   Do you remember where the meeting was
13        held?
14   A.   No.
15   Q.   And as far as you can remember, there
16        were just three of you in there,
17        Mr. Paulk, yourself, and
18        Mr. Calametti?
19   A.   There may have been Mr. Fresolone and
20        Mr. Malone as well.
21   Q.   What were they doing in there?
22   A.   What do you mean what were they doing?
23   Q.   Why were they in that meeting?
```

```
 1   A.    I think it was discussion on this
 2         incident.
 3   Q.    And why were they in there discussing
 4         it?
 5   A.    I think they had direct involvement in
 6         the incident.
 7   Q.    To your knowledge, what was
 8         Mr. Malone's involvement in the
 9         incident?
10   A.    I don't recall.
11   Q.    And do you know what Mr. Fresolone's
12         involvement was?
13   A.    I believe it all --
14               (Off-the-record Discussion.)
15   A.    I believe she went to Mr. Fresolone
16         concerning the incident.
17   Q.    Okay.  During the meeting that you had
18         with Mr. Paulk, Mr. Calametti,
19         Fresolone, and Malone about this
20         reprimand, did y'all discuss
21         Ms. Jackson's work performance?
22   A.    I don't recall.
23   Q.    Do you -- did you discuss
```

JAY PALMER -- June 19th, 2008

```
 1        Ms. Jackson's previous disciplinary
 2        history with the counseling form?
 3   A.   I don't remember.
 4   Q.   Did the fact that she had gotten the
 5        previous written counseling, did that
 6        play a role in deciding what level of
 7        discipline she was going to get for
 8        the January 5th incident?
 9   A.   I don't know.
10   Q.   So Mr. Calametti would be the one who
11        would know the answers to that?
12   A.   I believe so.
13   Q.   During that meeting, did folks express
14        their opinions as to what the
15        appropriate level of discipline would
16        be for Ms. Jackson?
17   A.   I'm sure they did.
18   Q.   Do you remember what Mr. Fresolone
19        thought?
20   A.   No, I don't remember.
21   Q.   Do you remember what Mr. Malone
22        thought about that?
23   A.   No, I do not.
```

JAY PALMER -- June 19th, 2008

1    Q.    What did Bret Paulk think should be
2          done about that incident with
3          Ms. Jackson?
4    A.    I don't recall.
5    Q.    During that meeting, did y'all review
6          the memos that had been written about
7          what happened on January 5th?
8    A.    I don't remember.
9    Q.    Do you remember any occasion where you
10         reviewed those memos?
11   A.    Concerning that incident?
12   Q.    Yeah.
13   A.    Yes.
14   Q.    Okay.  When did you do that?
15   A.    Recommendation for termination.
16   Q.    So prior to making the recommendation
17         for termination you think you hadn't
18         reviewed the memos about the incident
19         on January 5th?
20   A.    Oh, I'm sure I had, yes.
21   Q.    Do you think you reviewed them before
22         Ms. Jackson was reprimanded?
23   A.    I don't know.  I can't -- I don't

```
 1            recall.
 2   Q.      Okay.  I'm curious as to the Charly
 3           Jones memo.  Was that not included in
 4           the materials that you had reviewed?
 5   A.      This is the first time I've seen this
 6           memo.
 7   Q.      It's got a box on there that says
 8           transportation office manager at the
 9           top of it.  Do you see that?
10   A.      Which memo?
11   Q.      The Charly Jones memo.
12   A.      Yes.
13   Q.      And in that box there's a big check
14           that says personnel file; is that
15           right?
16   A.      Yes.
17   Q.      What does that indicate?
18   A.      That the office manager placed a copy
19           of this in her personnel file.
20   Q.      In Ms. Jackson's personnel file?
21   A.      Yes.
22   Q.      Okay.  When you were reviewing the
23           memos about what happened on
```

```
 1          January 5th, did you review those from

 2          Ms. Jackson's personnel file?

 3   A.     I don't recall.

 4   Q.     It could have been another group of

 5          them collected somewhere?

 6   A.     It could have been.

 7   Q.     But whatever group of memos it was, it

 8          didn't include this memo from Charly

 9          Jones?

10   A.     I don't recall this memo, no.

11   Q.     When did you first become aware that

12          Ms. Jackson was so upset on that day

13          that she had gone to Mr. Fresolone's

14          office in tears?

15   A.     I don't remember the time frame.

16   Q.     Did you know about it before today?

17   A.     That she went to Mr. Fresolone?

18   Q.     Yeah.

19   A.     Yes.

20   Q.     And that she was crying when she went

21          there?

22   A.     I wasn't aware that she was crying.

23   Q.     Okay.  The memo from Charly Jones says
```

| 1 | | she was; right? |
|---|---|---|
| 2 | A. | It said -- she'd come upset and in |
| 3 | | tears is what Mr. Jones' memo says. |
| 4 | Q. | Is that -- is this the first time that |
| 5 | | you are aware of her being in tears |
| 6 | | that day? |
| 7 | A. | I don't remember it. |
| 8 | Q. | Do you know why she was in tears? |
| 9 | A. | I guess, the incident from the |
| 10 | | morning. |
| 11 | Q. | Which incident was that? |
| 12 | A. | Where she refused to sign the |
| 13 | | recording policy. |
| 14 | Q. | When she was meeting with Bret Paulk? |
| 15 | A. | I don't know if it was before Bret or |
| 16 | | with Bret or after Bret. I don't |
| 17 | | remember. |
| 18 | Q. | And are you aware of whether Bret |
| 19 | | Paulk raised his voice with her during |
| 20 | | the meeting that he had with her? |
| 21 | A. | No. |
| 22 | Q. | Did you ever ask anybody about that? |
| 23 | A. | I don't remember asking anybody about |

```
 1         that.

 2   Q.    Are you aware that Mr. Fresolone had

 3         to tell Mr. Paulk that he shouldn't

 4         yell at Ms. Jackson anymore after

 5         their meeting?

 6   A.    I believe it was mentioned.

 7   Q.    Do you remember where it was

 8         mentioned?

 9   A.    No, I do not.

10   Q.    Did Mr. Paulk get any kind of written

11         counseling for his conduct that day?

12   A.    I don't recall any.

13   Q.    Okay.  You wouldn't disagree that

14         Mr. Paulk yelled at Ms. Jackson, would

15         you?

16   A.    I wouldn't know.

17                (Off-the-record Discussion.)

18   Q.    Who should Ms. Jackson have gone to

19         see with questions about the taping

20         policy?

21   A.    Her supervisor.

22   Q.    And that was Mr. Paulk; right?

23   A.    That's correct.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    And if he couldn't give her answers to
 2         her questions, then who should she
 3         have gone to see about it?
 4   A.    She could come see me.
 5   Q.    Do you know if she tried to do that?
 6   A.    I don't know.
 7   Q.    Was there anything wrong with her
 8         going to see Mr. Fresolone about the
 9         memo?
10   A.    Mr. Fresolone is not in the chain of
11         command.
12   Q.    What was Mr. Fresolone's position at
13         the time?
14   A.    He was assistant construction
15         engineer.
16   Q.    So he would have been directly under
17         Mr. Calametti?
18   A.    That's correct.
19   Q.    And were you also directly under
20         Mr. Calametti?
21   A.    No.
22   Q.    Who was your supervisor?
23   A.    Mr. Poiroux.
```

```
 1   Q.    So Mr. Poiroux supervises the district
 2         engineers directly?
 3   A.    That's correct.
 4   Q.    They're not under the construction
 5         engineers?
 6   A.    No.
 7   Q.    So Ms. Jackson, in going to see
 8         Mr. Fresolone, violated the chain of
 9         command?
10   A.    Violated the chain of command?  I
11         can't say that she did.
12   Q.    That might not have been the words
13         that you used.
14              (Off-the-record Discussion.)
15   Q.    She went outside the chain of command?
16   A.    She should have utilized her chain of
17         command.
18   Q.    You weren't available that day; right?
19   A.    Yes.
20   Q.    And Mr. Paulk had given her until the
21         end of the day to sign the policy;
22         right?
23   A.    I believe his memo says that.
```

JAY PALMER -- June 19th, 2008

1    Q.    So in your absence, who should she

2          have gone to see?

3    A.    Mr. Calametti or Mr. Poiroux.

4    Q.    Do you know if she attempted to go see

5          Mr. Calametti or Mr. Poiroux that day?

6    A.    No.

7    Q.    Was she disciplined for going outside

8          the chain of command?

9    A.    I do not believe so.

10   Q.    Apart from the incidents that happened

11         in October about Ms. Jackson's car and

12         in January about the taping policy,

13         did Ms. Jackson ever engage in any

14         other form of misconduct that you're

15         aware of?

16   A.    She refused to sign her performance

17         appraisal.

18   Q.    When did that happen?

19   A.    I believe it was December.

20   Q.    So that was her December 2006

21         performance appraisal?

22   A.    I believe so.

23   Q.    Tell me what happened on that

```
 1          occasion.
 2   A.     Mr. Paulk had sat down with her to go
 3          over her performance appraisal.  She
 4          didn't agree with it and informed him
 5          that she didn't want to sign it and
 6          then informed him that she wanted to
 7          see me about it.  So they came up to
 8          my office.
 9   Q.     And you testified about that earlier;
10          right?
11   A.     I don't believe we've talked about
12          that meeting, no.
13   Q.     Okay.  Maybe I'm confused.  What
14          happened during that meeting?
15   A.     We went over her appraisal.  She
16          disagreed the -- with her appraisal,
17          and she -- she refused to sign her
18          appraisal.
19   Q.     Okay.  What happened at the end of the
20          meeting?
21   A.     I had to call Mr. Calametti.
22   Q.     And did he come to your office?
23   A.     Yes, he did.
```

JAY PALMER -- June 19th, 2008

```
1    Q.    And was Ms. Jackson still in there
2          when he got in there?
3    A.    Yes.
4    Q.    And what was the discussion when
5          Mr. Calametti got there?
6    A.    Concerning her appraisal.
7    Q.    Did she express concerns about her
8          appraisal?
9    A.    She didn't agree with the appraisal.
10   Q.    Okay.  What didn't she agree with
11         about it?
12   A.    I would have to see my memo to file on
13         it.
14   Q.    You've got the appraisal in front of
15         you.  I don't think I have your memo,
16         but looking at the appraisal, can you
17         tell what she didn't agree with?
18   A.    No.  Not without looking at it.
19   Q.    She did eventually sign the
20         performance appraisal; right?
21   A.    That's correct.
22   Q.    And she signed it on the day that it
23         was presented to her?
```

1  A.    I believe so.

2  Q.    Was she insubordinate on that day?

3  A.    Her refusal to sign the appraisal,

4        yes.

5  Q.    But she did sign it on that day;

6        right?

7  A.    Yes.

8  Q.    Did she get any kind of counseling for

9        that refusal to sign?

10 A.    I do not believe so.

11 Q.    Did she get a verbal warning for

12       refusing to sign the performance

13       appraisal?

14 A.    I believe in our meetings, I give her

15       a copy of the Department's policy on

16       signing appraisals; the policy of

17       discipline would be applied right then

18       and there.  If she continued --

19            (Off-the-record Discussion.)

20 A.    And if she still refused to sign them,

21       the policy of positive discipline or

22       progressive discipline would be

23       applied immediately.

JAY PALMER -- June 19th, 2008

```
1    Q.    And she didn't have any progressive
2          discipline for not signing the policy;
3          right?
4    A.    No.  She requested to see
5          Mr. Calametti.
6    Q.    Okay.  And then she signed the policy;
7          right?
8    A.    After discussions, yes.
9    Q.    Are you aware that Ms. Jackson made a
10         complaint that on January 5th that
11         Mr. Paulk was discriminating against
12         her because of her gender?
13   A.    No.  Not at that time.
14   Q.    Did you become aware of that later on?
15   A.    Yes.
16   Q.    When did you become aware of it?
17   A.    Last week or this week.
18   Q.    How did you become aware of it?
19   A.    Mr. Redd had showed me her --
20   Q.    Okay.  You don't have to -- I don't
21         want to know anything --
22               MR. REDD:  Don't tell him what
23                    we talked about.
```

```
 1   A.      I was shown a copy of it.

 2   Q.      You were shown a copy of what?

 3   A.      Her grievance or complaint.

 4   Q.      Were you aware that during the -- in

 5           the course of the meetings on

 6           January 5th, Ms. Jackson made a

 7           complaint that she was being

 8           discriminated against, a verbal

 9           complaint?

10   A.      To who?  I don't know who.  To me?

11   Q.      No.  I don't believe it was to you.  I

12           believe it was to Mr. Malone and

13           everybody that was sitting in the

14           meeting with her.  Were you aware of

15           that?

16   A.      I don't recall that.

17   Q.      I show you what I have marked as

18           Exhibit 14 to your deposition.  Do you

19           recognize that document?

20                   (Plaintiff's Exhibit 14 was

21                    previously marked and is

22                    not attached hereto.)

23   A.      (Witness reviewing document.)
```

JAY PALMER -- June 19th, 2008

```
 1                      I believe I do.
 2   Q.    Can you tell me what it is?
 3   A.    Apparently it's a memo to file.
 4   Q.    And who is it from?
 5   A.    Mr. Paulk.
 6   Q.    When did you first see this document?
 7   A.    I don't recall.
 8   Q.    Was it before Ms. Jackson got the
 9         written reprimand on January 18th?
10   A.    I don't remember.
11   Q.    Did you review the memos like this one
12         from Mr. Paulk and the other employees
13         about the January 5th incident before
14         the written reprimand was issued?
15   A.    I don't remember.
16   Q.    Look at Page 2 of this memo.  Right
17         about in the middle of the page it
18         says (as read:)  Ms. Jackson also
19         stated that she felt threatened and
20         that I harassed and discriminated
21         against her due to the fact that she
22         was female.
23                      Do you see that?
```

```
 1   A.    Yes.
 2   Q.    Okay.  And that was something that she
 3         said during this meeting where
 4         Mr. Malone and Mr. Fresolone and a few
 5         others were present; right?
 6   A.    I don't know if they were present or
 7         not during that -- when she made that
 8         statement.
 9   Q.    Okay.  The next sentence says
10         Mr. Malone advised her that she should
11         read over the policies and
12         definitions; right?
13   A.    Yes.
14   Q.    That would indicate that Mr. Malone
15         was present when she made that
16         comment?
17   A.    Yes.
18   Q.    Do you know if ALDOT took any action
19         with regard to Ms. Jackson's complaint
20         that she was being discriminated
21         against because she was a female?
22   A.    Actions?  I'm not familiar with the
23         kind of actions -- not sure what type
```

JAY PALMER -- June 19th, 2008

```
 1        actions.
 2   Q.   Do you know if ALDOT did any
 3        investigation into those allegations?
 4   A.   As far as this particular incident, I
 5        don't know.
 6   Q.   And you didn't direct anybody to
 7        initiate any investigations as to
 8        whether Mr. Paulk was discriminating
 9        against Ms. Jackson because she's a
10        woman, did you?
11   A.   No.
12   Q.   When did you first become aware that
13        Ms. Jackson filed a formal grievance
14        against ALDOT?
15   A.   Against ALDOT?
16   Q.   That she filed a formal grievance
17        about her employment at ALDOT.
18   A.   I don't recall.
19   Q.   You testified earlier that you just
20        became aware last week of a grievance
21        that she filed; is that right?
22   A.   That she actually filed with the EEOC.
23   Q.   Would that be --
```

1   A.      I don't know if she filed a previous
2           grievance or how many grievances.
3   Q.      Let me show you what I have marked as
4           Exhibit 18 to your deposition.  Is
5           that the grievance that you're
6           referring to?
7                   (The referred-to document was
8                    marked for identification
9                    as Plaintiff's Exhibit No. 18.)
10  A.      (Witness reviewing document.)
11                          It may have been.
12  Q.      And you say you first became aware of
13          her having that grievance last week?
14  A.      I believe when I saw the document for
15          the first time was last week.
16  Q.      Okay.  Had you become aware before
17          last week of the fact that she had
18          filed a grievance?
19  A.      I wasn't aware of it.
20  Q.      Did -- did anybody from ALDOT ever
21          talk to you about Ms. Jackson's
22          grievance --
23  A.      I don't recall.

JAY PALMER -- June 19th, 2008

```
 1   Q.      -- besides Mr. Redd?

 2   A.      I don't recall anybody talking to me

 3           about it.

 4   Q.      Do you recall the human resources

 5           employee named Sandra Deitz coming and

 6           talking to you about Ms. Jackson?

 7   A.      As far as this -- for this grievance

 8           or complaint?

 9   Q.      Yes.

10   A.      I don't recall.

11   Q.      Do you recall Ms. Deitz ever coming to

12           talk to you about Ms. Jackson?

13   A.      I know she was involved in

14           discussions.

15   Q.      What discussions was she involved in?

16   A.      Termination discussions.

17   Q.      And when was she involved in

18           termination discussions?

19   A.      I don't recall.

20   Q.      What was her involvement in those

21           discussions?

22   A.      I don't remember.

23   Q.      Okay.  Were those discussions in
```

1          person, or were they over the phone?

2    A.    I know there was one phone

3          conversation.  I don't know if there

4          was any other in-person.  I don't

5          recall.

6    Q.    Okay.  Was that phone conversation

7          just the two of you?

8    A.    No.

9    Q.    Who else was on that phone call?

10   A.    Mr. Calametti, Ms. Brown, I believe

11         Mr. Fresolone, and Mr. Malone.

12   Q.    Did that conversation occur after the

13         request to terminate Ms. Jackson had

14         been transmitted to Montgomery?

15   A.    I'm sorry.  Say it again.

16   Q.    Did that conversation with Ms. Deitz

17         on the phone with all those other

18         people, did that occur after the

19         request for termination had been

20         transmitted to Montgomery?

21   A.    No.

22   Q.    It was before?

23   A.    I believe so.

```
 1   Q.    What was the reason that y'all were
 2         talking to Ms. Deitz at that time?
 3   A.    It was the termination process.  I
 4         think she was involved in the
 5         discussions.
 6   Q.    Why would Ms. Deitz be involved in the
 7         discussions about termination?
 8   A.    I don't recall.
 9   Q.    Who got her involved in those
10         discussions?
11   A.    I believe Mr. Calametti.
12   Q.    And you were the person who made the
13         initial recommendation to terminate
14         Ms. Jackson; is that right?
15   A.    Yes.
16   Q.    And Mr. Calametti got Ms. Deitz
17         involved after you made that initial
18         recommendation?
19   A.    No.
20   Q.    When did he get Ms. Deitz involved?
21   A.    I don't recall.
22   Q.    Was it before you made the initial
23         recommendation?
```

```
 1   A.      Yes.
 2   Q.      And Mr. Paulk was not involved in that
 3           telephone call?
 4   A.      I don't remember.
 5   Q.      Where -- where did -- where did
 6           that -- whose office did that call
 7           take place in?
 8   A.      I don't remember.  I don't recall
 9           whose office it was.
10   Q.      How long did the conversation last?
11   A.      I don't remember how long it lasted.
12   Q.      What was the reason that Mr. Calametti
13           wanted to call Ms. Deitz to involve
14           her in termination discussion?
15                 MR. REDD:  Object to the form.
16                     You can answer.
17                 THE REPORTER:  I didn't hear
18                     what you said.
19                 MR. REDD:  Object to the form.
20                     I told him he could
21                     answer.
22   A.      Say again?  What was the question
23           again?
```

JAY PALMER -- June 19th, 2008

```
1    Q.      What was the reason that Mr. Calametti
2            wanted to get Ms. Deitz involved in
3            termination discussions about
4            Ms. Jackson?
5                    MR. REDD:  Object to the form.
6    A.      I believe it was to discuss the
7            termination.
8    Q.      So before you wrote the letter
9            recommending that Ms. Jackson be
10           terminated, y'all had a meeting that
11           Ms. Deitz was involved in where you
12           guys discussed terminating
13           Ms. Jackson; right?
14   A.      I believe that's correct.
15   Q.      Okay.  And how long before you wrote
16           the letter did that meeting happen?
17   A.      I don't remember.
18   Q.      Was it weeks before?  Was it days
19           before?
20   A.      I don't recall.
21   Q.      And during that meeting, did you
22           discuss the specific incidents that
23           had occurred with Ms. Jackson?
```

1    A.    I believe so.

2    Q.    And which incidents were discussed

3          during the meeting?

4    A.    I don't recall.

5    Q.    Did anybody -- did Ms. Deitz give her

6          approval for terminating Ms. Jackson?

7                   MR. REDD:  Object to the form.

8                   You can answer.

9    A.    I believe she concurred.

10   Q.    Did y'all reach an agreement during

11         that meeting that Ms. Jackson should

12         be terminated?

13   A.    I don't -- I don't remember.

14                  MR. SIMON:  Can we take a

15                  quick break?

16              (Off-the-record discussion.)

17              (Brief recess was taken.)

18   Q.    (By Mr. Simon:)  We were talking about

19         Sandy Deitz being involved in some

20         termination discussions about

21         Ms. Jackson.  Was anybody else on the

22         phone with Ms. Deitz?

23   A.    I don't recall.

```
 1              MR. REDD:  You mean on her
 2                   end?
 3              MR. SIMON:  Yeah, on her end.
 4   A.    Oh, I don't recall.
 5   Q.    Do you know if Ron Green was there?
 6   A.    I don't remember.
 7   Q.    Is that the typical process when
 8         you -- when there's about to be a
 9         recommendation for termination to get
10         somebody from Sandy Deitz' office
11         involved?
12   A.    Not necessarily.
13   Q.    Do you know why her office was
14         involved, or why she was involved in
15         this?
16   A.    No.
17   Q.    But that's not something that would be
18         usual?
19   A.    It's something that wouldn't be
20         unusual.
21   Q.    Okay.  Her office is the Human
22         Resources Bureau; right?
23   A.    Is what, now?
```

```
 1    Q.    The Human Resources Bureau?

 2    A.    Oh, I'm not sure what her -- what

 3          bureau she's in.

 4    Q.    Do you know what her job is with the

 5          Department?

 6    A.    I think she is Title 7 section, I

 7          believe.

 8    Q.    And Title 7 is the employment

 9          discrimination law; right?

10    A.    I believe so.

11    Q.    Why would the -- why would the Title 7

12          coordinator be involved in the

13          discussions of terminating

14          Ms. Jackson?

15    A.    I don't know.

16    Q.    Did Ms. Deitz ask any questions during

17          the call?

18    A.    I don't remember any questions.

19    Q.    When y'all had that meeting, did you

20          discuss Ms. Jackson's issues of having

21          been assigned by herself to different

22          job sites?

23    A.    I don't know.
```

```
 1   Q.    Do you remember talking about
 2         Ms. Jackson being assigned to
 3         accompany Chris Burdette to different
 4         project sites?
 5   A.    I don't remember that.
 6   Q.    Was that the only conversation that
 7         you can recall having with Ms. Deitz
 8         about Ms. Jackson?
 9   A.    No.  I think there was another
10         discussion when she was involved.
11   Q.    Okay.  What was that other discussion?
12   A.    I believe she was involved with our
13         telephone conference with the
14         assistant director.
15   Q.    When did that happen?
16   A.    I don't recall.
17   Q.    What was the purpose of the telephone
18         conference with the assistant
19         director?
20   A.    To discuss the termination.
21   Q.    Okay.  And the assistant director is
22         Mr. Morris; right?
23   A.    I believe he is one of the assistants,
```

JAY PALMER -- June 19th, 2008

```
 1        yes.
 2   Q.   Is he the -- is that the assistant
 3        director who was involved in that
 4        discussion?
 5   A.   Yes.
 6   Q.   And did -- the discussion where
 7        Mr. Morris was involved, did that take
 8        place before or after the other
 9        conversations with Ms. Deitz?
10   A.   I believe it was after.
11   Q.   And what was the purpose of the
12        discussion with Mr. Morris?
13   A.   To try to make a determination.
14   Q.   As to --
15   A.   Termination.
16   Q.   Was a determination made at that time?
17   A.   I believe it was.
18   Q.   And what was the determination?
19   A.   To go ahead and go forth with the
20        termination.
21   Q.   And was that before you wrote the
22        letter recommending termination or
23        after?
```

```
 1    A.     That was before.

 2    Q.     Who was involved in the meeting with

 3           Mr. Morris?

 4    A.     Mr. Calametti, Ms. Brown, myself, and

 5           I believe Mr. Malone and Ms. Deitz.

 6    Q.     Where did that meeting take place?

 7    A.     In this building.

 8    Q.     Do you remember whose office it was

 9           in?

10    A.     It was in that office right there

11           (indicating).

12    Q.     The conference room next door?

13    A.     The conference room next door, the

14           small conference room.

15    Q.     Do you remember how many days before

16           you wrote your termination

17           recommendation letter that

18           conversation took place?

19                  (Off-the-record Discussion.)

20    A.     I don't remember how many days it was.

21    Q.     Would it have been within a week's

22           time frame?

23    A.     I don't recall.  It was shortly
```

JAY PALMER -- June 19th, 2008

```
 1        thereafter.
 2   Q.   What was the information that you
 3        shared with Mr. Morris during that
 4        meeting?
 5   A.   I don't recall.
 6   Q.   Did you discuss Ms. Jackson's actions
 7        on October 4th?
 8   A.   I don't know if that was discussed or
 9        not at that time.
10   Q.   Did you discuss Ms. Jackson's conduct
11        on January 5th?
12   A.   I don't remember if that was discussed
13        either.
14   Q.   Did you discuss the quality of
15        Ms. Jackson's work performance?
16   A.   I do not believe that was discussed.
17   Q.   But at the end of the meeting,
18        Mr. Morris concurred with the
19        recommendation that Ms. Jackson be
20        terminated?
21   A.   I don't know if he concurred with any
22        recommendation.  I think he made the
23        decision.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    Mr. Morris made the decision that
 2         Ms. Jackson should be terminated?
 3   A.    I believe so.
 4   Q.    Did he then direct you to write the
 5         termination recommendation?
 6   A.    No.
 7   Q.    How was it decided that you were going
 8         to be the one to write the
 9         recommendation?
10   A.    Mr. Calametti.
11   Q.    Mr. Calametti told you to do that?
12   A.    Yes.
13   Q.    Did Mr. Calametti tell you which
14         incidents to put in the termination
15         recommendation -- that were going to
16         be the basis for the termination?
17   A.    No.
18   Q.    Did Mr. Morris say what incidents
19         should be included in there?
20   A.    No.
21   Q.    Were you the person who decided which
22         incidents you were going to refer to
23         in your letter recommending
```

JAY PALMER -- June 19th, 2008

```
 1        termination?
 2   A.   We had others.  I had drafted a
 3        termination letter and reviewed it
 4        with Mr. Calametti.
 5   Q.   Okay.  So you and Mr. Calametti put
 6        that letter together, both of you
 7        together?
 8   A.   I put it together.  He reviewed it.
 9   Q.   Did he make any changes to it?
10   A.   I do not believe so.
11   Q.   Do you know on what basis Mr. Morris
12        decided to terminate Ms. Jackson?
13   A.   I don't know what you mean by basis.
14   Q.   Do you know why Mr. Morris decided to
15        terminate Ms. Jackson?
16   A.   I can only assume that it was based
17        off the incidents.
18   Q.   But you don't know?
19   A.   Ultimately, no.
20   Q.   You don't know whether it was because
21        of what happened on October 4th?
22   A.   No.
23   Q.   You don't know whether it was because
```

1   of what happened on January 5th?

2 A. I would say it would be a collection

3   of all the incidents.

4 Q. But you are guessing at this point

5   because you don't know what's in

6   Mr. Morris' mind, do you?

7 A. No.  I didn't particularly ask him

8   that.

9 Q. Do you know whether Ms. Jackson's work

10   performance was considered in the

11   termination decision?

12 A. I don't know.

13 Q. You don't really know what factors

14   were considered in the termination

15   decision, do you?

16     MR. REDD:  Object to the form.

17 A. I know that the incidents were

18   considered.

19 Q. Because they were discussed during the

20   phone call?

21 A. I don't know if they were discussed

22   during the phone call.

23 Q. Then how do you know the incidents

1          were considered?

2    A.    I believe he was aware of the

3          incidents by Ms. Deitz.

4    Q.    But you don't have personal knowledge

5          that those incidents were the reason

6          that Mr. Morris decided to terminate

7          Ms. Jackson, do you?

8    A.    No.

9    Q.    Did he ever say that?

10   A.    I don't recall.

11   Q.    Apart from the two telephone

12         conferences that you have talked to us

13         about where Ms. Deitz was present, did

14         you have any other conversations with

15         Ms. Deitz about Ms. Jackson?

16   A.    I don't remember others -- any others.

17   Q.    Let me show you what I've marked as

18         Exhibit 19 to your deposition.  Do you

19         recognize that document?

20              (The referred-to document was

21               marked for identification

22               as Plaintiff's Exhibit No. 19.)

23   A.    (Witness reviewing document.)

```
 1                    I don't recall it.
 2   Q.    Let me ask you to look at the last
 3         page.  It's signed by Sandra M. Deitz;
 4         right?
 5   A.    Yes.
 6   Q.    And it's dated February 14th?
 7   A.    Yes.
 8   Q.    Do you remember talking to Ms. Deitz
 9         about Ms. Jackson's grievance prior to
10         February 14th?
11                    MR. REDD:  Object to the form.
12   A.    I don't remember.
13   Q.    Let me ask you to look at the second
14         page.  At the top of the page it says
15         (as read:)  According to Vince
16         Calametti, division construction
17         engineer; Jay Palmer, district
18         engineer; and Bret Paulk, project
19         engineer, it is common for new
20         inexperienced EAs to be assigned to
21         observe job tasks being performed on
22         different project sites as part of
23         on-the-job training.
```

JAY PALMER -- June 19th, 2008

1                        Did you tell Ms. Deitz

2          that?

3     A.    I don't remember.  I don't remember

4          telling her that.

5     Q.    Are you saying you didn't tell her

6          that?

7     A.    I don't remember it.

8     Q.    Do you remember having a conversation

9          with Ms. Deitz where you talked about

10         what was common for inexperienced EAs?

11    A.    I don't remember if it was Sandy.  I

12         don't recall.

13    Q.    Did y'all -- did you talk to anybody

14         else about that?

15    A.    I don't recall.

16    Q.    Bret Paulk testified yesterday, I

17         believe, that Ms. Deitz came down and

18         met with him and you and Mr. Calametti

19         in person concerning Ms. Jackson.

20         Does that not square with your

21         recollection?

22    A.    I just don't remember.  I remember

23         talking to Sandy.

1  Q.   Do you remember talking to her about

2       the things that she's saying you

3       talked about in this investigation

4       report?

5  A.   I can only assume, yes, that's what we

6       talked about.

7  Q.   And do you remember if that

8       conversation was an in-person meeting

9       or whether it was one of these two

10      telephone conferences that you've been

11      telling me about already?

12 A.   I don't know if it was via telephone

13      or in person.  I don't remember.

14 Q.   During the first telephone conference

15      with Ms. Deitz where y'all were

16      discussing Ms. Jackson's termination,

17      did you talk about the things

18      referenced in Ms. Deitz's

19      investigative findings?

20           MR. REDD:  Which things?  All

21             of them?

22           MR. SIMON:  The ones at the

23             top of Page 2.

JAY PALMER -- June 19th, 2008

```
 1   A.    I don't recall talking -- I don't
 2         remember.  We may have.
 3   Q.    Now, Ms. Deitz submitted this
 4         investigation report on February 14th,
 5         2007; right?
 6   A.    I don't know when it was submitted.
 7   Q.    There's several signatures on the last
 8         page.  I was hoping you could help me
 9         figure out who they are.  There's the
10         word "approved" in handwriting on the
11         bottom of that page.  Do you see that?
12   A.    Yes.
13   Q.    And do you know whose signature that
14         is next to the word "approved?"
15   A.    No, I have no idea.
16   Q.    Could it be Ron Green's?
17   A.    I don't know.  It could be, I guess.
18         I don't know.  It could be Ron Greer
19         too.
20   Q.    Does Mr. Green still work at the DOT?
21   A.    I don't know.  I assume he does.
22   Q.    You know who he is; right?
23   A.    Yeah.
```

```
1   Q.    The other approval on here, that's Dan
2         Morris; right?
3   A.    I don't know.  I don't know if that's
4         his signature or not.  I don't know.
5   Q.    Okay.  Did you ever receive a copy of
6         this document?
7   A.    No.
8   Q.    This is the first time you're seeing
9         it?
10  A.    It may be.  I don't recall.  There's a
11        lot of documents, and I don't know if
12        this -- I've seen this one or not.
13        But typically I would not get a copy
14        of that.
15  Q.    Apart from the telephone conference
16        that we just talked about where
17        Mr. Morris was involved, did you have
18        any other discussions with Mr. Morris
19        about Ms. Jackson?
20  A.    No.  Just that one -- one
21        conversation.
22  Q.    And you only had those two
23        conversations with Ms. Deitz, that you
```

JAY PALMER -- June 19th, 2008

1          can recall, about Ms. Jackson; right?

2   A.    Those are the only -- apparently

3          this -- this one report, or

4          investigation report where she says

5          she talked to me about it.  I just

6          don't know.

7   Q.    That one you don't recall?

8   A.    I don't recall that.  No, I sure

9          don't.

10  Q.    Do you recall any other conversations

11         that you had with Ms. Deitz about

12         Ms. Jackson?

13  A.    No.

14  Q.    In what way was Ms. Jackson

15         insubordinate on January 5th?

16  A.    I need to look at that memo again,

17         review it.

18  Q.    Which one?

19  A.    The January 5th.

20  Q.    The one from -- the one that Bret

21         Paulk wrote or the one that Charly

22         Jones wrote?

23  A.    It's the one that Joey Fresolone

```
 1              wrote.
 2    Q.    Let me show you what I've marked as
 3          Plaintiff's Exhibit 20.  Is that the
 4          memo that you're talking about from
 5          Joey Fresolone?
 6                  (The referred-to document was
 7                   marked for identification
 8                   as Plaintiff's Exhibit No. 20.)
 9    A.    Yes.
10    Q.    Take a minute to look at that and let
11          me know what she did that was
12          insubordinate.
13    A.    (Witness reviewing document.)
14                        Okay.  What was the
15          question?
16    Q.    In what way was Ms. Jackson
17          insubordinate on January 5th?
18    A.    I believe her initial request to sign
19          the recording policy.
20    Q.    You mean her initial refusal to sign
21          it?
22    A.    I mean her initial refusal, that's
23          correct.
```

1    Q.    So her telling Bret Paulk that she
2          wasn't going to sign it was
3          insubordinate?
4    A.    Her telling Bret she wasn't going to
5          sign it, yes, was insubordinate to me,
6          yes.
7    Q.    Okay.  Was there anything else she did
8          that day that was insubordinate?
9    A.    I believe she told Joey she -- she
10         didn't want to sign it.
11   Q.    She did sign it by the end of the day;
12         right?
13   A.    I believe that's correct.
14   Q.    And that was the deadline that
15         Mr. Paulk gave her; right?
16   A.    I don't know if that was the deadline
17         that he gave her.  I believe that was
18         the deadline after all the drama had
19         occurred.
20   Q.    Take a look at Plaintiff's Exhibit 2.
21         Do you know if this is the meeting
22         that was in the morning that Josh
23         McElhenney sat in on, the first

```
 1       meeting?
 2                (Plaintiff's Exhibit 2 was
 3                 previously marked and is
 4                 not attached hereto.)
 5   A.   I believe so.
 6   Q.   Okay.  And it says in here that Bret
 7        stated that she had until the end of
 8        the day to sign the policy during that
 9        first meeting that they had; right?
10   A.   She told Bret that she would sign it
11        at the end of the day and that he
12        could not make her sign it.
13   Q.   And then it says that he then stated
14        that she had until the end of the day
15        to sign it; right?
16   A.   That's Josh's memo, yes.
17   Q.   Yeah.  Okay.  And that's Josh's memo
18        about what Bret told her; right?
19   A.   I'm sorry.  Say again.
20   Q.   That's Josh's memo about what Bret
21        told her during that first meeting of
22        the day; right?
23   A.   I believe so.
```

1    Q.    So it wasn't after all the drama of

2          the day that she was given that

3          deadline; it was at that first

4          meeting; right?

5    A.    Say the question again.

6    Q.    It wasn't after all the drama of the

7          day, as you said.  It was --

8    A.    No -- after all the -- I'm sorry.

9    Q.    It was actually during that first

10         meeting with Mr. McElhenney and Paulk

11         that she was told she had until the

12         end of the day to sign it; right?

13   A.    In Josh's memo, that's what he states.

14   Q.    So at what point was she insubordinate

15         for just not signing the memo?

16   A.    Her initial refusal to sign the memo

17         and the statement that -- that he

18         could not make her sign it.

19   Q.    And then she did sign it by his

20         deadline; right?

21   A.    I don't know if she signed it before

22         the deadline or after.  She signed it

23         that day, yes.

JAY PALMER -- June 19th, 2008

```
 1   Q.    Did she sign it after the end of that
 2         day?
 3   A.    I don't know.
 4   Q.    Was Ms. Jackson's conduct in
 5         Mr. Fresolone's office insubordinate?
 6   A.    It could have been borderline.
 7         Mr. Paulk had given her until the end
 8         of the day.  And she stated that the
 9         cover letter stated until the 16th as
10         indicated in the letter.
11   Q.    And it did state that, didn't it?
12   A.    I don't know.  I don't recall.
13   Q.    If it had stated that, then it
14         wouldn't have been insubordinate for
15         her to bring it up, would it?
16   A.    If her supervisor told her to sign it
17         that day, then, yes, it would.
18   Q.    And again, she did sign it that day;
19         right?
20   A.    Yes.
21   Q.    So what was the reason that
22         Ms. Jackson was reprimanded for the
23         incidents of January 5th?
```

JAY PALMER -- June 19th, 2008

```
 1   A.    I don't know.  I would have to see the
 2         letter of reprimand.
 3   Q.    I think you've got it there, don't
 4         you?
 5   A.    Do I?
 6                     Disruptive behavior and
 7         insubordination for refusal to sign
 8         the policy form.
 9   Q.    Anything else?
10   A.    It was also noted that she left her
11         job station without permission.
12   Q.    Was she given a written reprimand for
13         that?
14   A.    I do not know.
15   Q.    Did Ms. Jackson engage in any
16         misconduct after January 5th, 2007?
17   A.    I don't recall any other.
18   Q.    Let me see Mr. Fresolone's letter that
19         I just gave you.
20   A.    (Witness complies.)
21   Q.    And Mr. Fresolone's letter also
22         indicates that Ms. Jackson was upset
23         that morning, doesn't it?
```

```
 1    A.     Yes.

 2    Q.     Here it states that she was visibly

 3           upset; right?

 4    A.     I can't --

 5    Q.     Oh, I'm sorry.

 6    A.     Visibly upset, yes.

 7    Q.     Visibly very upset?

 8    A.     Yes.

 9    Q.     Had you seen this memo from

10           Mr. Fresolone before today?

11    A.     Yes.

12    Q.     Okay.  So you knew before today that

13           Ms. Jackson had been visibly very

14           upset at the -- at that first meeting

15           with Mr. Fresolone?

16    A.     Joey claimed that she was visibly

17           upset, yes.

18    Q.     Did you have any reason to disbelieve

19           it?

20    A.     No.

21    Q.     And that squares with Charly Jones'

22           recollection of the events too; right?

23    A.     I'm sorry?
```

1    Q.    And that squares with Charly Jones'

2          version of the events too; right?

3    A.    It does.

4    Q.    Who was the -- who was the first

5          person who made any kind of

6          recommendation that Ms. Jackson be

7          terminated?

8    A.    I don't recall.

9    Q.    How did you first hear about the

10         possibility that Ms. Jackson might be

11         terminated?

12   A.    How did I?

13   Q.    Yeah.

14   A.    I believe it was conversations --

15   Q.    With --

16   A.    -- concerning this written reprimand.

17   Q.    Okay.  Who were the conversations

18         with?

19   A.    Mr. Calametti.

20   Q.    Anybody else?

21   A.    I believe Mr. Paulk.

22   Q.    So you and Mr. Paulk discussed

23         terminating Ms. Jackson?

JAY PALMER -- June 19th, 2008

1    A.    No.  I believe we looked at all the

2          options as far as disciplinary steps.

3    Q.    And you decided to give her a written

4          reprimand; right?

5    A.    I believe Mr. Calametti did, yes.

6    Q.    So when -- when was it first suggested

7          that she be terminated after she

8          received this written reprimand?

9    A.    I don't know.

10   Q.    Do you know who first suggested it?

11   A.    I don't recall.

12   Q.    Was it Mr. Morris?

13   A.    After the reprimand?

14   Q.    Yeah.

15   A.    I don't believe so.

16   Q.    Was it Ms. Deitz?

17   A.    I don't believe so.

18   Q.    Was it Mr. Calametti?

19   A.    I don't -- I don't know.

20   Q.    Was it Mr. Poiroux?

21   A.    I don't know.

22   Q.    Was it you?

23   A.    I concurred.

JAY PALMER -- June 19th, 2008

```
 1   Q.    So you concurred with somebody
 2         else's --
 3   A.    I concurred with the discussions of
 4         termination.
 5   Q.    When did the first discussion of
 6         termination happen after the written
 7         reprimand was given?
 8   A.    I don't remember.
 9   Q.    Who was present during those
10         discussions about terminating
11         Ms. Jackson after the written
12         reprimand was given?
13   A.    I believe it was me, Mr. Calametti,
14         Mr. Paulk.  There may have been
15         others.
16   Q.    Give me an idea as to how long after
17         the written reprimand was given that
18         y'all sat down and discussed the
19         possibility of terminating
20         Ms. Jackson.
21   A.    I have no idea.
22   Q.    Who first brought up the subject?
23   A.    I don't remember who.
```

JAY PALMER -- June 19th, 2008

```
1    Q.    Did y'all meet specifically to discuss
2          terminating Ms. Jackson?
3    A.    I don't believe so.
4    Q.    Was it just water cooler conversation,
5          hey, I think we ought to let her go?
6    A.    No.
7    Q.    Was it a meeting that somebody
8          convened?
9    A.    I don't recall.
10   Q.    Where did that first discussion with
11         you, Mr. Paulk, and Mr. Calametti take
12         place?
13   A.    Where?
14   Q.    Yeah.
15   A.    I don't recall.
16   Q.    Did you guys look at any documents
17         during that meeting?
18   A.    I don't remember.
19   Q.    Did Mr. Paulk ever make a suggestion
20         that Ms. Jackson be terminated?
21   A.    I don't remember if he did or not.
22   Q.    Let's talk about just during that
23         first meeting.  You don't remember
```

```
 1          where it happened; is that right?
 2   A.     I'm sure it was in the division.
 3   Q.     You don't remember how long it lasted?
 4   A.     No.
 5   Q.     You don't remember who was there?
 6   A.     Yes, I do.
 7   Q.     Okay.  Was it just -- was it just the
 8          three of you?
 9   A.     I know it was the three of us.
10   Q.     You said there may have been others?
11   A.     There may have been others,
12          Mr. Malone, Mr. Fresolone.
13   Q.     And had you gathered to talk about
14          stuff other than terminating
15          Ms. Jackson?
16   A.     I don't recall if we gathered to talk
17          about other stuff.  No, I don't recall
18          that.
19   Q.     So tell me what was said during the
20          conversation.
21   A.     I believe it was a discussion to
22          decide what we were going to do as far
23          as disciplinary steps, either written
```

```
 1            reprimand or termination.
 2   Q.    Okay.  I thought you said that this
 3            conversation occurred after she got
 4            the written reprimand?
 5   A.    No.  I think it was before.
 6   Q.    Okay.
 7   A.    That was our discussions on what steps
 8            of discipline to take.
 9   Q.    Okay.  I understand.  I may have been
10            confused.
11   A.    I may have been confused.  I don't
12            know.
13   Q.    Okay.  Let's get on the same page for
14            a minute.  So you and Mr. Paulk and
15            Mr. Calametti and maybe others met to
16            discuss what would be the appropriate
17            discipline to take for the incidents
18            of January 5th?
19   A.    I believe so.
20   Q.    Okay.  And that was before she got the
21            written reprimand; right?
22   A.    Yes.
23   Q.    And maybe somebody during that meeting
```

```
 1           threw out the idea that she should be
 2           terminated; right?
 3   A.      Yes.
 4   Q.      Okay.  But that was decided -- you
 5           guys decided not to do that; right?
 6   A.      That was the decision, yes.
 7   Q.      And instead you decided to issue her a
 8           written reprimand; right?
 9   A.      Yes.
10   Q.      Okay.  And so Mr. Paulk was given the
11           job of writing the reprimand; right?
12   A.      That's correct.
13   Q.      Okay.  And then we've already figured
14           out that later on you went over that
15           written reprimand with him?
16   A.      Yes.
17   Q.      And then Ms. Jackson got the written
18           reprimand; right?
19   A.      Yes.
20   Q.      All right.  That was -- that was done;
21           right?
22   A.      Yes.
23   Q.      And that concluded the disciplinary
```

JAY PALMER -- June 19th, 2008

```
 1              process for the stuff that happened on
 2              January 5th; right?
 3    A.        I believe so.
 4    Q.        After Ms. Jackson got that written
 5              reprimand, when after that was the
 6              first discussion about terminating
 7              her?
 8    A.        I don't recall.
 9    Q.        After Ms. Jackson got that written
10              reprimand, when was the first time
11              that you can remember hearing that
12              somebody had suggested or spoken about
13              terminating Ms. Jackson?
14    A.        Can you say that again?
15    Q.        Yeah, yeah.  After the written
16              reprimand, when was the first time
17              that you can remember somebody
18              bringing up the subject of terminating
19              Ms. Jackson?
20                  MR. REDD:  Asked and answered.
21    A.        I don't remember when the first time
22              was.
23    Q.        At some point Ms. Jackson was
```

```
 1            transferred from -- from -- out from

 2            under Bret Paulk's supervision; right?

 3    A.     She was moved, yes.

 4    Q.     She was moved to under Tony Cooper?

 5    A.     That's correct.

 6    Q.     And what was the reason that she was

 7            moved there?

 8    A.     I don't know.  You would have to talk

 9            to Mr. Calametti about that.  He made

10            that decision.

11    Q.     So you're not aware that Ms. Jackson

12            was transferred because she had some

13            work restrictions as a result of being

14            pregnant?

15    A.     What was the question again, now?

16    Q.     You're not aware that Ms. Jackson was

17            transferred because she had work

18            restrictions resulting from her being

19            pregnant?

20    A.     I don't know if that was the specific

21            reason why she was transferred.

22    Q.     Let me show you what's been marked as

23            Exhibit 11.  That's a memo to you from
```

```
 1          Mr. Calametti; right?
 2                  (Plaintiff's Exhibit 11 was
 3                  previously marked and is
 4                  not attached hereto.)
 5   A.     (Witness reading document.)
 6   Q.     Is that right?
 7   A.     Yes.
 8   Q.     And it asks you to revise her Form 13
 9          and Form 40 to reflect her new duties;
10          right?
11   A.     Yes.
12   Q.     And it says she is being assigned
13          those temporary duties throughout her
14          pregnancy; right?
15   A.     Yes.
16   Q.     Okay.  And then the new Form 40 shows
17          her working under Tony Cooper; right?
18   A.     I would have to look at that Form 40.
19          Yes.
20   Q.     Can you tell from this memo that she
21          was being transferred to Mr. Cooper so
22          that she could perform these temporary
23          duties throughout her pregnancy?
```

JAY PALMER -- June 19th, 2008

```
1    A.     This is not actually a transfer

2           letter.  This is just her new duties

3           and a new supervisor.

4    Q.     Do you know if she ever got a transfer

5           letter?

6    A.     I don't know if she got a transfer

7           letter or not.

8    Q.     But typically when you transfer

9           somebody from one project engineer to

10          another, you give them a transfer

11          letter; right?

12   A.     Not necessarily.  If it's short

13          duration, no, we wouldn't.

14   Q.     Okay.  So would the duration of her

15          pregnancy, would that be considered a

16          short duration?

17   A.     Nine months?  Not necessarily, no.  We

18          could -- we could work her temporarily

19          in another office during that period,

20          yes.

21   Q.     So she might not have gotten a

22          transfer letter then?

23   A.     I don't know if she got one or not.  I
```

```
 1          don't know if I wrote a transfer

 2          letter or not on it.

 3    Q.    But you did prepare a new Form 40 for

 4          her; right?

 5    A.    No, I did not.

 6    Q.    Someone did; right?

 7    A.    Yes.  Should have.

 8    Q.    Let me show you what I've marked as

 9          Exhibit 21.  Is that the new Form 40?

10                (The referred-to document was

11                 marked for identification

12                 as Plaintiff's Exhibit No. 21.)

13    A.    It appears to be.

14    Q.    And the supervisor who signed it, is

15          that Tony Cooper's signature there?

16    A.    Yes.

17    Q.    And it's also got another signature

18          below his.  Whose signature is that?

19    A.    It should be the appointing authority.

20    Q.    Okay.  And the appointing authority

21          signed off on it in March of '07,

22          March 5th?

23    A.    It looks like it was initialed.
```

1   Q.    Do you know why there would be such a
2         long gap between when the supervisor
3         signed it and when the appointing
4         authority signed it?
5   A.    There's a long gap all the time when
6         document -- you send up paperwork to
7         Montgomery for signatures.
8   Q.    All right.  Now, February 13th, 2007,
9         is when you got the letter from
10        Mr. Calametti saying that she's being
11        reassigned; right?
12  A.    That's on his memo; that's correct.
13  Q.    Now, was it before or after you
14        learned about her being reassigned
15        that there started to be discussions
16        about terminating her?
17  A.    Oh, I don't know.  I don't recall.
18  Q.    Okay.  Your termination recommendation
19        was done on February 22nd, I believe;
20        is that right?
21  A.    That's correct.
22  Q.    And you're looking at the copy there
23        that your lawyer showed you?

```
 1   A.      Yes.

 2   Q.      So at some point in between

 3           February 13th when you learned that

 4           Ms. Jackson was transferred and

 5           February 22nd, there was a decision

 6           made that Ms. Jackson should be

 7           terminated; right?

 8   A.      Oh, I don't know if it was between

 9           those dates or not.

10   Q.      So it may have been before she was

11           transferred?

12   A.      It may have been.

13   Q.      Why would you transfer somebody that

14           was going to be terminated?

15   A.      It may be a possibility to diffuse the

16           situation if the tensions are high.

17   Q.      Were there any tensions?

18   A.      Oh, there was some tension in the

19           office.

20   Q.      I thought you just told me that

21           Ms. Jackson hadn't engaged in any

22           misconduct after January 5th?

23   A.      No.  But the tensions were still
```

```
 1          there.
 2   Q.     What kind of tensions are you talking
 3          about?
 4   A.     Feelings were hurt.
 5   Q.     Whose feelings were hurt?
 6   A.     I believe Ms. Jackson's.
 7   Q.     So you fired Ms. Jackson because her
 8          feelings were hurt?
 9   A.     No.
10   Q.     Okay.
11   A.     Absolutely not.
12   Q.     Let's be clear then.  Why -- if
13          Ms. Jackson was recommended for
14          termination before she was
15          transferred, I still don't understand
16          why she would be transferred if she
17          was already recommended for
18          termination.
19   A.     Oh, I don't know.  You would have to
20          ask Mr. Calametti that.
21   Q.     Okay.
22   A.     I didn't do the transfer.  I didn't --
23          I didn't move her.  That was
```

```
 1        Mr. Calametti.
 2   Q.   Okay.  But you don't know if she had
 3        been -- discussions about terminating
 4        her had started before or after the
 5        transfer?
 6   A.   No, I do not know.
 7   Q.   Who was the first person to start the
 8        ball rolling on getting Ms. Jackson
 9        terminated?
10             MR. REDD:   Asked and answered.
11   A.   I don't recall.
12   Q.   But you concurred with the decision to
13        terminate her; right?
14             MR. REDD:   Asked and answered.
15   A.   I concurred with the discussions that
16        termination was appropriate.
17   Q.   Okay.  When -- when did you decide in
18        your mind that Ms. Jackson should be
19        terminated?
20   A.   I don't recall.
21   Q.   Was it before you wrote the
22        termination recommendation?
23   A.   What was the question again, now?
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    I asked you when you decided in your
 2         own mind when Ms. Jackson -- that
 3         Ms. Jackson should be terminated.  And
 4         then I asked you was it before you
 5         wrote the termination recommendation?
 6   A.    I didn't decide the termination.
 7   Q.    I know.  At some point you arrived at
 8         your own personal opinion that
 9         Ms. Jackson should be terminated;
10         right?
11   A.    I concurred with the discussions and
12         decisions.  I didn't decide the
13         termination.
14   Q.    I understand that you didn't decide
15         the termination.
16   A.    Yeah.
17   Q.    But you agreed that termination was
18         the appropriate action; right?
19   A.    I concurred with it, yes.
20   Q.    You formed a personal opinion that it
21         was appropriate to terminate
22         Ms. Jackson; right?
23   A.    I don't know if it was a personal
```

```
 1        opinion.  I can't say that it was a
 2        personal opinion.
 3   Q.   Okay.  So you didn't have any opinion
 4        either way about whether Ms. Jackson
 5        should be terminated?
 6   A.   Based off the incidents, I concurred
 7        with the discussion that termination
 8        was --
 9   Q.   Okay.  That's not -- that's not the
10        question that I asked you.  The
11        question that I asked you is, did you
12        have a personal opinion about whether
13        Ms. Jackson should be terminated?
14   A.   Yes.  I concurred with the decision,
15        yes.
16   Q.   Okay.  Did you concur with the
17        decision after it was made or before
18        it was made?
19   A.   Before --
20             MR. REDD:  Object to the form.
21                   It's obvious you can't
22                   testify to something you
23                   don't know about.
```

JAY PALMER -- June 19th, 2008

```
 1   A.     Yeah, exactly.

 2   Q.     Exactly what your lawyer said?

 3                MR. REDD:  Object to the form.

 4   A.     I can't say I concur with something I

 5          don't know about.

 6   Q.     Before the decision was made to

 7          terminate Ms. Jackson --

 8   A.     Okay.

 9   Q.     -- did you have an opinion about

10          whether she should be terminated?

11   A.     Yes.

12   Q.     And what was your opinion?

13   A.     That the incidents listed below

14          concurred -- or warranted termination.

15   Q.     Okay.  When did you arrive at that

16          decision?

17   A.     I don't recall.

18   Q.     Did you arrive at that decision after

19          the discussions with Mr. Morris?

20   A.     No.

21   Q.     So you arrived at that decision before

22          the discussions with Mr. Morris?

23   A.     I didn't arrive at any decisions.  I
```

1       arrived --

2   Q.  I'm sorry.  Let's call it an opinion

3       then.

4   A.  Okay.

5                   MR. REDD:  Let's call it a

6                       concurrence.

7                   THE WITNESS:  Yeah.

8   Q.  You arrived at the opinion that

9       Ms. Jackson should be terminated

10      before you discussed it with

11      Mr. Morris; right?

12  A.  I believe that the incidents listed --

13  Q.  No, no.  That's not my question.

14  A.  Okay.

15  Q.  My question is, did you arrive at the

16      opinion in your own mind that

17      Ms. Jackson should be terminated

18      before the discussion with Mr. Morris?

19      It's a simple question.

20  A.  Yes, yeah.

21  Q.  Okay.  Did you arrive at the

22      decision -- at the opinion in your own

23      mind that Ms. Jackson should be

JAY PALMER -- June 19th, 2008

```
 1        terminated before the conversation,
 2        the first conversation, with
 3        Ms. Deitz?
 4  A.    I don't remember.
 5  Q.    Did you arrive at your opinion that
 6        Ms. Jackson should be terminated
 7        before you got this letter from
 8        Mr. Calametti saying that she was
 9        getting a new Form 40?
10  A.    No.
11  Q.    So it was after she got -- after you
12        learned that she was getting the new
13        Form 40 that you arrived at the
14        opinion that she should be terminated?
15  A.    No, it was not after that.
16  Q.    It was before this, before the new
17        Form 40?
18  A.    Yes.
19  Q.    So you had already decided in your
20        mind that it was your opinion that
21        Ms. Jackson should be terminated
22        before you got this letter from
23        Mr. Calametti to amend her Form 40?
```

JAY PALMER -- June 19th, 2008

```
 1   A.      Can you say that again?
 2   Q.      Yeah.  You had already arrived at the
 3           opinion that Ms. Jackson should be
 4           terminated before you got this letter
 5           from Mr. Calametti that's Exhibit 11;
 6           right?
 7   A.      Yes.
 8   Q.      What was the event or occurrence that
 9           caused you to form the opinion that
10           Ms. Jackson should be terminated?
11   A.      I believe it was the accumulation of
12           all the incidents.
13   Q.      And those had accumulated by
14           January 5th; right?
15   A.      Yes.
16   Q.      Did you form the opinion on
17           January 5th that she should be
18           terminated?
19   A.      I don't recall.
20   Q.      She was given a written reprimand for
21           the events of January 5th on
22           January 18th right?
23   A.      Yes.
```

JAY PALMER -- June 19th, 2008

```
1    Q.    At the time of January 18th, had you
2          formed the opinion that she should be
3          terminated?
4    A.    Before the 18th?
5    Q.    Right.
6    A.    Is that what you're asking me?
7    Q.    Right.
8    A.    I don't recall.
9    Q.    I'm not sure why this is so difficult.
10         I mean, you're a supervisor; right?
11   A.    Yeah.
12   Q.    And you're in Ms. Jackson's chain of
13         command; right?
14   A.    Yes.
15   Q.    She's an employee working under your
16         supervision; right -- or I'm sorry --
17         working under -- two steps below your
18         supervision; right?
19   A.    I'm in her chain of command.
20   Q.    At some time you're sitting around
21         doing something or something comes up
22         and you think, I think we need to
23         terminate LaShundra Jackson.  Did that
```

JAY PALMER -- June 19th, 2008

```
1        ever happen?
2                MR. REDD:   Object to the form.
3   A.   No.   That's pretty simplistic.   No.
4        That doesn't occur.
5   Q.   Obviously it occurred in somebody's
6        mind that Ms. Jackson should be
7        terminated; right?
8   A.   I believe it occurred in many minds.
9   Q.   At what point did it occur in your
10       mind?
11               MR. REDD:   Object to the form.
12                   I think you're answered
13                   that he doesn't know the
14                   exact day.
15  A.   I don't know the day.   I don't know.
16  Q.   And you don't know what it was that
17       made you think of that?
18  A.   Out of the blue, no, I do not.
19  Q.   Okay.   Do you know what it was that --
20       do you know who called the first
21       meeting that you attended where
22       Ms. Jackson's termination was
23       discussed?
```

JAY PALMER -- June 19th, 2008

| | | |
|---|---|---|
| 1 | A. | No, I do not. |
| 2 | Q. | But you weren't the first one to put |
| 3 | | that idea forward of terminating her; |
| 4 | | right? |
| 5 | A. | I don't know. |
| 6 | Q. | You don't know? |
| 7 | A. | I don't know if I was the first or |
| 8 | | not. |
| 9 | Q. | Let me show you what I've marked as |
| 10 | | Exhibit 22 to your deposition.  Do you |
| 11 | | recognize that document? |
| 12 | | (The referred-to document was |
| 13 | | marked for identification |
| 14 | | as Plaintiff's Exhibit No. 22.) |
| 15 | A. | Yes. |
| 16 | Q. | Can you tell me what it is? |
| 17 | A. | It's my recommendation that |
| 18 | | Ms. Jackson be terminated. |
| 19 | Q. | Okay.  And this is the recommendation |
| 20 | | that you were instructed to write by |
| 21 | | Mr. Morris? |
| 22 | A. | No. |
| 23 | Q. | Okay.  Did anyone instruct you to |

JAY PALMER -- June 19th, 2008

```
 1        write this recommendation?

 2   A.   Yes.

 3   Q.   Who instructed you to write it?

 4   A.   Mr. Calametti.

 5   Q.   And you reference four dates in this

 6        recommendation; right?  I'm sorry.

 7        And when I say you're referencing four

 8        dates, four dates of things that

 9        happened that formed the basis of your

10        recommendation that she be terminated;

11        right?

12   A.   There's three dates.

13   Q.   October 6th, November 2nd,

14        January 18th, January 5th; right?

15             MR. REDD:  Object to the form.

16   A.   There's four dates in that letter.

17   Q.   Okay.

18   A.   The 18th refers back to the

19        January 5th incident.

20   Q.   Okay.  Tell me -- tell me what it

21        was -- let's see.  We've talked about

22        October 6th.  What was the incident on

23        November 2nd that is the basis for her
```

JAY PALMER -- June 19th, 2008

1        termination?

2    A.    That was addressed in her

3          mid-appraisal.

4    Q.    Okay.  What was the incident?

5    A.    It was in the mid-appraisal.  It was

6          addressed in her mid-appraisal.

7    Q.    It was -- it was her mid-appraisal, or

8          it was addressed in her mid-appraisal?

9    A.    The issue concerning her professional

10         manner was addressed in her

11         mid-appraisal.

12   Q.    Okay.  What was the incident of her

13         professional manner that was addressed

14         in her mid-appraisal?

15   A.    I didn't look at her mid-appraisal.

16              (Off-the-record discussion.)

17   Q.    Let me show you what I've marked as

18         Exhibit 5.  Is that the mid-appraisal

19         that you're talking about?

20              (Plaintiff's Exhibit 5 was

21               previously marked and is

22               not attached hereto.)

23   A.    Yes.

JAY PALMER -- June 19th, 2008

```
 1   Q.    Okay.  What was the -- what was the
 2         incident that she was being -- or what
 3         was the incident of November 2nd
 4         that's being discussed here?
 5   A.    I don't believe it was an incident.
 6   Q.    Okay.
 7   A.    She was advised on her mid-appraisal
 8         that she should conduct herself in a
 9         professional manner in an office
10         setting.
11   Q.    Okay.  And was that one of the reasons
12         that she was terminated, for being
13         advised of that?
14   A.    I don't know.
15   Q.    You wrote it in your recommendation
16         letter; right?
17   A.    Yes.
18   Q.    Okay.  But you don't know whether that
19         was one of the reasons that you were
20         recommending she should be terminated?
21   A.    I listed it as one of my
22         recommendations that she should be
23         terminated.  I don't know if it was
```

JAY PALMER -- June 19th, 2008

```
 1            the determining incident that
 2            terminated her.  That one incident, I
 3            don't know.
 4    Q.      Did you think that what happened on
 5            November 2nd was a basis for
 6            terminating her?
 7    A.      I think where she was advised on
 8            November 2nd to conduct herself in a
 9            professional manner warranted
10            inclusion in this recommendation.
11    Q.      Okay.  And why did you think that?
12    A.      Because she was advised concerning her
13            behavior in conducting herself in a
14            professional manner, and then on
15            January 18th come the incident after
16            the mid-appraisal.
17    Q.      Had Ms. Jackson conducted herself in
18            an unprofessional manner as of
19            November 2nd, 2006?
20    A.      I believe she did.
21    Q.      Okay.  On what occasion did she do
22            that?
23    A.      I think the incident of -- of -- in
```

JAY PALMER -- June 19th, 2008

```
 1          October.
 2    Q.    Okay.  Any others?
 3    A.    I don't know.
 4    Q.    So really the November 2nd, being
 5          advised of conducting herself in a
 6          professional manner, that just relates
 7          to what happened on October 6th?
 8    A.    I don't know if it's specifically
 9          October 6th.  I don't know.
10    Q.    Okay.  Now, you wrote this letter, so
11          you --
12    A.    I didn't write her mid-appraisal.
13    Q.    I know you didn't write her
14          mid-appraisal.  Her mid-appraisal just
15          says that -- that Mr. Paulk spoke with
16          her about conducting herself in a
17          professional manner in an office
18          setting; right?
19    A.    Yes.
20    Q.    All right.  Do you know what he spoke
21          with her about on that day?
22    A.    I'm sure it was the October incident.
23    Q.    Do you know if it was?
```

```
 1   A.      No.
 2   Q.      Do you know if there were any other
 3           incidents that he talked with her
 4           about?
 5   A.      I don't know.
 6   Q.      So basically you're saying to me right
 7           now that you recommended terminating
 8           her because Mr. Paulk talked to her
 9           about conducting herself in a
10           professional manner?
11                   MR. REDD:  Object to the form.
12                        That's not what he's
13                        saying.
14   A.      No, that's not what I'm saying.
15   Q.      Okay.  What are you saying?
16   A.      I'm saying these are the accumulations
17           of all the incidents and issues.
18   Q.      Okay.  And the November 2nd incident
19           and issue is just her receiving her
20           mid-appraisal; right?
21   A.      Yes.  Which was addressed that she
22           needs to conduct herself in a
23           professional manner.
```

1    Q.    All right.  So you recommended that

2          she be terminated for incidents on

3          October 6th, November 2nd, and

4          January 5th; right?

5    A.    No.  November 2nd is not an incident.

6    Q.    Okay.  So you recommended that she be

7          terminated based on incidents

8          occurring on October 6th and

9          January 5th; correct?

10   A.    And areas that she needed to improve

11         upon, which was the November 2nd

12         mid-appraisal.

13   Q.    Let me show you what I've marked as

14         Exhibit 23 to your deposition.  Do you

15         recognize that document?

16               (The referred-to document was

17                marked for identification

18                as Plaintiff's Exhibit No. 23.)

19   A.    Yes.

20   Q.    Look at the last page of that

21         document.  The last sentence says (as

22         read:) I recommended the termination

23         of her employment based on incidents

JAY PALMER -- June 19th, 2008

```
 1          of October 4th, 2006, December 20th,

 2          2006, and January 5th, 2007; right?

 3   A.     Yes.

 4   Q.     Okay.  But you didn't mention the

 5          December 20th, 2006, in your

 6          termination recommendation letter, did

 7          you?

 8   A.     No.

 9   Q.     Did you just leave that out

10          inadvertently?

11   A.     No.  There were -- I don't believe

12          there was a disciplinary action on

13          that date.

14   Q.     Well, there was no disciplinary action

15          on November 2nd either, was there?

16   A.     It's a mid-appraisal which addresses

17          weaknesses that she needs to improve

18          on.

19   Q.     The mid-appraisal has to address some

20          weaknesses that people need to improve

21          on; right?  There's a section --

22   A.     No, that's not correct.

23   Q.     There's a section for it in there;
```

```
 1        right?
 2   A.   Yes.
 3   Q.   Did you -- could you only address
 4        incidents that somebody is disciplined
 5        for in a termination recommendation?
 6   A.   Not necessarily.
 7   Q.   So you could have -- there is no rule
 8        that says you couldn't have mentioned
 9        the December 20th incident in her
10        termination recommendation, is there?
11   A.   I don't believe so.
12   Q.   You just left it out?
13   A.   I didn't include it.
14   Q.   And you don't know which incidents
15        Ms. Jackson was actually terminated
16        because of, do you?
17   A.   I don't think there's a specific
18        incident.  I do not know.
19   Q.   Did you take any notes during the
20        meeting that you had with -- the first
21        meeting that you had with Ms. Deitz
22        about terminating Ms. Jackson?
23   A.   No.
```

JAY PALMER -- June 19th, 2008

1    Q.    Did you take any notes during that

2          meeting where Mr. Morris was on the

3          phone?

4    A.    No.

5    Q.    In your affidavit that's marked as

6          Exhibit 23, you say in here (as read:)

7          I'm unaware of any request for

8          accommodation because of Ms. Jackson's

9          pregnancy.

10                   Is that right?

11   A.    Yes.

12   Q.    Did Mr. Calametti not send you the

13         letter on February 13th requesting the

14         accommodation for Ms. Jackson's

15         pregnancy?

16   A.    There was not a request for

17         accommodations on that letter of

18         February 13th.

19   Q.    Okay.  Do you know what the temporary

20         work restrictions is that's attached

21         to this memo?

22   A.    To this memo?

23   Q.    Yeah.  Was it the doctor's note?

JAY PALMER -- June 19th, 2008

1    A.    I don't know.  I've never seen the
2          doctor's note.
3    Q.    Okay.  Where he says in the memo (as
4          read:) Attached please find temporary
5          work restriction on LaShundra Jackson.
6                    Do you know what the
7          temporary work restriction is that he
8          is referring to?
9    A.    No, I guess -- I can only assume it
10         was her pregnancy.
11   Q.    Okay.  Her actual pregnancy was not
12         attached to this memo, was it?
13   A.    I don't recall it being attached to
14         the memo.
15                   MR. REDD:  Was that a touch of
16                   sarcasm?
17   Q.    (By Mr. Simon:)  I'm trying to figure
18         out if you can recall seeing a
19         document attached to this memo?
20                   MR. REDD:  He said he didn't
21                   see the notes, so --
22   A.    I never saw the doctor's notes.
23   Q.    Okay.  I'm not asking you if it was

JAY PALMER -- June 19th, 2008

```
 1        the doctor's notes attached.  I'm
 2        asking you what was attached to this
 3        memo.
 4   A.   I do not know.
 5   Q.   But it was a temporary work
 6        restriction of some sort; right?
 7              MR. REDD:  He said he didn't
 8                  know.
 9   A.   I don't know.
10   Q.   The memo says that there is a
11        temporary work restriction attached;
12        right?
13   A.   Attached please find temporary work
14        restriction, yes.
15   Q.   And that's some kind of accommodation
16        for Ms. Jackson's pregnancy; right?
17              MR. REDD:  Object to the form.
18                  He doesn't know.
19   A.   Not necessarily.  It may be temporary
20        work restrictions.
21   Q.   Have you ever had any other
22        engineering assistants be brought in
23        from the field to do inside work
```

JAY PALMER -- June 19th, 2008

```
 1              because they're pregnant?
 2   A.    No.  I don't recall any.
 3   Q.    You testified in your affidavit about
 4         somebody named Ms. Weaver, and you
 5         said that she was already working in
 6         an inside position when she became
 7         pregnant?
 8   A.    She was assigned as office engineer
 9         for a project.
10   Q.    So at the time of her pregnancy -- at
11         the time that ALDOT learned of her
12         pregnancy, she was already working
13         inside?
14   A.    She was working in an office
15         environment, yes.
16   Q.    She was no -- she was not doing
17         inspection work?
18   A.    I wasn't aware of that.  She was the
19         office engineer for one of the
20         projects.
21   Q.    Currently?
22   A.    No.  She's no longer with the
23         Department.
```

JAY PALMER -- June 19th, 2008

| | | |
|---|---|---|
| 1 | Q. | But at the time that she announced her |
| 2 | | pregnancy, she was the office engineer |
| 3 | | for one of the projects? |
| 4 | A. | Yes. |
| 5 | Q. | If there was testimony from another |
| 6 | | ALDOT employee who worked with her |
| 7 | | that she was brought inside when she |
| 8 | | became pregnant, would you have any |
| 9 | | reason to dispute that? |
| 10 | A. | Without knowing all the information, I |
| 11 | | couldn't say yes or no. |
| 12 | Q. | Okay. |
| 13 | A. | I don't believe there was ever a |
| 14 | | request from Ms. Weaver, or I'm not |
| 15 | | aware of one. |
| 16 | Q. | You say on the first page of your |
| 17 | | affidavit (as read:) Prior to |
| 18 | | beginning actual work, Ms. Jackson was |
| 19 | | informed that her employment would |
| 20 | | consist of outside work. |
| 21 | A. | Yeah. |
| 22 | Q. | What's the importance of that? |
| 23 | A. | As a construction inspector, they work |

```
 1        outdoors.
 2    Q.  Are all probationary engineering
 3        assistants made project inspectors?
 4    A.  No.
 5    Q.  Some of them do other jobs?
 6    A.  Yes.
 7    Q.  Some of them do jobs that are inside?
 8    A.  Yes.
 9    Q.  But the job that Ms. Jackson was being
10        hired for was an outside job?
11    A.  Yes.
12    Q.  But there wasn't any kind of problem
13        with moving her to an inside job when
14        she became pregnant, was there?
15    A.  We had work for her.
16            (Off-the-record Discussion.)
17    Q.  Was it a problem to move her inside
18        though?
19    A.  No.
20    Q.  And Mr. Cooper had plenty of work for
21        her to do; right?
22    A.  Yes.
23    Q.  And Mr. Paulk, he didn't have enough
```

JAY PALMER -- June 19th, 2008

```
 1        work for her to do on the inside; is
 2        that right?
 3   A.   I don't know.
 4   Q.   What kind of work was she doing under
 5        Mr. Cooper?
 6   A.   I would assume she would be doing
 7        office work.
 8   Q.   Do you know what kind of office work
 9        it was?
10   A.   No, I do not.
11   Q.   Who prepared her new Form 40?
12   A.   That should have been Mr. Cooper.
13   Q.   Did you sign off on -- I'm sorry.  Did
14        you have any involvement in preparing
15        her new Form 40?
16   A.   I don't review Form 40s.
17   Q.   Did you have any involvement in
18        determining what her inside duties
19        were going to be when she was moved
20        inside?
21   A.   No.
22   Q.   Who did Ms. Jackson's final
23        performance appraisal?
```

```
 1   A.     I'm sorry?

 2   Q.     Who prepared Ms. Jackson's final

 3          performance appraisal?

 4   A.     I did.

 5   Q.     Were you -- were you her supervisor at

 6          that time?

 7   A.     No.

 8   Q.     Then why did you prepare it?

 9   A.     I was instructed to.

10   Q.     Who instructed you to prepare it?

11   A.     Mr. Calametti.

12   Q.     Did Mr. Calametti instruct you on what

13          ratings to give Ms. Jackson on her

14          performance appraisal?

15   A.     I don't believe so.

16   Q.     Who decided what numerical ratings she

17          was going to receive for the various

18          responsibilities?

19   A.     Who decided?

20   Q.     Yeah.

21   A.     I decided.

22   Q.     On what basis did you decide what

23          ratings she was going to get in each
```

JAY PALMER -- June 19th, 2008

```
 1        responsibility category?
 2   A.   Based on her performance with her
 3        supervisors.
 4   Q.   And how did you hear about that
 5        performance with her supervisors?
 6   A.   I believe I discussed it with them.
 7   Q.   You discussed Ms. Jackson's job
 8        performance with Mr. Paulk?
 9   A.   Yes.
10   Q.   Did you also discuss Ms. Jackson's job
11        performance with Mr. Cooper?
12   A.   Yes.
13   Q.   Did you get input from Mr. Cooper as
14        to how Ms. Jackson was doing as an
15        engineering assistant?
16   A.   I believe so.
17   Q.   And did you get input from Mr. Paulk
18        as to how Ms. Jackson was doing as an
19        engineering assistant?
20   A.   I believe so.
21   Q.   And what was the input that you got
22        from Mr. Paulk on how Ms. Jackson was
23        doing?
```

```
 1   A.     As far as her performance?

 2   Q.     Yeah.  Her work performance.

 3   A.     Specific items as per her appraisal?

 4          Is that what you mean?

 5   Q.     Yes.

 6   A.     I think they averaged "meets

 7          standards."

 8   Q.     Did you go over each of the

 9          performance elements with -- or I'm

10          sorry -- each of the responsibility

11          scores with Mr. Paulk before you put

12          them on the form?

13   A.     I believe so.  Can I see a copy of

14          the -- the appraisal?

15   Q.     Yeah.  Here you go.  It's marked as

16          Plaintiff's Exhibit 10.  Do you

17          recognize that document?

18                 (Plaintiff's Exhibit 10 was

19                  previously marked and is

20                  not attached hereto.)

21   A.     Yes.

22   Q.     And you prepared this on February 23rd

23          of '07; is that right?
```

JAY PALMER -- June 19th, 2008

```
 1   A.    That's the date I signed it.

 2   Q.    And Bret Paulk initialed it by your

 3         signature; right?

 4   A.    Yes.

 5   Q.    And Mr. Calametti did too?

 6   A.    Yes.

 7   Q.    Mr. Cooper didn't though?

 8   A.    No.

 9   Q.    And he was her direct supervisor at

10         the time that this was done; right?

11   A.    I don't know.  I don't believe he was.

12   Q.    You think that you prepared this

13         performance appraisal before

14         Ms. Jackson was transferred to

15         Mr. Cooper?

16   A.    I don't believe -- I'm not sure if she

17         was transferred.

18   Q.    You think you prepared this

19         performance appraisal before

20         Ms. Jackson was assigned to work with

21         Mr. Cooper?

22   A.    Oh, no, I do not.

23   Q.    So it was after she was assigned to
```

JAY PALMER -- June 19th, 2008

```
 1         work with Mr. Cooper that you prepared
 2         this performance appraisal?
 3   A.    I believe so.
 4   Q.    Was Mr. Cooper considered her
 5         supervisor?
 6   A.    I don't know.
 7   Q.    It says on her Form 40 that he was her
 8         supervisor; right?
 9   A.    Yes.
10   Q.    But you don't know whether he was
11         actually her supervisor?
12   A.    I don't know whether she was actually
13         permanently assigned to Mr. Cooper.
14   Q.    But you did get input from Mr. Cooper
15         on how Ms. Jackson was doing on her
16         job duties before you prepared this
17         appraisal; is that correct?
18   A.    Yes, I discussed this with Mr. Cooper.
19   Q.    And what did Mr. Cooper say about how
20         Ms. Jackson was doing on her job
21         duties?
22   A.    She did fine.
23   Q.    Let's talk about responsibility
```

```
 1          category Number 1 where she was given

 2          a "partially meets standards" in the

 3          category of "communicates orally with

 4          individuals."  What was the reason

 5          that you rated her a 1 in that

 6          category?

 7    A.    (Witness reviewing document.)

 8                    I believe it was with her

 9          communication skills with her

10          supervisor.

11    Q.    Which supervisor?

12    A.    Mr. Paulk --

13    Q.    She didn't have good --

14    A.    -- and Mr. McElhenney.

15    Q.    Mr. McElhenney was her supervisor?

16    A.    No.  Mr. Paulk and Mr. McElhenney.

17          Her supervisor, Mr. Paulk, and

18          Mr. McElhenney, an additional

19          supervisor.

20    Q.    He was not --

21    A.    Yes.

22    Q.    And did you rate her "partially meets

23          standards" because of what happened on
```

JAY PALMER -- June 19th, 2008

```
 1        January 5th?
 2   A.   I would say yes.
 3   Q.   Were there any other reasons that she
 4        got a 1 rating in that category?
 5   A.   I believe on that incident with
 6        Mr. Fresolone and Mr. Malone, her
 7        communication with those individuals
 8        as well.
 9   Q.   On January 5th; right?
10   A.   Yes.
11   Q.   Was there any reason other than what
12        happened on January 5th that you rated
13        her as a 1 in that category?
14   A.   I don't recall any additional.
15   Q.   Let's talk about responsibility
16        Number 6, "performs and obtains
17        inspections and tests on concrete."
18        She got a 1 rating in that category
19        too; right?
20   A.   Yes.
21   Q.   And the 1 rating is a poor rating;
22        right?
23   A.   No.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.     It's not?

 2   A.     No.

 3   Q.     Is it a good rating?

 4   A.     No.  It means she partially meets

 5          standards.

 6   Q.     That's below average; right?

 7   A.     No.  It's just that she partially

 8          meets the requirements.  It's not

 9          necessarily below average.  If she

10          doesn't have full certification, she

11          can't fully perform her duties.

12   Q.     So responsibility Number 6, you rated

13          her a 1.  What was the reason for

14          that?

15   A.     I don't believe she had her full

16          certifications.

17   Q.     What makes you think that she didn't?

18   A.     I don't believe she had passed or gone

19          through the ACI concrete school or the

20          Road Tech school.

21   Q.     What makes you -- what makes you think

22          that she hadn't?

23   A.     Typically she would have to be
```

JAY PALMER -- June 19th, 2008

```
 1        certified in concrete and roadway and
 2        nuclear gauge to adequately meet
 3        standards to perform those duties.
 4   Q.   Okay.  If you look at her previous
 5        performance appraisal from
 6        December 20th, what was her rating
 7        on -- did she get a rating in that
 8        category?
 9   A.   She got a 1.
10   Q.   And is that because she hadn't passed
11        her certifications?
12   A.   I would assume so.
13   Q.   How do you know that she didn't pass
14        her certifications by the time that
15        she did this review in February?
16   A.   Typically our probationary employees
17        are not allowed -- I'll not say not
18        allowed.  The opportunity is, after
19        they come off of probation, then the
20        formal training for concrete, asphalt,
21        radiological is initiated and
22        scheduled.
23   Q.   Okay.  So if I look at performance
```

JAY PALMER -- June 19th, 2008

1       appraisals of other engineering

2       assistants -- other probationary

3       engineering assistants, they should

4       all have a 1 for their score for

5       "performs and obtains inspections and

6       tests" on file?

7  A.    I don't know.

8  Q.    But if they haven't passed those

9       courses, then they should?

10  A.    If they can't perform concrete -- if

11       they're not fully certified, yeah,

12       they should be "meets standards."  But

13       if they pass one part, if they pass

14       the State or the ACI, we typically

15       grant -- or rate them -- or the

16       supervisor would typically rate them

17       "partially meets standards."  It's not

18       a below average.  It's not a poor

19       average.

20  Q.    What is the -- what is the reason for

21       doing one of these performance

22       appraisals on a probationary employee?

23  A.    One of what?

JAY PALMER -- June 19th, 2008

```
 1   Q.     What is the --

 2   A.     What reason?

 3   Q.     What is the reason that ALDOT has you

 4          do these performance appraisals for

 5          probationary employees?

 6   A.     This particular appraisal?

 7   Q.     This kind of appraisal, yeah.  I'm

 8          asking in general, not specifically

 9          about Ms. Jackson.

10   A.     To give the employee indication of

11          where they're at.

12   Q.     For permanent employees it determines

13          your merit raise; right?

14   A.     It can.

15   Q.     And a score of "exceeds standards" or

16          "consistently exceeds standards" will

17          give you a two-step raise; right?

18   A.     "Exceeds standards."

19   Q.     Well, what does "consistently exceeds"

20          do?

21   A.     They got a three-step.

22   Q.     Okay.  And the score of "meets

23          standards," what kind of raise do you
```

| | | |
|---|---|---|
| 1 | | get from that? |
| 2 | A. | I believe a one-step. |
| 3 | Q. | And a score of "partially meets |
| 4 | | standards," what kind of raise do you |
| 5 | | get from that? |
| 6 | A. | Zero. |
| 7 | Q. | No raise at all? |
| 8 | A. | That's correct. |
| 9 | Q. | They don't lower your pay, do they? |
| 10 | A. | No, they do not. |
| 11 | Q. | So the purpose for doing one of these |
| 12 | | for a probationary employee is to tell |
| 13 | | them where they're at with their |
| 14 | | performance? |
| 15 | A. | And it's the -- the supervisor's |
| 16 | | evaluation of the employee. |
| 17 | Q. | This one wasn't given to Ms. Jackson |
| 18 | | until she had already left the |
| 19 | | department, was it? |
| 20 | A. | That's correct. |
| 21 | Q. | What would be the purpose of doing a |
| 22 | | performance appraisal for somebody who |
| 23 | | is going to be terminated? |

JAY PALMER -- June 19th, 2008

1    A.    I do not know.

2    Q.    And who instructed you to do this

3          performance appraisal?  Mr. Calametti;

4          is that right?

5    A.    I believe so.

6    Q.    Let me show you what's been marked as

7          Exhibit 9.  That's the same

8          performance appraisal, but it's got

9          Mr. McInnes' signature on it; right?

10               (Plaintiff's Exhibit 9 was

11                previously marked and is

12                not attached hereto.)

13   A.    I think he initialed it.

14   Q.    It also -- if you look at the top of

15         the document where it says "period

16         covered from," it looks like the dates

17         have been changed; is that right?

18   A.    Yes.

19   Q.    Do you know who changed those dates?

20   A.    I do not.

21   Q.    Did you change them?

22   A.    I did not.

23   Q.    Were they changed after you had signed

JAY PALMER -- June 19th, 2008

```
 1        off on it?

 2   A.   Yes.

 3   Q.   Or were they changed after Mr. Poiroux

 4        had signed off on it?

 5   A.   I do not know that.

 6   Q.   Do you know why they were changed?

 7   A.   I do not.

 8   Q.   The dates that they were changed to,

 9        the starting point would be

10        Ms. Jackson's hire date; right,

11        7/3/06?

12   A.   I don't know what day exactly she was

13        hired on.

14   Q.   But that was around the time she was

15        hired; right?

16   A.   I believe so, yes.

17   Q.   Then do you know what the significance

18        of April 2nd, 2007, would be?

19   A.   No, I do not.

20   Q.   Could that be the end of her extended

21        probationary period?

22   A.   Oh, I don't know.  I don't know what

23        period -- what date that is.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    Look at -- she was extended -- her
 2         probation was extended for three
 3         months; right?
 4   A.    Yes.
 5   Q.    If you'll look at the December 20th
 6         performance appraisal, it says that
 7         it's through the period January 2nd,
 8         2007; right?
 9   A.    Yes.
10   Q.    So January 2nd, 2007, to March -- to
11         April 2nd, 2007, is three months;
12         right?
13   A.    Roughly, yes.
14   Q.    So would you agree with me that it
15         appears that this final performance
16         appraisal would be for the last three
17         months of her probationary period?
18   A.    This one?
19   Q.    The one that goes through April 2nd of
20         2007?
21   A.    According to this, it says from July
22         to April.
23   Q.    Oh, I'm sorry.  So -- so it really
```

JAY PALMER -- June 19th, 2008

```
 1         encompasses the entire nine months of
 2         her probationary period; right?
 3    A.   My appraisal?
 4    Q.   Yes.
 5    A.   My appraisal was from December.
 6    Q.   Okay.  So you were evaluating
 7         Ms. Jackson's performance from
 8         December 21st of '06 to February 23rd
 9         of '07?
10    A.   Yes.
11    Q.   So you don't know who changed it to be
12         that this was actually you were rating
13         her performance for the whole time
14         that she worked there?
15    A.   I do not.
16    Q.   And even for a month and a half after
17         she worked there?
18    A.   A month and a half?  I'm sorry?
19    Q.   Approximately a month and a half after
20         she worked there to April 2nd of 2007?
21         She didn't really work there until
22         April 2nd of 2007, did she?
23    A.   Oh, I don't know.
```

JAY PALMER -- June 19th, 2008

1   Q.    You don't know when her last day of

2         work was?

3   A.    It was -- the termination letter given

4         to her, no, I don't know that exact

5         date, no.

6   Q.    I don't think I have a copy of that.

7         That's okay.  But you didn't think

8         when you filled out this performance

9         appraisal that you were rating her for

10        her entire time at ALDOT, did you?

11  A.    No.  I thought it was during this time

12        period.  This is what was -- no.

13  Q.    Okay.  But somebody decided that you

14        really were rating her for that whole

15        time period?

16  A.    Well, maybe I was.  Maybe I misstated

17        the dates.  I don't remember.

18  Q.    Okay.  Let me show you what's been

19        marked as Exhibit 24.  This is a short

20        e-mail chain about some concrete tech

21        results.  Do you know why Ms. Hadley

22        says in this e-mail that she

23        especially needs to know if LaShundra

JAY PALMER -- June 19th, 2008

```
 1        Jackson passed the concrete tech on
 2        February 22nd?
 3              (The referred-to document was
 4               marked for identification
 5               as Plaintiff's Exhibit No. 24.)
 6   A.   No, I don't.
 7   Q.   Did you have any conversations with
 8        Ms. Hadley about needing to know this
 9        information?
10   A.   I don't recall any conversations.
11              MR. SIMON:  What's the Exhibit
12                  Number that I put on
13                  there?
14              THE REPORTER:  24.
15              MR. SIMON:  And here's your
16                  copy, sir.
17   Q.   (By Mr. Simon:)  Are you aware of
18        whether Ms. Jackson received her
19        unemployment benefits?
20   A.   If she did or did not?
21   Q.   Right.
22   A.   I don't recall whether she did or
23        didn't.
```

JAY PALMER -- June 19th, 2008

```
 1   Q.    You participated in the unemployment
 2         hearing; right?
 3   A.    I believe so.
 4   Q.    Let me show you what I have marked as
 5         Exhibit 25 to your deposition.  Do you
 6         recognize that document?
 7               (The referred-to document was
 8                marked for identification
 9                as Plaintiff's Exhibit No. 25.)
10   A.    I can't say if I've seen this document
11         or not.
12   Q.    Okay.  Let me ask you to look at the
13         second page of this document.
14   A.    Uh-huh.
15               (Off-the-record Discussion.)
16   Q.    In the paragraph right before the word
17         "decision" appears in bold, it says
18         (as read:) The employer has alleged
19         that the claimant's termination
20         resulted from her disruptive and
21         disrespectful behavior towards
22         supervisor and co-workers.
23                          And that was the
```

```
 1         allegation; right?
 2    A.   Where is this at?
 3    Q.   It's the -- it's the middle of that
 4         big paragraph on the second page (as
 5         read:) The employer has alleged that
 6         the claimant's termination resulted
 7         from her disruptive and disrespectful
 8         behavior towards supervisory personnel
 9         and co-workers.
10                        Right?
11    A.   That's what it says, yes.
12    Q.   And that was the allegation that was
13         the basis for Ms. Jackson's
14         termination; right?
15    A.   Yes.  As per the terminations, yeah.
16    Q.   And then the Hearing Officer goes on
17         to say, however, the claimant was
18         discharged after a warning for an
19         incident that occurred significantly
20         prior to the termination date; is that
21         correct?
22                   MR. REDD:  Object to the form.
23    A.   That's what it says.
```

JAY PALMER -- June 19th, 2008

163

```
 1   Q.     Okay.  Would that be a correct
 2          statement?  She was discharged after
 3          warning for an incident that occurred
 4          significantly prior to the termination
 5          date?
 6                  MR. REDD:  Object to the form.
 7   A.     I don't know what they mean by
 8          significant.  That's their -- their
 9          terminology.
10   Q.     You recommended the termination on
11          February 22nd; right?
12   A.     I believe so.
13   Q.     And so she was terminated sometime
14          after that; right?
15   A.     Yes.
16   Q.     And the last incident of misconduct
17          was January 5th; right?
18   A.     I believe so.
19   Q.     Okay.  The Hearing Officer says (as
20          read:) No cause or relationship has
21          been established between the incident
22          and termination.
23                  MR. REDD:  Object to the form.
```

```
 1   Q.     Is that correct?

 2   A.     That's what it says.

 3   Q.     What is the relationship between the

 4          incident that led to her termination

 5          and the termination itself?

 6                 MR. REDD:  Object to the form.

 7   A.     What's the question?

 8   Q.     What is the relationship between the

 9          incident that led to her termination

10          and the termination itself?

11                 MR. REDD:  Object to the form.

12   A.     Relationship?  What do you mean

13          relationship?

14   Q.     Well, I'm kind of asking you based on

15          what the hearing officer is saying

16          here.

17                 MR. REDD:  And I object

18                    because he can't read her

19                    mind.

20                 MR. SIMON:  I understand.  I'm

21                    asking what he thinks

22                    about it though.

23                 MR. REDD:  What he's
```

```
 1                    thinking -- go ahead.
 2   Q.   You recommended termination of
 3        Ms. Jackson about six weeks after the
 4        incident -- the last incident of
 5        misconduct; right?
 6   A.   Approximately, yes.
 7   Q.   Why was there such a long delay
 8        between that last incident of
 9        misconduct and when you recommended
10        termination?
11   A.   I don't know.
12            MR. SIMON:  I believe that's
13                all I have.  Let's take a
14                five-minute break to go
15                through everything and
16                make sure I've got
17                everything.
18            MR. REDD:  Sure.
19          (Brief recess was taken.)
20   Q.   (By Mr. Simon:)  Let me show you what
21        I've marked here as Exhibit 4.  That
22        letter shows that Ms. Jackson was
23        terminated effective Friday,
```

JAY PALMER -- June 19th, 2008

```
 1        March 9th; right?
 2               (Plaintiff's Exhibit 4 was
 3                  previously marked and is
 4                  not attached hereto.)
 5   A.   Yes.
 6   Q.   You filled out her final performance
 7        review and dated it February 23rd;
 8        right?
 9   A.   Yes.
10   Q.   And when you -- when you prepared it
11        and dated it, you didn't give it to
12        Ms. Jackson to sign, did you?
13   A.   No.
14   Q.   You didn't show it to her, did you?
15   A.   No.
16   Q.   Okay.  It says on there that all
17        signatures are mandatory; right?
18   A.   Where?
19   Q.   Under the block near the top that says
20        appraisal signatures, the last
21        sentence, it says that all signatures
22        are mandatory; right?
23   A.   Yes.
```

JAY PALMER -- June 19th, 2008

```
1   Q.    Okay.  Why wasn't Ms. Jackson's
2         signature requested on this form?
3   A.    I do not know.
4   Q.    Usually the employee would sign it
5         with the ratings supervisor; right?
6   A.    That's correct.
7   Q.    But you didn't do that in this
8         situation?
9   A.    No.
10  Q.    Why not?
11  A.    I do not know.
12  Q.    Did you just forget?
13  A.    No.
14  Q.    Were you instructed not to have her
15        sign it?
16  A.    I don't believe I was instructed not
17        to have her sign it.
18  Q.    Did you make a decision on your own
19        not to have her sign it?
20  A.    No.
21  Q.    Where -- what did you do with this
22        performance appraisal after you signed
23        it?
```

JAY PALMER -- June 19th, 2008

```
 1   A.    I believe it was forwarded to
 2         personnel.
 3   Q.    Okay.  You signed it on February 23rd;
 4         right?
 5   A.    Yes.
 6   Q.    And by personnel, do you mean the
 7         personnel in Montgomery?
 8   A.    No.  Here local.
 9   Q.    And do you know what personnel did
10         with it?
11   A.    I do not.
12   Q.    It's got Poiroux's signature on it on
13         the 27th; right?
14   A.    Yes.
15   Q.    And by the time he signed it,
16         Ms. Jackson should also have signed
17         it; right?
18   A.    I don't know.
19   Q.    That's how it worked on the December
20         performance appraisal; right?
21   A.    Yes.  That's how they typically work,
22         yes.
23               (Off-the-record Discussion.)
```

1          MR. SIMON:  Okay.  That's all

2               I've got.  Now you can

3               go.

4          MR. TRIPPE:  Well, Andy may

5               have some quick

6               questions, so let's take

7               a quick break.

8          MR. SIMON:  Okay.

9          (Brief recess was taken.)

10         MR. TRIPPE:  We're done.

11

12    (The deposition of **JAY PALMER**

13     concluded at approximately

14     11:54 a.m., on June 19th, 2008.)

15

16

17

18

19

20

21

22

23

JAY PALMER -- June 19th, 2008

```
1                 *   *   *   *   *   *   *   *

2              R E P O R T E R ' S   C E R T I F I C A T E

3                 *   *   *   *   *   *   *   *

4

5    STATE OF ALABAMA

6    COUNTY OF MONTGOMERY

7              I, Karen Reagan Drinkard,

8    AL-CCR #005, Certified Court Reporter

9    and Notary Public in and for the State

10   of Alabama at Large, do hereby certify

11   that on June 19th, 2008, pursuant to

12   notice and stipulation on behalf of

13   the Plaintiff, I reported the

14   deposition of JAY PALMER, who was

15   first duly sworn by me to speak the

16   truth, the whole truth, and nothing

17   but the truth, in the matter of

18   LASHUNDRA JACKSON, Plaintiff, versus

19   STATE OF ALABAMA DEPARTMENT OF

20   TRANSPORTATION, JOE McINNES, in his

21   official capacity as DIRECTOR OF THE

22   STATE OF ALABAMA DEPARTMENT OF

23   TRANSPORTATION, Defendant, Civil
```

```
1        Action Number 2:07-CV-645-MEF, now

2        pending in the United States District

3        Court for the Middle District of

4        Alabama, Northern Division; that the

5        foregoing 170 typewritten pages

6        contain a true and accurate

7        transcription of the examination of

8        said witness by counsel for the

9        parties set out herein; that the

10       reading and signing of said deposition

11       was waived by witness and counsel for

12       the parties.

13             I further certify that I am

14       neither of kin nor of counsel to the

15       parties to said cause, nor in any

16       manner interested in the results

17       thereof.

18             This 21st day of June, 2008

19

20

         _____
21       Karen Reagan Drinkard, CCR #005
         Reporter and Notary Public
22       State of Alabama at Large

23
```