IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON                         §
                                          §
        Plaintiff,                        §
                                          §
                                          §        CASE NO.: 2:07-CV-645-MEF
                                          §
STATE OF ALABAMA DEPARTMENT OF            §
TRANSPORTATION, JOE MCINNES, IN HIS       §
OFFICIAL CAPACITY AS DIRECTOR OF THE      §
STATE OF ALABAMA DEPARTMENT OF            §
TRANSPORTATION                            §
                                          §
        Defendants.                       §

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its Reply Brief in support of its Motion for Summary Judgment, Defendant makes several new

arguments and attaches new evidence that were not included in Defendant's Motion for Summary

Judgment. Case law from this and other circuits is clear that in summary judgment proceedings the movant

should not be allowed to submit evidence in support of its motion that the non-movant does not have an

opportunity to rebut. *See Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir. 1991); *Cia. Petrolera

Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 410 (1st Cir.1985) (nonmoving party should have

had opportunity to examine and reply to moving party's reply brief and supplemental affidavits containing

new evidence prior to hearing and disposition of summary judgment motion).  The law of this Circuit is clear

that the defendant bears the burden in its summary judgment brief to demonstrate to the district court the

basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers

to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact.

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). Plaintiff therefore submits the

following in reply to the new evidence and arguments made by Defendants in their reply.

## 1.    Probation extension for non-passage of math courses was discretionary

Defendant contends that the documents submitted by Plaintiff that show employees failing basic

math and algebra were not final results for those employees, and in support of that argument attached

Exhibit 26, which Defendant contends "reflects subsequent math test results for Engineering Assistants."

Def. Reply at 1.

Defendant has never produced to Plaintiff the document contained in Defendant's Exhibit 26,

despite the fact that Plaintiff's First Requests for Production of Documents asked for "all documents

showing the passage of an algebra course or test or satisfaction of the algebra requirement (including by

passage of the placement exam) for probationary Engineering Assistants in the Ninth Division from January

2002 until the present." Exhibit 14.

Furthermore, Defendant has made no showing or even argument that the document marked Exhibit

26 is admissible in these proceedings. There is no affidavit from any ALDOT employee or any other

evidence that would serve to authenticate the document as a business record. As such, it is inadmissible

hearsay, and should be disregarded by this Court.

In the alternative, if this Court chooses to consider this document, Plaintiff submits that the

documents attached hereto as Exhibit 15 demonstrate conclusively that white Engineering Assistants were

permitted to pass their probationary periods without passing basic math and algebra, and that the passage

of such courses was not a true prerequisite to being moved from probationary to permanent status. The

attached documents show that Gene Blan, a white probationary Engineering Assistant, initially failed

algebra, and then, just like Ms. Jackson, was not able to attend the algebra class for which he was

scheduled during his probationary period because of medical reasons. Exh. 14. The e-mail from Debra

Hadley states clearly that it is within the discretion of the supervisor whether Mr. Blan would be permitted

to pass probation, and that Vince Calametti was one of the supervisors who had that discretion. *Id.* ("I

advised Lawana that his probationary period may be extended also but that the decision would be left up

to all of you.") He was then allowed to pass his probationary period without passing algebra. *Id.* The

new exhibit #26 submitted by Defendant, shows that Mr. Blan passed algebra on October 22, 2007, which

is one month *after* he obtained permanent status as an Engineering Assistant. Exh. 15.

2.    **The decisionmakers on Ms. Jackson's termination were aware of her grievance before they terminated her.**

Defendant argues that the submission of Sandra Dietz's investigative findings, which specifically

reference her discussions with Paulk, Palmer, and Calametti regarding Ms. Jackson's grievance do not

establish knowledge on their part of Ms. Jackson's grievance. Def. Brief at 5. The attached letter from

L. Daniel Morris, dated February 16, 2007, clearly shows that Morris, who Palmer and Vince Calametti

both identified as the true decisionmaker on Ms. Jackson's termination (Palmer depo. at 84:17-23;

Deposition of Vincent Calametti (attached hereto as Exhibit 18) at 78:17-79:23), was aware of her

grievance before the first recommendation for her termination was made on February 22. Exhibit 16,

attached hereto.

Furthermore, Bret Paulk testified in his deposition that Ms. Dietz held a meeting with him, Palmer,

and Calametti during which the grievance was discussed. Paulk depo. at 184:2-23 (Exh. 12 to Plaintiff's

Response in Opposition to Defendant's Motion for Summary Judgment). Ronnie Poiroux also testified that

he heard about Ms. Jackson's grievance from Sandi Dietz in late January or February of 2007. Deposition

of Ronnie Poiroux (attached hereto as Exhibit 19) at 23:14-23.

### 3.    Bertha Alexander's grievance.

Defendants fault Plaintiff for failing to attach the findings of the grievance hearing to her affidavit. *See* Def. Reply at 2.   Plaintiff therefore attaches those findings hereto as Exhibit 17.  These findings show that Mr. Palmer was aware of Ms. Alexander's grievance, was named in the grievance as someone who had discriminated against Ms. Alexander, and in fact represented the Department of Transportation during the grievance hearing. *Id.* at 1-2.  The outcome of the hearing was not favorable to Ms. Alexander (*see* Exhibit 17 at 13), but that is not relevant to the issue at bar in the present case: whether Ms. Jackson's grievance of January 29, 2007, constitutes protected activity based on her claim that ALDOT was retaliating against her because of Ms. Alexander's grievance.

Respectfully submitted
ROSS LAW, P.C.
1104 San Antonio Street
Austin, Texas 78701
Telephone: 512/474-7677
Facsimile: 512/474-5306

s/ Kell A. Simon
Kell Simon
Alabama State Bar No.: ASB-0214-O77K

## CERTIFICATE OF SERVICE

I hereby certify that on this the 3rd day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification to the following:

Jim R. Ippolito, Jr.
Andrew W. Redd
Jason A. Trippe
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110

s/ Kell A. Simon
Of counsel

# Plaintiff's Exhibit 14

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LASHUNDRA JACKSON,       )
                                    )
      Plaintiff,          )
                                    )
vs.                         )     CASE NO.:2:07-CV-645-MEF
                                    )
STATE OF ALABAMA DEPARTMENT )
OF TRANSPORTATION;      )
JOE MCINNES; *etc.*,         )
                                    )
      Defendants.      )

## DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST INTERROGATORES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

COME NOW Defendants, by and through undersigned counsel, and in response to

Plaintiff's First Interrogatories and Requests for Production to Defendants, state as follows:

### Requests for Production

1.    Provide all personnel files of the plaintiff, including the Division, District, Central Office, and State Personnel Department files, and all documents and recordings related to her employment including but not limited to all documents related to the decision to terminate plaintiff's employment.

**RESPONSE:** Plaintiff's personnel files, maintained by ALDOT, will be made available for inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties. Said inspection is to be conducted where the materials are maintained in the normal course of business. Any files maintained by the State Personnel Department may be requested from that agency.

2.    Provide a copy of any notes, calendar entries or diary entries created by Bret Paulk, Vince Calametti, Jeremiah Taylor, Josh McElhenney, Charly D. Jones, Joseph Fresolone, Leon Malone, Ronnie Poiroux, Samuel Palmer, L. Daniel Morris, or J.D. McInnes that in any way relate to the plaintiff.

**RESPONSE:** To the extent that such materials exist and are not privileged, the same will be made available for inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties. said inspection is to be conducted where the materials are maintained in the normal course of business.

> 3.    Provide the complete personnel file of the following individuals: Bret Paulk, Vince Calametti, Jeremiah Taylor, Josh McElhenney, Charly D. Jones, Joseph Fresolone, Leon Malone, Ronnie Poiroux, Samuel Palmer

**RESPONSE:** To the extent that such documents do not contain privileged or private information, such will be made available for Plaintiff's inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties. Such inspection is to be conducted where such documents are maintained in the normal course of business.

> 4.    Provide a copy of all documents sent to and received from any agency such as the EEOC or the Department of Industrial Relations related to the plaintiff, her employment with the defendant(s), her unemployment compensation or benefits, or the termination of her employment.

**RESPONSE:** To the extent that such documents do not contain privileged or private information, such will be made available for Plaintiff's inspection and copying, at Plaintiff's pre-paid expense, on a date and at a time as mutually agreed upon by the parties. Such inspection is to be conducted where such documents are maintained in the normal course of business.

> 5.    Provide the personnel files of all employees of the Ninth Division who were disciplined, whether by verbal or written reprimand, suspension, termination, or some other form of discipline, for violating the same personnel rules that Plaintiff was terminated for violating from January 1, 2002 until the present.

**RESPONSE:** Suspensions and dismissals are "tracked" and the personnel files of employees who were suspended or dismissed for violating the same personnel rules as the

Plaintiff will be made available for Plaintiff's review and copying, at Plaintiff's prepaid

expense, on a date and at a time as mutually agreed upon by the parties, such inspection to

be conducted where such files are maintained in the normal course of business. Lesser

disciplinary or employment actions are maintained in the personnel files located at the

Division and are not "tracked." personnel files will be made available at the Division for

Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as provided above.

> 6.    Provide the defendant's file relating to any investigation of
> plaintiff's termination performed by any ALDOT employee,
> including but not limited to any memoranda concerning the
> plaintiff's proposed termination and any document showing
> concurrence or disagreement by anyone with the decision to
> terminate the plaintiff's employment.

RESPONSE: To the extent that such file(s) exist and do not contain privileged or

confidential materials, such will be made available for Plaintiff's inspection and copying, at

Plaintiff's prepaid expense, on a date and at a time as mutually agreed upon by the parties.

Such inspection is to be conducted where such documents are maintained in the normal

course of business.

> 7.    Provide all documents actually relied upon by the
> individual or individuals who made the decision to terminate the
> plaintiff's employment in reaching that decision.

RESPONSE: Documents relied upon by ALDOT personnel are contained in the Plaintiff's

personnel files, which will be made available to the Plaintiff as indicated above.

> 8.    Provide all documents showing the passage of an algebra
> course or test or satisfaction of the algebra requirement (including
> by passage of the placement exam) for probationary Engineering
> Assistants in the Ninth Division from January 2002 until the
> present.

RESPONSE: To the extent that such documents exist are not privileged, such will be made

available for plaintiff's inspection and copying, at Plaintiff's prepaid expense as indicated

above.

9.    Provide copies of all Form 11 documents relating to the plaintiff, including copies of all such documents received by the State Personnel Department.

**RESPONSE: Form 11s, as relate to the Plaintiff, which are in Defendants' possession, will**

**be made available for inspection and copying as indicated above.**

10.    Provide any and all documents relating to the termination of plaintiff's employment, including recommendations for termination, reviews of such recommendations, documents reflecting concurrence in or disagreement with such a recommendation, and all documents discussing the facts underlying the termination decision or the plaintiff's employment history.

**RESPONSE: To the extent that such documents exist and are not privileged, such will be**

**made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as**

**indicated above.**

11.    Provide all electronic mail sent or received by Bret Paulk, Vince Calametti, Jeremiah Taylor, Josh McElhenney, Charly D. Jones, Joseph Fresolone, Leon Malone, Ronnie Poiroux, Samuel Palmer, L. Daniel Morris, or J.D. McInnes that references the plaintiff, including but not limited to by the name Jackson, LaShundra, or Shun.

**RESPONSE: To the extent that such documents exist and are not privileged, such will be**

**made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as**

**indicated above.**

12.    Provide the personnel files of all Ninth Division employees of ALDOT who have become pregnant while employed by ALDOT from January 1, 2002 until the present.

**RESPONSE: To the extent that there are such employees and the files do not contain**

**privileged or confidential information, such will be made available for Plaintiff's inspection**

**and copying, at Plaintiff's prepaid expense, as indicated above.**

13.    Provide the personnel files of all Ninth Division employees of ALDOT who have taken maternity leave from January 1, 2002 until the present.

4

RESPONSE: To the extent that there are such employees and the files do not contain privileged or confidential information, such will be made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as indicated above.

    14.    Provide copies of all charges or complaints of race or sex discrimination retaliation, including internal grievances, administrative charges, or lawsuits, filed by Ninth Division employees between January 2005 and the present.

RESPONSE: To the extent that such documents exist such will be made available for Plaintiff's inspection and copying, at Plaintiff's prepaid expense, as indicated above.

### Interrogatories

    1.    Identify all individuals who made the decision to terminate the plaintiff's employment.

RESPONSE: Samuel F. Palmer, Vincent Calametti, R.F. Poiroux, L.D. Morris, D.J. "Joe" McInnes.

    2.    Identify all individuals who participated in the decision to terminate the plaintiff's employment and identify each such person's role in the decision-making process.

RESPONSE: Samuel F. Palmer, District Engineer, made recommendation to terminate probation based upon information and documentation received from subordinates. Vincent Calametti, reviewed and concurred with the recommendation of Palmer. R.F. Poiroux, Division Engineer, reviewed recommendation of Palmer, made independent assessment of matter and requested termination action. Ron Green, Personnel Director, reviewed request from Palmer, concurred and processed termination action. D.J. "Joe" McInnes, State Transportation Director and appointing authority, reviewed and executed termination action.

    3.    Identify all individuals employed by the defendant who had the responsibility of assigning the plaintiff her job tasks.

**RESPONSE:** Brett Paulk, Austin Harville, Tony Cooper, Richard Johnston, Mark

Batchelor, Jay Palmer, Andy Hoppes, Vince Calametti, Marion Stagner, Chris Burdette,

Skip Vines, Larry Hayes, Josh McElhenney.

> 4.     Identify all documents actually relied upon by the
> individual or individuals who made the decision to terminate the
> plaintiff's employment in reaching that decision.

**RESPONSE:** Plaintiff's personnel file, including performance appraisal, record of

counseling of October 6, 2006 and November 2, 2006 and written reprimand of January 18,

2007.

> 5.     Identify all individuals employed by the defendant who had
> the responsibility of training the plaintiff in her job duties as and
> Engineering Assistant.

**RESPONSE:** Brett Paulk, Austin Harville, Skip Vines, Larry Hayes, Tony Cooper,

Richard Johnston, Josh McElhenney.

> 6.     Identify all individuals who took over the plaintiff's job
> duties following her termination.

**RESPONSE:** Job assignments were and are subject to change, often daily; however the

following employees performed duties and assignments that the Plaintiff performed:

Marion Stagner, Andy Hoppes, Raymond Ingram, Adam Spence.

> 7.     Identify all probationary Engineering Assistants assigned to
> Bret Paulk between January 2001 and the present.

**RESPONSE:** John Majercik, George Issac, Lisa Champagne, Lashundra Jackson.

Defendants expressly reserve the right to seasonably amend and/or modify their

responses above as additional information may be received during the course of this litigation.

RESPECTFULLY SUBMITTED,

Jim R. Ippolito, Jr. (IPP 001)
Assistant Attorney General
Chief Counsel

Andrew W. Redd (RED001)
Jason A. Trippe (TRI012)
Assistant Attorneys General
Assistant Counsel

**ADDRESS OF COUNSEL:**

Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110
Telephone: (334) 242-6350
Fax: (334) 264-4359
redda@dot.state.al.us
trippej@dot.state.al.us

7

## CERTIFICATE OF SERVICE

I hereby certify that on this _8th_ day of _Nov._, 20_07_, I served the foregoing

on counsel of record by electronic mail and/or by placing a copy of same in the United States

Mail, postage prepaid and addressed as follows:

Mr. Kell Simon, Esq.
ROSS MELTON
1104 San Antonio Street
Austin, Texas 78701

_____
Andrew W. Redd (RED001)

## ADDRESS OF COUNSEL:

Alabama Department Of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama 36110
Telephone: (334) 242-6350
Fax: (334) 264-4359
redda@dot.state.al.us

# Plaintiff's Exhibit 15

**Form 13F**  |  **EMPLOYEE PERFORMANCE *PROBATIONARY***
**Revised (01/2006)**  |  **STATE OF ALABAMA**
**Personnel Department**

Employee Name: <u>GENE N BLAN JR</u>

Social Security Number: <u>XXX-XX-4434</u>

Agency: <u>012/TRANSPORTATION</u>

Division: <u>0090/9TH DIVISION - MOBILE</u>

Classification: <u>ENGINEERING ASSISTANT</u>

Class Code: <u>20111</u>

Period Covered From: <u>05/01/2007</u> To: <u>10/31/2007</u>

Position Number: <u>1736116</u>

---

**APPRAISAL SIGNATURES:**  Signatures are to be provided after the form has been completed.  Signatures denote supervisor and employee discussion and receipt of form, not agreement.  All signatures are mandatory.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN  XXX-XX- 3895 | | SSN  XXX-XX- 8936 |
| *Samuel R. Fountain* | *Gene N. Blan Jr.* | *Robert B Maddox* |
| Rater Signature | Employee Signature | Reviewer Signature |
| Samuel R. Fountain | 09/17/2007 | Robert B. Maddox |
| Rater Printed Name | Date | Reviewer Printed Name |
| 09/17/2007 | | 09/17/2007 |
| Date    Initial if comments attached | Initial if comments attached | Date    Initial if comments attached |

It is recommended that the employee be:

___ Continued in the probation (reason stated in Disciplinary Actions Area)

_✓_ Given permanent status in the position.. Probationary increase to $ <u>990.10</u> Step <u>3</u> Effective <u>November 1, 2007</u>

___ Separated before or at the end of the probationary period (reason stated in Disciplinary Actions Area)

APPOINTING AUTHORITY Signature                    09/21/07                    Date

---

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:**  Locate the Responsibility Score on the back of this form and write it in the appropriate space.  Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space.  The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score.  Documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 21.3 | − | 0 | = | 21.3 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Probationary Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | **X** Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

---

**WORK HABITS:**  Check the appropriate space for each Work Habit area.  Work Habits pertain to conduct occurring in this Appraisal period.  Provide an explanation below for marking any work habit as "Unsatisfactory."  Attach additional sheets if necessary.  No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ___ | X | ___ |
| Punctuality | ___ | X | ___ |
| Cooperation with Coworkers | ___ | X | ___ |
| Compliance with Rules | ___ | X | ___ |

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Probationary period. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Inspects | 2 |
| 2. Calculates | 2 |
| 3. Obtains | 2 |
| 4. Enters | 2 |
| 5. Communicates | 3 |
| 6. Operates | 2 |
| 7. Draws/Plots/Traces | 2 |
| 8. Maintains | 2 |
| 9. | |
| 10. | |

***RESPONSIBILITY SCORE:***

| 17 | ÷ | 8 | = | 2.13 | X | 10 | = | 21.3 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each blank provided. Attach a copy of the warning(s), reprimand(s), or suspension(s) to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** |
|---|---|---|
| 0 | 0 | 0 |

***DISCIPLINARY SCORE:*** **This section should include the use of the discipline steps of reprimand, and suspension only**. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**        0



# ALABAMA
# DEPARTMENT OF TRANSPORTATION

NINTH DIVISION
**OFFICE OF DIVISION ENGINEER**
1701 I-65 WEST SERVICE ROAD N
MOBILE, ALABAMA 36618-1109
TELEPHONE (251) 470-8200
FAX (251) 470-8381



BOB RILEY
GOVERNOR

JOE MCINNES
TRANSPORTATION DIRECTOR

| Transportation Office Manager | | | |
|---|---|---|---|
| Section | Info | Action | File |
| Accounting | | | |
| Personnel | | | |
| Personnel File | | | ✓ |
| Training | | | |
| Route | | | |
| Office manager | | | |
| Action Requested: | | | |

## M E M O R A N D U M

DATE:     May 1, 2007

TO:       Gene N. Blan, Jr.

FROM:     Debra A. Hadley
          EDP/Training Coordinator

RE:       Math Placement Assessment

Recently you completed the math placement assessment to determine your current skill level in various content areas. Based on your performance in those areas, you may be required to complete one or more courses.

Listed below are your results from the math placement assessment process. If you elected not to attempt one or more sections you will be presumed to need the course (if required).

| Content Area | Performance | | Course required | |
|---|---|---|---|---|
| Basic Math | Successful: | ☒ | Yes | ☐ |
| | Unsuccessful: | ☐ | No | ☒ |
| Algebra | Successful: | ☐ | Yes | ☒ |
| | Unsuccessful: | ☒ | No | ☐ |
| | Not Attempted: | ☐ | | |
| Geometry | Successful: | ☐ | Yes | ☐ |
| | Unsuccessful: | ☒ | No | ☐ |
| | Not Attempted: | ☐ | May be required in future: ☒ | |
| Trigonometry | Successful: | ☐ | Yes | ☐ |
| | Unsuccessful: | ☐ | No | ☐ |
| | Not Attempted: | ☒ | May be required in future: ☒ | |

If you have any questions, please contact me at (251) 470-8203 or Denisa Preston at (251) 470-8305. You will be scheduled for the required courses as soon as possible.

c:   Mrs. Jeannette Brown
     Mr. V. E. Calametti
     Mr. R. B. Maddox
     Mr. G. E. Stuckey
     Math Placement File
     Employee EDP File

R E C E I V E D

MAY ~ 3 2007

ALDOT Ninth Division
Personnel

**Brown, Jeannette**

| | |
|---|---|
| **From:** | Hadley, Debra |
| **Sent:** | Monday, August 20, 2007 8:58 AM |
| **To:** | Maddox, Robert |
| **Cc:** | Calametti, Vince; Brown, Jeannette; Brown, Jeannie V.; Jones, Mickey; Shelly, Lawana |
| **Subject:** | EDP - Algebra Training - Gene Blan |

I just wanted to make you all aware that I spoke with Lawana this morning and she stated that Mr. Blan will not be able to attend the Algebra training class this week (Aug. 20-24, 2007). I emailed her the cancellation/reschedule form so he can put the reason on there, sign it, get Mickey to sign it and return it to me.

Since he was unable to attend the Algebra class, his EDP Module Program will be extended 3 months as per EDP Procedures. I advised Lawana that his probationary period may be extended also but that the decision would be left up to all of you.

Thanks ☺

Debra A. Hadley
EDP/Training Coordinator - 9th Division
Alabama Department of Transportation
1701 West I-65 Service Road North
Mobile, Alabama 36618
(251) 470-8203 Work
(251) 473-3624 Fax Number
hadleyd@dot.state.al.us
Southern Link - 9072

**From:** Shelly, Lawana
**Sent:** Friday, August 17, 2007 10:06 AM
**To:** Hadley, Debra
**Subject:** EDP - Algebra Training

*There is a possibility that Gene N. Blan, Jr. will not be able to attend the Algebra Training because his wife had a blood clot in her lungs and had emergency open heart surgery Wed. p.m.. We should hear from him again today. He does not have a cell phone, so it is difficult to communicate with him. As soon as he reports in I will contract you.*

# Plaintiff's
# Exhibit 16


*Create file*



## ALABAMA DEPARTMENT OF TRANSPORTATION
1409 Coliseum Boulevard, Montgomery, Alabama 36110: 02

2007 FEB 20 A 9: 02

**Bob Riley**
**Governor**

February 16, 2007

**Joe McInnes**
**Transportation Director**

Ms. Lashundra Jackson
714 South Cedar Street
Mobile, AL  36603

    RE:   Complaint #DOT 146

Dear Ms. Jackson:

      I have reviewed the results of the investigation concerning your complaint #DOT 146 (copy attached). Based on my review, your claim that you have been retaliated against in your job assignments and/or duties appears to be without merit. I have reached this conclusion based on the following:

(1)   You complained that no one wanted to work with you or teach you, and you were assigned to (a) observe (i.e., ride with a consultant), rather than participate in, some of the project work, and (b) work alone on a project.

      These are common assignments as part of on-the-job training for most Engineering Assistants at ALDOT. Therefore, you have not been mistreated or treated differently, as the assignments would have occurred regardless of whether you are, or are not, related in any way to Ms. Alexander.

(2)   There was no evidence of retaliation, as defined by Title VII of the Civil Rights Act of 1964, as amended, based on the following:

    (a)   You have not previously participated in a protected activity during your employment with ALDOT, and

    (b)   You did not suffer any adverse employment action in, or as a result of, any of the incidents you described in your complaint.

      Sincerely,

L. Daniel Morris
Assistant Transportation Director

LaShundra Jackson
February 16, 2007
Page 2


Attachment


cc:     Jim Ippolito
        R. F. Poiroux

# Plaintiff's Exhibit 17

1st Request Sent - - 06
2nd Follow-up email Sent
12-13-06 @ 3:37

## STATE OF ALABAMA
## DEPARTMENT OF TRANSPORTATION

BERTHA ALEXANDER,                  )
                                   )
          Grievant,                )
                                   )        Docket # 959
vs.                                )
                                   )
ALABAMA DEPARTMENT OF              )
TRANSPORTATION,                    )
                                   )
          Respondent.              )

## GRIEVANCE DECISION

### I.

### Procedural Background

The Grievant, Bertha Alexander, filed a departmental complaint on May 24, 2005. (Respondent Exhibit 1)(hereinafter referred to as Rx1). At that time Ms. Alexander alleged that one of her superiors, Jay Palmer, a civil engineer manager racially discriminated against her by subjecting her to a hostile and harassing work environment in violation of the Reynolds consent decree.

On June 27, 2005 Ms. Alexander filed a second departmental complaint. (Rx4). At that time she accused Mark Hocutt, the project engineer who supervised her, of retaliating against her for filing her previous complaint. The alleged retaliation arose from a confrontation between Ms. Alexander and Mr. Hocutt on June 24, 2005.

The grievances were consolidated. A hearing on both was held before the undersigned Hearing Officer. The May 24, 2005 grievance is referred to in this decision as the Palmer grievance. The June 27, 2005 grievance is referred to as the Hocutt grievance.

See Page 3

WWW. EEOC. Gov / Offices/off
HTML

Pg 1

The grievance hearing was held on September 28, 2005. Ms. Alexander appeared at the grievance hearing pro se. A lawyer for the plaintiffs' class did not participate in the grievance proceeding.

The Department of Transportation was represented at the hearing by its attorney and civil engineer manager Jay Palmer.

Both parties called a number of witnesses to testify on their behalf. The witnesses were sequestered prior to providing their testimony to the Hearing Officer.

II.

### Issues

The claim of the Grievant is that she has been subjected to race discrimination by means of a hostile work environment and retaliation.

The position of the Department of Transportation (hereinafter referred to as DOT) was that any counseling of the Grievant was the result of her poor work performance and not her race.

III.

### Findings of Fact

Ms. Alexander testified that she transferred from another State Department merit system position to the DOT in February of 2001. In June, 2001 she was assigned as an administrative assistant to Mark Hocutt. Mr. Hocutt was a project engineer for one of the projects at the Ninth Division, Mobile, Alabama. Ms. Alexander performed secretarial and clerical work.

During the initial months of her supervision by Mr. Hocutt Alexander stated that

2

Hocutt praised her work. However, when a second black female began to work with Ms. Alexander Hocutt's attitude toward both ladies changed. He expressed that the new individual would "never work out". Alexander said that the lady was never given a chance to succeed. She was terminated by the DOT. At that time Hocutt's attitude toward Ms. Alexander worsened.



In Mr. Hocutt's view the attitude of Ms. Alexander changed after the termination of Marilyn Reed - Engineering Assistant 1 the other black female secretarial employee. Alexander's attitude deteriorated according to Mr. Hocutt.

In December of 2004 Ms. Alexander asked to be transferred out of the construction section of the Ninth Division. Her relationship with Mr. Hocutt continued to deteriorate after she asked for the transfer. Hocutt accused Alexander of taking too long for lunch breaks and for being late to work. Ms. Alexander said that she was occasionally late but called to let her supervisors know when she would be late. She said that often the supervisors would avoid her telephone calls. She added that Mr. Hocutt did not take into account the fact that on occasion she worked through part of her lunch so that she returned at a later time.

Hocutt also began to tell Ms. Alexander that their superior, Jay Palmer, was dissatisfied with her performance. He would tell Alexander that "Jay's watching you."

The situation continued to deteriorate to an even greater extent when Ms. Alexander was interviewed as a witness on behalf of the black female secretarial employee who had Marilyn Reed - Engineering Asst. 1 been terminated. Ms. Alexander said that she began to receive counseling slips in her personnel file. (Rx 1). However, she admitted that the counseling was in the nature of informal counseling. No disciplinary action was taken against her. She was not

3

reprimanded. She was not suspended.

Throughout this period one of Ms. Alexander's daily duties was to submit the time of individuals with the Hocutt project to the division payroll clerk. Those time sheets were submitted by e-mail. Ms. Alexander - as well as two other witnesses - testified that sometimes the computer did not generate the time records so that they were received by the payroll clerk.

Alexander explained that Mr. Hocutt changed her duties during 2005. At that time Hocutt requested that Alexander submit the time sheets of project employees directly to Hocutt. According to Alexander, Hocutt wanted to scrutinize the time records because he believed some employees were misstating their time. Hocutt would review the time sheets and submit them to Lisa Owens who worked in Mr. Palmer's office. Ms. Owens was the payroll clerk.

Ms. Owens agreed that for a brief period Mr. Hocutt was sending her the time records for his project because Hocutt said that he was checking on employees' comp time. However, by May, 2005 Ms. Alexander had again began sending Owens the daily time sheets. Mr. Hocutt added that there was a time that he sent the time sheets to the payroll clerk because he wanted to avoid too much overtime by project employees. He did not know when that situation ended. He said that it ended when overtime issues ceased. At that time he told Ms. Alexander to again send the time information to the payroll clerk. Alexander resumed that duty before May, 2005.

Owens said there were several days when the time sheets for Hocutt's project were not submitted in a timely manner. She complained to Mr. Palmer. The time sheets were to be received by Ms. Owens between 8:00 a.m. and 8:30 a.m. on a daily basis. According

4

to Owens, Ms. Alexander acknowledged that Alexander had not sent in the time due to Alexander's error. (Rx 7). Because the problem seemed to be escalating, Palmer stated that he called Ms. Alexander and told her she would need to get the employee time information in on time. Shortly thereafter, Alexander told Owens to tell Mr. Palmer that Alexander was tired of Palmer harassing her. As a result of that conversation, Palmer called a meeting on May 20, 2005 to determine what the problem was concerning Alexander's failure to send the time sheets in by the designated time. Palmer remarked that he was also aware that Ms. Alexander was frequently late to work.

Ms. Alexander said that she desired that the equal employment opportunity (EEO) officer accompany her to the meeting that Palmer had requested. She was not allowed to have the EEO officer with her at the meeting.

Ms. Alexander met with Mr. Palmer and Mr. Hocutt. At that time she told Mr. Palmer she was tired of being harassed. According to Alexander, Palmer's reply was "it is my job to harass you."

Mr. Palmer denied making that statement. He testified that he told Ms. Alexander that it was not harassment but part of his job to ensure that employee time was turned in in a timely manner. He cautioned Alexander that the failure to turn in the time in a timely manner would result in positive disciplinary action. He added that he expected Alexander to do her job and to get the project time to Ms. Owens as Mr. Hocutt had assigned and instructed Alexander to do. Ms. Alexander told Palmer that she understood and would send the project time to Ms. Owens and would call to verify that Owens had received the time. A memo documenting the counseling session was placed in Ms. Alexander's file. (Rx 6).

5

In regard to Ms. Alexander's alleged tardiness, Palmer testified that he spoke to her about it during the meeting. He warned Alexander that her failure to report to work on time would result in positive disciplinary action. Ms. Alexander explained to Palmer that she was sometimes late due to medication that she was taking for stress. (Grievant's Exhibit 2)(hereinafter referred to as Gx 2). Palmer requested that Alexander produce restrictions from a physician that would prevent her from being into work on time.

Counseling about tardiness was also documented in a memorandum written by Mr. Palmer and placed in Ms. Alexander's file. (Rx 6). Ms. Alexander had been previously cautioned about her punctuality during her mid-term performance review. (Rx 2). Palmer commented that there was no formal reprimand or disciplinary action taken against Alexander for either circumstance about which she was counseled on May 20, 2005.

Ms. Alexander complained to Leon Malone, the EEO officer, that she was being harassed by the division engineer about time sheets. Malone stated that Alexander never indicated to him that the harassment was racially motivated.

The events before and on May 20, 2005 resulted in the Palmer grievance.

In regard to the Hocutt grievance, Ms. Alexander testified that Mr. Hocutt had a propensity to harass older workers and black workers. Hocutt had two sets of rules, one for white workers and one for black workers. Alexander presented as witnesses one former DOT employee and one current DOT employee who confirmed that Mr. Hocutt was racially insensitive. Those witnesses stated that Hocutt was bad tempered. He was unprofessional with black employees and attempted to demean and ridicule them in the presence of other workers both white and black.

Alexander stated that it was one of her duties to provide to central office payroll

6

information submitted from work performed by independent contractors on behalf of the DOT. The payroll information was forwarded to the EEO officer, Leon Malone. Ms. Alexander acknowledged that due to the fact that she had not been trained concerning the process she made errors with respect to the contractor payroll records. However, once an error was pointed out to her she was able to correct the situation. Nevertheless, because of those errors and her suspicion that Mr. Hocutt desired to discipline her, Alexander told Mr. Malone that she did not want to be "written up" for any errors because she had not been properly trained.

Mr. Malone testified that a DOT contractor inquired about errors in the payroll. For that reason Malone went to Hocutt's project office and retrieved the payroll. Errors were found in the contractor's payroll and a notation thereof was submitted back to the project engineer. Malone thought that Ms. Alexander's statement to him was that she had been "written up" for the errors. He assumed that she had received a written warning concerning the errors. For that reason Malone directed an e-mail to Hocutt stating that the errors had occurred **before** receipt of the payroll by Ms. Alexander so that any notation citing an error by Ms. Alexander should be retracted.

According to Ms. Alexander, the e-mail from Malone made Hocutt extremely angry. Hocutt confronted her with the e-mail from Malone saying that he (Hocutt) did not write her up for errors. Alexander stated that Hocutt was yelling. Mr. Malone acknowledged that he heard some of the conversation between Alexander and Hocutt by means of a speaker phone conversation he had with the pair. Malone was not sure if Mr. Hocutt used a raised voice but he could tell that Alexander and Hocutt were arguing.

Hocutt explained that on June 16, 2005 he received an e-mail from the EEO officer,

7

Leon Malone, stating that Ms. Alexander had been written up because a contractor's payroll had been submitted in error. Because Alexander had not been written up he inquired about the matter to Mr. Malone. Mr. Malone told him that Alexander and Hocutt needed to straighten the situation out between themselves. According to Hocutt, Malone had assumed that because Hocutt was Ms. Alexander's supervisor he had written her up. That was not true.

Hocutt confronted Alexander. She denied that she had complained about him. She said that she had never mentioned Hocutt by name to Mr. Malone. In fact, Ms. Alexander wrote an e-mail to Mr. Malone about the confrontation. (Rx 4). She denied to Hocutt that she had ever said that she had been written up. What she had said was that she did not want to be written up for the payrolls. Hocutt's response to Alexander was that "it was all in your head." According to Hocutt, Ms. Alexander responded that it was not in her head but it was "harassment for this office." (Rx 9).

Because of the events involving Ms. Alexander and Mr. Palmer and then, Mr. Hocutt, Malone recommended that Alexander be reassigned.

Ms. Alexander was moved to a receptionist/secretary position. She is a secretary in the construction division working under Mr. Vince Calametti. Alexander acknowledged that he was a different supervisor. She added that the change had been one that had been to her satisfaction except that she still desired to be transferred out of the construction division of the DOT because Palmer and Hocutt see her on a daily basis and stare at her.

Mr. Hocutt was also reassigned. He no longer has supervisory authority over Ms. Alexander. He does see Alexander on a daily basis when he walks by her desk.

8

## IV.

## Discussion of Issues

Ms. Alexander claimed that she had been subject to racial discrimination. Specifically, she insisted that she had been subjected to a hostile work environment. To establish a hostile work environment claim a complaining party must show that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on the protected characteristic of the employee; (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment" and (5) the employer is responsible for such an environment under a theory of vicarious or direct liability. Miller v. Kenworth of Dothan, Inc., 277 F. 3d 1269, 1275 (11th Cir. 2002); Wideman v. Wal-Mart Stores, 141 F. 3d 1453 (11th Cir. 1998)(dismissal of hostile work environment claim affirmed on appeal where plaintiff's supervisors required plaintiff to work without a lunch break, incorrectly listed her as a job no show, reprimanded her for her absence, suspended her for a day, solicited negative comments about plaintiff from her co-workers, delayed authorization for needed medical assistance and threatened to shoot her in the head). The Grievant has the burden of proving such claims. See Hollyfield v. Reno, 115 F. 3d 1555, 1562 (11th Cir. 1997).

Based on applicable law, Ms. Alexander's claim of hostile work environment must fail for several reasons. Although it appears that the counseling for her failure to send in time sheets may have not been appropriate due to the difficulties with the computer and Ms. Alexander's belief that the duty was being performed by Mr. Hocutt, there was still an

9

appropriate counseling of Ms. Alexander for tardiness on May 20, 2005. Ms. Alexander did not demonstrate that that counseling - or that for the time sheets - was because of her protected characteristic as an employee i.e. that she was black. Instead, it appears that the counseling was because of her perceived inadequate job performance. Even if the counseling was based on a mistaken assumption on the part of the employer the employer cannot be held liable as long as its decision was not motivated by racial discrimination. Elrod v. Sears & Roebuck Co., 939 F. 2d 1466, 1470 (11th Cir. 1991).

Nor was it demonstrated by Alexander that the alleged harassment was sufficiently severe or persuasive to alter the terms and conditions of her employment and created a discriminatorily abusive work environment. See Wideman v. Wal-Mart Stores, supra. An employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes or disagrees with it. Smart v. Baugh State University, 89 F. 3d 437, 441 (7th Cir. 1996)("not everything that makes an employee unhappy is actionable adverse action"); Perryman v. West, 949 F. Supp. 815,819 (M.D. Ala. 1996). An adverse employment action for purposes of a prima facie case of discrimination in employment requires a serious and material change in the terms, conditions or privileges of employment. Davis v. Town of Lake Park, 245 F. 3d 1232, 1239 (11th Cir. 2001).

In the present case there was no adverse employment action as a result of the counseling of Alexander by Mr. Palmer. It was an informal counseling session. No disciplinary action was taken against Ms. Alexander on May 20, 2005. The terms and conditions of her employment were not affected.

Ms. Alexander complained that a memorandum concerning the counseling she

10

received on May 20, 2005 was placed in her file without her knowledge. Eleventh Circuit precedent indicates that courts will not treat job performance memorandums as actionable where they do not trigger a more tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities or more formal discipline. Davis v. Town of Lake Park, 245 F. 3d 1232, 1241 (11th Cir. 2001); Montgomery v. City of Birmingham, 2000 WL 168620 (N.D. Ala. 2000); Meriwether v. Alabama Department of Public Safety, 17 F. Supp. 2d 1260, 1275 (M.D. Ala. 1998).

Finally, in order to prove a hostile work environment the complaining party must demonstrate that the employer is responsible for such an environment under a theory of vicarious or direct liability. Miller v. Kenworth of Dothan, 277 F. 3d 1269, 1275 (11th Cir. 2002). Where an employer recognizes what may be improper conduct and takes appropriate remedial action it cannot be held liable for a hostile work environment. See Huddleston v. Roger Dean Chevrolet, 845 F. 2d 900, 904 (11th Cir. 1988); Henson v. City of Dundee, 682 F. 2d 897, 901 (11th Cir. 1982). In this case the DOT reassigned Alexander upon notice of the difficulties that Ms. Alexander was experiencing with Mr. Palmer and Mr. Hocutt. Alexander is no longer under the direct supervision of either individual. Thus, the DOT cannot be held liable for a hostile work environment charge because it took appropriate remedial action.

Ms. Alexander also insisted that the confrontation that she had with Mr. Hocutt concerning the contractor payroll records on June 24, 2005 was retaliation for filing her grievance and that it subjected Alexander to a hostile work place. However, there was no evidence to support that Mr. Hocutt confronted Alexander to retaliate against Alexander for filing a grievance against Mr. Palmer. While the Hearing Officer believes that Mr. Hocutt

11

lost his temper, that circumstance was based on what Hocutt perceived to be a false accusation against him. Off-handed comments in the course of conversations with fellow employees - even if delivered in a rude manner - are not proof of retaliation or a hostile work environment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "Only the most blatant remarks whose intent could be nothing more than to discriminate will constitute direct evidence of discrimination in a hostile work environment case." Earley v. Champion International Corp., 907 F. 2d 1077, 1081-82 (11th Cir. 1990). Even the utterance of an ethnic or racial epitaph which engenders offensive feelings in an employee does not affect the terms and conditions of employment to a sufficient degree to violate Title VII. Henson v. City of Dundee, 682 F. 2d 897, 904 (11th Cir. 1982).

To establish a claim of retaliation a complaining party must demonstrate that (1) she engaged in statutorily protected expression; (2) that there was a subsequent adverse employment action; and (3) that some causal relation exists between the protected expression and the adverse action. Donnellon v. Fruehauf Corp., 764 F. 2d 598, 600-601 (11th Cir. 1986).

In this instance despite losing his temper and perhaps yelling at Ms. Alexander Hocutt did not subject Ms. Alexander to any adverse disciplinary action. Nor was there evidence that he knew of Alexander's earlier grievance against Palmer so that a causal relation between that grievance and the confrontation of Alexander by Hocutt was not proven. Consequently, Hocutt's reaction to the memorandum from the division EEO officer cannot be deemed evidence of retaliation or of a hostile work environment.

## V.

### Conclusions

In regard to the Palmer grievance, Lisa Owens testified that Ms. Alexander acknowledged to Owens that Alexander had not sent the time sheets to payroll due to Ms. Alexander's own error. (DX 7). Similarly, there was evidence that Ms. Alexander was tardy to work. Consequently, the counseling session between Mr. Palmer and Ms. Alexander on May 20, 2005 does not compel the conclusion that it was racial in its basis. It was based on job performance. Regardless of whether the supervisor was right or wrong in his assertions at that counseling session, there are no grounds to support a grievance against the DOT.

In a similar vein, the June 24, 2005 confrontation between Mr. Hocutt and Ms. Alexander appears to be the result of a miscommunication caused by a misunderstanding by Mr. Malone of what Ms. Alexander had told him. The fact that Mr. Malone then wrote an e-mail to Hocutt stating that Ms. Alexander should not be written up which e-mail Mr. Hocutt took as an accusation against him causing him to confront Ms. Alexander in an antagonistic manner cannot be construed to be racial discrimination. While Mr. Hocutt may have overreacted to the Malone memo, that event does not support a grievance against the DOT.

Likewise, there was no evidence that Mr. Hocutt was retaliating against Mr. Alexander when he argued with her about the e-mail sent by Mr. Malone.

Lastly, Ms. Alexander contended that the Reynolds consent decree had been violated. She acknowledged that her only support for that claim was that Title VII of the

13

Civil Rights Act of 1964 is referred to in the decree and that in her view the statute had been violated. 42 U.S.C. §2000e. Because case law amply demonstrates that Title VII was not violated, Ms. Alexander has not proven that the consent decree was violated.

## VI.

### Recommendations

It is the recommendation of the Grievance Hearing Officer that Mr. Hocutt be counseled concerning maintaining his composure when he engages in counseling with employees with respect to whom he supervises.

It is further the recommendation of the Grievance Hearing Officer that DOT employees should be given copies of any informal counseling memorandum which are placed in their personnel files. It is not necessary that the employee be given an opportunity to agree or disagree with the memorandum.

It is further recommended that no retaliation be directed toward the Grievant and those persons who testified on her behalf.

DONE this the 7th day of October, 2005.

_____
Wesley Romine
Grievance Hearing Officer

cc:    Bertha Alexander
       570 Schwarz Street
       Mobile, Alabama 36617
       Robin Beardsley
       Kell Simon
       Gary Brown
       Sandy Dietz

14

Exhibit 8

28

## Alexander, Bertha

| | |
|---|---|
| **From:** | Brown, Jeannette |
| **Sent:** | Thursday, May 19, 2005 10:23 AM |
| **To:** | Little, Sharon A.; Driskell, Daniel; McElhenney, Josh; Lowery, Adam; Cooper, Charles; Bunch, Kathie; Ericksen, Matthew; Poiroux, R.F.; Hocutt, Mark; Alexander, Bertha; Palmer, Jay; Stuckey, Gerald; Nunnally, Joey; Forrester, John |
| **Cc:** | Brown, Jeannette; Carraway, Connie; Houston, Stacey; Calametti, Vince |
| **Subject:** | Potential Witnesses Marilyn Reed vs ALDOT |
| **Importance:** | High |





ALABAMA DEPARTMENT OF TRANSPORTATION

*Complaint Form*

| Name | Address |
|---|---|
| Bertha W. Alexander | P.O. Box 6983 Mobile, AL 36660 |

| SSN | Race/Sex | Division/Bureau | District/Section | Job Classification |
|---|---|---|---|---|
| 421-4-4315 | Blk F | 9th | 1 – Construction | Administrative Assistant 1 |

| Signature | Date Submitted |
|---|---|
| Bertha W. Alexander | 11-23-04 |

Date (HR Bureau use only):                    Docket # (HR Bureau use only):

If your complaint is **not** based on discrimination, please check here:    None ___

If your complaint **is** based on discrimination, please check one of the following:

Age ___    Consent Decree Violation ✓    Disability ___    National Origin ___

Race ✓    Religion ___    Retaliation ✓    Sex/Gender ___

Area in Which You Were Affected (*You must check one*):

Compensation ___    Disciplinary Action ✓    Hiring ___    Job Assignment/Duties ___

Retaliation ✓    Training ✓    Transfer ✓ 11-23-04 Hocutt yelled B.S. You are Never Leaving This Unit

Other (*explain*) Practice of Double Standards

Date of Incident: Off & On Since 10/03   Most Severe 11/19/04

Summary of Complaint (*including the name of the employee against whom this complaint is being filed*):
Complaint against Mark A. Hocutt & Samuel J. Palmer
Due To The Constant harassment inflicted upon me, by my
above referenced Supervisors Re: Parking Punctuality, Communication
with other DOT staff And having To Witness Their practice of Double Standards
Toward former Black employees assigned To This Unit, Praising my work
one day and Next eval I can not do anything correct. See Attachment
Names of Witnesses: Raymond Mickles, James Washington, James Hinton
Gwenda Hunter, Marilyn Reed, Dennis King, Lavaries Bryant.

Your Suggested Resolution:
Due To The Mental Stress That has been inflicted upon me Since
my assignment To This Unit And The Medication I have been perscribed for
Stress I respectfully Request Immediate Removal from Construction

Please return to:    (1) Your immediate Supervisor or
                     (2) Your Division EEO Representative or
                     (3) ALDOT Human Resources Bureau (Attention: Title 7 Coordinator)
                     1409 Coliseum Blvd. Montgomery, AL 36130                    Revised 1/11/02

Pg. 2

Future Retaliations That
could jeopardize My Employment
@ The Department Of Transportation.

Also, Mr Hocutt ~~stated~~ Maintained
performance had gone down significantly
Since The Termination Of ~~Formem~~ Former
Employee Marilyn Reed.

ALABAMA DEPARTMENT OF TRANSPORTATION

Complaint Form

*only other*




| Name | Address |
|---|---|
| Bertha W. Alexander | P O Box 6983 Mobile, Alabama  36660-0983 |

| SSN | Race/Sex | Division/Bureau | District/Section | Job Classification |
|---|---|---|---|---|
| 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 | B/Female | 9th | District 1 | ASA 1 |

| Signature | Date Submitted |
|---|---|
| Bertha W A lexander | May 24, 2005 |

Date (HR Bureau use only): 5/31/05    Docket # (HR Bureau use only): 2259

If your complaint is not based on discrimination, please check here:    None ___

If your complaint is based on discrimination, please check one of the following:

Age ___    Consent Decree Violation **X**    Disability ___    National Origin ___

Race **X**    Religion ___    Retaliation ___    Sex/Gender ___

Area in Which You Were Affected (You must check one):

Compensation ___    Disciplinary Action **X**    Hiring ___    Job Assignment/Duties ___

Retaliation ___    Training ___    Transfer ___

Other (explain) Being forced to maintain good work habits in a hostile work environment.

Date of Incident:
May 20, 2005 @ 7:45 a.m.

Summary of Complaint (including the name of the employee against whom this complaint is being filed):

Samuel J. Palmer, District 1

In a meeting with Mr. Palmer, District 1 and Mr. Mark Hocutt, Project Engr./ Supervisor at Mr. Palmer's office, I was confronted with several questions (1)  Why are you being late the past several days? (A) I'm on medications which I take first morning.  This was discussed with Supv. and informed I would work late to repay the 10 to 15 etc. minutes. Mr. Hocutt replied he was O.K. with this.  (2)  Whats up with your office time being late? I had to call you Wednesday, 5/18/05 & Thursday, 5/19/05.  (A) On 5/18/05 Mark Hocutt checked my files and time was sent to Lisa Owens 5/18/05 @ 7:22 a.m. On 5/19/05 time was not received by Lisa Owens due to a minor technical issue with the data saving process. (3) What about this statement you made "I'm tired of Jay harassing me" (A)  Yes, I said

Names of Witnesses: Mark Hocutt, Supervisor

Your Suggested Resolution: That Mr. Palmer be reprimanded for the mental stress he has imposed on me personally.  This stress has caused a fear of my reporting to work due to

the his state of "It's my job to harass you".  Mark Hocutt, Supervisor said not one word

in my defense.  Nor did he share our agreement on my being late with Mr. Palmer.

Please return to:    (1) Your immediate Supervisor or
(2) Your Division EEO Representative or
(3) ALDOT Human Resources Bureau (Attention: Title 7 Coordinator)
1409 Coliseum Blvd. Montgomery, AL 36130                Revised 11/1/01

CONTINUE FROM SUMMARY OF COMPLAINT

every time you see me pass by your office after 7:00 a.m. you call back and
ask Mark Hocutt why is BJ late and never ask if I had reported my arrival
time to the office etc. (4) What about this statement you made on the time
sheet you sent "Sorry human error" (A)  The reply directed to you was "I was
sorry for getting the office time up after 8:00 I'm human, I made an error.

Now, the statement "I tired of Jay harassing me over the least small error I
made" was conveyed to Mark Hocutt in the project office.  Samuel J. Palmer
stated to my face that it was his job to harass me if I was not doing my job.

Since the meeting at District 1 with Mr. Palmer and Mr. Hocutt fear has been
inflicted upon me as to my future with ALDOT due to Mr. Palmer statement of
reprimand.  At present I am prescribed Alprazolam 3x per day by Dr. Daniel
Polansky.

Note*** Mark Hocutt has assigned to his office more active construction project
than any other project engineer at ALDOT.  I'm performing my assigned task to
the best of my ability considering the process of (OJT).  I commend myself for
having endured the stress of working in such an hostile environment and
performing as well as I have.



# ALABAMA DEPARTMENT OF TRANSPORTATION

## Complaint Form



| Name<br>Bertha W. Alexander | Address<br>P. O. Box 6983        Mobile, AL  36660 | | |
|---|---|---|---|
| SSN<br>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 | Race/Sex<br>Black/F | Division/Bureau<br>Nine | District/Section<br>Dist 1<br>Construction | Job Classification<br>Administrative Assistant |

| Signature<br>*Bertha Alexander* | Date Submitted<br>June 27, 2005 |
|---|---|

Date EEO Received (only)                                        Date Rec'd HR Bureau (only)

If your complaint is **not** based on discrimination, please check here:        None ____

If your complaint **is** based on discrimination, please check one of the following:

Age __XX__        Consent Decree Violation __X__        Disability ____        National Origin ____

Race __XX__    Religion ____        Retaliation __XX__        Sex/Gender ____

### Area In Which You Were Affected (*You must check one*):

Compensation ____        Disciplinary Action __XX__        Hiring ____        Job Assignment/Duties ____

Retaliation __XX__        Training ____        Transfer ____

Other (*explain*) _____

---

Date of Incident:    June 24, 2005

Summary of Complaint (*including the name of the employee against whom this complaint is being filed*):

At my work station, going about my daily task of checking contractor's payrolls on the above date in the a.m., I was confronted by Mr. Hocutt, my supervisor in a very unpleasant state of anger adamant in his accusation of my making false statements against him. I question his motive for such out bursts. He then put a e-mail in face for viewing. Mr. Hocutt's on going accusations regarding the e-mail allowed no time for explanation. I then contacted Mr. Malone, EEO, in an effort to

Names of Witnesses: Mr. Eddie Kerr, Thompson Engineering

Your Suggested Resolution:    Due to the unfair treatment of former black employees under Mr. Hocutt's supervision, I feel that my continue assignment under the construction umbrella, in a hostile work environment, and being in the second stage of an

Please return to:    (1) Your immediate Supervisor or
(2) Your Division EEO Representative or
(3) ALDOT Human Resources Bureau (Attention: Title 7 Coordinator)
1409 Coliseum Blvd. Montgomery, AL 36130                    Revised 1/11/02

June 27, 2005
Page 2

## SUMMARY OF COMPLAINT CONTINUED −

defuse Mr. Hocutt's rage of anger. Mr. Hocutt then questioned Mr. Malone's reason for
the e-mail and said false statements was being made against him. Mr. Hocutt then
requested to meet in Mr. Malon's office, he agreed. Prior to leaving for Mr. Malone's
office after a few minutes of conversation over the telephone, Mr. Hocutt's statement
directed to me was "your mental stress is all in your head". The degree of my stress
is a medical diagnosis determined by my treating physician, Dr. Daniel Polansky.
Mr. Hocutt is not qualified to make such an accusation regarding my health.

## SUGGESTED RESOLUTION CONTINUED −

harassment complaint which was filed against Mr. Hocutt's supervisor and associate,
Mr. Samuel J. Palmer, I strongly feel would progress my stress and medication level to
a higher degree. At present my stress relief Rx is ALPRAZOLAM 0.25MG 3 x daily.
Daniel Polansky, MD, treating physician.

Also, see attached e-mails for record.

# LASHUNDRA JACKSON v. STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION

# VINCE  CALAMETTI

## June 20, 2008

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


LASHUNDRA
JACKSON,

     Plaintiff,
CIVIL ACTION NO.
vs.              2:07-CV-645-MEF

STATE OF ALABAMA
DEPARTMENT OF
TRANSPORTATION,
JOE McINNES, in
his official
capacity as
DIRECTOR OF THE
STATE OF ALABAMA
DEPARTMENT OF
TRANSPORTATION,

     Defendants.


     *    *    *    *    *    *


     DEPOSITION OF VINCE CALAMETTI,

taken pursuant to notice and
stipulation on behalf of the
Plaintiff, in the 9th Division Office
of the Alabama Department of
Transportation, 1701 I-65 West Service
Road North, Mobile, Alabama, before
Karen Reagan Drinkard, AL-CCR #005,
Certified Court Reporter and Notary
Public in and for the State of Alabama
at Large, on June 20th, 2008,
commencing at 8:39 a.m.

Page 2

1  APPEARANCES
2
3
4  FOR THE PLAINTIFF:
5
6  KELL A. SIMON, ESQUIRE
7  Ross, Melton, PC
8  Attorneys at Law
9  1104 San Antonio Street
10  Austin, Texas 78701
11
12
13  FOR THE DEFENDANTS:
14
15  ANDREW REDD, ESQUIRE
16      and
17  JASON A. TRIPPE, ESQUIRE
18  State of Alabama Department of
19  Transportation
20  1409 Coliseum Boulevard
21  Montgomery, Alabama 36110
22
23

Page 4

1  agreed by and between the parties
2  hereto and the witness, that the
3  signature of the witness to this
4  deposition is hereby waived.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1  STIPULATIONS
2
3      It is stipulated and agreed
4  by and between counsel representing
5  the parties that the deposition of
6  VINCE CALAMETTI may be taken before
7  Karen Reagan Drinkard, AL-CCR #005,
8  Certified Court Reporter and Notary
9  Public in and for the State of Alabama
10  at Large, without the formality of a
11  commission; and all formality with
12  respect to other procedural
13  requirements is waived; that
14  objections to questions, other than
15  objections as to the form of the
16  questions need not be made at this
17  time, but may be reserved for a ruling
18  at such time as the deposition may be
19  offered in evidence or used for any
20  other purpose by either party as
21  provided by the Federal Rules of Civil
22  Procedure.
23      It is further stipulated and

Page 5

1  INDEX
2
3  EXAMINATION                Page
4  MR. SIMON....................... 6
5
6
7  EXHIBITS                   Page
8
    PX-32  Doctor's Note, date    26
9  illegible
10  PX-33  Letter to LaShundra     89
    Jackson from Daniel
11  Morris, 2/16/07
12  PX-34  Affidavit of Vincent E.  114
    Calametti, signed
13  5/27/08
14
15  (The following exhibits were
      previously marked in this case and
16    referred to at the following pages:)
17  PX-6............................ 17
    PX-7............................ 128
18  PX-8............................ 51
    PX-9............................ 110
19  PX-10........................... 101
    PX-15........................... 52
20  PX-19........................... 58
    PX-22........................... 83
21  PX-24........................... 133
22
23

1      VINCE CALAMETTI, of lawful
2  age, having first been duly sworn,
3  testified as follows:
4
5  EXAMINATION
6  BY MR. SIMON:
7  Q.    Can you state your full name for the
8  record, please?
9  A.    Vincent E. Calametti.
10  Q.    And my name is Kell Simon, and I
11  represent LaShundra Jackson in her
12  lawsuit against the DOT.  What did you
13  do to prepare for your deposition,
14  Mr. Calametti?
15  A.    Reviewed the files and just
16  discussions with my attorneys.
17  Q.    Okay.  When was the last discussion
18  that you had with your attorneys to
19  prepare for the deposition?
20  A.    This morning.
21  Q.    How long did y'all meet this morning?
22  A.    10 minutes.
23  Q.    And when was the preparation session

1  before that?
2  A.    Yesterday.
3  Q.    How long did y'all meet yesterday?
4  A.    15 minutes.
5  Q.    Was that at the end of the day?
6  A.    Yes.
7  Q.    After the depositions were over
8  yesterday?
9  A.    Yes, sir.
10  Q.    When was the time before that, that
11  you spent time preparing with your
12  lawyers?
13  A.    Well, I have had various small
14  discussions with them throughout the
15  week.
16  Q.    Okay.  Have those been following the
17  depositions that we've been taking
18  this week?
19  A.    Some were probably following; some --
20  some I think on Monday also.
21  Q.    What's your position at the
22  transportation department?
23  A.    I am division engineer.

1  Q.    For the 9th Division?
2  A.    Yes, sir.
3  Q.    And how long have you held that job?
4  A.    Since February 16th, '08.
5  Q.    When did you first meet LaShundra
6  Jackson?
7  A.    I first met Ms. Jackson -- I guess it
8  would be while she was on a project in
9  west Mobile County.
10  Q.    And what was the occasion for you guys
11  to meet at that time?
12  A.    She had had a concern as far as her --
13  the -- her project workload or her
14  project assignment on the project.
15  Q.    What was her concern?
16  A.    Her concern was that she was
17  overloaded with her work and did not
18  feel that there was project staffing
19  for -- for the work -- her to do the
20  work.
21  Q.    And so did you go out to the project
22  to meet her?
23  A.    I did.

1  Q.    Why did you go out there?
2  A.    To -- she had called in with some
3  concerns, and to address the concerns.
4  Q.    How long did y'all meet for?
5  A.    10, 15 minutes, a short period.
6  Q.    What were the kinds of things that she
7  was telling you when you went out
8  there?
9  A.    She was -- she was concerned that
10  there wasn't enough staffing on the
11  project to properly inspect the job.
12  Q.    And did you think her concerns had
13  merit?
14  A.    I had -- typically when I get
15  concerns --
16      (Brief interruption.)
17  MR. SIMON:  Quick break.
18      (Off-the-record discussion.)
19  Q.    (By Mr. Simon:)  What -- did you wind
20  up changing the staffing or anything
21  on the project after you talked to
22  her?
23  A.    No.

1  Q.    Did you move her from that project to
2  another project?
3  A.    No.
4  Q.    How did you resolve the concerns that
5  she had?
6  A.    Well, actually they had already been
7  resolved.  Typically when I -- at that
8  time, I was the division construction
9  engineer, and whenever I got a concern
10  from an inspector, I either talked to
11  the district engineer or the project
12  engineer.  I think at this -- at this
13  point, I asked Leon Malone to come out
14  with me just to ride and witness the
15  conversation.  And she had talked to
16  the project engineer that morning.
17  The project engineer had made staffing
18  corrections on the job, so really by
19  the time I got out there, the problem
20  had been resolved.
21  Q.    What kind of adjustments did the
22  project engineer make?
23  A.    The project engineer had assigned

1  another EA, that was under his
2  direction, some duties on the job.
3  Q.    What time frame was this?
4  A.    Time frame as in the year or --
5  Q.    Yeah, uh-huh.
6  A.    I'm not sure.
7  Q.    Do you know how long -- how long
8  Ms. Jackson had been employed with the
9  DOT when she brought up this issue?
10  A.    I don't recall.
11  Q.    And who was the other engineering
12  assistant that the project engineer
13  assigned to work -- to work on the
14  project?
15  A.    I don't recall.
16  Q.    When you talked to her, did she say
17  that that had -- that the assignment
18  of the other engineering assistant had
19  alleviated the concern that she had?
20  A.    Yes, she did.
21  Q.    Was she insubordinate to you in any
22  way during that meeting?
23  A.    No.

1  Q.    Was she confrontational?
2  A.    No.
3  Q.    Did she seem genuinely concerned about
4  having the work get done?
5  A.    Yes.
6  Q.    What was the next interaction you had
7  with Ms. Jackson?
8  A.    It was probably that -- the direct
9  interaction, I don't really remember
10  that.  But I remember that Jay Palmer
11  had talked to me about her car, her
12  concerns over her car.
13  Q.    What were her concerns over her car?
14  A.    That they were -- that there were
15  scratches made during work hours.
16  Q.    She said that her car had been
17  vandalized?
18  A.    I don't remember the term
19  "vandalized."  I just remember the
20  scratches.
21  Q.    Do you recall talking to her about it?
22  A.    No, I don't recall talking directly to
23  her.

1  Q.    So that wasn't really an interaction
2  with her; that was more an interaction
3  with Jay Palmer about her?
4  A.    About her concerns, yes, sir.
5  Q.    And did you investigate those concerns
6  at all?
7  A.    No.  I just listened to -- Jay had
8  advised me of all the events.
9  Q.    How long was your conversation with
10  Jay?
11  A.    You know, not long.  Minutes,
12  30 minutes.
13  Q.    And when you say that he had advised
14  you of all the events, what were the
15  events that he had advised you about?
16  A.    Just that some concerns had been
17  discussed and that he had -- I think
18  he had recommended she move her car to
19  the front and then that the -- that
20  she had made some comments about not
21  wanting anyone to get hurt or
22  something to that nature over -- over
23  the -- over scratches on her car.

Page 14

1  Q.    Do you know if Ms. Jackson got any
2  kind of discipline for that incident?
3  A.    I think there was a -- yes, I think
4  there was a discipline on that
5  incident.  Or maybe it was a
6  counseling.  I'm not quite sure.  I
7  don't remember.
8  Q.    Is a counseling different from a
9  discipline?
10  A.    A counseling is a step in the
11  progressive positive discipline
12  process.
13  Q.    What step is it?
14  A.    It's one of the initial steps.
15  Q.    Is there a step before counseling?
16  A.    I'm sure you can -- you can talk to
17  the employee, but the counseling is --
18  to my recollection, it's one of the
19  first steps.
20  Q.    Is that -- is that progressive
21  disciplinary policy written down
22  somewhere?
23  A.    Yes.

Page 15

1  Q.    Where is it written down?
2  A.    There's a booklet.
3  Q.    And you called it positive progressive
4  discipline; is that right?
5  A.    Progressive positive discipline.
6  Q.    Progressive positive discipline.  At
7  the time that you talked to
8  Mr. Palmer, had Ms. Jackson already
9  received the counseling?
10  A.    I don't know.
11  Q.    Did you recommend to Mr. Palmer that
12  that's the discipline to be given to
13  Ms. Jackson?
14  A.    No, I didn't.
15  Q.    Did you make any recommendations to
16  him at that time?
17  A.    No, I didn't.
18  Q.    Do you know about what the time frame
19  of that -- issues about her car came
20  up?
21  A.    No, I don't.
22  Q.    Did you ever, apart from the time that
23  you went out to the project that we've

Page 16

1  already talked about, did you ever
2  observe Ms. Jackson performing her job
3  duties at ALDOT?
4  A.    Not that I can recall.
5  Q.    What was the next interaction that you
6  had with anybody about Ms. Jackson
7  after the issues about her car came
8  up?
9  A.    Late one afternoon I was called over
10  to the district office, that
11  Ms. Jackson wanted me to be present
12  when they -- when a document was
13  signed.
14  Q.    What document was that?
15  A.    I don't recall specifically which
16  document it was.
17  Q.    Was it a document that she was
18  supposed to sign?
19  A.    Yes.
20  Q.    Would it have been her performance
21  review?
22  A.    I don't recall.
23  Q.    Do you know the time frame when that

Page 17

1  occurred?
2  A.    No, I don't.
3  Q.    Thinking back on it, there's been some
4  testimony already about the
5  performance review.  It was done on
6  December 20th or so of 2006.  If you
7  think back to Christmas of '06, do you
8  think that might have been the
9  approximate time frame when you
10  were -- when Ms. Jackson wanted to
11  meet with you about that?
12  A.    I don't remember.
13  Q.    Let me show you what's been marked as
14  Exhibit 6.  Do you recognize that
15  document?
16      (Plaintiff's Exhibit 6 was
17      previously marked and is
18      not attached hereto.)
19  A.    Yes, sir.
20  Q.    Is this -- after looking at this
21  document, do you think this may have
22  been the document that she wanted you
23  to be there when she signed it?

Page 18

1  A.   I can't recall.  I'm not sure.
2  Q.   Do you recall her wanting to ask you
3  some questions about the -- this
4  particular performance review, the one
5  from December of '06?
6  A.   No.
7  Q.   Do you recall ever meeting with her
8  about it?
9  A.   No, I don't.
10  Q.   Do you know -- did you ever talk to
11  Ms. Jackson about the scratches on her
12  car?
13  A.   Not that I can recall, no.
14  Q.   And do you recall ever talking with
15  Ms. Jackson about this performance
16  appraisal?
17  A.   No, sir.
18  Q.   Okay.  Do you know if there's anything
19  about this performance appraisal that
20  caused Ms. Jackson to be terminated?
21  A.   Not that I -- not that I can see.
22  Q.   Okay.  Do you know if there were any
23  incidents surrounding this performance

Page 19

1  appraisal that caused Ms. Jackson to
2  be terminated?
3  A.   No, sir.
4  Q.   I'm sorry?
5  A.   No, sir.
6  Q.   And Ms. Jackson's performance was
7  rated as "meeting standards" on this
8  appraisal; right?
9  A.   Yes, sir.
10  Q.   And she was rated as being
11  satisfactory in all of her work habits
12  down at the bottom of that page?
13  A.   Yes, sir.
14  Q.   And it looks like Ms. Jackson signed
15  the performance appraisal on
16  December 20th; right?
17  A.   Yes, sir.
18  Q.   And it looks like Mr. Bret Paulk also
19  signed it on December 20th?
20  A.   Yes, sir.
21  Q.   And do you know if there was any
22  trouble with getting Ms. Jackson to
23  sign the appraisal?

Page 20

1  A.   Not that I can recall specifically.
2  Q.   You don't recall her engaging in any
3  misconduct about signing the
4  appraisal?
5  A.   Not that I remember.
6  Q.   You testified earlier that you believe
7  your next interaction with anybody
8  about Ms. Jackson after the incident
9  about the scratches on her car was
10  trying -- was her trying -- wanting
11  you to be present when she was going
12  to sign a document?
13  A.   Yes.
14  Q.   And could that have been the taping
15  policy that those issues came up about
16  a little bit later on?
17  A.   No.
18  Q.   Was there -- to your recollection, was
19  there any problem with her behavior or
20  her conduct at this time when she
21  wanted you to be there to sign this
22  document?
23  A.   I was there for maybe just several

Page 21

1  minutes.  I was there; the document
2  was signed; it was over.  I wasn't
3  part of the meeting.  I was just --
4  and I don't really know why I was
5  asked to be there.  I was there; it
6  was signed; and that was it.
7  Q.   Okay.  Do you know for certain that it
8  was Ms. Jackson that requested you to
9  be there?  Could it have been
10  Mr. Palmer or Mr. Paulk or somebody
11  else?
12  A.   No.  I think it was Ms. Jackson that
13  asked that I be there.
14  Q.   Now, you -- you know about the
15  incidents surrounding her not wanting
16  to sign the tape recording policy;
17  right?
18  A.   Yes, I do.
19  Q.   Did you go in then for a few minutes
20  for her to sign this other document --
21  did that occur before or after the
22  taping policy stuff came up?
23  A.   I don't recall the exact time frame of

1  when that occurred.
2  Q.   Okay.  And you don't think she engaged
3  in any misconduct during the course of
4  trying to get you there to be with her
5  when she was signing this document, do
6  you?
7  A.   I don't know.
8  Q.   After that situation of her wanting
9  you to be there with her when she was
10  signing this document, what was the
11  next interaction that you had
12  anybody -- with anybody about
13  Ms. Jackson?
14  A.   I'm sorry.  The next interaction about
15  anything or --
16  Q.   Yeah.  About anything about
17  Ms. Jackson.
18  A.   I can't recall specifically what the
19  next one was.
20  Q.   Okay.  What was the next interaction
21  that you had with Ms. Jackson after
22  that?
23  A.   To the best of my memory, it may have

1  been during the presentation of the
2  doctor's --
3  MR. REDD:  Note.
4  A.   -- note, I guess, as far as the
5  pregnancy.
6  Q.   Okay.  When she brought you that
7  doctor's note -- I'm sorry.  I'm
8  assuming that she brought it to you;
9  is that right?
10  A.   Yes.
11  Q.   Okay.  You said presentation.  Was
12  that the first doctor's note that she
13  got or was it the second one?
14  A.   To my knowledge, I think it was the
15  second one.
16  Q.   Was it the one that restricted her to
17  inside duties?
18  A.   Yes, yes, sir.
19  Q.   Did she also bring you the doctor's
20  note that gave her some lifting
21  restrictions initially?
22  A.   I don't recall that it was directly --
23  that I -- I received that -- that one.

1  Q.   Did you ever -- did you receive that
2  one?
3  A.   When it was -- I can't recall that I
4  received it, but I knew about it.
5  Q.   Okay.  How did you know about it?
6  A.   I think probably just through
7  discussions with Mr. Palmer.
8  Q.   And what was the first time that you
9  can remember discussing that with
10  Mr. Palmer?
11  A.   Sometime after he received it.  I'm
12  not sure.  I don't remember.
13  Q.   Did he initiate the discussion with
14  you about it?
15  A.   I can't remember.
16  Q.   I'm guessing so since it sounds like
17  you learned about it through him?
18  A.   I think so, yes, sir.
19  Q.   Okay.  And when he talked to you about
20  the first doctor's note, what were
21  y'all's discussion about it, as far as
22  you can remember?
23  A.   Probably he was advising me of it.  I

1  don't think there was really any kind
2  of -- much of a discussion about it.
3  Q.   And it -- it was a doctor's note that
4  said that she had some -- that she
5  wasn't to do heavy lifting; is that
6  right?
7  A.   I can't really remember exactly what
8  it said.
9  MR. SIMON:  Andy, do you
10  happen to have a clear
11  copy?
12  MR. REDD:  I don't have a
13  clear copy of either one,
14  to be honest with you.
15  What I have is a pretty
16  bad copy.  I mean, I've
17  got the first --
18  Q.   (By Mr. Simon:)  Mr. Calametti, did
19  you --
20  MR. REDD:  This is what I have
21  as the first one.
22  MR. SIMON:  Yeah.  That's what
23  I've got too.  And

1  that's -- if we can get a
2  copy -- I'll just mark
3  this one.
4  MR. REDD:  If you can make out
5  what it says.  The date
6  is not real good on it.
7  Q.    (By Mr. Simon:)  Let me show you what
8  I've marked as Exhibit 32.  I know
9  it's hard to read, so I'm going to
10  suggest that it might say something
11  with no heavy lifting during
12  pregnancy.  Does that sound right to
13  you?
14      (The referred-to document was
15      marked for identification
16      as Plaintiff's Exhibit No. 32.)
17  A.    Yes, sir.
18  Q.    Do you think that was the initial
19  doctor's note that you and Mr. Palmer
20  talked about?
21  A.    I would think so.
22  Q.    Did you direct Mr. Palmer to do
23  anything about Ms. Jackson when you

1  guys were discussing that note?
2  A.    Not specifically that I can remember.
3  Q.    Do you recall asking him to get
4  clarification on what she could lift
5  or couldn't lift?
6  A.    That is -- that is typically what we
7  would do if there are some type of
8  restrictions, but I specifically can't
9  remember in this instance.  But
10  typically that's what we would do.
11  Q.    Okay.  And do you guys have a form or
12  something that's supposed to be given
13  to the doctor that -- where they can
14  check off, like what kind of things
15  they can lift and what weight they can
16  lift and things like that?
17  A.    I don't know specifically that it's a
18  form that -- someone might have sent
19  their Form 40 showing that their --
20  what their duties are and asking the
21  doctor if they could meet these
22  requirements.
23  Q.    Do you know if after Ms. Jackson

1  brought that note to ALDOT, if her
2  duties changed at all in response to
3  giving that note?
4  A.    I don't know.
5  Q.    Did you ever have any followup
6  communication with Mr. Palmer about
7  any changes to Ms. Jackson's duties
8  after that note was given?
9  A.    Not that I can remember.
10  Q.    As far as you can remember, was it
11  just one conversation with Mr. Palmer
12  about that note?
13  A.    As far as I remember.  I don't
14  remember anything else.
15  Q.    Do you remember the time frame when
16  those conversations would have
17  occurred -- or I'm sorry -- that
18  conversation with Mr. Palmer about the
19  first doctor's note?
20  A.    No, sir, I don't.
21  Q.    Do you recall whether it was before or
22  after the issues came up about
23  Ms. Jackson not wanting to sign the

1  tape recording policy?
2  A.    I don't remember.
3  Q.    After the conversations with
4  Mr. Palmer about Ms. Jackson's lifting
5  restrictions due to her pregnancy,
6  what was the next interaction that you
7  had with anybody about Ms. Jackson?
8  A.    I don't specifically remember what the
9  next one was.
10  Q.    Do you remember any further
11  interactions with Ms. Jackson herself?
12  A.    Yes.  I remember receiving the -- the
13  second doctor's note.
14  Q.    Okay.  And where were you when you
15  received that note?
16  A.    In my office.
17  Q.    And did Ms. Jackson bring that note to
18  your office?
19  A.    Yes, yes.
20  Q.    Did she have anyone with her when she
21  brought it?
22      (Off-the-record Discussion.)
23  A.    I think Miss -- Miss Alexander was

1 there.
2 Q.   So both of them came into your office?
3 A.   I think so.
4 Q.   And tell me about the conversation
5 that transpired.
6 A.   We just -- I was presented the -- the
7 note, and I specifically don't
8 remember exactly what all was talked
9 about.
10 Q.   Did -- when you got the note, do you
11 know if Ms. Alexander knew that
12 Ms. Jackson was pregnant at the time?
13 A.   I'm not sure she knew.
14 Q.   What makes you say that?
15 A.   I -- well, of course, I wouldn't
16 have -- I wouldn't have known what had
17 been discussed between the two, so I
18 wasn't sure.
19 Q.   Did you feel uncomfortable having both
20 of them in there bringing you that
21 note about the pregnancy restrictions?
22 A.   No.  Only in the fact that I didn't
23 want to discuss something that -- that

1 someone else didn't know about.  But
2 no, I was not uncomfortable.
3 Q.   And when you say that someone else
4 didn't know about it, if
5 Ms. Alexander -- are you meaning that
6 if Ms. Alexander didn't know about the
7 pregnancy, that you didn't want to
8 discuss it at that time?
9 A.   If Ms. Jackson didn't want it
10 discussed, I certainly didn't want to
11 discuss it.
12 Q.   And when she brought you that second
13 doctor's note, do you remember talking
14 to her about what kind of duties she
15 could do as an engineering assistant
16 not being able to work outside?
17 A.   I don't recall exactly the -- the "not
18 outside."  But with that doctor's
19 note, I think I probably said that we
20 could comply with that doctor's note.
21 Q.   And that second note was the one that
22 said that she wasn't to be assigned
23 any outside duties; right?

1 A.   I think it said -- I remember it
2 referencing the office work during
3 pregnancy.
4 Q.   Office work during pregnancy.  And
5 there's office work for engineering
6 assistants to do?
7 A.   Yes, sir.
8 Q.   What kind of -- what kind of office
9 work would an engineering assistant
10 do?
11 A.   They would do project documentation,
12 seeing that the -- that the pay items
13 are documented in accordance with the
14 construction manual.
15 Q.   Is that what you mean when you say
16 project documentation?
17 A.   Yes.
18 Q.   So seeing that the pay items are
19 properly documented?
20 A.   Yes.
21 Q.   What else?
22 A.   Well, that -- that encompasses quite a
23 bit.  But it would be that each and

1 every pay item is documented in
2 accordance with the construction
3 manual, that the pay item has the
4 proper material receipts, has the
5 proper calculations to pay the
6 contractor, and then to close out the
7 final estimate.
8 Q.   What other kinds of work might an
9 engineering assistant who was assigned
10 to office duties be doing?
11 A.   Well, that pretty much encompasses all
12 of it, but I can get into more
13 specifics as far as the individual pay
14 items.  But that encompasses the broad
15 range that they would do in the
16 office.
17 Q.   Okay.  So it's -- it would mostly be
18 project documentation relating to pay
19 items?
20 A.   Yes.
21 Q.   Are there other engineering assistant
22 positions in the building -- inside
23 that are not necessarily related to

1  particular projects?
2  A.    When you say in the building, what --
3  which -- are you talking about that
4  particular building or --
5  Q.    I'm talking about inside versus
6  outside.
7  A.    Okay.  Yes.  There are engineer
8  assistants that work in the design
9  section preparing design plans -- or
10  assisting in design plans.  There are
11  engineering assistants that work in
12  maintenance doing sign work, managing
13  the logo sign program.
14  Q.    Anything else?
15  A.    Let's see.  There are probably
16  engineering assistants -- excuse me --
17  that work in the materials section
18  that may -- that may do the materials
19  end of project documentation.
20  Q.    Who was the person who decided that
21  Ms. Jackson was going to be
22  transferred to Tony Cooper's
23  supervision?

1  A.    That would be me.
2  Q.    Okay.  And why did you decide to
3  transfer her to Tony Cooper?
4  A.    At the time Tony Cooper had several
5  large jobs that required quite a bit
6  of office work, and I transferred her
7  somewhere that had the need -- that
8  required the need of additional office
9  people, personnel.
10  Q.    Did it have anything to do with
11  Mr. Cooper's supervisory or management
12  style?
13  A.    He is a good -- he is a good
14  supervisor and manager, but it was --
15  it was -- to the best of my
16  recollection, it was good -- it was a
17  good fit.  He had a lot of work.
18  Q.    Did you consider putting Ms. Jackson
19  in the design section?
20  A.    No.
21  Q.    Do you know if there were any slots
22  open in the design section that she
23  could have filled in on?

1  A.    I don't know.
2  Q.    Did you consider putting her in
3  maintenance doing any of the managing
4  of the logos on the sign program?
5  A.    No.
6  Q.    Did you consider putting her in any
7  jobs on the materials section?
8  A.    No.
9  Q.    Do you know what kind of work
10  Ms. Jackson did when she was assigned
11  to work with Tony Cooper?
12  A.    No.
13  Q.    Mr. Cooper testified that
14  Ms. Jackson's job, while she was
15  working under him, was to type up the
16  handwritten notes of a project
17  engineer.  Were you aware of that?
18  A.    No.
19  Q.    Would those be considered engineering
20  assistant duties, typing someone's
21  notes into a computer?
22  A.    There is a -- we have a computer
23  documentation -- a project

1  documentation called Site Manager, so
2  I can understand that -- that, yes,
3  that type of documentation would be
4  part of office duties.
5  Q.    But you don't know that Ms. Jackson
6  was typing those documents into Site
7  Manager, do you?
8  A.    No, I don't.
9  Q.    Would -- would typing a project
10  engineer's handwritten notes into,
11  like, a word processing program, would
12  that be considered an engineering
13  assistant's duty?
14  A.    If the project engineer needed it
15  done, yes, I would consider it.
16  Q.    That's also a job that a secretary
17  could do; right?
18  A.    If the project engineer needed it
19  done, I guess he could choose various
20  people to do it.
21  Q.    Okay.  And one of those people could
22  be a secretary; right?
23  A.    Yes.

Page 38

```
 1  Q.    What were the projects that Tony
 2  Cooper had going on that had a lot of
 3  office work that needed to be done on
 4  them at the time that you transferred
 5  Ms. Jackson to his office?
 6  A.    The big one that comes to my mind
 7  would be the Schillinger Road project
 8  from U.S. 45 to Lot Road.
 9      (Off-the-record Discussion.)
10  Q.    Any other large jobs in Mr. Cooper's
11  office that you can recall?
12  A.    No, sir.
13  Q.    But you don't know if Ms. Jackson was
14  assigned any duties on the Schillinger
15  Road project, do you?
16  A.    I don't know.
17  Q.    How long did Ms. Jackson work with
18  Tony Cooper?
19  A.    I can't recall the exact time.
20  Q.    And she was transferred to work with
21  him because of her restrictions to
22  working inside; right, working in
23  office duties?
```

Page 39

```
 1  A.    Yes.
 2  Q.    Did that occur before or after the day
 3  that Ms. Jackson didn't want to sign
 4  the taping policy?
 5  A.    I can't remember the exact date.
 6  Q.    Do you recall whether Ms. Jackson was
 7  transferred to Tony Cooper before or
 8  after she didn't want to sign the
 9  taping policy?
10  A.    I can't remember the exact date, so I
11  would hate to --
12  Q.    Okay.  When the -- when the issues of
13  the taping policy came up, who was her
14  direct supervisor?
15  A.    I believe it was Bret Paulk.
16  Q.    Okay.  And that was her supervisor
17  that she had before she moved to Tony
18  Cooper; right?
19  A.    Yes, I believe so.
20  Q.    Does that refresh your memory as to
21  whether the issues with the taping
22  policy came up before or after she was
23  transferred to Mr. Cooper?
```

Page 40

```
 1  A.    Again, I can't recall the exact dates.
 2  I know they're in -- the memos are in
 3  the file with the dates.  I can't, you
 4  know --
 5  Q.    Who -- who was her supervisor at the
 6  time that the issues came up about her
 7  not wanting to sign the taping policy?
 8  MR. REDD:  I thought he
 9  answered that.
10  A.    Again, to the best of my memory, I
11  think it was Bret Paulk.
12  Q.    Okay.  And were you involved at all
13  in -- on that day when she didn't want
14  to sign the taping policy?  Were you
15  involved in that situation at all?
16  A.    No.
17  Q.    Do you know if you were at work in the
18  building that day?
19  A.    I -- I was on annual leave.  I believe
20  to the best of my memory, I was on
21  annual leave.
22  Q.    Okay.  And that was January 5th, 2007;
23  right?
```

Page 41

```
 1  A.    I believe so, yes.  Around there.
 2  Q.    When did you first hear about the --
 3  Ms. Jackson not wanting to sign the
 4  taping policy?
 5  A.    I think it was probably when I
 6  returned from annual leave.
 7  Q.    Who did you hear about it from?
 8  A.    I can't recall exactly who first
 9  informed me.
10  Q.    Do you remember if you were informed
11  verbally or in writing?
12  A.    I don't remember.
13  Q.    Tell me the first conversation that
14  you can recall having with anybody
15  about Ms. Jackson not wanting to sign
16  the taping policy?
17  A.    Again, I can't recall the first
18  conversation.
19  Q.    And tell me any conversation that you
20  can recall having with anybody about
21  Ms. Jackson not wanting to sign the
22  taping policy.
23  A.    Again, I can't recall.  I know that
```

1  Mr. Fresolone and I talked about it,
2  but just in generalities for several
3  minutes.
4  Q.    Now, Mr. Fresolone didn't think that
5  that taping policy was fair, did he?
6  A.    I don't know.
7  Q.    And you talked to Mr. Fresolone, you
8  say, in generalities.  Did you talk
9  about Ms. Jackson when you talked to
10  Mr. Fresolone about it, or was it just
11  a general conversation about the
12  taping policy?
13  A.    It was just a general conversation
14  about the events of the -- of the
15  taping -- of the signing of the taping
16  policy with Ms. Jackson.
17  Q.    What did Mr. Fresolone tell you during
18  that conversation?
19  A.    Again, I can't remember the specifics
20  of it.  I just -- I just think it was
21  the events around -- explaining the
22  events around it.
23  Q.    Did he say that Ms. Jackson had

1  engaged in any misconduct?
2  A.    I can't really remember what the --
3  what the direct conversation was
4  about.
5  Q.    Do you know if, prior to the
6  January 5th incident about her not
7  wanting to sign the taping policy,
8  Ms. Jackson had ever been accused of
9  any other misconduct at ALDOT?
10  A.    I know there was the -- prior to that,
11  I think there was the -- the
12  counseling on the workplace violence
13  regarding the -- the car.  That's all
14  I can remember at this time.
15  Q.    So at this time you can't remember any
16  other misconduct that Ms. Jackson was
17  accused of prior to January 5th
18  besides the issues about the scratches
19  on the car?
20  A.    Not right now.
21  Q.    If you recall any later on, let me
22  know, okay?
23  A.    Yes, sir.

1  Q.    Do you think that that conversation
2  with Joey Fresolone about the taping
3  policy -- do you think that was the
4  first time that you had heard about
5  Ms. Jackson not wanting to sign it?
6  A.    Again, I can't remember any -- any
7  additional specific conversation I had
8  had with anyone about it.
9  Q.    Do you remember any meetings with
10  Mr. Palmer regarding the incidents on
11  January 5th about the taping policy?
12  A.    Not specifically, no, sir.
13  Q.    Do you know how it was decided what
14  level of discipline Ms. Jackson was
15  going to get for her conduct on
16  January 5th?
17  A.    No.
18  Q.    Did Mr. Palmer ever come to you and
19  ask you about what discipline might be
20  appropriate?
21  A.    Not that I can recall.
22  Q.    Did Mr. Paulk ever come and consult
23  with you on that?

1  A.    Not that I can recall.
2  Q.    Did Mr. Fresolone ever come and
3  consult with you on that?
4  A.    Not that I can recall.
5  Q.    Do you know what level of discipline
6  Ms. Jackson got for the incidents on
7  January 5th?
8  A.    To the best of my memory, I think it
9  was a reprimand.
10  Q.    Would that be a written reprimand?
11  A.    To the best of my memory, yes, sir.  I
12  think it was.
13  Q.    Did you ever see the written
14  reprimand?
15  A.    Yes, I think I did.
16  Q.    Did you see it before it was given to
17  Ms. Jackson or after?
18  A.    I can't recall.
19  Q.    Did you tell anybody to prepare the
20  reprimand?
21  A.    Not that I can recall.
22  Q.    And you didn't draft it yourself, did
23  you?

1  A.   No.
2  Q.   Do you know who drafted it?
3  A.   No.
4  Q.   Who made the decision that a written
5  reprimand would be appropriate
6  discipline for that situation?
7  A.   I don't know.
8  Q.   Did Ms. Jackson ever come and talk to
9  you about the written reprimand that
10 she got for the incidents on
11 January 5th?
12 A.   I don't remember a specific meeting on
13 it.
14 Q.   What had Ms. Jackson done wrong on
15 January 5th?
16 A.   I wasn't -- of course, I wasn't at the
17 specific meetings. I wasn't there
18 during the event, but she was
19 insubordinate during the signing of
20 the policy -- in the not signing of
21 the policy.
22 Q.   Do you know in what way she was
23 insubordinate?

1  A.   Just refusing to sign it.
2  Q.   Okay.  Are you aware that Mr. Paulk
3  gave her until the end of the day to
4  sign it?
5  A.   Through the -- through the memos, yes.
6  Q.   And -- okay.  And are you aware that
7  she did sign it by the end of the day?
8  A.   Yes.
9  Q.   So do you know what it was about her
10 conduct that was insubordinate if she
11 signed it by the deadline that she
12 had?
13 A.   It was still that the -- that it was
14 very disruptive to the -- to the
15 operations of that project office for
16 that -- for that -- for the entire
17 day.
18 Q.   What was the project office doing with
19 respect to the taping policy for the
20 entire day?
21 A.   I'm sorry.  I don't really understand
22 that question.
23 Q.   You said that -- that it disrupted the

1  project office for the entire day.
2  I'm trying to figure out what -- in
3  what way it disrupted the office for
4  the entire day.
5  A.   It required quite a bit of the project
6  engineer's time to -- you know,
7  through the various meetings that were
8  required through the day, and that was
9  disruptive.
10 Q.   Do you know what times those meetings
11 occurred and how long they were?
12 A.   No.
13 Q.   So you don't really know that it took
14 all day to get this resolved, do you?
15 A.   I wasn't -- no, I don't.
16 Q.   Now, let's go back to the question in
17 what way she was insubordinate.  Are
18 you saying she was insubordinate
19 because it took the whole day to get
20 the issue resolved?
21 A.   It was -- it was just through the
22 actions of not signing it and refusing
23 to sign it, changing various reasons

1  why she wouldn't sign it, and that was
2  insubordinate.
3  Q.   What were the different reasons that
4  she gave for not wanting to sign it?
5  A.   Several that I can remember:  That she
6  wanted an attorney to look at it; that
7  it was illegal; that -- it was
8  various.  I can't remember all the
9  reasons, but I remember that there
10 were various reasons.
11 Q.   And do you remember this from
12 conversations that you were having at
13 the time with people or documents you
14 were looking at, at the time -- or do
15 you remember this from documents that
16 you have seen in reviewing and
17 preparing for this case?
18 A.   Both.  I have seen the documents when
19 they were written and in reviewing the
20 documents recently.
21 Q.   What was the occasion for you to see
22 the documents when they were written?
23 A.   Just going through the normal chain of

1  command as far as when the incident
2  occurred.
3  Q.   And the documents that you're talking
4  about, are those the various memos
5  written by different employees about
6  what happened that day?
7  A.   Yes.
8  Q.   Were those copied to you?
9  A.   I think they were, some of them.
10  Q.   And in reviewing them, did you make
11  any determination about what the
12  appropriate action for ALDOT to take
13  would be?
14  A.   No.
15  Q.   You just kind of looked at them more
16  for informational purposes?
17  A.   Yes, sir.
18  Q.   Do you recall any conversations that
19  you had with Mr. Paulk about what
20  happened on January 5th?
21  A.   No, sir.
22  Q.   And did you -- do you recall any
23  conversations that you had with

1  Mr. Palmer about what happened on
2  January 5th?
3  A.   No, sir.
4  Q.   Let me show you Exhibit 5 -- I'm
5  sorry -- Exhibit 8.  Do you recognize
6  that document?
7      (Plaintiff's Exhibit 8 was
8       previously marked and is
9       not attached hereto.)
10  A.   (Witness reviewing document.)
11  Yes, sir.
12  Q.   You've seen that one before?
13  A.   Yes.
14  Q.   When -- when did you first see that
15  document?
16  A.   At some time after I returned from the
17  annual leave.
18  Q.   How long were you on annual leave at
19  that time?
20  A.   Generally the -- probably a week.  I
21  go to Disney every year at that
22  time --
23  Q.   Okay.

1  A.   -- to run a race.
2  Q.   To do what?
3  A.   To run a race.
4      (Off-the-record discussion.)
5  Q.   Let me show you what I've marked as
6  Exhibit 15.  Do you recognize that
7  document?
8      (Plaintiff's Exhibit 15 was
9       previously marked and is
10       not attached hereto.)
11  A.   Yes, sir.
12  Q.   And can you tell me what it is?
13  A.   It's a letter of reprimand from Bret
14  Paulk to Ms. Jackson.
15  Q.   Okay.  And it was copied to you;
16  right?
17  A.   Yes.
18  Q.   And was the first time that you saw
19  that document when you received it
20  after it was copied to you by
21  Mr. Paulk?
22  A.   To the best of my memory, yes, sir.
23  Q.   Did you discuss this letter of

1  reprimand with Mr. Paulk after he sent
2  it to you?
3  A.   Not specifically that I can remember.
4  Q.   And you didn't direct Mr. Paulk to
5  write this letter?
6  A.   Not specifically that I remember, no,
7  sir.
8  Q.   When you say not specifically --
9  A.   I don't remember telling him to write
10  a reprimand letter.
11  Q.   Do you remember telling anybody to
12  have a reprimand letter written for
13  Ms. Jackson about this situation?
14  A.   No, sir.
15  Q.   Did you think that a written reprimand
16  was the appropriate level of
17  discipline for what had happened that
18  day, based on your review of the
19  documents?
20  A.   Yes, sir.
21  Q.   And based on your conversations with
22  people about what had happened?
23  A.   Yes, sir.

1  Q.    Did Ms. Jackson engage in any kind of
2  misconduct at the Department of
3  Transportation after January 5th?
4  A.    Not -- not that I can remember.
5         (Off-the-record discussion.)
6         (Brief recess was taken.)
7  Q.    Who instituted the termination
8  proceedings for Ms. Jackson -- or I
9  should ask it a little bit different.
10  Who initiated the termination
11  proceedings for Ms. Jackson?
12  A.    There was a conference call with
13  division personnel and Mr. Dan Morris,
14  and the termination was discussed
15  during that conversation.
16  Q.    When did that conversation occur?
17  A.    I don't know a specific date.
18  Q.    Do you recall what month it was in?
19  A.    No, I don't.
20  Q.    Was it after Ms. Jackson received the
21  written reprimand regarding the
22  incidents on January 5th?
23  A.    Yes.

1  Q.    And what was the occasion for that
2  conference call?  Was it specifically
3  to discuss Ms. Jackson?
4  A.    Yes.
5  Q.    Who was present during that conference
6  call?
7  A.    There was myself, Joe Fresolone, Jay
8  Palmer and Jeanette Brown.
9  Q.    And Dan Morris was there on the phone?
10  A.    Yes.
11  Q.    Was anybody else there on the phone?
12  A.    No.
13  Q.    Sandy Deitz wasn't there?
14  A.    Not that I can recall, no.
15  Q.    Who initiated the call?
16  A.    Well, actually I think I -- I did.  I
17  was -- I was given Mr. Morris' number.
18  Q.    So it was Morris who wanted to have
19  the telephone call?
20  A.    Yes.
21  Q.    Do you know why Mr. Morris wanted to
22  have the telephone call about
23  Ms. Jackson?

1  A.    To review -- to review the personnel
2  records.
3  Q.    How did Mr. Morris know anything about
4  Ms. Jackson in the first place?
5  A.    I'm not sure.
6  Q.    You said he wanted to review the
7  records.  Do you know who had told him
8  that there were such records?
9  A.    I think -- to the best of my memory, I
10  think Ms. Deitz had discussed it with
11  Mr. Morris.
12  Q.    What makes you think that?
13  A.    Because I had also had discussions
14  with Ms. Deitz over the personnel
15  records.
16  Q.    What was the reason that you were
17  having discussions with Ms. Deitz
18  about the personnel records?
19  A.    Answering questions from Ms. Deitz.
20  Q.    And why was Ms. Deitz asking you
21  questions?
22  A.    I don't -- I'm not really sure why she
23  was doing it.

1  Q.    So Ms. Deitz -- I'm just trying to get
2  a picture of what was happening.  She
3  calls you out of the blue, and she
4  says I have some questions about
5  LaShundra Jackson for you?
6  A.    It could be possible, yes.
7  Q.    What kind of questions did Sandy Deitz
8  ask you?
9  A.    I can't remember the exact questions.
10  Q.    Did she ask you questions about
11  Ms. Jackson's job performance?
12  A.    Again, I can't remember the exact
13  questions.
14  Q.    Did she ask you any questions about
15  any misconduct that Ms. Jackson had
16  engaged in?
17  A.    Again, I can't remember the exact
18  questions.
19  Q.    Did you and Ms. Deitz discuss the
20  incidents of January 5th?
21  A.    I can't remember the specific --
22  but -- the specific incidents we
23  discussed.

Page 58

1  Q.    Let me show you what's previously been
2  marked as Exhibit 19.  Do you
3  recognize that document?
4      (Plaintiff's Exhibit 19 was
5       previously marked and is
6       not attached hereto.)
7  A.    (Witness reviewing document.)
8  I'm sorry.  And the
9  question again?
10  Q.    I just asked you if you recognize that
11  document?
12  A.    Yes.
13  Q.    And what is it?
14  A.    It is a review of a complaint filed by
15  Ms. Jackson.
16  Q.    Now, just to try to get the time frame
17  clear, the conversation that you had
18  with Ms. Deitz about the personnel
19  information, did that occur before you
20  saw this document or after?
21  A.    Ask me that one more time.  I'm sorry.
22  Q.    Yeah.  I'm sorry.  And that was a
23  little bit confusing the way I asked

Page 59

1  it.  Let's back up a little bit.  This
2  document is dated February 14th, 2007;
3  correct?
4  A.    Yes.
5  Q.    Is that right?
6  A.    Yes.
7  Q.    So that's like a month and a half or
8  so after the incidents on January 5th;
9  right?
10  A.    Yes.
11  Q.    And when -- when was the first time
12  that you can recall seeing this
13  investigative determination document?
14  A.    I think it was in the discussions
15  with -- with our -- with my attorneys
16  in preparation for this.
17  Q.    Okay.  And I don't want you to tell me
18  anything about the discussions that
19  you had with your attorneys, so don't
20  go any further than that.
21  You didn't see this
22  document prior to Ms. Jackson's
23  termination, you don't think?

Page 60

1  A.    Not that I can recall.
2  Q.    Okay.  If you will look on Page 2 of
3  this document, the first sentence on
4  that page says (as read:) According to
5  Vince Calametti, Jay Palmer, and Bret
6  Paulk, it is common for new
7  inexperienced EAs to be assigned to
8  observe various job tasks being
9  performed on different project sites
10  as part of on-the-job training.
11  Is this -- is that what
12  Ms. Deitz had called to ask you about?
13  A.    To the best of -- yes, to the best of
14  my recollection.
15  Q.    Okay.  Had she -- during the
16  conversation that you had with her
17  where you were probably talking about
18  what kind of work is given to new,
19  inexperienced EAs, did you guys also
20  discuss Ms. Jackson's reprimand?
21  A.    Not specifically that I can remember.
22  Q.    Do you recall discussing anything
23  about Ms. Jackson's disciplinary

Page 61

1  history?
2  A.    Not specifically that I can remember.
3  Q.    Okay.  So to your recollection, she
4  was mostly calling to ask you
5  questions about information that she
6  needed to write this investigative
7  determination for the grievance?
8  MR. REDD:  Object to the form.
9  A.    The best I can remember is just the --
10  the event that I was involved in,
11  which -- as far as my review of her
12  initial discussion on the project that
13  day.
14  Q.    Okay.  So what you and Ms. Deitz
15  talked about was what you testified to
16  early on in your deposition about your
17  first interaction with Ms. Jackson
18  when you went out and talked to her on
19  the project; is that right?
20  A.    Yes.
21  Q.    Okay.  So Ms. Deitz calls you on the
22  phone and asks you these questions,
23  and then that's the end of the

1  conversation about Ms. Jackson.  And
2  then what's the next conversation
3  about Ms. Jackson that you had with
4  Ms. Deitz -- and I may be confused.
5  Was there only the one conversation
6  with you and Ms. Deitz?
7  A.   No.  I think there were -- there were
8  conversations after that when we
9  discussed the -- the whole personnel
10 file.
11 Q.   And what -- who initiated that call?
12 A.   Ms. Deitz.
13 Q.   And to your recollection, did that
14 call occur -- that call occurred
15 subsequent to the call that she made
16 to you about asking you questions
17 about your visit to the project;
18 right?
19 A.   Yes.
20 Q.   Did that call occur before or after
21 February 14th; do you remember?
22 A.   I don't remember.
23 Q.   When she called you and you discussed

1  the whole personnel file -- when she
2  called you initially, what kind of
3  questions did she ask?
4  A.   I don't remember the specific
5  questions.  I just remember discussing
6  the file.
7  Q.   What did you discuss about the file?
8  A.   In general, just the events that were
9  documented in the file.
10 Q.   Would those have been the --
11 Ms. Jackson's performance appraisal?
12 A.   I think it was more centered on the --
13 the events as far as the counseling
14 and then the January event.
15 Q.   Had anyone recommended Ms. Jackson's
16 termination at that point in time?
17 A.   No.
18 Q.   Do you know why Sandy Deitz was
19 calling you to discuss Ms. Jackson's
20 disciplinary history?
21 A.   I -- the probationary period was
22 coming to an -- was within a month or
23 so of being completed, so just a

1  review of the file to determine the
2  probationary status of the employee.
3  Q.   Does Ms. Dietz routinely make calls to
4  you to discuss probationary periods
5  coming to an end for engineering
6  assistants working in the 9th Division?
7  A.   Not routinely.
8  Q.   Has she done that before with respect
9  to any other employees?
10 A.   Not that I -- not that I can remember.
11 Q.   Do you know why then Ms. Jackson was
12 of particular interest to Ms. Deitz?
13 A.   No.
14 Q.   Did you not think it was out of the
15 ordinary that Ms. Deitz was calling
16 you to discuss Ms. Jackson's
17 probationary period?
18 A.   No.  Again, it was to -- it was to
19 discuss all of the -- all of the
20 personnel actions -- the documentation
21 in the file.
22 Q.   But she called -- she called you
23 specifically to discuss Ms. Jackson;

1  right?
2  A.   Yes.
3  Q.   Ms. Deitz works in the central office
4  in Montgomery; right?
5  A.   Yes.
6  Q.   Do you know what her job is?
7  A.   I don't know the specific title, no.
8  Q.   If you will look at the third page of
9  this document, it says "investigator"
10 next to her name; right?
11 A.   Yes.
12 Q.   Do you know what she is an
13 investigator of?
14 A.   It's one of the -- it's one of the
15 Title 6, Title 7 type of programs.
16 I'm not sure exactly which -- what it
17 is.
18 Q.   I mean basically she investigates
19 employee complaints and grievances;
20 right?
21 A.   Yes.
22 MR. REDD:  Object to the form.
23 Q.   And I'm just trying to figure out why

1   somebody whose job is to investigate
2   employee complaints and grievances
3   would be calling you to ask you to
4   review Ms. Jackson's disciplinary file
5   with her.
6   A.   I don't know.
7   Q.   Did she -- did she have the file with
8   her when she called you; do you know?
9   A.   I don't know.
10  Q.   Did you pull Ms. Jackson's file during
11  the telephone call so that you could
12  look over the documents while you were
13  on the phone?
14  A.   I don't know specifically that I did
15  that, no.
16  Q.   What kind of questions did Ms. Deitz
17  ask you during the call?
18  A.   Again, I can't remember the specific
19  questions.
20  Q.   Did you make any suggestions to her as
21  to what course of action you thought
22  ALDOT should take with respect to
23  Ms. Jackson?

1   A.   No.
2   Q.   Did you tell her that Ms. Jackson's
3   supervisors thought that she was a --
4   that the quality of her work was good?
5   A.   No.  Not that I remember.
6   Q.   Did you tell her about the written
7   reprimand that Ms. Jackson received
8   for the incidents of January 5th?
9   A.   Not that I can remember.
10  Q.   Did you guys discuss the incidents of
11  January 5th?
12  A.   Again, I think that's -- that was the
13  general discussion was the -- just
14  those personnel actions, those
15  documented personnel actions in their
16  file, but I can't remember
17  specifically discussing any of them.
18  Q.   Was she just asking you for more
19  information about them?
20  A.   No.  I just think that just general
21  discussions of what was in the file.
22  Q.   Did you think this was a totally
23  bizarre telephone call at the

1   beginning, somebody from Montgomery
2   wanted to discuss a probationary EAs
3   personnel file?
4   A.   No.  Because I have -- I have -- you
5   know, there are discussions with
6   Ms. Deitz on personnel files and --
7   and what's in files, so...
8   Q.   Okay.  So did you get the impression
9   that she was calling you just because
10  she wanted to make sure she had
11  everything in the file?
12  A.   Again, I don't really know.
13  Q.   Did she ask you questions about
14  specific documents that were in the
15  file?
16  A.   Not that I can -- not that I can
17  recall, you know, the exact
18  conversations we had regarding this --
19  this file.
20  Q.   Okay.  And maybe I'm confused or maybe
21  I -- maybe you need to help me
22  understand.  I'm just trying to figure
23  out, you get a call from Sandy Deitz,

1   hey, this is Sandy in Montgomery; I
2   want to ask you some questions about
3   LaShundra Jackson.  And then, you
4   know, what -- how does the
5   conversation go on from there?
6   A.   It was just a general discussion
7   regarding the what was -- the
8   documents in the file.
9   Q.   Okay.  Did Ms. Deitz make any
10  suggestions about any actions that she
11  thought ALDOT should take?
12  A.   Ms. Deitz wanted me to set up the
13  conference call with Mr. Morris.
14  Q.   Did she say why she wanted to hold
15  that conference call?
16  A.   Just to discuss the contents of the
17  personnel file.
18  Q.   And did -- did she say that it was
19  Mr. Morris who wanted that call
20  initiated?
21  A.   I can't really recall, you know how --
22  how -- who said they wanted the -- the
23  call.

1  Q.    Okay.  So you don't know whose idea it
2  was to have that call with Mr. Morris?
3  A.    Whether it was Sandy's or Mr. Morris,
4  no, I don't know.
5  Q.    But it wasn't your idea?
6  A.    It wasn't my idea.
7  Q.    How long after the conversation with
8  Ms. Deitz did you have the call with
9  Mr. Morris?
10  A.    Within a matter of days.
11  Q.    And where were you for that conference
12  call with Mr. Morris?
13  A.    I was in -- we have another little
14  small conference room right there
15  (indicating).  We were in that room.
16  Q.    Next door to the room we are in right
17  now?
18  A.    Yes, sir.
19  Q.    And Ms. Deitz didn't participate in
20  that conference call?
21  A.    Not to my memory, no.
22  Q.    Between the time that you talked to
23  Ms. Deitz and this conference call

1  with Mr. Morris, did you do anything
2  at all relating to Ms. Jackson?
3  A.    No.
4  Q.    You didn't go back and look in her
5  personnel file again?
6  A.    Not that I can recall.
7  Q.    Did you have anybody -- did you direct
8  anybody to do anything with regard to
9  Ms. Jackson during that interval?
10  A.    Not that I can recall.
11  Q.    Did you ask anybody to make any copies
12  of documents relating to Ms. Jackson?
13  A.    Not that I can recall.
14  Q.    Did you ask anybody to speak with
15  anybody about Ms. Jackson during that
16  time?
17  A.    No, sir.
18  Q.    During that second conference call --
19  or during the second phone call with
20  Ms. Deitz, did y'all discuss
21  Ms. Jackson's grievance at all?
22  A.    Not that I can recall, no.
23  Q.    During the first call with Ms. Deitz

1  where you talked about the initial
2  time when you went out on the project,
3  did she tell you that the reason that
4  she was calling was because
5  Ms. Jackson had filed a grievance and
6  she was -- and Sandy was investigating
7  it?
8  A.    Not that I can recall, no.
9  Q.    So as far as you can recall, she just
10  called to ask you some general
11  questions about that particular
12  incident?
13  A.    Yes.
14  Q.    When you called Mr. Morris for the
15  conference call in the room next
16  door -- and you say it was yourself,
17  Mr. Fresolone, Mr. Palmer, and
18  Ms. Brown who were physically present?
19  A.    Yes.  To the best of my memory, yes.
20  Q.    Mr. Paulk wasn't there?
21  A.    Not that I can recall, no.
22  Q.    And did you call -- did you call
23  directly into Dan Morris' office?

1  A.    No.
2  Q.    Where did you call to?
3  A.    I called him on his cell phone.
4  Q.    Did you dial the number?
5  A.    I don't remember.
6  Q.    And you all were on the speaker phone
7  in that -- in that little room?
8  A.    Yes.
9  Q.    At the time that you called him, did
10  you know why Mr. Morris wanted to have
11  that call with you?
12  A.    I knew it was to discuss this
13  personnel.
14  Q.    When you say this personnel, what do
15  you mean by that?
16  A.    This personnel file.
17  Q.    Ms. Jackson's personnel file?
18  A.    Yes.
19  Q.    How long did the telephone call with
20  Mr. Morris last?
21  A.    It was not a long call.  I don't know
22  the exact --
23  Q.    More like than hour or more like

Page 74

1  15 minutes?
2  A.    Closer to 15 minutes than an hour.
3  Q.    Did you take any notes during the
4  call?
5  A.    No.
6  Q.    Do you know if anybody took any notes
7  during the call?
8  A.    I don't remember anybody taking any
9  notes.
10  Q.    Ms. Brown, as the transportation
11  office manager, didn't take any notes
12  during the call?
13  A.    Not that I can recall.
14  Q.    What was she doing there?
15  A.    Just listening to the call.
16  Q.    And what about Mr. Fresolone?  What
17  was he doing there?
18  A.    The same thing.
19  Q.    And Mr. Palmer?
20  A.    The same.
21  Q.    So the people who were doing the
22  talking on the call were you and
23  Mr. Morris?

Page 75

1  A.    I think I asked those people to -- to
2  be there because they were familiar
3  with -- more familiar than I was with
4  some of the -- some of the
5  documentation in the file.
6  Q.    Okay.  During that call with
7  Mr. Morris -- so he answers the phone,
8  and what's the first thing that's said
9  after he answers?
10  A.    Hello, Mr. Morris.
11  Q.    Somehow I anticipated that answer.
12  Sorry.  So what's the first
13  substantive conversation that you had
14  with Mr. Morris during that call?
15  A.    Again, I don't know the specifics of
16  the exact conversation, but it's a --
17  Mr. Morris had a working knowledge of
18  the -- of the events, and we discussed
19  just generalities in the file is what
20  we discussed.
21  Q.    Mr. Morris is the guy with the bow
22  ties; right?
23  A.    Well, the times I've seen him, yes,

Page 76

1  he's had a bow tie on, but I don't
2  know that it's always a bow tie.
3  (Off-the-record Discussion.)
4  Q.    Did Mr. Morris ask -- ask questions
5  about the -- what happened, for
6  instance, on January 5th?
7  A.    I can't specifically remember any of
8  the questions he discussed.  I know
9  the general incident was discussed.  I
10  don't know the specific questions.
11  Q.    When you say in general, you mean the
12  incident of January 5th?
13  A.    Yes.
14  Q.    And do you recall anything specific
15  that you said during that phone call?
16  A.    No.
17  Q.    Do you recall anything specific that
18  Mr. Morris said during the call?
19  A.    No.  We talked about the incidents and
20  that the -- that this was a
21  probationary employee and that -- the
22  outcome of the probation was
23  discussed.

Page 77

1  Q.    And this call happened before any
2  letters were written recommending her
3  termination; right?
4  A.    Yes.
5  Q.    At the time of this call then, she had
6  probably about a month and a half left
7  in her probationary period; right?
8  A.    Approximately.  I'm not sure of the
9  exact time frame.
10  Q.    During the telephone conference with
11  Mr. Morris, did anyone suggest that
12  Ms. Jackson not be made a permanent
13  employee at the conclusion of her
14  probation?
15  A.    Can you ask me that one more time,
16  please?
17  Q.    Yeah.  During the conversation with
18  Mr. Morris, did anybody suggest that
19  Ms. Jackson -- well, let me ask it
20  this way -- that wasn't quite --
21  during the conversation with
22  Mr. Morris, did anybody suggest that
23  Ms. Jackson's employment be terminated

1 during her probationary period?
2 A.   Yes.
3 Q.   And who suggested that?
4 A.   Mr. Morris.
5 Q.   What did he say?
6 A.   I can't really remember how
7 specifically he said it, but that was
8 the conversation.
9 Q.   Okay.  Did he say I think y'all should
10 let her go?
11 A.   Probably not in those words.
12 Q.   Was it an -- was it an expression of
13 an opinion, or was it more like a
14 directive?
15 A.   It was -- it was the outcome of a
16 discussion.
17 Q.   You don't remember the words that he
18 used, but you say it was the outcome
19 of the discussion?
20 A.   Yes.
21 Q.   And Mr. Morris was the one who -- was
22 he the one who brought up the idea of
23 termination first?

1 A.   Yes.
2 Q.   And did he say, I think you should go
3 ahead and terminate Ms. Jackson?
4 A.   Maybe not in those words, but that was
5 the -- the conversation was dealing
6 with the termination during
7 probationary -- during the
8 probationary period.
9 Q.   Did he say, y'all should think about
10 terminating Ms. Jackson, or was it
11 more specific than that?
12 A.   I think it was more specific than
13 that.
14 Q.   It was more towards y'all should
15 terminate Ms. Jackson?
16 A.   I don't know if I'd want to phrase it
17 like that.  It was more that he felt
18 that termination was warranted during
19 this probationary period.
20 Q.   And did he say why he felt that the
21 termination was warranted?
22 A.   I think it was based on the review of
23 the file.

1 Q.   What makes you think that?
2 A.   Just the general conversation.
3 Q.   He never said during the conversation,
4 based on the review of her file, I
5 think you should terminate her?
6 MR. REDD:  Did he say that, or
7 did Dan say that?
8 Q.   Did Dan say that?
9 A.   Not exactly that I can remember how
10 he -- how he phrased it.
11 Q.   During the meeting -- during that
12 telephone conference, did y'all
13 discuss the fact of Ms. Jackson being
14 pregnant?
15 A.   Not that I can recall.
16 Q.   That didn't come up as an issue that
17 someone might be concerned about
18 terminating someone who had just
19 announced that she was pregnant?
20 A.   Not that I can recall.
21 Q.   Did y'all discuss during the meeting
22 the reason that her probation had been
23 extended?

1 A.   Not that I can recall.
2 Q.   Because really her probation was
3 supposed to end in December of '06
4 when she got that December 20th
5 performance appraisal?
6 A.   I think that was the time frame, yes.
7 Q.   And it got extended for about three
8 months because of something about an
9 algebra test or something?
10 A.   Yes.
11 Q.   Oh, did y'all discuss Ms. Jackson's
12 grievance during the conversation with
13 Mr. Morris?
14 A.   Not that I can recall.
15 Q.   You may have though?
16 A.   I don't recall discussing it.
17 Q.   Okay.  Is it possible that you did?
18 A.   I don't -- I don't recall the -- I
19 don't recall discussing it, again.
20 Q.   I didn't ask you whether you recalled
21 it.  I asked you whether it was
22 possible that that discussion had
23 occurred?

Page 82

1  MR. REDD:  I think he's
2  answered the best he can.
3  Obviously anything can be
4  possible.  Just answer
5  his question.
6  A.   I'm sure it may have been possible,
7  but I'm not -- I don't recall
8  discussing it.
9  Q.   After Mr. Morris suggested that
10  termination may be warranted, what was
11  the next thing that y'all discussed
12  during the call?
13  A.   I think that was generally the end of
14  the conversation.
15  Q.   So did -- so he said, okay, I think
16  termination is warranted, and somebody
17  said, okay, we'll go ahead and fire
18  her?
19  A.   No one -- no one, you know, objected
20  or no one -- I think everyone agreed
21  that that was a -- the direction to
22  head, so I think that was the end of
23  the conversation -- or the outcome of

Page 83

1  the conversation.
2  Q.   Okay.  Did Mr. Morris direct anybody
3  to write a recommendation for
4  termination?
5  A.   No.  Not that I can recall.
6  Q.   Did you direct anybody to write a
7  recommendation for termination?
8  A.   Not that I can recall.
9  Q.   Who wrote the termination
10  recommendation?
11  A.   I would have to look at the initial
12  paperwork, but I think that is -- I
13  would have to look at the paper.  I
14  don't know who actually wrote the
15  letter.
16  Q.   Let me show you what's been marked as
17  Exhibit 23.  Do you recognize that
18  document?
19  A.   I'm sorry.  This one is actually 22.
20  Q.   Oh, yeah, 22.  You're right.
21      (Plaintiff's Exhibit 22 was
22       previously marked and is
23       not attached hereto.)

Page 84

1  A.   Yes, I do.
2  Q.   Okay.  Is that the termination
3  recommendation?
4  A.   Yes, sir, it is.
5  Q.   Did you draft this?
6  A.   No.
7  Q.   Do you know who drafted it?
8  A.   Mr. Jay Palmer.
9  Q.   Did you tell Mr. Palmer to write this
10  letter?
11  A.   I think, because Ms. Jackson was with
12  Mr. Cooper and had not been there but
13  week or so, Mr. Palmer was the next
14  level of -- was the next supervisory
15  level.  Jay and I probably discussed
16  him initiating this letter.
17  Q.   And those are your initials
18  handwritten on the bottom where it
19  says recommend approval; right?
20  A.   Yes, sir.
21  Q.   Do you know what happened -- where
22  this letter was sent after you
23  recommended approval?

Page 85

1  A.   It was more than likely forwarded to
2  Mr. Poiroux.
3  Q.   And would he have written another
4  letter that was forwarded to
5  Montgomery?  Is that how it usually
6  works?
7  A.   Usually, yes, sir.
8  Q.   And do you know if Mr. Poiroux did
9  that?
10  A.   I would have to look at the paper, but
11  I think there was a recommendation to
12  Montgomery.
13  Q.   Did it occur to you at the time that
14  Ms. Jackson got the written reprimand
15  for the incidents of January 5th that
16  she should be terminated?
17  A.   I did not have that -- that thought,
18  no.
19  Q.   So you didn't think that her conduct
20  up to that time warranted termination?
21  MR. REDD:  Object to the form.
22  That's not exactly what
23  you asked.

1  A.   I wasn't thinking in that -- you know,
2  I did not -- it was review the
3  document, process the document.  I
4  wasn't in a -- in a mode to think
5  about the status of the employee.  It
6  did not come to my mind.
7  Q.   I mean, you were signing off on a
8  discipline for an employee; right, or
9  reviewing a discipline for an
10 employee?
11 A.   I was reading it.
12 Q.   And when you were reading it, you knew
13 that she was on probationary status;
14 right?
15 A.   Yes.
16 Q.   And you knew that her probation was
17 going to conclude pretty soon after
18 that?
19 A.   Again, when I read it, I didn't -- I
20 didn't have the probationary end
21 period in my mind.
22 Q.   You didn't think about that until
23 Mr. Morris called and suggested that

1  Ms. Jackson be terminated?
2  A.   We did not start thinking about the
3  end of the probationary period until
4  those discussions.
5  Q.   What's the usual process for making a
6  decision about whether a probationary
7  EA, a project inspector, is going to
8  make permanent status?
9  A.   I'm sorry.  Ask that one more time.
10 Q.   What's the usual or typical process
11 for deciding whether an EA that's
12 probationary is going to make
13 permanent status?
14 A.   That is the -- the permanent -- the
15 grade is initiated at that project
16 engineer's level.  And, of course, if
17 they have any concerns or questions,
18 they may ask a supervisor above them.
19 Q.   And when you say the grade, are you
20 talking about the rating on the
21 performance appraisal?
22 A.   Yes.
23 Q.   So, for instance, with regard to

1  Ms. Jackson's December 20th appraisal,
2  Mr. Paulk had the responsibility at
3  that time of deciding whether
4  Ms. Jackson was going to be made
5  permanent or not, or making the
6  initial recommendation for it?
7  A.   Yes.
8  Q.   And it happened differently with
9  respect to Ms. Jackson, because
10 Mr. Morris got involved at some point;
11 is that right?
12 A.   For what?
13 Q.   For her -- for the second probationary
14 period.
15 A.   Yes.
16 Q.   And to your knowledge, how did
17 Mr. Morris first hear about
18 Ms. Jackson?
19 A.   To my knowledge, it was through
20 Ms. Deitz.
21 Q.   But you don't know anything about the
22 conversations that occurred between
23 Ms. Deitz and Mr. Morris?

1  A.   No.
2  Q.   Give me just a second.  I'm looking
3  for something.
4      (Off-the-record discussion.)
5  Q.   All right.  Let me show you what I
6  have marked as Exhibit 33 to your
7  deposition.  Have you ever seen that
8  document before?
9      (The referred-to document was
10     marked for identification
11     as Plaintiff's Exhibit No. 33.)
12 A.   (Witness reviewing document.)
13 Yes.
14 Q.   When did you see that document?
15 A.   In preparation for this -- this
16 deposition.
17 Q.   Had you ever seen it prior to
18 Ms. Jackson being terminated?
19 A.   Not that I can recall.
20 Q.   Did you ever meet with Ms. Jackson to
21 discuss her proposed termination with
22 her?
23 A.   Not that I can recall.

1  Q.   Did you ever meet with Ms. Jackson to
2  ask her about the events that occurred
3  on January 5th?
4  A.   In some of the meetings -- in some of
5  the -- in the documents that were --
6  when I received some of the doctor's
7  documents, we had some discussions.
8  That may -- that may have come up in
9  some of those in generalities or
10  discussions on them or listening to
11  the employee, or -- but I can't recall
12  specifically that it did.
13  Q.   Did you discuss Ms. Jackson's having
14  been transferred to Tony Cooper with
15  Mr. Morris?
16  A.   Not that I can recall.
17  Q.   And had you ever mentioned Ms. Jackson
18  being moved to do inside work with
19  Mr. Morris?
20  A.   Not that I can recall.
21  Q.   Do you know whether Mr. Morris knew
22  that Ms. Jackson was working inside
23  under Tony Cooper?

1  A.   No.
2  Q.   Do you know if Mr. Morris knew that
3  Ms. Jackson was pregnant?
4  A.   No, I don't.
5  Q.   Do you know whether anyone else in the
6  9th Division had conversations with
7  Mr. Morris about Ms. Jackson?
8  A.   No, I don't.
9  Q.   Did you have any further conversations
10  with Mr. Morris about Ms. Jackson
11  after the conference call that you had
12  in the room next door?
13  A.   Not that I recall.
14  Q.   Did you have any further conversations
15  with Mr. Poiroux about Ms. Jackson?
16  A.   I'm sorry.  After this?
17  Q.   After the call with Mr. Morris.
18  A.   Only that I'm sure that I told
19  Mr. Poiroux that there had been a
20  discussion.
21  Q.   Did you tell Mr. Poiroux that
22  Mr. Morris had decided that
23  Ms. Jackson should be terminated?

1  A.   I'm sure I told Mr. Poiroux that the
2  final probationary status had been
3  discussed and the termination had been
4  recommended and -- yes.
5  Q.   She was terminated while on probation;
6  right?
7  A.   Yes.
8  Q.   It wasn't just that her probation was
9  just allowed to run out and that she
10  was let go at the end; correct?
11  A.   That's correct.
12  Q.   Did you have any further conversations
13  with Mr. Palmer about Ms. Jackson's
14  employment status after the letter he
15  wrote and gave to you?
16  A.   Not that I can recall.
17  Q.   And did you instruct Mr. Palmer on
18  what to put in that letter?
19  A.   Not that I can recall, no.
20  Q.   Is there a policy in the 9th Division
21  that probationary EAs have to pass
22  their basic math and algebra tests
23  before they can be made permanent?

1  A.   Yes.
2  Q.   Is that policy still currently in
3  effect?
4  A.   No.
5  Q.   When -- when did it stop being in
6  effect?
7  A.   I don't know.
8  Q.   Was it while you were the division
9  engineer or while Mr. Poiroux was the
10  division engineer?
11  A.   I believe it was when Mr. Poiroux was
12  the division engine.
13  Q.   Do you know if it was in effect when
14  Ms. Jackson was an employee?
15  A.   Yes.
16  Q.   It was?
17  A.   Pardon me?
18  Q.   It was in effect at that time?
19  A.   Yes.
20  Q.   Were you involved in the decision to
21  end that policy?
22  A.   No.  I don't think so.
23  Q.   Do you know who made that decision?

1   A.    It would be Mr. Poiroux.
2   Q.    While the policy was in effect, was
3   there room for supervisors to exercise
4   discretion, if an employee hadn't
5   passed both basic math and algebra, to
6   make them permanent anyway if there
7   were extenuating circumstances?
8   A.    I don't know of any cases like that.
9   Q.    Are you familiar with an employee
10  named Gene Blan, B-L-A-N?
11  A.    Not really, no, sir.
12  Q.    I'm not going to mark this as an
13  exhibit, because it's my own copy.
14  But I'm going to ask you to take a
15  look at this document and tell me if
16  that refreshes your recollection about
17  Mr. Blan.
18  A.    (Witness reviewing document.)
19  Okay, yes.
20  Q.    Can you tell me what that document is?
21  A.    This is an e-mail from Debra Hadley to
22  Brenda Maddox.  I'm cc'd, Jeanette
23  Brown, Jeannie Brown, Mickey Jones,

1   and Lawana Shelly.
2       (Off-the-record Discussion.)
3   Q.    And the e-mail says (as read:) I just
4   wanted to make -- make you all aware
5   that I spoke with Lawana this morning,
6   and she stated that Mr. Blan will not
7   be able to attend the algebra training
8   class this week, August 20th to 24th,
9   2007, I emailed her the
10  cancellation/reschedule form so he can
11  put the reason on there, sign it, get
12  Mickey to sign it, and return it to
13  me.  Since he was unable to attend the
14  algebra class, his EDP module program
15  will be extended for three months as
16  per EDP procedures.  I have advised
17  Lawana that his probationary period
18  may be extended also, but that the
19  decision will be left up to all of
20  you.  Thanks, Debra Hadley.
21  Is that how it reads?
22  A.    Yes.
23  Q.    Do you know whether there was a

1   decision made about what to do with
2   Mr. Blan's probationary period?
3   A.    I don't -- I don't know what the
4   decision was.
5   Q.    Does Mr. Blan still work here?
6   A.    I don't know.
7       (Off-the-record Discussion.)
8   Q.    And let me also show you this
9   document.  Can you tell me what that
10  is?
11  A.    It's an employee performance
12  probationary document on Gene N. Blan.
13  Q.    And when is it signed by his project
14  engineer or direct supervisor?
15  A.    September 17th, 2007.
16  Q.    And the algebra class that Mr. Blan
17  was supposed to take was at the end of
18  August; right?
19  A.    That's correct.
20  Q.    So it looks like Mr. Blan made his
21  probationary period even though he
22  skipped the algebra class.  Would that
23  be a proper inference to draw from

1   those two documents?
2   A.    Well, I know he made his probationary
3   period, and I know he missed this
4   class.  I don't know if he was
5   scheduled for another class.
6   Q.    Okay.  But he made his probationary
7   period less than a month after the
8   last class that he was scheduled for;
9   right?
10  A.    Yes.
11  Q.    Okay.  And the e-mail that you
12  received does indicate that it's
13  within the supervisor's discretion to
14  extend the probation period or make a
15  person permanent even if they don't
16  pass the algebra test?
17  A.    Well, I think that was a poor choice
18  of words on her -- on Ms. Hadley's
19  part.  I do not know that.  That
20  decision, again, was -- policy within
21  the division.  And so at this time
22  frame, I don't know that that had been
23  given to the direct supervisor.  I

1 personally don't know that.
2 Q.   When you say it was a poor choice of
3 words, did you mean where she says,
4 but that the decision would be left up
5 to all of?  You.  Is that the poor
6 choice of words that you're talking
7 about?
8 A.   Yes.
9 Q.   And when she refers to all of you,
10 she's talking about, not only
11 Mr. Maddox, but you and the other
12 people who were cc'd on the e-mail?
13 A.   I took it that she was talking to
14 Brent Maddox because that's
15 Mr. Fountain's supervisor.
16 Q.   Who is Mr. Fountain?
17 A.   Mr. Fountain is the project engineer
18 on Mr. Blan.
19 Q.   Okay.  Thank you.  Did you take any --
20 did you play any role in deciding
21 whether Mr. Blan was going to be made
22 permanent or continue on his
23 probation?

1 A.   No.
2 MR. REDD:  Are we at a good
3 place to take a short
4 break?
5 MR. SIMON:  Sure, yeah.
6     (Brief recess was taken.)
7 Q.   (By Mr. Simon:)  Mr. Calametti, did
8 you talk with your attorneys about
9 this case during the break?
10 A.   Yes.
11 Q.   What did you talk about with them
12 during the break about the case?
13 MR. REDD:  I hope you get done
14 fast.
15 A.   I asked how I was doing.
16 Q.   Did you talk about any of the details
17 about the substance of the case?
18 A.   No details.
19 Q.   We were talking about probationary
20 engineering assistants and the basic
21 math and algebra tests.  Do you know
22 of any other probationary engineering
23 assistants who have, during the time

1 that the policy that we were
2 discussing was in effect -- any
3 probationary engineering assistants
4 who passed their probationary period
5 without having passed the basic math
6 and algebra?
7 A.   Not off the top of my head, no, sir.
8 Q.   And just to be clear, to your
9 knowledge, did supervisors have the
10 discretion to allow those probationary
11 EAs to pass probation even if they
12 hadn't passed the basic math and
13 algebra?
14 A.   No, they didn't.
15 Q.   So when Ms. Jackson hadn't passed her
16 basic math and algebra, it was simply
17 required that she be extended on her
18 probation?
19 A.   Yes.
20 Q.   Who filled out Ms. Jackson's final
21 performance appraisal?
22 A.   I do not know.
23 Q.   Have you ever seen it before, to your

1 knowledge?
2 A.   Yes.
3 Q.   Had you seen it before you -- before
4 Ms. Jackson was terminated?
5 A.   No.
6 Q.   Had you seen it before you started
7 preparing for the depositions in this
8 case?
9 A.   Yes.
10 Q.   When did you see it?
11 A.   Sometime afterwards.  I don't know the
12 exact time, but sometimes -- sometime
13 after -- after it was generated.  I
14 mean, I don't know the exact date.
15 Q.   Did you see it before she was fired?
16 A.   Not that I can recall, no.
17 Q.   I show you what's been marked as
18 Exhibit 10.  Is that the final
19 appraisal that we're talking about?
20     (Plaintiff's Exhibit 10 was
21     previously marked and is
22     not attached hereto.)
23 A.   Yes, sir.

Page 102

1  Q.   And you initialed the final appraisal
2  next to Mr. Palmer's signature; right?
3  A.   Yes.
4  Q.   And did you do that before it was sent
5  to Mr. Poiroux?
6  A.   Yes.
7  Q.   Okay.  And to your understanding, you
8  were rating Ms. Jackson for the period
9  from December 21st of '06, to
10  February 23rd of '07?
11  A.   That's what it says.  But
12  Mr. Palmer -- just to clarify,
13  Mr. Palmer was doing the rating during
14  that period.
15  Q.   Okay.  What was the reason for you to
16  initial on this appraisal?
17  A.   Just through the chain of command.
18  That's the way Mr. Poiroux -- the
19  chain of command directed or reviewed
20  all employee grades.
21  Q.   You didn't sign off on the
22  December 20th appraisal, did you?  I
23  may be wrong about that.

Page 103

1  A.   I did not.
2  Q.   But normally that's something you
3  would do is sign off on a probationary
4  EA's first performance appraisal?
5  A.   I would sign off on all
6  probationary -- any grade that is
7  generated, typically the line of
8  communication signed off on it.
9  Q.   When did that become the policy?
10  A.   That the supervisors sign off or
11  initial or review?
12  Q.   Yeah.
13  A.   I'm not sure of the date.  But it's
14  been for some time though.
15     (Off-the-record discussion.)
16  MR. SIMON:  I'm sorry, Andy.
17  What was that?
18  MR. REDD:  I asked him if that
19  was -- the initials on
20  Exhibit 2, it looks like
21  SJP, and I just wanted to
22  make sure it was
23  Mr. Palmer.

Page 104

1  Q.   And again, you initialed them before
2  it was sent to Mr. Poiroux; is that
3  right?
4  A.   Typically, yes.
5  Q.   Did your initialing it mean that you
6  approved the rating?
7  A.   Yes.  That I had reviewed it and did
8  not see a problem with it.
9  Q.   Did you discuss the rating with
10  Mr. Palmer?
11  A.   The reading?
12  Q.   Rating.
13  A.   Rating.  Not that I can recall.
14  Q.   Did you direct Mr. Palmer to prepare
15  this performance appraisal?
16  A.   Not that I can recall.  But with --
17  with Mr. Palmer being the next
18  supervisor over Mr. Cooper, and with
19  Mr. Cooper not having had her very
20  long, it would have been appropriate
21  for Mr. Palmer to perform the rating,
22  fill the document out with input from
23  Mr. Paulk.

Page 105

1  Q.   Do you know if Mr. Palmer got input
2  from Mr. Paulk when he filled this
3  out?
4  A.   I don't know that.
5  Q.   Do you know if he got input from
6  Mr. Cooper in filling this out?
7  A.   I don't know that.
8  Q.   Under the recommendations box, it says
9  it is recommended that the employee be
10  separated before or at the end of the
11  probationary period; correct?
12  A.   Yes, sir.
13  Q.   And it also says (as read:) Reason
14  stated in "disciplinary actions" area;
15  right?
16  A.   I'm sorry?
17  Q.   It also says right next to that,
18  reason stated in "disciplinary
19  actions" area?
20  A.   Yes.
21  Q.   And was there a reason stated in the
22  "disciplinary actions" area?
23  A.   There was a 1 under the reprimand.

Page 106

1  Q.   Okay.  So does that mean that the
2  reason Ms. Jackson was fired was
3  because of the reprimand?
4  A.   That was the -- the reason of the
5  disciplinary score of -- of 7.
6  Q.   So the reason that Ms. Jackson was
7  terminated was because she got a
8  disciplinary score of 7?
9  MR. REDD:  Object to the form.
10  A.   That's -- that's what the document --
11  that's how the document is filled out.
12  Q.   Okay.  Look at it again.  The document
13  says that the reason for the
14  separation is to be stated in the
15  "disciplinary actions" area; right?
16  Is that right?
17  A.   Yes.
18  Q.   Okay.  And in the "disciplinary
19  actions" area, there is no statement
20  as to the reason that Ms. Jackson was
21  terminated, is there?
22  A.   Not on this form, correct, yes, sir.
23  Q.   The only statement in the

Page 107

1  "disciplinary actions" area is that
2  she got one reprimand; right?
3  A.   Yes.
4  Q.   And the one reprimand led to her
5  getting a disciplinary score of 7;
6  right?
7  A.   Yes, sir.
8     (Off-the-record Discussion.)
9  Q.   Look at the "responsibilities" section
10  on the second page of the performance
11  review.  Do you know why Ms. Jackson
12  was given the ratings that she was
13  given under "responsibilities?"
14  A.   No.
15  Q.   Did you discuss those with Mr. Palmer?
16  A.   Not to my recollection.
17  Q.   The ratings of 1s and 2s that
18  Ms. Jackson got, are those the sort of
19  ratings that a good employee would get
20  on their performance review?
21  A.   That -- that led to a 16.7, which is a
22  "meets standards," which would be
23  an -- I would say, an average

Page 108

1  employee.
2  Q.   Okay.  So you would say that the
3  individual "responsibilities" scores
4  on Page 2, looking at those, you would
5  see an average employee?
6  A.   One that meets standards.
7  Q.   You would see an average employee?
8  A.   Yes.
9  Q.   Are these scores that are typical of a
10  probationary engineering assistant,
11  the "responsibilities" scores that
12  Ms. Jackson got?
13  A.   I don't know.
14  Q.   Do you think that most probationary
15  engineering assistants get higher
16  scores than that?
17  A.   I'm not really sure.
18  Q.   Are these the scores, the
19  "responsibilities" scores -- absent
20  the reprimand that Ms. Jackson got,
21  would these "responsibilities" scores
22  have supported moving her to permanent
23  status?

Page 109

1  A.   The scores on their own and no
2  disciplinary actions?
3  Q.   Right.
4  A.   Probably, yes.
5  Q.   Probably, yes?  So there was nothing
6  about Ms. Jackson's job performance
7  that led to her termination; correct?
8  A.   Correct.
9  Q.   As far as you knew, she was doing a
10  fine job on the tasks that she had;
11  correct?
12  MR. REDD:  Object to the form.
13  A.   As far as I knew, but I'm not her
14  front line.  I didn't observe her
15  daily work.
16  Q.   And as far as you know, it was
17  Mr. Palmer who decided what the
18  numerical scores were going to be in
19  the "responsibilities" categories?
20  A.   As far as I know, yes.
21  Q.   And the "responsibilities" score that
22  she got adds up to the lowest possible
23  score in the "meets standards"

1 category; correct?
2 A.   Yes, sir.
3 Q.   So she's just barely meeting
4 standards; right?
5 A.   Yes, sir.
6 Q.   Let me show you what I've marked as
7 Exhibit 9 to your deposition.  Do you
8 recognize that document?
9      (Plaintiff's Exhibit 9 was
10        previously marked and is
11        not attached hereto.)
12 A.   Yes, sir.
13 Q.   Okay.  When did you first see that
14 particular document that's marked as
15 Exhibit 9?
16 A.   I don't think I've seen it before
17 today.
18 Q.   Okay.  Can you tell me what it is?
19 A.   It is -- it looks like a version of
20 the same document that we were just
21 discussing.
22 Q.   Did you see any differences between
23 the one we were just discussing and

1 Exhibit 9?
2 A.   Yes.
3 Q.   What are the differences that you've
4 noticed?
5 A.   The first period covered from has
6 been -- the date has been changed.
7 The employee -- unavailable for
8 signature has been documented.
9 There's been a circle placed in --
10 over the 9th Division and the class
11 code.  It looks like all --
12 everybody's Social Security number has
13 been blacked out.  There's a McInnes
14 signature and dated.  And then on the
15 "responsibilities" score, the number
16 of responsibilities has been changed
17 and corrected.
18 Q.   What's the change that was made to
19 their --
20 A.   The total number of responsibilities
21 is to be divided by the number of
22 responsibilities, and that is the
23 average responsibility rating.

1 Q.   And so it's really supposed to be 15
2 divided by 9?
3 A.   Yes.
4 Q.   And that's what they corrected it to?
5 A.   Yes.
6 Q.   Okay.  When you initialed this
7 performance review, did you know that
8 you were initialing a review that
9 covered July 3rd of 2006 to April 2nd
10 of 2007?
11 A.   No.
12 Q.   You thought you were initialing
13 something that was reviewing her
14 performance from December 21st of '06
15 to February 23rd of '07; right?
16 A.   Yes, sir.
17 Q.   And do you know who changed the dates
18 on the period covered?
19 A.   No, sir.
20 Q.   Did you ever have any discussions
21 any -- with anybody about changes to
22 those dates?
23 A.   No.

1 Q.   Did you notice any other changes
2 between Exhibits 10 and 9?
3 A.   No, sir.
4 Q.   Can I have those back for a second,
5 please?
6 A.   (Witness complies.)
7 Q.   And on Exhibit 9, which is the one
8 that encompasses the time period from
9 July of '06 to April of '07, there's
10 still no reason for termination
11 written in the "disciplinary actions"
12 section; is there?
13 A.   That's correct.
14 Q.   Do you know the reason that
15 Ms. Jackson was not available to sign
16 her performance appraisal?
17 A.   No.
18 Q.   I'm sorry?
19 A.   No.
20 Q.   I want to show you what I have marked
21 as Exhibit 34 to your deposition.  Do
22 you recognize that document?
23      (The referred-to document was

Page 114

```
1       marked for identification
2       as Plaintiff's Exhibit No. 34.)
3   A.   Yes.
4   Q.   Can you tell me what it is?
5   A.   It is my affidavit.
6   Q.   And you signed it on May 27th of 2008;
7   right?
8   A.   Yes.
9   Q.   Did you draft this document?
10  A.   Through my attorneys, yes.
11  Q.   Did you tell your attorneys what to
12  write on here -- I'm sorry.  Strike
13  that.
14       Look at the last page of
15  your affidavit.  You don't mention
16  Mr. Morris anywhere in this affidavit,
17  do you?
18  A.   No.
19  Q.   In the last paragraph, you say (as
20  read:) It is common to extend an
21  employee's probation if the employee
22  has not met all of the requirements to
23  achieve permanent status.
```

Page 115

```
1   Which requirements did
2   Ms. Jackson not meet to achieve
3   permanent status?
4   A.   It was the math requirements.
5   Q.   Okay.  Were there any others?
6   A.   No.
7   Q.   Okay.  So apart from the math
8   requirement, there's no other reason
9   that she didn't make permanent
10  status --
11  MR. REDD:  Object to the form.
12  Q.   -- in December of 2006?
13  A.   Correct.
14  Q.   The next sentence says (as read:) When
15  you -- when I received the
16  recommendation from Jay Palmer to
17  terminate Ms. Jackson's employment, I
18  reviewed the information provided by
19  Mr. Palmer including Ms. Jackson's
20  personnel file.
21       Had you not already done
22  that review prior to Mr. Palmer making
23  the recommendation to terminate?
```

Page 116

```
1   A.   Yes.  We had -- we had discussed --
2   that review had been done, yes.
3   Q.   Okay.  And it wasn't really a
4   recommendation from Mr. Palmer to
5   terminate; it was a recommendation
6   from Mr. Morris; isn't that true?
7   A.   Well, the actual letter came from
8   Mr. Palmer through -- after
9   discussions with Mr. Morris, yes.
10  Q.   Okay.  And so really what happened is
11  you directed Mr. Palmer to write the
12  termination letter, he wrote it, and
13  then you forwarded it to Mr. Poiroux;
14  right?
15  A.   We agreed with -- in the discussion
16  with Mr. Morris, we agreed with the
17  recommendation of termination, and the
18  procedure was for the recommendation
19  to come from the supervisors.
20  Q.   And so you had directed Mr. Palmer to
21  make the recommendation for
22  termination?
23  A.   Yes.
```

Page 117

```
1   Q.   After you got the recommendation from
2   Mr. Palmer, did you go back and look
3   again at Ms. Jackson's file?
4   A.   Yes.
5   Q.   What documents did you look at in her
6   file after you received the
7   recommendations from Mr. Palmer?
8   A.   All the documents, just looking at the
9   dates, just seeing if I could see
10  anything.
11  Q.   Okay.  The way this is written it
12  sounds like you made the determination
13  that, based on the events during
14  probation, the Department should
15  terminate Ms. Jackson's employment,
16  after you received the recommendation
17  from Mr. Palmer; is that correct?
18  A.   Well, I think the -- I think we had --
19  we had discussed termination, but as
20  in the procedures, you know, once we
21  get the termination letter, you know,
22  we review and we make sure -- I make
23  sure I agree with his recommendations.
```

Page 118

1  Q.    So you didn't actually decide that you
2  wanted to terminate Ms. Jackson until
3  after you got Mr. Palmer's
4  recommendation letter?
5  A.    I verified my -- my earlier -- after
6  discussions with Mr. Morris, yes, I
7  verified that I was still good with
8  that recommendation.
9  Q.    Okay.  So you were -- and you were
10  good with that recommendation before
11  you got the letter from Mr. Palmer as
12  well; right?
13  A.    Yes.
14  Q.    What was the final incident that
15  caused Ms. Jackson to be terminated?
16  A.    Chronologically it was the
17  January 18th incident.
18  Q.    What was the January 18th incident?
19  A.    Oh, it was the January 18th letter.
20  I'm sorry -- leading up -- I think it
21  was the signing of the ALDOT policy.
22      (Off-the-record Discussion.)
23  Q.    What were the other incidents that

Page 119

1  caused her to be terminated?
2  A.    It was the October 6th, 2006, counsel
3  for disruptive behavior and
4  threatening comments while working on
5  the job, which is in violation of --
6  of employee rules, and November 2nd, a
7  counseling in her mid-appraisal, was
8  advised of conducting herself in a
9  professional manner during her
10  mid-appraisal review, and then the
11  January 18th letter of the reprimand
12  for disruptive behavior and
13  insubordinate demeanor on January 5th.
14  Q.    So those are the three incidents that
15  led to her being terminated?
16  A.    Yes.
17  Q.    And what exactly was the November 2nd
18  incident?
19  A.    It was a counsel -- it was a review
20  where she was advised that she needed
21  to improve on conducting herself in a
22  professional manner.
23  Q.    And that was relating to the -- what

Page 120

1  happened in October about the
2  scratches on the car; right?
3  A.    No.  That was -- I didn't fill out the
4  appraisal form, so -- I think that was
5  more advising the employee of
6  something that needed to be worked on
7  and improved on and a behavior that
8  needed to be worked on and improved
9  on.
10  Q.    Do you know that for a fact, or are
11  you just guessing?
12  A.    Well, I don't -- like I said, I did
13  not perform that mid-appraisal, so you
14  would have to ask the one who did
15  the --
16  Q.    I did ask Bret Paulk that in his
17  deposition, and he said that the
18  November 2nd comments about behaving
19  in a professional manner related to
20  the November 4th behavior about the
21  scratches on the car.  Would you have
22  any reason to dispute that?
23  A.    No.

Page 121

1  Q.    What -- when you received that letter
2  from Mr. Palmer, what review did you
3  do to see what the incident was on
4  November 2nd?
5  A.    Again, I just -- I just reviewed the
6  file and reviewed all the paperwork
7  contained in the file.
8  Q.    Sir, are you saying that someone being
9  counseled on a mid-period performance
10  appraisal to behave unprofessionally
11  in the office is grounds for
12  termination in this case?
13  MR. REDD:  Object to the form.
14  A.    I'm sorry.  One more time, please.
15  Q.    Would you say that, in this case,
16  Ms. Jackson being counseled to conduct
17  herself in a professional manner is
18  grounds for her termination?
19  MR. REDD:  Object to the form.
20  A.    I think it was part of the whole trend
21  that was seen through the probationary
22  period.
23  Q.    It's one of the reasons that's given

Page 122

1 there for her termination; right?
2 A.   That's correct.
3 Q.   Had you ever seen Ms. Jackson conduct
4 herself in a manner that was anything
5 but professional?
6 A.   No.
7 Q.   Did you ever talk to anybody about
8 what the unprofessional behavior was
9 that was referenced on -- let me ask
10 you a different way, because there's
11 no unprofessional behavior referenced
12 there.  Did you ever talk to anybody
13 about what the counseling about
14 professional behavior was on that
15 mid-appraisal?
16 A.   No.
17 Q.   You never asked Mr. Paulk, did
18 Ms. Jackson behave unprofessionally?
19 A.   No.
20 Q.   You never asked him why he wrote that
21 on the mid-appraisal?
22 A.   No.
23 Q.   So you don't really know what he's

Page 123

1 referring to on the mid-appraisal, do
2 you?
3 A.   Correct.
4 Q.   Was Ms. Jackson terminated for any
5 conduct that had occurred on
6 December 20th of 2006?
7 A.   Not to my knowledge.
8 Q.   Was Ms. Jackson's conduct on
9 December 20th, 2006, discussed during
10 the termination meeting with
11 Mr. Morris?
12 A.   Not to my knowledge.
13 Q.   During the termination meeting with
14 Mr. Morris, was any conduct on
15 November 2nd discussed?
16 A.   Not to my knowledge.
17 Q.   During that termination meeting, did
18 you discuss any conduct relating to
19 what happened on October 4th or 5th
20 or 6th relating to the car?
21 A.   I can't remember the exact
22 conversation, but I think a review
23 was -- was discussed on -- on the

Page 124

1 incident.
2 Q.   And during that termination meeting,
3 did y'all discuss the incidents of
4 January 5th?
5 A.   I think just general discussion was
6 made.
7 Q.   I think you answered this earlier.  If
8 I did -- if you did, I apologize.  Did
9 y'all talk about Ms. Jackson's scores
10 on her probationary performance
11 review, the one she got in December,
12 during the termination meeting?
13 A.   Not to my recollection, no.
14 Q.   And you didn't discuss the quality of
15 her work as an engineering assistant?
16 A.   No, we didn't.
17 Q.   Did you discuss, during that
18 termination meeting, the fact that
19 Mr. Paulk had yelled at Ms. Jackson
20 during those meetings on January 5th?
21 MR. REDD:  Object to the form.
22 Those meetings?
23 Q.   Any of the meetings on January 5th.

Page 125

1 A.   No.
2 Q.   Are you aware that Mr. Paulk did yell
3 at Ms. Jackson?
4 A.   No.
5 Q.   Are you aware that he raised his voice
6 at her?
7 A.   I think he did -- did say that he may
8 have raised his voice to try to -- to
9 be heard.
10 Q.   When did he say that?
11 A.   In just general discussions after the
12 events.
13 Q.   You had general discussions with
14 Mr. Paulk about those events?
15 A.   Just him advising me when Mr. Palmer
16 advised me.
17 Q.   I'm sorry.  I didn't understand that.
18 Did you have general conversations
19 with Mr. Paulk about the events of
20 January 5th?
21 A.   Well, and again, I'm not sure exactly
22 who advised me, but I think when
23 Mr. Palmer advised me, he may have

1  said that, yes.  I -- I -- someone had
2  said that, and I'm not exactly sure
3  who said it.
4  Q.    And are you aware that Mr. Fresolone
5  counseled Mr. Paulk about not raising
6  his voice?
7  A.    No, I'm not.
8  Q.    Did you think that the taping policy
9  was a fair policy?
10  A.    To be honest with you, I haven't
11  thought about it.
12  Q.    Would you want to go into a meeting
13  where your supervisor could tape you
14  without your consent?
15  MR. REDD:  Object to the form.
16  A.    To be honest with you, I have never
17  thought about it.
18  Q.    Well, think about it now.  Would you
19  want to go into a meeting where your
20  supervisor could tape you without your
21  consent?
22  A.    Without my consent?
23  Q.    Right.

1  MR. REDD:  You need to clarify
2  that.
3  MR. SIMON:  No, I don't.
4  MR. REDD:  With notice?
5  Without consent but with
6  notice that the taping is
7  going on?
8  MR. SIMON:  I'm going to show
9  him the exhibit in a
10  minute.  I'm asking him a
11  general question about
12  it.
13  Q.    (By Mr. Simon:) Do you think it's
14  fair for a supervisor to be able to
15  tape their employees without the
16  employee's consent?
17  A.    If that's what the ALDOT policy is,
18  then I'm going to go along with the
19  policy.
20  Q.    I'm not asking you if you would go
21  along with it; I'm asking you whether
22  you think it's fair.
23  A.    Well, if that's the ALDOT policy then,

1  yes, I will think it is fair.  I would
2  go along with the ALDOT policy.
3  Q.    Would you want to go into a meeting
4  with your supervisor and have them
5  tape you without your consent?
6  A.    In accord -- I would -- I would have
7  to agree in accordance with ALDOT
8  policy.  I would think it would be
9  okay.
10  Q.    In your own mind though, would you
11  feel comfortable going into a meeting
12  where your supervisor could tape you
13  without your consent?
14  MR. REDD:  Object to the form.
15  A.    Could I see the policy?
16  Q.    Sure.
17  (Off-the-record discussion.)
18  Q.    Are you ready to answer the question?
19  MR. REDD:  Show him the
20  policy.
21  Q.    I'm showing you what's been marked as
22  Exhibit 7.
23  (Plaintiff's Exhibit 7 was

1  previously marked and is
2  not attached hereto.)
3  A.    And the question one more time,
4  please?
5  MR. SIMON:  Could you read it
6  back for me, please?
7  (Requested portion of Record
8  read, Page 128, Line 10.)
9  A.    Yes, I would feel comfortable.
10  Q.    Do you know who prepared this policy?
11  A.    No, sir.
12  Q.    Is it a policy that is specific to the
13  9th Division?
14  A.    No.  I think this is a statewide
15  policy.
16  Q.    Is it still in effect today?
17  A.    I think so, yes.
18  Q.    Okay.  Have you signed it?
19  A.    Yes.
20  Q.    Do you recall when you signed it?
21  A.    Not -- not the date, no.
22  Q.    Do you know if Ms. Deitz ever
23  participated in any discussions about

Page 130

1 the possibility of terminating
2 Ms. Jackson's employment?
3 A.   I don't know.
4 Q.   Did you ever get Ms. Deitz involved in
5 any discussions about the termination
6 of Ms. Jackson?
7 A.   I did not.
8 Q.   And who made the decision about what
9 Ms. Jackson was going to be
10 reprimanded for on the January 5th
11 incident?
12 A.   I don't know.
13 Q.   And do you know whether anybody
14 instructed Mr. Paulk to extend
15 Ms. Jackson's probationary period?
16 A.   I don't know.
17 MR. REDD:  Object to the form.
18 Q.   Do you know if anybody instructed
19 Mr. Paulk to tell Ms. Jackson that if
20 she didn't pass those classes, that
21 her probation would be extended?
22 A.   You know, I think I may have -- you
23 know, I think there's a memo that I

Page 131

1 have said that if a probationary
2 employee doesn't pass those two
3 classes, it will be extended.
4 Q.   Okay.  Was that something that you
5 said specifically to Mr. Paulk about
6 Ms. Jackson?
7 A.   No, I can't specifically say -- I
8 think it was in -- it was when the
9 request to -- when the request came in
10 to be excused from the class that she
11 was scheduled for.
12 Q.   You told Mr. Paulk that he needed to
13 tell her that she would be extended if
14 she didn't go?
15 A.   I would have to look at my document.
16 I don't know exactly what the -- I
17 think it was a memo to file or I
18 believe I forwarded a document, I
19 believe.
20 Q.   You can look at it.  I don't know what
21 you're talking about.
22     (Off-the-record discussion.)
23 MR. REDD:  Just tell him what

Page 132

1 you remember.
2 A.   Well, when I -- when this document
3 came through -- I think; I may be
4 incorrect -- but I thought I forwarded
5 that over by -- by memo to the
6 personnel.
7 Q.   Okay.  When you say "this
8 document," what are you referring --
9 MR. REDD:  Tell him what
10 exhibit you're talking
11 about.
12 A.   It is Exhibit Number 6.
13 MR. REDD:  To the Motion for
14 Summary Judgment.
15 THE WITNESS:  Thank you.
16 Q.   So you think you forwarded that by
17 hand with a memo saying tell her she
18 needs to pass this class if she wants
19 her probation extended?
20 A.   Yes.  But I'm not sure who that memo
21 went to.
22 Q.   All right.  I'm almost through.  I
23 just have a couple of things to clean

Page 133

1 up.
2 Let me show you what I
3 have marked as Exhibit 24.  I'll ask
4 you to read over that real quick.  Do
5 you recognize that document?
6     (Plaintiff's Exhibit 24 was
7       previously marked and is
8       not attached hereto.)
9 A.   I know what the document is.  I don't
10 recognize it right offhand.
11 Q.   Okay.  What is it?
12 A.   It is a copy of an e-mail from Debra
13 Hadley to Nita Jernigan referencing
14 the concrete tech results January
15 24th, 25th, 26th, 2007, and also a
16 reply from -- well --
17 Q.   I mostly want to ask you about that
18 initial e-mail, the one from Debra
19 Hadley to Nita Jernigan.
20 A.   Okay.
21 Q.   Do you know why Ms. Hadley especially
22 needed to know if Ms. Jackson had
23 passed or not?

Page 134

1  A.   No.
2  Q.   And February 22nd is the same day that
3  Mr. Palmer did the performance review
4  and the termination letter for
5  Ms. Jackson; correct?
6  A.   The termination letter is dated
7  the 22nd.  The performance review is
8  dated the 23rd.  Same time frame.
9  Q.   Okay.  Did you talk with Mr. Palmer
10  about needing to know results of all
11  Ms. Jackson's test results so she
12  could be rated that way on her
13  performance review?
14  A.   Not to my memory, no.
15  Q.   Would you need to know the results of
16  this concrete tech class in order to
17  properly rate Ms. Jackson on her
18  "attends and passes" score?
19  A.   I would think it would have input.  It
20  wouldn't be the total score.
21  Q.   Do you know if Ms. Jackson's -- what
22  the results of her concrete tech were?
23  A.   No.

Page 135

1  Q.   But they would partly justify the
2  rating that was given to Ms. Jackson
3  on that final performance appraisal?
4  A.   It would be considered, yes.
5  MR. SIMON:  Let's take a short
6  break.  I want to review
7  a couple things.
8      (Brief recess was taken.)
9  MR. SIMON:  I don't have any
10  more questions.
11  MR. REDD:  I don't either.
12  Let's go home.
13
14  (The deposition of VINCE CALAMETTI
15   concluded at approximately
16   12:01 p.m., on June 20th, 2008.)
17
18
19
20
21
22
23

Page 136

1  * * * * * * * *
2  REPORTER'S CERTIFICATE
3  * * * * * * * *
4
5  STATE OF ALABAMA
6  COUNTY OF MONTGOMERY
7
8      I, Karen Reagan Drinkard,
9  AL-CCR #005, Certified Court Reporter
10  and Notary Public in and for the State
11  of Alabama at Large, do hereby certify
12  that on June 20th, 2008, pursuant to
13  notice and stipulation on behalf of
14  the Plaintiff, I reported the
15  deposition of VINCE CALAMETTI, who was
16  first duly sworn by me to speak the
17  truth, the whole truth, and nothing
18  but the truth, in the matter of
19  LASHUNDRA JACKSON, Plaintiff, versus
20  STATE OF ALABAMA DEPARTMENT OF
21  TRANSPORTATION, JOE McINNES, in his
22  official capacity as DIRECTOR OF THE
23  STATE OF ALABAMA DEPARTMENT OF

Page 137

1  TRANSPORTATION, Defendant, Civil
2  Action Number 2:07-CV-645-MEF, now
3  pending in the United States District
4  Court for the Middle District of
5  Alabama, Northern Division; that the
6  foregoing 136 typewritten pages
7  contain a true and accurate
8  transcription of the examination of
9  said witness by counsel for the
10  parties set out herein; that the
11  reading and signing of said deposition
12  was waived by witness and counsel for
13  the parties.
14      I further certify that I am
15  neither of kin nor of counsel to the
16  parties to said cause, nor in any
17  manner interested in the results
18  thereof.
19      This 25th day of June, 2008
20
21
22      Karen Reagan Drinkard, ACCR #005
       Reporter and Notary Public
23      State of Alabama at Large

# LASHUNDRA JACKSON v. STATE OF ALABAMA DEPARTMENT OF TRANSPORTATION

# RONNIE  POIROUX

## June 19, 2008

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**
**www.ReaganReporters.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


LASHUNDRA
JACKSON,

    Plaintiff,
CIVIL ACTION NO.
vs.              2:07-CV-645-MEF

STATE OF ALABAMA
DEPARTMENT OF
TRANSPORTATION,
JOE McINNES, in
his official
capacity as
DIRECTOR OF THE
STATE OF ALABAMA
DEPARTMENT OF
TRANSPORTATION,

    Defendants.



     *    *    *    *    *    *


    DEPOSITION OF RONNIE POIROUX,
taken pursuant to notice and
stipulation on behalf of the
Plaintiff, in the 9th Division Office
of the Alabama Department of
Transportation, 1701 I-65 West Service
Road North, Mobile, Alabama, before
Karen Reagan Drinkard, AL-CCR #005,
Certified Court Reporter and Notary
Public in and for the State of Alabama
at Large, on June 19th, 2008,
commencing at 1:45 p.m.

Page 2

1  APPEARANCES
2
3
4  FOR THE PLAINTIFF:
5
6  KELL A. SIMON, ESQUIRE
7  Ross, Melton, PC
8  Attorneys at Law
9  1104 San Antonio Street
10  Austin, Texas 78701
11
12
13  FOR THE DEFENDANTS:
14
15  ANDREW REDD, ESQUIRE
16      and
17  JASON A. TRIPPE, ESQUIRE
18  State of Alabama Department of
19  Transportation
20  1409 Coliseum Boulevard
21  Montgomery, Alabama 36110
22
23

Page 4

1  agreed by and between the parties
2  hereto and the witness, that the
3  signature of the witness to this
4  deposition is hereby waived.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1  STIPULATIONS
2
3      It is stipulated and agreed
4  by and between counsel representing
5  the parties that the deposition of
6  RONNIE POIROUX may be taken before
7  Karen Reagan Drinkard, AL-CCR #005,
8  Certified Court Reporter and Notary
9  Public in and for the State of Alabama
10  at Large, without the formality of a
11  commission; and all formality with
12  respect to other procedural
13  requirements is waived; that
14  objections to questions, other than
15  objections as to the form of the
16  questions need not be made at this
17  time, but may be reserved for a ruling
18  at such time as the deposition may be
19  offered in evidence or used for any
20  other purpose by either party as
21  provided by the Federal Rules of Civil
22  Procedure.
23      It is further stipulated and

Page 5

1  INDEX
2
3  EXAMINATION              Page
4  MR. SIMON...................... 6
5  MR. REDD....................... 61
6  MR. SIMON...................... 64
7
8
9  EXHIBITS                 Page
10
    PX-27  Letter to R.F. Poiroux      9
11  from LaShundra Jackson,
    1/2/07
12
    PX-28  Affidavit of Ronnie      31
13  Poiroux, signed 5/27/08
14
15  (The following exhibits were
    previously marked in this case and
16  referred to at the following pages:)
17
18
19  PX-5............................ 33
20  PX-6............................ 13
21  PX-9............................ 59
22  PX-10........................... 44
23

1
2         RONNIE POIROUX, of lawful
3  age, having first been duly sworn,
4  testified as follows:
5
6  EXAMINATION
7  BY MR. SIMON:
8  Q.    Could you state your full name for the
9  record, please?
10 A.    Ronald Francis Poiroux.
11 Q.    And we have met before, Mr. Poiroux.
12 My name is Kell Simon.  Of course, I
13 represent Ms. Jackson in her lawsuit
14 against the ALDOT.  You used to be
15 employed as the division engineer for
16 the 9th Division; right?
17 A.    Correct.
18 Q.    You're not still in that job, are you?
19 A.    No.
20 Q.    Have you retired from the DOT?
21 A.    Yes.
22 Q.    When did you retire?
23 A.    March the 1st.

1  Q.    Of this year?
2  A.    Uh-huh.
3  Q.    Congratulations.  You were the
4  division engineer during the time that
5  Ms. Jackson worked for the DOT; is
6  that correct?
7  A.    That's correct.
8  Q.    And you remember Ms. Jackson as an
9  employee there?
10 A.    Yes.
11 Q.    Who made the decision to hire
12 Ms. Jackson; do you know?
13 A.    No.
14 Q.    Did you have any part in that?
15 A.    No.
16 Q.    Who typically makes the decision on EA
17 hires in your division, or who made
18 those decisions when you were the
19 division engineer in Ms. Jackson's
20 department?
21 A.    Usually the district engineer or in
22 conjunction with the construction
23 engineer.

1  Q.    But you don't know in Ms. Jackson's
2  case specifically who decided to hire
3  her?
4  A.    No.
5  Q.    When did you first meet Ms. Jackson?
6  A.    The first I can remember that we met
7  sometime in January.
8  Q.    Of 2007?
9  A.    Yes.  I think it was '07.
10 Q.    Do you remember the circumstances of
11 your meeting?
12 A.    She sent a letter to me voicing some
13 concerns, and I met with her to
14 discuss it.
15 Q.    What kind of concerns had she voiced
16 to you in the letter?
17 A.    I don't know.  I would have to see
18 that letter.  I'm sure that that's --
19 Q.    Is this the letter that you're talking
20 about?  I've just marked it as
21 Exhibit 27.
22     (The referred-to document was
23       marked for identification

1      as Plaintiff's Exhibit No. 27.)
2  A.    Yes.  I think this is the one.
3  Q.    Okay.  And so you met with Ms. Jackson
4  about this letter?
5  A.    Correct.
6  Q.    Was it shortly after she sent it to
7  you?
8  A.    I don't know what -- when it was.  It
9  was sometime after.
10 Q.    During the meeting with you, what was
11 Ms. Jackson's demeanor?
12 A.    Well, I think we had a -- you know, a
13 good meeting.  She voiced her
14 concerns, and I talked to her about
15 them and told her I would investigate
16 them and respond to them.
17 Q.    Was she insubordinate to you in any
18 way during that meeting?
19 A.    No.
20 Q.    Was she loud or disruptive?
21 A.    No.
22 Q.    Was she respectful?
23 A.    Yes.

1  Q.    Did you do an investigation of her
2  concerns?
3  A.    Yes.  I looked into the memo she sent
4  us.
5  Q.    Okay.  And she was complaining to you
6  about discrimination and retaliation;
7  right?
8  A.    She made -- several things,
9  complaining about the district
10 engineer.  I don't know if it said
11 discrimination or not, but I would
12 have to look through this closely.
13 Q.    Okay.  I'm just looking at the -- at
14 the subject line where it says (as
15 read:)  Regarding -- or re:
16 Retaliation/discrimination/evaluation
17 rebuttal.
18 Do you know -- what were
19 her complaints to you about
20 discrimination, to the best of your
21 recollection?
22 A.    I don't know if we even talked about
23 discrimination at that meeting.

1  Q.    Do you remember what her complaints
2  were about retaliation?
3  A.    No, I don't remember.
4  Q.    And do you remember what the issue was
5  with her evaluation rebuttal?
6  A.    The best I recall, that she didn't
7  agree with her evaluation.
8  Q.    Okay.  And do you know who had done
9  that evaluation?
10 A.    No, I do not know.
11 Q.    If you will look at the third
12 paragraph on the first page, she's
13 talking about her rebuttal there.  And
14 if you will look -- look at the third
15 sentence where she says here (as
16 read:) As for draws/plots, that is
17 only being taught to the PCETs because
18 they're in the office every day.  If
19 it was being taught to everyone, then
20 why am I always asked to take a leave
21 when it's raining instead of being
22 taught draws/plots.  There's a serious
23 problem in the 9th Division

1  construction office that is going
2  unaddressed.
3  Did you do any
4  investigation into that issue?
5  A.    I don't remember exactly what -- what
6  action I took on that.  I just don't
7  remember.
8  Q.    Okay.  Did you understand that what
9  she was complaining about was that she
10 had received a rating of 2 on the task
11 of "draws and plots" and that she
12 hadn't actually gotten to draw or plot
13 anything before her performance
14 appraisal had been done?
15 A.    I don't recall that.
16 Q.    Okay.  What do you recall about
17 those -- her bringing up those
18 particular issues?
19 A.    Truthfully I don't remember discussing
20 it with her.
21 Q.    You didn't remember discussing it with
22 her or with them, did you say?
23 A.    With her.

1  Q.    What do you recall about your -- about
2  what you guys discussed in the meeting
3  in your office?
4  A.    Basically I recall that, you know, we
5  discussed her performance grade sheet,
6  and I explained to her that -- that
7  she needs to, you know, apply herself
8  and gain as much knowledge and skills
9  and ability as she can to do her job
10 well and also to, you know, be a good
11 employee for the Department; that, you
12 know, the more knowledge and skills
13 she has, the better employee she would
14 be.
15 Q.    Had she gotten a good grade on that
16 grade sheet?
17 A.    I don't remember what she got on it.
18 Q.    Let me show you what I've marked as
19 Exhibit 6.  Is that the grade sheet
20 that you're talking about?
21     (Plaintiff's Exhibit 6 was
22      previously marked and is
23      not attached hereto.)

1  A.   Yes.  I think this is the one.
2  Q.   And so now I ask the question again,
3  did she get a good grade on this grade
4  sheet?
5  A.   She got "meets standards," which is an
6  average grade.
7  Q.   "Meets standards" is a high enough
8  grade to get you off your probation as
9  an engineering assistant; correct?
10 A.   It could be, as long as there's no
11 other factors involved.
12 Q.   And you signed off on this performance
13 review; right?
14 A.   Correct.
15 Q.   And that was several days before
16 Ms. Jackson sent you that letter?
17 A.   Yes.
18 Q.   Did you speak with Mr. Paulk about
19 Ms. Jackson's performance?
20 A.   No.  I don't recall discussing it with
21 him.
22 Q.   Did you ever speak with Mr. Palmer
23 about her performance?

1  A.   I don't remember.
2  Q.   So you signed on this performance --
3  you signed off on this performance
4  review as the reviewing supervisor
5  without really knowing how her job
6  performance was from talking to
7  anybody; is that right?
8  A.   Correct.  I have over 400, you know,
9  that I review -- well, actually it's
10 two or three times a year on some of
11 them.  So it's a lot of them, and I
12 just can't, you know, go in detail
13 with any one of them.
14 Q.   So you just basically review them and
15 sign off on them?
16 A.   Correct.
17 Q.   Do you know the reason that
18 Ms. Jackson was continued on
19 probation?
20 A.   I would have to look back to the
21 documentation to see exactly what it
22 stated.
23 Q.   Okay.  You don't remember offhand

1  though?
2  A.   No.
3  Q.   During the time that Ms. Jackson was
4  an engineering assistant, was there a
5  policy in effect that said if you
6  didn't pass your basic math or algebra
7  during your probationary period that
8  it would be extended?
9  A.   Correct.
10 Q.   Was that a written policy anywhere?
11 A.   No.  Just that was our policy here in
12 this division.  That's what we went
13 by.
14 Q.   Was that the policy up until the time
15 you retired?
16 A.   No.  I think they changed that policy
17 sometime in '07.  I don't know when.
18 They went with the statewide policy.
19 Q.   So the 9th Division policy was
20 different from the statewide policy?
21 A.   I don't know.  I don't know what the
22 other divisions required.
23 Q.   Who decided to change the policy in

1  '07?
2  A.   I don't know.  It came from the
3  central office.
4  Q.   So the central office directed the
5  9th Division that that couldn't be the
6  policy anymore?
7  A.   Correct.
8  Q.   Do you know when that policy had been
9  instituted?
10 A.   No, I don't.
11 Q.   Do you know if -- did supervisors have
12 the discretion to allow their
13 engineering assistants to pass the
14 probationary period even if they
15 didn't pass their basic math and
16 algebra while the policy was in
17 effect?
18 A.   I don't think they did, no.
19 Q.   So you think there was no discretion
20 for those supervisors?
21 A.   No.  It was our policy.
22 Q.   Okay.  If there were extenuating
23 circumstances that prevented the

1  employee from being able to take
2  either the basic math or algebra class
3  during their probation, would the
4  supervisor have been allowed to go
5  around the policy and make them
6  permanent anyway?
7  A.  Well, we would have to look at those
8  on an individual basis and see the
9  circumstances.
10 Q.  Okay.  So there is some room for that
11 on a case-by-case basis?
12 A.  Yes.  I would say there is the
13 possibility.
14 Q.  Okay.  And that was even when the
15 policy was in effect?
16 A.  Right.
17 Q.  Do you know if anybody ever did that
18 for LaShundra Jackson?
19 A.  Repeat your question?
20 Q.  Do you know if anybody ever looked at
21 whether there were any extenuating
22 circumstances that would have allowed
23 Ms. Jackson's probation to be -- that

1  would have allowed her to be made
2  permanent after her probationary
3  period ended at six months?
4  A.  I don't know.
5  Q.  Was her getting her probation extended
6  one of the things that you understood
7  that she was complaining to you about?
8  A.  Yes.
9  Q.  And did you look into why her
10 probation was extended at that point
11 in time?
12 A.  Yes.
13 Q.  What did you do to look into that?
14 A.  Looked through their personnel record,
15 all the personnel information we had.
16 Q.  Ms. Jackson's personnel information.
17 A.  Yes.
18 Q.  What did that show to you?
19 A.  I don't know.  It was in one of the
20 responses there.  I don't remember
21 exactly.  That's been a long time ago.
22 I know I made a response to her
23 letter.

1  Q.  You made a written response to her
2  letter?
3  A.  Yes.
4  Q.  Okay.  And do you think you explained
5  in that response why her probation was
6  extended?
7  A.  I hope I did.
8  Q.  Did you have any followup meetings
9  with Ms. Jackson about the concerns
10 that she raised during the meeting
11 with you on January 2nd -- I'm
12 sorry -- during the meeting about the
13 memo that she wrote to you on
14 January 2nd?
15 A.  Not that I recall.
16 Q.  Did you have any other interaction
17 with Ms. Jackson while she was an
18 employee of ALDOT besides that meeting
19 that you had with her at that time?
20 A.  I don't remember of any.
21 Q.  When did you first learn about any
22 suggestion or recommendation to
23 terminate -- to terminate

1  Ms. Jackson's employment?
2  A.  I don't remember.
3  Q.  Do you remember who made the initial
4  recommendation to terminate her?
5  A.  No.  It normally comes from the
6  district engineer.
7  Q.  And are you typically involved in the
8  process of deciding whether to
9  terminate an engineering assistant
10 that's on probation?
11 A.  Well, when it gets to my level, I
12 review the records in the file and the
13 information presented to make sure
14 it's -- I feel it's justified.
15 Q.  And do you believe you did that for
16 Ms. Jackson?
17 A.  Yes.
18 Q.  Did you write your own letter of
19 recommendation for her termination?
20 A.  I don't remember.  I would have to
21 look at that letter and see.
22 Q.  Did you become aware at any point in
23 time that Ms. Jackson had been accused

1  of being insubordinate while she was
2  an employee of ALDOT?
3  A.    Yes.
4  Q.    When did you first learn about that?
5  A.    I don't remember the exact time.
6  Q.    Can you give me an approximate time
7  frame?
8  A.    Not really.
9  Q.    What did you understand was the act of
10  insubordination that she had engaged
11  in?
12  A.    The best I recall, there was an
13  incident with her car being scratched,
14  and she made some threatening
15  complaints.  And we had a new policy,
16  statewide policy, concerning tape
17  recordings, and she refused to sign
18  it.  And she was disruptive that day,
19  because I know she had quite a few of
20  our supervisors tied up just about all
21  day trying to get that resolved.  And
22  I think there was another incident.  I
23  can't remember.  I would have to look

1  at the records to say for sure.
2  Q.    Do you know what form of discipline,
3  if any, Ms. Jackson got regarding
4  either of those incidents that you
5  just mentioned?
6  A.    The best I recall, the first
7  incident, she was counseled by her
8  supervisors, and I don't recall on the
9  second incident what transpired.
10  Q.    And when you say the second incident,
11  you're talking about the issue about
12  the taping policy?
13  A.    Correct.
14  Q.    Do you know if Ms. Jackson ever filed
15  a formal grievance or complaint with
16  ALDOT's Human Resources Bureau?
17  A.    I did learn that she had.
18  Q.    When did you learn about that?
19  A.    It was late -- probably sometime in
20  February or late January, sometime in
21  there.
22  Q.    Of '07?
23  A.    Right.

1  Q.    How did you --
2  A.    Or it could have been later.  I don't
3  know.
4  Q.    How did you learn about that?
5  A.    I think the best I can recall is Sandy
6  Deitz, when she was investigating
7  the -- I don't know if she was
8  investigating the termination request
9  or what, but she's the one that
10  informed me.
11  Q.    Okay.  You had a conversation with her
12  about it?
13  A.    Well, she discussed it with me.
14  Q.    Was that on the telephone or was that
15  in person?
16  A.    I don't recall.
17  Q.    What was your discussion with
18  Ms. Deitz?
19  A.    What was the discussion?
20  Q.    Yeah.  Tell me about what you guys
21  said.
22  A.    Oh, I don't recall exactly the
23  discussion, but she told me about

1  the -- you know, that she filed a
2  complaint.
3  Q.    Did she say what the nature of the
4  complaint was?
5  A.    No.
6  Q.    Did she tell you it was discrimination
7  or harassment or retaliation?
8  A.    I don't recall her telling me which
9  one.
10  Q.    Did she ever send you a copy of the
11  complaint that Ms. Jackson had filed?
12  A.    I don't remember seeing one.  We may
13  have got one.
14  Q.    Do you know if you ever asked her --
15  asked Ms. Deitz to send it to you or
16  to see it?
17  A.    I don't recall.
18  Q.    Ms. Jackson was terminated a couple
19  weeks after she filed that complaint;
20  right?
21  A.    I don't know exactly the time frame.
22  Q.    And you said earlier you're not sure
23  if Ms. Deitz was contacting you to

1 talk about the termination
2 investigation or the grievance
3 investigation; is that right?
4 A.   Correct.
5 Q.   Those were going on around the same
6 time, do you think?
7 A.   I think so.
8 Q.   Do you know which investigation
9 started first?
10 A.   No.
11 Q.   That's something Ms. Deitz would know;
12 right?
13 A.   Right.
14 Q.   Did Ms. Deitz do an investigation
15 about the recommendation to terminate
16 Ms. Jackson?
17 A.   I think she did, because she normally
18 investigates all termination or
19 personnel actions of that nature.
20 Q.   Do you know if Ms. Deitz was involved
21 in any meetings or conversations where
22 the discussion was whether to
23 terminate Ms. Jackson?

1 A.   Not that I'm aware of.
2 Q.   Were you ever involved in any
3 conversations with Dan Morris about
4 terminating Ms. Jackson?
5 A.   I don't remember any.
6 Q.   Do you know who was the person who
7 made the decision to terminate
8 Ms. Jackson?
9 A.   No.
10 Q.   Did you direct Mr. Palmer to write the
11 letter recommending Ms. Jackson's
12 termination?
13 A.   No.
14 Q.   Do you know if anybody directed him to
15 write that letter?
16 A.   I don't know.
17 Q.   Okay.  So he may have been directed to
18 write that letter; you just don't
19 know?
20 A.   I don't know.
21 Q.   And your role in the termination
22 process was basically that you
23 concurred with Mr. Palmer's

1 recommendation to terminate, so you
2 sent your concurrence up to
3 Montgomery?
4 A.   Well, it went through Vince Calametti,
5 our construction engineer.  He looked
6 into it also.  It's required for him
7 to do that before it comes to me.
8 Q.   Okay.  So --
9 A.   And then I review it.
10 Q.   Okay.  So what you reviewed, was --
11 was it a recommendation from
12 Mr. Calametti?
13 A.   I think it started when Mr. Palmer,
14 went to -- went to Vince Calametti for
15 his investigation into it, and his
16 recommendation to me before I reviewed
17 it.
18 Q.   Did you know that -- that there was
19 going to be a recommendation for
20 Ms. Jackson's termination before you
21 received the paperwork from
22 Mr. Calametti?
23 A.   I don't -- I can't recall when I

1 actually knew about it.
2 Q.   So it could be that the first time you
3 learned about anybody's request to
4 terminate Ms. Palmer -- I mean,
5 Ms. Jackson was when you received the
6 recommendation from -- the written
7 recommendation from Mr. Calametti to
8 terminate her?
9 A.   I don't remember.  It could be or it
10 could not be.  I just don't remember.
11 Q.   Did you have any conversations with
12 Mr. Calametti about terminating
13 Ms. Jackson?
14 A.   I think I discussed it and went over
15 the facts.
16 Q.   When did you guys discuss it?
17 A.   I don't remember.
18 Q.   Do you remember the approximate time
19 frame?
20 A.   No.  It's probably after -- I'm sure
21 it's after Mr. Palmer's recommendation
22 and before I sent it to Montgomery,
23 during that time period.

Page 30

1    Q.    So y'all would have met and reviewed,
2    like, her personnel file and her
3    performance review and stuff?
4    A.    (Nods head.)
5    Q.    Is that right?
6    A.    Well, he would meet with me and go
7    over the facts and all, and then I
8    would look into it myself, too.  I
9    don't know if we had all the paperwork
10    there at that meeting.
11    Q.    Okay.  What documents did you review
12    when you decided to terminate -- or to
13    recommend Ms. Jackson's termination?
14    A.    Well, I got her personnel file and,
15    you know, went through it, and the
16    documentation and everything that was
17    presented.
18    Q.    Do you remember specifically any of
19    the documents that you looked at?
20    A.    No.
21    Q.    I'm going to show you what I've marked
22    as Exhibit 28 to your deposition.  Do
23    you recognize that document?

Page 31

1       (The referred-to document was
2         marked for identification
3         as Plaintiff's Exhibit No. 28.)
4    A.    Yes.
5    Q.    Can you tell me what it is?
6    A.    It's my affidavit concerning this
7    case.
8    Q.    And you signed it on May 27th; right?
9    A.    Correct.
10    Q.    A couple weeks ago?  A couple weeks
11    ago; is that right?
12    A.    That's correct.
13    Q.    And on May 27th you seemed to have a
14    pretty good recollection of what
15    documents you reviewed when you
16    recommended her termination; is that
17    correct?
18    A.    Yes.
19    Q.    Okay.  And that included the
20    information provided to you by her
21    supervisors?
22    A.    Correct.
23    Q.    And her personnel file?

Page 32

1    A.    Correct.
2    Q.    You also say in your affidavit that
3    you recommended her termination based
4    on incidents on October 4th
5    through 6th, November 2nd, and
6    January 5th, 2007; right?
7    A.    Correct.
8    Q.    Can you tell me what -- the incidents
9    on October 4th through 6th, what were
10    those?
11    A.    I think that's on her car and her
12    threatening comments.
13    Q.    Okay.  What was the incident on
14    November 2nd?
15    A.    The best I recall, that was her
16    performance -- doing her performance
17    grade sheet, the best I recall, either
18    that or the -- I think that's what it
19    was.  I would have to look back and
20    see exactly.
21    Q.    And what was the incident on
22    January 5th?
23    A.    That's the policy on recording.

Page 33

1    Q.    Now, you said about the incident of
2    November 2nd, it was about an
3    appraisal.  Do you remember what that
4    was?
5    A.    No.  I would have to look back and see
6    the exact details, but I think it
7    deals with insubordination.
8    Q.    Let me show you what I've marked as
9    Exhibit 5.  Do you recognize that
10    document?
11       (Plaintiff's Exhibit 5 was
12         previously marked and is
13         not attached hereto.)
14    A.    Oh, yes.
15    Q.    Okay.  And does this document reflect
16    the incident that happened on
17    November 2nd?
18    A.    I don't know if this is the one or
19    not.  I would have to look in the file
20    to make sure.
21    Q.    Okay.  It's dated November 2nd; right?
22    A.    Yes.
23    Q.    Does that refresh your memory as far

1 as what the incident was on
2 November 2nd?
3   A.   The best I can recall, that's when she
4 was insubordinate to her supervisor
5 concerning, I think, math, the
6 algebra.
7   Q.   She was -- she was insubordinate to a
8 supervisor regarding algebra?
9   A.   I don't know.  I would have to look
10 through the exact incident to find
11 out.  I'm sure there's some document
12 on that.  I just can't recall the full
13 details of the incident.
14   Q.   Okay.  Earlier you told me that she
15 was terminated for something on
16 October 4th about her remarks about
17 her car and then about something on
18 January 5th about the taping policy.
19 Are you saying that there's another
20 incident of insubordination that you
21 haven't told me about?
22   A.   Yes.  There's an incident on
23 November 2nd.

1   Q.   Okay.
2   A.   And I would have to get the records in
3 the file to see the exact
4 documentation of it.
5   MR. SIMON:  Okay.  Can we take
6 a break and get her file
7 so that he can look at
8 it?  Because I don't have
9 any documents showing
10 incidents on
11 November 2nd.
12   MR. REDD:  Sure.
13   MR. SIMON:  Is that it right
14 there?
15   MR. REDD:  That's my copy, but
16 I don't know how complete
17 it is.
18   MR. SIMON:  Do we have a copy
19 of her personnel file
20 here?
21   MR. REDD:  Off the record.
22     (Off-the-record discussion.)
23   Q.   (By Mr. Simon:)  Mr. Poiroux, you're

1 looking through what I think your
2 lawyer has given you that's
3 Ms. Jackson's personnel file?
4   MR. SIMON:  Is that right,
5 Andy?
6   MR. REDD:  Yes.  This is what
7 our personnel division
8 furnished me.
9   MR. SIMON:  Okay.
10   Q.   (By Mr. Simon:)  And specifically I
11 want you to look for information
12 regarding the incident on November 2nd
13 so that you can tell me why that would
14 be a reason for firing her.
15   A.   (Witness reviewing documents.)
16   MR. REDD:  Then, on the
17 record, did you instruct
18 him to look for another
19 2006 event that was the
20 reason for termination?
21 Is that how you
22 characterized it?
23   MR. SIMON:  No.  That's not

1 how I said it.
2   MR. REDD:  Can you read it
3 back, please, ma'am?
4     (Off-the-record Discussion.)
5     (Requested portion of Record
6      read, Page 36, Line 10.)
7     (Off-the-record discussion.)
8     (Brief recess was taken.)
9   Q.   (By Mr. Simon:)  Mr. Poiroux, have you
10 had an opportunity to review
11 Ms. Jackson's personnel file?
12   A.   Yeah.  I've scanned through it.
13   Q.   Okay.  After looking through it, can
14 you tell me what the incident was on
15 November 2nd that was part of the
16 basis for her termination?
17   A.   In Mr. Palmer's letter, it stated that
18 November 2nd, '06, Ms. Jackson was
19 advised of conducting herself in a
20 professional manner during her
21 mid-appraisal review.
22   Q.   Okay.  And that's -- the mid-appraisal
23 review is the document we've been

1  looking at that's dated November 6th;
2  right?
3  A.   No.
4  Q.   I mean, November 2nd.
5  A.   Correct.
6  Q.   And so is the -- is the incident on
7  November 2nd, 2006, the line on the
8  mid-appraisal that says (as read:)
9  Spoke with employee about conducting
10  herself in a professional manner in an
11  office setting?
12  A.   Repeat that now.
13  Q.   Is the incident on November 2nd, 2006,
14  the line on the mid-appraisal that
15  says (as read:) Spoke with employee
16  about conducting herself in a
17  professional manner in an office
18  setting?
19  A.   What's the question now?
20  Q.   Is that -- is that language, does that
21  reflect the incident that happened on
22  November 2nd, 2006?
23  A.   I don't know if that would describe

1  the whole incident or not.
2  Q.   Okay.  Do you know what the incident
3  was on November 2nd?
4  A.   Not in full detail.  The best I
5  recall, it was -- I just don't know
6  the exact detail.  You would have to
7  talk to the supervisors or who was
8  involved in it closer.
9  Q.   Okay.  But you say that you
10  recommended termination based on what
11  happened on that day?
12  MR. REDD:  Objection.  That's
13  a mischaracterization of
14  what he said.  Object to
15  the form.
16  A.   Could you repeat that question?
17  Q.   Sure.  You said in your affidavit that
18  you recommended termination based on
19  an incident -- based, at least in
20  part, on an incident that happened
21  that day; right?
22  A.   It was considered in my decision.
23  Q.   Okay.  I'm sure lots of things were

1  considered in your decision, but the
2  November 2nd incident was one of the
3  things that you terminated her for;
4  right?
5  A.   One of the things I considered to make
6  my recommendation.
7  Q.   You also considered her personnel
8  file; right?
9  A.   Right.
10  Q.   But you're not saying in here that you
11  based your termination decision on her
12  personnel file, are you?
13  A.   No.  No.  Basically what I'm saying is
14  I reviewed it before I made my
15  decision to recommend termination.  I
16  didn't terminate her; I just made my
17  recommendation.
18  Q.   Okay.  Did you review the incident of
19  November 2nd, 2006, before you made
20  your termination recommendation?
21  A.   The best I can recall, I did.
22  Q.   The best you can recall, you did?
23  A.   Did.

1  Q.   And that incident was one of the
2  reasons that she was recommended for
3  termination?
4  A.   I believe it was considered in part of
5  the process or making my
6  recommendation.
7  Q.   Okay.  You haven't answered my
8  question though.  My question was, was
9  it one of the reasons that you decided
10  to terminate her?
11  A.   It was considered as one of the
12  points, yes.
13  Q.   What do you mean it was considered as
14  one of the points?
15  A.   I reviewed all the incidents, you
16  know, and I considered that one as
17  well.
18  Q.   Okay.  And in considering that
19  particular incident, did that lead you
20  to decide to terminate her?
21  MR. REDD:  In and of itself?
22  Object to the form.
23  A.   Not that one incident.  I considered

Page 42

1  all of them.  That one I feel was not
2  as important as some of the others,
3  but it was, you know, considering the
4  whole review.
5  Q.    Okay.  You say in your affidavit that
6  you recommended the termination based
7  on incidents on November 4th
8  through 6th, November 2nd, and
9  January 5th.  Are you saying that's
10  not really right?
11  A.    No.  That's correct.
12  Q.    Was Ms. Jackson's -- did you consider
13  her performance appraisal from
14  December 20th or so of '06 as one of
15  the things you were looking at when
16  you decided to terminate her?
17  A.    Which one is that?
18  Q.    I don't know if we've marked that or
19  I've shown you that one yet.  Oh, I
20  have it.  Here you go.  That's
21  Exhibit 6.  Did you consider that when
22  you made the decision to terminate
23  her?

Page 43

1  A.    Yes.  That was looked at and
2  considered.
3  Q.    Okay.  And was there anything on there
4  that caused you to decide that you
5  wanted to terminate Ms. Jackson?
6  A.    No.  I don't see anything.
7  Q.    Okay.  And, in fact, that performance
8  appraisal done on --
9  A.    December 20th.
10  Q.    Thanks.  It reflects that she was
11  compliant with all the rules and
12  cooperation with co-workers and all
13  that stuff; right?
14  A.    Correct.
15  Q.    And so as of December 20th of '06, she
16  was -- as far as her performance
17  appraisal went, she was considered as
18  being compliant with all those
19  categories?
20  A.    At that point.
21  Q.    Did you look at -- did you also
22  consider Ms. Jackson's performance
23  appraisal that she received in

Page 44

1  February of '07 when you were deciding
2  whether to terminate her?
3  A.    I would have to look at that one and
4  see.
5  Q.    That's marked as Exhibit 10.  Did you
6  consider that document when you were
7  deciding whether to terminate her?
8      (Plaintiff's Exhibit 10 was
9      previously marked and is
10      not attached hereto.)
11  A.    I don't know.  I would have to look at
12  the time frame.  I can't remember the
13  exact dates and all.  I would have to
14  look and see where it fell into my
15  recommendations, because I don't -- I
16  don't remember the times.
17  Q.    Well, in your affidavit it says on
18  February 23rd, 2007, I requested
19  the -- your lawyer is handing you
20  papers.  Can you tell me what that --
21  hand me that.
22  MR. REDD:  It's his
23  recommendation that you

Page 45

1  just asked him about.
2  Q.    Okay.  Your lawyer is helping you out
3  here.
4  MR. REDD:  Well, no.  You
5  asked a question about a
6  recommendation letter,
7  and he needs to see it
8  before he responds to it.
9  That's fair.
10  Q.    (By Mr. Simon:)  Did you -- did you
11  see her final performance appraisal
12  when you recommended her for
13  termination?
14  A.    No.  Not this one, no.  We made the
15  decision before this was filled out.
16  Q.    Do you know who filled out that final
17  performance appraisal?
18  A.    It says Jay Palmer, I think.
19  Q.    Okay.  Was Mr. Palmer her supervisor?
20  A.    I don't know who her supervisor was at
21  that time.
22  Q.    She was an engineering assistant;
23  right?

1  A.   Right.
2  Q.   Would Mr. Palmer have been supervising
3  engineering assistants?
4  A.   Yes.  I think he does in the office
5  there as well as --
6  Q.   Are you aware that Ms. Jackson was
7  transferred to Tony Cooper's
8  supervision on February 16th?
9  A.   I remember she was transferred, but I
10  don't remember all the details of how
11  she went to Mr. Cooper.
12  Q.   Okay.  So to the best of your
13  recollection, she may have been being
14  supervised by Mr. Palmer at the time
15  he wrote that performance review?
16  A.   I don't know.  You would have to ask
17  Mr. Palmer.
18  Q.   Would it be unusual for a district
19  engineer to fill out a performance
20  review as ratings supervisor for an EA
21  that was working under a project
22  engineer?
23  A.   That normally don't happen unless

1  there's extenuating circumstances.
2  Q.   Do you know if there were extenuating
3  circumstances at the time he filled
4  this out?
5  A.   I don't know.  I know she went through
6  several project engineers.  So I
7  don't -- I don't know.  He may have
8  got with them all and, you know, kind
9  of summarized it all.
10  Q.   It does say on there that he is
11  recommending that she be separated
12  from employment; right?
13  A.   I don't see that.
14  Q.   Look on the first page under the
15  signature boxes.
16  A.   Okay.  I just had eye surgery, so you
17  have to bear with me.
18  Q.   Sure.
19  A.   They won't give me no real glasses
20  though.
21  Yes.
22  Q.   Would that -- would an employee being
23  recommended for separation from

1  employment, would that be an
2  extenuating circumstance that would
3  cause a district engineer to rate an
4  EA project inspector?
5  A.   It could.  Especially if she's with
6  more than one supervisor during that
7  time period.  You like to get input,
8  you know, from each supervisor.
9  Q.   Do you know if Mr. Paulk -- I'm sorry.
10  Do you know if Mr. Palmer got input
11  from Ms. Jackson's direct supervisor
12  as he was preparing this performance
13  appraisal?
14  A.   I don't know.
15  Q.   Did you ever talk to Mr. Palmer about
16  this performance appraisal?
17  A.   I don't recall.
18  Q.   Did you sign off on this?
19  A.   Yes.
20  Q.   You did?  That was four days after
21  Mr. Palmer signed it?
22  A.   Correct.
23  Q.   And Ms. Jackson didn't sign it, did

1  she?
2  A.   No.
3  Q.   Do you know why she didn't sign it?
4  A.   No.
5  Q.   It says on the form that signatures
6  are mandatory, does it not, just above
7  the signature boxes?
8  A.   (As read:) All signatures are
9  mandatory.
10  Q.   Do you know if Ms. Jackson ever signed
11  her final performance appraisal?
12  A.   I don't know.
13  Q.   I may have asked you this before.  If
14  I did, I'm sorry.  Did you direct
15  Mr. Palmer to fill out this final
16  performance appraisal?
17  A.   Not that I recall, no.  We always have
18  to fill out the final.
19  Q.   Do you remember signing off on this
20  final appraisal?
21  A.   Yes.
22  Q.   What do you remember about it?
23  A.   I remember reviewing it and signing

Page 50

1  it.
2  Q.    Had you ever seen it before you
3  reviewed it and signed it?
4  A.    I don't recall.
5  Q.    Who would typically be the person who
6  recommends termination of a
7  probationary engineering assistant
8  that's working under project
9  engineers?
10  A.    Who would make the recommendation?
11  Q.    Yeah, the initial recommendation.
12  A.    It would be the project engineer or
13  district engineer, or together.
14  Q.    And I think I understood that they
15  would send that recommendation
16  typically up to the construction
17  engineer; is that right?
18  A.    Correct.
19  Q.    And then you would receive that from
20  the construction engineer?
21  A.    Right.
22  Q.    And then you would forward it on to
23  Montgomery?

Page 51

1  A.    Right.  That's the process.
2  Q.    When does Sandy Dietz's office usually
3  get involved in that process?
4  A.    After it's gone to Montgomery.
5  Q.    And to your recollection, she did
6  contact you to discuss it after it had
7  gone to Montgomery, the recommendation
8  on Ms. Jackson?
9  A.    To the best my memory serves me, that
10  was after we submitted the
11  recommendation that she was
12  investigating it.
13  Q.    But you're not sure if she was
14  investigating the termination
15  recommendation or the grievance;
16  right?
17  A.    Correct.
18  Q.    Do you know what the kind of
19  triggering incident was that started
20  the ball rolling for Ms. Jackson's
21  termination?
22  A.    I don't know.  You would have to
23  discuss that with Mr. Palmer.  That's

Page 52

1  where the recommendation comes from.
2  Q.    He didn't know what it was either.  Do
3  you know -- did you ever discuss with
4  Mr. Palmer, what that triggering
5  incident was?
6  A.    Not that I'm aware of.
7  Q.    Did you ever discuss with anybody what
8  that triggering incident was?
9  A.    Well, I don't know if it was a
10  triggering incident.  I just don't
11  know exactly what you --
12  Q.    I mean, typically when you terminate
13  somebody's employment, it's because
14  they've done something bad enough to
15  get fired; right?
16  A.    Well, it could be one incident or it
17  could be several or it could have
18  been, you know, a long time period of
19  incidents and poor performance.  It,
20  you know, doesn't necessarily have to
21  be one triggering incident.
22  Q.    Do you know if there was a triggering
23  incident for Ms. Jackson's

Page 53

1  termination?
2  A.    I don't -- I don't -- I'm not aware of
3  one.
4  Q.    Were you involved in any of the
5  meetings or conversations around
6  January 5th when Ms. Jackson didn't
7  want to sign the taping policy?
8  A.    What, now?
9  Q.    Were you involved in any meetings or
10  conversations around January 5th when
11  Ms. Jackson didn't want to sign the
12  taping policy?
13  A.    They informed me of it.  I don't know
14  if it was after the fact or what.  I
15  just don't remember.
16  Q.    Who informed you of that?
17  A.    I don't know if it was Mr. Calametti
18  or Mr. Malone.
19  Q.    And what was the information that he
20  got?
21  A.    They -- they informed me that she
22  wouldn't sign the, you know, policy.
23  Q.    Did they inform you that Bret Paulk

Page 54

1 had yelled at her about it?
2 A. No.
3 Q. Did they inform you that she had left
4 Mr. Paulk's office in tears?
5 A. No.
6 Q. Did you at some point learn that
7 Ms. Jackson was pregnant?
8 A. Yes.
9 Q. When did you learn about that?
10 A. I don't recall.
11 Q. Was it while she was employed there at
12 DOT?
13 A. Yes. The best I recall, it was.
14 Q. And is that the reason that she was
15 transferred to Tony Cooper --
16     (Off-the-record Discussion.)
17 Q. -- her pregnancy?
18     (Off-the-record Discussion.)
19 A. I remember getting -- them getting
20 something from a doctor, I think,
21 requesting office work or something.
22 I don't remember exactly, but I think
23 that was why she was transferred to

Page 55

1 office. The best I can recall, that's
2 what it was.
3 Q. Do you remember how long before your
4 termination recommendation that was?
5 A. No.
6 Q. But you learned about it before you
7 recommended her termination; right?
8 A. Yes.
9 Q. Is it common for an engineering
10 assistant who is doing inspection work
11 who becomes pregnant to be reassigned
12 to inside duties?
13 A. Yes. We can do temporary assignment.
14 Q. Do you know anybody that that's
15 happened with?
16 A. I don't recall any names, but I'm sure
17 it has.
18 Q. And do you know what kind of work
19 Ms. Jackson was doing while she was
20 assigned under Tony Cooper?
21 A. No.
22 Q. Do you know how long her assignment to
23 Mr. Cooper was contemplated or

Page 56

1 supposed to last?
2 A. No.
3 Q. That was very poorly worded. Did you
4 understand that question?
5 A. Right.
6 Q. Okay. Do you know if it had already
7 been -- if there was already a
8 recommendation to terminate
9 Ms. Jackson at the time that she was
10 transferred to Mr. Cooper?
11 A. Not that I'm aware of.
12 Q. Do you know if anybody had been
13 discussing the termination of
14 Ms. Jackson at the time of her
15 transfer?
16 A. Not that I'm aware of.
17 Q. Did you ever discuss Ms. Jackson's
18 termination with her?
19 A. No.
20 Q. Did you ever discuss Ms. Jackson's
21 termination with Mr. McInnes?
22 A. Not that I recall, no.
23 Q. And I think I already asked this, but

Page 57

1 did you ever discuss it with
2 Mr. Morris?
3 A. I don't recall.
4 Q. Did you review the memos that
5 different employees wrote who were
6 involved in the January 5th
7 discussions?
8 A. Yes.
9 Q. Did you review those while you were
10 looking through her personnel file?
11 A. Yes.
12 Q. Did you ever get complaints from
13 anybody -- let me ask you a different
14 way. Do you know if there were
15 complaints made by any other
16 9th Division employees about damage to
17 their car, parking where Ms. Jackson
18 parked?
19 A. Not that I'm aware of.
20 Q. That final performance review that she
21 got is not a very good review, is it?
22 A. It partially meets standards.
23 Q. That's a below average review, is it

Page 58

1  not?
2  A.   Correct.
3  Q.   And she received "partially meets
4  standards" ratings on a bunch of the
5  tasks on that second page; is that
6  right?  I think it's three of them.
7  A.   Three.
8  Q.   Would that be the sort of review that
9  a substandard employee would get?
10  A.   That, or some of them get lower if
11  they are graded by individual items
12  and work.
13  Q.   But those -- those ratings scores, if
14  you looked at those ratings scores on
15  somebody's performance appraisal, you
16  would think that was not a very good
17  employee, wouldn't you?
18  A.   Below average, yes.
19  Q.   Okay.  And that was your understanding
20  of how her performance was when you
21  looked at that appraisal for her when
22  you signed off on it as the reviewing
23  supervisor?

Page 59

1  A.   Correct.
2  Q.   You thought she was a below average
3  employee?
4  A.   According to her grade sheet.
5  Q.   Let me show you what's been marked as
6  Exhibit 9.  This is another copy of
7  Ms. Jackson's final performance
8  review, but it has some changes on it
9  that I wanted to ask you about.  On
10  the period covered -- I hope you can
11  see this with your eyes -- it looks
12  like the date's been changed.  Can you
13  see that on there?
14       (Plaintiff's Exhibit 9 was
15        previously marked and is
16        not attached hereto.)
17  A.   I see it's marked out, but I can't
18  read it.
19  Q.   It looks to me like it says that the
20  "from" date is 7/3/06 and the "to"
21  date is 4/2/2007.  Does it look like
22  that to you?
23  A.   I can't tell.  I just can't see.  I'm

Page 60

1  sorry.
2  Q.   Okay.  That's all right.  Assuming
3  that those are the correct readings of
4  those dates, July 3rd of '06 to
5  April 2nd or '07, you didn't make
6  those changes on this document, did
7  you?
8  A.   I didn't.
9  Q.   At the time you signed it, you thought
10  this was her review from December 21st
11  of '06 to February 23rd of '07; right?
12  A.   Where is the document I signed?
13  Right.
14  Q.   So somebody else changed it to
15  encompass a larger time period after
16  you signed it?
17  A.   Correct.
18  Q.   Do you know who that was?
19  A.   No.
20  Q.   Did you ever have any conversations
21  with anybody about making that change?
22  A.   Not that I recall.
23  Q.   Did you ever tell Ms. Jackson that you

Page 61

1  didn't see any reason why she
2  shouldn't pass her probationary period
3  even though she hadn't passed the
4  algebra class?
5  A.   I don't recall that.
6  Q.   Is it possible that you told her that
7  and you just don't remember it?
8  A.   I could have.  I don't know.
9  Q.   You could have?
10  A.   I just don't remember.
11  Q.   But is it possible that you did tell
12  her that?
13  A.   I don't -- I don't know if I did or
14  not.
15  MR. SIMON:  I have nothing
16  further.
17
18  EXAMINATION
19  BY MR. REDD:
20  Q.   A couple of questions before you go.
21       (Off-the-record Discussion.)
22  Q.   You were asked a question about the
23  last evaluation that was done on -- on

1  Ms. Jackson, and Mr. Simon asked
2  you -- or indicated to you or asked
3  you whether or not that was a poor
4  evaluation, and I think your response
5  was it was below average?
6  A.   Correct.
7  Q.   That last evaluation includes a
8  mandatory seven-point deduction for
9  the reprimand that she had received
10  earlier in the -- earlier prior to the
11  evaluation, did it not?
12  MR. SIMON:  Objection.
13  Leading.
14  A.   Yes.
15  Q.   It's seven points, I think, if I'm not
16  mistaken?
17  A.   Yes.
18  Q.   Okay.  So if you discount the
19  seven points for the misconduct, her
20  evaluation would have been a 16.7, and
21  if I'm reading this correctly, a 16.7
22  falls within the range of "meets
23  standards," which would have been an

1  average evaluation?
2  MR. SIMON:  Objection.
3  Leading.
4  A.   Correct.
5  Q.   Based upon your review of that
6  particular document?
7  MR. SIMON:  Objection.
8  Leading.
9  Q.   You can answer.
10  A.   That's correct.
11  Q.   Now, you were also asked about a
12  triggering event that led to
13  Ms. Jackson's termination.  Now,
14  please correct me if I'm wrong, but --
15  and I think it's established that
16  Ms. Jackson initially was required to
17  serve a six-month probationary period
18  as all employees do; correct?
19  A.   Correct.
20  Q.   And in her situation, her probation
21  was extended three months?
22  A.   That is correct.
23  Q.   And at the end of that extended

1  probationary period, the Department
2  would have to make an evaluation
3  whether or not to give her permanent
4  status or to release her from duty,
5  and I'm not sure if we can extend the
6  probation another three months, but a
7  decision would have to have been made;
8  correct?
9  MR. SIMON:  Objection.
10  Leading.
11  A.   That's correct.
12  Q.   Could that be a triggering event to
13  make a decision?
14  MR. SIMON:  Objection.
15  Leading.
16  A.   It could be.
17  Q.   Okay.
18  A.   You get to a point where you have to
19  make a decision.
20  MR. REDD:  I think that's all.
21
22  EXAMINATION
23  BY MR. SIMON:

1  Q.   When you look at that performance
2  review -- strike that.  When you
3  average up Ms. Jackson's score on that
4  performance review, if you don't
5  include the disciplinary score, what
6  would her rating be?
7  A.   16.7.
8  Q.   And is that -- and that's -- that's
9  the lowest rating an employee can
10  still get and still meet standards;
11  right?
12  A.   That is correct.
13  Q.   So it's still considered below
14  average; right?
15  MR. REDD:  Object to the form.
16  A.   No.  It's in the "meets standards"
17  range.
18  Q.   Okay.  But it's --
19  MR. REDD:  It meets standards.
20  Q.   And as far as you know, did -- did you
21  ever talk to anybody about
22  Ms. Jackson's performance before you
23  signed that review?

Page 66

1   A.   I don't recall.
2   MR. SIMON:  Okay.  Nothing
3   further.
4
5   (The deposition of RONNIE POIROUX
6    concluded at approximately
7    3 o'clock p.m., on June 19th, 2008.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 67

1   * * * * * * * *
2   REPORTER'S CERTIFICATE
3   * * * * * * * *
4
5   STATE OF ALABAMA
6   COUNTY OF MONTGOMERY
7
8        I, Karen Reagan Drinkard,
9   AL-CCR #005, Certified Court Reporter
10  and Notary Public in and for the State
11  of Alabama at Large, do hereby certify
12  that on June 19th, 2008, pursuant to
13  notice and stipulation on behalf of
14  the Plaintiff, I reported the
15  deposition of RONNIE POIROUX, who was
16  first duly sworn by me to speak the
17  truth, the whole truth, and nothing
18  but the truth, in the matter of
19  LASHUNDRA JACKSON, Plaintiff, versus
20  STATE OF ALABAMA DEPARTMENT OF
21  TRANSPORTATION, JOE McINNES, in his
22  official capacity as DIRECTOR OF THE
23  STATE OF ALABAMA DEPARTMENT OF

Page 68

1   TRANSPORTATION, Defendant, Civil
2   Action Number 2:07-CV-645-MEF, now
3   pending in the United States District
4   Court for the Middle District of
5   Alabama, Northern Division; that the
6   foregoing 67 typewritten pages contain
7   a true and accurate transcription of
8   the examination of said witness by
9   counsel for the parties set out
10  herein; that the reading and signing
11  of said deposition was waived by
12  witness and counsel for the parties.
13       I further certify that I am
14  neither of kin nor of counsel to the
15  parties to said cause, nor in any
16  manner interested in the results
17  thereof.
18       This 23rd day of June, 2008
19
20
21       Karen Reagan Drinkard, ACCR #005
         Reporter and Notary Public
22       State of Alabama at Large
23